1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:   (858) 793-0323

      -and-

MARK LEBOVITCH
(markl@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:   (212) 554-1444

*Attorneys for Plaintiff City of Sunrise*
*Firefighters' Pension Fund*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, on behalf of themselves and all others similarly situated,<br><br>         Plaintiff,<br><br>      v.<br><br>ORACLE CORPORATION, SAFRA A. CATZ, MARK HURD, LAWRENCE J. ELLISON, THOMAS KURIAN, KEN BOND, and STEVE MIRANDA,<br><br>         Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

1.      Plaintiff City of Sunrise Firefighters' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Oracle Corporation ("Oracle" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Oracle; and (d) other public information regarding the Company.

## I.     **INTRODUCTION**

2.      This federal securities class action is brought on behalf of purchasers of Oracle stock between May 10, 2017 and March 19, 2018, inclusive (the "Class Period").   The claims asserted herein are alleged against Oracle and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.      Oracle is one of the world's largest software companies.   Among other things, the Company offers both on-premises and cloud solutions to a variety of end users.   Unlike on-premises solutions, which are installed on a user's computers, cloud solutions are accessed through the internet, and are typically hosted by a third-party vendor like Oracle.   Another significant difference is the "pay as you go" or on-demand usage service model associated with cloud services, as opposed to the traditional upfront capital expenditure for on-premises solutions.

4.      Historically, Oracle's revenues were driven by the sale of the Company's on-premises software services, but those revenues have stagnated in recent years as customers shifted to cloud-based programs.   Although Oracle initially hesitated when deciding whether to enter the cloud storage business, as cloud storage became mainstream, Oracle began to rapidly expand its cloud offerings.

5.      This matter arises from Defendants' misrepresentations regarding revenue growth within Oracle's cloud segment and the drivers of that growth.   Throughout the Class Period, Defendants falsely attributed the Company's revenue growth in its cloud segment to a variety of

factors and initiatives, including, among other things, Oracle's "unprecedented level of automation and cost savings," as well as the Company being "customer-focused" and "intimate partners with our customer." In truth, Oracle drove sales of cloud products using threats and extortive tactics. The use of such tactics concealed the lack of real demand for Oracle's cloud services, making the growth unsustainable (and ultimately driving away customers). Among other things, the Company threatened current customers with "audits" of their use of the Company's non-cloud software licenses unless the customers agreed to shift their business to Oracle cloud programs.

6.     The truth was revealed on March 19, 2018, when the Company disclosed that cloud revenue growth had stagnated and forecasted significantly slower sales growth for its cloud business than its competitors. Following these disclosures, analysts connected Oracle's poor financial performance to its improper sales tactics. Gartner, Inc.—a leading research and advisory company—observed that Oracle had to rely on coercive practices because its cloud-based offering is a "bare-bones minimum viable product." These revelations caused Oracle shares to decline by $4.90 per share, or nearly 9.5%—the Company's largest single-day stock drop in over five years.

## II.     JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Oracle maintains its corporate headquarters in Redwood City, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

1    III.    **PARTIES**

2          9.      Plaintiff City of Sunrise Firefighters' Pension Fund is a public pension fund that

3    provides retirement benefits to firefighters employed by the city of Sunrise, Florida.  As of March

4    31, 2018, Plaintiff managed approximately $143 million in assets on behalf of approximately 235

5    participants.  Plaintiff purchased shares of Oracle stock on the New York Stock Exchange

6    ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal

7    securities laws alleged herein.

8          10.     Defendant Oracle is a multinational technology company.   Incorporated in

9    Delaware, the Company maintains its corporate headquarters at 500 Oracle Parkway, Redwood

10   City, California.  Oracle stock trades on NYSE, which is an efficient market, under ticker symbol

11   "ORCL."  As of November 30, 2017, Oracle had 5.16 billion shares of stock outstanding, owned

12   by at least hundreds or thousands of investors.

13         11.     Defendant Safra A. Catz ("Catz") is, and was at all relevant times, co-Chief

14   Executive Officer of Oracle, as well as a member of the Company's Board of Directors.

15         12.     Defendant Mark Hurd ("Hurd") is, and was at all relevant times, co-Chief

16   Executive Officer of Oracle, as well as a member of the Company's Board of Directors.

17         13.     Defendant Lawrence J. Ellison ("Ellison) is, and was at all relevant times, Oracle's

18   Chief Technology Officer, as well as the Chairman of the Company's Board of Directors.

19         14.     Defendant Thomas Kurian ("Kurian") is, and was at all relevant times, Oracle's

20   President, Product Development.

21         15.     Defendant Ken Bond ("Bond") is, and was at all relevant times, Oracle's Senior

22   Vice President of Investor Relations.

23         16.     Defendant Steve Miranda ("Miranda") is, and was at all relevant times, Oracle's

24   Executive Vice President, Oracle Applications Product Development.

25         17.     Defendants Catz, Hurd, Ellison, Kurian, Bond, and Miranda are collectively

26   referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their

27   positions with Oracle, possessed the power and authority to control the contents of Oracle's reports

28   to the SEC, press releases, and presentations to securities analysts, money and portfolio managers,

and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.  **BACKGROUND**

18.    Based in California, Oracle is one of the world's largest software companies.  The Company develops database software and technology, cloud engineered systems, and enterprise software products.  Historically, Oracle's revenues were driven by the sale of the Company's on-premises software services, but those revenues have stagnated in recent years as customers shifted to cloud-based programs.

19.    In 2008, when cloud-based software products began to gain popularity and technology companies such as Google and Amazon were starting to expand into this new area of data storage, Oracle stated its intention to stay out of the cloud business.  At the time, Defendant Ellison, called cloud storage "complete gibberish" and questioned when this "idiocy [was] going to stop?"  By 2015, however, as cloud storage entered the mainstream, Oracle publicly acknowledged the importance of developing successful cloud services in order to compete with platforms offered by Amazon and Microsoft and began to aggressively pursue several acquisitions in an attempt to expand its cloud offerings.

20.    As a late comer to the cloud space, Oracle had ceded significant market share to its competitors.  Instead of focusing on creating a better product, however, Oracle relied on improper sales practices to railroad its customers into purchasing the Company's cloud offerings.  One such practice was to "audit" customers' use of the Company's non-cloud software licenses and charge those customers hefty penalties unless they agreed to shift their business to Oracle cloud programs.  Oracle's use of audits was well known within the industry, but the extent to which the

Company was using threats of audits to coerce customers to purchase cloud products was not known to investors, and expressly denied by the Company.

21.     In addition to threatening customers with audits, Oracle also decreased its customer support for certain of its on-premises and hardware systems, in an effort to drive customers away from such systems and into cloud-based systems.   Oracle also strong-armed customers by threatening to dramatically raise the cost of legacy database licenses if the customer chose another cloud provider.

## V.     ORACLE DEFRAUDS INVESTORS

22.     The Class Period starts on May 10, 2017, the first trading day after Oracle presented at the Jefferies Technology Group Investor Conference.   During the conference, which began after the market closed on May 9, 2017, Defendant Bond touted that Oracle's cloud business was growing, stating that "[t]he good news . . . growth in cloud is actually getting bigger."   During the conference, an unidentified analyst questioned how much of Oracle's revenue growth was attributable to the Company's practice of auditing its customers.   In response, Bond immediately deflected the question, stating that "[i]t's funny.   This is one of those things where – gets talked about a lot.   And I think this is one of those things where the story is a lot bigger than the realities." Bond further assured investors that the Company's auditing practices were not used to coerce customers into purchasing products and that Oracle approaches its audits in "as gracious [a] way as we can," and stated that "as we go to cloud . . . this conversation is going to go away."

23.     The statements and omissions set forth in ¶22 were materially false and misleading. In truth, the growth in Oracle's cloud revenues were driven, at least in part, by improper, coercive sales practices, which include: (1) threatening existing customers with "audits" of their use of Oracle's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to Oracle cloud programs; (2) decreasing customer support for certain Oracle on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (3) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.   These tactics alienated and angered the Company's customers, which in

1   some cases have not only refused to purchase Oracle's cloud offerings but have also looked to

2   terminate their existing business relationships.

3       24.     On June 21, 2017, Oracle issued a press release announcing its financial results for

4   the fiscal fourth quarter and fiscal year ended May 31, 2017.[1]  In the press release, which was also

5   filed with the SEC on Form 8-K, the Company reported that quarterly "cloud revenues were up

6   58% to $1.4 billion."  The press release also quoted Defendant Catz stating that the Company was

7   "experience[ing] rapid adoption of the Oracle Cloud."   In the press release, Defendant Hurd is

8   quoted stating that Oracle "sold $855 million of new annually recurring cloud revenue (ARR) in

9   Q4" and touting that "[n]ext year is going to be even better.  We expect to sell a lot more than $2

10  billion in new cloud ARR in fiscal year 2018."

11      25.     That same day, Oracle held a conference call with analysts and investors to discuss

12  the Company's earnings and operations.   During the conference call, Defendant Ellison told

13  investors that the Company's cloud revenues would "accelerate into hyper-growth" as existing

14  customers "begin to migrate their millions of Oracle databases" to Oracle's cloud-based offerings.

15  Also, during the call, Defendant Catz attributed Oracle's cloud revenue growth to "the increasing

16  preference of customers for cloud."  During the call, an analyst questioned whether the Company's

17  "phenomenal quarter around this aggressive cloud transition" was a "1-year phenom[enon]."

18  Defendant Catz responded that "this is absolutely not a 1-year phenomena.  In fact, what you

19  should see, as this goes on, is we will have less drag from the [cloud] transition and the base will

20  continue to grow."

21      26.     The statements and omissions set forth in ¶¶24-25 were materially false and

22  misleading.   In truth, the growth in Oracle's cloud revenues were driven, at least in part, by

23  improper, coercive sales practices, which include: (1) threatening existing customers with "audits"

24  of their use of Oracle's non-cloud software licenses and levying expensive penalties against those

25  customers, unless the customers agreed to shift their business to Oracle cloud programs; (2)

26  decreasing customer support for certain Oracle on-premises or hardware systems, in an effort to

27

28  [1] Oracle's fiscal year ends on May 31.

drive customers away from such systems and into cloud-based systems; and (3) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.  These tactics alienated and angered the Company's customers, which in some cases have not only refused to purchase Oracle's cloud offerings but have also looked to terminate their existing business relationships.

27.     On September 14, 2017, Oracle issued a press release announcing its financial results for the fiscal first quarter ended August 31, 2017.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported that "Total Cloud Revenues were up 51% to $1.5 billion."  The press release also quotes Defendant Catz stating that the "sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher."

28.     That same day, Oracle held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Catz touted that "[c]ustomer adoption of our cloud products and services continue to be very, very strong."  Similarly, Defendant Hurd stated that "cloud bookings were executing well on a very big and growing pipeline" and that the Company expected that fiscal year 2018 full year "cloud booking growth to be quite strong."  Hurd attributed Oracle's cloud revenue growth to being better than the competition, noting specifically that "our products are better.  Our sales force is better.  Our ability to implement is better."  Hurd further stated that Oracle's "ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

29.     The statements and omissions set forth in ¶¶27-28 were materially false and misleading.  In truth, the growth in Oracle's cloud revenues were driven, at least in part, by improper, coercive sales practices, which include: (1) threatening existing customers with "audits" of their use of Oracle's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to Oracle cloud programs; (2) decreasing customer support for certain Oracle on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (3) strong-arming

1    customers by threatening to dramatically raise the cost of legacy database licenses if the customers

2    choose another cloud provider.  These tactics alienated and angered the Company's customers,

3    which in some cases have not only refused to purchase Oracle's cloud offerings but have also

4    looked to terminate their existing business relationships.

5         30.    On September 18, 2017, Oracle filed with the SEC its Form 10-Q for the fiscal first

6    quarter ended August 31, 2017, reiterating the financial results announced by the Company in its

7    September 14 press release.  The Form 10-Q was signed by Defendant Catz and contained

8    certifications by Defendants Catz and Hurd that attested to the purported accuracy and

9    completeness of the 10-Q.  In the quarterly report, the Company touted "higher growth of our

10   cloud SaaS and cloud PaaS and IaaS revenues as customer preferences have pivoted to the Oracle

11   Cloud for new deployments and as customers migrate to and expand with the Oracle Cloud for

12   their existing on-premise workloads."  Oracle attributed its cloud revenue growth to "increased . .

13   . investments in and focus on the development, marketing and sale of our cloud-based applications,

14   platform and infrastructure technologies."  The Company also touted the superior quality of its

15   cloud products, stating that its products "provide a comprehensive and fully integrated stack of

16   applications, platform, compute, storage and networking services in all three primary layers of the

17   cloud."

18        31.    The statements and omissions set forth in ¶30 were materially false and misleading.

19   In truth, the growth in Oracle's cloud revenues were driven, at least in part, by improper, coercive

20   sales practices, which include: (1) threatening existing customers with "audits" of their use of

21   Oracle's non-cloud software licenses and levying expensive penalties against those customers,

22   unless the customers agreed to shift their business to Oracle cloud programs; (2) decreasing

23   customer support for certain Oracle on-premises or hardware systems, in an effort to drive

24   customers away from such systems and into cloud-based systems; and (3) strong-arming customers

25   by threatening to dramatically raise the cost of legacy database licenses if the customers choose

26   another cloud provider.  These tactics alienated and angered the Company's customers, which in

27   some cases have not only refused to purchase Oracle's cloud offerings but have also looked to

28   terminate their existing business relationships.  Oracle had to rely on these coercive practices given

1   that its cloud-based offering is a "bare-bones minimum viable product," not "a comprehensive and

2   fully integrated stack of applications" as the Company had represented.

3       32.    On October 5, 2017, Oracle presented at the OpenWorld Financial Analyst

4   Meeting.  During the meeting, Defendant Miranda touted that Oracle's cloud business was

5   experiencing rapid growth and attributed that growth to being more "customer-focused" and

6   "much more intimate partners with our customer."

7       33.    The statements and omissions set forth in ¶32 were materially false and misleading.

8   In truth, the growth in Oracle's cloud revenues were driven, at least in part, by improper, coercive

9   sales practices, which include: (1) threatening existing customers with "audits" of their use of

10  Oracle's non-cloud software licenses and levying expensive penalties against those customers,

11  unless the customers agreed to shift their business to Oracle cloud programs; (2) decreasing

12  customer support for certain Oracle on-premises or hardware systems, in an effort to drive

13  customers away from such systems and into cloud-based systems; and (3) strong-arming customers

14  by threatening to dramatically raise the cost of legacy database licenses if the customers choose

15  another cloud provider.  These tactics alienated and angered the Company's customers, which in

16  some cases have not only refused to purchase Oracle's cloud offerings but have also looked to

17  terminate their existing business relationships.

18      34.    On December 14, 2017, Oracle issued a press release announcing its financial

19  results for the fiscal second quarter ended November 30, 2017.  In the press release, which was

20  also filed with the SEC on Form 8-K, the Company reported that "Total Cloud Revenues were up

21  44% to $1.5 billion."  The press release attributes this revenue growth, at least in part, to "the

22  increasing scale and the gathering momentum in our cloud business."

23      35.    That same day, Oracle held a conference call with analysts and investors to discuss

24  the Company's earnings and operations.  During the conference call, Defendant Catz boasted that

25  "[c]ustomer adoption of our cloud products and services continues to be very strong. . . .  Bottom

26  line, our transition to the cloud is going well."

27      36.    The statements and omissions set forth in ¶¶34-35 were materially false and

28  misleading.  In truth, the growth in Oracle's cloud revenues were driven, at least in part, by

improper, coercive sales practices, which include: (1) threatening existing customers with "audits" of their use of Oracle's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to Oracle cloud programs; (2) decreasing customer support for certain Oracle on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (3) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.  These tactics alienated and angered the Company's customers, which in some cases have not only refused to purchase Oracle's cloud offerings but have also looked to terminate their existing business relationships.

## VI.   DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE SIGNIFICANT INVESTOR LOSSES

37.     The truth about the Company's practices and their impact on Oracle's business was revealed on March 19, 2018, when the Company disclosed that cloud revenue growth had stagnated and forecasted significantly slower sales growth for its cloud business than its competitors.  Specifically, the Company reported that quarterly cloud revenue rose only 32%, or just half the average reported quarterly growth over the past two years, and Oracle projected that cloud sales growth would decline even further to only 20% in the following quarter.  As a result of these disclosures, Oracle shares declined by $4.90 per share, or nearly 9.5%.

38.     Following these disclosures, market researchers and the media connected Oracle's poor financial performance to its aggressive sales tactics.  Indeed, these recent disclosures suggest that the growth in Oracle's cloud revenues were driven by improper, coercive sales practices.  One market commentator—Gartner, Inc.—also observed that Oracle's cloud offering "remains a bare-bones minimum viable product, and it is arguably too minimal to be viable for a broad range of common cloud . . . use cases."

## VII.   LOSS CAUSATION

39.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Oracle stock and operated as a fraud or deceit on the Class (as

defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on March 19, 2018 the price of Oracle stock fell.  As a result of their purchases of Oracle stock during the Class Period, Plaintiff and other members of the Class suffered harm.

## VIII.   CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Oracle stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Oracle and their families and affiliates.

41.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Oracle has approximately 5.16 billion shares of stock outstanding, owned by at least hundreds or thousands of investors.

42.    Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether Defendants' misconduct impacted the price of Oracle stock;

(f)    Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g)    The extent of harm sustained by Class members and the appropriate measure of harm.

43.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

44.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

45.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

46.     Oracle's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

47.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Oracle who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.     PRESUMPTION OF RELIANCE

48.     At all relevant times, the market for Oracle stock was an efficient market for the following reasons, among others:

(a)     Oracle stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Oracle filed periodic public reports with the SEC and NYSE;

(c)     Oracle regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Oracle was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

49.    As a result of the foregoing, the market for Oracle stock promptly digested current information regarding Oracle from all publicly available sources and reflected such information in the price of Oracle stock. Under these circumstances, all purchasers of Oracle stock during the Class Period suffered similar injury through their purchase of Oracle stock at artificially inflated prices and the presumption of reliance applies.

50.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding revenue growth in Oracle's cloud segment—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Oracle's cloud business, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

51.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

52.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiff and other members of the Class.

53.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

55.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Oracle's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

57.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Oracle stock and were harmed when the truth about Oracle negatively impacted the price of those securities.  Plaintiff and the Class would not have purchased Oracle stock at the prices they paid, or at all, had they been aware of the truth about Oracle.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

59.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

60.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Oracle within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Oracle, the Individual Defendants had the power and ability to control the actions of Oracle and its employees.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 10, 2018

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


*/s/ David R. Stickney*
DAVID R. STICKNEY

David R. Stickney (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:    (858) 793-0323

-and-

MARK LEBOVITCH
(markl@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:    (212) 554-1444


KLAUSNER, KAUFMAN, JENSEN
    & LEVINSON
Robert D. Klausner
(bob@robertdklausner.com)
7080 Northwest 4th Street
Plantation, Florida 33317
Tel:     (954) 916-1202
Fax:    (954) 916-1232


*Attorneys for Plaintiff City of Sunrise Firefighters'
Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Frank Cagan, on behalf of City of Sunrise Firefighters' Pension Fund ("Sunrise Firefighters"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Sunrise Firefighters. I have reviewed the allegations of the complaint with counsel to Sunrise Firefighters and authorize its filing.

2. Sunrise Firefighters did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Sunrise Firefighters is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Sunrise Firefighters' transactions in the Oracle Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Sunrise Firefighters has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Sunrise Firefighters will not accept any payment for serving as a representative party on behalf of the Class beyond Sunrise Firefighters' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ____ day of August, 2018.

_____
Frank Cagan
Chairman
*City of Sunrise Firefighters' Pension Fund*

**City of Sunrise Firefighters' Pension Fund**
**Transactions in Oracle Corporation**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Purchase | 6/29/2017 | 17,660 | 50.2846 |
| Purchase | 9/26/2017 | 516 | 47.9591 |
| Purchase | 9/27/2017 | 1,293 | 48.2207 |
| Purchase | 9/28/2017 | 328 | 48.1636 |
| Purchase | 10/12/2017 | 3,527 | 48.3776 |
| | | | |
| Sale | 7/25/2017 | (507) | 51.0700 |
| Sale | 7/26/2017 | (1,480) | 51.0769 |
| Sale | 8/23/2017 | (2,900) | 49.1819 |
| Sale | 9/22/2017 | (3,790) | 48.2240 |