BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
MARK LEBOVITCH (admitted *pro hac vice* )
JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
ABE ALEXANDER (admitted *pro hac vice*)
JULIA K. TEBOR (admitted *pro hac vice*)
(markl@blbglaw.com)
(johnr@blbglaw.com)
(abe.alexander@blbglaw.com)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:   (212) 554-1444

-and-

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:   (858) 793-0323

*Counsel for Lead Plaintiff Union Asset*
*Management Holding AG and Lead*
*Counsel for the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| *In re Oracle Corporation Securities Litigation* | Case No. 18-cv-4844-BLF<br><br>ECF CASE<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>Dept: Courtroom 3, 5th Floor<br>Judge: Honorable Beth Labson Freeman |

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     JURISDICTION AND VENUE ...............................................................7

III.    PARTIES ...................................................................................................8

        A.      Lead Plaintiff ................................................................................8

        B.      Defendants ....................................................................................8

IV.     FORMER ORACLE EMPLOYEES WHO SUBSTANTIATE THE
        ALLEGATIONS ......................................................................................11

V.      SUMMARY OF THE FRAUD ...............................................................13

        A.      Oracle Belatedly Pivots From Its Stagnating Legacy "On-
                Premises" Business To Focus On The Growing "Cloud" Market .......13

        B.      As Oracle Begins to Ramp Its Cloud Business, It Denies Rumors
                That It Generates Cloud Revenue Through Improper Sales Tactics .....17

        C.      Throughout The Class Period, Defendants Report Astonishing
                Growth In Oracle's Cloud Business, Which They Attribute To
                Oracle's Supposedly Superior Cloud Products and Business
                Practices ....................................................................................22

        D.      In Reality, Oracle's Supposedly Explosive Cloud Growth Was
                Fueled By Extortionate and Coercive Sales Practices .........................26

                1.      Oracle Fuels Its Cloud Growth By Coercing Customers To
                        Subscribe To Cloud Products Under Threat Of Audit
                        Penalties .........................................................................27

                2.      Oracle Also Uses "Attached Deals" To Disguise Legacy
                        On-Premise Revenue As All-Important Cloud Revenue
                        And Pad The Company's Cloud Growth ...............................36

                3.      Regulator Findings And Industry Experts Further Confirm
                        Oracle's Use Of "Audits" To Generate Cloud Revenues
                        From Customers Who Do Not Actually Want Oracle Cloud
                        Product ............................................................................42

        E.      The Truth About Oracle's Cloud Revenue Growth Emerges .............46

                1.      On December 14, 2017, Oracle Reports Stagnating Cloud
                        Growth ...........................................................................47

                2.      On March 19, 2018, Oracle Reports That Its Cloud Growth
                        Slowed Even More Significantly ........................................48

                3.      On June 14, 2018, JPMorgan Releases a Large-Scale CIO
                        Survey Showing That Oracle Is "Trailing In Cloud
                        Computing Plans" ............................................................50

       4.     On June 19, 2018, Oracle Reports Additional Cloud Slowdowns And Stuns Investors By Announcing It Will No Longer Report Cloud Business Financial Results ....................................51

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ..............................................54

    A.    Defendants Knew And Had Access To Information Undermining Their Statements to Investors ...............................................................54

    B.    Prior To Making Their Class Period Misstatements And Omissions, Defendants Were Informed Of Allegations That Oracle Generated Artificial Cloud Revenues Through Coercive Audits And Sales Tactics ........................................................................55

    C.    Defendants Specifically Denied The Allegations That They Were Using Audits To Close Cloud Sales ................................................56

    D.    Oracle's Use Of Engineered Deals To Drive Cloud Sales Was Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units .................................58

    E.    Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Class Period, Underscoring Its Efforts To Obscure Declining Growth ........................................................................59

    F.    Defendants' Statements Touting Oracle's Cloud Growth Concerned The Single Most Important Issue Facing The Company During The Class Period ...............................................................60

    G.    Defendants Stated That They Were Deeply Focused On Oracle's Cloud Revenues ....................................................................62

    H.    Defendant Kurian Sold Hundreds Of Millions Of Dollars' Worth Of Oracle Stock During The Class Period ...........................................63

    I.    The Executive Defendants Were Directly And Extensively Involved In Developing And Maintaining Oracle's Cloud Business ..................65

VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........................................................69

    A.    Defendants' Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017 ...........................69

    B.    Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017 .........................75

    C.    Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018 .............................79

    D.    Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Second Quarter 2018 .........................84

    E.    Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018 ...........................87

VIII.    LOSS CAUSATION .......................................................................................... 89

IX.      THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .......................... 92

X.       THE PRESUMPTION OF RELIANCE ................................................................ 93

XI.      CLASS ALLEGATIONS .................................................................................. 94

XII.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................................. 95

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
         AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST
         ALL DEFENDANTS) ....................................................................................... 95

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
         ACT (AGAINST DEFENDANTS CATZ, HURD, AND ELLISON] ........................... 97

COUNT III  FOR VIOLATION OF SECTION 20A OF THE EXCHANGE ACT
         (AGAINST DEFENDANT KURIAN) ................................................................... 99

XIII.    PRAYER FOR RELIEF ................................................................................. 101

XIV.     JURY DEMAND ......................................................................................... 101

1    Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff"), by and through

2  its undersigned counsel, brings this action pursuant to Sections 10(b), 20(a), and 20A of the

3  Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange

4  Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons

5  or entities who purchased or otherwise acquired securities of Oracle Corporation ("Oracle" or the

6  "Company") during the period from March 15, 2017 to June 19, 2018, inclusive (the "Class

7  Period") and were damaged thereby (the "Class").  Lead Plaintiff alleges the following based upon

8  personal knowledge as to itself and its own acts and upon information and belief as to all other

9  matters.  Lead Plaintiff's information and belief is based on the ongoing investigation of its

10 undersigned counsel, including from the following sources: (i) Oracle's public filings with the

11 SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and

12 reports; (iv) Company website and marketing materials; (v) news and media reports concerning

13 the Company and other facts related to this action; (vi) price and volume data for Oracle securities;

14 (vii) accounts from former Oracle employees, some of whom were afraid to provide Lead Counsel

15 with information for fear of retaliation by Oracle; (viii) documents obtained from the National

16 Economic Prosecutor's Office of Chile (the "FNE") concerning its investigation; and (ix)

17 additional materials and data concerning the Company and industry as identified herein. Lead

18 Counsel's investigation into the factual allegations continues, and many of the relevant facts are

19 known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff

20 believes that substantial additional evidentiary support is likely to exist for the allegations set forth

21 herein after a reasonable opportunity for discovery.

22 **I.    INTRODUCTION**

23    1.    Prior to the Class Period, Larry Ellison, Oracle's founder and strategic visionary,

24 made a critical blunder by underestimating a fundamental shift in database technology that had

25 serious implications for Oracle's revenue growth.  By the time senior management recognized this

26 tactical error, Oracle was years behind its competitors in creating and selling the new technology,

27 causing its revenues to stagnate. In an effort to make up this ground, Oracle resorted to

28 systematically coercing and bribing its existing customers into making phony "purchases" of its

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF

new product line. Throughout the Class Period, Defendants concealed these Company-wide sales tactics from investors, and publicly reported explosive – but, unbeknownst to investors, artificial – growth in Oracle's critical new market. Defendants attributed this growth to supposedly legitimate factors, such as the superiority of Oracle's products and sales teams, while rebuffing any questions about whether Oracle engaged in aggressive sales tactics to boost its new revenue stream.

2.     The truth, however, eventually emerged.  By the end of the Class Period, customers were refusing to renew the short-term subscriptions that had been pushed on them under duress, and other customers were resisting the Company's strong-arm tactics.  Oracle's sales growth declined precipitously, revealing to the market that the Company's previously-reported explosive sales growth was neither genuine nor sustainable.  The Company's stock price plummeted.  Shortly thereafter, senior management announced that they would no longer disclose critical information regarding Oracle's faltering new business, causing the stock price to decline sharply again.

3.     This securities fraud class action arises from misrepresentations by Oracle and its senior executives concerning the most important initiative in Oracle's history – its purported transformation from a struggling "on-premises" database technology company into a high-growth "cloud" computing enterprise.  Historically, Oracle's principal business was selling "on-premises" database technology and software, which is installed and run within the physical confines of the customer's data center and computers.  Several years before the Class Period, a new database technology began to emerge as a challenger to Oracle's historic business model – the "cloud."  As the name suggests, cloud database technology was located remotely – in a "cloud computing platform" established by the vendor – and was accessed by the customer via the internet.

4.     In a critical strategic error, Oracle dismissed the cloud for years. Defendant Ellison famously ridiculed cloud technology as "gibberish," "idiocy," and "nonsense."  However, the cloud soon became an undeniable force in the database software field.  Other companies, such as Amazon and Microsoft, that quickly embraced the new technology, were soon generating billions of dollars in quarterly cloud-related revenue, reporting enormous growth rates as high as 90%.

5.      Meanwhile, Oracle's on-premises business begin to stagnate and even decline.  For a company in the technology field – where revenue growth is king – a stagnating revenue stream is tantamount to death in the eyes of the market.  As one market commentator remarked, the "cloud has become a matter of existential importance to Oracle as its legacy business of selling [on-premises] software licenses and hardware products erodes."

6.      Oracle therefore embarked on a "pivot to the cloud" in an effort to surmount the declines in its legacy business and remain relevant to investors.  Given the stakes riding on this initiative, Oracle shareholders and other stock market participants were keenly focused on Oracle's ability to transform itself into a cloud company.  As Defendant Catz explained, Oracle's "move to cloud" was "the biggest and most important opportunity in our Company's history."

7.      Oracle faced a basic problem, however.  Having dismissed cloud technology for so long, its cloud-based offerings lagged behind competitors, forcing Oracle to scramble to play catch up.  Nevertheless, Oracle assured investors that it had surmounted this problem by virtue of its superior cloud products and sales operation.

8.      On the first day of the Class Period, March 15, 2017, Defendants (falsely) assured investors that Oracle had successfully turned the corner in its quest to remake itself as a cloud company, with eye-popping results.  That day, Oracle announced that its cloud revenue had jumped 110% year-over-year, to $1.2 billion for the quarter.  Defendant Safra Catz, Oracle's co-CEO, stated that Oracle was experiencing "hypergrowth … in the cloud" and emphasized that "[o]ur pivot to the cloud is now clearly in full swing."  Showing that Oracle's cloud growth more than made up for troubles in its legacy business, Catz asserted that "the increase in revenue from our cloud business has overtaken new software license declines on an annual basis," marking "a significant milestone in our transformation."  Defendant Hurd emphasized that Oracle was now "the fastest-growing scale cloud business in the world."

9.      A few months later, Oracle again delivered what appeared to be blockbuster results, reporting that its quarterly cloud revenues had surged to $1.4 billion.  Defendant Catz again underscored the central role of cloud growth in driving Oracle's profitability, stating that "[t]his

cloud hypergrowth is expanding our operating margins," and "[t]he cloud has become our predominant growth vehicle."

10.     Defendants attributed Oracle's remarkable cloud growth to Oracle's superior technology and sales force.  Defendant Hurd, for instance, stated that Oracle's outstanding results were driven by the fact that "[w]e're better" than competitors – "Our products are better.  Our sales force is better.  Our ability to implement is better."  And when questions surfaced in the press asking whether Oracle was boosting its cloud performance by engaging in aggressive sales tactics, the Company denied them, calling such suggestions "inaccurate" "rumor" that was "absolutely not true."

11.     The market reacted very favorably to Defendants' statements. *Barron's* reported that Oracle "wowed Wall Street with a financial report that put to rest fears of the company being rendered obsolete by cloud computing."  Another industry observer reported that analysts were "ga-ga during the conference call following [Oracle's earnings] report, responding to the results with phrases such as 'really phenomenal,' 'impressive,' 'very strong,' and 'really fabulous.'"

12.     Oracle's purported cloud "hypergrowth" drove the Company's stock price from $42.79 just before the Class Period to a high of $52.97 during the Class Period – an increase of nearly 24%.  As *Dow Jones Institutional News* reported, Oracle's increasing share price was "credited mostly to [Oracle's] growing cloud business," and "left the shares at 17 times adjusted forward earnings – the highest multiple Oracle has fetched since 2008."

13.     Unfortunately for investors, a substantial portion of Oracle's reported cloud revenue and growth was artificial.   As detailed herein, numerous former senior Oracle cloud sales executives from across the globe reported that Oracle widely employed two tactics to generate artificial cloud revenue.

14.     First, Oracle employed a strategy called "Audit, Bargain, Close."  In order to coerce cloud-based sales, Oracle would audit an on-premises customer for violations of its on-premises software license.  When it found violations, Oracle would threaten to impose large penalties unless the customer agreed to purchase a short-term cloud subscription that the customer neither desired nor intended to use.

15.     Second, Oracle employed a tactic known as the "attached deal."  Oracle would offer the customer a significant discount on the on-premises products that the customer wanted and needed, provided the customer also "purchased" a short-term cloud subscription – even if the customer neither wanted nor intended to use the attached cloud product.

16.     Oracle's use of these tactics was so widespread that its employees coined an internal term for these transactions: "financially engineered deals."  As detailed below, numerous former Oracle cloud sales executives and employees in multiple locations across the world reported that the majority of their team's sales, between 65% and 90%, were achieved using these improper tactics.

17.     Oracle's use of coercion and "financial engineering" to boost its cloud revenues was highly misleading to investors.  Purported "cloud" revenue generated through these deals was artificial and unsustainable.   Rather than truly purchasing cloud products through these transactions, as Defendant led investors to believe, customers were simply purchasing a discount on audit penalties or a discount on the on-premises products that they actually wanted.  Although these transactions were not true sales of cloud products, Oracle nevertheless touted the inflated "cloud" revenues and growth metrics stemming from these tactics as proof of its seminal transformation.

18.     In late 2017, many of the cloud subscriptions parceled out through these financially engineered deals began to expire.  As would be expected when initial sales are achieved through coercion, very few of the customers on the receiving end of these engineered deals – "virtually zero" and "less than 15%" according to knowledgeable witnesses – renewed their cloud subscription when the initial term expired.

19.     Consequently, in December 2017, Oracle was forced to begin disclosing that its cloud revenues were rapidly decelerating, thus revealing through a series of partial corrective disclosures that Oracle's purported cloud transformation was not as represented.  As detailed herein, between December 14, 2017 and March 19, 2018, Oracle was forced to disclose that its cloud revenue growth rate had fallen precipitously, declining from 58% to just 32% – which was far below the growth rates that its competitors were reporting.

20.    Market participants connected Oracle's weak cloud growth to its improper sales practices.  For example, analysts reported that Oracle's cloud business was facing "fundamental challenges" stemming from its "auditing mentality."  *Forbes* published an article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," in which it reported that Oracle had used an "'Audit Bargain Close' playbook … to pressure customers into cloud adoption." *Forbes* asked whether Oracle would reveal how much of its purported cloud success was real, and how much was artificial, writing: "[The Audit Bargain Close tactic] does lead to more sales in the cloud category, which is just what Oracle wants. But it leads to questions that should be disturbing to Oracle customers and possibly to Oracle employees and investors: Has Oracle shifted its core competency from creating technology products to running an enterprise sales staff that is expert in squeezing customers? Is Oracle's cloud technology less important to its revenues than its cloud promotion practices? Will Oracle ever reveal how much of its cloud sales are actually shelfware?"

21.    As a result of these disclosures, the market started to recognize that Oracle's cloud growth was not genuine or sustainable, and Oracle's stock price fell from approximately $50 per share to approximately $46 per share, a decline of nearly 10%.

22.    Rather than level with investors, Oracle attempted to shield its flagging cloud revenues from public view.  On June 19, 2018, the last day of the Class Period, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business.   Under pressure from analysts on a conference call that day, Defendant Catz was forced to disclose that total cloud revenue growth for the quarter had come in at ja fraction of the growth rates reported by the Company's competitors. This news demonstrated that Oracle's cloud business had slowed to crawl, and made clear the impetus behind the Company's desire to hide its cloud results.  Moreover, in another departure from its past disclosure practice, Oracle declined to provide separate guidance for cloud revenues going forward, further signaling a significant deceleration in its cloud business.

23.    Oracle's decision to shield its cloud results from public view indicated that the Company had something to hide.  In a June 20, 2018 report, William Blair analysts concluded that Oracle's maneuver was "an attempt to ***pull the proverbial wool over investors' eyes—particularly***

*related to cloud sales*." RBC analysts reported that Oracle's move was a "[r]adical change in disclosure," while Oppenheimer analysts reported that the change was "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business."

24.     In the wake of these disclosures, market observers fully realized that Oracle's plummeting cloud growth reflected the coercive sales tactics described herein. For instance, in an article entitled "What Oracle Doesn't Want You to Know," *The Upper Edge* reported that Oracle's "Cloud Deals [were] Manufactured by Duress" using the Audit, Bargain, Close and "attached deal" tactics.

25.     As a result of Oracle's disclosures, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, wiping out billions of dollars in shareholder value. Based on the allegations set forth herein, Lead Plaintiff seeks relief for itself and all other similarly situated Oracle investors for violations of Sections 10(b), 20(a) and 20A of the Exchange Act.

## II.     <u>JURISDICTION AND VENUE</u>

26.     The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391 (b). Oracle maintains its corporate headquarters in Redwood City, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.   **PARTIES**

A.     **Lead Plaintiff**

28.    Lead Plaintiff Union Asset Management Holding AG is the parent holding company of the Union Investment Group. The Union Investment Group, based in Frankfurt-am-Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients with approximately $395 billion in assets as of October 9, 2018. As set forth in the certification filed with this Court (ECF No. 17-4), certain Union funds purchased Oracle common stock during the Class Period and were damaged by Defendants' conduct alleged herein.

B.     **Defendants**

29.    Defendant Oracle is a technology company. Incorporated in Delaware, the Company maintains its corporate headquarters at 500 Oracle Parkway, Redwood City, California. Oracle stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "ORCL." As of December 14, 2018, Oracle had approximately 3.59 billion shares of stock outstanding, owned by at least hundreds or thousands of investors.

30.    Defendant Safra A. Catz ("Catz') is, and was at all relevant times, co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. Previously, Catz served as the Company's President from January 2004 to September 2014; Chief Financial Officer from April 2011 to September 2014 and November 2005 to September 2008; and interim Chief Financial officer from April 2005 to July 2005.  Prior to being named President, Catz held various other positions at Oracle since 1999.  During the Class Period, Catz signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy.  Catz also regularly spoke to investors about Oracle's business and cloud growth, professing to be knowledgeable about these matters.  In September 2014, Ellison described Catz as "[v]ery details-oriented," "the No. 2 person for some time," and "our first-ever, de facto chief operating officer."[1]

---

[1] Chronical Staff, "On The Record: Larry Ellison," *San Francisco Chronical* (September 18, 2014).

31.     Defendant Mark Hurd ("Hurd") is, and was at all relevant times, co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. Previously, he served as the Company's Co-President from September 2010 to September 2014. As stated on Oracle's website, Hurd "manages corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support." Hurd's personal webpage profile states that he "helped shift the long-term strategy of the company toward the cloud."   During the Class Period, Hurd signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy.  Hurd also regularly spoke to investors about Oracle's business and cloud growth, professing to have detailed knowledge of those matters.  Hurd has publicly touted how he "stay[s] close to the action,"[2] earning him the description as an executive that "digs into details and is a hands on manager that examines every alternative."[3]

32.     Defendant Lawrence J. Ellison ("Ellison") is, and was at all relevant times, Oracle's Chief Technology Officer, as well as the Chairman of the Company's Board of Directors. Ellison co-founded Oracle in 1977, was its CEO until 2014, and served as the Company's Chairman of the Board of Directors from May 1995 to January 2004.   The Company's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched."  Catz stated that Defendant Ellison "led the transformation to the cloud," and is still "in charge" at Oracle even after becoming the Company's Chief Technology Officer in 2014, noting "don't let titles fool you."[4]  During the Class Period, Ellison regularly spoke to investors about Oracle's business and cloud growth, professing to have detailed knowledge of these subjects.

33.     Defendant Thomas Kurian ("Kurian") served as Oracle's President, Product Development from January 2015 to September 2018.  Kurian started working at Oracle in 1996,

---

[2] Barb Darrow, "So, huge changes at Oracle with Ellison stepping down right? Wrong!" *Gigaom*, (September 18, 2014).

[3] Paul R. La Monica, "HP's Hurd mentality," *CNN Money* (March 29, 2005).

[4] *https://www.youtube.com/watch?v=rh0denX3Bks*

holding various product management and development positions. Beginning in 2008, Kurian reported directly to Ellison. According to his personal webpage profile, Kurian was responsible for "[l]ead[ing] [the] transformation of Oracle's products with [the] introduction of [a] leading suite of Cloud Services over 10 years." Kurian also spoke to investors about Oracle's business and cloud growth, professing to know what he was speaking about. Kurian's colleagues described him as a hands-on manager, stating that he "likes to get involved in the minutia of various projects" and "does not sufficiently delegate responsibility."[5] On September 5, 2018, Oracle announced that Defendant Kurian was taking a voluntary "leave of absence," after which he resigned from the Company.

34. Defendant Ken Bond ("Bond") is, and was at all relevant times, Oracle's Senior Vice President of Investor Relations. Bond has served in this role since 2009. During the Class Period, Bond regularly spoke to investors about Oracle's business and the sources of its cloud revenues, professing to be a reliable source of information. As Bond assured investors in November 2017, "I've been doing this for a quite a while in Tech for a very long time," after being "I think here at Oracle 8, 9 years now."[6]

35. Defendant Steve Miranda ("Miranda") is, and was at all relevant times, Oracle's Executive Vice President, Oracle Applications Product Development. As stated on Oracle's public website, Defendant Miranda is "responsible for leading all aspects of product strategy, product development, and product delivery for the entire portfolio of Oracle Applications." Oracle's website further states that "Miranda's primary focus is on delivering the industry's most complete, proven, and innovative set of cloud solutions." Miranda has been with the Company since 1992, holding a variety of leadership positions within the development organization. During the Class Period, Miranda spoke to investors about Oracle's business and cloud growth, professing to be a reliable source of information.

---

[5] Nadia Damouni, "Ellison's backing helps Kurian's star to rise at Oracle," *Reuters* (January 11, 2015).

[6] Oracle Corp. at RBC Capital Markets TIMT Conference, November 8, 2017.

36.     Defendants Catz, Hurd, Ellison, Kurian, Bond, and Miranda are collectively referred to herein as the "Executive Defendants."

IV.     **FORMER ORACLE EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS**

37.     The former Oracle employees cited throughout include the following:

a.     FE 1, a Regional Sales Director for Middle East and Africa at Oracle from February 2009 to March 2018. FE 1 reported to Abdulrahman Aldossary, Senior Vice President of Oracle Middle East & Africa, who reported to Alfonso Di Lanni, Senior Vice President of Sales at Oracle. Di Lanni reported to Loid Le Guisquet, Executive Vice President of EMEA (Europe, Middle East, and Africa) and Le Guisquet reported to Defendant Hurd. As part of FE 1's job responsibilities, FE 1 sold cloud and other Oracle products to customers and attended meetings at which cloud sales were discussed. Oracle presented FE 1 numerous awards for his sales leadership.[7]

b.     FE 2, a former Vice President in North America cloud sales, from September 2015 to December 2018. As set forth more fully below, FE 2 spoke with customers and sales personnel about sales of Oracle cloud products, and saw draft presentations prepared for Defendant Hurd.

c.     FE 3, a Senior Technology & Cloud Sales Consultant from 2012 to March 2017, who was responsible for supporting all of Oracle's Southern California cloud sales. FE 3 facilitated sales of Oracle products, including cloud, and attending meetings concerning cloud sales. FE 3 reported to a Vice President of Sales, who reported to Rich Geraffo, Executive Vice President of North America Technology, who reported to Defendant Hurd.

d.     FE 4, Vice President of Global Sales Engineering, who served as General Manager of Sales Engineering in 2015. FE 4 sold the first iterations of

---

[7] For ease of comprehension and readability, the Complaint uses the pronoun 'he' and possessive 'his' in connection with the Former Employees. However, this convention is not meant to identify the actual gender of any of the Former Employees.

Oracle's cloud product. FE 4 reported to Defendant Miranda, who reported to Defendant Kurian.

e.     FE 5, a Director of Cloud Customer Success at Oracle from 2016 to October 2018, who led the team responsible for cloud customer success and renewal for ERP, EPM and SCM product suites and would reach out to customers to check on the accounts. FE 5 reviewed documents and information reflecting customer renewal rates and attended meetings discussing these rates and the percentage of customers that were "Dead on Arrival" or "DOA." FE 5 reported to the Senior Director of Customer Success, Doug Rhoades.

f.     FE 6, a Channel Sales Representative from October 2010 to January 2018, who worked with authorized resellers to engineer deals with customers in the Northeast Region.

g.     FE 7, a Regional Technology Sales Director at Oracle from February 2013 to October 2018, who was responsible for Oracle's cloud business in the Czech Republic, Hungary, and Slovakia. FE 7 reported to Natalie Korhonen, who, in turn reported to Giovanna Sangiorgi, EMEA Vice President of Sales, Oracle. Sangiorgi reported to Le Guisquet, who, as above, reported to Hurd.

h.     FE 8, a Cloud Platform Sales Manager at Oracle from March 2013 to July 2018, who managed a North America cloud sales team.

i.     FE 9, a Director of Cloud Customer Success and Customer Experience at Oracle from 2016 to 2018, whose team was responsible for customer adoption and expansion of cloud. FE 9 reviewed documents and information reflecting customer renewal rates and attended meetings discussing these rates and the percentage of customers that were "Dead on Arrival" or "DOA." FE 9 reported to the Senior Director of Customer Success, Doug Rhoades.

V. **SUMMARY OF THE FRAUD**

A. **Oracle Belatedly Pivots From Its Stagnating Legacy "On-Premises" Business To Focus On The Growing "Cloud" Market**

38. For years, Oracle was a leader in the development and marketing of database software and technology. Oracle achieved its past success by selling licenses for Oracle's "on-premises" database software and products. "On-premises" software – in contrast with "cloud-based" software, discussed immediately below, is installed locally, on a licensee's own computer and maintained on the user's own infrastructure and platforms. Through its sale of on-premises products, Oracle became one of the most successful database technology and software companies in the world.

39. Over the last decade, however, numerous competitors introduced database software options that threatened to strip market share away from Oracle. Unlike Oracle, each of these competitors' new products were "cloud-based." In contrast with "on-premises" software, "cloud-based" software allows licensees to store and access data over the internet. Cloud-based products have certain attractive features, including that its users do not need to build and maintain expensive "on-premises" infrastructure and platforms.

40. In 2006, Amazon introduced its cloud-based software, Amazon Web Service, with analysts applauding that "Amazon was one of the first companies to launch a [cloud] product for the general public, and it continues to have one of the most sophisticated and elaborate set of options."[8] Then, in 2008, Google followed suit and released Google Cloud Platform, which led market commentators to proclaim that Google had instantly "become a player in the enterprise" space.[9] Finally, in 2010, Microsoft unveiled Azure, which *Forbes* heralded as providing "an attractive migration path for existing Windows applications for customers who want the economic or functional benefits of moving to Microsoft-hosted cloud servers."[10]

---

[8] Peter Wayner, "Cloud versus cloud: A guided tour of Amazon, Google, AppNexus, and GoGrid," *InfoWorld* (July 21, 2008).

[9] Jon Brodkin, "10 cloud computing companies to watch," *NetworkWorld* (May 18, 2009).

[10] "In Pictures: 10 Cloud Computing Leaders," *Forbes* (June 4, 2010).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                    -13-

41.     While Oracle's competitors were developing cloud-based software products to satisfy growing demand and snatch up market share, Oracle was stubbornly refusing to acknowledge that customers were increasingly shifting towards cloud technology.

42.     Even though the cloud model posed such an existential threat to Oracle's core business, Oracle's leadership, particularly Defendant Ellison, Oracle's co-founder, Chairman, and Chief Technology Officer, publicly ridiculed the new technology.  For instance, at a September 2008 OpenWorld Conference, Oracle's annual business and technology conference, Ellison called cloud computing "complete gibberish" and wondered aloud when this "idiocy [was] going to stop."  Again, in October 2009, Ellison referred to cloud-based software as "water vapor" and "nonsense."[11]

43.     Despite Oracle and Ellison misconstruing its significance, cloud-based technology became the focus of the computing industry, with an importance that could not long be ignored. For example, an October 17, 2009 *Economist* article noted that "the rise of cloud computing is … changing the nature of competition within the computer industry."  In a November 11, 2010 white paper, Microsoft's chief strategist Rolf Harms observed that "[c]omputing is undergoing a seismic shift from client/server to the cloud, a shift similar in importance and impact to the transition from mainframe to client/server."[12]  Likewise, *Forbes* recognized in a September 27, 2011 article that cloud-based software was the "ultimate disruptive innovation" and "spell[ed] very big trouble for the traditional enterprise software leaders who plainly know they need to make the leap, but don't have the business models, DNA, or dire necessity to support the change today."[13]

44.     Oracle's competitors quickly began to reap the benefits of their investments in cloud-based infrastructure and generate substantial revenues from these products.  By 2015, Amazon reported $2 billion each quarter in revenue and dramatic year-over-year growth of 70-80% from its cloud-based software.  Likewise, by the start of the Class Period, Google reported

---

[11] Robin Wauters, "Oracle's Larry Ellison Rips into Cloud Computing 'Nonesense,'" *Seeking Alpha* (October 1, 2009).

[12] Rolf Harms and Michael Yarmartino, "The Economics of the Cloud" (Nov. 11, 2010).

[13] Aaron Levie, "Is the cloud the ultimate disruptive innovation," *Forbes* (Sep. 27, 2011)

substantial cloud revenue each quarter and a growth rate in excess of 80%.  Similarly, by the start of the Class Period, Microsoft reported billions in revenue each quarter and a growth rate of 93% for its cloud-based product, Azure.

45.     Having bet the wrong way on the industry's future, Oracle was soon forced to decide between becoming a declining on-premises company or reshaping itself as a cloud-based business with prospects for significant growth.  *Fortune* correctly framed the issue: "What do you do when you are the best company in your industry but your industry is mired in a slump of mediocre performance? That's the dilemma faced by Oracle," adding that the "meaty revenue pie that is the enterprise-tech market… is shrinking slowly" due to cloud competition.[14]  Industry-watchers referred to Oracle's situation as an "innovator's dilemma," which "describes how successful companies that fail to adopt new technology or business models to meet customers' future needs can quickly fall behind," noting that Oracle was "reluctant to make any wholesale shift away from the on-premises model."[15]  Analysts believed the Company needed "an even more radical and rapid organizational and cultural shift to 'cloud-first,'" rather than holding onto its legacy businesses during the industry's shift to the cloud.[16]

46.     Eventually, even Defendant Ellison could no longer deny that Oracle would need to develop its own competitive cloud-based technology.  Oracle, however, failed to grasp the urgency of the situation, with Ellison stating in an October 2, 2012 CNBC interview that such technology would be developed over the "next couple of years."  In response, analysts noted at the time that Oracle was "[c]ertainly" not as "cloud-based" as its competitors in the industry and that its approach to cloud-based technology was "not all quite there yet."[17]  Market commentators

---

[14] Kevin Kelleher, "What kind of problem does Oracle have exactly?" *Fortune* (June 28, 2013).

[15] Jessica Twentyman, "Oracle and SAP are Big Software, but for how long?" *The Register* (May 13, 2013).

[16] John Freeman et al., "The Death Of The Commercial Database: Oracle's Dilemma," *Seeking Alpha* (February 10, 2017).

[17] Josh Bersin, "Oracle Transformed – It's Now All about the Cloud," *Forbes* (October, 3 2012).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                          -15-

further stated in May 2013 that "Ellison has been talking big about cloud lately," but that "Oracle, shockingly, appears to be failing" in implementing a cloud strategy.[18]

47.     Without a competitive cloud-based product offering, Oracle's revenue growth suffered.  In June 2013, Oracle reported software sales that fell short of analyst expectations.[19]  In September 2015, Oracle announced that revenue for the first quarter fell by nearly 2% and that new software license sales had declined by 16%, which analysts blamed on Oracle not "moving fast enough to make up for declines in its traditional software sales."[20]  Then, in May 2016, Oracle announced that the Company's annual revenue had fallen 3% for fiscal year 2016 – the first annual decline since the Company recovered from the tech industry meltdown in 2002.

48.     Confronted with these poor results, Oracle belatedly pivoted to the cloud in high gear, announcing that it would refocus its efforts entirely on competing in this rapidly developing market.  In an October 26, 2015 CNBC interview, Hurd affirmed that Oracle now was "determined to compete on every level of the cloud feature for feature."  Likewise, Catz explained that Oracle finally was making the "move to cloud," which would represent "a generational shift in technology that [wa]s the biggest and most important opportunity in our Company's history."[21]

49.     Oracle's pivot to the cloud was the single-most important issue impacting the Company, with the market keenly focused on its shift to this new technology and ability to open up a growing revenue stream.  For example, *USA Today* stated that "Oracle's future and relevance is pinned on its ability to become a bigger player in cloud," noting that even small improvements in cloud sales "were enough … to pop the company's stock."[22]  Market commentators noted that the "cloud has become a matter of existential importance to Oracle as its legacy business of selling

---

[18] Brad Peters, "The Worst (And Best) Enterprise Cloud Strategies," *Forbes* (May 21, 2013).

[19] Oracle's fiscal year ends May 31 of each calendar year.

[20] Abhirup Roy, "Oracle Unveils Mixed Fiscal 1Q Earnings Results," *FoxBusiness* (September 16, 2015).

[21] Oracle Corp., Third Quarter 2016 Earnings Call, March 15, 2016.

[22] John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today* (April 26, 2017).

software licenses and hardware products erodes in the face of a growing enterprise preference for usage-based application and infrastructure subscriptions."[23]

50.     Oracle leadership's slowness to acknowledge the growing importance of cloud, however, had caused the Company to fall far behind in this critical market.  As analysts explained at the time, "[t]he rise of cloud computing … caught the software giant [Oracle] somewhat flat-footed, leaving the firm in scramble mode as it races its peers to the cloud."  Indeed, as of September 2016, Amazon's cloud computing revenue dwarfed that of Oracle, with Oracle's cloud infrastructure business bringing in just $171 million in quarterly sales compared to Amazon's $2.89 billion.  In addition, Oracle faced tough competition from smaller cloud specialists, including Salesforce.com, with analysts noting that Oracle was also "at risk from smaller and faster cloud services specialists."[24]  Analysts explained that it would take Oracle a long time to catch up with its cloud competitors, with one Deutsche Bank analyst writing in a September 2016 report that "Oracle talked up its 'next-gen' infrastructure as a cheaper rival to [Amazon's cloud product], but we don't believe it will be competitive anytime soon."

## B.     As Oracle Begins to Ramp Its Cloud Business, It Denies Rumors That It Generates Cloud Revenue Through Improper Sales Tactics

51.     As a late entrant in the cloud software market, Oracle faced a considerable challenge.  It not only needed to develop a cloud product with competitive capabilities, but it also needed to develop an effective sales and marketing strategy for its nascent cloud product.

52.     From the outset of Oracle's cloud efforts, market watchers cautioned the Company's senior management not to play "catch up" by employing improper sales tactics to generate cloud revenues.  In particular, market participants voiced early concerns that Oracle and its auditing department should not attempt to extract artificial "cloud" revenues through their audits of its licensees' "on-premises" software licenses.

---

[23] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not infrastructure. Yet." *diginomica* (January 24, 2017).

[24] Manikandan Raman, "Oracle Corporation Is At Risk From Competitors Like Salesforce," *Benzinga* (September 19, 2016).

53.     By way of background, Oracle's software license contracts gave it the right to audit its customers' compliance with the license and impose fees if it found violations. Oracle's License Management Services ("LMS") is a division within Oracle that is tasked with conducting audits of Oracle's on-premises licensees. LMS is, according to the Company's website, the "established authority on Oracle licensing policy." The stated purpose of LMS's audits was to determine whether Oracle's licensees were using Oracle's software in accordance with the terms of the Company's on-premises license and, if not, issue a penalty for such non-compliance. According to Oracle's public statements, LMS purportedly provided "Oracle customers with an open, transparent, and definitive assessment of their compliance position." Oracle's LMS auditors supposedly maintained a "customer-first approach," with their audits limited to "validate the effectiveness of [the customer's] internal controls, and through them, to maintain a compliant position."

54.     Beginning in 2014, certain industry participants expressed concern that Oracle may attempt to misuse LMS "audits" to push Oracle's cloud product on its existing on-premises customers base – which provided a potential and rich revenue opportunity for Oracle's nascent cloud business. These industry participants included Clear Licensing Counsel, a prominent and independent European organization that advocates for the interests of software consumers.

55.     As part of its investigation, Lead Counsel spoke with the Founder and Chairperson of Clear Licensing Counsel, Martin Thompson. In addition to his role as the head of Clear Licensing Counsel, Mr. Thompson is also a prominent author on software licensing issues and the owner and founder of The ITAM Review, a global resource for ITAM, SAM and Licensing professionals.

56.     Mr. Thompson described how, on May 7, 2014, he participated in a scheduled two-hour meeting with Oracle representatives in Oracle's Thames Valley Park offices in Reading, United Kingdom. The meeting was attended by, among others, Debbie Wynne-Owen, Oracle's Senior Director of Global Operations within LMS. During the meeting, Clear Licensing highlighted to Oracle's executives that customers believed that the Company's auditing group, LMS, engaged in "questionable sales tactics," with "LMS activity leading to sales engagement."

These findings were based on a survey conducted by Clear Licensing Counsel of 100 organizations located across the globe, including from the United States (29% of respondents), Europe (56% of respondents), Asia (9% of respondents) and Oceania (6% of respondents).  Clear Licensing's findings were also corroborated by accounts provided during a roundtable session held on March 26, 2014 at the Home Office, UK Government, which included representatives of 15-20 major Oracle "on-premise" customers, including from both the public and private sector and some of the largest companies in the world.  Following the meeting, in mid-October 2014, Mr. Thompson sent Oracle's Senior Director of Global Operations a written report documenting Clear Licensing Counsel's findings and provided Oracle's executives with an opportunity to respond.

57.     Having received no meaningful response from Oracle to its report, Clear Licensing Counsel then sent a letter on January 6, 2015 to Defendant Ellison and Oracle's Board of Directors, including Defendants Hurd and Catz.  In that letter, Clear Licensing Counsel and Mr. Thompson specifically cautioned Defendants Ellison, Hurd and Catz that they needed "to take steps to improve the trust of your customers  … if you wish to succeed in migrating them to your cloud computing services."

58.     Clear Licensing Counsel's letter warned Oracle's executives that, based on its comprehensive survey and analysis, there was a "deep-rooted mistrust of [Oracle's] core customer base as a result of your auditing and licensing practices."  According to the survey results, Oracle's audits were "often unclear and difficult to respond to" and its licensing terms and changes were "poorly communicated," with 92% of Oracle's on-premises customers expressing that Oracle did not clearly communicate changes to its licensing.   Customers wondered whether potential violations of license agreements were just a pretext to generate cloud revenues.  Clear Licensing Counsel cautioned Defendants that, "if Oracle does not address these concerns then the company's ability to meet its stated $1 billion cloud sales target next year, together with the longer-term outlook for its cloud computing business, will remain in doubt." The letter further stated that one of the "key issues" Clear Licensing Counsel identified in its November 2014 report was that "***Oracle routinely moves the licensing goals posts to favour revenue streams over customer requirements***." The letter concluded by stating that "for the sake of the company's long-term

future and the success of its cloud computing services, we urge you to review these recommendations that have been validated by your customers."

59.     Clear Licensing Counsel's letter to Defendants Ellison, Hurd, Catz, and Oracle's Board of Directors was publicly released on or about January 6, 2015.  Following the letter's release, various media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's documented concerns.  As one commentator explained in a report titled "Oracle Faces Withering Criticism of Its Licensing Practice," Clear Licensing Counsel's letter "received substantial attention in software-licensing circles" during the ensuing months after its publication.[25]  Indeed, numerous media outlets published articles and reports about Clear Licensing Counsel's "scathing report" and letter to Defendants Ellison, Catz, Hurd, and Oracle's Board, "predict[ing] that Oracle will struggle to move to the cloud unless it changes its ways."[26]

60.     Months later, the financial press published additional reports questioning whether Oracle was misusing its "audit" process to manufacture artificial cloud sales – precisely as Clear Licensing Counsel feared.  For example, on June 18, 2015, *Forbes* published an article titled "Is Oracle Using Legal Pressure To Increase Cloud Sales?"  In that article, *Forbes* pointed to accounts suggesting that Oracle was "indeed increasing the pressure on existing clients" through its "audits," but that the impact that "these new practices have on boosting Oracle's cloud earnings and possibly alienating its existing customer base is not easy to discern."

61.     Five days later, on June 23, 2015, *CRN* published a report titled "Here's Why Some Partners Think Oracle Cloud Sales Numbers Are Misleading."[27]  *CRN* explained that "Oracle says its cloud business is growing at a pace that will soon catapult it to the top of the heap in the enterprise software space, but some of its partners think it's just bombast."  CRN referred to three unnamed Oracle customers, who claimed that Oracle salespeople were attempting to sell customers "cloud products they don't need," including by urging the customer into "buying cloud as a way

---

[25] https://scottandscottllp.com/oracle_faces_withering_criticism/

[26]  https://www.informationweek.com/software/enterprise-applications/oracle-must-reform-says-software-licensing-group/d/d-id/1318492

[27] CRN is a top technology news and information source for solution providers, IT channel partners, and value-added resellers (VARs).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                          -20-

to reduce their support renewal [for on-premises product], not necessarily because they want to use Oracle cloud products."  For these reasons, according to one of CRN's unidentified sources, "Oracle's cloud numbers [reported to investors] are definitely misleading."

62.    Oracle denied the accusations contained in *CRN's* and the related reports.  As discussed in the same *CRN* article, Oracle publicly assured investors that the allegations that Oracle customers are buying cloud that they did not want and would not use were ***"absolutely not true."***

63.    Over the next several months, additional media outlets published reports that continued to question the legitimacy of Oracle's sales practices for its nascent cloud product.  For example, on September 11, 2015, *Business Insider* published an article titled "'I Felt Like We Were Being Extorted': Customer Says Oracle Tried To Strong-Arm Him Into a Cloud Sale."  In that report, *Business Insider* explained how, according to one unidentified source, Oracle had "used some ugly tactics to sell its cloud and other products the customer didn't want."  The report accused Oracle of threatening its customers with an "audit" of their on-premises license and then, to make "the threat go away," telling those customers that they could "buy credits for cloud services" that they did not otherwise want or intend to use.

64.    Oracle again minimized these allegations and denied that they had merit.  On January 14, 2016, the Senior Vice President of Oracle (UK), Dermot O'Kelly, publicly responded on behalf of Oracle to the "[r]eports last year [that] claimed that Oracle sales reps have used aggressive tactics to convince customers to move to the cloud through methods like tough software audits."  In his response, Oracle's Senior Vice President "insisted Oracle wants companies to move at their own pace to the cloud."  In denying the accusations, he publicly stated, in remarks published by *Cloud Pro* that ***"[i]t would be wrong to force a company to do something that's against their will."***

65.    Six months later, Oracle again assured industry and securities market observers that its cloud revenues were legitimate.  On July 21, 2016, Pacific Square Research published a report summarizing "a number of stories in the press, such as [the] one from Business Insider," discussed above at paragraph 63, which asserted that Oracle "used some ugly tactics to sell its cloud and other products the customer didn't want," including the "nuclear option" of "audits" to "boost

cloud." Oracle denied these allegations. The Pacific Square Research report quoted an Oracle spokesperson (i.e., Defendant Bond) as stating that these allegations were fictitious *"conspiracy rumor"* that did not even warrant a substantive response, explaining:

> Responding to *every rumor* is never a productive endeavor.... Only color I can add is that if the ***conspiracy rumor*** were true, people would not use the cloud credit and there would be no renewal or revenue growth as a new business would replace cancelled business – not at all what we're expecting.

66.     Unknown to investors at the time, the accusations that Oracle deflected and rebuffed as "conspiracy rumor" were, in fact, not "conspiracy rumor" at all.  As discussed further below, Oracle widely engaged in the very practices that its executives publicly shunned, and the "revenue growth" that Oracle's executives trumpeted each quarter as proof of Oracle's success was, in significant part, the artificial product of their coercive audits and unsustainable sales practices.

**C.     Throughout The Class Period, Defendants Report Astonishing Growth In Oracle's Cloud Business, Which They Attribute To Oracle's Supposedly Superior Cloud Products and Business Practices**

67.     While denying that its cloud revenue was driven by abusive sales practices, Oracle reported dramatic growth in its cloud business throughout the Class Period. Further rebutting any charge that coercive tactics were driving its cloud revenue, Oracle attributed its ostensible success to legitimate business factors, thus assuring investors that its revenue growth was genuine and sustainable.

68.     For instance, on March 15, 2017, the first day of the Class Period, Oracle issued its earnings release for the third quarter of 2017, touting that cloud billings had jumped 110% year-over-year (versus 39% year-over-year growth the prior quarter) to $1.2 billion, driving overall financial results higher.   Defendant Catz stated in the release that Oracle was enjoying "hypergrowth … in the cloud," called the Company's growth rate "astonishing," and stated that, "***Our new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect***; total revenue is up, margins are up, operating income is up, net income is up, EPS is up."

---

69.     On Oracle's third quarter earnings call that same day, Defendants continued to tout the growth of Oracle's cloud business.  Defendant Hurd stated that Oracle was "***the fastest-growing scale cloud business in the world***," while Defendant Catz added that "Our pivot to the cloud is now clearly in full swing."  Defendant Catz emphasized that, for the first time, the growth in Oracle's cloud business had overtaken the declines in its legacy "on-premises" business, stating ***"more importantly, the increase in revenue from our cloud business has overtaken new software license declines on an annual basis***," and adding that, "***This is a significant milestone in our transformation,*** where the combination of our cloud and new software license business added together ***are growing.***"

70.     Analysts responded enthusiastically to Defendants' statements about Oracle's represented cloud growth, calling the results "a material inflection point" and a "key milestone" in Oracle's shift to the cloud.  For instance, in a March 15, 2017 report issued following Oracle's earnings release and conference, Macquarie analysts raised their price target for Oracle shares and wrote, "Oracle reported a solid third quarter, ***one of its best reports in years, even as the [Company] heads towards the tipping point in its cloud transition*** when cloud growth and margin scale are offsetting declines in new license revenues."

71.     On March 16, 2017, Barclays raised their Oracle price target, writing, "With the company emerging on the other side of cloud transition …, we continue to like the long-term story.  If the company is starting to show meaningful client wins for its database/IaaS offering (something management hinted at), we could see ***a re-rating of the name***."[28]

72.     Meanwhile, Oracle continued to rebuff any suggestion that its cloud revenue was driven by coercive sales tactics.  On May 9, 2017, at a Jefferies Technology Group Investor Conference, Defendant Bond was asked about the importance of audits as a driver of revenue growth.  An analyst asked if Bond could provide "some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers."  In response, Bond stated, "This is one of those things where – gets talked about a lot.  And I think this is one of those things

---

[28] "Re-rating" of Oracle refers to an expansion of the stock's earnings multiple, such that investors would be willing to pay more for each dollar of the Company's earnings.

where ***the story is a lot bigger than the realities***." Defendant Bond assured investors that Oracle used its audits properly, stating that "we try to do [audit] as best we can, in as gracious [a] way as we can." Bond also assured investors that cloud revenue was not being generated by audits, stating that with regard to questions about revenue associated with auditing, "the key, as we go to cloud, is this conversation is going to go away."

73. As the Class Period progressed, Oracle continued to emphasize its rapid cloud revenue growth to the investor community. For example, on June 21, 2017, Oracle issued its earnings release for the fourth quarter of 2017, in which it reported that cloud revenues had surged again by 58% to $1.4 billion, pushing up the Company's earnings per share. Defendant Catz again underscored that cloud growth was a primary driver of Oracle's profitability, stating that, "This cloud hypergrowth is expanding our operating margins."

74. On the conference call with investors and analysts that day, Defendants stated that Oracle's cloud business had become the primary driver of Oracle's growth, with Catz stating that "[t]he cloud has become our predominant growth vehicle," and Ellison reiterating that "[o]ur rapid SaaS growth is the driving force behind Oracle's revenue and earnings growth in Q4." [29]

75. Defendants also assured investors that the Company's cloud revenue was high-quality and sustainable. On the June 21, 2017 conference call, an analyst questioned Defendants about the quality of Oracle's reported cloud revenue, and specifically whether the Company's cloud growth was sustainable or whether it was a "1-year phenom." Catz responded by denying that Oracle's reported cloud growth was driven by a short-term, "1-year" spike in revenue, but rather was built on a base of "recurring revenue," stating "***So this is absolutely not a 1-year phenomena***. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand

---

[29] "SaaS" refers to software-as-service, a business line in which the Company licensed Oracle cloud-hosted "pre-packaged" software and applications on a subscription basis. In fiscal year 2017, Oracle told investors it was successfully pushing its cloud offerings into two additional lucrative cloud businesses: platform-as-service ("Paas"), which provides a framework for developers to build and deploy customized applications; and infrastructure-as-service ("Iaas"), which provides scalable and automated compute resources.

that in our PaaS-IaaS business, we're not even at scale. ***So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue -- of the recurring revenue business***."

76.     Investors and analysts relied upon Defendants' assurances about Oracle's purportedly tremendous cloud growth. For example, on June 22, 2017, *Business Insider* published an article entitled "***Oracle's blow-out earnings caused over 20 Wall Street analysts to raise price targets***." The article reported, "***OracleCloud computing really is starting to breathe new life into Oracle***. … A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday before settling down to about $50 in the afternoon."

77.     Also on June 22, 2017, Macquarie analysts again increased their price target, writing, "Oracle reported its ***best quarter in years*** as we believe the company has weathered the worst of its transition to the cloud .... Critical metrics like cloud ARR, license revenues, total software revenues, billings, and margins all beat [consensus analyst estimates], making the quarter ***a solid turning point as management rounds the bend on a multiyear rapid cloud transition***."

78.     In another June 22, 2017 report, William Blair analysts wrote, "At this point, it appears that ***Oracle has crossed the cloud chasm, which will lead to higher sustained revenue growth . . . and double-digit non-GAAP EPS growth***."

79.     Throughout the Class Period, Defendants continued to assure investors that the Company's cloud growth was driven by a variety of legitimate business factors and conditions, such as the quality of Oracle's cloud products and sales force, as well as the value and cost-saving delivered to consumers. For example, when asked on a September 14, 2017 earnings call about the reasons for Oracle's "momentum in [the] cloud portfolio," Defendant Hurd responded that the Company's cloud growth was due to the fact that "[w]e're better – our products are better. Our sales force is better. Our ability to implement is better. Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

80.     Similarly, at a November 7, 2017 Sanford C. Bernstein Technology Innovation Summit, Defendant Bond was asked about the "the real biggest driver you think of why [clients]

would be moving on-premise to [the cloud]."  He stated that "from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And *I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early*."

81.     Buoyed by Defendants' reported success in the cloud, Oracle's stock price surged during the Class Period, rising from $42.79 on March 14, 2017 to a high of $52.97 on March 9, 2018 before the truth fully emerged – an increase of nearly 24%.

**D.     In Reality, Oracle's Supposedly Explosive Cloud Growth Was Fueled By Extortionate and Coercive Sales Practices**

82.     Unbeknownst to investors, Oracle's "astonishing" cloud growth was illusory and driven by the very practices it denied engaging in: improper and extortionate tactics to coerce customers to buy short-term cloud subscriptions they did not want and would not renew.

83.     Specifically, as numerous former Oracle employees, industry insiders, and even a government investigation have confirmed, Oracle generated a substantial volume of its cloud sales using a highly improper practice known as "Audit, Bargain, Close" or "ABC."

84.     In the typical ABC deal, Oracle's LMS auditing department would audit an existing on-premises client for violations of the software license, and present the client with a hefty bill – say, $10 million.  Oracle sales would then intervene, offering to reduce the penalties significantly – by, for instance, $4 million – if the customer purchased $2 million in cloud subscriptions.  These customers, who neither wanted nor needed the cloud products, "purchased" a cloud subscription simply to save money on audit penalties, and, of course, almost never renewed those subscriptions.  Oracle misleadingly reported these sham "sales" as cloud revenue, highlighting them as evidence of explosive business growth, when, in fact, they were nothing of the sort.

85.     Oracle also sold cloud subscriptions to customers who did not want them, and in some cases could not even use them, through so-called "attached deals."  In an "attached deal," Oracle would offer a customer who was only interested in renewing its "on-premises" services a sharp discount on those services if the customer agreed to tack on an unwanted one-year cloud subscription.  In many cases, the customer was told that it was receiving a free cloud "trial"

subscription on top of a full-price on-premises contract, while Oracle internally booked the deal as a full-price cloud sale coupled with a discounted on-premises purchase.  Thus, Oracle used these attached deals to disguise legacy on-premises revenue as all-important cloud revenue.

86.    As discussed more below, these practices were so commonplace within Oracle that the Company internally nicknamed them "financially engineered" and "Dead On Arrival" deals.

### 1.    Oracle Fuels Its Cloud Growth By Coercing Customers To Subscribe To Cloud Products Under Threat Of Audit Penalties

87.    Many of Oracle's most senior executives during the Class Period confirmed that the "Audit, Bargain, Close" tactic was a key driver of Oracle's cloud revenue and the vehicle through which the overwhelming majority of their teams' cloud sales were made, including:

a.    FE 1, Regional Sales Director for Middle East and Africa, who reported that during the Class Period at least 80% of Middle East and Africa cloud revenue was generated through engineered deals and that it was "crystal clear these [sales] are fake" because "none of these deals are renewed";

b.    FE 3, Senior Technology & Cloud Sales Consultant, who was responsible for supporting Oracle's Southern California cloud sales, stated that Oracle relied on the ABC tactic as a key way to "juice the numbers" for its reported cloud sales;

c.    FE 4, Vice President of Global Sale Engineering, who served as General Manager of Sales Engineering in 2015 selling the first iterations of the cloud product, who characterized this practice as a "part of the core [Oracle] playbook";

d.    FE 5, Director of Cloud Customer Success at Oracle from 2016 to October 2018, who confirmed that customers were forced to purchase cloud products under threat of audit and that that these customers would be "irate" when the customer success team called to ask how they could get them to deploy and expand their cloud footprint.

88.    These former Oracle executives detailed the mechanics of the ABC scheme.  To start, Oracle installed its main on-premises products with extra options and management packs enabled by default, but did not inform its customers that these features had been installed and must be disabled in order to avoid license overages.  Once a customer fell into this trap, Oracle's sales and LMS teams worked in a highly coordinated fashion to audit the client for its license violations and push cloud products.

89.     FE 1 confirmed that the sales teams and LMS closely coordinated to use audits in order to sell unwanted cloud subscriptions. FE 1 also stated that sales would direct LMS to target clients for audit.  In particular, FE 1 stated that the sales team would "identify large clients they thought they could get more money out of and threaten them with audits," instructing LMS to say the Company had suspicions that they were out of compliance.  Indeed, FE 1 stated that the sales teams would actually write out the threatening audit letters and give them to LMS to then send to the client.  FE 1 stated that frequently, neither sales nor LMS had real evidence that customers targeted for audits were noncompliant, but that the mere threat of an audit would put the customers under so much pressure, because of the enormity of the potential penalties, that customers had no choice but to agree to Oracle's demands that the client purchase cloud products. FE 1 stated that once the cloud sale was complete, the sales team would tell LMS that the customer had trued up, and LMS would close the file without even following-up with the client (making clear that the audit was initiated as a mere pretext to push the cloud sale through).  FE 1 stated that "any statements from Oracle that LMS was independent from sales are a lie."

90.     FE 4 independently corroborated reports by FE 1 about the close coordination between LMS and sales as part of the ABC scheme.  FE 4 stated that the sales team would trigger audits, which LMS would run and then send back to the sales team for review. FE 4 explained that LMS would never send a letter to a customer without approval by the sales manager or account executive handling the customer.

91.     FE 3 further corroborated these reports, stating that LMS worked with sales personnel to ensure that customers signed ABC-based deals: by the start of the Class Period, as Oracle pushed for higher cloud growth, LMS was given expanded authority to initiate audits, and sales would come in "to finish the deal."

92.     Similarly, FE 6, a Channel Sales Representative from October 2010 to January 2018 who worked with authorized resellers to engineer deals with customers, confirmed that he learned from vendor partners that customers were made to purchase products under threats of audit. FE 6 stated that it was a "regular practice" for sales representatives to contact LMS to start an audit when the customer was not going to buy cloud product, and tell LMS "[t]hey're not going to buy

anything from me so let's just audit them." LMS would find a compliance violation, and the representative would start negotiating from there. FE 6 confirmed that these "extortive" tactics were a "common practice."

93.     Oracle's audit of the City and County of Denver is an example of Oracle's deployment of the ABC tactic.  As part of its investigation, Lead Counsel obtained documents concerning Oracle's audit of Denver from a CBS reporter, who obtained these documents through a FOIA request. The documents reflect that on July 27, 2016, Denver received a letter from Sean Cogliardi, an Oracle Senior License Consultant, stating that the Company would initiate an audit of its compliance with its license for on-premises products in three days, notwithstanding the fact that Denver's contract provided for a much longer notice period.  *See* Figure 1, below.

94.     Notably, while Denver requested that the parties maintain a documentary record of all audit-related discussions so that it could comply with Colorado's open records laws, Oracle resisted this request, insisting on face-to-face discussions and stating that if Denver did not capitulate, legal counsel would need to be involved.  In an email to Cogliardi, Denver "reiterated [its] earlier request that all audit-related communications continue in writing." In response, Cogliardi claimed that Denver's contract required it to respond to unwritten audit communications and that "Michelle Cline, Oracle's Legal Counsel is copied on this email.  Please provide contact information for City and County of Denver's attorney should the matter need to be handled by our respective Counsels."

Dear Mr. Cardenas,

My name is Sean Cogliardi and I am with Oracle License Management Services (LMS), a group within Oracle Finance that delivers services to govern, manage, and promote awareness of the proper use and distribution of Oracle solutions. LMS regularly conducts license audits as a part of its license management validation program under the rights contained in our agreements.

I am contacting City and County of Denver to initiate a license audit to ensure that the organization's use of Oracle products is in accordance with the terms and conditions specified in its agreements.

I will follow up with you in three business days to make sure you received my email, answer any questions you may have, go over the audit process and establish a project timeline. I would also like to schedule an in person meeting with you and your team at your earliest convenience. Please do not hesitate to reach out should you have any question.

Best Regards,

Sean Cogliardi

**Figure 1.**  Excerpt from July 27, 2016 letter from Oracle to the City and County of Denver.

95.     Next, Oracle LMS held an onsite (face-to-face) meeting with Denver on October 20, 2016.  Consistent with reports by FE 1 that LMS did not close out sales-driven audits (but simply let sales swoop in once the customer had been sufficiently intimidated), Oracle did not deliver a final audit report to Denver detailing the manner in which the client was supposedly non-compliant and demanding payment for those violations.

96.     Instead, on November 28, 2016, Denver discussed "'right sizing' [Denver's] licensing agreement," not with LMS, but with Richard Luby, an Oracle *sales manager*.  In an email dated December 2, 2016, Luby pressured Denver to quickly make a deal to resolve the audit, telling Denver that further delay could result in a *tripling* of its audit penalties from approximately $3 million to "in excess of $10M."  Specifically, Luby told Denver employees that the "sales group at Oracle [originally] believed we could resolve CCD's Oracle licensing issues for somewhere between $2.5-$3M."  However, "[s]ince this time [Denver] sent LMS a detailed spreadsheet listing [Denver's] deployed Oracle environment, leading LMS to now believe the current over-deployment would require in excess of $10M to license. Our SVP has communicated extensively this week with the LMS director on this issue, and has been struggling to secure LMS' consent for a $3M agreement, but is only willing to do so if Denver is in agreement on the number."

97.     Significantly, after Denver expressed it willingness to accede to Oracle's demands, that sales manager told Denver that the sales team would arrange for LMS to put the audit on hold while the sale was being negotiated: "Our Sr VP [of Oracle *sales*] *will be talking with Oracle LMS today about holding/freezing the audit so we can go through this process*.  He asked me if a 6 week freeze will be sufficient . . . ."  However, according to Luby, LMS would only agree to a freeze if Denver acted quickly on a deal. Specifically, Luby told Denver that LMS was "under increased internal pressure due to earlier delays" and that LMS "followed up with our VP Brent Mitchell agreeing to put their process on hold if the request goes to [Denver City] council before the holidays."

98.     If Oracle's aim were to bring Denver into compliance, it would have first completed the audit before attempting to sell the client additional products in order to ensure that the client was purchasing whatever it needed in order to "right size" its licenses.  But Oracle was *not*

interested in bringing Denver into compliance – rather, it was interested in pushing cloud. Accordingly, Oracle froze the Denver audit, pivoted to sales, and left the threat of an audit hanging over the client while those sales negotiations were ongoing.

99.     As noted above, at the time of the audit, Denver was strictly an on-premises customer of Oracle's and, as such, the audit concerned Denver's use of on-premises software. Accordingly, any legitimate "right sizing" of Oracle's on-premises licensure should have involved the acquisition of additional licenses for on-premises software. Instead, on December 22, 2016, Oracle told Denver that it would be forced to pay an extra $2 million to "right size" its ***on-premises*** licensing, unless it "purchased" a one-year subscription to Oracle's ***cloud***. Specifically, Oracle told Denver it had two options:  pay $8 million in additional fees without a cloud subscription (including $3 million for the license and the remainder for new support and existing support), or pay $6 million with a one-year cloud subscription (including only $1.2 million for the license, $1.7 million for cloud, and the remainder for support). *See* Figure 2, below.

100.     Importantly, Oracle's email explicitly states "Please note that the list of products included within the [on-premises] Unlimited License Agreements (ULA) in both options is ***exactly the same***." In other words, Denver would acquire ***the same*** on-premises licensing under ***either*** option – the only difference was that Oracle would provide a $2 million discount for "right-sizing" those licenses if Denver agreed to nominally "buy" a one-year cloud subscription.

1
2
3
4
5
6
7
8
9
10
11
12
13



**Figure 2.** Excerpt of an email in which Oracle tells Denver it will be charged an extra $2 million to acquire *the exact same* on-premises licenses, unless it buys a one-year cloud subscription.

101.   Tellingly, Oracle only priced in a one-year subscription to cloud services when presenting Denver with a 5-year licensing proposal, demonstrating that Oracle had no expectation that Denver would use its cloud subscription beyond the first year.

102.   Reports from the senior former Oracle sales executives identified above make clear that Oracle's deployment of the ABC tactic in its audit of Denver was no anomaly.  Instead, the use of audits to coerce clients was a primary vehicle through which Oracle sold cloud services.  FE 1 confirmed that during the Class Period at least 80% of Middle East and Africa cloud revenue was generated by "inserting cloud into compliance-based deals."  In particular, FE 1 reported that more than 75% of their team's cloud sales in 2017 were made to customers under threat of license audits, who purchased the product simply to avoid the hefty penalties; in 2018 such sales accounted for 86% of his team's revenue.

103.   Statements by FE 2, who had visibility into Oracle's North American cloud sales, confirm that 90-95% of those cloud sales were engineered deals, including ABC deals that were

driven by "audits or the threat of audits."  Specifically, FE 2 reported that 90-95% of the cloud deals FE 2's team dealt with had no "use cases" attached to them.

104.    As background, When making a legitimate sale, Oracle generates a "use case" for each customer that describes the customer's needs and the Oracle products or services that would be appropriate to meet those needs.  FE 2 explained that the absence of these "use cases" in connection with cloud deals was highly unusual: "Something like ninety to ninety-five percent of transactions that were closed did not have use cases attached to them, where a customer said, 'I'm buying with intent.' Why is the customer buying these products if there is no use case for them to get it?"

105.    When FE 2 followed up with customers and with sales personnel, FE 2 discovered that these deals were generated through the ABC tactic or were attached deals, and that customers neither intended to use nor renew the cloud products.  Specifically, FE 2 stated that the sales team would hand FE 2 and colleagues a cloud deal and tell them that the customer had no intent to actually use the product, so now FE 2 and colleagues needed to try to convince them to do so.  Moreover, customers told FE 2 that they had no intention of using the cloud credits they had purchased,[30] and that they either bought cloud credits as part of an ABC deal or did it to reduce their perpetual spend on legacy support costs (*i.e.* an attached deal).

106.    FE 1 reported that the ABC scheme was used to close huge cloud sales worth tens of millions of dollars, involving high-profile clients like Saudi Telecom Company, a $120 million deal, attaching $22 million in unwanted cloud.  FE 1 explained that large compliance-based deals sometimes fulfilled the MEA ("Middle East and Africa") region's sales quotas for the entire year. FE 1 explained that it was "crystal clear these [sales] are fake" because "none of these deals are renewed."

107.    Indeed, FE 1 reported that less than 9% of the MEA region's cloud subscriptions were renewed, and many were never even used.  In fact, FE 1 stated that, using the threat of an audit, cloud products were sold to numerous customers who not only did not, but ***could not***, use

---

[30] Customers who purchase "cloud credits" pre-pay to access Oracle cloud services; those credits are depleted as customers consume those services.

them.  In Saudi Telecom Company's case, for instance, government regulations prevented the client from using a cloud data center that was located outside the country. Saudi Telecom still purchased $22 million worth of cloud products, despite the fact that there were no Oracle data centers in-country at the time of that purchase, because it was not interested in using the cloud product, but, rather, was effectively purchasing a discount on audit penalties.

108.    Corroborating these reports of dismal renewal rates associated with ABC deals, FE 5 noted that his Customer Success team recorded when customers purchased cloud product under threat of an audit so that the team members would not waste their time contacting the customer about renewals.

109.    Notably, FE 3 reported that the use of the ABC scheme to coerce clients into purchasing cloud products was "an active practice" at Oracle and that the practice "was stepped up into high gear at the beginning of" fiscal year 2017 (*i.e.*, which, for Oracle, begins in June 2016).  Indeed, FE 3 stated that just before the start of the Class Period, the pace and frequency of Oracle's auditing increased exponentially: from 1 to 2 audits in FE 3's region prior to the Company's big cloud pivot to 5-6 audits *per quarter* – as much as a ***twenty-four-fold increase in audits***.  At that time, the Company began going after even the small and midsize customers who were in the $50,000-$75,000 range, and sent audit letters regardless of whether a sales person was in an active sales cycle with that customer.  FE 3 further stated that the Company "also went after customers who hadn't purchased any licenses in two years.  If a customer was audited and they had not paid for a license, the Company would forget about the audit if they bought cloud."

110.    Multiple former Oracle employees reported that Defendants Hurd and Catz personally approved engineered deals, including Audit, Bargain, Close deals.  As FE 1 explained, sales teams had to request approval for all of their sales using the Deal Approval System (DAS). When inputting approval requests into DAS, Oracle employees were required to show that the deal was a "cloud insertion" deal, and in particular that LMS was engaged as part of the sales process (*i.e.*, that audits were being used to facilitate the deal).  FE 1 further explained that in ABC deals, the sequencing of DAS reports showed that LMS was engaged with the sales team and the client. FE 1 stated that all deals worth more than $5 million had to be approved by "HQ," which meant

either Hurd or Catz.  FE 1 stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd or Catz signed off on the deal.

111.   Like FE 1, FE 3 confirmed that cloud deals made using the ABC scheme were escalated to Defendant Hurd's office if a discount in excess of 50% was offered on software.  FE 3 stated that 80% of FE his engineered deals went to Hurd's office for approval.  FE 3 stated that he personally had "audit cloud deals," clearly marked as such, that were approved by Hurd's office.

112.   FE 1 also reported that he and other EMEA sales teams routinely discussed the volume and size of their audit-driven cloud deals with Loic Le Guisquet, Oracle's President of EMEA, Asia Pacific, and Japan, who managed the Company's operations in these regions, sat on the Oracle Executive Management Committee during the Class Period, and reported directly to Defendant Hurd.  FE 1 explained that, on a weekly basis, he prepared slides concerning EMEA sales volume and progress and provided them to Le Guisquet for presentation to Defendant Hurd. Indeed, Le Guisquet routinely instructed FE 1 to ensure that the slides defined certain terms or included certain content so that Defendant Hurd would be able to follow them.  FE 1 stated that these slides "would very clearly say that LMS was engaged [on cloud deals presented in the slides], and that they were compliance deals."  In addition, FE 1 reported attending "QBR" or quarterly business review meetings, at which sales executives received instructions on how to generate engineered deals.  For instance, FE 1 reported that executives were instructed to offer customers a 90% discount on on-premises licenses if they purchased $300,000 worth of cloud subscriptions. Likewise, FE 1 reported that executives were told at these meetings that, if a customer targeted for an engineered deal objects that they did not need, or will not use cloud products, sales personnel should assure the customer that they did not need to use the product, and that the purchase of cloud products was merely a necessary condition to unlocking the on-premises discount.

113.   FE 2 likewise explained that the metrics used in presentations going directly to Oracle's senior management made clear that Oracle's cloud revenue was driven by engineered deals.  FE 2 stated that "[a]mong all of Hurd's direct reports there was absolute awareness of the quality of the cloud revenue."  FE 2 stated, "I saw presentations that went to Hurd's directs. I saw

the info they were receiving about deal quality and it was absolutely something that was discussed." FE 2 reported that these presentations stated that 90-95% of the Company's cloud deals did not have use cases associated with them, demonstrating they were not driven by actual customer need. FE 2 also reported that FE 2 saw slides in draft presentations prepared for Hurd listing "attached" as the top "use case by customer" for cloud purchases (*i.e.*, the reason they purchased cloud).

114.    FE 3 also discussed his concerns about Oracle's engineered deals –*i.e.*, audit-driven and attached deals – being "borderline unethical" with another of Hurd's direct reports, Rich Geraffo, Vice President of Sales. FE 3 reported that Geraffo responded by stating that "cloud was the future of Oracle's business model, and that auditing was a part of Oracle's business and strategy to drive revenue."

### 2.    Oracle Also Uses "Attached Deals" To Disguise Legacy On-Premise Revenue As All-Important Cloud Revenue And Pad The Company's Cloud Growth

115.    As noted above, Oracle also generated illusory cloud growth through the use of "attached deals" – deals in a which a customer seeking to renew its "on-premises" contract was offered a sharp discount on those services if it agreed to purchase a one-year cloud subscription that it neither wanted nor needed. Cloud "revenue" generated through these "attached deals" was never sustainable and did not, as Oracle misled investors into believing, represent Oracle's growing share of the cloud market. Instead, these one-year cloud subscription that clients neither wanted nor renewed (nor even used) amounted to short-term infusions of cash from an artificial revenue stream that Defendants knew would quickly evaporate. FE 3, FE 7, FE 8, and FE 4 all confirmed that Oracle relied heavily on this tactic throughout the Class Period to produce significant purported cloud "revenue."

116.    FE 7, who was responsible for Oracle's cloud business in the Czech Republic, Hungary, and Slovakia, reported that his teams relied heavily on "attached deals" to sustain Oracle cloud sales, which had "struggle[d] from the inception." FE 7 explained that, in the typical "attached deal," a customer had a large on-premises contract for database or middleware products.

In exchange for a lowered price on these on-premises contracts, the customer "filled the difference [between the full contract price and the discounted price] with cloud products." Because the customer's on-premises support and maintenance costs were calculated based on the total value of their on-premises licenses, the customer accepted the attached deal, since it would save on support maintenance. FE 7 gave the following example:  if a client had $1 million worth of on-premises licenses, but ended up paying $900,000 through an attached deal, with the addition of $100,000 in cloud, this client would save more than $20,000 per year in support costs.  As FE 7 explained, however, the problem was that because almost none of these customers ever wanted or needed cloud services in the first place, they "never renewed the cloud portion of their deals.  The products did not work very well, and almost none of the customers actually wanted them. They simply agreed to the attached deals for the discount on their licenses and maintenance costs."  FE 7 further reported that customers were often told that they were receiving a free cloud subscription on top of their on-premises renewal, while Oracle internally recorded the deal as a discounted on-premises contract and a full-price cloud sale.  FE 7 reported that 65% of his teams' cloud sales were made through engineered sales, including attached deals, and that at least half of his teams' Paas and Iaas sales were attached deals.

117.    FE 2, FE 3, and FE 4 all echoed FE 7's description of the mechanics of Oracle's attached deals and the abysmal renewal rates associated with them.  FE 3 stated that 90% of cloud revenue in his territory was generated through attached deals.  FE 3 stated that "[n]early every [cloud] deal" FE 3 was involved with was an attached deal.

118.    FE 4 likewise confirmed that attached deals were "commonplace," though FE 4 said that most cloud sales were driven by "extortion" through the audit process, described above. By using the attached deals, FE 4 explained, "[e]ssentially they were not growing their business or building additional licenses, they were just shifting revenues from one set of books [on-premise] to another [cloud]." Indeed, according to FE 4, Oracle knew that customers were going to just let the cloud contract expire, and sales leadership often expressly communicated to customers that they could *"wash [their] hands"* of cloud products after the contract expired but keep the other reduced support costs for on-premise products.

119.   FE 3 confirmed that "the cloud subscription involved in the [attached] deal was only for one year of service. After that first year, most companies had no interest in renewing the cloud services but were enjoying the decreased maintenance and service costs on their $100,000 worth of [on-premises] software." FE 3 corroborated reports by Oracle's other former employees that sales personnel explicitly agreed with customers that they would not need to use or renew the cloud software as part of the attached deal. FE 3 reiterated that "[c]ustomers who were given this deal did not renew the cloud subscriptions once they ran out," and stated that FE 3 saw attached deals renewed less than 15% of the time. FE 3 stated that periodic reports detailing cloud utilization reviewed by FE 3 showed many of Oracle's customers who took attached deals were not using their cloud credits and had not even logged into their product. FE 7 stated that his teams would review customer cloud usage reports and see that "ninety percent of our attached deals were not using at all. I would say it was [throughout 2017 and 2018]. I had relationships with the other sales territories," including Austria, Poland, Russia, and Hungary, "and we were not an exception." FE 7 stated, "Almost no one was turning anything on. They weren't using their [cloud] credits."

120.   FE 8 also corroborated these accounts, stating that it was "extremely common to provide very steep discounts to on-premise licenses in exchange for a customer purchasing cloud subscriptions," estimating that more than 75% of his cloud revenue came from attached deals. FE 8 confirmed that both Oracle and the customers on the receiving end of the attached deals understood that the cloud subscriptions would not be renewed after one year. FE 8 stated, "It just wasn't sustainable. Customers were purchasing a million dollars of cloud subscriptions but weren't planning on making that same purchase next year. They were not renewing." FE 8 reported that less than 10% of his clients renewed their cloud subscriptions at the same level they initially signed up for. If a client renewed for half of what they had originally been sold, he would be "ecstatic," but even that was rare. Most just declined to renew any amount of cloud product. "They did it just for the deal and then would not renew the next year."

121.   FE 2 likewise reported that FE 2 learned from speaking with customers and sales personnel that, when speaking with customers, sales affirmatively acknowledged that the customers would not renew their cloud subscriptions after a year in order to preserve the economic

1   attractiveness of the engineered deal, whether an ABC or an engineered deal.   Indeed, FE 2

2   explained that given the structure of the attached deal, there was a strong economic incentive for

3   customers not to renew after the one year subscription was up, in order to maximize the benefit of

4   the continuing discount on maintenance costs for on-premises product.

5        122.   FE 9 and FE 5, both Directors of Customer Success at Oracle from 2016 to 2018

6   and whose teams were responsible for customer adoption and expansions, related that many of the

7   cloud contracts were called "dead on arrivals" or "DOA," because when it came time to renew, the

8   customers would refuse and, instead, say that they only bought the cloud product because they got

9   a discount on another product they actually wanted.   According to both FE 9 and FE 5, at some

10   point Oracle changed the nomenclature from "dead on arrival" to "no plan adoption" or "financial

11   deal" because of the connotation that Oracle's sales teams were selling products that were not

12   going to be used.

13        123.   FE 5's and FE 9's group would reach out to customers approximately one quarter

14   before they were up for renewal to check on the health of the account.   They would hear that the

15   customers had never used their cloud products.   FE 9 explained that customers would tell FE 9's

16   group that they had gotten cloud product in order to get a better deal on another product. FE 9

17   corroborated the accounts of other former employees and stated that a customer would be quoted

18   a high price for just an on-premises product and then quoted a lower price for the on-premises

19   product combined with cloud.   The customer would take the second option because it was cheaper

20   even if they had no intention of using the cloud.

21        124.   Enterprise Resource Planning (ERP) was one of Oracle's most important cloud

22   products, with Defendant Hurd identifying it as the "most important application segment in the

23   world" and stating that "ERP is one of those [cloud products] that we're particularly focused in on

24   here."   With regard to Oracle's ERP cloud product, customers told FE 9's group that they already

25   had an ERP system and did not want to use Oracle's.   FE 5 corroborated that customers would

26   admit that they had only purchased cloud, including ERP, to get a discount on on-premises

27   products. These customers, according to FE 5, "didn't have any intention to use it. They were just

28   bundling it together to reduce their overall costs."   FE 5 described how a lot of the cloud contracts

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                          -39-

1   and related revenue were from customers who neither wanted nor needed the cloud products. FE

2   9 stated that ERP employees were very vocal with Customer Success managers and directors about

3   how the "renewal rates suck."

4          125.    FE 9 stated that cloud ERP renewals would range from only 15%-25% and that

5   90% of the accounts that did not renew were DOA. FE 5 similarly explained that Oracle's renewal

6   rate was 15-20% for certain quarters, and that the percent of DOA customers that did not renew

7   was 90%.

8          126.    FE 9 further stated that customer health was measured as "green," "yellow," or

9   "red." If customer health was "red," it meant that Oracle was anticipating that the account would

10  "churn," or fail to renew, and Customer Success would have to provide a reason for said churn.

11  According to FE 9 and FE 5, Oracle had an internal system called Customer Lifecycle Management

12  ("CLM") that tracked the health of customer accounts and the reason for customer "churn." CLM

13  would show whether accounts were red, yellow, or green and the reasons for accounts not

14  renewing.  According to FE 5, red accounts were DOA and yellow accounts would need work to

15  convince customers to renew.  FE 5 stated that the health of the portfolio and the corresponding

16  color was automatically assigned in CLM, and the information was accessible to renewal

17  representatives, customer success managers, certain sales teams, and the implementation success

18  managers responsible with getting customers to deploy products.

19         127.    Corroborating FE 9's account, FE 5 stated that whether an account was DOA would

20  be reflected in the CLM system and that team members would put in the customer's disposition

21  notes that they were "DOA." Through these entries in the CLM system, FE 9 knew that ERP

22  renewals were only 15-25% and that 90% of the accounts that did not renew were DOA.  According

23  to FE 9, only approximately 10% of the customers that were DOA could be convinced to use the

24  product. FE 9 described that Customer Success reports based on information from CLM were

25  discussed in meetings with the VP and SVP of Customer Success.  Customer Success would put

26  together these reports, which FE 9 understood would be summarized and presented at a higher

27  level.

28

128.     FE 9 was told each renewal rate for accounts marked red, yellow, and green during quarterly management meetings. FE 5 similarly described how the number of DOA cloud deals was common knowledge within the customer success team and that "[a]t every quarterly business review DOA rates would come up," with the statistics of each type of customer health ("red," "yellow," and "green") seen in spreadsheets distributed during these meetings and the DOA rates were "always an issue."

129.     FE 5 explained that Doug Rhoades, the Senior Director of Customer Success, ran these meetings, and Steve McMillan, Senior Vice President of Customer Success attended the meetings as well.  FE 5 and his peers often complained to Rhoades that the DOA rates were so high and that there was no chance of convincing DOA customers to renew their cloud contracts.

130.     FE 7 stated that Oracles was "effectively hiding from customers the cloud portion [of the contract] because customers, in the beginning, didn't want to hear about cloud."  FE 7 reported that "in many cases," cloud subscriptions would be added to a customer's contract even though Oracle had never discussed that description with them.  "Sometimes they would only find out when someone asked them to renew, or if automated email systems sent out information about their cloud credits."

131.     FE 6 corroborated that customers often did not know cloud products were inserted in a deal or how to use those cloud products.  FE 6 stated that FE he heard from many sales representatives that Oracle "would bundle things together and push cloud subscriptions right through" and that customers did not "underst[and] what they were getting in terms of cloud."

132.     Similarly, in certain instances, FE 9 would reach out to customers to set up the product, the customer would ask what the product was and tell FE 9 that they were not going to pay for it. FE 9 would have to then report and justify why there was churn on the original product. When FE 9 raised these issues FE 9 "got [his] ass handed to [him] by the Sales VP and Sales."

133.     The accounts of Oracle's former employees confirm that Defendants Hurd and Catz were well aware that a substantial volume of Oracle's cloud revenue was generated through these attached deals, and was therefore illusory, unsustainable, and did not represent actual capture of market share.  For example, as numerous former Oracle employees stated, entries in Oracle's

internal deal tracking system clearly noted when cloud sales were the product of engineered deals, and deals at or above the $5 million threshold required and received Hurd's approval.

134.    Corroborating this point, FE 7 reported that entries on the DAS system would make clear when a deal was attached because the entry would request discounts to an Oracle on-premises contract in order to facilitate a cloud sale, and "notifications of larger deals would be sent to Catz's office for approval and to Hurd's office for inclusion in the [revenue] forecast." Likewise, as discussed above, FE 3 stated that software discounts in excess of 50% had to be approved by Defendant Hurd's office, and that virtually all attached deals involved on-premises discounts of this magnitude. FE 3 stated that 80% of his engineered deals went to Hurd's office for approval.

### 3.    Regulator Findings And Industry Experts Further Confirm Oracle's Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle Cloud Product

135.    The above accounts provided by Oracle's former executives have been corroborated by industry experts and the findings of one of the world's top anti-competition regulators, the National Economic Prosecutor's Office of Chile (the "FNE"). The FNE is Chile's chief "authority responsible for defending and promoting competition in all markets or productive sectors of the Chilean economy."[31]

136.    The FNE has long been recognized as a top enforcement agency, with the Chairman of the U.S. FTC publicly stating in 2011 that "Chile has one of the most advanced antitrust systems in Latin America."[32] Further strengthening its capabilities, the FNE, the Department of Justice, and the FTC entered into a cooperation agreement that provides "for antitrust enforcement cooperation and coordination."[33]

137.    On September 11, 2015, the FNE initiated an investigation into alleged anti-competitive conduct by Oracle. The investigation, which lasted over two-and-a-half years before its findings were made public, was comprehensive in scope and included, among other things, the

---

[31] http://www.fne.gob.cl/en/about-us/fiscalia-nacional-economica/

[32] https://www.justice.gov/opa/pr/department-justice-and-federal-trade-commission-sign-antitrust-cooperation-agreement-chile

[33] Id.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                    -42-

1   FNE (i) conducting a survey of 115 Oracle clients; (ii) gathering statements from 50 Oracle

2   representatives and employees; (iii) collecting additional statements from Oracle's customers,

3   competitors, former employees and experts; and (iv) reviewing policies and practices of the

4   company and their impact on competition.

5        138.   Oracle was advised of the FNE's investigation from the outset.  On September 16,

6   2015, Vanessa Facuse Adreucci of the FNE sent Oracle's representative, General Manager Rodrigo

7   Astorga, a certified letter informing Oracle of the inception of its investigation.  After advising

8   Oracle of the investigation, the FNE and Oracle remained in regular contact about the regulator's

9   inquiry and findings, with Oracle being provided a full opportunity to attempt to address and refute

10  the allegations.

11       139.   Throughout its investigation, FNE also requested information from Oracle that

12  specifically pertained to the audit process and the ABC deals. For example, on March 31, 2016,

13  FNE's Division Chief for Unilateral Abuse, Gaston Palmucci, sent a letter to Oracle requesting

14  that Oracle produce a complete list of clients in Chile and their addresses whose licenses had been

15  audited, analyzed and monitored by LMS between 2013 and 2016. On September 29, 2016, FNE

16  requested from Oracle: (i) any document or internal presentation related to audit-driven sales of

17  Oracle products for the years 2014-2016; (ii) any response to Oracle's LMS services quality survey

18  for clients between 2014 and 2016; and (iii) sales policies relating to the promotion of Oracle

19  products to clients negotiating with LMS between 2014 and 2016. On October 13, 2016, FNE also

20  asked for certain Oracle employees to testify at an FNE hearing, including an LMS principal

21  consultant and several sales personnel, including Territory and Account Managers and a Regional

22  Sales Director. Further, on November 17, 2017, FNE submitted a letter to Oracle requesting

23  information regarding the amount of sales generated through audits.

24       140.   FNE also requested information and documents from Oracle's customers similarly

25  pertaining to Oracle's audits and ABC deals. For example, on October 22, 2015, FNE's Division

26  Chief for Unilateral Abuse, Gaston Palmucci, sent a letter to the General Manager of certain of

27  Oracle's clients, such as Walmart and IBM, requesting the companies' representatives appear at a

28  hearing and assist with FNE's investigation.  Additionally, on April 28, 2016, FNE submitted a

questionnaire to 34 Oracle clients asking various questions, including whether an audit occurred and an infraction was found, and whether the client acquired additional Oracle products as a result any ensuing negotiation. Next, on September 26, 2016, FNE submitted letters to 21 Oracle clients asking for: (i) documents related to Oracle's audits and the "true up" processes, including audit reports, presentations, and letters; and (ii) emails related to the negotiation process between Oracle's clients and Oracle's sales and/or LMS for fines or purchases of new products. Then, on May 26, 2017, FNE submitted a letter to Oracle clients requesting further information regarding the auditing and negotiating processes, including: (i) whether, if an audit violation was found, the client had to obtain additional services or products from Oracle; (ii) all emails with Oracle's sales personnel or LMS related to negotiations, including emails pertaining to the purchase of new products.

141.    Following its lengthy investigation, the FNE prepared a 30-page report outlining its findings (the "Report") and requiring Oracle to agree to various reforms.  As stated in the FNE's March 28, 2018 Report, which was first made public in April 2018, "in the case of Oracle, it can be said that audits are used with relative frequency."[34]

142.    The FNE further found that, after informing customers that they were being audited, members of Oracle's sales department would enter the "auditing" process and propose "sales solutions" that were *not* "related to the [audit] findings detected."  Specifically, the FNE found that "'cloud' products or licenses that were neither wanted nor used by customers were incorporated into this [sale] solution."  As the FNE explained in its Report, "in the commercial proposals that follow an audit, [Oracle] includes cloud services that were not always wanted by the clients."

143.    The Chilean regulator found numerous customer complaints "in relation to Oracle's audit policy," with "clients repeatedly stat[ing] that contractual terms would appear in the audits that they did not know of."  The Chilean regulator further found that Oracle's "clients described consistently the way Oracle acted in this process [of auditing] as especially tough, with surprising

---

[34] The FNE Report is in Spanish. The quotations in this Complaint are English translations of the Spanish text. U.S. media sources reported on the FNE investigation in July 2018.

and costly results for the client companies, and in which [Oracle] applied contractual clauses that, the [Oracle] clients noted, they did not have any knowledge until they received the audit reports." The Chilean regulator emphasized how Oracle's audits frequently related to products that customers did not know they purchased, with 64% of Oracle's audits conducted on products that were "installed automatically."

144.    The FNE further highlighted that Oracle's use of its audits constituted an "abuse of a dominant position" – a violation of Chilean fair competition laws – and that Oracle's practice of misusing the audit process to generate unwanted cloud sales "could lead to a sale in the market contravening free competition."

145.    In an effort to stop Oracle from further misusing its "auditing" process to generate sales of unwanted product, the Chilean regulator insisted that Oracle institute a series of corrective measures.  These measures required Oracle to, among other things (i) "improve the information [provided to Oracle clients] about products related to those for which the clients have acquired a license, but that could have an additional cost and require a separate licensing contract"; (ii) "create a special contact for clients to address disputes and complaints"; (iii) "improve the visibility for [Oracle] clients of the tools that allow them to verify internally if Oracle products that have been download and/or are being used in their systems to be able to determine … if it is in compliance with Oracle's licensing policies"; (iv) "improve the information given in the letters that open and close the process of auditing"; and (v) "implement local training to the workers from the division called License Management Services of Oracle (LMS), which is in charge of the [Oracle] audits."

146.    While Oracle agreed to implement reforms mandated by the Chilean regulator, it refused to acknowledge any wrongdoing or that it engaged in the underlying practices. Specifically, Oracle stated that it "should be noted that the implementation of such measures does not constitute or represent an acknowledgement by Oracle of the commission of any anti-competitive conduct, nor the recognition of the existence of any risk related to free competition."

147.    The Chilean regulators' findings in its Report are also corroborated by the accounts of industry participants, which Oracle repeatedly discredited before and during the Class Period as spreading "conspiracy rumors."  For example, the advisory firm UpperEdge, which has advised

customers in over 700 audits, has explained that, based on its experience, if an Oracle "customer cannot develop a business case for migrating to Oracle's Cloud solutions, then Oracle will create one, and audits are one of the more common tactics we have seen effectively drive Cloud sales."[35]

148.    Similarly, research and advisory company Gartner, which services clients in 100 countries around the world, has explained that Oracle "uses high-pressure sales tactics to sell its cloud IaaS offerings, including software audits or threatening to dramatically raise the cost of database licenses if the customer chooses another cloud provider." [36]

149.    Finally, the advisory firm Palisade Compliance, which has advised hundreds of Oracle clients, has observed that Oracle, through its audits, attempts "to rig the system so customers are forced to use [their] cloud."[37]

### E.    The Truth About Oracle's Cloud Revenue Growth Emerges

150.    Eventually Oracle's unsustainable practices fueling Oracle's revenue growth began to collapse.

151.    Former Oracle employees have explained how Oracle's ability to deploy financially engineered deals slowed dramatically in late 2017, resulting in a slowdown in the Company's cloud revenue growth and decline in its stock price.  As FE 1 stated, cloud sales declined in late 2017 because customers were "becoming more knowledgeable and hiring consultants that helped them fight back" when the Company attempted to use audits to drive a cloud deal.  FE 1 said his own teams experienced this, and that his colleagues reported seeing this as well.

152.    FE 8 also stated that Oracle's use of engineered deals to drive cloud revenue ultimately led to plateauing cloud revenue growth towards the end of 2017. FE 8 said, "It just wasn't sustainable.  Customers were purchasing a million dollars of cloud subscriptions but

---

[35] Jeff Lazarto, "Oracle Gets Creative With Cloud Selling Tactics," *UpperEdge* (April 10, 2018).

[36] Founded in 1979, Gartner is a leading research and advisory company serving clients in 100 countries around the world.  Technology research is Gartner's flagship service and its reports have been cited in Oracle press releases, blog posts, and conference calls on several occasions.  Dennis Smith et al., "Magic Quadrant for Cloud Infrastructure as a Service, Worldwide," *Gartner* (May 23, 2018).

[37] *https://palisadecompliance.com/new-years-resolutions-oracle-should-make/* (January 2, 2019)

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                          -46-

weren't planning on making that same purchase next year.  They were not renewing.  They did it just for the deal and then would not renew the next year."  Without these renewals, Oracle's sales declined.

153.    As a result of these developments, beginning in December 2017, Oracle was forced to publicly report dramatically slowing cloud revenue growth, revealing to investors in a series of partial corrective disclosures the truth that Oracle's cloud revenue growth rates were illusory and unsustainable.

### 1.    On December 14, 2017, Oracle Reports Stagnating Cloud Growth

154.    Leading up to the Company's second quarter 2018 earnings release on December 14, 2017, analysts and commentators continued to trumpet the tremendous cloud growth Oracle had reported throughout the year and repeat the Company's statements touting its cloud pipeline and renewals.  For instance, Trefis analysts reported on December 12, 2017 that:

> Oracle's IaaS, PaaS, and SaaS revenues grew at high double digits through the year, with the trend expected to continue through fiscal 2018 as well.  Oracle's cloud segment has been the only revenue stream to witness growth in recent years.  Fiscal 2017 was termed as a turnaround year for Oracle in terms of transitioning its customers to cloud-based offerings, with revenues jumping 50% to $3.6 billion. The trend has continued in FY'18 thus far, with robust revenue growth across cloud services segments.

155.    However, after the market closed on December 14, 2017, Oracle surprised investors by reporting that cloud revenue growth had decelerated, growing by less than 40%.  Oracle's growth compared unfavorably to, among others, the 90% year-over-year growth reported by Microsoft less than two months earlier, and the 76% growth reported by Google Cloud.  Oracle also reported disappointing cloud margins, which was a function of the fact that Oracle's cloud volume was ramping far less quickly than its competitors.  Moreover, the Company reported significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a marked decline.

156.    Analysts and the financial press expressed concern about Oracle's slowing cloud growth and the sustainability of its cloud business.  For instance, BMO analysts lowered their price target for Oracle shares from $57 to $55 on December 15, 2017, reporting as a "key point" that "a

major concern for investors is the long-term growth of cloud revenue, particularly the SaaS business, given the revenue miss and lower guide." *Dow Jones Newswires* also reported that "Disappointment over Oracle results triggers downgrade, price cuts," and "[a]nalysts were sounding some alarm after Oracle Corp. literally clouded up the view on a vital metric for growth, disappointing investors and analysts over both its results and forecast."

157.    Investors and analysts also connected the disclosure to Oracle's sales practices, including the *Business Insider*, which noted in a December 15, 2017 article that "there are some signs that *some of Oracle's customers are fed up with some of its hard-nosed sales tactics*." Additionally JMP analysts noted in a December 15, 2017 report that "*many customers are irate with Oracle due to auditing practices* on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

158.    In response to Defendants' disclosures, Oracle stock declined by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15.

### 2.    On March 19, 2018, Oracle Reports That Its Cloud Growth Slowed Even More Significantly

159.    On March 19, 2018, Oracle issued its third quarter 2018 financial results, disclosing that the Company's cloud growth had slowed even more significantly to only 32%. Again, Oracle's reported cloud revenue growth stood in stark contrast to its competitors. In comparison, for the same quarter, Microsoft announced cloud growth of 98% and Google experienced 85% cloud revenue growth. Oracle's cloud margins were again disappointing, coming in at 58.1%, which is far from the 80% Defendants had assured investors Oracle would achieve. In addition, Oracle admitted that it expected additional deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," well below the market's expectations.

160.    Analysts and commentators expressed deepening concern about Oracle's cloud business. For instance, in a March 20, 2018 article entitled "Oracle's cloud biz heading in the wrong direction right now," *TechCrunch* reported that "Oracle's cloud numbers could be reason for concern . . . . [T]he general trend from Oracle seems contrary to the eye-popping growth

numbers we have seen from other companies."   In a March 20, 2018 report entitled, "Cloud Decelerates Again," Deutsche Bank analysts observed that apparently "strong SaaS bookings are not translating to rev[enue]s growth," in part because of what appeared to be "slow Cloud Machine deployments" by clients who purchased cloud – *i.e.*, despite reporting growing cloud sales, the Company did not appear to be achieving sustained revenue due to cloud customers not actually using the product.   The market linked Oracle's faltering revenues to the use of the practices described herein, including in a March 20, 2018 JMP analyst report, which highlighted Oracle's "cloud weakness," including that there were "fundamental challenge[s]" in the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon."

161.   In response to the Company's March 19, 2018 disclosures, Oracle stock price declined nearly 10%, from $51.95 per share on March 19 to $47.05 per share on March 20, on high volume.

162.   In the months following this partial corrective disclosure, investors' questions about Oracle's coercive sales practices intensified.   In a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," *Forbes* reported that Oracle was using its "'Audit Bargain Close' playbook" to "pressure customers into cloud adoption" and added that:

> That hardly seems like a great business retention strategy, but given Oracle's power over its customer base that comes from its licensing and compliance practices, it is a powerful tool. It does lead to more sales in the cloud category, which is just [what] Oracle wants. But it leads to questions that should be disturbing to Oracle customers and possibly to Oracle employees and investors: Has Oracle shifted its core competency from creating technology products to running an enterprise sales staff that is expert in squeezing customers? Is Oracle's cloud technology less important to its revenues than its cloud promotion practices? Will Oracle ever reveal how much of its cloud sales are actually shelfware?

163.   Oracle, however, continued to deny that these concerns had merit.   For example, on May 22, 2018, *The Information* published a report titled "***Oracle's Aggressive Sales Are Backfiring With Customers***."   In the report, the authors quoted an anonymous Oracle employee, who accused Oracle of coercing customers to "strike [cloud service] deals to avoid expensive audits of how they were using Oracle software." The article also reported that Oracle had attempted

to use the tactic to coerce toy-maker Mattel, Guardian Life Insurance, and Southern California Edison into doing large cloud deals, but they refused, choosing instead to pay steeper penalties. The article further reported that, according to the employee, Mattel told Oracle that it "was 'not strategic' as a cloud partner" and chose to continue its relationship with Microsoft Azure.

164.   Oracle denied *The Information's* report, claiming it was based on "inaccurate accounts" fabricated by "anonymous sources or competitors" and stated that "Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. ***We are disappointed that The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services***."

### 3.    On June 14, 2018, JPMorgan Releases a Large-Scale CIO Survey Showing That Oracle Is "Trailing In Cloud Computing Plans"

165.   On June 14, 2018, JP Morgan issued a report that – contrary to Oracle's statements to *The Information* and elsewhere – further indicated to the marketplace that Oracle's cloud business was suffering as a result of its coercive tactics.  Specifically, JPMorgan issued a report announcing it was downgrading Oracle shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to their IT environment in the future."

166.   JPMorgan reported that while, in the past Oracle "has been stable and received ~11% of the votes," the Company's standing in this latest poll dropped by ***more than 40%*** to a mere 6.5%.  The analysts stated that these results made them "uncomfortable because the results of our CIO surveys over the years have been highly predictive" of sales trends.  The JPMorgan analysts concluded:

> [W]e ask the following: if the largest-scale CIO survey shows ORCL now has negative spending intentions; and ORCL is lagging in Digital Transformation projects; and ORCL is trailing in Cloud Computing plans; and its criticality as a

mega-vendor has fallen to new lows; and ORCL databases are being unplugged in favor of Microsoft and Amazon databases; and ORCL applications are being unplugged in favor of Salesforce and Workday applications; and customers are weary of ORCL's unpopular commercial tactics – then where is this business and this stock heading in the next couple of years?

167.   JP Morgan further discussed the "Specific Reasons for Declining Oracle Spend," stating that reasons that the CIOs moved away from Oracle included that "they do not like Oracle's 'business practices and the difficulty of working with them in the past.'" JP Morgan further stated that the CIOs are "moving off of Oracle Business Intelligence Cloud Service because they have not found value in it."

168.   On this news, the price of Oracle stock fell approximately 5%, from $48.27 per share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume.

**4.      On June 19, 2018, Oracle Reports Additional Cloud Slowdowns And Stuns Investors By Announcing It Will No Longer Report Cloud Business Financial Results**

169.   On June 19, 2018, Oracle held its fourth quarter 2018 earnings call with investors. On that call, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business, and would, instead, consolidate those financial results into a combined "Cloud Services and License Support" line item so that investors could no longer see them.  In addition, under pressure from analysts on the call, Catz disclosed total cloud revenue growth for the quarter had come in at a lackluster 21%, demonstrating that Oracle's cloud business had slowed to crawl, and making clear the impetus behind the Company's desire to hide its cloud results. Oracle also declined to provide separate guidance for cloud revenues going forward. PiperJaffray reported on June 20, 2018 that Oracle had informed it that the "reporting change was driven by Larry Ellison."

170.   As the market immediately recognized, Oracle's decision to shield its cloud results from public view meant that the Company had something to hide, and that the welfare of that business was in jeopardy.  In a June 20, 2018 report, William Blair analysts concluded that "it is an attempt to ***pull the proverbial wool over investors' eyes—particularly related to cloud sales***," and was "the main factor driving the stock down in the aftermarket, given the importance of cloud services growth (into which investors now have less visibility) to the bull thesis."  RBC analysts

reported on June 19 that Oracle's move was a "*[r]adical change in disclosure*," while Oppenheimer analysts reported on June 20 that the change was "a *red flag*" that "masks visibility and raises concerns about the performance and trajectory of the cloud business." JPMorgan analysts similarly reported on June 20 that "*Oracle's sudden decision to discontinue the disclosure of detailed cloud revenue obfuscates one of the most important metrics to gauge the cloud transition story*." (emphasis in original).

171.    Analysts also reported that Oracle's stated rationale for the move – namely, that it was hard to distinguish cloud revenue from more traditional on-premises revenue – was not credible.  For instance, *TechCrunch* reported on June 20, 2018 that John Dinsdale, an analyst with Synergy Research, a firm that analyzes the cloud market, stated, "when a company chooses to reduce the amount of financial detail it shares on its key strategic initiatives, that is not a good sign. I think one of the justifications put forward is that is becoming difficult to differentiate between cloud and non-cloud revenues. If that is indeed what Oracle is claiming, *I have a hard time buying into that argument. Its competitors are all moving in the opposite direction*." Confirming the point, *TechCrunch* reported that "the bigger players have been more open about this. For instance, in its most recent earnings report, Microsoft reported its Azure cloud revenue grew 93 percent. Amazon reported its cloud revenue from AWS was up 49 percent to $5.4 billion in revenue, getting very specific about the revenue number."

172.    Other analysts agreed that Oracle's explanation was not credible – and further reported that Oracle's radical disclosure change undermined Defendants' prior statements.  For example, Deutsche Bank reported on June 20, 2018 that:

> The decision to stop disclosing any key cloud metric is *at odds with Oracle's own multi-year effort to pitch itself as a leading cloud vendor* and materially limits investor visibility into Oracle's growth engine . . . . *We're not convinced by Oracle's explanation that the on-premise and cloud boundaries are blurring.* … This move implies that Oracle's cloud growth is largely coming from <u>existing</u> database/apps migrations, not new logos or workloads . . . .

173.    Similarly, on June 20, 2018, JMP analysts reported that, "We think it is worth remembering that, as little as three quarters ago on the F1Q18 earnings call, Oracle was focusing investors on cloud growth."

174.    Notably, JMP further reported that the dramatic deceleration in Oracle's cloud growth was driven by the Company's treatment of its customers:

We think Oracle would benefit from shifting its focus away from winning and toward customer success . . . . Last night, we spoke with an industry contact that underscored Oracle's lack of focus on customer success as he provided his perspective on ORCL's decision to deemphasize the cloud metrics. He stated: *"No one is re-upping. There was a big incentive to sell cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was no customer success to say, 'Hey, you bought this, now let's get value from it."*

175.    Similarly, *The Upper Edge* reported on June 27, 2018 that the fall-out from Oracle's coercive sales tactics was causing its plummeting cloud numbers.  In an article entitled "What Oracle Doesn't Want You to Know," *The Upper Edge* reported that "[m]any analysts are speculating that the timing of this change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud growth, suggests that it may have something to hide." The article stated that Oracle had "Poor Cloud Application Performance" and that "[w]e have worked with customers that have deployed Oracle's SaaS applications for a number of years and we have yet to hear a success story that did not require much more work than anticipated just to get the system running in production and stable, let alone delivering the expected business value." *The Upper Edge* noted that Oracle's "Cloud Deals [were] Manufactured by Duress:"

Oracle claims there is a potential compliance issue that will cost the customer millions of dollars. This can be done either after an audit has been completed, even though the compliance claim may be in dispute, or prior to initiating an audit based on some sort of claim that Oracle believes there is a compliance issue. Oracle creates a big fuss and may even threaten to terminate licenses or launch into a full-scale audit unless the fees are paid immediately. Then the Oracle sales rep steps in and says they can significantly reduce the compliance fees owed or eliminate the audit if the customer makes a purchase that includes some sort of cloud service.

176.    Further, the article stated that when a customer needs to purchase additional licenses for on-premise products, the "sales rep steps in and says they can significantly improve the pricing if the deal includes a cloud services purchase. We have seen a number of customers sign up for cloud services with no intention of ever using them simply because the overall cost was lower when compared to buying just the additional on-prem licenses they required." *The Upper Edge* article went on to state that:

The issue with these two scenarios is that these deals do not represent customer demand for Oracle's cloud solutions. … These scenarios are what Oracle means when they refer to cloud sales to existing on-prem customers as new workstreams. It is code for an existing customer buying a cloud solution they did not require and that is not replacing a current Oracle on-premise licenses product set. Oracle's hope is that the customer will use the solution since they have the right to do so and will hopefully find value and renew and expand the service in the future. This is a key distinction between the true customer-driven demand vs. a coerced trial period that may lead to demand.

177.    As a result of Oracle's revelations that its cloud business growth had ground to a near-halt, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

178.    Numerous facts, in addition to those discussed above, support a strong inference that Defendants knew, or were deliberately reckless in not knowing, that Oracle's cloud growth and revenues were fueled by the improper and extortionate sales and audit practices detailed below.

### A.    Defendants Knew And Had Access To Information Undermining Their Statements to Investors

179.    Defendants knew and had access to information demonstrating that Oracle generated cloud revenue growth through audits and attached deals.  As detailed above, numerous former Oracle employees, including FE 1, FE 3, and FE 7 explained that Defendants Hurd and Catz approved Oracle's engineered cloud deals through the DAS system.  As these former Oracle employees explained, entries on DAS made clear whether a cloud deal was closed using the ABC scheme, as well as whether it was an attached deal.  DAS entries specified whether a deal was audit-driven, whether LMS was engaged as part of the sales process, and whether steep discounts were requested as part of an attached deal.  Moreover, multiple former Oracle employees independently confirmed that Defendants Hurd or Catz had to sign off on large deals and deals that included a steep discount, as virtually all attached deals did.  FE 1 further stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd or Catz signed off on the deal.  Likewise, FE 3 stated that 80% of FE 3's engineered deals went to Hurd's office for approval and that he personally had "audit cloud deals," clearly marked as such, that were approved by Hurd.

180.    FE 1 also described presentations he prepared specifically for Hurd's consumption that "would very clearly say that LMS was engaged" on cloud deals and that "they were compliance deals."  FE 2 similarly reported that presentations going to Hurd's direct reports showed that 90-95% of the Company's North American cloud sales had no use cases associated with them, demonstrating that they were not driven by actual customer need.  FE 2 stated that "[a]mong all of Hurd's direct reports, there was absolute awareness that there were issues with the quality of the cloud revenue."  FE 2 stated, "I saw presentations that went to Hurd's directs. I saw the info they were receiving about deal quality and it was absolutely something that was discussed."

**B.      Prior To Making Their Class Period Misstatements And Omissions, Defendants Were Informed Of Allegations That Oracle Generated Artificial Cloud Revenues Through Coercive Audits And Sales Tactics**

181.    Both prior to and during the Class Period, multiple sources informed Defendants of Oracle's illicit audit and sales activities designed to inflate the Company's cloud revenues.  For example, as discussed above, on May 7, 2014, Clear Licensing representatives met with high-level Oracle executives, including Oracle's Senior Director Global Operations within LMS, and informed them of LMS's "questionable sales tactics," with "LMS activity leading to sales engagement."    *See* ¶56.  Later, on November 3, 2014, Clear Licensing sent Oracle's Senior Director Global Operations a written report providing the results of Clear Licensing's survey of a hundred Oracle customers, together with summaries of customer accounts bolstering Clear Licensing's findings of LMS's abusive audit and sales practices. *Id*.  Thereafter, on January 6, 2015, after having received no meaningful response from the Company, Clear Licensing sent a letter to Defendant Ellison and Oracle's Board, including Defendants Hurd and Catz, informing them of the customer survey results, expressing concern that Oracle's audits were being used to improperly generate cloud revenues, and warning them of Oracle's inability to meet its stated $1 billion cloud sales target next year if these practices continued to go unaddressed. *See* ¶57.

182.    Defendants also knew and had access to media reports published prior to and during the Class Period, which the Company denied, detailing Oracle's coercive audit and sales practices.

For example, immediately following the public release of Clear Licensing's January 6, 2015 letter, multiple media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's "scathing report" and prediction "that Oracle will struggle to move to the cloud unless it changes its ways." *See* ¶59.  Months later, the financial press published additional reports recounting allegations from various sources, including unnamed Oracle customers, that the Company was misusing its "audit" process to generate artificial cloud revenues, including pressuring customers to buy "cloud products they don't need." *See* ¶60.

183.    Defendants were further informed of allegations of Oracle's coercive audit and sales tactics prior to the Class Period through the Chilean regulator FNE's comprehensive investigation, which ultimately found that Oracle pushed cloud-based products to resolve audits even when the customer did not want cloud. *See* ¶135-146.  Specifically, in September 2015, the FNE informed Oracle that it had opened an investigation into Oracle's licensing and audit practices. *See* ¶137.  During its investigation FNE specifically asked Oracle for information concerning its auditing practices and attached deals, including: (i) documents or internal presentations related to sales as a result of an audit; (ii) policies related to the promotion of Oracle products to customers negotiating with LMS; and (iii) information concerning the amount of sales generated through audits or "true up" processes. *See* ¶140. That Defendants made their misstatements and omissions in the midst of a regulatory investigation and in the face of specific accusations of wrongdoing further supports the scienter inference.

## C.    Defendants Specifically Denied The Allegations That They Were Using Audits To Close Cloud Sales

184.    Both prior to and during the Class Period, Defendants were also directly asked about allegations regarding the Company's abusive sales and auditing practices to boost cloud revenue, and in response, they denied that there was any misconduct and falsely attributed the Company's cloud business growth to legitimate business factors.

185.    As set forth above, prior to making their Class Period misstatements and omissions, Defendants were informed by, among others, Clear Licensing, media reports and the FNE of allegations of Oracle's improper licensing and audit practices.  However, with each of these

1   sources, Oracle denied the accusations.  Indeed, Oracle told investors as early as June of 2015 that

2   media reports regarding the Company's improper auditing practices were "absolutely not true" and

3   "conspiracy rumor," assuring that "[i]t would be wrong to force a [customer] to do something

4   that's against their will."

5        186.   Defendants' pattern of making such false denials continued throughout the Class

6   Period, including in response to analysts' specific inquiries.  For example, on May 9, 2017, an

7   analyst questioned Defendant Bond about the importance of audits as a driver of revenue growth

8   and whether he could provide "some sort of indication as to what percentage of revenue and margin

9   is associated with auditing practices of customers." In response, Defendant Bond denied that the

10  Company's audit practices were driving its revenue growth, stating that "[t]his is one of those

11  things where – gets talked about a lot. And I think this is one of those things where the story is a

12  lot bigger than the realities." Defendant Bond further assured investors that Oracle did not use

13  extortive audits, stating that "we try to do it as best we can, in as gracious [a] way as we can" and

14  that "as we go to cloud, we don't have to worry about that anymore."

15       187.   Similarly, during the Class Period Defendants repeatedly denied media reports of

16  Oracle's abusive auditing practices, consistently characterizing them as "inaccurate accounts."  For

17  example, following a May 22, 2018 report by *The Information* that Oracle used the threat of audits

18  to drive cloud sales, the Company publicly responded that it had "no reason to resort to scare

19  tactics to solicit business" and was "disappointed that The Information is presenting inaccurate

20  accounts regarding a handful of customers, based on anonymous sources or competitors who seek

21  to enhance their own consulting services."

22       188.   Likewise, Defendants made further false denials by repeatedly attributing the

23  Company's "astonishing" cloud business growth to legitimate business factors and assuring

24  investors that Oracle's "hypergrowth" in the cloud revenue was sustainable.  For example, on the

25  September 14, 2017 earnings call, Defendant Hurd claimed that the Company's cloud growth was

26  due to the fact that "[w]e're better – our products are better. Our sales force is better. Our ability

27  to implement is better." Similarly, at the November 7, 2017 industry conference, Defendant Bond

28  explained why customers were purportedly moving from on-premise to cloud, stating that **"from**

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                    -57-

a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early."  Finally, throughout the Class Period, Defendants also falsely denied that Oracle's cloud growth was the product of short-term sales tactics, including when Catz stated on the June 21, 2017 earnings call that cloud revenue growth was "absolutely not a 1-year phenomena."

189.    Defendants' repeated denials of wrongdoing in response to repeated analyst questions and media reports, coupled with their false assurances to investors of the Company's legitimate sales practices, further support a strong inference of scienter.

### D.    Oracle's Use Of Engineered Deals To Drive Cloud Sales Was Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units

190.    As discussed above, numerous senior former sales executives in Oracle's North American operations (including FE 2, FE 3, FE 4, FE 6, FE 9, and FE 5), Middle East and Africa operations (FE 1), and European operations (FE 7) all gave highly corroborative accounts detailing the widespread use of the ABC scheme and attached deals to drive significant cloud revenue for Oracle.   These accounts describe the same deal mechanics implemented widely across the Company by the entirety of Oracle's sales personnel, with detailed information about the substantial volume of ABC and attached deals all flowing towards Hurd and Catz (including through the DAS system) for years at a time.

191.    Moreover, Oracle's deployment of the ABC deals required a high degree of coordination between sales and LMS departments all over the world.  The high degree of overlap, replication, and coordination in the implementation of the ABC and attached deal scheme, as well as the ubiquitous use of these tactics by an army of Oracle employees over different departments in different parts of the world for years on end, further strengthens the inference that Defendants knew or, at minimum, were deliberately reckless in not knowing of the misstated and omitted facts.

### E.      Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Class Period, Underscoring Its Efforts To Obscure Declining Growth

192.    Defendants' attempt to conceal Oracle's deteriorating cloud revenues further supports the scienter inference.  As discussed above (*see* ¶¶169-77), in June 2018, Defendants dramatically changed Oracle's financial reporting of cloud revenues.  Specifically, Oracle stopped separately reporting financial results for its cloud business, instead consolidating those results into its legacy "on-premises" business.  In so doing, they attempted to – and did – mask the Company's deteriorating cloud performance, which was no longer powered by a huge volume of deals completed through coercive sales tactics and audits.

193.    Oracle's sudden and drastic change in its financial reporting is particularly suspicious when considered in the context of Oracle's prior decisions to report separately their cloud and non-cloud revenues.  In September 2015, the Company heralded its decision to separately report its cloud and non-cloud revenues, as it would "better reflect how we look at the Company now that cloud has become a significant contributor to revenue."  Then, in June 2017 the Company announced that it would start disclosing additional details regarding its "cloud revenues," including breaking out cloud SaaS revenue separately from cloud PaaS/IaaS revenue.  Oracle touted this additional "cloud" disclosure at the time as a "significant improvement in our financial reporting to align with how we are running the business now" because the "cloud has become our predominant growth vehicle."  That Oracle would suddenly eliminate its critical "cloud" revenues disclosures – just twelve months after introducing additional disclosures to "significant[ly] improv[e]" in its financial reporting – further strengthens the scienter inference.

194.    Indeed, Oracle's top competitors – including Amazon, Microsoft, and IBM – separately reported (and continue to separately report) their "cloud" and "non-cloud" revenues, ensuring that investors are given "a clear view of [their] cloud growth."  Such disclosure is valuable because "[s]oftware is moving to the cloud, and without explicit, easy to understand, non-changing

data, it is going to be difficult for investors to correctly appraise the more valuable recurring Cloud business."[38]

195.    Analysts' contemporaneous reaction to Oracle's about-face change in its financial reporting further demonstrates its suspicious nature.  William Blair concluded the change was "an attempt to pull the proverbial wool over investors' eyes—particularly related to cloud sales." Oppenheimer identified the reporting change as "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business."  JPMorgan similarly characterized the change as an attempt to "obfuscate[] one of the most important metrics to gauge the cloud transition story." and *The Upper Edge* characterized the change as "suggest[ing] that [Oracle] may have something to hide."  Analysts also correctly found Oracle's stated rationale for the move – i.e., that it is difficult to distinguish cloud revenue from traditional on-premises revenue – dubious, stating that they had "a hard time buying into that argument" and that they were "not convinced by Oracle's explanation," particularly given Oracle's "multi-year effort to pitch itself as a leading cloud vendor" and that Oracle's cloud competitors were all reporting these figures.

## F.    Defendants' Statements Touting Oracle's Cloud Growth Concerned The Single Most Important Issue Facing The Company During The Class Period

196.    Oracle's "move to cloud" was, as Defendant Catz publicly told investors,  "the biggest and most important opportunity in our Company's history."  Defendant Catz echoed these sentiments at Oracle OpenWorld in the beginning of the Class Period, stating that "[m]oving to the cloud [wa]s the single largest opportunity and we have to face it."[39]  Defendant Hurd likewise stated that "[t]his movement to cloud, this is an inevitable destination as opposed to an interesting turn,"[40] and that "[t]he move to the cloud is not just a technical thing; this is a business model,

---

[38] Jordan Novet, "Oracle Falls 7% After Company Reduced Visibility Into Its Cloud Business," *CNBC* (June 20, 2018).

[39] Sohini Bagchi, "Digital India Driving Growth For Oracle: CEO Safra Catz," *CXOtoday.com* (May 9, 2017).

[40] Stephanie Condon, "Oracle CEO Mark Hurd: AI Shouldn't be a standalone application," *ZDNet* (October 2, 2017).

generational change about how we think about IT."[41]   Defendant Hurd further stated that the cloud market presented a "tremendous opportunity for us to grow and blow way past $10 billion" in revenue.[42]   Likewise, Defendant Ellison told investors during the Company's November 2017 annual shareholders meeting that "[w]e expect the bulk of our business going forward, and the bulk of our growth will be driven by our public cloud business."

197.   Oracle's need to generate revenues through its new cloud offerings was particularly acute because demand for its on premises products was declining.   Wall Street recognized the importance of Oracle's transition to the cloud.   As the USA Today explained, "Oracle's future and relevance [wa]s pinned on its ability to become a bigger player in cloud."[43]   In December 2017, *Forbes* further described how "Oracle's cloud segment has been the only revenue stream to witness growth in recent years," adding that the "trend is likely to continue in the coming years."[44]   Media reports additionally stated that the "cloud has become a matter of existential importance to Oracle as its legacy business of selling software licenses and hardware products erodes in the face of a growing enterprise preference for usage-based application and infrastructure subscriptions."[45]   Analysts further explained that "[w]ithout aggressive action to significantly increase non-database [i.e., cloud] revenue, we do not believe Oracle can offset the oncoming decline in commercial database revenue fast enough to maintain its present valuation," adding that "Oracle needs an even more radical and rapid organizational and cultural shift toward 'cloud-first.'"[46]   Finally, further demonstrating its importance to the Company and its investors, Oracle's cloud revenues were

---

[41] "Mark Hurd Chief Executive Officer" Oracle NetSuite company profile.

[42] Anita Balakrishnan, "Oracle CEO pushes back on challenge from Salesforce: 'Are you kidding me?'" *CNBC* (May 4, 2017).

[43] John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today* (April 26, 2017).

[44] Trefis Team, "Oracle Earnings Preview: Cloud-Based Segments To Continue To Drive Growth," *Forbes* (December 12, 2017).

[45] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not infrastructure. Yet." *diginomica* (January 24, 2017).

[46] John Freeman et al., "The Death Of The Commercial Database: Oracle's Dilemma," *Seeking Alpha* (February 10, 2017).

1   discussed by Defendants and investors on every earnings call during the Class Period, occupying

2   the vast majority of the executives' discussion and analyst inquiry.

3       198.    Given the "existential" import of cloud to Oracle and its future, Defendants knew

4   – or were deliberately reckless in not knowing – that its cloud revenues were driven by illusory

5   "sales" completed through coercive audits and attached deals.

6   **G.    Defendants Stated That They Were Deeply Focused On Oracle's Cloud**
        **Revenues**

7

8       199.    Defendants stated that they were acutely focused on the Company's cloud revenues.

9   Beginning in late 2012, Defendant Ellison stated that "over the next couple of years senior

10  management down to individual programmers and sales people are focused on one thing:  selling

11  applications in the cloud, selling our platform in the cloud and selling our infrastructure in the

12  cloud," echoing that the Company was "laser-light focused" on cloud.[47]  A year later, Defendant

13  Hurd reinforced to investors that "[w]e are very focused on the cloud."[48]  Once again, in 2016,

14  Defendant Catz told investors that, "as you know, our focus is now on cloud" and that "[w]e had

15  leading products to begin with, but we started and rewrote them all, focused exclusively – really

16  focused on the cloud."   During the Class Period, the Company's executives continued to assure

17  investors that they were singularly focused on "cloud revenues," with Defendant Hurd telling

18  investors that his "focus" was on the "transformation to the cloud."[49]  That Defendants were, by

19  their own admissions, "very focused" and "laser-focused" on the Company's cloud business and

20  revenues further strengthens the scienter inference.

21

22

23

24  [47] Steffanie Marchese, "CNBC EXCLUSIVE: CNBC TRANSCRIPT: ORACLE CEO LARRY
    ELLISON SITS DOWN ONE-ON-ONE WITH MARIA BARTIROMO TODAY ON CNBC,"
25  *CNBC (*October 2, 2012).

26  [48] Rachel King, "Oracle's Hurd defends cloud strategy in light of exec shuffle," *ZDNet* (September
    29, 2014).

27  [49] Steven Bertoni, "PODCAST: Oracle CEO Mark Hurd On How A Tech Giant Can Stay Nimble
28  and Bet Big On Future Trends," *Forbes* (February 27, 2018).

**H.      Defendant Kurian Sold Hundreds Of Millions Of Dollars' Worth Of Oracle Stock During The Class Period**

200.      Defendant Kurian was, by his own account, responsible for leading Oracle's product transformation from on-site products to cloud services. *See* ¶33. At the same time that Defendants were touting the Company's cloud business, Kurian – who was deeply attuned to the true sources of Oracle's cloud revenues – was selling millions of his personal shares. Indeed, during the Class Period, Defendant Kurian exercised his options and sold nearly 4 million shares, reaping over ***$191 million*** in gross proceeds from insider sales.

201.      Defendant Kurian's sale transactions, which were made over the open market and not pursuant to any 10b5-1 plan, are set forth below:

| Defendant | Transaction Dates | Shares Sold | Price Per Share | Total Value ($) |
|---|---|---|---|---|
| KURIAN | 07/18/17 | 750,000 | $50.46 | $37,843,275 |
| KURIAN | 01/18/18 | 1,500,000 | $50.29 | $75,433,950 |
| KURIAN | 01/18/18 | 200,000 | $50.29 | $10,057,860 |
| KURIAN | 04/23/18 | 137,843 | $46.13 | $6,358,698 |
| KURIAN | 04/26/18 | 300,000 | $46.06 | $13,818,000 |
| KURIAN | 04/27/18 | 25,600 | $46.06 | $1,179,136 |
| KURIAN | 04/30/18 | 57,155 | $46.00 | $2,629,130 |
| KURIAN | 05/02/18 | 91,888 | $45.85 | $4,213,065 |
| KURIAN | 05/02/18 | 253,877 | $45.85 | $11,640,260 |
| KURIAN | 05/03/18 | 333,637 | $45.15 | $15,063,711 |
| KURIAN | 05/04/18 | 300,000 | $45.15 | $13,545,000 |
| **Kurian Totals** | | **3,950,000** | | **$191,782,084** |

202.      Kurian's sales, both individually and collectively, were unusual and suspicious in size and timing. For instance, in the first transaction that occurred on July 18, 2017, Kurian sold 750,000 shares at over $50 per share, reaping over $37.8 million in gross proceeds. The sale – which represented nearly 7% of Kurian's entire holdings – was made shortly after the Company announced positive fourth quarter fiscal year 2017 results on June 21, 2017, including that cloud

revenues had increased by 58% to $1.4 billion, that sent the Oracle's shares to a historic high for the Company.

203.    Similarly, with regard to the second transaction on January 18, 2018, Kurian sold 1.7 million shares again at a share price of over $50 for gross proceeds of approximately $85.5 million.  This sale represented about 15% of Defendant Kurian's inventory at that time.  The sale was made toward the end of the third quarter of fiscal year 2018, the period for which Defendants would later disclose – *after* Kurian unloaded his personal shares – that Oracle's cloud revenue growth had stagnated and that the Company forecasted significantly slower sales growth for its cloud business than its competitors.  When Oracle ultimately revealed this negative news to investors on March 19, 2018, the Company's shares plummeted by over 9.4% to $47.05.  Thus, Defendant Kurian's January 18, 2018 sale allowed him to avoid this loss and instead cash out on the artificially inflated stock price resulting from Defendants' misrepresentations and omissions.

204.    Likewise, Kurian's flurry of sales made over the course of 10 trading days in late April and early May 2018, amounted to 1.5 million shares, or 15.6% of Kurian's holdings, for gross proceeds of over $68 million.  Defendant Kurian made these sales at the end of the fourth quarter of fiscal year 2018, the period for which the public would later learn – *after* Kurian dumped his personal shares on the market – that Oracle's cloud growth had been artificially inflated as a result of the improper sales tactics described herein  Significantly, Kurian's sales were executed at a weighted average price of $45.63, a stark difference from the close price at the end of the Class Period on June 20, 2018 of $42.82, thereby yielding Kurian an additional several million dollars as a result of Defendants' fraud.

205.    Finally, Defendant Kurian's sales were inconsistent with his prior trading history.  Defendant Kurian sold a higher percentage of his available shares during the Class Period than in the previous period of the same length.  Indeed, Defendant Kurian sold *42.5%* of his available shares during the Class Period – which was nearly three-times the percentage of shares that he sold in the prior period of equal length. Specifically, during the prior period of the same length (December 8, 2015 to March 14, 2017), Kurian sold only 1,104,300 shares, or *15.5%* of his available shares, for gross proceeds of approximately $45.7 million.

206.   Defendant Kurian's unusually timed and outsized personal stock sales provide further support for the scienter inference.

## I.   The Executive Defendants Were Directly And Extensively Involved In Developing And Maintaining Oracle's Cloud Business

207.   Each of the Executive Defendants was directly and extensively involved in developing and maintaining Oracle's cloud business; the implementation and execution of Oracles' licensing, audit and sales policies and practices; and the day-to-day operations of the Company.

(a)   **Defendant Catz** played a key role in designing and implementing Oracle's strategy to transition its customers from on-premises software products to the Company's cloud offerings.  Catz spoke frequently to the financial press about Oracle's election to "move to the cloud," characterizing the strategy as "a generational shift in technology that [wa]s the biggest and most important opportunity in our Company's history."  In press releases and earnings calls, Catz frequently spoke about and held herself out as knowledgeable to both investors and analysts about the Company's reported financial results and forecasts, including Oracle's "hypergrowth . . . in the cloud," customer adoption of these products and sales pipeline, the factors driving the Company's cloud revenue, growth and forecasts, and whether such revenue and profitability were sustainable. Later, Catz spoke about and held herself out as knowledgeable about the principal reasons for reduced guidance in cloud revenue growth. Catz, who has served as a Company executive for the past 20 years and a member of the Company's Board since 2001, was also heavily involved in the day-to-day operations of the Company.  Indeed, Defendant Ellison described Catz as "[v]ery details-oriented," "the No. 2 person for some time," and "our first- ever, de facto chief operating officer."  In 2005, Defendant Ellison stated "[i]f I dropped dead tomorrow, Safra Catz would be the CEO of Oracle."  Catz's active involvement in Oracle's day-to-day operations is further corroborated by former Oracle employee accounts. Former Oracle employees' accounts demonstrate that Catz had personal knowledge as to how Oracle's cloud revenue was being generated by its sales team, including the specific volume of Oracle's revenue generated through engineered deals such as Audit, Bargain, Close deals. *See, e.g.*, ¶¶110, 134. In addition, Catz was actively involved in reviewing and approving specific sales transactions, including engineered

deals.  *Id*. Former employees reported that Catz reviewed and approved sales in excess of $5 million, as demonstrated by entries in Oracle's DAS database and internal documents, and that those sales included engineered deals.  *Id*. Former employees stated that the DAS entries for deals approved by Catz clearly indicated whether approved deals were audit-driven or attached. *See* ¶¶110, 111, 134.  In addition, Catz signed and certified the purported accuracy of each of the Company's quarterly and annual filings during the Class Period.

(b)     **Defendant Hurd** also played a key role in designing and implementing Oracle's strategy to transition its customers from on premises software products to the Company's cloud offerings.  Hurd repeatedly touted his "focus" on Oracle's transformation to the cloud and the Company's cloud products.  According to the Company's website, Hurd "manages corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support."  Hurd's bio page further represents that he "helped shift the long-term strategy of the company toward the cloud" and "[a]dapting to this new business model."  Hurd also spoke frequently to the financial press about Oracle's transition to the cloud, affirming that the Company was "determined to compete on every level of the cloud feature for feature."  Hurd further claimed to have familiarity with the quality of Oracle's cloud products, their importance to the Company's business prospects and implementation of sales strategies with respect to such products, including ERP.  For example, on the September 14, 2017 earnings call, Defendant Hurd attributed the Company's cloud growth to the fact that "[w]e're better – our products are better. Our sales force is better. Our ability to implement is better."  Throughout the Class Period, Hurd similarly spoke about and held himself out as knowledgeable to both investors and analysts about the Company's reported financial results and forecasts, including Oracle's growth rates for its cloud business and drivers for such growth. Hurd too was actively involved in Oracle's day-to-day operations. Hurd stated that he "stay[s] close to the action," earning him the description as an executive that "digs into details and is a hands-on manager that examines every alternative."  Hurd's hands-on management style is further supported by former Oracle employee accounts. Former Oracle employees' accounts demonstrate that Hurd had personal knowledge as

to how Oracle's cloud revenue was being generated by its sales team, including the volume of Oracle's revenue generated through engineered deals such as Audit, Bargain, Close deals. *See* ¶¶110-114, 133-34. Former employees similarly reported that presentations delivered and prepared for Hurd made clear that Oracle was using engineered deals to drive cloud sales.  These presentations "would very clearly say that LMS was engaged" on cloud deals, that those deals were "compliance deals," and that 90-95% of the Company's North American cloud sales had no legitimate "use case." *Id*.  In addition, Hurd was actively involved in reviewing and approving specific sales transactions, including engineered deals.  Former employees reported that Hurd reviewed and approved sales in excess of $5 million, as demonstrated by entries in Oracle's DAS database and internal documents, and that those sales included engineered deals.  *Id*. Former employees stated that the DAS entries for deals approved by Hurd clearly indicated whether approved deals were audit-driven or attached. *See* ¶¶110, 111, 134. In addition, in Hurd's role as a Board Director, he corresponded with industry participants regarding Oracle's licensing, audit and sales practices, and the letter from Clear Licensing's Counsel was addressed to him as a Board member.  *See* ¶¶57, 58. In addition, Hurd signed and certified the purported accuracy of each of the Company's quarterly and annual filings during the Class Period.

(c)   **Defendant Ellison** co-founded Oracle, was its longtime CEO and Board Chairman, and continues to remain actively involved in the Company's day-to-day operations as its Chief Technology Officer and one of its Board Directors.  In public filings, Oracle states that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched." Ellison's active involvement in designing and implementing Oracle's strategy to transition its customers from on premise software products to the Company's cloud offerings  is confirmed by Defendant Catz who credited Ellison as "le[ading] the transformation to the cloud," and has stated that Ellison is still "in charge" at Oracle even after becoming the Company's CTO in 2014, noting "don't let titles fool you."  Ellison also regularly spoke to the financial press about Oracle's pivot to the cloud.  Ellison further claimed to have familiarity with the quality of and

customer experience with Oracle's cloud products. Ellison likewise regularly spoke about and held himself out as knowledgeable to both investors and analysts about the Company's reported financial results and forecasts, including Oracle's growth rates for its cloud business and drivers for such growth, as well as customer renewal rates. Ellison also directed the manner in which Oracle's financials would be reported, including making the decision to no longer separately report cloud revenues in June 2018. In addition, in Ellison's role as a Board Director, Ellison corresponded with industry participants regarding Oracle's licensing, audit and sales practices, and the letter from Clear Licensing's Counsel was addressed to him. *See* ¶¶57, 58. In addition, Ellison signed the Company's 2017 Annual Report as a member of the Company's Board of Directors.

(d) **Defendant Kurian** by his own account, "led [the] transformation of Oracle's products with [the] introduction of leading suite of Cloud Services over 10 years." Market commentators similarly recognized Kurian's critical role in Oracle's cloud transition, noting "Kurian's chief responsibility has been to transition Oracle's traditional software -- which usually sits on corporate clients' own servers – to the cloud-computing age."[50] Kurian was actively involved in carrying out the day-to-day business associated with Oracle's cloud products. Kurian's colleagues described him as a hands-on manager, stating that he "likes to get involved in the minutia of various projects" and "does not sufficiently delegate responsibility." *See* ¶33. Kurian also dictated the new features Oracle added to existing cloud products. At press and industry conferences, Kurian frequently spoke about and held himself out as knowledgeable about the Company's cloud business, including its business partners, "tremendous growth," existing demand and new customers.

(e) **Defendant Bond** oversaw Oracle's investor relations and regularly spoke to investors about Oracle's business and the sources of its cloud revenues, including the driving factors for customers switching from on-premises to cloud, Oracle's cloud growth and customer renewals. Bond also repeatedly discussed and held himself out as knowledgeable about the

---

[50] "Oracle's Kurian Is Said to Be at Odds With Ellison on Cloud," *DataCenter Knowledge* (Sep. 12, 2018).

propriety of Oracle's licensing, auditing and sales practices, including by continually responding to media reports and analyst inquiries regarding the Company using audits to boost cloud sales.

(f)     **Defendant Miranda** was directly involved in operations, reporting, and investor relations, as well as executing on the Company's strategic initiatives with respect to its cloud product suite. The Company's website acknowledges that Miranda was "responsible for leading all aspects of product strategy, product development, and product delivery for the entire portfolio of Oracle Applications."  Oracle's website further states that "Miranda's primary focus is on delivering the industry's most complete, proven, and innovative set of cloud solutions." Miranda also publicly claimed to have knowledge about the quality and features of Oracle's cloud products.  Miranda also frequently spoke to investors about Oracle's cloud business, professing to know the reasons why customers were purportedly choosing Oracle's cloud products.

208.    The Executive Defendants' deep involvement in the Company's operations and cloud business in addition to the many other factors discussed above further strengthens their scienter inference.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Defendants' Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017

209.    The Class Period begins on March 15, 2017.  On that day, Oracle issued a press release announcing its financial results for the third quarter of fiscal year 2017, and filed that press release with the SEC on Form 8-K.  The press release stressed the Company's growing cloud revenue, stating that, "Total Cloud Revenues, including infrastructure as a service (IaaS), were $1.2 billion, up 62% in U.S. dollars [year-over-year] and up 63% in constant currency."

210.    Oracle's March 15, 2017 press release also quoted Catz, who emphasized Oracle's "hypergrowth" in cloud – including 85% for two key cloud businesses, SaaS and PaaS –  and the positive impact of this volume growth on "nearly every important non-GAAP business metric," including both cloud and total margins:

The *hyper-growth we continue to experience in the cloud has rapidly drive both our SaaS and PaaS businesses to scale* .... [O]ur SaaS and PaaS businesses grew at the *astonishing rate of 85%* in Q3. ... *Our new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect*; total revenue is up, margins are up, operating income is up, net income is up, EPS is up. Take a look. Q3 was a very strong quarter.

211.   These statements were materially false and misleading when made.   It was misleading for Defendants to report that Oracle's cloud revenues were $1.2 billion, and to state that Oracle's cloud business had experienced "hypergrowth," including 62% growth in total cloud revenue year -over-year and "astonishing" 85% year-over-year growth in SaaS and PaaS  while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

212.   Also on March 15, 2017, Oracle held its fiscal third quarter 2017 earnings conference call.  On that call, Catz trumpeted Oracle's achievement of a key milestone in cloud, namely that cloud growth was now outpacing declines in the legacy on-premises business:

Our pivot to the cloud is now clearly in full swing. *We continue to see outside growth rates in our cloud business, especially when compared with our key competitors who are all seeing slowing growth*; but more importantly, *the increase in revenue from our cloud business has overtaken new software license declines on an annual basis* ....

213.   On that same call, Hurd also highlighted Oracle's cloud growth, stating, "Cloud revenue was up 72% and were now at an annualized $5 billion run rate .... SaaS/PaaS revenue was up 86%."  Hurd further stated that Oracle was "*the fastest-growing scale cloud business in the world*..."

214.   Finally, on Oracle's March 15, 2017 earnings call, Ellison also told investors that Oracle's cloud business was "growing rapidly."  Ellison stated, "*SaaS and PaaS are large, rapidly growing businesses for us. Together SaaS and PaaS grew 85% this past quarter*, but soon

infrastructure as a service will be growing even faster, and before long infrastructure as a service will become Oracle's largest cloud business. In summary, ***all of Oracle's cloud businesses are growing rapidly*** …."

215.   These statements were materially false and misleading when made.   It was misleading for Defendants to state that Oracle was seeing "outside growth rates in its cloud business," was "the fastest-growing scale cloud business in the world," and was "growing rapidly," and to report revenue growth rates noted above, while failing to disclose that (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

216.   Analysts and investors reacted positively to Defendants' misleading statements about Oracle's cloud growth.  For instance, a Cannacord analyst report dated March 15, 2017, stated that "Oracle, as it always does, spoke bullishly about its push into IaaS to counter Amazon and for now investors are believers." A Macquarie analyst report dated March 15, 2017 stated that "Oracle reported a solid third quarter, one of its best reports in years, even as the co. heads towards the tipping point in its cloud transition when cloud growth and margin scale are offsetting declines in new license revenues." Similarly, a Barclays analyst report dated March 16, 2017 stated "An Inflection Point? Oracle has had a tough transition to the cloud. However, management is now guiding for double-digit EPS growth in FY18 (partly helped by cost benefits from the recent hardware restructuring) and talks about increasing momentum around its IaaS business." A BTIG analyst report dated March 16, 2017 stated of Oracle's delivered strong F3Q17 results, that "we are continuing to see signs that we are at a material inflection point" in the Company's transition to cloud, and we "expect to see meaningful earnings growth in FY18 for the first time in three fiscal years" as a result of Oracle's "strong cloud revenue growth."

217.    As a result of Defendants' representations, Oracle's stock price significantly increased from $41.70 on March 15, 2017 to $44.29 on March 16, 2017.  Deutsche Bank reported on March 16, 2017 that "[t]he *key catalyst* for the after-market rally in the stock is the Cloud growth."

218.    On March 17, 2017, Oracle filed its financial results for the third quarter of fiscal 2017 with the SEC on Form 10-Q.  Oracle's March 17, 2017 Form 10-Q was signed by Defendants Catz and Hurd.  The Form 10-Q reported that total cloud revenues for the three months ended February 28, 2017 were $1.189 billion, and for the nine months ended February 28, 2017 were $3.211 billion.

219.    These statements were materially false and misleading when made.  It was misleading for Defendants to report total cloud revenues for the three months ended February 28, 2017 were $1.189 billion and for the nine months ended February 28, 2017 were $3.211 billion, while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

220.    On May 4, 2017, Oracle held a press conference announcing the addition of new partners to its Oracle Network Cloud Service, during which Defendant Kurian told investors that Oracle "continue[s] to see tremendous growth across our cloud business." Defendant Kurian was quoted in a related press release from the same day as stating that "[w]e continue to see tremendous growth across our cloud business."

221.    These statements were materially false and misleading when made.  It was misleading for Defendant Kurian to state that Oracle "continue[s] to see tremendous growth across our cloud business" while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit,

Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

222.  Additionally, on May 9, 2017, Defendant Bond presented at the Jefferies Technology Group Investor Conference. Defendant Bond told investors that Oracle's cloud growth was driven by customers "willingly making a choice" to abandon a multi-vendor IT strategy and consolidate their IT needs in Oracle, stating that "[a]s we move to cloud, the first thing that we see is we start to address more of the customer spend. The customers are willingly making a choice, where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle."  Defendant Bond also told investors that "[t]he good news" was that "growth in cloud is actually getting bigger."

223.  These statements were materially false and misleading when made.  It was misleading for Defendant Bond to state that Oracle's cloud growth was being driven by "customers [] willingly making a choice" to abandon a "multi vendor strategy" to consolidate with Oracle, and that these customer decisions were creating a "significant uplift in revenue for Oracle," without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

224.  Defendant Bond was also asked by an analyst to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers."

In response, Defendant Bond denied that Oracle used audits to drive cloud sales, stating that: "This is one of those things where – gets talked about a lot. ***And I think this is one of those things where the story is a lot bigger than the realities***." Defendant Bond further assured investors that the Company was not using extortive or coercive techniques with regard to its audits, stating that "***And we try to do it as best we can, in as gracious [a] way as we can.***" Defendant Bond further assured investors that could revenues were not being driven by the audits and, in fact, the transition to cloud would decrease any incidence of audits, stating that "[o]n the other hand, the key, as we go to cloud, ***is this conversation is going to go away***" and that ***"as we go to cloud, we don't have to worry about that anymore.*** Because when you're in the cloud, you basically have a number of users that you've signed up for."

225.   These statements were materially false and misleading when made.  It was misleading for Defendant Bond to deny that Oracle used audits to drive cloud sales, and that Oracle's audits were not coercive, without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

226.   On May 10, 2017, Kurian presented at Oracle OpenWorld in India and again highlighted Oracle cloud's growth, stating that "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers." This statement was materially false and misleading when made.  It was misleading for Defendant Kurian to state that Oracle had a "very, very strong growth in customers" due to legitimate demand for Oracle's product while failing to disclose that: (1) a material portion of Oracle's growth in cloud customers was through "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; and (2) the customers obtained through these deals were artificial because they were not truly purchasing Oracle's cloud products, but were rather purchasing a discount on audit penalties or on-premises products.

### B.   Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017

227.   On June 21, 2017, Oracle issued a press release announcing its fiscal fourth quarter and full year 2017 results, and filed that press with the SEC on Form 8-K.  The press release emphasized that Oracle's year-over-year cloud fourth quarter cloud revenues had increased dramatically, stating that, "Total cloud revenues ***were up 58%*** [year-over-year] to $1.4 billion, and non-GAAP total cloud revenues ***were up 64%*** [year-over-year] to $1.4 billion."  The press release further highlighted that the Company's year-over-year cloud full-year cloud revenues had also increased dramatically, stating that, "Total cloud revenues ***were up 60%*** [year-over-year]to $4.6 billion. Non-GAAP cloud revenues ***were up 66%*** [year-over-year] to $4.7 billion."

228.   These statements were materially false and misleading when made.  It was misleading for Oracle to report that totally quarterly cloud revenues were up 58% to $1.4 billion, and total annual cloud revenues were up 60% to $4.6 billion, without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

229.   The June 21, 2017 press release also quoted Catz, who stressed the "rapid adoption" of Oracle's cloud products and the "hyper-growth" of its business:  "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . ***We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4***.  This ***cloud hyper-growth is expanding our operating margins***, and we expect earnings per share growth to accelerate in fiscal 2018."

230.   In that same press release, Hurd trumpeted the Company's cloud revenues, and, in particular, that Oracle had delivered on its ambitious promise to deliver $2 billion in annual recurring revenue for the 2017 fiscal year – with most of it supposedly booked during the Class

Period.  This achievement marked another critical milestone in Oracle's cloud transition that persuaded investors the Company's pivot to cloud was complete.  "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, *putting us over our $2 billion ARR bookings goal for fiscal year 2017 . . . . We also delivered over $1 billion in quarterly SaaS revenue for the first time*. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018."

231.   These statements were materially false and misleading when made.  It was misleading for Defendants to state that Oracle was experiencing "rapid adoption" of its cloud products, "hyper-growth" of its cloud business, and to emphasize the purportedly ballooning cloud sales figures set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

232.   Also on June 21, 2017, Oracle held its fiscal fourth quarter and full year 2017 earnings call with investors.  On that call, Catz told investors, "As you can see, we had a tremendous quarter in just about every way, as cloud revenue, new software license and earnings were all much better than expected. *The adoption by our customers of our products and services is at an all-time high . . . . The cloud has become our predominant growth vehicle*." Catz further stated, "our tremendous growth resulted in SaaS revenue crossing the $1 billion a quarter threshold in Q4, having grown 76% in constant currency . . . . Cloud PaaS and IaaS revenue for the quarter were $403 million, up 45% from last year." Catz further reported that "Total cloud revenues in the quarter were $1.4 billion, up 66% from last year," and that "cloud billings grew 42% in U.S. dollars this quarter."

233.   Similarly, Hurd highlighted Oracle's growing cloud bookings, stating, "cloud bookings, $855 million. *It's the best quarter we have ever had. It's up 43% over what was a very*

*strong Q4 last year*. We had a goal of $2 billion in ARR, and we finished with nearly $2.1 billion. Next year, we will sell more . . . . As Safra said, cloud revenue growth at 66%, we're now at a $6 billion annualized run rate . . . . *[w]ith revenue now at an annualized run rate of $6 billion and a growth rate of 66%, we're clearly the fastest-growing cloud company at scale*." Hurd stated that the success of Oracle's cloud business was exceeding expectations:  "[w]e tracked ahead of virtually every metric that I track, whether it was cloud bookings, cloud revenue, EPS."

234.    On that same June 21, 2017 earnings call, Ellison told investors that Oracle was outpacing its competitors in cloud growth and highlighted that growth as the driving force of Oracle's success:  "Last fiscal year, *we sold more than $2 billion in cloud annually recurring revenue*. … Our *rapid SaaS growth* is the driving force behind Oracle's revenue and earnings growth in Q4."

235.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that Oracle was "clearly the fastest-growing cloud company at scale," that customer "adoption" of cloud products was "at an all-time high," and that "the cloud business has become our predominant growth vehicle," and to report the significant revenue growth and recurring revenue results described above while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

236.    On the call, an analyst asked Defendants about the quality of Oracle's reported cloud revenue, and specifically whether the Company's cloud growth was sustainable or whether it was a "1-year phenomenon," asking:  "You just reiterated the fiscal '18 double-digit earnings growth. And I guess, I think what's becoming more relevant is, do we think about this as a 1-year phenom bouncing off of the fiscal transition? Or how can we really be thinking about earnings growth beyond fiscal '18 into '19 and '20?"  Catz responded by falsely denying that Oracle's

reported cloud growth was driven by a short-term, "1-year" spike in revenue, but rather was built on a base of "recurring revenue":

> **So this is absolutely not a 1-year phenomena**. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale. **So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue -- of the recurring revenue business**.

237. These statements were materially false and misleading when made. It was misleading for Defendants Catz to emphasize the quality and sustainability of Oracle's cloud revenue, and state that the Company's cloud growth was "absolutely not a 1-year phenomena," without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

238. Analysts and investors reacted positively to Oracle's announcement. *Tech Trader Daily* reported on June 22, 2017 that analysts were "ga-ga during the conference call following the report, responding to the results with phrases such as 'really phenomenal,' 'impressive,' 'very strong,' and 'really fabulous." In a June 26, 2017 article, *Barron's* stated that Oracle "last week wowed Wall Street with a financial report that put to rest fears of the company being rendered obsolete by cloud computing." On June 22, 2017, BTIG analysts reported that "Oracle delivered excellent F4Q17 results with on-premise license to cloud transition now charging ahead at full steam" and "it's now clear that we're at a material inflection point and a trendline has formed." On June 22, 2017 *Business Insider* article noted that "OracleCloud computing really is starting to breathe new life into Oracle. The company had a blow-out Q4 2017 earnings Wednesday thanks to 58% year-over-year growth for the quarter in cloud. A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday[.]"

239.     As a result of Oracle's disclosures, Oracle's stock price increased from $45.07 on June 21, 2017 to $48.93 on June 22, 2017.  This included an increase of more than 10% in after-hours trading, which *Dow Jones Institutional News* called "the stock's biggest one-day gain in two-and-a-half years, following a strong earnings report for its fiscal fourth quarter credited mostly to its growing cloud business. That left the shares at 17 times adjusted forward earnings – the highlight multiple Oracle has fetched since 2008."

240.     On June 27, 2017, Oracle filed its financial results for the fiscal year ended May 31, 2017 with the SEC on Form 10-K, which was signed by Defendants Catz and Hurd.  The Form 10-K reported that total cloud revenues for the year ended May 31, 2017 was $4.57 billion

241.     This statement was materially false and misleading when made.  It was misleading for Defendants to report total cloud revenues for the year ended May 31, 2017 as $4.57 billion while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

## C.     Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018

242.     On September 14, 2017, Oracle issued a press release announcing its fiscal first quarter 2018 results, and filed that press with the SEC on Form 8-K.  The press release reported substantial increases in Company's year-over-year cloud growth, emphasizing that "Total Cloud Revenues were up 51% [year-over-year] to $1.5 billion." The Company also highlighted to investors that SaaS revenues were up 62% year-over-year to $1.1 billion and PaaS and IaaS revenues were up 28% year-over-year to $400 million. In addition, Catz highlighted to investors that Oracle was continuing to experience "sustained hyper-growth" in its cloud business:  "***The***

*sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher* . . ."

243.    These statements were materially false and misleading when made.   It was misleading for Defendants to report that "Total Cloud Revenues were up 51% to $1.5 billion," and state that Oracle's cloud business was experiencing "sustained hyper-growth" that was driving Oracle's revenue and earnings higher, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

244.    Also on September 14, 2017, Oracle held its fiscal first quarter 2018 earnings call with investors.  On that call, Catz stressed the "very, very strong" customer adoption of Oracle's cloud products and stated that this drove the Company's outstanding revenue and earnings results: "[a]s you can see, we had another good quarter. *Customer adoption of our cloud products and services continue to be very, very strong*, and our on-premise business remains very resilient. The result was that total revenue were at the high end of my guidance, and earnings per share beat my guidance by $0.01."

245.    Hurd also trumpeted Oracle's cloud growth during Oracle's September 14, 2017 earnings call with investors.  Hurd stated, "Cloud revenue up 51% now at a $6 billion annual run rate." Defendant Hurd stated that SaaS revenue was "up 61%, as Safra said, accelerating from 55% growth last year" and that with regard to PaaS, Oracle's "revenue was up 28%."  Defendant Hurd then highlighted Oracle's cloud bookings by stating, "[o]ur cloud bookings were executing well on a very big and growing pipeline. . . Revenue growth now at an annualized rate of $6 billion or growth rate of 51%, and we are the fastest growing cloud company at scale."

246.    These statements were materially false and misleading when made.   It was misleading for Catz to state that "[c]ustomer adoption of our cloud products and services continue

to be very, very strong" and for Hurd to state that Oracle was "the fastest growing cloud company at scale," and to report the revenue figures and growth rates set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

247.    On that same call, a Macquarie analyst noted Oracle's "momentum in [the] cloud." Defendant Hurd responded, attributing Oracle's success to its superior products, implementation, and salesforce: "just sort of every aspect of selling in the cloud, I think the company holistically is getting better at. We're better -- our **products** are better. Our **sales force** is better. Our **ability to implement** is better. Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

248.    These statements were materially false and misleading when made.  It was misleading for Hurd to Defendants to state that Oracle's cloud growth was driven by its superior products, implementation, and salesforce while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

249.    Following Defendants' statements, on September 14, 2017, MUFG analysts reported that "the company had a solid quarter as it continues its transition to the cloud. We note the company's sustained a 50+% year-over-year (YoY) cloud revenue growth rates have persisted even as cloud revenues passed $1B in FY 2Q17." A September 15, 2017 Cowen report noted that

"ORCL beat across the board, with total Cloud growth of 51%[.]" A September 15, 2017 Credit Suisse report stated that "[w]e maintain our Outperform rating and $62 target price following better than expected F1Q results, with organic cc revenue growth accelerating to ~3.5% y/y, its best rate in 2 years."

250.    On September 18, Oracle filed its fiscal first quarter 2018 financial results with the SEC on Form 10-Q, which was signed by Defendants Catz and Hurd.  In that Form 10-Q, Oracle reported that total cloud revenues were $1.467 billion for the three months ended August 31, 2017.

251.    These statements were materially false and misleading when made.  It was misleading for Defendants to report that total cloud revenues were $1.467 billion for the three months ended August 31, 2017 while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

252.    On October 5, 2017, Defendants Bond, Hurd, Catz, Miranda, and Kurian, among other Oracle senior executives participated in Oracle's OpenWorld Financial Analyst Meeting. During that meeting, Defendant Miranda highlighted the reasons that Oracle's customers were choosing cloud. First, Miranda highlighted Oracle SaaS's speed, stating "[w]hat do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, ***most customers today are moving to SaaS for speed***. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption."  Second, Defendant Miranda highlighted that Oracle had the "broadest" and "best" set of solutions, stating "[n]ext and probably what gets overlooked is though ***we have the broadest, it doesn't mean we don't have the best of breed in every solution going forward***." Third, Miranda stressed Oracle's "global reach" of its products supporting globalization and broader infrastructure, stating "our global reach, not only the global reach in terms of the

breadth of Oracle's products and supporting globalizations and local rules and regulations, but the global reach of our broader infrastructures: Oracle's consulting, Oracle's partners, the training that we can afford, the language we can do, support that can take global customers – really aligned for global customers today but also customers who are expanding globally." Fourth, Miranda highlighted that the benefits for customers included "us doing the labor and hosting things" and that "we think it's more secure because we keep you always up to date. And we enhance the technology . . . [s]o there's substantial benefits."  Miranda concluded by stating that "just functionally, the speed of innovation is unmatched . . . . Today, in our SaaS ERP and SaaS HR and SaaS CRM, we update 100% of our customers twice a year. And the importance of that is really borne out over the last couple of years."

253.   These statements were materially false and misleading when made.  It was misleading for Defendant Miranda to state that Oracle's speed, "broadest" and "best" set of solutions, "global reach," product updates, and "speed of innovation" were causing Oracle's customers to adopt the Company's cloud products, while failing to disclose that: (1) a material driver of Oracle's cloud sales to on-premises customers was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially engineered deals;" and (2) in these deals, the on-premises customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products.

254.   At a November 7, 2017 Sanford C. Bernstein Technology Innovation Summit, Defendant Bond made additional false and misleading statements regarding the drivers of Oracle's cloud revenue growth.  Specifically, Bond was asked about the "revenue impact of a client moving from an on-prem revenue license to cloud" and the "driver, the real biggest driver you think of why they would be moving on-premise to SaaS."  Defendant Bond responded that Oracle's customers were moving from on-premises to cloud for two reasons.  First, because "***by moving on-premise loads to cloud, you're going to see a reduction of total cost of ownership***," *i.e.*, the cloud product was less expensive.  "That's the first primary advantage."  Second, "***You'll also see customers who want to move toward cloud for what I'll call an innovation advantage***," *i.e.*, the cloud product made technology updates easier to install.  Bond summed up: "***So from a cost***

1  *standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer.*
2  *And I think this is one of the biggest drivers of why you're seeing customers really excited about*
3  *this even if it's still early.*"

4  255.    These statements were materially false and misleading when made.   It was
5  misleading for Defendant Bond to state that the drivers of Oracle's customers moving from on-
6  premises to the cloud was a "reduction of total cost of ownership" and "an innovation advantage,"
7  while failing to disclose that: (1) a material driver of Oracle's cloud sales to on-premises customers
8  was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create
9  "financially engineered deals;" and (2) in these deals, the on-premises customers were not truly
10  purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or
11  on-premises products.

12  **D.   Defendants' Materially False And Misleading Statements And Omissions**
13  **During Oracle's Fiscal Second Quarter 2018**

14  256.    On November 15, 2017, Oracle held its Annual Meeting of Stockholders.
15  Defendants continued to discuss Oracle's explosive cloud growth at that meeting.   Ellison stated,
16  "Where we deliver ***the applications in the public cloud is growing very, very, very rapidly*** and
17  really subsuming, taking over our application business . . . . ***Our SaaS applications business has***
18  ***been growing in excess of 50%, been growing very, very, very rapidly***."

19  257.    These statements were materially false and misleading when made.   It was
20  misleading for Defendant Ellison to state that Oracle's SaaS business "has been growing in excess
21  of 50%" and "very, very rapidly," while failing to disclose that: (1) a material portion of Oracle's
22  cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the
23  coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through
24  these deals was artificial because it did not result from true purchases of Oracle's cloud products,
25  but rather resulted from clients purchasing a discount on audit penalties or on-premises products;
26  and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not
27  consist of true cloud sales, and was not sustainable.

28

258.    As discussed above, on December 14, 2017, the corrective disclosure period began. On that day, Oracle held its fiscal second quarter 2018 earnings call with investors.  Oracle reported slowing cloud growth in the second quarter of 2018 that missed market expectations, and provided guidance for the further slowing of cloud growth that also fell below market expectations. These occurrences were a function of the fact that the Company was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. This partially revealed to the market that the Company's cloud revenue was unsustainable.  As a result of Defendants' announcements, Oracle's stock priced dropped approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, 2017.

259.    Nevertheless, Defendants made a number of soothing statements that continued to conceal the full truth from investors and partially mollified their concern about Oracle's cloud business.

260.    On the December 14, 2017 earnings call, Catz told investors that total cloud revenues in the quarter were $1.5 billion, up 39% from the previous year, and stated that "[c]loud SaaS revenue for the quarter were $1.1 billion, up 47% from last year. Fusion cloud revenue was 56% for the quarter. Cloud PaaS and IaaS revenue for the quarter was $398 million, up 20% from last year."  Catz also told investors that "[a]s for cloud margins, our SaaS business continues to scale and grow, and the gross margin has expanded to 66%, up from 59% last Q2."

261.    Catz further told investors that "[c]ustomer adoption of our cloud products and services continues to be very strong, and what we have called our on-premise business remains robust. Bottom line, our transition to the to the cloud is going well."

262.    These statements were materially false and misleading when made.  It was misleading for Defendant Catz to report that "customer adoption of our cloud products" "continues to be very strong" and that the "transition to the cloud is going well," and to report the revenue metrics set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the

coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

263.    On Oracle's December 14, 2017 earnings call, a MoffettNathanson analyst asked Defendants to explain why cloud revenue growth was slowing and, specifically, whether customers were not deploying Oracle cloud products: "I think what some of us are trying to reconcile is, is the cloud guidance is a little bit slower than it has been. So it looks like something might be decelerating a little bit. And I just wanted to understand, is there a gap as people maybe buy licenses on-prem, and then maybe it's a quarter or 2 before they deploy in the cloud?"  Catz responded by falsely denying that customers were not declining to deploy cloud products, but were, rather, strategically timing that deployment and "moving to [Oracle's] cloud when it makes sense for them."

264.    Addressing the same analyst question about the cause of Oracle's revenue slowdown, Ellison also falsely stated that the slowdown was merely due to the fact that "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database," a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to become available."

265.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that any slowdown in revenue or delay in deployment was due to "customers "waiting for the Autonomous Database just to become available," or to customer's strategic deployment decisions, when in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.

266.    In response to analyst questions about "competitors and surveys saying customers are moving off Oracle," Ellison denied that customers were "moving off Oracle," instead

challenging the analyst to "go ahead.  You tell me who's moving off of Oracle." Hurd also responded to the same question by stating that "I'd like to just go back to the math and just go back to the numbers, right? I mean, we've got sort of every other database being used, just in share terms, is ours. And when you see us throwing up yet again another growth rate above market, it's just any of these sort of stories, anecdotes -- by the way, I've heard them for 7 years, right, that -- yes and predates me. So everyone's, 'Oh, everyone's moving off the Oracle Database.. . .I'd just love somebody show up with something more than a story. Just show up with a number . . . certainly, nobody gaining share over us . . . when you just look at overall numbers, we're gaining share in Database.'"

267.   These statements were materially false and misleading when made.  It was misleading for Defendants to state that Oracle customers were not "moving off [] Oracle" and to emphasize Oracle's "growth rate above market," while failing to disclose that a material portion of Oracle's cloud customers were declining to renew the "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics.

E.   **Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018**

268.   On March 19, 2018, Oracle held its fiscal third quarter 2018 earnings call with investors.  As discussed above, Oracle reported even more significant slowdowns in its cloud revenue and margin growth than it had in December 2017, again missing market expectations, and provided guidance for further slowing cloud growth below market expectations. These occurrences were a function of the fact that the Company was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. This partially revealed to the market that the Company's cloud revenue was unsustainable.  As a result of Defendants' announcements, Oracle's stock price declined nearly 10%, from $51.95 per share on March 19, 2018 to $47.05 per share on March 20, 2018.

269.   Nevertheless, as before, Defendants made a number of soothing statements that continued to conceal the full truth from investors and partially mollified their concern about

Oracle's cloud business.  For instance, Defendants assured investors that Oracle's cloud renewal rates remained highly positive and would drive additional revenue expansion.  Ellison stated, "the combination of faster sales and higher renewal rates should dramatically increase our growth rate in our SaaS business."

270.    Ellison also attributed the decline in Oracle's cloud revenue growth to Oracle's "bring your own license" or BYOL program.  "BYOL" allowed clients to purchase software licenses that could be flexibly used in whatever medium the customer chose, either cloud or on-premises. Thus, if customers had existing Oracle software licenses for other Oracle legacy services, customers could reuse them when subscribing to Oracle PaaS.

271.    Ellison stated, "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

272.    These statements were materially false and misleading when made.  It was misleading for Ellison to attribute the decline in Oracle cloud revenue growth to its BYOL program, when, in truth, the deceleration was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.

273.    Additionally, on May 22, 2018, in response to a report by *The Information* that Oracle customers were resisting the Company's efforts to use audits to drive cloud deals, the Company put out a response that:

> Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that ***The Information is presenting inaccurate accounts regarding a***

*handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services.*

274. These statements were materially false and misleading when made. It was misleading for Oracle to deny that Oracle used audits to drive cloud sales, and state that Oracle had "no reason to resort to scare tactics to solicit business," without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

## VIII.   **LOSS CAUSATION**

275. The artificial inflation created by Defendants' alleged misrepresentations and omissions regarding Oracle's cloud sales and revenue were removed from Oracle's share price in direct response to information revealed in a series of disclosures. As set forth below, these disclosures divulged information that gradually corrected Defendants' prior misrepresentations and omissions of material fact and/or disclosed facts Defendants misrepresented and omitted that were a substantial factor in causing investors' economic loss.

276. On December 14, 2017, after the market closed, Defendants issued Oracle's second quarter 2018 financial results and disclosed that Oracle revenue growth had decelerated, growing by less than 40%. The Company also reported significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a marked decline.

277. Following these revelations, the price of Oracle stock declined by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, on high trading volume of 75,176,000 shares versus the class period average of 14,856,931 shares.

278. The market connected these disclosures to Oracle's sales practices. For example, a *Business Insider* article dated December 15, 2017 noted that "there are some signs that some of Oracle's customers are fed up with some of its hard-nosed sales tactics." Additionally, JMP analysts noted in a December 15, 2017 report that "many customers are irate with Oracle due to auditing practices on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

279. Defendants, however, prevented the stock from falling further by falsely stating that "customer adoption of our cloud products" "continues to be very strong" and that the "transition

to the cloud is going well." Defendants further told investors that the cloud margins had underperformed because, "a lot of customers are waiting for the Autonomous Database just to become available." Defendants' damage control worked. For example, a December 15, 2017 Jefferies report entitled "Patience Grasshopper" stated that "[w]e understand investor frustration with the unwinding complexity of this model as it evolves, but we continue to believe that the business momentum in the field continues to build and this will translate into meaningful cash flow growth over time."

280.   On March 19, 2018, after the market closed, Oracle issued its third quarter 2018 financial results, again disclosing that the Company's cloud growth had slowed even more significantly to only 32%. Oracle admitted that it expected further deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," well below the market's expectations.

281.   In response to the Company's March 19, 2018 disclosures, Oracle stock declined nearly 10%, falling from $51.95 per share on March 19 to $47.05 per share on March 20, on high volume of 68,601,000 shares.

282.   The market connected these disclosures to Oracle's undisclosed financially engineered deals and extortive tactics. For example, a JMP analyst report dated March 20, 2018 highlighted Oracle's "cloud weakness," including that there were "fundamental challenge[s]" in the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon."  And, in the months following this partial corrective disclosure, investors' questions about Oracle's coercive sales practices intensified. For example, in a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," *Forbes* reported that Oracle was using its "'Audit Bargain Close' playbook" "to pressure customers into cloud adoption" and in a May 22, 2018 article, *The Information* reported that large Oracle customers were resisting the Company's efforts to use audits to drive cloud deals.

283.   Defendants, however, prevented the stock from falling further by issuing a number of soothing statements to investors. For example, Defendants attributed the falling cloud revenue

growth to Oracle's BYOL program, with Ellison stating that "there's no question, BYOL has lowered our cloud revenue and increased our license revenue." Again, Defendants' assurances worked. For example, on March 19, 2018, MUFG analysts issued a report entitled "BYO License Artificially Dampens Cloud Growth: Thesis Still Intact."

284.   On June 14, 2018, JPMorgan issued a report announcing it was downgrading Oracle shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to their IT environment in the future."  JPMorgan reported that while in the past Oracle "has been stable and received ~11% of the votes," the Company's standing in this latest poll dropped by more than 40% to 6.5%.  JPMorgan connected this drop in CIO ranking to Oracle's coercive practices, stating that reasons that CIOs moved away from Oracle included that they "do not like Oracle's business practices and difficulty of working with them in the past."  Investors were focused on this article.  For example, Data Centre stated in a June 15, 2018 article that the JP Morgan report "may come as no surprise to customers who have long been frustrated with Oracle's strong-arm tactics to get them to shift to the fluffy stuff, as the legacy database vendor becomes increasingly desperate to catch up to other cloud vendors."

285.   On this news, the price of Oracle stock fell approximately 5%, from $48.27 per share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume of 37,001,300 shares.

286.   On June 19, 2018, Oracle held its fourth quarter 2018 earnings call with investors after the market closed. On that call, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business, and would, instead, consolidate those financial results into a combined "Cloud Services and License Support" line item so that investors could no longer see them. In addition, Catz disclosed that total cloud revenue growth for the quarter had come in at just 21%.

287.   On this news, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume of 59,129,000 shares.

288.    The market immediately connected the June 19, 2018 disclosure and the decrease in transparency with "red flags" at Oracle. For example, JMP reported that the dramatic deceleration in Oracle's cloud growth was driven by the Company's treatment of its customers and that an industry contact told them that *"No one is re-upping. There was a big incentive to sell cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was no customer success to say, 'Hey, you bought this, now let's get value from it."* Similarly, *The Upper Edge* reported on June 27, 2018 that "[m]any analysts are speculating that the timing of this change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud growth, suggests that it may have something to hide" and noted that Oracle's "Cloud Deals [were] Manufactured by Duress."

289.    All told, the stock declined 19% percent from its Class Period high of $52.97 to $42.82 on June 20, 2018.

290.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Oracle's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Oracle securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions would cause the price of Oracle securities to decline.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

291.    Oracle's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

292.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer

of Oracle who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.      THE PRESUMPTION OF RELIANCE

293.    At all relevant times, the market for Oracle stock was an efficient market for the following reasons, among others:

   (a)      Oracle stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

   (b)      As a regulated issuer, Oracle filed periodic public reports with the SEC and NYSE;

   (c)      Oracle regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   (d)      Oracle was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

294.    As a result of the foregoing, the market for Oracle stock promptly digested current information regarding Oracle from all publicly available sources and reflected such information in the price of Oracle stock. Under these circumstances, all purchasers of Oracle stock during the Class Period suffered similar injury through their purchase of Oracle stock at artificially inflated prices and the presumption of reliance applies.

295.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding revenue growth in Oracle's cloud segment—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Oracle's cloud business, as set forth above, that requirement is satisfied here.

## XI.   **CLASS ALLEGATIONS**

296.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Oracle stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Oracle and their families and affiliates.

297.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Oracle has approximately 3.59 billion shares of stock outstanding, owned by at least hundreds or thousands of investors.

298.   Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)   Whether Defendants' misconduct impacted the price of Oracle stock;

(f)   Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g)     The extent of harm sustained by Class members and the appropriate measure of harm.

299.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

300.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

301.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act And
SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

302.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

303.    This Count is asserted on behalf of all members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

304.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

305.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others

1  similarly situated in connection with their purchases of Oracle common stock during the Class
2  Period.

3       306.    Defendants, individually and in concert, directly and indirectly, by the use of means
4  or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a
5  continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class;
6  made various untrue and/or misleading statements of material facts and omitted to state material
7  facts necessary in order to make the statements made, in light of the circumstances under which
8  they were made, not misleading; made the above statements intentionally or with a deliberately
9  reckless disregard for the truth; and employed devices and artifices to defraud in connection with
10 the purchase and sale of Oracle common stock, which were intended to, and did deceive the
11 investing public, including Lead Plaintiff and the Class, regarding, among other things, the reasons
12 for Oracle's cloud revenues and growth.

13      307.    Defendant Oracle is liable for all materially false and misleading statements made
14 during the Class Period, as alleged above.  The Executive Defendants, as top executive officers of
15 the Company during their respective tenures, are liable as direct participants in the wrongs
16 complained of herein.  The Executive Defendants are liable for the false and misleading statements
17 they personally made and/or signed, as alleged above.

18      308.    As described above, Defendants acted with scienter throughout the Class Period, in
19 that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness.
20 The misrepresentations and omissions of material facts set forth herein, which presented a danger
21 of misleading buyers or sellers of Oracle stock, were either known to the Defendants or were so
22 obvious that the Defendants should have been aware of them.

23      309.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the
24 integrity of the market, they paid artificially inflated prices for Oracle common stock, which
25 inflation was removed from its price when the true facts became known.  Lead Plaintiff and the
26 Class would not have purchased Oracle common stock at the prices they paid, or at all, if they had
27 been aware that the market price had been artificially and falsely inflated by these Defendants'
28 misleading statements.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 18-cv-4844-BLF                                                                                    -96-

310.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Oracle common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### [Against Defendants Catz, Hurd, and Ellison]

311.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

312.    This Count is asserted on behalf of all members of the Class against the Defendants named in this count for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

313.    During their tenures as officers and/or directors of Oracle, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Oracle, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Oracle during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

314.    In their capacities as senior corporate officers of the Company, the Defendants named in this count had direct involvement in the day-to-day operations of the Company.  Specifically, the Executive Defendants had the following roles and responsibilities:

315.    Defendant Catz is, and was at all relevant times, co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors.  During the Class Period, Catz signed and certified each of the Company's quarterly and annual SEC filings,  attesting to their

purporting accuracy.  In September 2014, Ellison described Catz as "[v]ery details-oriented," "the No. 2 person for some time," and "our first- ever, de facto chief operating officer."

316.    Defendant Hurd is, and was at all relevant times, co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors.  As stated on Oracle's website, Hurd "manage[d] corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support."  Hurd's personal page states that he "helped shift the long-term strategy of the company toward the cloud" and "[a]dapting to this new business model."  During the Class Period, Hurd signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purporting accuracy.

317.    Defendant Ellison is, and was at all relevant times, Oracle's Chief Technology Officer, as well as the Chairman of the Company's Board of Directors. The Company's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched."  According to Catz, Defendant Ellison "led the transformation to the cloud," and is still "in charge" at Oracle even after becoming the Company's CTO in 2014, noting "don't let titles fool you." In addition, Ellison signed the Company's 2017 Annual Report as a member of the Company's Board of Directors.

318.    As a result of the foregoing, each of these Defendants, as a group and individually, were controlling persons of Oracle within the meaning of Section 20(a) of the Exchange Act.

319.    As set forth above, Oracle violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

320.    By virtue of their positions as controlling persons of Oracle and as a result of their own aforementioned conduct, Defendants Catz, Hurd, and Ellison are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Oracle common stock.  As detailed above, during the respective times these Defendants served as officers and/or

directors of Oracle, each of these Defendants was culpable for the material misstatements and omissions made by Oracle.

321.   As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Oracle common stock.

## COUNT III

### For Violation Of Section 20A Of The Exchange Act
### (Against Defendant Kurian)

322.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

323.   This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Kurian on behalf of all persons who purchased Oracle common stock contemporaneously with any sales of Oracle common stock by Defendant Kurian during the Class Period.

324.   As set forth in the paragraphs above, and as further set forth in the chart below, Defendant Kurian committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Oracle common stock while in the possession of material, adverse, nonpublic information about, among other things, the Company's misleading cloud sales practices and revenue.  This conduct violated Section 20A of the Exchange Act.

| Defendant | Transaction Dates | Shares Sold | Price Per Share | Total Value ($) |
|---|---|---|---|---|
| KURIAN | 07/18/17 | 750,000 | $50.46 | $37,843,275 |
| KURIAN | 01/18/18 | 1,500,000 | $50.29 | $75,433,950 |
| KURIAN | 01/18/18 | 200,000 | $50.29 | $10,057,860 |
| KURIAN | 04/23/18 | 137,843 | $46.13 | $6,358,698 |
| KURIAN | 04/26/18 | 300,000 | $46.06 | $13,818,000 |
| KURIAN | 04/27/18 | 25,600 | $46.06 | $1,179,136 |
| KURIAN | 04/30/18 | 57,155 | $46.00 | $2,629,130 |
| KURIAN | 05/02/18 | 91,888 | $45.85 | $4,213,065 |

| Defendant | Transaction Dates | Shares Sold | Price Per Share | Total Value ($) |
|---|---|---|---|---|
| **KURIAN** | 05/02/18 | 253,877 | $45.85 | $11,640,260 |
| **KURIAN** | 05/03/18 | 333,637 | $45.15 | $15,063,711 |
| **KURIAN** | 05/04/18 | 300,000 | $45.15 | $13,545,000 |
| **Kurian Totals** | | **3,950,000** | | **$191,782,084** |

325.    Lead Plaintiff purchased shares of Oracle common stock contemporaneously with certain sales of Oracle common stock made by Defendant Kurian while he was in possession of material, adverse, nonpublic information, as set forth in the chart below.  These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | | Lead Plaintiff's Purchases | | |
|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Purchase Date | Shares Purchased | Price |
| **Kurian** | 7/18/17 | 750,000 | $50.46 | 7/19/17 | 205,000 | $50.99 |
| | | | | | 115,800 | $50.99 |
| | | | | | 28,000 | $50.99 |
| | | | | | 3,600 | $50.99 |
| | | | | | 2,600 | $50.99 |
| | | | | 7/28/17 | 48,000 | $50.18 |
| **Kurian** | 1/18/18 | 1,500,000 | $50.29 | 1/22/18 | 10,000 | $50.45 |
| **Kurian** | 1/18/18 | 200,000 | $50.29 | | | |

326.    Numerous other Class members also purchased Oracle common stock contemporaneously with Defendant Kurian's sales of stock during the Class Period based on material, adverse, nonpublic information.

327.    By virtue of his knowledge of material, adverse, nonpublic information, Defendant Kurian was duty bound not to benefit therefrom, a duty which he violated by selling his shares at inflated prices.

328.    Accordingly, under Section 20A of the Exchange Act, Defendant Kurian is liable to Lead Plaintiff and the Class for all profits gained and losses avoided as a result of his stock sales.

1

**XIII.  PRAYER FOR RELIEF**

2

WHEREFORE, Lead Plaintiff prays for judgment as follows:

3

A.  Determining that this action is a proper class action under Rule 23 of the Federal

4

Rules of Civil Procedure;

5

B.  Awarding compensation to Lead Plaintiff and other Class members against all

6

Defendants, jointly and severally, for all harm sustained as a result of Defendants'

7

wrongdoing, in an amount to be proven at trial, including interest thereon;

8

C.  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred

9

in this action, including attorneys' fees and expert fees; and

10

D.  Awarding such equitable/injunctive or other further relief as the Court may deem

11

just and proper.

12

**XIV.  JURY DEMAND**

13

Lead Plaintiff demands a trial by jury.

14

Dated:  March 8, 2019                    Respectfully submitted,

15

                                         **BERNSTEIN LITOWITZ BERGER**
16
                                         **& GROSSMANN LLP**

17

                                         _/s/ John Rizio-Hamilton_
18                                       John Rizio-Hamilton

19

20                                       MARK LEBOVITCH (admitted _pro hac vice_)
                                         JOHN RIZIO-HAMILTON (admitted _pro hac vice_)
21                                       ABE ALEXANDER (admitted _pro hac vice_)
                                         JULIA K. TEBOR (admitted _pro hac vice_)
22                                       (markl@blbglaw.com)
                                         (johnr@blbglaw.com)
23                                       (abe.alexander@blbglaw.com)
                                         (julia.tebor@blbglaw.com)
24                                       1251 Avenue of the Americas
                                         New York, NY 10020
25                                       Tel:    (212) 554-1400
                                         Fax:    (212) 554-1444
26
                                                 -and-
27
                                         JONATHAN D. USLANER (Bar No. 256898)
28                                       (JonathanU@blbglaw.com)

12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:     (858) 793-0323

*Counsel for Lead Plaintiff Union Asset Management
Holding AG and Lead Counsel for the Class*

1

## <u>CERTIFICATE OF SERVICE</u>

I, John Rizio-Hamilton, hereby certify that on March 8, 2019, I caused a true and correct copy of the foregoing CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
JOHN RIZIO-HAMILTON