1    JORDAN ETH (CA SBN 121617)
     JEth@mofo.com
2    MARK R.S. FOSTER (CA SBN 223682)
     MFoster@mofo.com
3    ROBERT W. MAY (CA SBN 295566)
     RMay@mofo.com
4    SU-HAN WANG (CA SBN 284863)
     SWang@mofo.com
5    MORRISON & FOERSTER LLP
     425 Market Street
6    San Francisco, California 94105-2482
     Telephone:   415.268.7000
7    Facsimile:   415.268.7522

8    Attorneys for Defendants
     ORACLE CORPORATION, SAFRA A. CATZ,
9    MARK HURD, LAWRENCE J. ELLISON,
     THOMAS KURIAN, KEN BOND, and STEVE MIRANDA
10
     JAMES C. MAROULIS (CA SBN 208316)
11   Jim.Maroulis@oracle.com
     ORACLE CORPORATION
12   500 Oracle Parkway
     Mail Stop 5OP7
13   Redwood City, California 94065
     Telephone:   650.506.5200
14   Facsimile:   650.506.7114

15   Attorney for Defendant ORACLE CORPORATION

16               **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18                    **SAN JOSE DIVISION**

| | |
|---|---|
| 19 | Case No. 5:18-cv-4844-BLF |
| 20 | **CLASS ACTION** |
| 21 *In re Oracle Corporation Securities Litigation* | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 22 | |
| 23 | |
| 24 | Date:   October 17, 2019 |
| 25 | Time:  9:00 a.m.<br>Ctrm:  3, Fifth Floor |
| 26 | Judge: Hon. Beth Labson Freeman |
| 27 | Date Action Filed:  August 10, 2018 |
| 28 | |

1   TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on October 17, 2019, at 9:00 a.m., before the Honorable

3   Beth Labson Freeman in the San Jose Courthouse of the United States District Court for the

4   Northern District of California, 280 South 1st Street, San Jose, CA 95113, Fifth Floor, Courtroom

5   3, Defendants Oracle Corporation ("Oracle"), Safra A. Catz, Mark Hurd, Lawrence J. Ellison,

6   Thomas Kurian, Ken Bond, and Steve Miranda will and hereby do move to dismiss Plaintiff's

7   Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the

8   "Complaint").  Defendants seek dismissal pursuant to Federal Rules of Civil Procedure 8, 9(b),

9   and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 (the "Reform Act").

10         This motion is based upon this Notice of Motion and Motion, the Memorandum of Points

11   and Authorities in support hereof, the Declaration of Robert W. May ("Decl.") and the Exhibits

12   attached to it ("Ex."), all other pleadings and papers on file herein, and such other argument and

13   evidence as may be presented to the Court before the Motion is taken under submission.

14

15   Dated:  April 19, 2019           MORRISON & FOERSTER LLP

16

17              By:   */s/ Jordan Eth*
                       Jordan Eth

18

19              Attorneys for Defendants
           ORACLE CORPORATION, SAFRA A.

20              CATZ, MARK HURD, LAWRENCE J.
           ELLISON, THOMAS KURIAN, KEN

21              BOND, and STEVE MIRANDA

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ....................................................................................................... 2

    A.  Oracle and Its Business .................................................................................. 2

    B.  Plaintiff's Securities Fraud Allegations ........................................................ 4

III.  ISSUES TO BE DECIDED ...................................................................................... 6

IV.  PLAINTIFF MUST PLEAD FRAUD WITH EXACTING PARTICULARITY ......... 6

V.  PLAINTIFF FAILS TO STATE A CLAIM FOR SECURITIES FRAUD .............. 7

    A.  Plaintiff Fails to Plead a Materially False or Misleading Statement ............ 8

        1.  Plaintiff fails to show the falsity of statements about Cloud revenues, growth rates, or adoption ................................................................ 8

            a.  Plaintiff fails to show that reported Cloud revenue or growth stemmed from improper sales practices ................. 9

            b.  Plaintiff fails to show that Defendants misled investors about the sustainability of Cloud growth. ................................. 13

            c.  There was no duty to disclose the alleged practices in any case. .... 14

        2.  Plaintiff fails to show that any Defendant misled investors about the reasons for the deceleration of Cloud growth. ............................ 15

        3.  Many challenged statements are non-actionable for the additional reason that they are statements of general corporate optimism. .............. 17

        4.  The Safe Harbor further protects the forward-looking statements .............. 17

    B.  Plaintiff Fails to Plead a "Strong Inference" that Any Defendant Intended to Deceive Investors. ...................................................................................... 18

        1.  The CW allegations do not support any inference of scienter. ................. 19

            a.  The CW allegations are not reliable. ............................................ 19

            b.  The CW allegations also are not indicative of scienter. ................. 20

        2.  The core operations inference does not apply. ........................................ 21

        3.  Kurian's stock sales do not support any inference of scienter. ................. 22

        4.  Scienter cannot be inferred from Oracle's change to its financial reporting. ...................................................................................... 23

        5.  Plaintiff does not even try to show Defendants had actual knowledge that their forward-looking statements were false when made ................... 23

        6.  Holistically considered, Plaintiff's fraud theory is not cogent ................... 24

VI.  PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A ................ 25

VII.  CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Accuray Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) .................................................................. 11

*Bao v. Solarcity Corp.*,
  No. 14-cv-01435-BLF, 2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ............................ 16, 20, 21

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................. 24

*Brodsky v. Yahoo! Inc.*,
  592 F. Supp. 2d 1192 (N.D. Cal. 2008) ................................................................ 25

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ............................................................. 9, 11

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................................ 14

*In re Cisco Sys. Inc. Sec. Litig.*,
  No. C 11–1568 SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ......................... 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................................................... 15, 16, 23

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ................................................................ 17, 18, 19, 23

*In re Fusion-io, Inc. Sec. Litig.*,
  No. 13-cv-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ........................ 11

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................ 24

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ............................................................................ 25

*Metzler Inv. GmbH v. Corinthian Colls.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................... 7, 8, 9, 10, 14, 22, 23, 25

*In re Nimble Storage, Inc. Sec. Litig.*,
  756 Fed. App'x 779 (9th Cir. 2019) ..................................................................... 10

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
  No. 15-cv-02938-HSG, 2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ...................... 8

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)...................................................................................19

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014)....................................................9, 10, 19, 21, 24, 25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)...................................................13, 17, 18, 20, 21, 22

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003)......................................................................................8

*In re Redback Networks Inc. Sec. Litig.*,
    No. C 03-5642 JF (HRL), 2007 WL 4259464 (N.D. Cal. Dec. 4, 2007)................10

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017)..................................................................................14

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)......................................................................................7

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)...................................................8, 11, 21, 22, 23

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)....................................................................................18

*In re Splash Tech. Holdings Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................................17

*In re Syntex Corp. Sec. Litig.*,
    855 F. Supp. 1086 (N.D. Cal. 1994) ........................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................18, 19

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)..................................................................................12

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993)......................................................................................13

*In re VeriFone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ........................................................................10

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*Webb v. SolarCity*,
    884 F.3d 844 (9th Cir. 2018).................................................................................24

*Welgus v. TriNet Grp., Inc.*,
    No. 15-cv-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ..............................21, 23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)...........................................................7, 19, 20, 21, 25

**Statutes**

15 U.S.C. § 78u-4(b)(2)(B)........................................................................................18

15 U.S.C. § 78u-5(c)(1) .............................................................................................17

1    **I.       INTRODUCTION**

2            Plaintiff claims that Oracle coerced its customers to purchase its Cloud products, making

3    Oracle's reported Cloud sales and growth between March 15, 2017, and June 19, 2018, "illusory,"

4    "fake," and "phony."  Yet Plaintiff does not contest that Oracle accurately reported its financial

5    results; met or exceeded its Cloud projections every quarter during the class period; and sold real

6    products to real customers who paid real money for those products.  Instead, all Plaintiff offers is

7    a handful of former employees' opinions about an unknown number of transactions with

8    unidentified customers for unquantified amounts, and allegations about conduct months and years

9    before the class period.  These unsubstantiated accusations do not meet the requirements for

10   pleading either falsity or scienter.

11           Oracle's allegedly wrongful practices supposedly involved Oracle waiving its contractual

12   right to collect penalties for customers' license violations in exchange for customers purchasing

13   Cloud products.  Oracle also allegedly gave customers "sharp discounts" on other products when

14   customers also purchased Cloud products.  Plaintiff does not show why promoting sales that way

15   would materially mislead investors and, if it was done, that it was widespread in the class period.

16           Instead, Plaintiff points to criticisms of the alleged practices that pre-date the class period,

17   and vague and conclusory anecdotes from nine confidential witnesses (CWs)—Oracle employs

18   over 137,000 people—who are former employees with sales or other customer-facing roles.  The

19   CW allegations are vague, especially with respect to timing, making it impossible to show that

20   any of the alleged wrongdoing coincided with any challenged statement.  None of those anecdotes

21   mentions a customer by name that was affected by the alleged practices during the class period.

22   Nor does Plaintiff allege any facts about the amount of sales affected by these practices, let alone

23   any material effect on reported results.

24           The Complaint also lacks factual allegations giving rise to any inference of scienter.

25   Plaintiff's CWs provide no information about direct contact with any of the six Individual

26   Defendants, all of whom are current or former Oracle officers and directors.  No CW offers any

27   fact about what any Defendant knew.  The only alleged motive is the sale of stock by Thomas

28   Kurian, one of the six Individual Defendants, whose only alleged misstatements were to describe

1   Cloud growth as "tremendous" and "strong."  Plaintiff does not show anything suspicious about

2   the timing or amount of his sales or any corroborative sales by the other Individual Defendants,

3   which negates any inference of scienter, especially given their collective ownership of around $50

4   billion worth of Oracle shares during the class period.  Also negating scienter is Oracle's

5   repurchase of $12 billion of its stock during the class period.  It makes no sense that Oracle would

6   buy its stock knowing the price was artificially inflated by its own alleged fraud.

7          The defective allegations here bear a close resemblance to those rejected in cases like

8   *Metzler*, *Apollo*, *Intuitive*, and *VeriFone*, all of which resulted in dismissals affirmed by the Ninth

9   Circuit.  As shown below, and for the same reasons, this Court should dismiss this case.

10  **II.     BACKGROUND**

11         **A.     Oracle and Its Business**

12         Oracle is a Delaware corporation based in Redwood City.  The Individual Defendants are

13  six current or former Oracle officers and directors:  Safra A. Catz (co-CEO and director);

14  Mark Hurd (co-CEO and director); Lawrence J. Ellison (co-founder, former CEO, and current

15  Chief Technology Officer and Chair of the Board of Directors); Thomas Kurian (former

16  President, Product Development); Ken Bond (Senior Vice President, Investor Relations); and

17  Steve Miranda (Executive Vice President, Oracle Applications Product Development).  (¶¶ 30-

18  35.)[1]

19         Since the 1970s, Oracle has been the world's leading business software company and is

20  well known for its broad portfolio of products and services that address all aspects of corporate

21  information technology environments—including applications, platforms, and infrastructure.

22  Oracle employs over 137,000 people and has over 400,000 customers worldwide.  (Ex. 13 at 19,

23  41.)  Oracle generated almost $40 billion in revenues in fiscal year 2018, which ended May 31,

24  2018.  (Ex. 12 at 1.)

25         In 2011, Oracle began offering Cloud products and services along with its traditional on-

26  premise products and services.[2]  As the name implies, on-premise products use the customers'

27

28
---
[1] Unless otherwise noted, references to "¶ __" are to the Complaint.
[2] For brevity's sake, this Motion uses the term "products" for all Oracle's Cloud offerings.

own computer systems at their own locations.  By contrast, Cloud technology allows customers to use the computer systems housed and maintained in Oracle's data centers.  Using the Cloud lowers a customer's overall costs and provides for more efficient updates.  (*E.g.*, ¶¶ 39, 43.)  The Oracle Cloud offers integrated applications for sales, service, marketing, human resources, finance, supply chain, and manufacturing, among other areas.  Oracle's Cloud offerings include Software as a Service (SaaS), Platform as a Service (PaaS), and Infrastructure as a Service (IaaS).

Oracle frequently updates and expands its products.  For example, in late FY18, Oracle launched its Autonomous Data Warehouse Cloud service that uses machine learning to reduce customer downtime and cost.  Also in late FY18, Oracle introduced its Bring Your Own License (BYOL) program that allows customers to use certain existing on-premise licenses for corresponding Cloud services, enabling customers to transition to the Cloud at a lower cost.

Each quarter during the class period, Oracle projected its Cloud revenue growth compared to the previous year.  Oracle met or exceeded these projections every fiscal quarter of the class period, as shown below:

| TABLE 1[1] | 4Q17[5] | 1Q18 | 2Q18 | 3Q18 | 4Q18 |
|---|---|---|---|---|---|
| Actual Cloud Revenue[2] (in millions) | $1,411 | $1,492 | $1,528 | $1,571 | $1,700 |
| Projected Cloud Growth (year over year)[3] | 69%-73% | 48%-52% | 39%-43% | 21%-25% | 17%-21% |
| Actual Cloud Growth (year over year)[4] | 75% | 51% | 39% | 22% | 20% |

[1] All figures are reported in constant currency.  (*See* Ex. 8 at 5 n.1.)
[2] Revenues are non-GAAP reported figures.  (Exs. 8 at 6; 9 at 5; 10 at 5; 11 at 5; 6 at 5.)
[3] (Exs. 1 at 6; 2 at 6; 3 at 5; 4 at 6; 5 at 5.)
[4] (Exs. 2 at 5; 3 at 5; 4 at 5; 11 at 5.)
[5] For 4Q17 only, growth rates are for SaaS and PaaS only (a majority of Cloud revenue).

When providing updates to investors, the Individual Defendants were understandably enthusiastic about Cloud performance.  For example, Catz described year-over-year "hypergrowth"; Ellison characterized the business as "growing rapidly"; and Catz underscored "rapid adoption" by customers of Cloud, Oracle's "predominant growth vehicle."  (¶¶ 211, 214, 229, 232.)

The Individual Defendants' excitement about the Cloud, however, was not without qualification.  On November 7, 2017, for example, when asked why Oracle's projections of Cloud revenue growth had declined from 80% in FY16 (before the class period) to 40% for 2Q18, including whether the trajectory would continue to decline, Bond explained:  "as the numbers get bigger, it does get harder to grow.  It's law of large numbers, right?"  (Ex. 19 at 7.)  Analysts recognized that as well.  (Ex. 18 ("we expect growth rates to moderate slightly as the law of large numbers increasingly becomes a factor").)

On June 19, 2018, the last day of the class period, Oracle announced then-record Cloud quarterly revenue of $1.7 billion for the quarter (Ex. 6 at 5), 20% above the previous year's quarterly revenue, which Plaintiff nevertheless claims shows that "growth had ground to a near-halt."  (¶ 177.)  Oracle also announced that, going forward, it would consolidate the financial results of its Cloud and on-premise businesses, given that the line differentiating the two businesses had blurred following BYOL's introduction.  The next day, Oracle's stock price fell approximately 7.5% from $46.27 per share to $42.82 per share.  Within a month, the stock price rebounded, and traded above $48 per share.  (¶ 287; Ex. 21.)

**B.    Plaintiff's Securities Fraud Allegations**

On March 8, 2019, Plaintiff filed the current Complaint.  (ECF 40.)  Plaintiff sues on behalf of all persons who purchased Oracle securities between March 15, 2017, and June 19, 2018.  The class period's bookends coincide with Oracle's announcement of financial results for 3Q17 ended February 27, 2017, and FY18 ended May 31, 2018.

Plaintiff asserts three claims under the Securities Exchange Act of 1934:  (1) § 10(b) against all Defendants; (2) § 20(a) (control person liability) against Catz, Hurd, and Ellison; and (3) § 20A (insider trading) against Kurian.  (¶¶ 302-328.)

Plaintiff challenges Oracle's reported financial results and qualitative discussions about its Cloud revenues and Cloud growth.  Most of the statements challenged by Plaintiff relate to Oracle's reported or projected Cloud revenues (¶¶ 209, 213, 218, 227, 230, 232, 233, 234, 240, 242, 245, 250, 260) or reported or projected Cloud growth (¶¶ 210, 212, 213, 214, 220, 222, 226, 227, 229, 232, 233, 242, 244, 245, 256, 260).  Plaintiff challenges some statements that explain

why and when Oracle customers were adopting Cloud products.  (¶¶ 222, 232, 247, 252, 254.)  Plaintiff also challenges Oracle's explanations from December 2017 through March 2018 about why Cloud revenues and growth rates, while still strong and positive, were decelerating relative to earlier periods.  (¶¶ 263, 264, 266, 270, 271.)

Although the majority of the challenged statements consists of audited, reported financial results, Plaintiff does not claim that any of the numbers are inaccurate.  For example, Plaintiff does not claim that Oracle did not, in fact, generate Cloud revenues of $1.4 billion in 4Q17, with SaaS and PaaS revenue up 75% year-over-year, as reported.  (¶ 229.)  Instead, Plaintiff claims that Oracle's accurately reported financial results and descriptions of success during the class period were "illusory," "fake," or "artificial."  (*E.g.*, ¶¶ 1, 82, 87, 115.)  Plaintiff claims that Cloud sales were driven by "improper and extortionate tactics to coerce customers to buy short-term cloud subscriptions they did not want and did not renew."  (¶ 82.)  Plaintiff makes no claim that customers were obligated to renew these subscriptions, nor does Plaintiff claim that Oracle made any false statements about its reported renewal rates.

Plaintiff's accusations parrot claims made in various pre-class-period articles and blog posts about Oracle's allegedly "aggressive," "high-pressure," and "strong-arm" sales tactics.  (*E.g.*, ¶¶ 59, 60, 63.)  Plaintiff also relies upon vague accounts from nine CWs who are former employees.  (¶ 37.)  Plaintiff claims that the CWs were among Oracle's "most senior executives" (¶ 87), but they in fact served as mid- or low-level directors or managers in sales or other customer-facing functions.  With the exception of one CW who reported to Miranda before the class period, none of the other eight reported directly to any Individual Defendant.  The Complaint refers to various CWs' "teams," but includes no allegations about the size of those teams—in terms of employee headcount, revenue generated, deals closed, or otherwise.

Plaintiff's claims of improper sales tactics center on an alleged tactic called "Audit, Bargain, Close."  (¶ 14.)  As Plaintiff acknowledges, Oracle's contracts gave it the right to audit its customers' compliance with licensing terms and impose fees for violations.  (¶ 53.)  Plaintiff claims that Oracle abused its contractual right by giving customers the option to minimize or avoid paying the fees in exchange for agreeing to purchase Oracle Cloud products.  (*E.g.*, ¶¶ 14,

84.)  Plaintiff provides no details regarding the number of audits conducted or whether the audits materially affected Oracle's revenue in any quarter.  Plaintiff also claims that Oracle pushed so-called "attached" deals, essentially providing on-premise customers a "sharp discount" if they agreed to try Cloud products.  (¶ 85.)  Plaintiff contends that these alleged practices were "improper," but cites no law, accounting rule, or policy that precludes a company from encouraging its existing customers to try new products.  Plaintiff does not allege the amount of revenue supposedly generated by these practices, either.

The 100-page Complaint mostly consists of repetitive and conclusory assertions, a significant portion of which describe irrelevant events occurring long before the class period, including a single transaction with the City of Denver in 2016 and a Chilean regulator's report relating to alleged events in 2013-2016.  Plaintiff does not allege (because it cannot) that the Denver transaction or Oracle's Chilean business had any material effect on Oracle's reported results even before the class period.  Plaintiff's allegations of wrongdoing are divorced entirely from the alleged misstatements, forcing the reader to try to connect the dots between the alleged misconduct (¶¶ 82-149) and each of the approximately 40 challenged statements (¶¶ 209-74).  Similarly, Plaintiff's scienter allegations are not specifically linked to any of the challenged statements or any Individual Defendant's state of mind at any point in time.  (¶¶ 178-208.)

## III.   ISSUES TO BE DECIDED

First, whether the § 10(b) claim should be dismissed given Plaintiff's failure to plead falsity and scienter—two independent grounds for dismissal—for each challenged statement and each Defendant in compliance with the exacting pleading standards.

Second, whether the § 20(a) claim should be dismissed because the § 10(b) claim fails.

Third, whether the § 20A claim should be dismissed because the § 10(b) claim fails and because Plaintiff fails to allege any information known to Kurian at the time of his stock trades.

## IV.   PLAINTIFF MUST PLEAD FRAUD WITH EXACTING PARTICULARITY.

To state a § 10(b) claim, a complaint must meet both the "heightened" pleading requirements of Fed. R. Civ. P. 9(b) and the "even more exacting pleading requirements" of the Reform Act, "which require that the complaint plead with particularity both falsity and scienter."

1   *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *Zucco Partners, LLC v.*

2   *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

3           To meet this burden, a complaint must "'specify each statement alleged to have been

4   misleading, the reason or reasons why the statement is misleading,'" and it must state with

5   particularity facts giving rise to a "strong inference of scienter." *Metzler Inv. GmbH v.*

6   *Corinthian Colls.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (quoting 15 U.S.C. §§ 78u-4(b)(1) &

7   78u-4(b)(2)(A)). "By requiring specificity, [the Reform Act] prevents a plaintiff from skirting

8   dismissal by filing a complaint laden with vague allegations of deception[.]" *Id.*

9           Although well-pleaded factual allegations are assumed to be true, the Court does not

10  consider "conclusory allegations" or "indulge unwarranted inferences." *Id.* at 1064-65, 1070.

11  The Court considers documents incorporated by reference and those subject to judicial notice,

12  including public disclosures, like SEC filings, for what was said. *Id.* at 1061, 1064 & n.7.

13  Accordingly, the Court should consider similar documents here, including Exhibits 1 to 14 and 16

14  to 20, which are incorporated in the Complaint by reference, and Exhibits 15 and 21, SEC filings

15  and stock data that are subject to judicial notice. *See id.*

16          Where, as here, fraud accusations depend on confidential witness allegations, a complaint

17  must meet the additional hurdle of establishing those statements' reliability. CWs must be

18  "described with sufficient particularity to support the probability that a person in the position

19  occupied by the source would possess the information alleged." *Zucco*, 552 F.3d at 995. In

20  conducting this test, courts look to "the level of detail provided by the confidential sources, the

21  corroborative nature of the other facts alleged (including from other sources), the coherence and

22  plausibility of the allegations, the number of sources, the reliability of the sources, and similar

23  indicia." *Id.* Any "statements which are reported by confidential witnesses with sufficient

24  reliability and personal knowledge must [also] themselves be indicative of scienter." *Id.*

25  **V.      PLAINTIFF FAILS TO STATE A CLAIM FOR SECURITIES FRAUD.**

26          Plaintiff's § 10(b) claim should be dismissed for two independent reasons: Plaintiff fails

27  to plead both falsity and scienter in compliance with the Reform Act's pleading requirements.

28

A.     **Plaintiff Fails to Plead a Materially False or Misleading Statement.**

A complaint must plead "contemporaneous statements or conditions" showing the "misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). The particularized facts must be "necessarily inconsistent" with the challenged statements. *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003). This requires pleading "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality." *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016).

The Complaint does not meet this standard for statements made between March and December 2017 about Cloud's success (*see* Part 1), or for statements between December 2017 and March 2018 about Cloud's decelerating growth (Part 2). Many challenged statements are not false for additional reasons: They are non-actionable statements of optimism (Part 3) or protected by the Reform Act's Safe Harbor for forward-looking statements (Part 4).

1.     **Plaintiff fails to show the falsity of statements about Cloud revenues, growth rates, or adoption.**

The gist of Plaintiff's claim is that Defendants reported Cloud revenues and growth and expressed optimism without disclosing that Oracle's financial results were, according to Plaintiff, a result of improper sales tactics. (¶¶ 1, 82.) The Complaint suffers from a host of flaws that have doomed similar complaints alleging improper business conduct.

Consider *Metzler*. Drawing from CW allegations, the *Metzler* plaintiffs alleged that Corinthian Colleges presented a "public face to the market—one of growth and financial success" that masked the fact that "[a]ll of Corinthian's stated financial results during the entire Class Period were false and misleading as a result of the Company-wide scheme to inflate enrollment figures . . . ." 540 F.3d at 1055-56. In affirming dismissal, the Ninth Circuit held that, although the complaint "sets forth a considerable number of alleged false statements, [its] explanation of how and why the statements were false is decidedly vague." *Id.* at 1070. Citing a string of controlling cases, *Metzler* held that it is not enough to allege that "a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of

1    fraud generally." *Id.*; *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605-07 (9th

2    Cir. 2014) (rejecting claim that results were rendered false by "unethical" business practices).

3         That is exactly what the Complaint does here.  With one exception discussed in Part 1(c),

4    Plaintiff alleges that statements made between March and December 2017 were allegedly

5    misleading for "failing to disclose that:  (1) a material portion of the cloud revenue was produced

6    through 'financially engineered deals' created by Oracle's use of the coercive 'Audit, Bargain,

7    Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial

8    because it did not result from true purchases of Oracle's cloud products, but rather resulted from

9    clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a

10   material portion of the reported cloud revenue and revenue growth did not consist of true cloud

11   sales, and was not sustainable."  (¶¶ 211, 215, 219, 221, 223, 226, 228, 231, 235, 237, 241, 243,

12   246, 248, 251, 257, 262.)

13        As in *Metzler*, these conclusory allegations are "decidedly vague."  This boilerplate

14   explanation—supposedly applicable to every challenged statement—is the antithesis of the

15   specificity mandated by the Reform Act.  As other courts have held:  "This repetition necessarily

16   means that Plaintiffs' allegations of falsity are not particular to the public statements Plaintiffs

17   identify." *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113 (N.D. Cal. 2009).  Rather than

18   plead with specificity, Plaintiff leaves it to the Court to "sort out the statements and match them

19   with the corresponding adverse facts."  *Id*.  This is insufficient.  *See id.*

20        Further, as shown below, Plaintiff has not adequately alleged (a) that any of Oracle's

21   Cloud revenues or growth resulted from illusory sales; (b) that Defendants misled investors about

22   the "sustainability" of Oracle's Cloud revenues and growth; or (c) that Defendants had a duty to

23   disclose the allegedly improper sales practices in any case.

24             **a.**     **Plaintiff fails to show that reported Cloud revenue or growth**
                   **stemmed from improper sales practices.**

25

26        Plaintiff attacks Oracle's reported Cloud numbers as "fake," "illusory," "artificial," and

27   the result of alleged sales practices that the Complaint labels as "improper," "coercion," and

28   "bribery," among similar invective.  (*E.g.*, ¶¶ 1, 14, 16, 17, 52, 82, 83, 115, 118.)  Those are

1    serious charges liberally sprinkled throughout the Complaint in conclusory fashion.  Yet, the

2    Complaint does not show that one penny of Oracle's revenues was "illusory."  Nor does Plaintiff

3    show that the alleged sales practices were improper or widespread.

4          Controlling Ninth Circuit decisions like *Metzler*, 540 F.3d at 1070, and *Apollo*, 774 F.3d

5    at 606-07, hold that it is not enough to say that revenues were generated by allegedly deceptive or

6    "unethical" business practices.  Far more is needed to establish falsity when it is uncontested, as

7    here, that Oracle actually received the revenue reported and properly recognized it.

8          On-point is *In re Redback Networks Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal.

9    Dec. 4, 2007), *aff'd*, 329 Fed. App'x 715 (9th Cir. 2009).  The plaintiffs there alleged that

10   reported revenue resulted from sales that were "improper" and "illegitimate."  *Id.*  But it was

11   "clear on the face of the complaint that the sales in question, and the resulting revenues, were

12   real," where Redback "sold real products for real money."  *Id.*  The court found no "cases holding

13   that accurate reporting of revenues can constitute the basis of a securities fraud claim."  *Id.*  In so

14   holding, the court relied on *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1485 (N.D. Cal. 1992)

15   (*VeriFone I*), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (*VeriFone II*).  There, plaintiffs challenged

16   defendants' accurate reporting of revenues while failing to disclose that those revenues were

17   allegedly "boosted" by large one-time sales that would not recur.  The accurate reporting of

18   revenues, regardless of source, did not state a claim, the court held.  *Id.*; *accord In re Nimble*

19   *Storage, Inc. Sec. Litig.*, 756 Fed. App'x 779 (9th Cir. 2019) (statements not misleading where

20   plaintiffs did not show falsity of reported numbers).

21         The same is true here.  Oracle sold real products for real money to real customers and

22   reported real, audited results.  Plaintiffs do not allege otherwise.  This is fatal to Plaintiff's

23   attempt to show the falsity of statements about Cloud revenue and growth.

24         Plaintiff's legal theory is not the only defect.  Plaintiff also fails to substantiate the claim

25   that Oracle engaged in improper sales tactics, much less that those tactics were widespread during

26   the class period.  The CW allegations are vague, conclusory, and lacking in specific time

27   references.

28         Consider Plaintiff's claim that Oracle's sales were "fake."  (¶ 87(a).)  That accusation is

drawn from statements from CW1, a regional sales director from the Middle East, who said unspecified sales were "fake," because the deals were not later "renewed." (*Id.*)  How does that render any statement false?  Plaintiff does not point to any rule (there is none) that requires that customers promise to or actually renew their subscriptions in the future.  The Complaint's source documents claim that Oracle used "aggressive sales tactics" and applied "pressure." (*E.g.*, ¶¶ 1, 10, 20, 60, 64, 89, 148, 162, 163, 282.)  It is not improper to use aggressive tactics to sell products, and applying such tactics would not make Oracle's revenues illusory or fake.

What's more, Plaintiff concedes that "Oracle's software license contracts gave it the right to audit its customers' compliance with the license and impose fees if it found violations." (¶ 53.)  It was also Oracle's right to forgo collecting those fees in exchange for customers agreeing to try Oracle's Cloud products.  Some allegedly did, while others allegedly elected not to (¶ 163), which undermines Plaintiff's coercion claim.

One obvious defect is the Complaint's lack of specificity as to the timing of alleged wrongdoing.  The Complaint names only two customers who were allegedly affected by the alleged sales practices—the City of Denver and Saudi Telecom.  As the allegations about Denver all pre-date the class period (¶¶ 94-101), they necessarily do not describe "contemporaneous statements or conditions" showing the falsity of any statement. *Ronconi*, 253 F.3d at 432.  The allegations about Saudi Telecom have a similar flaw—no temporal reference at all. (¶ 106.)  The investigation by the Chilean antitrust authority, like the City of Denver allegations, related to alleged conduct in Chile pre-dating the class period.  (¶¶ 139-140.)  So, too, do allegations from Clear Licensing Counsel representatives.  (¶¶ 58-59.)  Moreover, the CW allegations are not tied to any point in time within the class period, which is especially problematic given that two CWs left Oracle before the class period (¶¶ 37(c), 37(d)), while the remaining CWs worked at Oracle before, during, and, in some cases, after the class period.

Courts routinely dismiss complaints that rely on CW allegations that are "vague as to the time" or not "contemporaneous with" the challenged statements. *In re Accuray Sec. Litig.*, 757 F. Supp. 2d 936, 945 (N.D. Cal. 2010); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015); *Brodsky*, 630 F. Supp. 2d at 1115.  This Court should too.

An equally glaring deficiency is the Complaint's failure to identify any improper sales during the class period. Although Oracle reported having over 400,000 customers during the class period (Ex. 13 at 41) and many are named in each quarterly earnings call (*e.g.*, Ex. 1 at 8; Ex. 3 at 6), not one is cited to corroborate Plaintiff's claims. Instead, the Complaint at length purports to tell of the "customer" experience, as vaguely recounted by a handful of former mid- or low-level sales representatives, who present hypothetical or composite customer sketches. (*E.g.*, ¶¶ 1-3, 14-18, 20, 37(b), 37(e), 37(f), 37(i), 40, 46, 56, 58, 60, 61, 82, 84, 85, 87(d).) The Complaint fails to allege how many of Oracle's 400,000 customers were audited or what portion of Oracle's $40 billion in annual revenue was subject to audit. This makes it impossible for the Court to assess whether the practices existed, whether they were widespread, and the effect on challenged revenues and growth numbers, if any, during the class period.

The lack of particularity prompts an obvious question: How much of Oracle's reported revenue and growth resulted from these practices during the class period? The Complaint does not say, even though a challenge to the accuracy of reported financial metrics must specify precise amounts by which an alleged fraud inflated results. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (affirming dismissal where there was "no sufficient allegation of the amounts by which revenues were allegedly overstated"). The Complaint comes nowhere close to doing that, let alone substantiating Plaintiff's accusation that a "material portion of the cloud revenue was produced through" allegedly improper sales tactics. (*E.g.*, ¶¶ 211, 231.)

The only numbers that Plaintiff provides demonstrate nothing. Plaintiff alleges that Saudi Telecom purchased "$22 million in unwanted cloud." (¶ 106.) Putting aside that the Complaint does not address when this supposedly happened, how Oracle accounted for the sale, and that Oracle recognized revenue ratably for Cloud products over a contract's life (Ex. 14 at 32), it is hard to see how the Saudi Telecom deal would have materially affected Oracle's reported revenues given that sales of Cloud products alone in each quarter exceeded $1 billion. The Complaint references other vague numbers. For example, CW7 said "65%" of his cloud sales were "attached" deals. (¶ 116.) 65% of what? Just as with other percentages that the Plaintiff alleges, the Complaint does not say. (*E.g.*, ¶¶ 107, 111, 119, 120, 125, 127.) Such vague

1   statements make it impossible to draw any conclusions about the potential materiality of the

2   alleged sales practices on Oracle's reported financial results.

3                  **b.**      **Plaintiff fails to show that Defendants misled investors about the sustainability of Cloud growth.**

4

5        Plaintiff also fails to show that Defendants misled investors about the sustainability of

6   Oracle's cloud revenues and growth rates.  (*E.g.*, ¶¶ 21, 215, 219, 221, 223, 228.)  With one

7   possible exception discussed in Part 4, Plaintiff does not point to any statement by any Defendant

8   saying anything about "sustainability."

9        There was no duty, of course, to predict "that future prospects may not be as bright as past

10   performance." *VeriFone II*, 11 F.3d at 869.  In *VeriFone*, the plaintiffs alleged that reported

11   financial results were misleading because the defendants did not disclose that internal reports

12   showed that future sales demand was "projected to show little, if any, growth," and "not expected

13   . . . to grow." *Id*.  The Ninth Circuit affirmed dismissal, ruling that "these alleged nondisclosures

14   are, in substance, failures to make a forecast of future events." *Id.*  Later, in *Police Ret. Sys. of St.*

15   *Louis v. Intuitive Surgical, Inc.*, the Ninth Circuit affirmed dismissal on the same grounds.  759

16   F.3d 1051, 1061 (9th Cir. 2014).  The court held that factually accurate financial results are not

17   misleading when alleged downward trends are not disclosed:  "Nothing about the statements . . .

18   would give a reasonable investor the impression that . . . growth was different than it was in

19   reality.  The statements accurately reflect the company's growth" and "do not purport to speak to

20   any trends in . . . [revenue] growth or revenues." *Id*.  These holdings apply here with even more

21   force as Plaintiff makes no claim that *any* internal report cast doubt on Oracle's guidance.

22        Moreover, Plaintiff does not challenge what Oracle, in fact, said about future Cloud

23   expectations.  Oracle routinely provided Cloud revenue growth guidance—all of which was met

24   or exceeded during the class period, including the last quarter when Oracle achieved 20% Cloud

25   revenue growth, just as predicted.  (*See* Table 1, p.3.)  This was not unbridled optimism, but

26   precise, numerical guidance, met each time.  There is no fraud claim when predictions pan out.

27   *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1094 (N.D. Cal. 1994) (no claim where

28   "predictions proved to be accurate"), *aff'd*, 95 F.3d 922 (9th Cir. 1996).

1    **c.    There was no duty to disclose the alleged practices in any case.**

2    Even if Plaintiff could allege (and it did not) that the alleged sales practices were

3    widespread with material impact during the class period, Defendants had no duty to disclose

4    them.  (*E.g.*, ¶¶ 211, 215, 219, 225, 228, 231, 237, 241, 246, 248, 251, 253, 255, 257, 262.)

5    The Ninth Circuit has repeatedly ruled that disclosure of allegedly omitted information is

6    required only when necessary "to make . . . statements made, in the light of the circumstances

7    under which they were made, not misleading."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d

8    997, 1000 n.2, 1006 (9th Cir. 2002).  Alleged omissions are misleading only when they

9    "affirmatively create an impression of a state of affairs that differs in a material way from one that

10   actually exists."  *Id.* at 1006.

11   Applying that rule, non-disclosure in *Brody* of a pending merger offer did not render

12   statements about a stock repurchase misleading because the company "neither stated nor implied

13   anything regarding a merger."  *Id.*  In *Metzler*, the non-disclosure of a pending federal

14   investigation was not misleading because Corinthian Colleges did not make some "affirmative

15   statement" that "suggested it was not under any regulatory scrutiny."  540 F.3d at 1071.  And in

16   *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d

17   1268, 1278 (9th Cir. 2017), the non-disclosure of alleged ethical improprieties was held non-

18   actionable because defendants did not represent there "would be no violations" of business

19   standards of conduct that the company had publicly promoted.

20   Here, Plaintiff does not point to any statement by Defendants that affirmatively created an

21   impression that denied the existence of the alleged sales practices.  Plaintiff, however, asserts that

22   on May 9, 2017, Defendant Bond "den[ied] that Oracle used audits to drive cloud sales, and that

23   Oracle's audits were not coercive."  (¶ 225.)  That is not what he said.

24   In response to a question about whether Oracle used audits to drive cloud sales, Bond

25   responded that "this is one of those things where the story is a lot bigger than the realities" and

26   "we try to do [audits] as best we can, in as gracious a way as we can."  (¶ 224.)  "A lot bigger

27   than the realities" does not deny the existence of these practices, but rather expresses Bond's

28   point of view that those anecdotes were "exaggerated."

As for Bond's opinion, Plaintiff fails to show that it was false.  Plaintiff does not allege how many customers were audited.  They do not show that he subjectively disbelieved his opinion, that it was objectively false, or that it lacked a reasonable basis.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616-18 (9th Cir. 2017).

### 2. Plaintiff fails to show that any Defendant misled investors about the reasons for the deceleration of Cloud growth.

Plaintiff also challenges a series of statements made between December 2017 and March 2018.  In those statements, Defendants explained why Oracle's Cloud revenue growth was increasing at a lower rate compared to earlier periods.  (¶¶ 263-280.)

When asked on December 14, 2017, about Oracle's lowered Cloud guidance and whether there was a gap between purchasing and deploying Cloud, Catz said that customers were "moving to [Oracle's] Cloud when it makes sense for them," while Ellison explained that customers were waiting for Oracle's then-forthcoming deployment of a new product, "the Autonomous Database." (¶¶ 263, 264.)  When asked about news reports that customers were moving "off Oracle," Ellison and Hurd responded with questions of their own—"you tell me who's moving off Oracle"—and pressed for "somebody [to] show up with something more than a story" and to "show up with a number . . . because, certainly nobody [is] gaining share over us." (¶ 266.) Finally, on March 19, 2018, Ellison explained that Oracle's then-new BYOL program—which allowed customers to purchase software licenses that could be flexibly used on premise or in the cloud—"lowered our cloud revenue and increased our license revenue." (¶ 271.)

Here again, Plaintiff does not allege that these statements were false.  Plaintiff does not plead any contrary facts about the Autonomous Database, BYOL, or Oracle's market share, nor does Plaintiff identify any customers who were then "moving off" Oracle.  Instead, Plaintiff claims that all the statements about deceleration were false because, according to the Complaint, "Oracle was finding it increasingly difficult" to use its allegedly improper sales practices and a "material portion of Oracle's cloud customers were declining to renew." (¶¶ 265, 267, 272.)

1   Plaintiff's falsity allegations fare no better here.  As discussed above in Part 1, Plaintiff

2   pleads no particularized facts showing that the alleged sales practices were used during the class

3   period, much less on a widespread basis.  Without any facts tied to specific times, Plaintiff

4   certainly does not establish that Oracle was finding it "increasingly difficult" to sustain the

5   alleged practices between December 2017 and March 2018.  *Cf. Bao v. Solarcity Corp.*, 2016 WL

6   54133, at *5-6 (N.D. Cal. Jan. 5, 2016) (rejecting CW allegations when complaint did not state

7   when during CWs' tenures certain facts and events allegedly inconsistent with public statements

8   took place).  Nor does Plaintiff explain how Oracle allegedly had the capacity to compel

9   customers to purchase Cloud products in the past, but then, somehow lost that capacity at the end

10  of the class period.  Likewise, there are no particularized facts naming any customers, let alone

11  verifiable figures, that support the conclusory allegation about a "material portion" of customers

12  declining to renew Cloud purchases.

13  Finally, Plaintiff challenges an additional purported "denial" of the challenged sales

14  practices that was issued on May 22, 2018.  (¶ 273.)  Oracle was responding to a report in *The*

15  *Information*, and stated:  "Oracle, like virtually every other software company, conducts software

16  audits in limited circumstances to ensure that our products are used as licensed.  We pride

17  ourselves in providing our existing 400,000 customers a variety of options to move to the cloud

18  when they are ready.  Oracle is grateful to its large and growing customer base and has no reason

19  to resort to scare tactics to solicit business.  We are disappointed that ***The Information is***

20  ***presenting inaccurate accounts regarding a handful of customers, based on anonymous***

21  ***sources or competitors who seek to enhance their own consulting services***."  (¶ 273.)

22  As with the earlier purported "denial" discussed in Part 1(c), the foregoing statement does

23  not deny that the sales practices at issue ever occurred.  Rather, this passage states only that the

24  article's description of certain specific customer situations was inaccurate and that Oracle does

25  not need to resort to "scare tactics."  Plaintiff has not shown anything improper about upselling

26  and cross-selling or offering discounts, incentives, and audit accommodations.  Nor has Plaintiff

27  shown that Oracle's opinion was subjectively disbelieved, objectively false, or lacking any

28  reasonable basis.  *Align*, 856 F.3d at 616-18.

3.   **Many challenged statements are non-actionable for the additional reason that they are statements of general corporate optimism.**

In connection with announcing Oracle's quarterly financial results, some of the Defendants expressed their enthusiasm about Cloud.  The Ninth Circuit has repeatedly held that similar statements—which may be described as "corporate optimism," "vague," or "aspirational"—are not actionable because reasonable investors do not rely on statements that are not "objectively verifiable."  *Intuitive*, 759 F.3d at 1060.  For example, in *Intuitive*, the defendants optimistically described sales opportunities as "very, very large" and said that the company will come out "stronger," and was "in a pretty good position."  *Id*.  These statements were "the antithesis of facts."  *Id.*

The same holds true with the optimistic statements challenged by Plaintiff that, for example, characterize Cloud growth as "tremendous" and "very, very strong"; describe Oracle's products and sales force as "better" than they used to be; and portray Oracle's transition to the Cloud as "going well" with "a lot to like about cloud."  (¶¶ 220, 244, 247, 252, 254, 260.)  These and similar expressions have long been considered non-actionable.  *See, e.g.*, *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (finding non-actionable the words "strong," "robust," "well positioned," "solid," and "improved").  This is an additional reason why these statements cannot be the basis of a securities fraud claim.

4.   **The Safe Harbor further protects the forward-looking statements.**

Plaintiff challenges five statements that are, on their face, forward-looking statements either in whole or in part.  (¶¶ 229, 230, 236, 269, 280.)  The Reform Act's Safe Harbor precludes liability for such statements when accompanied by meaningful cautionary language.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010); 15 U.S.C. § 78u-5(c)(1).

The challenged forward-looking statements forecast future earnings, revenue, or other financial performance.  (*See* ¶¶ 229, 230, 236, 269, 280.)  For example, on the June 21, 2017 earnings call, Defendant Catz replied to an analyst question asking whether projected future earnings growth was a "1-year phenomenon" and "how can we really be thinking about earnings growth beyond fiscal '18 into '19 and '20?"  (¶ 236.)  Catz responded:  "***So this is absolutely not***

1     ***a 1-year phenomena.***  In fact, what you should see, as this goes on, is we will have less drag from

2     the transition and the base will continue to grow.  And so this should really accelerate.  And

3     understand that in our PaaS-IaaS business, we're not even at scale.  ***So as we really scale that up,***

4     ***profitability is going to increase more quickly and revenues will be built on the base of another***

5     ***recurring revenue – of the recurring revenue business***."  (*Id.*)

6          The foregoing is a forward-looking statement on its face because it is responding to a

7     question specifically asking about future periods, it is worded in the future tense multiple times,

8     and it employs qualified language such as "this *should* really accelerate."  Catz's statement, like

9     the others, was accompanied by a robust preamble from Oracle's Investor Relations, which is

10    repeated before every earnings call (Ex. 1 at 4; Ex. 2 at 4; Ex. 3 at 4; Ex. 4 at 4; Ex. 5 at 4; Ex. 6

11    at 4), and is precisely the type of cautionary statement that the Ninth Circuit has held sufficient to

12    trigger the Safe Harbor.  *Cutera*, 610 F.3d at 1112.

13         For example, Oracle clearly cautioned that its "objective is to increase the renewal rates

14    on acquired and new cloud-based service contracts and hardware support contracts; however, we

15    cannot be certain that our customers will renew our cloud-based contracts, software license

16    updates and product support contracts or our hardware support contracts."  (Ex. 8 at 11.)

17    Similarly, Oracle cautioned that "customers may not purchase or subscribe to our software,

18    hardware or cloud offerings or renew software support, hardware support or cloud subscriptions

19    contracts.  Renewals of these contracts are important to the growth of our business."  (Ex. 15 at

20    15.)  These on-point warnings were meaningful and thus protect the forward-looking statements.

21    *Cutera*, 610 F.3d at 1112-13; *Intuitive*, 759 F.3d at 1058-59.

22         **B.     Plaintiff Fails to Plead a "Strong Inference" that Any Defendant Intended to
                    Deceive Investors.**

23

24         Plaintiff also fails to plead particularized facts giving rise to a "strong inference" of

25    scienter—"a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v.*

26    *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Scienter must be adequately pled for

27    each false or misleading statement and must be set out in "great detail."  *In re Silicon Graphics,*

28    *Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999); 15 U.S.C. § 78u-4(b)(2)(B).  For forward-

looking statements, Plaintiff must show Defendants had "actual knowledge" that their statements were false.  *Cutera*, 610 F.3d at 1112.  Scienter must also be alleged with respect to each Individual Defendant.  *Apollo*, 774 F.3d at 608-09.  Corporate scienter is derived from individual defendants.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

An inference of scienter must be both "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  This "inquiry is inherently comparative" and requires the court to "take into account plausible opposing inferences," *Zucco*, 552 F.3d at 991, but "omissions and ambiguities count against inferring scienter."  *Tellabs*, 551 U.S. at 326.  As part of the "holistic analysis," the court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco*, 552 F.3d at 991.  Where a complaint relies on CW accounts, as here, the CW allegations must be based on the CW's "personal knowledge," and those statements "must themselves be indicative of scienter."  *Id.* at 995.

As shown below, Plaintiff's allegations—based on CW statements, "access" to information, the "core operations" inference, and stock sales by one of the six Individual Defendants—are not particularized, much less as cogent as the nonculpable inferences here.

**1.      The CW allegations do not support any inference of scienter.**

The CW allegations do not support any inference of scienter.  (*See* ¶¶ 87-92, 102-134, 151-152, 179-180, 190-191.)  The CWs offer no allegations about Defendants Ellison, Kurian, Bond, or Miranda, so the CW allegations provide no basis from which their scienter may be inferred.  As to the two remaining Individual Defendants—Hurd and Catz—the Complaint fails to sufficiently establish the reliability of the CWs, and the CW allegations themselves are not indicative of scienter.  *Zucco*, 552 F.3d at 995-96.

**a.      The CW allegations are not reliable.**

First, no CW alleges any direct contact with Hurd or Catz.  Most of the CWs were in reporting relationships that were three or four levels removed from the Individual Defendants. (¶ 37.)  At most, CW1 prepared presentations "for Hurd's consumption" (¶ 180), CW2 saw

presentations that went to Hurd's direct reports or draft presentations "prepared for Hurd" (¶¶ 113, 180), and CW9 "understood" that information "would be summarized and presented at a higher level" (¶ 127).  Plaintiff "fail[s] to offer any confidential witness who could have personal knowledge of Defendants' specific conduct . . . that would provide sufficient support for a reasonable inference regarding Defendants' state of mind."  *Solarcity*, 2016 WL 54133, at *6.

Second, the CWs' allegations are unreliable hearsay.  *Zucco*, 552 F.3d at 997 & n.4.  For example, the Complaint alleges that CW3 "reported that Geraffo [VP of Sales] responded by stating that 'cloud was the future of Oracle's business model'" (¶ 114); that CW9 "stated that ERP employees were very vocal with Customer Success managers and directors about how the 'renewal rates suck'" (¶ 124); and that CW6 "stated that [] he heard from many sales representatives that Oracle 'would bundle things together and push cloud subscriptions right through'" (¶ 131).  None of these assertions is based on personal knowledge, as *Zucco* requires.

Third, two of the CWs—3 and 4—were not employed by Oracle during the class period. (¶¶ 37(c)-(d).)  Their allegations provide "little reliable insight into what occurred during the class period."  *Solarcity*, 2016 WL 54133, at *5.

Finally, six of the CWs were regional employees who focused on limited portions of Oracle's Cloud business in different regions.  (¶¶ 37(a)-(c), (f)-(h).)  Their own regional experiences "provide only snippets of information, not a view of the company's overall health; and the witnesses lack first hand knowledge regarding what the individual defendants knew or did not know about [Oracle's] financial health."  *Intuitive*, 759 F.3d at 1063.

**b.     The CW allegations also are not indicative of scienter.**

Even if the CWs were reliable and had personal knowledge, the allegations must themselves be indicative of scienter.  *Zucco*, 552 F.3d at 995-96.  The Complaint also fails this second hurdle, failing to link any Defendant's state of mind to a point in time, much less to any of the dozens of challenged statements.

None of the allegations attributed to CWs 2, 5, 6, or 9 are as of any particular time, which is especially problematic given that they worked at Oracle before or after the class period, some as early as 2010.  (¶¶ 37(b), (e), (f), (i).)  These CWs do "not state when in his/her tenure [the

allegedly contradicting events] occurred; if they occurred before the relevant time period, they cannot establish simultaneity." *Solarcity*, 2016 WL 54133, at *6.

CWs 1, 3, 7, and 8 make conclusory allegations about events that occurred in 2017, 2018, or "throughout the class period." (¶¶ 102, 115, 119, 151, 152.) At most, Plaintiff's allegations show "isolated instances" of the alleged conduct "rather than widespread deception, which would be necessary to establish fraudulent intent or reckless ignorance." *Apollo*, 774 F.3d at 608. The CWs lack first-hand knowledge about what Defendants knew. *Intuitive*, 759 F.3d at 1063.

The CWs' conclusory allegations about Defendants Hurd's and Catz's access to information do not fill the void. The CWs allege that Hurd and Catz approved compliance deals through the Deal Approval System (¶¶ 110, 111, 133, 134, 179, 190); that Hurd's direct reports received information or had "absolute awareness" about deals (¶¶ 112-114, 180); and that Hurd and Catz were "well aware" Oracle's Cloud revenue was illusory (¶ 133). Yet the Complaint does not "identify any documents or facts suggesting that the defendants knew that the growth rate" was any different than disclosed. *Ronconi*, 253 F.3d at 431. Plaintiff's allegations about the systems, code names, approval process, and color-coding of spreadsheets fare no better. (¶¶ 110, 112, 113, 122, 126, 128.) These generalized allegations are insufficient because "they do not detail the actual contents of the reports" that the Individual Defendants "purportedly referenced or had access to." *Intuitive*, 759 F.3d at 1063; *Zucco*, 552 F.3d at 998. Without specific facts, scienter cannot be inferred.

## 2. The core operations inference does not apply.

Next, Plaintiff asks the Court to infer fraudulent intent indirectly by invoking the so-called "core operations" inference. (¶¶ 196-199, 207.) The core operations theory "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Intuitive*, 759 F.3d at 1062. "Proof under this theory is not easy." *Id.* Plaintiff must show that this is one of the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.*; *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *19 (N.D. Cal. Dec. 18, 2017), *aff'd*, 2019 WL 1373202 (9th Cir. Mar. 26, 2019). This is not one of those circumstances.

The Complaint also alleges that scienter exists because Defendants Hurd, Catz, and Ellison made statements that Cloud was "important" (¶ 196) and that they were "focused" on Cloud (¶ 199); and because all six Individual Defendants were involved in the day-to-day operations of Oracle (¶¶ 207, 208).  These generalized allegations are precisely the types that "[a]t best, [] support a 'mere inference of [the defendants'] knowledge of all core operations,' not scienter."  *Intuitive*, 759 F.3d at 1062.  None of these allegations pleads specific information about companywide growth or revenue that contradicted Defendants' public statements, or describe or quantify the allegedly improper sales tactics.  *Metzler*, 540 F.3d at 1068.

### 3.    Kurian's stock sales do not support any inference of scienter.

Kurian's stock sales during the class period also fail to create an inference of his scienter.  Kurian is alleged to have made only two false statements—May 4 and May 10, 2017—about Cloud's "tremendous" and "very strong" growth.  (¶¶ 220, 226.)  As discussed in Part V.A(3), the statements are not actionable, so the Court need not even reach the stock-sale inquiry.  In any case, there is nothing suspicious about his stock sales.

The amount of Kurian's stock sales do not support any inference of scienter.  For one thing, Plaintiff distorts the amount of his sales by not accounting for his option exercise prices.  Doing so shows that the total net proceeds of the stock sales is $53.7 million (Ex. 20), not the $191.8 million alleged by Plaintiff (¶ 201).  His sales during the class period amount to no more than 34% of his available Oracle stockholdings.  (Decl. ¶ 21.)  The Ninth Circuit has held that courts "typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter."  *Metzler*, 540 F.3d at 1067 (noting no inference of scienter for defendant who sold 75% of holdings.)

Where, as here, "the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made," stock sales do not support scienter.  *Ronconi*, 253 F.3d at 436.  That was so in *Ronconi*, even though eleven defendants (including the CEO and CFO) sold stock—and seven of them sold more than 69% of their holdings during the class period.  Likewise, in *Metzler*, even though two defendants sold stock, the absence of stock sales by a third defendant supported the

inference that "there was no insider information from which to benefit." *Metzler*, 540 F.3d at 1067 (same).  The inference of scienter is far weaker here than in those dismissed cases where only one of the six Individual Defendants is alleged to have sold any stock during the class period (and, in fact, the two others who sold stock did so pursuant to 10b5-1 trading plans, which would undercut an inference of scienter (*see Metzler*, 540 F.3d at 1067 n.11)).

Finally, the timing of Kurian's sales is not suspicious.  The sales are not "calculated to maximize the personal benefit from the allegedly undisclosed information." *Align*, 856 F.3d at 622.  Approximately 81% of his class period sales *followed* the first alleged corrective disclosure on December 14, 2017, and 38% of those sales were also made after the second alleged corrective disclosure on March 9, 2018.  (¶ 201.)

### 4. Scienter cannot be inferred from Oracle's change to its financial reporting.

Plaintiff asserts that an inference of scienter arises from Oracle's decision at the class period's end to cease reporting Cloud revenues separately.  (¶¶ 192-195.)  There is nothing nefarious about that.  Oracle explained that its BYOL program resulted in large database contracts where some licenses were to be deployed on premise, while others were to be used in the Cloud (*see* Ex. 6 at 4), making it less relevant to distinguish between Oracle's Cloud and on-premise business.  The changed disclosure reflects the evolution of Oracle's business.  Plaintiff does not plead otherwise.  As this Court has recognized, "if the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, 'no public company would ever remove disclosures from its filings.'" *Welgus*, 2017 WL 6466264, at *8, *21.  Changing what is publicly disclosed does not establish scienter.  *Id*.

### 5. Plaintiff does not even try to show Defendants had actual knowledge that their forward-looking statements were false when made.

Plaintiff does not even attempt to show that any Defendant had actual knowledge that any forward-looking statements were false or misleading.  *Cutera*, 610 F.3d at 1112; *Ronconi*, 253 F.3d at 429.  This separately bars Plaintiff's challenge to the Defendants' forward-looking statements discussed in Part V.A(4) above.  (*See* ¶¶ 229, 230, 236, 269, 280.)

1

### 6.    Holistically considered, Plaintiff's fraud theory is not cogent.

2       Considering the scienter allegations together and holistically, the Complaint still fails to

3  plead a theory of fraud that is cogent and compelling.

4       At best, "Plaintiff['s] allegations reveal isolated instances of [allegedly improper

5  behavior], rather than widespread deception, which would be necessary to establish fraudulent

6  intent or reckless ignorance based on a holistic analysis." *Apollo*, 774 F.3d at 608.  According to

7  Plaintiff's unsubstantiated claims, Defendants knew that customers would not renew their one-

8  year Cloud subscriptions (*see* ¶¶ 118, 119, 121) and that the one-year subscriptions were "short-

9  term infusions of cash . . . that Defendants knew would quickly evaporate" (¶ 115).  How does

10 $1.7 billion in Cloud revenues for 4Q18—a record amount at the end of the class period—support

11 a claim for "evaporation"?

12      What motive would Defendants have to engage in such a short-lived fraud?  None is

13 alleged.  Ellison and the other Individual Defendants collectively owned around $50 billion worth

14 of Oracle shares during the class period (Ex. 17 at 24), and most suffered the same alleged

15 "losses" as Plaintiff.  *Cf. In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160

16 (C.D. Cal. 2007) ("[A]ny inference of scienter is defeated when [defendants] end up reaping the

17 same large losses as did Plaintiff when the stock price dropped.").  As in other cases, a "lack of

18 stock sales can detract from a scienter finding." *Webb v. SolarCity*, 884 F.3d 844, 856 (9th Cir.

19 2018).

20      Moreover, Oracle repurchased over $12 billion worth of its shares during the class period.

21 (Ex. 5 at 5; Ex. 6 at 6.)  This further undercuts a finding of intent, "since it is illogical that

22 [Oracle] would have been repurchasing its shares had it been aware of facts that would indicate

23 the price would fall." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017); *In re

24 Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (same).  These

25 stock purchases "support an inference of innocence." *SolarCity*, 884 F.3d at 856.

26      Further, given that Plaintiff's case is predicated on claims of "illusory"—albeit accurate—

27 financial results based on alleged sales practices that industry critics had publicly complained of

28 since at least 2014, the absence of any issues with Oracle's independent auditors also cuts against

1    inferring scienter.  *Metzler*, 540 F.3d at 1068-69.  The absence of a restatement does, too.  *Zucco*,

2    552 F.3d at 997 n.5.

3         Plaintiff's theory is not cogent or more compelling than the opposing, nonculpable

4    inference that the Court can draw.  Oracle launched and promoted a new product line in a

5    competitive market, achieved impressive results and strong growth rates that—as with all

6    things—grew at a lower rate over time, consistent with the "law of large numbers."  (Ex. 19 at 7.)

7    Yet even at the end of the class period, Oracle's Cloud revenues were growing, just not as fast as

8    before.  That is consistent with Oracle's projections.  That is not fraud.

9    **VI.    PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A.**

10        Plaintiff's other claims under §§ 20(a) and 20A also fail.  Section 20A allows recovery

11   against someone who violates the Exchange Act by trading securities "while in possession of

12   material, nonpublic information" by a person who traded contemporaneously with the insider.

13   *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1033 n.10 (9th Cir. 2002).

14        "[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first

15   allege a violation of § 10(b) or Rule 10b 5."  *Lipton*, 284 F.3d at 1035 n.15.  As shown above, the

16   Complaint fails to plead a predicate violation under Section 10(b).  That is fatal for these claims.

17   *See id.*; *Zucco*, 552 F.3d at 990; *Apollo*, 774 F.3d at 610.  The § 20A claim fails for a second

18   reason:  Plaintiff "fail[s] to identify any specific material nonpublic information in the possession

19   of [Kurian] at the time of a specific trade."  *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1208

20   (N.D. Cal. 2008).

21   **VII.   CONCLUSION**

22        For all the foregoing reasons, Defendants respectfully request that the Court grant

23   Defendants' Motion to Dismiss.

24

25   Dated:  April 19, 2019                    MORRISON & FOERSTER LLP

26

27                                            By:  */s/ Jordan Eth*

28                                            Attorneys for Defendants