1  BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
2  MARK LEBOVITCH (admitted *pro hac vice*)
3  JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
   ABE ALEXANDER (admitted *pro hac vice*)
4  JULIA K. TEBOR (admitted *pro hac vice*)
   (markl@blbglaw.com)
5  (johnr@blbglaw.com)
   (abe.alexander@blbglaw.com)
6  (julia.tebor@blbglaw.com)
   1251 Avenue of the Americas
7  New York, NY 10020
   Tel:    (212) 554-1400
8  Fax:    (212) 554-1444
            -and-
9  JONATHAN D. USLANER (Bar No. 256898)
10 (jonathanu@blbglaw.com)
   12481 High Bluff Drive, Suite 300
11 San Diego, CA 92130
   Tel:    (858) 793-0070
12 Fax:    (858) 793-0323
13
   *Counsel for Lead Plaintiff Union Asset*
14 *Management Holding AG and Lead Counsel*
   *for the Class*
15

16              UNITED STATES DISTRICT COURT
17             NORTHERN DISTRICT OF CALIFORNIA

18 |                                    | Case No. 18-cv-4844-BLF |
19 | IN RE ORACLE CORPORATION SECURITIES | ECF Case |
   | LITIGATION                         | |
20 |                                    | **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** |
21 | | |
22 | | |
   | | Date: October 17, 2019 |
23 | | Time: 9:00 a.m. |
   | | Ctrm: 3, Fifth Floor |
24 | | |
   | | Judge: Hon. Beth Labson Freeman |
25 | | |
26 | | Date Action Filed: August 10, 2018 |

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  SUMMARY OF FACTS .............................................................................................3

III.  THE COMPLAINT ADEQUATELY ALLEGES
MATERIAL MISREPRESENTATIONS AND
OMISSIONS .................................................................................................................6

  A.  Defendants Falsely Denied Using Financially
Engineered Deals ...........................................................................................7

  B.  Defendants Misled Investors By Touting Cloud
Revenue Hypergrowth ....................................................................................8

  C.  Defendants Misled Investors About the Drivers Of
Cloud Growth ...............................................................................................13

  D.  Defendants Misled Investors About "Sustained"
Cloud Growth ...............................................................................................13

  E.  Defendants Misled Investors About The Causes of
Oracle's Decelerating Cloud Growth ...........................................................15

  F.  Defendants' Remaining Arguments Fail .......................................................17

IV.  THE COMPLAINT ADEQUATELY ALLEGES
SCIENTER .................................................................................................................18

V.  THE COMPLAINT ADEQUATELY ALLEGES CLAIMS
UNDER SECTIONS 20A AND 20(a) ........................................................................25

VI.  CONCLUSION ..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdo v. Fitzsimmons*,
   2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) .........................................................17

*In re Adaptive Broadband Sec. Litig.*,
   2002 WL 989478 (N.D. Cal. 2002) .........................................................25

*In re Atossa Genetics Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) .........................................................15

*Beaver Cty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*,
   94 F. Supp. 3d 1035 (D. Minn. 2015) .........................................................13

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ......................................................... *passim*

*In re Bofl Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) .........................................................12, 21

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................................11, 24

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .........................................................12, 20

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007) .........................................................11

*In re Finisar Sec. Litig.*,
   646 Fed. App'x 506 (9th Cir. 2016) .........................................................7

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) .........................................................13

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .........................................................20

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) .........................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................... *passim*

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .........................................................25

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017) ........................................................13

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...........................................................7, 21

*Makor Issues & Rights Ltd. v. Tellabs Inc.*,
   513 F. 3d 702 (7th Cir. 2008) ...............................................................25

*Meltzer Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................................10

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) .................................................................6

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................8, 11, 17, 22

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017) ..................................9, 13, 14

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) .....................................................21

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...............................................................25

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .....................................................18, 21, 22

*Oregon Pub. Emps. Ret. Fund v. Apollo*
   774 F.3d 598 (9th Cir. 2014) ...............................................................10

*Police and Fire Ret. Sys. of the City of Detroit v. Crane*,
   87 F. Supp. 3d 1075 (N.D. Cal. 2015) ..................................................9, 10

*Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*,
   759 F. 3d 1051 (9th Cir. 2014) ..............................................................23

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ..............................................................23

*In re Quality Sys. Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ........................................................ *passim*

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ............................................9

*In re Redback Networks Inc. Sec. Litig.*,
  2007 WL 4259464 (N.D. Cal. Dec. 4, 2007) ........................................................................10

*Reese v. Malone*,
  747 F.3d. 557 (9th Cir. 2014) ..............................................................................................20

*S. Ferry LP, #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ...............................................................................................13

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ...........................................................................................9, 18

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .......................................................................................6,14,18

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................................8

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. Jun. 17, 2011) ........................................................................7

*In re Sunbeam Sec. Litig.*,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) ..................................................................................20

*In re SupportSoft, Inc. Sec. Litig.*,
  2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) .......................................................................9

*Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................12, 18

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ......................................................................20

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) .......................................................................15

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................20

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) .............................................................................................12

*In re VeriFone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993) .................................................................................................10

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ...................................................................................................7

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...........................................................................11

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) .........................................................................22

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ...............................................................................14, 15

**STATUTES**

Fed. R. Evid. 801(d)(2)(D) ...........................................................................................21

Fed. R. Civ. P. 15 ...........................................................................................................25

## I.     INTRODUCTION

Based on the detailed reports of former senior executives from multiple locations throughout the world, a lengthy regulatory investigation, Oracle's own documents, and the accounts of numerous industry participants, the Complaint alleges that Oracle systemically employed "financially engineered deals" to artificially inflate its cloud revenues and growth rates. Through this widespread strategy, Oracle coerced its customers into bogus "purchases" of short-term cloud subscriptions. In truth, these were not cloud sales: these customers were purchasing relief from draconian audit penalties related to Oracle's on-premises software, or discounts on the on-premises software itself. ¶¶82-134.

Nevertheless, Defendants reported these "sales" as cloud revenues, emphasized that Oracle was "the fastest growing cloud company at scale," and assured investors that this revenue growth was driven solely by the superiority of its cloud products and sales force. Significantly, when asked whether they were using coercive, financially engineered deals to fuel Oracle's remarkable growth, Defendants denied it. ¶¶51-66, 224, 273. This misconduct violates basic tenets of the securities laws set forth in Ninth Circuit decisions such as *Orexigen* and *Berson*. As the Ninth Circuit recently held, once Defendants emphasized positive cloud data, they were "obligated to share []information" that "diminished the weight of those results"—*i.e.*, that Oracle's cloud results were driven by coerced and artificial sales and did not represent true customer demand. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014-15 (9th Cir. 2018).

Nowhere does Defendants' brief deny that Oracle employed financially engineered deals—nor could it, given the raft of information demonstrating that Oracle did. Rather, Defendants contend that the former employee reports do not state when the alleged misconduct occurred or how much revenue impact it had. Mot. 1. This argument is divorced from the Complaint, which pleads this information in detail. Among other things: (i) facts reported by a former Vice President in North America cloud sales demonstrate that 90-95% of North America cloud sales during the Class Period were financially engineered deals; (ii) a former Regional Sales Director for Middle East and Africa reported that more than 75% of his team's cloud sales in 2017 and 86% of his team's cloud sales in 2018 were financially engineered deals; and (iii) a Senior Technology &

Cloud Sales Consultant reported that the use of financially engineered deals spiked at the start of fiscal year 2017, and 90% of cloud revenue in Southern California was generated through such deals. ¶¶87, 102-05, 110-14, 117. These reports are corroborated by the findings of a regulator, Oracle documents illustrating how financially engineered deals were executed, and numerous reports by industry participants and the financial press that such deals were commonplace. ¶¶54-61, 63, 93-101, 135-49. And when the financially engineered deals began to expire, Oracle's growth rate plummeted from 58% to 21%. Such facts easily support the inference that these tactics were material in scope, which is all that is required. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (statement actionable "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists").

Defendants also argue that, even if Oracle employed financially engineered deals, they are immune from liability because the sales were "real" and the Company "accurately reported its financial results." Mot. 1. Again, this argument ignores the Complaint, which alleges that Oracle's cloud revenue and growth rates were artificially inflated because a material portion of that revenue was *not* true cloud sales. Moreover, under Ninth Circuit law, even if Oracle's cloud revenue and growth rates were "technically accurate" (and they were not), Defendants' statements were still misleading because Defendants failed to "share [] information" that "diminished the weight of those results." *Orexigen*, 899 F.3d at 1014-15.

The Complaint also adequately alleges scienter. This is not a case of isolated misconduct by a few rogue employees; numerous facts demonstrate that this was a Company-wide strategy at the core of Oracle's "playbook." ¶¶82-134. All significant financially engineered deals were reported to—and approved by—Defendants Hurd and Catz through Oracle's internal Deal Approval System ("DAS"). ¶¶110-11, 134. Further, both before and during the Class Period, Defendants were directly informed of Oracle's tactics: regulators, industry participants and the media repeatedly confronted Oracle with concerns over its widespread use of financially engineered deals to artificially inflate its cloud numbers—making it impossible for Defendants to say they were unaware. ¶¶51-66, 224, 273. Defendants' motion should be denied.

## II.      SUMMARY OF FACTS

Oracle's traditional "on-premises" products were installed within the customer's physical facilities. ¶38. During the last decade, new "cloud" technology emerged and became increasingly dominant. Cloud technology allows users to store and access their data remotely via the Internet. *Id*. While other companies such as Amazon and Google quickly adopted cloud computing, Oracle refused to do so, with Defendant Ellison dismissing it as "nonsense." ¶40-42. That was a big mistake. By late 2015, Oracle's revenue flattened and started to decline, while its competitors were reporting large cloud revenues and explosive growth rates. ¶¶44-45, 47.

Forced to recognize that the only way it could show meaningful growth was to create a successful cloud business, Oracle announced that it was making the "move to cloud." ¶48. Oracle's ability to transform itself into a cloud technology company was the most important issue facing the Company, and the primary focus of its investors. ¶¶196-98. Oracle's executives stated that this was a "generational shift in technology that is the biggest and most important opportunity in [the] Company's history." ¶48. Analysts and the financial press reported that it was a matter of "existential importance" for Oracle, and that "Oracle's future and relevance is pinned on its ability to become a bigger player in cloud." ¶49.

However, the rise of cloud computing had caught Oracle "flat-footed, leaving the firm in scramble mode as it races its peers to the cloud." ¶50. From the outset, prominent financial press and industry sources, including *Forbes*, *CRN* and Clear Licensing Counsel, reported that Oracle may be ginning up cloud "sales" to try to catch up with its competitors. ¶¶51-66, 162. The concerns centered on whether Oracle was systemically misusing "audits" of its on-premises customers to coerce them into "buying" short-term cloud products that the customer did not want, need, or intend to use or renew. ¶58. These reports questioned whether Oracle's "Cloud Sales Numbers Are Misleading" because they were built on such phony "sales." Oracle's executives repeatedly denied these reports as "absolutely not true" and "conspiracy rumor." ¶¶61-66.

During the Class Period, Defendants made a bevy of statements designed to convince investors that Oracle had successfully accomplished its all-important "pivot to the cloud." As detailed in the Complaint, Defendants: (i) emphasized Oracle's explosive cloud revenue "hyper-

growth" rates, underscoring that Oracle was supposedly now "the fastest-growing scale cloud business in the world" (¶¶213, 228, 232-33); (ii) stated that the "drivers" of the Company's cloud revenues were purely legitimate, including that Oracle's cloud "products," "sales force," and "ability to implement" were superior to its competitors' (¶¶79, 80, 222, 224-27, 252, 254); and (iii) represented that Oracle's cloud revenue "hyper growth" was "sustained," and was "absolutely not a 1-year phenomena." ¶236. Notably, when questions again arose about whether Oracle was juicing its cloud revenues with artificial and coercive sales, Defendants continued to deny them, stating that the reports were "inaccurate" and would end "as we go to cloud." ¶¶224, 273.

The market credited Defendants' representations, concluding that Oracle had successfully transformed itself into a high-growth cloud computing enterprise. Analysts reported that "it appears that Oracle has crossed the cloud chasm, which will lead to higher sustained revenue growth," and Oracle had "put to rest fears of the company being rendered obsolete by cloud computing." ¶¶78, 238. Oracle's stock price soared 24% to a 52-week high. ¶¶68, 75-76, 81.

Unbeknownst to investors, however, Oracle engaged in the very coercive sales practices that Defendants assured investors Oracle shunned. ¶¶82-148. Oracle widely employed two tactics to manufacture "sales" of cloud product to existing on-premises customers. First, Oracle used the "Audit, Bargain, Close" or "ABC" strategy. Oracle installed its on-premises products in a way that would likely cause its customers to run afoul of the licensing agreement. Oracle then audited the customer's use of the on-premises product and threatened them with large audit penalties. Finally, Oracle allowed the customers to avoid the larger audit penalties on the on-premises licenses only if they "purchased" a short-term cloud subscription. Second, Oracle employed "attached deals." In this strategy, Oracle would offer customers large discounts on their on-premises products if they nominally "purchased" an unwanted cloud product. These two practices were so widespread that Oracle employees coined a term for them: "financially engineered deals." ¶16.

The Complaint features the accounts of nine former Oracle executives from across the globe who consistently recounted these practices (¶¶87-134), including among others:

FE 1, a Regional Sales Director for Middle East and Africa, who reported that more than 75% of his team's cloud sales in 2017 and 86% of his team's cloud sales in 2018 were financially

engineered deals. ¶¶37, 87, 89, 102, 106-07, 110, 112.

FE 2, a Vice President in North America cloud sales during the Class Period, who reported that 90-95% of the sales his team dealt with were driven by engineered deals. ¶¶37, 103-05, 113, 117, 121, 180. The North American market was a highly material, if not the most significant, market for Oracle. *See* Defendants' Ex. 8 at 14 (earnings release showing that the Americas constituted over 55% of Oracle's "[t]otal cloud and on-premise software revenues"). FE 2 also saw presentations that went to Hurd's direct reports stating that 90-95% of the Company's cloud sales had no use cases. ¶113.

FE 3, a Senior Technology & Cloud Sales Consultant in Southern California from 2012 to March 2017, who reported that the ABC scheme was "an active practice" used to "juice the numbers" that "was stepped up into high gear at the beginning of" fiscal year 2017, and 90% of cloud revenue in his territory was generated through attached deals. ¶¶37, 87, 91, 109, 111, 114-15, 117, 119, 134.

FE 5 and FE 9, both Directors of Customer Success at Oracle from 2016 to 2018, who explained that a high percentage of the cloud contracts were known as "dead on arrivals" or "DOA," because when it came time to renew, customers would refuse and say that they bought cloud only because they got a discount on an on-premises product. ¶¶37, 87, 108, 122-26.

FE 7, who was responsible for Oracle's cloud business in the Czech Republic, Hungary, and Slovakia, reported that 65% of his team's cloud sales were financially engineered deals during the Class Period. ¶¶37, 115-17.

FE 8, a Cloud Platform Sales Manager who managed a North American cloud sales team, who reported that financially engineered deals were "extremely common," and comprised more than 75% of his cloud revenue. ¶¶37, 115, 120.

The accounts of these former Oracle executives are independently corroborated by other credible sources. Among them, Chile's top anti-competition regulator determined, following a two-and-a-half-year investigation, that Oracle used its "auditing process" to require on-premises customers to purchase "'cloud' products or licenses that were neither wanted nor used by customers." ¶¶135-46. Industry participants—including Gartner, UpperEdge, and Palisades

1    Advisory—also uniformly described how Oracle's "audits are one of the more common tactics we
2    have seen effectively drive Cloud sales." ¶¶146-49.

3        Revenue growth manufactured through these tactics soon deteriorated. Between December
4    2017 and March 2018, Oracle reported a dramatic slowdown in cloud revenue growth, from 58%
5    to 32%, far below the 76-98% growth rates competitors were reporting. ¶¶154, 159. Analysts and
6    the financial press attributed the revenue slowdown to Oracle's tactics, noting that customers were
7    "irate with Oracle due to [its] auditing practices" (¶157) and its "Audit Bargain Close playbook."
8    ¶¶162, 166. *Forbes* reported that these practices raised "disturbing" questions for Oracle investors,
9    including whether Oracle would "ever reveal how much of its could sales are actually shelfware?"
10   Oracle's stock price fell 10%.

11       On June 19, 2018, Oracle shocked investors by announcing that its cloud revenue growth
12   had slowed to a paltry 21%, and it would cease reporting cloud results and guidance. ¶169.
13   Analysts reported that the "radical change in disclosure" was "an attempt to pull the proverbial
14   wool over investors' eyes particularly related to cloud sales." ¶170. The financial press likewise
15   reported that this maneuver "suggests [Oracle] has something to hide"—namely, that the drop-off
16   in cloud revenues was the result of years of artificial, "coerced" sales to create an illusion of "true
17   customer-driven demand" that was now melting away. ¶¶174-77. Oracle's stock price declined
18   another 7.5%, or 19% from its Class Period high. ¶289.

19   **III.    THE COMPLAINT ADEQUATELY ALLEGES MATERIAL**
         **MISREPRESENTATIONS AND OMISSIONS**
20       The Exchange Act protects investors from: (i) misstatements and (ii) omissions of material
21   fact that render a statement misleading. A statement is false or misleading "if it would give a
22   reasonable investor the impression of a state of affairs that differs in a material way from the one
23   that actually exists." *Berson*, 527 F.3d at 985. Under the securities laws, "statements, although
24   literally accurate, can become, through their context and manner of presentation, devices which
25   mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Importantly, if a
26   company chooses to tout positive information, it must also "disclos[e] adverse information that
27   cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th
28

---

1  Cir. 2016). "Whether a public statement is misleading … is a mixed question to be decided by the

2  trier of fact." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *9 (C.D. Cal. Jun. 17, 2011). It

3  cannot be resolved as a matter of law unless "the adequacy of the disclosure … is so obvious that

4  reasonable minds could not differ." *Orexigen*, 899 F.3d at 1014.

5      **A.    Defendants Falsely Denied Using Financially Engineered Deals**

6      Defendants falsely denied that Oracle was using financially engineered deals to generate

7  artificial cloud revenue. On May 9, 2017, an analyst asked Defendant Bond to "give us some sort

8  of indication as to what percentage of revenue and margin is associated with auditing practices of

9  customers." ¶224. Recognizing the issue was a prominent one that "gets talked about a lot," Bond

10 denied that Oracle used audits to drive cloud sales, stating that "the story" was bigger than "the

11 realities," Oracle audited "in as gracious way as we can" and that as "we go to cloud, [] this

12 conversation is going to go away." *Id.* On May 22, 2018, in response to an article by *The*

13 *Information* about Oracle's coercive use of audits to drive cloud deals, Oracle stated that it "had

14 no reason to resort to scare tactics to solicit business" and the article was "inaccurate." ¶273.

15     In truth, Oracle *was* using audits of on-premises licenses to coerce customers into

16 "purchasing" cloud products they did not want. *See, e.g.,* ¶¶87-114. Defendants' denials and

17 statements minimizing Oracle's use of these tactics were false or, at minimum, misleading. *See In*

18 *re Finisar Sec. Litig.*, 646 Fed. App'x 506, 507 (9th Cir. 2016) (falsity pled when defendant denied

19 existence "of an inventory build-up and down-played concerns"); *Lloyd v. CVB Fin. Corp.*, 811

20 F.3d 1200, 1209 (9th Cir. 2016) ("[T]he omission of that [adverse] fact, combined with the

21 reassurance that everything was fine . . . meets the pleading standard for a material omission.");

22 *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (falsity pled where defendant stated

23 "everything [was] going fine" in response to market fears).

24     Defendants attempt to rewrite these denials, contending that, in the response to *The*

25 *Information* article, Oracle never "den[ied] that the sales practices at issue ever occurred," but

26 merely maintained that the "article's description of certain specific customer situations was

27 inaccurate." Mot. 16. But Defendants' denial was not so limited. ¶273. Defendants' effort to

28 rewrite their Class Period denials is particularly suspect in light of Oracle's years of flat denials on

this issue, including telling investors that these same allegations were "absolutely not true," "conspiracy rumor," and that using aggressive audits to generate cloud revenue would be "wrong." ¶¶64-65; *see Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014) (false statements must be viewed "in context"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1134 (N.D. Cal. 2017) ("[S]tatements made before or after the class period . . . may be relevant in that they shed light on the 'truth or falsity of Class Period statements.'"). At best, Defendants' argument creates a factual dispute about how the market understood their Class Period denials, which the Ninth Circuit has held cannot be resolved "as a matter of law." *Berson*, 527 F.3d at 986-87.

## B. Defendants Misled Investors By Touting Cloud Revenue Hypergrowth

Defendants touted Oracle's cloud revenue "hypergrowth," telling investors, among other things, that Oracle was "the fastest-growing scale cloud business in the world," and "the cloud has become our predominant growth vehicle." ¶¶213, 229-35. These statements were part of their broad, successful campaign to convince the market that Oracle had transformed itself into a high-growth cloud company. Such statements were materially misleading because they failed to disclose that Oracle's cloud revenue growth was driven in significant part by artificial transactions, in which customers were not truly purchasing cloud product, but rather were purchasing discounts on on-premises products or relief from audit penalties related to on-premises products.

Defendants' statements are actionable under Ninth Circuit law holding that once Defendants "chose to tout" the growth in cloud sales, they were "bound to do so in a manner that wouldn't mislead investors as to what the [growth] consisted of." *Berson*, 527 F.3d at 987; *see also Schueneman*, 840 F.3d at 706. Once Oracle emphasized its positive growth rates, it was "obligated to share [] information" that "diminishe[d] the weight of those results," including that those results were driven by coerced and artificial sales, and did not represent true customer demand. *Orexigen*, 899 F.3d at 1014-15.

Defendants' primary argument is that all their statements regarding cloud revenue growth are not actionable *as a matter of law* because "Oracle actually received the revenue reported and properly recognized it." Mot. 10-11. This argument fails for two reasons. First, Defendants ignore that, while the revenue generated through these tactics was "received," it was *not* true cloud

revenue and it was improperly booked as such. As noted above, the customers were purchasing relief from audit fines for on-premises products, or discounts for on-premises products. As FE 4 reported, "essentially [Oracle was] not growing their business or building additional licenses, they were just shifting revenues from one set of books [on-premises] to another [cloud]." ¶118.

Second, even if Oracle's revenue figures were "literally accurate," statements concerning literally accurate data are actionable where, as here, they omit facts that render them misleading in context. In *Orexigen*, the plaintiff alleged that the company's disclosure of early test results for its key drug was misleading. In rejecting defendants' argument that the disclosure was not actionable because the results were accurate, the Ninth Circuit reasoned: "[a]lthough the 25 percent interim results were still technically accurate, the issue is whether, having learned new information that diminished the weight of those results, Orexigen was obligated to share that information. We conclude that Orexigen was so obligated." 899 F.3d at 1015. Similarly, here, it "cannot [be said] as a matter of law, that defendants fulfilled th[eir] duty" to disclose the adverse information that diminished the weight of the "sustained hyper-growth" they so heavily touted to the market. *Berson*, 527 F.3d at 987.

Indeed, courts routinely hold such statements actionable. *See S.E.C. v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011) (statements describing "growth as accelerated" actionable where defendants did not "simultaneously disclos[e] the unusual nature of the … transactions"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *9 (D. Or. June 27, 2017) (defendant's representations about its "growth" due to customer demand actionable where it "did not include disclosure of the additional facts that [defendant] was aggressively pulling in sales"); *Police and Fire Ret. Sys.of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 (N.D. Cal. 2015) (statements that revenue growth was "accelerating" misleading where company failed to disclose how it was altering underlying contracts); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. Oct. 1, 2013) (misleading to conceal "the true causes of the increased sales and financial success"); *In re SupportSoft, Inc. Sec. Litig.*, 2005 WL 3113082, at *2 (N.D. Cal. Nov. 21, 2005) (statement that company "continue[s] to grow and outperform the industry" misleading for failure to disclose that company implemented new policy to generate a near-term revenue spike).

Defendants' authority is inapposite. Mot. 10. *In re VeriFone Securities Litigation*, unlike here, concerned the alleged "failure to disclose a forecast of future sales and revenue." 11 F.3d 865, 869 (9th Cir. 1993). In *Oregon Public Employees Retirement Fund v. Apollo*, the student enrollments were bona fide (whereas here the sales were not), and all the material risks of collecting tuition on those enrollments were disclosed. 774 F.3d 598, 609-10 (9th Cir. 2014). In *Meltzer Inv. GMBH v. Corinthian Colleges, Inc.*, unlike here, plaintiffs failed to connect the alleged misconduct to the company's "financial well being" or its "characterizations of its financial health." 540 F.3d 1049, 1070-71 (9th Cir. 2008). *In re Redback Networks Inc. Securities Litigation*, 2007 WL 4259464 (N.D. Cal. Dec. 4, 2007), was a pure omissions case based on stated financials. Here, in contrast, Defendants made a host of misleading statements as part of a broad campaign to convince the market that Oracle had fundamentally transformed itself into a high-growth cloud business—which was the single most important issue to investors. These statements included representations that Oracle was "the fastest growing cloud company at scale," that its growth was driven by superior products and sales force, and denials that the revenue was stemming from the improper means alleged. That broad course of misleading statements—all of which triggered a duty to disclose here—was absent in *Redback*.

Defendants contend that their misstatements are not misleading because striking financially engineered deals is not "illegal." Mot. 11. However, the law does not require that, to plead a materially misleading statement, Plaintiff must allege that the defendant engaged in underlying illegal or criminal behavior. All that is necessary is that the statement create "the impression of a state of affairs that differs in a material way from the one that actually exists"—precisely the case here. *Berson*, 527 F.3d at 985; *Crane*, 87 F. Supp. 3d at 1084 (whether "the 'repapering scheme' was itself illegal or unethical … is a distraction"; "it doesn't matter whether the repapering scheme was proper or improper. What matters is that the defendants misled investors.").

Defendants also argue that the reports from former employees are "conclusory" and vague as to time or the amount of revenue impacted. Mot. 9-12. However, the Complaint specifies the time as to which each former employee's report pertains (*see, e.g.,* ¶¶91, 102, 109, 119), and the reports specify the percentage of sales that were artificially manufactured by the improper tactics

1   (¶¶102-03, 106-07, 109, 113, 116-17, 120, 125, 127). Further, these detailed accounts are

2   corroborated by Oracle's documents about the Denver audit and reports from regulators and other

3   industry participants both before and during the Class Period. ¶¶54-61, 63, 93-101, 135-49.

4        For instance, Defendants point to a statement by FE 1 as vague (Mot. at 10-11), but ignore

5   the numerous specific statements by FE 1 that "more than 75% of their team's cloud sales in 2017

6   were made to customers under threat of license audit, who purchased the product simply to avoid

7   the hefty penalties" and in "2018 such sales accounted for 86% of his team's revenue." ¶102. FE

8   1 also stated that "less than 9% of the MEA region's cloud subscriptions were renewed, and many

9   were never even used." FE 2, a former Vice President in North America cloud sales from

10   September 2015 to December 2018, stated that 90-95% of cloud sales were financially engineered.

11   ¶¶103-05, 113. FE 7 reported that 65% of his team's sales during the Class Period were engineered.

12   ¶¶115-17. Similarly, FE 5 and FE 9, both Directors of Customer Success at Oracle from 2016 to

13   2018, stated that "many of the cloud contracts were called 'dead on arrivals' or 'DOA,' because

14   when it came time to renew, the customers would refuse and, instead, say that they only bought

15   the cloud product because they got a discount on another product they actually wanted." ¶122. FE

16   5 explained that the cloud renewal rate was just 15-20% for certain quarters, and that 90% of DOA

17   customers did not renew. ¶125; *see also* ¶¶106-07, 119-22, 151-52. Such allegations are more than

18   adequate. *See Mulligan*, 36 F. Supp. 3d at 962 (former employee accounts sufficiently

19   particularized where they "provided consistent accounts of the conditions, practices and

20   procedures [] within their respective spheres"); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F.

21   Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (falsity pled based on multiple corroborating reports

22   from employees in various locations with differing levels of seniority).

23        Plaintiff does not have access to Oracle's books and records, and accordingly is not

24   required to plead at this stage the precise amount of overall revenue affected by Oracle's improper

25   sales practices. *See In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192,

26   1222 (W.D. Wash. 2009) ("Plaintiffs are not required to quantify the amount by which the

27   Allowance was understated."); *In re Faro Techs. Securities Litig.*, 534 F. Supp. 2d 1248, 1260

28   (M.D. Fla. 2007) (rejecting argument that "a plaintiff may not sue for misrepresentation absent

1  allegations that quantify the falsity" because this "is simply not required (and often simply not

2  available) at the pleading stage").

3      Importantly, the Complaint's detailed allegations give rise to the inference that the artificial

4  sales were material in scope, including: (i) the former employee reports that these practices were

5  widespread and accounted for a large majority of their team's sales; (ii) the corroborating reports

6  of regulators and industry participants that such practices were common; (iii) the sharp decline in

7  Oracle's cloud growth rates at the end of the Class Period—from 58% to 21%—which gives a

8  numerical indication of the severe extent to which these practices impacted Oracle's overall cloud

9  revenue growth; and (iv) Oracle's decision to hide its faltering cloud business from public view

10  once the impact of these practices emerged. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th

11  Cir. 2005) (sustaining complaint where there were "at least some specific allegations of how the

12  adjustments affected the company's financial statements and whether they were material in light

13  of the company's overall position.").

14      Contrary to Defendants' assertion, the former employees were not "low-level sales

15  representatives." Mot. 12. They included the Regional Sales Director for Middle East and Africa,

16  Vice President in North America cloud sales, Vice President of Global Sales Engineering,

17  Directors of Cloud Customer Success, and Regional Technology Sales Director. ¶37. Moreover,

18  contrary to Defendants' argument, reports of employees who left before the Class Period, along

19  with other pre-Class Period events—the investigation by the Chilean government, the ABC sale

20  to Denver, and the Clear Licensing Counsel report—are relevant because they corroborate the

21  allegations of fraud during the Class Period. *See In re Bofl Holding, Inc. Sec. Litig.*, 2017 WL

22  2257980, at *13 (S.D. Cal. May 23, 2017) (falsity alleged where pre-class period employees

23  corroborated other former employee statements); *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130,

24  1145 (9th Cir. 2017) (pre-class period employee report was highly probative).

25      Finally, Defendants' reliance on *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th

26  Cir. 2002) (Mot. 12) is misplaced. Unlike here, *Vantive* concerned only the "general allegation that

27  management was informed about important issues in the company"; in any event, the Ninth Circuit

28  has recognized that, after the Supreme Court's *Tellabs* decision, *Vantive is* "too demanding" and

1   "focused too narrowly." *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 783-84 (9th Cir. 2008).

2   **C.   Defendants Misled Investors About the Drivers Of Cloud Growth**

3       Defendants also stated that Oracle's cloud revenue growth was driven by customers

4   "willingly" purchasing cloud due to Oracle's supposed superiority to its competitors. *See, e.g.*,

5   ¶¶80, 222, 224-27, 252, 254. For example, in response to an analyst's question, Defendant Hurd

6   stated that Oracle's successful results were driven by the fact that its cloud products, salesforce,

7   and ability to implement were superior to its competitors'. Defendant Bond similarly assured

8   investors that the "driver" of Oracle's cloud sales was "a reduction of total cost of ownership" (*i.e.*,

9   lower pricing) and an "innovation advance" that made updates easier to install. ¶254. When listing

10  the "drivers" of Oracle's cloud revenues, Defendants failed to disclose that Oracle's coercive sales

11  practices were, in reality, a material driver of cloud revenue growth. *See* ¶¶82-149.

12      Companies mislead investors where, as here, they disclose certain drivers of success while

13  omitting other factors that show the purported success is less promising. *In re LendingClub Sec.*

14  *Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (omission misleading because "investors

15  would also have been interested to know that millions of dollars of loans were not the result of

16  organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly

17  neutral platform, but were inflated artificially through self-dealing disguised as real transactions");

18  *Precision*, 2017 WL 3084274, at *9 (defendant's representations about its "growth" due to

19  customer demand actionable where it "did not include disclosure of the additional facts that

20  [defendant] was aggressively pulling in sales"); *Beaver Cty. Emps. Ret. Fund v. Tile Shop*

21  *Holdings, Inc.*, 94 F. Supp. 3d 1035, 1050 (D. Minn. 2015) (misleading to attribute expanding

22  gross margins to legitimate practices where the margin expansion was driven by undisclosed

23  related party transactions); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184-85

24  (S.D.N.Y. 2010) (statements attributing purportedly "organic" loan growth to "existing customers"

25  misleading where significant number of loans were purchased). Defendants' only argument

26  specifically applicable to these statements—that they are "puffery"—is addressed below.

27  **D.   Defendants Misled Investors About "Sustained" Cloud Growth**

28      Defendants repeatedly characterized Oracle's cloud revenue growth as "sustained." ¶¶242,

1   249. Further, in response to analyst questions about whether Oracle's cloud growth was a "1 year

2   phenomenon," Defendant Catz stated that it was "absolutely *not* a 1-year phenomena." ¶236. These

3   statements were important to investors, who were focused on whether Oracle's "multiyear rapid

4   cloud transition" was bona fide. ¶77. These statements were misleading, as they omitted that

5   Oracle relied upon unsustainable sales practices to artificially inflate the cloud growth metrics.

6   Representations about "sustainable growth" are misleading where, as here, the company omits that

7   they relied upon "aggressive sales strategies" that are not sustainable. *Murphy*, 2017 WL 3084274,

8   at *13-14.

9        Defendants misconstrue the Complaint by contending that Plaintiff is alleging a duty to

10   predict that Oracle's future prospects may not be as rosy as past performance. *See* Mot. 13.

11   Defendants' misstatements were not forward-looking. They were present representations of fact

12   about the quality of cloud revenue, and the legitimacy of Oracle's supposed transformation, which

13   were misleading because they failed to disclose that Oracle's cloud revenues were fueled in

14   significant part by artificial "sales." Defendants' failure to disclose this fact violated the basic

15   disclosure principle that, when they "tout[ed] positive information to the market, they [were]

16   bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse

17   information that cuts against the positive information." *Schueneman*, 840 F.3d at 706.

18        Defendants also argue that these statements are not actionable because Oracle met its

19   revenue growth guidance during the Class Period. Mot. 13. Defendants' argument is nonsensical:

20   Defendants used coercive sales tactics *to reach* the guidance. And when Oracle's improper sales

21   practices failed, Oracle ceased reporting cloud guidance to obfuscate the truth. ¶171.

22        Defendants also incorrectly argue that Defendant Catz's statement that cloud revenue

23   growth was not a "1-year phenomena" is inactionable under the PSLRA safe harbor. Mot. 17-18.

24   However, as noted above, this statement is not forward-looking because it incorporated and relied

25   on Oracle's "then-present circumstances," *i.e.,* the current quality and source of its revenue growth.

26   *Quality Systems*, 865 F.3d at 1142 ("Nor is the safe harbor designed to protect [companies] when

27   they make a materially false or misleading statement about current or past facts, and combine that

28   statement with a forward-looking statement.").

Moreover, even if this statement was purely forward looking (which it is not), it would still not be protected by the PSLRA's safe harbor. Catz knew that Oracle's cloud revenue was generated by financially engineered deals, and as such, the cloud growth was unsustainable. *See Zaghian v. Farrell*, 675 F. App'x 718, 719 (9th Cir. 2017) (statements that a product would be successful did not fall into statutory safe harbor where defendants knew that the product would not achieve the touted financial outcome). In addition, this statement was not accompanied by "meaningful cautionary language." Nowhere in any of Oracle's purported "risk warnings" did it warn of its financially engineered deals. *See id.* (boilerplate statement that the product might fail to "achieve . . . sales expectations" insufficient); *see also In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (statement did not fall within the safe harbor where risk warnings were "vague"). Defendants' cited authority is inapposite. *See Zaghian*, 675 F. App'x at 720 (distinguishing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (cited Mot. 18) because Cutera warned of the exact risk). Other paragraphs referenced by Defendants are not even arguably forward-looking. ¶¶229-30.

## E.       Defendants Misled Investors About The Causes of Oracle's Decelerating Cloud Growth

When asked about the deceleration in Oracle's cloud revenues beginning in late 2017, Defendants repeatedly denied that customers were "moving off of Oracle [cloud]," and assured investors that revenues had decelerated merely because customers were waiting for Oracle's next generation cloud product, known as the "Autonomous Database," or because of Oracle's "Bring Your Own License" program. *See, e.g.*, ¶¶263-64, 266, 269-71. The Complaint details that, in truth, Oracle's cloud revenues declined because customers refused to renew short-term subscriptions that had been forced on them, and other customers began to fight against Oracle's "playbook." ¶¶150-53. These misrepresentations about the true causes of Oracle's revenue decline are actionable. *See Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *10 (C.D. Cal. Aug. 4, 2017) (finding actionable statements about the "causes of the [sales] declines").

Defendants assert that Plaintiff must plead "contrary facts" that disprove their explanation for the declines in cloud revenues. Mot. 15. However, it is not Plaintiff's burden to disprove

Defendants' factual assertions at the pleading stage. *See Orexigen*, 899 F. 3d at 999 ("If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."). Plaintiff has pled former employee reports as well as copious market reaction showing that the deceleration was due to Oracle's coercive sales practices. ¶¶150-53, 157, 160, 174-76. It has also pled that Defendants' "BYOL" excuse—*i.e.*, that the BYOL program made it hard to distinguish between cloud and non-cloud revenue—was not credible. *See, e.g.*, ¶171 (*TechCrunch*: "I have a hard time buying into that argument"); ¶172 (Deutsche Bank: "[w]e're not convinced by Oracle's explanation"). At best, whether Defendants' purported explanations are true is a question of fact.

Defendants also erroneously assert that Plaintiff does not allege the "specific times" when customers refused to renew. Mot. 16. Multiple former employees discuss a lack of renewals specifically in late 2017 (¶¶150-53), and others reported that the issue arose in 2017 and 2018, also when the deceleration was occurring. ¶119 (FE 7 stating that 90% of their team's attached deals were not using or deploying their product throughout 2017 and 2018).

Defendants also assert that the Complaint does not contain "verifiable figures" for the precise amount of sales that were not renewed, or specifically name the customers who declined to renew. Mot. 16. As noted above, such evidence is essentially impossible to obtain without discovery and is not required at this stage. Further, the Complaint alleges detailed non-renewal figures. For example, FE 1 reported that less than 9% of the Middle East and Africa region's cloud subscriptions were renewed (¶107), and FE 3 stated that attached deals were renewed less than 15% of the time. ¶119. Similarly, FE 8 stated that less than 10% of FE 8's clients renewed their cloud subscriptions at the same level they had initially signed up for, and most declined to renew any amount of product. ¶120. Finally, Defendants incorrectly argue that the Complaint provides no explanation for how Oracle lost the ability to compel customers to make artificial cloud purchases. Multiple former employees explained that the original coerced cloud deals were short-term and were not renewed when they expired, while customers also began to push back against the ABC tactic after it became widespread. *See, e.g.*, ¶¶87, 105-08, 116-17, 119-22, 127, 151-52.

1

### F.      Defendants' Remaining Arguments Fail

2      Defendants' remaining arguments can be swiftly rejected. Defendants contend that they

3  did not have a duty to disclose the improper sales practices and their impact because the Complaint

4  supposedly "does not point to any statement by Defendants that affirmatively created an

5  impression that denied the existence of the alleged sales practices." Mot. 14. This is wrong on the

6  facts and the law. First, Defendants need not have issued a denial to be under an obligation to

7  disclose the truth. *See Orexigen*, 899 F.3d at 1010; *Berson*, 527 F.3d at 985. Second, as discussed

8  herein, Defendants indeed denied the improper sales practices, while making numerous additional

9  statements touting Oracle's cloud revenue growth and the supposedly legitimate drivers of that

10  growth. All these statements triggered a duty to disclose the truth.

11      Defendants also argue that Plaintiff's allegations are "boilerplate," and "leave[] it to the

12  Court to sort out the statements and match them with the corresponding adverse facts." Mot. 9.

13  Not so. The Complaint cites detailed and corroborating facts, including: (i) accounts from former

14  employees across many departments in various parts of the world; (ii) particular examples of

15  financially engineered deals; (iii) Oracle documents illustrating the ABC audit practices; (iv)

16  regulatory findings; and (v) other specific reports from industry participants describing the

17  improper practices. ¶¶82-149. The Complaint also "clearly lay[s] out the relevant events and

18  misstatements and why Plaintiff[] allege[s] those statements were misleading." *Abdo v.*

19  *Fitzsimmons*, 2017 WL 6994539, at *7 (N.D. Cal. Nov. 3, 2017).

20      Plucking snippets of their statements out of context, Defendants also incorrectly contend

21  that the Court must conclude, as a matter of law at the pleading stage, that a handful of their

22  statements about revenue growth and the drivers of that growth were immaterial "puffery." Mot.

23  17. "[D]etermining whether a given statement is material entail[s] fact-intensive assessments that

24  are more properly left to the jury." *Mulligan*, 36 F. Supp. 3d at 966. The "Court may not assess the

25  statements listed in the [complaint] in a vacuum, plucking the statements out of their context to

26  determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery." *Id.*

27      Here, the statements that Defendants argue are puffery, when taken in context, are neither

28  vague nor immaterial under Ninth Circuit law. Defendants' statements about cloud revenue growth

are "concrete description[s]," not "feel good optimistic statements," and concerned the single most important issue to Oracle and its investors. *Quality Sys.*, 865 F.3d at 1144 (statement that sales were "unchanged, or even growing, compared to previous quarters" not puffery); *Todd*, 642 F.3d at 1221 ("how officers and directors . . . describe revenue growth to investors is important"). And the statements discussing "drivers" of cloud revenue growth were specific answers to analyst questions, that again concerned the most important issue to Oracle and its investors. *See, e.g.,* ¶¶247, 254. Indeed, analysts repeatedly relied on Defendants' statements when issuing buy ratings for Oracle stock (¶¶216, 238, 249), Defendants' statements caused Oracle's stock price to rise significantly (¶¶217, 239), and when the truth was revealed, Oracle's stock price declined dramatically, and the market reacted harshly (¶¶157-58, 161, 168, 170-77). It cannot be said that such statements are immaterial as a matter of law.

## IV.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. The following facts, viewed collectively, raise a strong inference of scienter.

*First*, Defendants Hurd and Catz personally approved numerous financially-engineered deals through which Oracle generated significant cloud revenue. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show" scienter is through "contemporaneous reports or data, available to" the defendant). As multiple former Oracle sales executives explained, Hurd and Catz were required to, and did, approve all cloud deals worth over $5 million and any deal where a discount in excess of 50% was offered on software by signing off on DAS entries that clearly noted those deals were engineered. ¶¶110-11, 134. In addition, FE 1 personally prepared presentations for Hurd that "would very clearly say that LMS was engaged" on cloud deals and that "they were compliance deals." ¶112. Likewise, FE 2

described slides in draft presentations prepared for Hurd that listed "attached" as the top reason customers purchased cloud products, as well as "presentations that went to Hurd's directs," which showed that 90-95% of the Company's cloud deals were not driven by customer need. ¶113. These allegations are more than sufficient. *See Quality Sys.*, 865 F.3d at 1144 (scienter adequately alleged where witnesses reported that defendants had access to and used internal sales reports).

Defendants assert that Hurd's and Catz's approval of engineered deals cannot support an inference of scienter because the DAS entries supposedly did not show that Oracle's revenue growth rate was different than the publicly reported rate. Mot. 21. This argument is a red herring. Defendants deceived investors about Oracle's use of engineered deals to generate cloud revenue, which is precisely what the DAS entries approved by Hurd and Catz made clear. Moreover, while Defendants broadly argue that the former employees' reports are unreliable, the reports independently provided virtually identical detailed accounts of Oracle's use of engineered deals, how such sales were reported up through internal databases and presentations, and the volume of their teams' cloud sales that were engineered during the Class Period. ¶¶82-134.

Equally baseless is Defendants' assertion that the scienter allegations are somehow insufficient because no former employee "alleges any direct contact with Hurd or Catz." Mot. 19. There is no requirement that a former employee have "direct contact" with the individual defendants, particularly where the Complaint includes detailed allegations that Hurd and Catz signed off on large engineered deals. Moreover, FEs 1 and 2 both described presentations prepared for Hurd—indeed, FE 1 even described content that he was instructed to add that was specifically addressed to Hurd—describing the Company's use of engineered deals to drive sales.

*Second*, Defendants were confronted with numerous reports that Oracle was using financially engineered deals to manufacture phony cloud revenue, including (i) articles by major media outlets, such as *Forbes* and *Business Insider*, that included corroborating reports from customers (¶¶60-63); (ii) a report by Clear Licensing sent to Defendants Ellison, Hurd, Catz, and Oracle's Board of Directors (¶¶58-59); and (iii) an ongoing investigation by Chile's top anti-competition regulator stemming from Oracle's misuse of audits to generate cloud sales (¶¶135-47). Both before and during the Class Period, Oracle and Bond denied reports that Oracle used

audits to generate cloud revenue, calling them "absolutely not true" and "a conspiracy rumor." ¶185. Such facts strongly support the scienter inference. *See Reese v. Malone*, 747 F.3d. 557, 571 (9th Cir. 2014) (inference of scienter where issue was "the focus of both public and government inquiries"); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (given "the red flags from . . . the *Los Angeles Times* article, and the investigations by regulatory agencies, it would be absurd to suggest that management was without knowledge of the matter").

Defendants do not contest (nor could they) that their public denials of these reports support the scienter inference. Courts consistently hold that denials "demonstrate, at a minimum, extreme recklessness." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999). Rather, Defendants incorrectly assert that pre-Class Period warnings cannot support an inference of scienter during the Class Period. Mot. 6. Defendants ignore that they also denied reports questioning Oracle's cloud sales practices during the Class Period. ¶273. Moreover, "common sense dictates that facts relevant to scienter will ordinarily date from before any alleged misrepresentations" because the "circumstances preceding the statements . . . would be among those knowable at the time of the statements." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012).

*Third*, Oracle's use of engineered deals was widespread and well-known within the Company. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (inference of scienter where undisclosed practices "were well known throughout the Company"). Nine former Oracle executives from different departments across the world provided virtually identical accounts concerning the ubiquitous use of engineered deals to generate fake cloud revenues. ¶¶37, 87-134; *see also In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (adequacy of confidential witness statements evaluated in light of "corroborative nature of the other facts alleged (including from other sources)"). Significantly, former employees reported that these practices were routinely discussed by Oracle's most senior executives. ¶180.

Defendants incorrectly contend that the former employees offer "only snippets of information, not a view of the company's overall health." Mot. 20. The former employees' accounts provide a comprehensive and consistent view of Oracle's use of engineered deals to

generate cloud revenue: all identify the same deal mechanics implemented widely across different departments and regions and comprising the vast majority of their sales. Moreover, their accounts are corroborated by reports in the financial press, findings by a regulator, and accounts of industry participants. *See Oracle*, 380 F.3d at 1231 (reports by "former employees . . . in various regions of the United States (and working in a number of different departments)" "offer a substantial window into the overall financial health of the corporation," and "[i]n combination with the remaining allegations in the Complaint, these statements create a strong inference of scienter.").

Next, Defendants assert that portions of three former employee reports are "unreliable hearsay." Mot. 20. But statements made by Oracle executives to the former employees—including a senior executive's admission to FE 3 that "auditing was part of Oracle's business and strategy to drive revenue" (¶114)—are neither inadmissible hearsay (*see* Fed. R. Evid. 801(d)(2)(D)) nor "unreliable" at the pleading stage. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus."). Likewise, it is irrelevant that two of the former employees left Oracle shortly before the Class Period. *See Quality Systems.*, 865 F.3d at 1145 (pre-class period employee report was highly probative). As one court explained in rejecting a similar challenge, "the fact that [the former employee] worked at [the company] before the Class Period does not diminish the probative value of his allegations" because they "corroborate the allegations of other [former employees] and tend to indicate that [the defendant] was engaged in a pattern of misconduct that began before the Class Period and extended into it." *In re Bofi Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *8 n.6 (S.D. Cal. May 23, 2017).

*Fourth*, Oracle's efforts to obscure its declining cloud revenue growth by radically changing the way it reported its cloud results further supports an inference of scienter. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015) ("Evidence that a defendant has taken steps to cover-up . . . a misdeed is strong proof of scienter."). In June 2018, as the Company was finding it increasingly difficult to use engineered deals to generate cloud revenue, Oracle ceased separately reporting cloud results and issuing cloud guidance. Analysts reported that Oracle's about-face was "an attempt to pull the proverbial wool over investors' eyes—particularly

related to cloud sales," and pointed out how suspicious the change was given that "as little as three quarters ago on the F1Q18 earnings call, Oracle was focusing investors on cloud growth" and telling investors that "'[w]e are the fastest growing cloud company at scale.'" ¶¶170-76.

Defendants' self-serving explanation that Oracle changed its reporting to accommodate its new "BYOL program" (Mot. 23) is baseless and cannot be credited at this stage. In making this argument, Defendants ignore the Ninth Circuit's admonition in *Orexigen* that a court should *not* substitute Defendants' factual narrative for the Complaint's well-pled allegations. 899 F.3d at 999. In any event, Defendants' counternarrative is not credible and, at most, raises a factual dispute that cannot be decided now. Defendants do not explain why Oracle would have suddenly changed its reporting of cloud revenues in June 2018 to accommodate the BYOL program that had been rolled out *nine months earlier*. Nor do Defendants explain why, if their explanation for the change in financial reporting were so compelling, analysts rejected it. *See, e.g.*, ¶¶170-77. And, this is not a situation in which Defendants merely removed certain language from the Company's SEC filings, *see Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *8 (N.D. Cal. Dec. 18, 2017) (Mot. 23)—Defendants' change in financial reporting was an attempt to "pull the wool over investors' eyes" regarding the Company's cloud business, as analysts recognized. ¶170.

*Fifth*, Oracle's "move to cloud" was "the biggest and most important opportunity" in its history, and the subject of greatest importance to the market. ¶¶196-97. The inference is strong that Defendants knew, or were deliberately reckless in not knowing, that the sales of the most important segment of Oracle's business were driven by engineered deals. *See Mulligan*, 36 F. Supp. 3d at 969 ("core operations" theory indicative of scienter). Moreover, given the importance of cloud growth to Oracle and investors, Defendants reassured the market *for years* that they were very closely monitoring it. Ellison, for instance, told investors that "senior management down to individual programmers and sales people are focused on one thing: selling applications in the cloud, selling our platform in the cloud and selling our infrastructure in the cloud." ¶199. These reassurances bolster the inference of scienter. *Oracle*, 380 F.3d at 1231 (inference of scienter where "all three top executives said that they monitored portions of Oracle's global database").

Contrary to Defendants' assertions, the Complaint does not advance "generalized" scienter

allegations based on Defendants' positions (Mot. 22); rather, the Complaint contains specific allegations based on Defendants' own admissions about the importance of cloud revenue and their careful attention to it. *See* ¶¶196-99. While Defendants rely on *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.,* that case undermines their argument, as the Ninth Circuit noted that "core operations" allegations *support* an inference of scienter where, as here, the defendant stated he "monitor[ed]" the data in question. 759 F.3d 1051, 1062 (9th Cir. 2014); *see* ¶¶179-80 (Hurd and Catz approved deals through DAS).

*Sixth*, Defendant Kurian's stock sales further bolster the scienter inference as to him. ¶¶200-06. Kurian sold more than 40% of his holdings (even by Defendants' reckoning, he sold more than a third of his holdings) for proceeds of more than $191 million, and his sales were unusual in both amount and in timing. *See, e.g., Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (stock sales supported scienter where defendant sold "about 20% of his stock for $1,340,000"). Most of Kurian's sales occurred just before Oracle announced a dramatic deceleration in cloud growth and ceased reporting cloud results. That these sales occurred after Oracle announced its first quarterly decline in cloud growth does not negate the fact that Kurian sold just before the more substantial stock declines accompanying announcements of increasingly troubling news. Moreover, Kurian's Class Period sales were nearly triple his trading during the prior period of the same length (and, even by Defendants' accounting, more than double).

Defendants' reliance on *Metzler* is misplaced, as the sales there were neither suspiciously timed nor inconsistent with pre-class period trading. Indeed, courts have found a defendant's sales of 18% of his holdings suspicious "when considered along with the proceeds of those sales," which amounted here to over $191.7 million in gross proceeds, and at a minimum, $53.7 in net proceeds. *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199 (C.D. Cal. 2004).

Defendants also attempt to rebut the Complaint's strong inference of scienter with their own self-serving narrative based on "facts" nowhere alleged in the Complaint. Mot. 24-25. In crafting their counter-narrative, Defendants have asked the Court to judicially notice or consider 21 exhibits that include, among other things Defendants' self-serving statements about the reasons why Oracle changed its reporting (Mot. 12) and why its cloud growth declined (Mot. 25), a

"rebound" in Oracle's stock price after the Class Period (Mot. 4), and an irrelevant stock "buy back" not referenced in the Complaint (Mot. 7). The Court should decline Defendants' invitation to improperly accept the truth of their exhibits' contents to resolve disputed facts in their favor. The Ninth Circuit has rejected such an "improper application of judicial notice and the incorporation-by-reference doctrine" which is "not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Orexigen*, 899 F.3d at 998, 1003.

Further, as to Defendants' arguments regarding the "buyback," courts have consistently held that such buybacks could be viewed as an attempt to "keep the ball rolling" as the alleged fraudulent practice "began taking its toll on the Company[]." *See, e.g.*, *Countrywide*, 554 F. Supp. 2d at 1068. Such is the case here. If the Court were to consider materials outside the pleadings, it should consider that the *Wall Street Journal* and others widely reported that Oracle has a pattern of "buy[ing] its way to stability" through stock buybacks. *See* Dan Gallagher, *Oracle Buys Its Way to Stability*, The Wall Street Journal (Sept. 18, 2018 2:41PM), https://advance.lexis.com/api/ permalink/ded086a0-8cf6-4f80-887e-fe66f463a6bd/?context=1000516.   These reports explained that the buybacks provided an artificial boost to earnings per share, "which has helped offset the pressure of disappointing financial results as the legacy software maker slowly transitions to the cloud," and helped its stock price "recover[]." *Id.*; *see also* Richard Waters, *Oracle Props Up Earnings with Buyback Despite Revenue Miss*, Financial Times (Sept. 17, 2018), https://www.ft.com/content/007ad198-babc-11e8-94b2-17176fbf93f5. This manipulative conduct is why, contrary to what Defendants assert (Mot. 4), Oracle's stock price did not fall further and supposedly "rebounded." If anything, such manipulative behavior *supports* the scienter inference. In any event, the impossibility of resolving such fact-intensive arguments based on documents outside the pleadings is precisely why the Ninth Circuit forbids judicially noticing such purported arguments masquerading as "facts." *See Orexigen*, 899 F.3d at 998, 1000.

Defendants also rhetorically ask why Oracle would conceal its unsustainable sales tactics. Mot. 24. The same question could be asked of any company that engages in misleading conduct that is ultimately revealed. As courts have explained in rejecting this argument, Defendants "may have thought that there was a chance that the situation . . . would right itself" and "so, the benefits

of concealment might exceed the costs." *Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F. 3d 702, 710 (7th Cir. 2008). This is particularly so here because Oracle's on-premises business had flatlined, it needed to show cloud growth to have any relevance to investors, and it desperately needed to gain any toehold in a market that was dominated by its competitors. ¶¶38-66.

Defendants contend that an "absence" of stock sales supposedly negates scienter. Mot. 22-23. They overlook Kurian's sale of $191 million in stock. Further, the Ninth Circuit has rejected this contention, holding that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *16 (N.D. Cal. 2002) ("that Defendants did not sell their own stock matters little").

Finally, contrary to Defendants' argument, a restatement is not required to plead a Section 10(b) claim. "[T]he lack of a restatement [does] not mean that [Oracle] only engaged in legitimate conduct." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008).

## V.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTIONS 20A AND 20(a)

Defendants seek dismissal of the claims under Sections 20(A) and 20(a) of the Exchange Act based solely on their argument that Plaintiff failed to plead a predicate violation of Section 10(b), including sufficiently pleading scienter as to Kurian. Mot. 25. As discussed above, Plaintiff has adequately pled a violation of Section 10(b), including Kurian's scienter.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. If, however, the Court should dismiss any part of Plaintiff's claims, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15.

Dated: May 31, 2019                          Respectfully submitted,


**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**


*/s/ John Rizio-Hamilton*
John Rizio-Hamilton


MARK LEBOVITCH (admitted *pro hac vice*)
JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
ABE ALEXANDER (admitted *pro hac vice*)
JULIA K. TEBOR (admitted *pro hac vice*)
(markl@blbglaw.com)
(johnr@blbglaw.com)
(abe.alexander@blbglaw.com)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

              -and-

JONATHAN D. USLANER (Bar No. 256898)
(JonathanU@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323


*Counsel for Lead Plaintiff Union Asset Management
Holding AG and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I, John Rizio-Hamilton, hereby certify that on May 31, 2019, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
JOHN RIZIO-HAMILTON