JORDAN ETH (CA SBN 121617)
JEth@mofo.com
MARK R.S. FOSTER (CA SBN 223682)
MFoster@mofo.com
ROBERT W. MAY (CA SBN 295566)
RMay@mofo.com
SU-HAN WANG (CA SBN 284863)
SWang@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Defendants
ORACLE CORPORATION, SAFRA A. CATZ,
MARK HURD, LAWRENCE J. ELLISON,
THOMAS KURIAN, KEN BOND, and STEVE MIRANDA

DORIAN E. DALEY (CA SBN 129049)
Dorian.Daley@oracle.com
DEBORAH K. MILLER (CA SBN 95527)
Deborah.Miller@oracle.com
JAMES C. MAROULIS (CA SBN 208316)
Jim.Maroulis@oracle.com
ORACLE CORPORATION
500 Oracle Parkway
Mail Stop 5OP7
Redwood City, California 94065
Telephone: 650.506.5200
Facsimile: 650.506.7114

Attorneys for Defendant ORACLE CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| *In re Oracle Corporation Securities Litigation* | Case No. 5:18-cv-4844-BLF<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**<br><br>Date: October 17, 2019<br>Time: 9:00 a.m.<br>Ctrm: 3, Fifth Floor<br><br>Judge: Hon. Beth Labson Freeman<br><br>Date Action Filed: August 10, 2018 |

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. PLAINTIFF FAILS TO PLEAD MATERIAL FALSITY. .......... 2

A. Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues, Growth Rates, Or Adoption. .......... 2

1. Plaintiff fails to show that reported Cloud revenue or growth was “fake” or stemmed from improper sales practices. .......... 2

2. Plaintiff fails to show that Defendants misled investors about the sustainability of Cloud growth. .......... 5

3. There was no duty to disclose the alleged practices in any case. .......... 6

B. Plaintiff Fails To Show That Any Defendant Misled Investors About The Reasons For The Deceleration Of Cloud Growth. .......... 7

C. Many Challenged Statements Are Non-Actionable Vague Statements. .......... 8

D. The Safe Harbor Further Protects The Forward-Looking Statements. .......... 9

III. PLAINTIFF ALSO FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER. .......... 10

A. The CW Allegations Do Not Support Any Inference Of Scienter. .......... 10

1. The CW allegations are not reliable. .......... 10

2. The CW allegations also are not indicative of scienter. .......... 11

B. Alleged “Denials” Do Not Support Any Scienter Inference. .......... 12

C. Scienter Cannot Be Inferred From Oracle’s Changed Reporting. .......... 13

D. Kurian’s Stock Sales Do Not Support Any Inference Of Scienter. .......... 13

E. The Core Operations Inference Does Not Apply. .......... 14

F. Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge That Their Forward-Looking Statements Were False When Made. .......... 14

G. Holistically Considered, Plaintiff’s Theory Is Not Cogent. .......... 15

IV. PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A. .......... 15

V. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bao v. SolarCity*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .......... 11

*Brody v. Transitional Hosps. Corp.*, .......... 6
280 F.3d 997 (9th Cir 2002)

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008).......... 1, 3, 14

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .......... 15

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).......... 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*,
856 F.3d 605 (9th Cir. 2018).......... 7, 14

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......... 15

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010).......... 10

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005).......... 5, 12

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......... 12

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004) .......... 14

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2019).......... 1, 3, 13, 15

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......... 15

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016).......... 7, 10

*Metzler Inv. GmbH v. Corinthian Colls.*,
540 F.3d 1049 (9th Cir. 2008).......... 1, 2, 5, 6, 14, 15

## TABLE OF AUTHORITIES

Page(s)

*Mulligan v. Impax Labs.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......... 7, 14

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. June 27, 2017) .......... 4

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) .......... 4, 8

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .......... 12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .......... 1, 2, 5, 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
759 F.3d 1051 (9th Cir. 2014) .......... 1, 9, 11, 12

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) .......... 14

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .......... 1, 9, 11

*Redback Networks, Inc. Sec. Litig.*,
2007 WL 4259464 (N.D. Cal. Dec. 4, 2007),
*aff'd*, 329 Fed. App'x 715 (9th Cir. 2009) .......... 1, 3

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .......... 12

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .......... 6, 9

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 12, 14

*S. Ferry v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......... 5

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011) .......... 3, 9

*Shenwick v. Twitter*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .......... 7

# TABLE OF AUTHORITIES

Page(s)

*Shueneman v. Arena Pharm.*,
840 F.3d 698 (9th Cir. 2016) ..... 1, 3

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ..... 13

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999) ..... 13

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ..... 8

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ..... 12

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ..... 1, 5

*In re VeriFone Sec. Litig.*,
784 F. Supp. 2d 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) ..... 3

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ..... 7

*Zucco Partners LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..... 10, 15

## I. INTRODUCTION

Plaintiff's Opposition repeatedly overstates the Complaint's allegations. Plaintiff says there are "detailed reports" from "former senior executives," but Plaintiff's CWs were many levels removed from the Individual Defendants and provide no specifics. Plaintiff says "Oracle's own documents" support Plaintiff's claim, but the Complaint cites only one document, a scheduling email that—like the so-called "lengthy regulatory investigation"—predates the Class Period. Plaintiff points to Oracle Cloud's decelerating growth rates, but ignores that Oracle itself publicly projected these precise rates. The fact that some "industry participants" criticized Oracle's sales tactics does not show that Oracle misled investors. None of the rest does, either.

Like the Complaint, the Opposition calls Oracle's revenues "artificial." But no document, witness, auditor, customer, or government entity supports Plaintiff's pejoratives. There is nothing about discounting, promoting, or upselling that makes Oracle's real sales to its real (and sophisticated) customers "fake." That makes this case like the affirmed dismissals in *Apollo*, *Intuitive*, *Metzler*, *Redback*, *Vantive*, and *VeriFone*.

Plaintiff wishes away those key cases, offering instead cases that each involved a concealed *fact* directly contradicting public statements. In *Orexigen*, clinical trials were reported as ongoing and positive when specific factual allegations showed that the trials had been stopped and unsuccessful. In *QSI*, the company stated that the market was booming when specific facts showed that it was saturated. In *Shueneman*, defendants stated that "all" animal studies supported the safety of a new drug when a rat study showed that the drug was potentially carcinogenic. In *Berson*, backlog was touted when the government issued a stop-work order that turned a factory into a "ghost town." Here, Plaintiff relies not on facts, but its own labelling of Oracle's revenue.

As to scienter, Plaintiff alleges no specific facts about what any Defendant knew at any specific point in the Class Period, let alone any facts showing an intent to deceive. The Opposition does not dispute that the Individual Defendants collectively owned $50 billion of Oracle stock, seeing the same "losses" alleged by Plaintiff, and that Oracle repurchased $12 billion of its own stock at prices inflated by its own alleged fraud (i.e., inflicting harm on itself). Plaintiff's claim is as illogical as it is unsubstantiated. The Complaint should be dismissed.

## II. PLAINTIFF FAILS TO PLEAD MATERIAL FALSITY.

The Opposition presents a narrative devoid of particularized, contemporaneous facts showing the falsity of any Class Period statement. (MTD 8.)

### A. Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues, Growth Rates, Or Adoption.

#### 1. Plaintiff fails to show that reported Cloud revenue or growth was "fake" or stemmed from improper sales practices.

Plaintiff alleges fraud by adjective. Like the Complaint, the Opposition labels Oracle's audited (and never restated) Cloud revenues as "artificial" and "fake." (Opp. 1:18, 2:14, 2:26, 7:7, 8:15, 10:28, 14:5, 16:25, 20:21.) Saying revenue is "fake" is like calling news "fake"; it does not make it so. Completely lacking are particularized allegations showing anything "fake."

The Opposition offers three explanations for the supposed fakeness: customers obtained "discounts"; customers allegedly "purchas[ed] relief from draconian audit penalties"; and Oracle's Cloud revenue was "not true cloud revenue" because, according to the Opposition, "it was improperly booked as such." (Opp. 1:7-9, 8:28-9:1.) These contentions are meritless.

Plaintiff cites no legal, accounting, or other authority holding that giving discounts makes revenues false. If that were so, much of commerce would be a sham. Likewise, Plaintiff points to nothing prohibiting Oracle from inducing Cloud sales by waiving what the Complaint itself concedes is Oracle's contractual right to audit customers and seek additional license fees when a customer is not in compliance. (MTD 11; ¶ 53.) These realities force Plaintiff to argue, without citation to the Complaint, any witness, or any accounting principle, that Oracle's Cloud revenues were "improperly booked." (Opp. 9:1.)

Plaintiff's failure to show that Oracle inaccurately reported or recognized its revenues makes this case no different from the Ninth Circuit's decisions in *Metzler Inv. GmbH v. Corinthian Colls.*, 540 F.3d 1049 (9th Cir. 2008), and *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014), where the plaintiffs, as here, challenged reported financial results based on allegations of wrongdoing. (MTD 8-9.) Plaintiff argues that the Complaint here "connect[s] the alleged misconduct" to Oracle's reported financial results, unlike *Metzler*, but Plaintiff shows no such connection. (Opp. 10.) Plaintiff brushes aside *Apollo* by saying sales

there were "bona fide," relying again on the unsupported assertion about "fake" revenue.

The Opposition skirts *Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007), *aff'd*, 329 Fed. App'x 715 (9th Cir. 2009), and ignores *VeriFone I*, which *Redback* cites in concluding that there is no authority "'holding that accurate reporting of revenues can constitute the basis of a securities fraud claim.'" *Id.* (citing *In re VeriFone Sec. Litig.*, 784 F. Supp. 2d 1471, 1485 (N.D. Cal. 1992) (*VeriFone I*), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (*VeriFone II*)). Plaintiff calls *Redback* a "pure omissions case"—there is no such thing (*see* MTD 14)—and says *Redback* did not involve a "broad campaign" to convince the market of the company's success. (Opp. 10.) But Oracle succeeded here. As in *Redback*, Oracle "sold real products for real money." 2007 WL 4259464, at *3. Those revenues stand to this day.

Plaintiff counters with inapposite Ninth Circuit decisions that show what is lacking here. (Opp. 8-9.) In *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), the company touted a drug's promising heart benefit as supported by a study at 25% completion, while in possession of contrary information showing that, at the 50% completion level, the drug no longer showed a benefit. Plus, an FDA official had warned Orexigen that the 25% interim results should not be misinterpreted and was quoted as "condemning Orexigen's SEC filing as 'unreliable, misleading, and likely false.'" *Id.* at 996. Nothing like that is alleged here.

Also inapposite is *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008), where the company touted its financial success while concealing a stop-work order that rendered its factory a "ghost town." *Id.* at 988 & n.5. Here, Oracle's Cloud revenues rose steadily throughout the Class Period, indisputably achieving a record at the Class Period's end. (MTD 3.)

In *Shueneman v. Arena Pharm.*, 840 F.3d 698 (9th Cir. 2016), the company disclosed that "all animal studies" supported the company's drug application with the FDA while it had a "rat study" showing that the drug potentially caused cancer. The company "was free to express confidence in FDA approval," but it could not claim that "*all of the data* was running in [the drug's] favor." *Id.* at 708 (emphasis added). No internal, contradictory reports are cited here.

In *SEC v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011)—a post-trial enforcement case not governed by the Reform Act—the SEC claimed that the defendant improperly recognized as

revenue the sale of fixed assets in violation of Generally Accepted Accounting Principles. The defense expert conceded that in his entire career as an auditor he had never seen that done. Here, Plaintiff has not alleged a GAAP violation and ignores there has not been a financial restatement.

The district court cases cited by the Opposition likewise undermine Plaintiff's claim. (Opp. 9.) For example, in *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8 (D. Or. June 27, 2017), the court observed that there is "nothing inherently wrong with . . . 'aggressively pursuing quarterly results.'" There, plaintiffs had alleged specific facts supporting their claim that the company's short-term pursuit of sales threatened the prospects for achieving its long-term target, which the company later withdrew. Here, far from withdrawing guidance, Oracle met or beat its Cloud guidance every quarter during the Class Period. (MTD 3.)

Plaintiff also does not even substantiate the claim that Oracle engaged in "coercive" sales tactics in a widespread way during the Class Period. Courts routinely dismiss complaints, like Plaintiff's, which are "vague" as to time and lacking "contemporaneous statements." (MTD 11 (citing cases).) The Opposition ignores every cited case on this point. (*Id.*)

The Opposition claims that there are "detailed accounts that are corroborated" by "Oracle's documents about the Denver audit and reports from regulators." (Opp. 11:3.) None of this is contemporaneous with the statements at issue. Plaintiff quotes one document (scheduling an audit) and one Chilean regulator's report, both of which pre-date the Class Period. (MTD 11.) Plaintiff identifies no customer who claims it was "coerced" by Oracle during the Class Period.

The so-called "detailed accounts" that are supposedly corroborated by pre-Class Period matters are vague. (MTD 11-12.) The Opposition responds that "the Complaint specifies the time as to which each former employee's report pertains." (Opp. 10:27 (citing ¶¶ 91, 102, 109, 119).) Not one of the cited paragraphs mentions a specific date. Instead, the Opposition rests on assertions like "by the start of the Class Period" (¶ 91), "just before the start of the Class Period" (¶ 109), "during the Class Period" (¶ 102), and "[throughout 2017 and 2018]" (¶ 119 (brackets in original)). These allegations fail: "Generically asserting in an undifferentiated manner that facts occurred 'during the Class Period' is insufficient." *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (MTD 8:7; ignored by Plaintiff).

Plaintiff also fails to plead any specific transactions, any specific customers, or any specific amounts of revenue that were "fake" because of the tactics. (MTD 12.) The Opposition does not dispute that the only specific transaction mentioned in the Complaint pre-dates the Class Period, and has no answer to Defendants' showing that the CWs' various percentages lack any meaningful reference points. (MTD 12.) Plaintiff argues that, according to CW2, 95% of North American Cloud sales were "coerced" (Opp. 11:9), but the Complaint does not say that. Rather, the allegations attributed to CW2—an alleged former Vice President of Cloud Sales, not a Group Vice President, Senior Vice President, or Executive Vice President—relate only to the "sales his team dealt with." (Opp. 3:3; ¶ 103.) The Complaint never alleges CW2 knew anything about all North American Cloud sales and pleads no facts about the amount of sales that "his team dealt with." Nor does the Complaint allege a time period relating to these purportedly "coerced" sales.

Underscoring the lack of specificity is Plaintiff's protest that it does not have "access to Oracle's books and records" and "accordingly is not required to plead at this stage the precise amount of overall revenue affected by Oracle's improper sales practices." (Opp. 11:23-25.) *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002), held that complaints must allege "the amounts by which revenues were allegedly overstated." Plaintiff asserts that *Vantive* has been called "too demanding" and "focused too narrowly." (Opp. 12-13.) Plaintiff distorts *S. Ferry v. Killinger*, 542 F.3d 776, 783-84 (9th Cir. 2008), which questioned *Vantive*'s "segmented" scienter analysis, not its falsity holding. Indeed, *Metzler* squarely endorsed *Vantive*'s falsity analysis. 540 F.3d at 1070. Similarly, *Apollo* held that plaintiffs "must show with particularity" how business decisions "affected the company's financial statements and whether they were material in light of the company's overall financial position." 774 F.3d at 609. In *In re Daou Sys., Inc.*, 411 F.3d 1006, 1018-20 (9th Cir. 2005) (Opp. 12), the complaint detailed "the approximate amount by which revenues and earnings were overstated," and "the dates of some of the related transactions and identities of the customers and the company employees."

**2. Plaintiff fails to show that Defendants misled investors about the sustainability of Cloud growth.**

Plaintiff fails to demonstrate that Defendants misled investors about the "sustainability" of

Oracle Cloud growth. Notwithstanding Plaintiff's contrary assertion (Opp. 13:28), there is only one challenged statement saying anything about "sustained" growth. (¶ 242.) That was on September 14, 2017, when Catz characterized Oracle's 51% year-over-year 1Q18 growth as "sustained hyper-growth." (*Id.*) The impressive numbers speak for themselves. (MTD 13.)

Plaintiff opines that Oracle's "sharp decline in cloud growth rates at the end of the Class Period—from 58% to 21%—[] gives a numerical indication of the severe extent to which these practices impacted Oracle's overall cloud revenue growth." (Opp. 12:6-9.) The "numerical indication" is the one Oracle itself disclosed, so no investor was misled. (MTD 3, 13.) And it was accompanied by a reason that Plaintiff conspicuously ignores: the law of big numbers, that "as the numbers get bigger, it does get harder to grow" by similar rates. (MTD 4; Ex. 19 at 7.)

**3. There was no duty to disclose the alleged practices in any case.**

Even if Plaintiff could show that improperly aggressive sales tactics meant that Oracle's revenue was fake (it has not), Plaintiff would still fail to show there was any material omission that Defendants had a duty to disclose. (MTD 14.) The Opposition does not contest that alleged omissions are only misleading when they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." (MTD 14 (citing *Metzler*, *Brody*, *Hewlett-Packard*).) The Opposition does not distinguish any of the cases applying this rule.

What triggered the duty to disclose here? Plaintiff says that Defendants "falsely denied that Oracle was using financially engineered deals." (Opp. 7:6.) According to Plaintiff, this happened on May 9, 2017, when Bond responded to a question about whether Oracle used audits to drive Cloud sales. (*Id.*) Bond issued no "denial." He said "the story is a lot bigger than the realities" and that Oracle does its audits "as best we can, in as gracious a way as we can." (MTD 14; ¶ 224.) "A lot bigger" is not the same as "No, we don't." The Motion quoted his words. (MTD 14:25.) Defendants did not "rewrite" the denial, as the Opposition accuses. (Opp. 7:24.) Further, without pleading facts about the number of allegedly "coerced" customers, Plaintiff cannot show that Bond misled investors as to how "big" the alleged practices were.

Bond expressed his opinion in response to the question. The Complaint does not attempt to plead the opinion's falsity. The Opposition ignores this point and *Align*, which held that

plaintiffs must show that the speaker subjectively disbelieved the opinion, that it was objectively false, or that it lacked a reasonable basis. (MTD 15 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 616-18 (9th Cir. 2018)).) Plaintiff's flawed theory is not enhanced by alleged denials *years before* the Class Period. (Opp. 8:1-3; ¶¶ 64-65.)

Plaintiff's remaining Ninth Circuit decisions are inapposite. In *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1204, 1209 (9th Cir. 2016), the defendant assured investors on March 4, 2010, that there were "no serious doubts" about "loans as of December 31, 2009," when a significant borrower had told defendant in January 2010 that "it could not repay its loans and was considering bankruptcy," had fallen delinquent, and "never again became current."

In *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957-59 (9th Cir. 1996) (a pre-Reform Act case), the defendant said "everything is going fine" in response to questions about market fears about FDA drug approval, when others reviewing clinical data said there was "no hope" for approval and the FDA later denied approval. In *Mulligan v. Impax Labs.*, 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014), the company assured investors that it had implemented remedial efforts that the FDA was "pretty happy with" when, in fact, contemporaneous FDA warning letters, corroborated by CW allegations, showed repeated observations of conditions that were not resolved. In *Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1137-40 (N.D. Cal. 2017), the court found a duty to disclose declining daily average use metrics that undercut touted monthly metrics. Remaining cases held that there was a duty to disclose self-dealing transactions, which are absent here. (Opp. 13.)

### B. Plaintiff Fails To Show That Any Defendant Misled Investors About The Reasons For The Deceleration Of Cloud Growth.

Plaintiff fails to show anything false about statements made between December 2017 and March 2018 about why Oracle's Cloud revenue growth was increasing at a lower rate. (MTD 15-16.) Even Plaintiff concedes that during the entire Class Period, Oracle's Cloud revenue was growing at double-digit rates. (MTD 3.) Plaintiff's only complaint is that Oracle's spectacular growth rates were decelerating—as disclosed (*id.*)—during the Class Period.

Plaintiff asserts that Oracle's explanations for deceleration being related to BYOL and the Autonomous Database were false because, according to CWs, "customers refused to renew short

term subscriptions" and "began to fight against Oracle's 'playbook.'" (Opp. 15:24 (citing ¶¶ 150-53).) Again, the Complaint lacks particularity. Plaintiff's cited allegations do not reference any customer, transaction, or other fact that demonstrates any statement's falsity. (*Id.*) Sales in the Middle East "dramatically slowed," according to CW1, but no facts are given—just conclusory opinions. CW1 says that happened "towards the end of 2017," but does not say whether that is a reference to the calendar or fiscal year (which ended May 31, 2017)—six-plus months before the deceleration statements. Other time-references say "throughout 2017 and 2018" and thus are not contemporaneous, as required. (MTD 8); *Norfolk*, 2016 WL 7475555, at *3.

Nowhere does the Complaint allege facts showing that, in fact, BYOL or Autonomous Database changes were not the reason for the decline. The Opposition contends that "it is not Plaintiff's burden to disprove Defendants' factual assertions." (Opp. 15:28-16:1 (citing *Orexigen*, 899 F.3d at 999).) But these assertions are quoted in the Complaint. (¶ 271.) No specific allegation even attempts to refute those explanations. That makes this case distinguishable from *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *10 (C.D. Cal. Aug. 4, 2017), where the plaintiffs cited internal board documents identifying price declines as the reason for an earnings miss that contradicted public explanations attributing them to slower customer traffic.

Just as particularity is lacking here, so too is logic. Plaintiff claims that customers signed coercive one-year deals starting in 2014 (¶ 54) and that the "deals were short-term and were not renewed when they expired." (Opp. 16:27.) If true, why did it take years after the deals expired for Oracle's strong revenue growth rates to "decelerate"? Under Plaintiff's logic, revenue growth should have declined before the Class Period, not later. And revenues should have "evaporated," as Plaintiff claims they did (¶ 115), even though they indisputably continued to grow and hit record levels at the Class Period's end. (MTD 3.)

**C. Many Challenged Statements Are Non-Actionable Vague Statements.**

Many of the challenged statements at issue here—about "tremendous" growth and "very, very, strong" adoption, for example—are the type of vague, aspirational, and optimistic statements that are not actionable as a matter of law. (MTD 17; ¶¶ 220, 244, 247, 252, 254, 260.) The Opposition treats this exclusively as an issue of materiality that is a "fact-intensive

assessment" that cannot be resolved at the pleading stage. (Opp. 17-18.)

Contrary to the Opposition's suggestion, the Ninth Circuit routinely affirms dismissal of claims based on these types of statements. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014); *Apollo*, 774 F.3d at 606. In *Apollo*, the Ninth Circuit distinguished *Todd*, 642 F.3d at 1217-18, observing that it involved an "objective misstatement where a defendant publicly reported an incorrect amount for the accounting impact of a transaction." 774 F.3d at 606. In *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (*QSI*) (Opp. 18:3), defendants "did not just describe [the company's] pipeline in subjective or emotive terms," but "provided a concrete description of the past and present state of the pipeline" with information about the "proportion" of the market. Here, Oracle disclosed the actual data about its Cloud revenue growth, so investors were not misled by characterizations of those figures as "tremendous." Plaintiff next claims that analysts "relied" on these statements. (Opp. 18:7.) But "reliance does not come into play" on this issue. *Intuitive*, 759 F.3d at 1060.

Finally, the Opposition insists that "context" must be considered—without saying what context should be considered here (Opp. 17:21)—and ignoring that the Ninth Circuit has held that "context more appropriately factors into the question of whether an alleged misrepresentation was material to investors, not into whether a statement itself could be a misrepresentation." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276-77 (9th Cir. 2017) (affirming dismissal and rejecting challenge to "vague" statements).

**D. The Safe Harbor Further Protects The Forward-Looking Statements.**

The Safe Harbor further protects five of the challenged forward-looking statements. The Opposition counters that three are not forward looking (discussing only one) and that they were not accompanied by meaningful cautions. (Opp. 14:22-28.) Plaintiff's arguments lack merit.

Catz's June 21, 2017 statement that earnings growth "is absolutely not a 1-year phenomena" responded to a question about future earnings. The question, answer, and language were about the future. (MTD 17-18.) The Opposition ignores Catz's words and just says she spoke about "then-present circumstances" without showing so or comparing her language to *QSI*, 865 F.3d at 1142 (emphasis added) (Opp. 14:25), where a company said it "*has* on hand and *has*

access to sufficient sources of funds to meet its anticipated . . . needs." The other two statements refer to what "we expect" regarding future earnings and Cloud revenue. (¶¶ 229, 230.) Plaintiff argues that these statements are "not even arguably forward-looking." (Opp. 15:13.) That is baseless.

The Opposition's argument that Oracle's cautions were "not meaningful" also lacks merit. (Opp. 15.) The Opposition wrongly says that *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010), requires the "exact risk" to be disclosed. (Opp. 15:13.) In *Cutera*, the cautions were meaningful in their discussion of the need to "attract and retain sales and marketing personnel" because they "spoke directly to the purported misstatements" about the projected "productivity" of the sales force. 610 F.3d at 1106, 1112. Here, Plaintiff's claim is that Oracle concealed the risk that Oracle's future Cloud revenues were jeopardized because, according to the Complaint, "customers were refusing to renew the short-term subscriptions." (¶ 2.) Oracle, however, warned that it "cannot be certain that our customers will renew our cloud-based contracts," and that "customers may not purchase . . . cloud subscriptions contracts." (MTD 18; Ex. 8 at 11; Ex. 15 at 15.) This is not "boilerplate." (Opp. 15:8.)

## III. PLAINTIFF ALSO FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

A second and independent ground for dismissal is Plaintiff's failure to plead facts giving rise to a "strong inference" of scienter as to each Defendant. (MTD 18-25.)

### A. The CW Allegations Do Not Support Any Inference Of Scienter.

Plaintiff ignores *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009), the leading Ninth Circuit decision on CW allegations. It requires pleading both that (1) the CWs are reliable; and (2) the CW allegations themselves are indicative of scienter. *Id.*

#### 1. The CW allegations are not reliable.

The Opposition fails to show that the CWs are reliable or that their allegations are based on personal knowledge. The Opposition does not dispute that the CWs report hearsay, nor does it respond to *Zucco*'s skepticism of it. (MTD 20.) Plaintiff says that hearsay is allowed (Opp. 21:12), relying on *Lloyd*, 811 F.3d at 1208, where the hearsay was reliable because it was

"specific in time, context, and details, and involved important communications from a chief executive officer to his Board." The allegations do not do that here.

The CWs' regional experiences provide only "snippets of information, not a view of the company's overall health." (MTD 20 (citing *Intuitive* at 1063).) Ignoring *Intuitive*, Plaintiff counters that the allegations "provide a comprehensive and consistent view." (Opp. 20-21.) Plaintiff again overstates the CWs' vague allegations about their own geographically scattered "teams," which are not described with any detail and are thus unreliable.

Plaintiff says it does not matter that two CWs left before the Class Period, ignoring multiple decisions, including this Court's *SolarCity* decision, stressing the importance of "simultaneity" between CW allegations and the challenged statements. (MTD 20-21.) *QSI* does not help Plaintiff. (Opp. 21). *QSI* credited pre-class period allegations from a CW, who was a former director and COO, about executives' real-time access to reports. 865 F.3d at 1145. Plaintiff's CWs are not senior executives and allege no details about any reports from any time.

**2. The CW allegations also are not indicative of scienter.**

Even more glaring is Plaintiff's failure to show that the CW allegations are indicative of scienter. The Opposition does not contest that the CWs do not make any allegations about Ellison, Kurian, Bond, or Miranda. (MTD 19).

No CW purports ever to have interacted with any Individual Defendant during the Class Period. In a world where everyone is supposedly connected by six degrees of separation, it makes it hard to infer anything about the Individual Defendants' mental states when the CWs are three and four degrees removed from them. Plaintiff insists that "direct contact" with Individual Defendants is unnecessary. (Opp. 19:17.) Again, Plaintiff ignores *Intuitive*'s holding that CW allegations failed because they lacked "'first-hand knowledge regarding what the individual defendants knew or did not know.'" (MTD 20:19-20 (quoting *Intuitive*, 759 F.3d at 1063; *Bao v. SolarCity*, 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016)).)

Plaintiff emphasizes that Hurd and Catz "personally approved" deals and that CW1 "prepared slides" at unspecified times for Hurd's "consumption" without saying that Hurd ever reviewed them. (Opp. 18:20; ¶ 180.) Nowhere does Plaintiff allege the contents of the "slides"—

as *Intuitive*, 759 F.3d at 1063, requires—or any facts about the allegedly improper transactions beyond vague percentages that show nothing, for the reasons discussed above.

Allegations from CW1 and CW7 that Hurd and Catz "signed off on large engineered deals" through Oracle's DAS system (Opp. 19) reveal little about the approval process, nothing about any particular deals (timing, amounts, customer names), and no facts that support an inference of fraudulent intent with respect to any (much less all) of the challenged statements. The Opposition says it is a "red herring" that the Complaint fails to point to any information in the DAS system about revenues or growth rates that contradicted public statements. (Opp. 19.) But, as in *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001), Plaintiff fails to "identify any documents or facts suggesting that defendants knew that the growth rate" or revenues were any different from what Oracle disclosed. (MTD 21:14.) Plaintiff ignores *Ronconi*.

The Opposition's cases highlight what the Complaint lacks. In *Daou*, 411 F.3d at 1023, the CWs provided first-hand accounts describing how defendants "personally directed" improper accounting practices. In *Nursing Home Pension Fund, Local 144 v. Oracle*, 380 F.3d 1226, 1231 (9th Cir. 2004), the CWs alleged "hard numbers," including that internal data would have shown defendants that they would miss their growth projections by at least 50%. *Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014), inferred scienter in view of evidence directly contradicting challenged statements "which came to light through discovery related to government investigations, civil lawsuits and associated guilty pleas in the months and years following the [oil] spills." In *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *2, *10 (N.D. Cal. Feb. 27, 2018), the red flags included lawsuits and investigations from the Office of the Comptroller of the Currency and the Consumer Financial Protection Bureau related to the unauthorized creation of fake bank and credit-card accounts. In *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009), the SEC found that defendants had received several letters from its auditors detailing control weaknesses that resulted in $400 million of improperly recognized revenue.

**B. Alleged "Denials" Do Not Support Any Scienter Inference.**

The Opposition claims that Bond's alleged "denial" supports an inference of scienter. (Opp. 21-22.) As discussed above, Bond did not deny anything. (MTD 14:20, 16:13.) In *In re*

*Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1332 (S.D. Fla. 1999) (Opp. 22), defendants had been confronted by employees about company accounting practices, the company was forced to restate certain financials by about $100 million, and defendants denied engaging in accounting fraud. Nothing like that happened here—Bond expressed his opinion. Plaintiff pleads no facts about Bond's state of mind at any time, let alone when he made his challenged statement. That is fatal.

**C. Scienter Cannot Be Inferred From Oracle's Changed Reporting.**

Oracle's changed reporting at the Class Period's end does not support any inference of scienter: "There are many potential reasons why a company might cease to report a metric and those reasons may have no relation to the prior falsity of that metric. For example, a change in strategy for the company may make older metrics less relevant. . . . Thus, the Court cannot infer from Defendants' decision to cease reporting some of its key operating metrics that Defendants previously committed securities fraud by reporting those metrics." *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1002 (N.D. Cal. 2017); (MTD 23 (citing cases)).

Plus, Oracle did provide a reason: the introduction of the BYOL program blurred the line between on-premise and Cloud revenue, making it less relevant to distinguish between the two. (MTD 23.) The Opposition argues that the Court "should not substitute Defendants' factual narrative for the Complaint's well-pled allegations." (Opp. 22 (citing *Orexigen*, 899 F.3d at 999).) That argument fails because the Complaint discusses the changed disclosure announced on the June 19, 2018 investor call (¶¶ 22-24, 169-77, 192, 286-289), but only characterizes the change. Because the disclosure is repeatedly referenced in the Complaint (*see id.*), it is incorporated by reference. Incorporation "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Orexigen*, 899 F.3d at 1002. That is the case here. Defendants' June 19 explanation—which is not contradicted by any particularized factual allegation—strongly undercuts any inference of scienter.

**D. Kurian's Stock Sales Do Not Support Any Inference Of Scienter.**

The Opposition does not contest that an analysis of Kurian's stock sales is irrelevant if his two aspirational statements are held non-actionable (MTD 22:12); or that *Metzler* holds that

courts "typically require larger sales amounts—and corroborative sales by other defendants," 540 F.3d at 1067, and that no other Defendant is alleged to have sold Oracle stock. The Opposition also ignores *Ronconi*, which affirmed dismissal where eleven defendants sold stock and seven sold more than 69% of their holdings. 253 F.3d at 436. Here, Defendants collectively owned $50 billion worth of Oracle stock and experienced the same "losses" as Plaintiff. (MTD 24.)

Plaintiff asserts that Kurian's sales were "suspiciously timed" (Opp. 23), but does not point to any facts that Kurian knew when he sold his stock to show that the sales were "calculated to maximize the personal benefit from the undisclosed information." *Align*, 856 F.3d at 622. That contrasts with *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996), and *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199 (C.D. Cal. 2004) ($610 million in sales), where multiple defendants sold large dollar amounts soon after receiving specified inside information.

### E. The Core Operations Inference Does Not Apply.

The Opposition contends that the core operations inference applies because Cloud was "important" to Oracle. (Opp. 22.) Saying something is "important" does not give Plaintiff a free pass. Otherwise, scienter could be inferred anytime an alleged fraud is related to a significant component of any business, as is almost always the case. Rather, the theory allows a court to infer a defendant's knowledge of a fundamental fact bearing on core operations where it would be "absurd to suggest" the defendant did not know that fundamental fact. In *Berson*, 527 F.3d at 982, the "prominent fact" was stop-work orders that ground production to a halt. In *Mulligan*, it was seven notices and warnings from the FDA regarding quality control issues affecting the company's manufacturing facility. 36 F. Supp. 3d at 948-50, 952-53, 970. Here, Oracle achieved record Cloud revenues, amounts that no one at the time or since—other than Plaintiff here—has challenged. Nothing put Defendants on notice that the reported revenue was "fake."

### F. Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge That Their Forward-Looking Statements Were False When Made.

All Plaintiff says about the "actual knowledge" requirement is that "Catz knew" that Oracle's "cloud growth" was "financially engineered" and "unsustainable." (Opp. 15:3.) Plaintiff does not support the assertion or even try to meet the requirement. (MTD 23.)

### G. Holistically Considered, Plaintiff's Theory Is Not Cogent.

None of the above supports any scienter inference individually or collectively. On top of that, Plaintiff says "don't look" at Oracle's $12 billion in stock repurchases, because they are not alleged. But they are disclosed in the transcripts that the Complaint extensively references (Exs. 5, 6; ¶¶ 22, 159, 268, 286) and thereby incorporated by reference. *Orexigen*, 899 F.3d at 1002-04. Plaintiff ignores cases like *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017), and *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013), which held that repurchases cut against scienter. (MTD 24.) Those decisions apply here.

It makes no sense that Oracle would knowingly repurchase its stock at artificially inflated prices. Citing one case, Plaintiff argues that courts "have consistently held" that buybacks could be viewed as an attempt to perpetuate an alleged fraud. (Opp. 24.) But *In re Countrywide Fin. Corp. Deriv. Litig.* articulates precisely what is necessary and missing here: "particularized allegations suggesting that the directors approved the repurchase for the purpose of inflating the stock price" and allegations that "tie" events to "the timing of repurchase with any precision." 554 F. Supp. 2d 1044, 1067 (C.D. Cal. 2008). The articles cited in the Opposition—but not the Complaint—do not accuse Oracle of wrongdoing. They call the repurchases a "nice surprise."

A restatement is not required to plead scienter, *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) (Opp. 25), but Plaintiff does not deny that the absence of issues with auditors or a restatement cuts against an inference of scienter, under controlling decisions *Zucco*, 552 F.3d at 997 n.5, and *Metzler*, 540 F.3d at 1068-69 (MTD 24-25), which the Opposition ignores.

## IV. PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A.

The Opposition does not dispute that Plaintiff's claims under §§ 20(a) and 20A must fail with dismissal of the § 10(b) claim or that the 20A claim fails for the additional reason that the Complaint fails to plead any information about what Kurian knew when he sold stock. (MTD 25.)

## V. CONCLUSION

For these reasons, Defendants request that the Court grant Defendants' Motion to Dismiss.

Dated: June 21, 2019

MORRISON & FOERSTER LLP

By: */s/ Jordan Eth*

Attorneys for Defendants