1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION


4
    CITY OF SUNRISE FIREFIGHTERS'      )  CV-18-4844-BLF
5   PENSION FUND,                      )
                                       )  SAN JOSE, CALIFORNIA
6                    PLAINTIFF,         )
                                       )  OCCTOBER 17, 2019
7              VS.                      )
                                       )  PAGES 1-51
8   ORACLE CORPORATION ET AL,          )
                                       )
9                    DEFENDANT.         )
                                       )
10  _____

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12            UNITED STATES DISTRICT JUDGE

13           A P P E A R A N C E S

14

15     FOR THE PLAINTIFF:     **BY:  JOHN J. RIZIO-HAMILTON**
                              BERNSTEIN LITOWITZ BERGER
                              AND GROSSMANN LLP
16                            1251 AVENUE OF THE AMERICAS
                              44TH FL.
17                            NEW YORK, NY 10020

18     FOR THE DEFENDANT:     **BY:  JORDAN ETH**
                              **MARK FOSTER**
19                            **SU-HAN WANG**
                              MORRISON & FOERSTER LLP
20                            425 MARKET STREET
                              SAN FRANCISCO, CA 94105

21

22        APPEARANCES CONTINUED ON THE NEXT PAGE

23  OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                 CERTIFICATE NUMBER 13185
24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1          APPEARANCES CONTINUED:

 2          FOR THE PLAINTIFF:      BY:  JONATHAN DANIEL USLANER
                                    BERNSTEIN LITOWITZ BERGER AND
 3                                  GROSSMAN LLP
                                    2121 AVENUE OF THE STARS
 4                                  SUITE 2575
                                    LOS ANGELES, CA 90067
 5

 6          ALSO PRESENT:           JIM MAROULIS
            ORACLE
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            SAN JOSE, CALIFORNIA              OCCTOBER 17, 2019

2                     P R O C E E D I N G S

3      (COURT CONVENED AT 9:02 A.M.)

4            THE CLERK:  CALLING CASE 18-4844. CITY OF SUNRISE

5      FIREFIGHTERS' PENSION FUND VERSUS ORACLE CORPORATION, ET AL.

6      COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

7            MR. RIZIO-HAMILTON:  GOOD MORNING, YOUR HONOR.

8      JOHN RIZIO-HAMILTON FROM BERNSTEIN LITOWITZ BERGER AND

9      GROSSMANN FOR THE LEAD PLAINTIFF.

10            THE COURT:  GOOD MORNING.  WELCOME.

11            MR. RIZIO-HAMILTON:  GOOD MORNING.  THANK YOU.

12            MR. ETH:  GOOD MORNING, YOUR HONOR.

13      JORDAN ETH FOR DEFENDANTS.  I'M HERE WITH MY COLLEAGUES

14      MARK FOSTER AND SU-HAN WANG, AND WITH THE SENIOR MANAGING

15      COUNSEL AT ORACLE, JIM MAROULIS.

16            THE COURT:  THANK YOU.  I APPRECIATE IT.  THANK YOU

17      FOR COMING TODAY.

18      MR. ETH, GOOD MORNING.

19            MR. ETH:  GOOD MORNING.

20            THE COURT:  ALL RIGHT.

21      WELL, THIS IS THE FIRST TIME GOING THROUGH THIS COMPLAINT

22      ON A MOTION TO DISMISS.  IT PROBABLY WON'T BE THE LAST TIME

23      MR. ETH, I THINK YOU ARE USED TO THE DRILL HERE.

24            WHAT I WOULD LIKE TO DO, I WANT TO MAKE SOME COMMENTS, AND

25      THEN I WOULD REALLY LIKE TO HEAR YOUR ARGUMENT ON THIS.  AS
```

1    WITH THESE CASES, THERE'S REALLY A LOT FOR ME TO GET THROUGH

2    THE COMPLAINT.  MR. RIZIO-HAMILTON, IT'S REALLY QUITE

3    EXTENSIVE, YOU'VE CLEARLY PUT A LOT OF WORK INTO IT.

4            MR. RIZIO-HAMILTON:  THANK YOU VERY MUCH, YOUR HONOR.

5            THE COURT:  THE WAY I SEE THE ALLEGATIONS OF FALSE

6    STATEMENTS, TO ME THEY FALL INTO TWO BIG BUCKETS.  AND I'M

7    PUTTING ASIDE, MR. ETH, YOUR ARGUMENTS ON THE NONACTIONABLE,

8    WHICH I WILL GET TO, BUT I JUST WANT TO DO THESE TWO BIG

9    BUCKETS.

10            THERE'S, IN MY VIEW, AND I HOPE YOU WILL CORRECT ME IF I'M

11    MISTAKEN OR OVER-GENERALIZING, THERE'S THE BUCKET OF THE

12    STATEMENTS ABOUT THE GROWTH RATE AND THE REVENUES, SO THOSE ARE

13    SPECIFIC FACTUAL STATEMENTS THAT ARE CLAIMED TO BE FALSE

14    BECAUSE OF THE ALLEGED OMISSION.

15            AND THEN THERE'S THE SECOND BUCKET OF RESPONSES TO

16    INQUIRIES ABOUT THE UNDERLYING PRACTICES THAT PRODUCED THE SALE

17    OF THE CLOUD PRODUCTS.  I DON'T READ ANY OF THE FALSE

18    STATEMENTS THAT ARE ALLEGED TO HAVE OCCURRED IN THE CLASS

19    PERIOD TO BE AN EXPRESS DENIAL, AND I ACCEPT THAT THE PRACTICES

20    OCCURRED, BECAUSE THAT'S FACTUALLY ALLEGED IN THE COMPLAINT.

21            WHAT I'M MISSING FOR THOSE, I BELIEVE, IS ANY -- IS THE

22    SUFFICIENT ALLEGATION OF SCIENTER FOR THAT BUCKET OF

23    STATEMENTS.

24            I ALSO DON'T HAVE -- I DON'T BELIEVE THERE ARE ANY

25    ALLEGATIONS OF SCIENTER REGARDING ELLISON, KURIAN, BOND OR

1    MIRANDA.  AND I'VE POINTED OUT IN THE REPLY BRIEF, I DIDN'T SEE

2    ANYTHING.  BUT MR. RIZIO-HAMILTON, IF YOU CAN DIRECT ME TO THE

3    PARAGRAPH WHERE YOU ESTABLISH THEIR KNOWLEDGE, I WOULD BE GLAD

4    TO LOOK AT IT, BUT I DIDN'T EVEN SEE IT ALLEGED.  AND WHETHER

5    YOUR CW'S, YOUR CONFIDENTIAL WITNESSES, ACTUALLY HAVE ENOUGH

6    EVIDENCE ON THE OTHERS IS A DIFFERENT ISSUE, BUT I DIDN'T SEE

7    ANYTHING WITH REGARD TO THOSE DEFENDANTS.

8        AND I'M NOT SURE THERE ARE ANY STATEMENTS ATTRIBUTED TO

9    MIRANDA DURING THE CLASS PERIOD.  SO YOU CAN HELP ME OUT, MAYBE

10   I MISSED IT, BUT I DIDN'T SEE ANYTHING.  CLEARLY THE FOCUS IS

11   ON MR. HURD AND MS. CATZ, C-A-T-Z, AND THEN SEPARATELY

12   MR. KURIAN REGARDING THE INSIDER TRADING ALLEGATIONS.

13       SO THAT'S KIND OF A BIG DIVIDE, THAT'S WHERE I'M KIND OF

14   THINKING.  I'M NOT ACTUALLY SURE YOU'VE ESTABLISHED FALSITY OF

15   THE STATEMENTS ABOUT THE REVENUES AND THE PERCENTAGE GROWTH,

16   AND I'M NOT SEEING SUFFICIENT ALLEGATIONS OF SCIENTER AS TO THE

17   OTHER BUCKET.

18       SO MR. ETH, IT IS YOUR MOTION, I'M GOING TO LET YOU GET

19   STARTED.

20          MR. ETH:  OKAY.  THANK YOU, YOUR HONOR.

21       AND WE SEE IT BREAKING DOWN PRETTY MUCH THE WAY YOU HAVE

22   AS WELL.

23       IT'S UNDISPUTED, OF COURSE, THAT ORACLE ACCURATELY

24   PROJECTED IT'S CLOUD REVENUES QUARTER AFTER QUARTER.  AND THE

25   KEY ALLEGATION HERE, WHICH PLAINTIFFS REPEAT QUITE A FEW TIMES,

1    IS THAT THE REVENUES WERE NEVERTHELESS PHONY IN SOME WAY, PHONY

2    OR BOGUS OR NOT GENUINE, A LOT OF DIFFERENT SYNONYMS FOR THAT.

3        AND THERE ARE THREE DIFFERENT REASONS WHICH CORRESPOND

4    ROUGHLY TO WHAT THE COURT WAS JUST SAYING, THAT WE THINK THE

5    COMPLAINT SHOULD BE DISMISSED.

6        THE FIRST ONE, OF COURSE, IS PARTICULARITY.  THE SECOND IS

7    LACK OF AN AFFIRMATIVE STATEMENT ABOUT THE SALES PRACTICES.

8    AND THE THIRD, WHICH APPLIES ACROSS THE BOARD, IS SCIENTER.

9        AND ON PARTICULARITY, PLAINTIFFS SAY THEY HAVE DETAILED

10   REPORTS.  THERE AREN'T ANY DETAILED REPORTS.  THEY SAY THAT THE

11   CW'S, WHICH I THINK THEY CALL FE'S, BUT I THINK THEY ARE

12   COMMONLY KNOWN AS CW'S ARE FROM THE MOST SENIOR EXECUTIVES OR

13   SENIOR EXECUTIVES.  BUT WHAT THEY ACTUALLY ARE FROM, THE BEST

14   THEY CAN DO, IS TWO OF THE CW'S ARE FOUR LEVELS REMOVED.  FOUR

15   LEVELS REMOVED FROM MR. HURD.  THAT'S THE BEST THEY CAN DO IS

16   FOUR LEVELS OF SEPARATION.

17       AND THE CASE LAW ON CW'S IS WELL KNOWN TO THIS COURT AND

18   THROUGHOUT THE CIRCUIT IN ZUCCO, AND INTUITIVE SYSTEMS AND SO

19   ON.  THEY DON'T MENTION ZUCCO OR INTUITIVE ON THIS POINT, SO I

20   WILL LEAVE THAT POINT.

21       ANOTHER KEY POINT IS TIMING.  THAT WHAT THE ALLEGED TRUTH

22   IS, HAS TO MATCH UP WITH THE TIMING OF THE STATEMENTS.  AND

23   MOST OF THE VAGUE ALLEGATIONS HERE ARE ACTUALLY BEFORE THE

24   CLASS PERIOD.  IT'S LIKE WE SEE THE TRAILER MORE THAN THE MOVIE

25   HERE, IT JUST KIND OF GOES ON, AND ON, AND ON UNTIL WE FINALLY

1   GET TO THE CLASS PERIOD.

2           THE COURT:  SO WOULD YOU SUGGEST THEN THAT THE

3   ALLEGATIONS OF FALSE STATEMENTS THAT PREDATE THE CLASS PERIOD

4   DO NOT REASONABLY INFER THAT THAT CONDUCT CONTINUED DURING THE

5   CLASS PERIOD?

6           MR. ETH:  ABSOLUTELY.

7       THEY DON'T ACTUALLY REASONABLY SHOW THAT THEY OCCURRED

8   BEFORE THE CLASS PERIOD.  THERE'S A DIFFERENCE -- ONE IS VAGUE,

9   GENERALIZED, DEFICIENT.  THE OTHER IS EVEN WEAKER, EVEN WEAKER.

10      AND WHAT WE HEAR ABOUT THE TIMING IS THEY SAY, WELL, WE

11  HAVE A REPORT FROM A CHILEAN COMPETITION REGULATOR.  PUT ASIDE

12  WHETHER A CHILEAN COMPETITION REGULATOR HAS ANY BEARING ON U.S.

13  SECURITIES LAWS, THAT WAS FROM 2013, '14, '15, BEFORE THE CLASS

14  PERIOD.

15      THERE'S A GROUP CALLED CLEAR LICENSING COUNCIL, 2015.  A

16  BUNCH OF NEWS ARTICLES.  ORACLE IS A REALLY BIG COMPANY, THERE

17  ARE NEWS ARTICLES ABOUT IT.  NEWS ARTICLES FROM 2015, IT'S ALL

18  PRE-CLASS PERIOD.  SO THAT'S ANOTHER ISSUE IS TIMING.

19          THE COURT:  WELL, BUT I THINK THAT MR. RIZIO-HAMILTON

20  PROPERLY CITES CASES THAT INDICATE THAT CONDUCT THAT PRE-DATES

21  THE CLASS PERIOD CAN PROVIDE CONTEXT.  AND YOU COULD REASONABLY

22  DRAW SOME INFERENCES ABOUT CONDUCT DURING THE CLASS PERIOD.

23      I AGREE WITH YOU THERE HAS TO ALSO BE AN ALLEGATION OF

24  CONDUCT DURING THE CLASS PERIOD, AND MAYBE THAT'S WHERE WE NEED

25  TO FOCUS.

1            MR. ETH:  I'M NOT MOVING TO STRIKE THOSE ALLEGATIONS,

2     I'M JUST SAYING THAT THEY DON'T SUPPORT THE CLASS PERIOD.

3            ON TOP OF THAT, CUSTOMERS, A LOT OF THIS READS LIKE A

4     CUSTOMER COMPLAINT.  WHERE ARE THE CUSTOMERS.  ORACLE HAS

5     400,000 CUSTOMERS.

6            A COUPLE OF CUSTOMERS MENTIONED, ONE IS THE CITY AND

7     COUNTY OF DENVER BEFORE THE CLASS PERIOD, WE DON'T EVEN KNOW IF

8     THE TRANSACTION EVEN OCCURRED, AND THAT'S BEFORE THE CLASS

9     PERIOD.  AND THE OTHER ONE IS SAUDI TELECOM.  AGAIN, WE DON'T

10    EVEN KNOW WHAT DECADE THAT WAS.  THERE'S NOTHING IN THERE ABOUT

11    THAT.

12            ON TOP OF THAT, THERE ARE NO DOLLAR FIGURES.  AND THIS IS

13    A REALLY CRUCIAL POINT, BECAUSE THE PLAINTIFFS SAY, LOOK AT ALL

14    OF THE CORROBORATING EVIDENCE WE HAVE FROM AROUND THE GLOBE.

15    SO-AND-SO SAID IT'S 27 PERCENT OF THIS, AND SO-AND-SO SAID IT'S

16    90 PERCENT OF THAT, AND 15 PERCENT OF THIS, AND 30 PERCENT OF

17    THAT.

18            YOU NOTICE THEY KEEP SAYING THIS, THAT, AND SO ON, BECAUSE

19    WE DON'T HAVE THE X VARIABLE.  AND MY CHILDREN DOING WORD

20    PROBLEMS, THEY CAN'T FIGURE THIS OUT WITHOUT KNOWING WHAT THE X

21    IS.  20 PERCENT OF 3 IS VERY DIFFERENT THAN 20 PERCENT OF 3

22    MILLION OR 3 BILLION.

23            WHAT THE ALLEGATIONS ACTUALLY SAY IS FOR NORTH AMERICAN

24    SALES, THERE WAS A FORMER EMPLOYEE, A CONFIDENTIAL WITNESS,

25    THAT IT WAS A CERTAIN PERCENTAGE OF THE SALES THAT THAT

1     PERSON'S TEAM DEALT WITH.

2          THAT'S ANOTHER TERM, "TEAM."  WHAT'S A TEAM?  IS IT ONE?

3     ARE THEY A ONE-PERSON TEAM, TWO-PERSON TEAMS, FIVE-PERSON

4     TEAMS, 20-PERSON TEAMS, THOUSAND-PERSON TEAMS.  IT'S COMPLETELY

5     VAGUE.  AND WHAT WE ASSUME IN THESE CASES, PLAINTIFFS PUT

6     FORWARD THE BEST THAT THEY CAN.

7          AND THEN A REALLY CRITICAL POINT THAT I THINK WILL BE

8     FATAL TO THEIR CASE IS THAT THEY NEVER -- PUT ASIDE DOLLARS OF

9     TRANSACTIONS, THERE'S NOTHING SHOWING HOW THE DOLLARS TRANSLATE

10    INTO RECOGNIZED REVENUES.  NOTICE THAT THE FORMER EMPLOYEES ARE

11    ALL SALES PEOPLE.  WHERE'S THE ACCOUNTING PERSON?  THE SALES

12    PERSON GOES OUT, AND LET'S SAY THERE IS A DEAL.  THEY DON'T

13    ALLEGE.  LET'S SAY THE DEAL IS $10 MILLION AND LIST PRICE

14    $1 MILLION OF CLOUD.  AGAIN, THEY DON'T ALLEGE THAT, DOES IS

15    THAT MEAN IT'S $1 MILLION OF REVENUE, AND FOR WHAT PERIOD?

16    CLOUD USUALLY IS DONE RATEABLY OVER TIME.  IS IT A MILLION

17    DOLLARS AT THE TIME OF THE DEAL?

18          REVENUE RECOGNITION IS A COMPLICATED CONCEPT.  THERE'S

19    NOTHING ABOUT THAT.  SO THAT COMES BACK TO AN EVEN MORE

20    FUNDAMENTAL POINT, WHICH IS, AND THIS IS WHERE I STARTED, WE

21    HEAR THAT THE REVENUE IS FAKE, PHONY, BOGUS, NOT GENUINE,

22    ILLUSORY.  YOU CAN LOOK THROUGH THE THESAURUS, THEY'VE COVERED

23    IT ALL, BUT WHAT WE DON'T HAVE IS GAAP.  WHERE'S THE GAAP RULE?

24          THERE ARE RULES IN THIS COUNTRY FOR HOW GAAP REVENUE IS

25    RECOGNIZED.  AND IT'S EITHER RECOGNIZED PROPERLY OR IT ISN'T.

1    WHAT'S ORACLE SUPPOSED TO DO, SAY YES, OUR AUDITOR SIGNED OFF,

2    OUR ACCOUNTING PEOPLE SIGNED OFF, THEY ARE RIGHT, BUT WE ALSO

3    HAVE TO DISCLOSE THEY ARE PHONY.  THAT WOULD BE A MISSTATEMENT.

4    THEY ARE CORRECT UNDER GAAP, AND THERE'S NO ALLEGATION OF GAAP.

5    AND THIS COURT, THIS DISTRICT, THIS CIRCUIT, HAS SEEN PROBABLY

6    HUNDREDS OF CASES ABOUT GAAP VIOLATIONS AND HOW THEY ARE TO BE

7    ALLEGED.  SO THAT'S NOT THERE.

8         OBVIOUSLY THERE'S ALL THE CASES WHICH WE'VE COVERED IN OUR

9    BRIEFING, REDBACK AND MELTZER, AND SO FORTH, WHICH WE THINK ARE

10   RIGHT ON POINT.

11        LET ME GO TO THE SECOND POINT THE COURT MENTIONED WHICH IS

12   AFFIRMATIVE STATEMENTS.  THE COURT POINTS TO A COUPLE OF

13   ALLEGED DENIALS.  ACTUALLY, THE COMPLAINT SAYS "REPEATED

14   DENIALS."

15        WELL, THERE WERE SOME BEFORE THE CLASS PERIOD THEY POINT

16   TO, DURING THE CLASS PERIOD THEY POINT TO TWO ALLEGED DENIALS,

17   TWO.  ONE WAS IN MAY OF 2017, PARAGRAPH 224, WHERE DEFENDANT

18   BOND WAS ASKED, WHAT PERCENTAGE OF REVENUE AND MARGIN IS

19   ASSOCIATED WITH AUDITING PRACTICES?

20        CLOUD REVENUE, THIS QUARTER?  WHICH QUARTER?  "ASSOCIATED

21   WITH," WHAT DOES ANY OF THAT MEAN?  AND THE ANSWER IS, WELL, I

22   THINK THIS IS ONE OF THOSE THINGS WHERE THE STORY IS A LOT

23   BIGGER THAN THE REALITY.  WE TRY TO DO IT AS BEST WE CAN, AS

24   GRACIOUSLY AS WE CAN.  THAT'S NOT A DENIAL.  IT DOESN'T SAY

25   NEVER HAPPENED, IT'S NOT A DENIAL.

1    THE SECOND ONE, WHICH IS ABOUT A MONTH, LESS THAN A MONTH

2    BEFORE THE END OF THE CLASS PERIOD, IT'S IN SOME KIND OF ONLINE

3    PUBLICATION, AND IT'S CALLED *THE INFORMATION*.  AND ORACLE SAID

4    *THE INFORMATION*, WHICH IS THE NAME OF THE PUBLICATION,

5    PRESENTED INACCURATE REPORTS REGARDING A HANDFUL OF ACCOUNTS,

6    AND THAT WE DON'T HAVE TO SCARE OUR CUSTOMERS.

7    IT'S NOT A DENIAL.  WE DON'T HAVE TO SCARE OUR CUSTOMERS,

8    AND THAT THESE PARTICULAR ACCOUNTS FROM THAT PUBLICATION

9    WEREN'T ACCURATE.

10    THE CASES THAT PLAINTIFFS PRIMARILY RELY ON REALLY SHOW

11    WHAT'S MISSING HERE.  I'M JUST GOING TO MENTION TWO OR THREE OF

12    THE KEY NINTH CIRCUIT CASES.  ONE OF THEM IS OREXIGEN, KHOJA V.

13    OREXIGEN.

14    THERE, THE COMPANY HAD DONE A DRUG TRIAL, THE COURT IS

15    FAMILIAR WITH THE CASE?

16    THE COURT:  I'M FAMILIAR, YES.

17    MR. ETH:  SO IT SAID WHEN YOU ARE AT THE 50 PERCENT

18    LEVEL, AND THEY HAD INFORMATION THE DRUG DIDN'T WORK, THEY SAID

19    LET'S TELL YOU ABOUT OUR 25 PERCENT LEVEL.

20    WELL, WAIT A MINUTE, LET'S SAY THAT THE TRIAL IS

21    CONTINUING EVEN THOUGH IT ISN'T.  WELL, ALL RIGHT.  WE'VE GOT

22    SPECIFIC DIRECT CONTRADICTION.

23    THEN THERE'S WHAT I AFFECTIONATELY CALL THE RAT STUDY

24    CASE, WHICH IS SCHUENEMAN, WHERE THE COMPANY REPRESENTED THAT

25    NO ANIMALS WERE BEING HARMED.  RATS WERE GETTING CANCER, LIKE,

1     WE CAN PUT ASIDE WHETHER THAT'S A GOOD IDEA OR BAD IDEA, THAT'S

2     A DIRECT CONTRADICTION OF A SPECIFIC FACT.

3          AND THEN THERE'S BERSON WHERE THE DEFENDANTS SAID, HERE IS

4     OUR BACKLOG.  WHAT THEY DIDN'T DISCLOSE IS THAT INCLUDED STOP

5     WORK ORDERS THAT TURNED ONE OF THEIR FACTORIES INTO A GHOST

6     TOWN.

7          SO I MEAN, THERE ARE LOTS OF OTHER CASES, BUT IT'S COVERED

8     IN THE BRIEF.  SO THAT'S THE SECOND ONE.

9          THE THIRD ONE THE COURT MENTIONED IS SCIENTER, WHICH CUTS

10    ACROSS EVERYTHING.  AND SCIENTER HAS TO BE EACH DEFENDANT, EACH

11    STATEMENT, CAN'T BE BROAD BRUSH ALL DEFENDANTS ALL THE TIME.

12         AND CRITICAL TO THIS, LOOKING AT THE CW'S, NO PERSONAL

13    KNOWLEDGE OF ANY OF THE CW'S OF ANYTHING THAT ANY DEFENDANT

14    SAW, DID, WROTE, SAID, YOU KNOW, ANYTHING.  THERE'S JUST NO

15    CONNECTION.  WELL, MAYBE THERE'S A DRAFT REPORT I MAY HAVE

16    PREPARED, THAT'S THE BEST THAT THEY GET.  SO IT'S JUST MIND

17    READING.  SO WE'VE GOT THAT PROBLEM.

18         THEY TRY TO RELY ON THE CORE OPERATIONS INFERENCE, WHICH

19    THE COURT IS FAMILIAR WITH, DIFFICULT TO USE, RARE.  WHAT THEY

20    SAY IS WELL, YOU KNEW ABOUT THE BUSINESS, YOU KNEW ABOUT CLOUD.

21         WELL, THAT'S FINE, OF COURSE THEY DO, BUT WHERE IS -- YOU

22    KNEW THAT THESE WERE FAKE.  I MEAN, YOU KNEW THAT YOUR AUDITED

23    FINANCIALS WERE WRONG.  WHAT IS IT THAT YOU KNEW THAT THREE

24    PERCENT OR 20 PERCENT OF SOMEONE'S TEAM HAD SOME PRACTICES THAT

25    WERE X, Y OR Z, WHERE IS THAT THAT ADDS UP IN ANY WAY?

1          AND THE CASE THEY RELY ON, THE CASE CALLED MULLIGAN.

2     MULLIGAN IS A PHARMACEUTICAL CASE WHERE THE MANUFACTURER HAD

3     RECEIVED 483 NOTICES AND WARNING LETTERS.

4              THE COURT:  PHARMACEUTICAL CASES ARE DIFFERENT

5      BECAUSE THERE ARE LOTS OF AGENCIES GIVING A LOT OF INFORMATION.

6      I KNOW.  THEY ARE A LOT TRICKIER TO COMPARE TO THIS KIND OF

7      CASE.

8              MR. ETH:  THAT'S RIGHT.  THAT'S RIGHT.

9          AND THEN WE COME TO STOCK SALES, WHICH ARE OFTEN USED IN

10     THESE CASES.  WE HAVE ONE DEFENDANT ALLEGED TO HAVE SOLD, THAT

11     WAS MR. KURIAN, TWO STATEMENTS, I THINK HE SAID TREMENDOUS AT

12     ONE POINT, HE SAID VERY, VERY GOOD.  SO WHETHER OR NOT THOSE

13     WOULD EVEN BE ACTIONABLE.

14         AND MANY OTHER CASES SAY WHEN YOU HAVE ONE DEFENDANT, BUT

15     THERE ARE OTHERS WHO DON'T SELL, THAT'S NOT CORROBORATING,

16     ESPECIALLY WHEN THEY HAVE SOMETHING LIKE $50 BILLION WORTH.

17     AND THERE'S A LOT OF BACK AND FORTH ABOUT WHETHER ORACLE'S

18     BUYBACK OF $12 BILLION CAN COME IN.

19             THE COURT:  I DON'T BELIEVE I CAN ACTUALLY CONSIDER

20      THAT AT THIS TIME.  MR. RIZIO-HAMILTON OBJECTS TO THAT.  I

21      THINK THAT'S A LITTLE BIT OUTSIDE OF THE PLEADINGS.

22             MR. ETH:  I UNDERSTAND.  AND THAT'S FINE, WE DON'T

23      HAVE TO GO THERE.  IT IS MENTIONED IN ONE OF THE TRANSCRIPTS

24      THAT THEY CITE, BUT THAT'S FINE.  I UNDERSTAND THE POINT.

25             AND THE LAST THING I JUST WANTED TO END ON, BECAUSE I

1    THINK IT IS COVERED BY THE BRIEFS, AND THEN IF THERE'S ANYTHING

2    TO RESPOND TO, I WILL, IT'S JUST LOOKING AT IT WHOLISTICALLY.

3         PLAINTIFF'S THEORY IS THAT ORACLE ABUSED ITS CUSTOMERS TO

4    ENTER INTO ONE-YEAR DEALS THAT THEY KNEW WOULDN'T BE RENEWED.

5    THAT'S WHAT ORACLE DID.

6         THERE'S NO REALLY, LIKE, WHY WOULD YOU DO THIS, OR OF

7    COURSE ANY OTHER PARTICULARS OR ANYTHING LIKE THAT; WHEREAS THE

8    COUNTER IS VERY STRAIGHTFORWARD, THAT ORACLE LAUNCHED AND

9    PROMOTED A NEW PRODUCT LINE.  AND IT GREW, AND IT GREW FAST.

10   AND IT GREW FAST, BUT AT DECELERATING RATES.

11        WE SEE IN THE COMPLAINT ABOUT HOW A LOT OF SALES PLUNGED

12   AND ALL OF THAT.  THEY NEVER PLUNGED, THEY HIT A RECORD, AND

13   ORACLE ACCURATELY FORECAST THAT THROUGHOUT.

14             THE COURT:  ALL RIGHT.

15             MR. ETH:  UNLESS THE COURT HAS ANY QUESTIONS.

16             THE COURT:  I WILL COME BACK AFTER I HEAR FROM

17   MR. RIZIO-HAMILTON AND GIVE YOU THE LAST WORD, BUT RIGHT NOW, I

18   WANT TO TAKE UP SOME OF THESE ISSUES WITH HIM.

19        THANK YOU, MR. ETH.

20             MR. RIZIO-HAMILTON:  GOOD MORNING, YOUR HONOR.

21             THE COURT:  GOOD MORNING.

22        MR. RIZIO-HAMILTON, I THINK YOU ARE PROBABLY USED TO

23   TAKING A SECOND CRACK AT A COMPLAINT WHEN YOU START OUT ON

24   THESE BIG CASES, AND I THINK THAT'S WHERE WE ARE HEADED TODAY.

25        I ACTUALLY AGREE WITH MUCH OF WHAT MR. ETH HAS OUTLINED

1    AND WHAT HE HAS PUT IN HIS BRIEFS, AND I HAVE SOME REAL

2    CONCERNS ABOUT WHAT'S MISSING FROM THE COMPLAINT, ALTHOUGH IT'S

3    100 PAGES LONG.

4         SO, YOU KNOW, AS I SAY, I THINK WE ARE HEADED TO

5    AMENDMENT.  WE CERTAINLY DON'T DISMISS THE FIRST TIME OUT.  BUT

6    ONE THING THAT DID STRIKE ME WHEN I READ THE COMPLAINT IS IT

7    DID READ LIKE LOTS OF MY CONSUMER CLASS ACTIONS AT THE

8    BEGINNING.

9         AND I THINK ONE OF MY OVERARCHING QUESTIONS TO YOU IS

10   THAT, OR COMMENTS, IF THE CONDUCT THAT YOU ALLEGE ORACLE

11   ENGAGED IN, AND I WILL ACCEPT THAT AS TRUE, AS BASICALLY

12   HOLDING AN AUDIT OVER THE HEAD OF THEIR CUSTOMERS AND THEN

13   MAKING A DEAL THEY COULDN'T REFUSE ON THE CLOUD SERVICES AND

14   THE ATTACHED DEALS WHERE THE OTHER PRODUCTS WERE DEEPLY

15   DISCOUNTED, IF THAT IS ACTIONABLE AS A FALSE STATEMENT, THEN

16   EVERY DISCOUNT A COMPANY OFFERS TO ITS CUSTOMER BASE IS GOING

17   TO BE GROUNDS FOR A SECURITIES FRAUD CASE IF IT'S NOT

18   DISCLOSED, OH, BY THE WAY, WE GAVE TEN PERCENT OFF FOR VOLUME.

19   OR OH, BY THE WAY, WE WERE RESTRUCTURING THE FAILURE TO PAY OF

20   OUR CUSTOMER AND DISCOUNTED THE PAST DUE AMOUNTS BY THEIR

21   AGREEING TO BUY FUTURE PRODUCTS FROM US.

22        THAT'S NOT WHAT THE SECURITIES LAWS ARE POLICING IS THE

23   SALES TACTICS OF THE CUSTOMERS IN REDUCING PRICES.  GAAP IS

24   GOING TO DEAL WITH A LOT OF THAT.  AND IT WILL COME IN, AS

25   MR. ETH SUGGESTS, IN THE REVENUE RECOGNITION.  BUT NOTHING THAT

1    I'M AWARE OF, NOR THAT YOU ALLEGE, MAKES THE CONDUCT ITSELF

2    UNLAWFUL OR FRAUDULENT TO THE CUSTOMERS.  THE CUSTOMERS AREN'T

3    REALLY MY CONCERN HERE, BUT IT IS THE BASIS.

4        AND SO WITH THE GUIDANCE THAT ORACLE OFFERED OVER THE

5    CLASS PERIOD, WHICH WAS MET IN EVERY INSTANCE WHICH ALERTED

6    INVESTORS, WE ARE GOING TO START OUT AT THIS HYPERGROWTH, AS

7    ONE OF THE DEFENDANTS CALLED IT, AND THEN IT'S GOING TO STEP

8    DOWN TO BE MERELY REMARKABLE GROWTH IN TODAY'S STANDARDS, MAYBE

9    NOT LIKE MICROSOFT, YOU SUGGEST MICROSOFT AS GROWING AT

10   90 PERCENT, AND ALL I CAN SAY IS GOOD FOR THEM.

11       BUT HERE, IF ORACLE TOLD ITS INVESTORS, OUR GUIDANCE FOR

12   THE NEXT QUARTER IS 21 PERCENT, AND THEY MET THAT, I DON'T KNOW

13   WHAT MORE AN INVESTOR NEEDS TO KNOW.  ALL THE REASONS IT'S

14   GOING TO GO DOWN.  ALL THE INVESTOR WANTS TO KNOW IS WHAT'S THE

15   BOTTOM LINE GOING TO BE.

16       SO THOSE ARE REALLY MY CONCERNS ABOUT THE LACK OF FALSITY

17   OF THAT FIRST BUCKET OF STATEMENTS.  I HAVE REAL CONCERNS ABOUT

18   WHETHER YOU CAN -- I WILL GIVE YOU A CHANCE, BUT I'M NOT SURE

19   YOU REALLY HAVE MUCH TO WORK WITH THERE.

20       SO LET ME HEAR FROM YOU NOW.

21           MR. RIZIO-HAMILTON:  SO THANK YOU VERY MUCH FOR KIND

22    OF SETTING THE TABLE.  I REALLY APPRECIATE THAT, IT'S VERY

23    HELPFUL.

24           THE COURT:  SURE.

25           MR. RIZIO-HAMILTON:  THERE'S A LOT THERE, AND I'M

1        GOING TO TRY TO UNPACK IT A LITTLE BIT.

2               THE COURT:  THANK YOU.

3               MR. RIZIO-HAMILTON:  SO LET ME START WITH WHAT MIGHT

4        BE THE MOST FUNDAMENTAL ASPECT OF WHAT YOU'VE SAID, WHICH IS

5        WHY WOULD THIS BE MISLEADING TO INVESTORS.

6               SO I THINK THAT THERE'S A COUPLE OF POINTS THAT ARE

7        IMPORTANT TO BEAR IN MIND.  THE FIRST IS THE CONTEXT IN WHICH

8        THIS OCCURRED.

9               THIS WAS A TIME AT WHICH THE MARKET WAS MOST CONCERNED

10       WITH RESPECT TO ORACLE ABOUT WHETHER IT COULD BUILD A

11       LEGITIMATE AND HEALTHY AND RAPIDLY GROWING CLOUD BUSINESS.  IT

12       WAS THE SINGLE MOST IMPORTANT ISSUE FACING THE COMPANY ITSELF.

13              WE QUOTE PRETTY DETAILED STATEMENTS FROM THE DEFENDANTS,

14       THEMSELVES, SAYING THIS WAS A GENERATIONAL SHIFT IN TECHNOLOGY,

15       AND IT WAS THE COMPANY'S BIGGEST OPPORTUNITY, CERTAINLY THE

16       MARKET SAW IT THAT WAY.  WHATEVER THE COMPANY DID IN CLOUD IS

17       WHAT HAD THE GREATEST IMPACT ON ITS STOCK DURING THE CLASS

18       PERIOD OF.

19              IN FACT, THE FINANCIAL PRESS AND OTHER MEDIA OUTLETS

20       REPORTED THAT ORACLE'S FUTURE AND RELEVANCE WAS PINNED ON ITS

21       ABILITY TO CREATE THIS CLOUD BUSINESS AND THEY EVEN CALLED IT

22       ANNEX TERRIBLE ISSUE FOR THE COMPANY.

23              SO IN THAT CONTEXT, THERE IS A WORLD OF DIFFERENCE BETWEEN

24       WHAT THE MARKET WAS LEAD TO BELIEVE WAS HAPPENING AND WHAT WAS

25       ACTUALLY HAPPENING AT ORACLE.  AND LET ME SORT OF OUTLINE THE

1       TWO DIFFERENT BUSINESS STRATEGIES, AND I THINK THAT MAY HELP

2       MAKE CLEAR WHY THE SITUATION HERE WAS MISLEADING.

3            SO ON THE ONE HAND, IF ORACLE HAD ACHIEVED THIS SUSTAINED

4       HYPERGROWTH BY SELLING GREAT PRODUCTS TO CUSTOMERS IN RESPONSE

5       TO TRUE CUSTOMER DEMAND FOR THOSE PRODUCTS, IT WOULD HAVE A

6       HEALTHY BUSINESS THAT WAS TRULY BUILT ON CUSTOMER DEMAND AND

7       TRULY WAS, IN EVERY LEGITIMATE WAY, GROWING IN THE WAY THAT

8       ORACLE EMPHASIZED ITS BUSINESS WAS GROWING.

9            IF ON THE OTHER HAND, AND THIS IS WHAT HAPPENED HERE, AND

10      I APPRECIATE THE COURT SAYING THAT IT TAKES THAT FOR GRANTED AT

11      THIS STAGE OF THE PROCEEDINGS, IF ON THE OTHER HAND ORACLE WAS

12      REALLY COERCING ITS CUSTOMERS INTO THESE PURCHASES AND COERCING

13      THEM BY INITIATING AUDITS OF AN ENTIRELY DIFFERENT PRODUCT

14      LINE, AND ON-PREMISES PRODUCT, AND THEN LEVERAGING THE FINE ON

15      THE ON-PREMISES AUDIT INTO A SO CALLED PURCHASE OF A CLOUD

16      PRODUCT, OR ENTICING CUSTOMERS TO MAKE THESE SO CALLED

17      PURCHASES BY OFFERING THEM REALLY STEEP DISCOUNTS ON A

18      COMPLETELY DIFFERENT PRODUCT, AGAIN THE ON-PREMISES PRODUCT,

19      THEN WHAT ORACLE IS REALLY DOING IS SIMPLY DISGUISING LEGACY

20      ON-PREMISES REVENUE AND CATEGORIZING IT AS CLOUD REVENUE.

21            THE COURT:  SO YOU WOULD HAVE TO ALLEGE A GAAP

22       PROBLEM THERE, AND FOR THE RECORD IT'S G-A-A-P, AND YOU DON'T.

23            NOW MAYBE YOU CAN BECAUSE IF THIS IS A REVENUE RECOGNITION

24       PROBLEM THEN THE GUIDANCE ON CLOUD IS A FALSE STATEMENT, BUT

25       YOU HAVE NO ALLEGATIONS ON THAT.

1        SO I MEAN, I DON'T ACTUALLY KNOW THAT YOU ARE TELLING ME

2    THAT YOU CAN MAKE THOSE ALLEGATIONS, BUT THE COMPLAINT IS

3    SILENT ON ANY GAAP PROBLEM OR ANY AUDIT PROBLEM.

4        SO I HAVE TO ASSUME AS WELL ON BEHALF OF ORACLE, THAT THE

5    ACCOUNTING OF THESE SALES AND REVENUE RECOGNITION WAS IN

6    ACCORDANCE WITH GAAP REQUIREMENTS.

7        SO IF YOU WANT TO ALLEGE IT DIFFERENTLY UNDER A DIFFERENT

8    THEORY, I WOULD GIVE YOU THE OPPORTUNITY, BUT THAT'S NOT THE

9    CASE YOU FILED.

10        MR. RIZIO-HAMILTON:  WELL, I WOULD MAKE TWO POINTS IN

11    RESPONSE.

12        THE COURT:  OKAY.

13        MR. RIZIO-HAMILTON:  THE FIRST IS THAT THERE'S

14    SIGNIFICANT CASE LAW DEMONSTRATING THAT STATEMENTS ABOUT

15    REVENUE GROWTH ARE ACTIONABLE AND MISLEADING EVEN ABSENT ANY

16    ALLEGATIONS OF GAAP VIOLATION.

17        THE COURT:  CERTAINLY TRUE.  BUT YOU ARE SUGGESTING

18    THAT THE SALES WERE PHONY BECAUSE OF THE WAY THEY WERE

19    ACCOUNTED, AND YET YOU HAVE NO ALLEGATION THAT THEY WERE

20    IMPROPERLY ACCOUNTED.

21        YOU ARE SAYING THE MARKET WANTED TO KNOW THE REASON FOR

22    THE GUIDANCE NUMBERS.

23        MR. RIZIO-HAMILTON:  I'M SAYING THAT THE MARKET

24    WANTED TO KNOW WHAT THE BUSINESS PRACTICES AND STRATEGY WERE

25    THAT WERE DRIVING THIS PURPORTED SUSTAINED HYPERGROWTH.

1          THE COURT:  SO YOU DIDN'T POINT TO ME A SINGLE CASE

2    WHERE THE COURT HAS FOUND A FALSE STATEMENT WHERE THE COMPANY

3    FAILED TO DISCLOSE, OH, BY THE WAY, WE GAVE A TEN PERCENT

4    DISCOUNT.  OR OH, BY THE WAY, WE RESTRUCTURED THE PRIOR DEBT IN

5    ORDER TO GET THE NEW SALE.  I DON'T KNOW OF ANY.

6          MR. RIZIO-HAMILTON:  I WILL GIVE YOU A FEW.

7       AND THESE ARE CITED ON PAGE 9 OF OUR BRIEF.

8          THE COURT:  OKAY.

9          MR. RIZIO-HAMILTON:  SEC V. TODD, THE NINTH CIRCUIT

10   DECISION, IS ONE OF THEM WHERE THERE WAS A TRANSACTION THAT WAS

11   PERFECTLY PROPER UNDER GAAP, IT INVOLVED AOL.  THERE WERE OTHER

12   TRANSACTIONS IN THAT CASE AS TO WHICH THERE WERE GAAP

13   VIOLATIONS, BUT AS TO THE TRANSACTION WITH AOL, THERE WAS NO

14   GAAP VIOLATION.  BUT THE MANNER IN WHICH IT WAS STRUCTURED, I

15   BELIEVE IT WAS A SALE OF ASSETS, PERMITTED THE COMPANY TO

16   RECOGNIZE MORE REVENUE ON THE TRANSACTION THAN IT OTHERWISE

17   WOULD HAVE BEEN ABLE TO AT THE TIME.

18      AND THE COURT HELD THAT NOTWITHSTANDING THE ABSENCE OF A

19   GAAP VIOLATION, THE COMPANY STATEMENTS ABOUT REVENUE GROWTH

20   THAT WERE BASED IN PART ON THE REVENUES REALIZED FROM THAT

21   TRANSACTION WERE MISLEADING.

22          THE COURT:  DID THEY MISS THEIR REVENUE GROWTH

23   PROJECTIONS IN THE SEC CASE?

24          MR. RIZIO-HAMILTON:  I DON'T BELIEVE THEY DID, BUT AS

25   I STAND BEFORE YOU, I AM NOT A ONE HUNDRED PERCENT CERTAIN.

1    THE COURT:  I DID NOT READ THAT CASE.  I WILL NOW.

2    MR. RIZIO-HAMILTON:  ALSO ON PAGE 9 OF THE BRIEF, THE

3    SUPPORTSOFT CASE IS ONE EXAMPLE WHERE THE COMPANY TOUTED ITS

4    REVENUE GROWTH, BUT DIDN'T DISCLOSE THAT IT HAD IMPLEMENTED A

5    POLICY TO GENERATE NEAR TERM REVENUE SPIKES.

6    AND THE COURT HELD THAT THE REVENUE GROWTH STATEMENTS WERE

7    ACTIONABLE, EVEN THOUGH THE FIGURES WERE ACCURATELY REPORTED

8    UNDER GAAP.  TO THE SAME EFFECT IS THE CRANE CASE, ALSO CITED

9    ON PAGE 9 OF THE BRIEF, AND THE MURPHY V. PRECISION CASE, WHERE

10   THE COMPANY'S STATEMENTS ABOUT THE ORGANIC GROWTH IT HAD

11   SUPPOSEDLY ACHIEVED, WERE MISLEADING WHERE IT OMITTED THAT IT

12   HAD BEEN "AGGRESSIVELY PULLING IN SALES, OFFERING DISCOUNTS AND

13   EXTENDING PAYMENT OPTIONS," IN THE WORDS OF THE COURT.

14   SO THERE IS CASE LAW TO SUPPORT PROPOSITION THAT REVENUE

15   GROWTH STATEMENTS MAY BE ACTIONABLE EVEN WITHOUT A GAAP

16   VIOLATION.  AND YOUR HONOR, THESE SAME CASES STAND FOR ANOTHER

17   PROPOSITION THAT YOUR OPENING REMARKS TOUCHED UPON WHICH I ALSO

18   THINK IS VERY IMPORTANT, WHICH IS TO SAY THAT, DO THE

19   UNDERLYING PRACTICES THAT ARE DRIVING THE REVENUE GROWTH AND

20   UNDISCLOSED, HAVE TO BE, THEMSELVES, ILLEGAL OR PROHIBITED SUCH

21   THAT THEY WOULD BE ACTIONABLE IN THE CONSUMER CONTEXT OR

22   SOMETHING LIKE THAT?

23   AND THE ANSWER IS NO.  IN THESE CASES THAT I HAVE JUST

24   MENTIONED, THE UNDERLYING PRACTICES, THE UNDERLYING DEAL

25   STRUCTURES AND HOW THE CONTRACTS HAVE BEEN CHANGED IN CERTAIN

1    OF THESE CASES, IT WAS PERFECTLY LEGAL, AND IT WAS PERFECTLY

2    PERMISSIBLE FROM THE STANDPOINT OF THE CONSUMERS ON THE OTHER

3    END OF THE TRANSACTIONS OR THE CONTRACTS, BUT NEVERTHELESS, THE

4    MANNER IN WHICH THE COMPANY SPOKE ABOUT THE REVENUE THAT HAD

5    BEEN ACHIEVED THROUGH THESE TRANSACTIONS WAS MISLEADING.

6         AND WE RESPECTFULLY SUBMIT THAT THE SAME IS TRUE HERE AND

7    THAT IT IS PARTICULARLY SO WITHIN THE UNIQUE CONTEXT OF THIS

8    CASE.  AGAIN, THESE STATEMENTS, THE EMPHASIS ON THE PURPORTED

9    SUSTAINED HYPERGROWTH AND CLOUD SALES, WERE BEING MADE TO THE

10   MARKET AT A TIME WHERE THE MARKET WAS INTENTLY FOCUSED UPON THE

11   COMPANY'S ABILITY TO CREATE A RAPIDLY GROWING CLOUD BUSINESS.

12   AND THERE IS A MATERIAL DIFFERENCE BETWEEN DOING THAT IN THE

13   TRUE SENSE WHERE YOU ARE TRULY SELLING CLOUD PRODUCTS TO

14   CUSTOMERS WHO WANT THEM, WHO INTEND TO USE THEM AND HAVE

15   LEGITIMATE DEMAND FOR THEM, ON THE ONE HAND, AND ON THE OTHER

16   HAND, DOING IT IN THE MATTER HERE.

17        THE COURT:  SO I GUESS I STRUGGLE WITH, WHERE'S THE

18   LINE BETWEEN KNOWING THAT YOUR CUSTOMERS WON'T RENEW AND HOPING

19   THEY WILL?  YOU KNOW, BECAUSE IT'S LEGITIMATE TO HOPE THAT THEY

20   WILL RENEW.

21        LET'S TAKE ALL THESE TACTICS OFF THE TABLE AND JUST IN AN

22   ORDINARY SALE OF A NEW PRODUCT, YOU SELL IT FOR A ONE YEAR TERM

23   AND THE HOPE AND EXPECTATION IS RENEWAL, BUT NO ONE IS GOING TO

24   HOLD A SALESMAN OR COMPANY TO A GUARANTEE OF A RENEWAL UNDER

25   THAT CIRCUMSTANCE.

1        AND WE LOOK AT THAT SIDE BY SIDE WITH WHAT YOU'VE ALLEGED

2   HERE AS THESE ODIOUS TACTICS THAT YOU SUGGEST AS PERHAPS AN

3   INDICATOR THAT AS SOON AS THESE CUSTOMERS GET OUT OF THE SHADOW

4   OF THE PUNITIVE ALTERNATIVES, THEY ARE GOING TO HEAD FOR A

5   COMPETITOR.

6        I DON'T KNOW WHERE THE LINE IS.  AND THAT'S WHAT MAKES A

7   CASE LIKE THIS SO DIFFICULT, BECAUSE SALES TACTICS, THERE ARE A

8   LOT OF BRASS TAX THAT GO ON WITH SELLING, AND I DON'T THINK THE

9   SECURITIES LAWS ARE REALLY DESIGNED TO POLICE SALES TACTICS IN

10  THE WAY THESE CLAIMS WOULD SUGGEST, GIVEN THAT THE GUIDANCE WAS

11  ACCURATE AND MET.

12        MR. RIZIO-HAMILTON:  A COUPLE POINTS, YOUR HONOR.

13        I THINK THAT ONE PLACE TO DRAW THE LINE IS WHEN THE

14  CUSTOMER DIDN'T WANT THE PRODUCT TO BEGIN WITH.

15        THE COURT:  SO YOU DON'T HAVE ANY ALLEGATIONS THAT

16  THE CUSTOMER DOESN'T WANT THE PRODUCT.  YOU HAVE NOTHING FROM

17  THE CUSTOMER.  YOU DON'T EVEN HAVE ANYTHING FROM A CW WHO SAYS,

18  I SPOKE TO A CUSTOMER WHO SAID THEY ARE SQUEEZING ME AND I HAVE

19  NO CHOICE.

20        MR. RIZIO-HAMILTON:  YOU KNOW, WE HAVE MULTIPLE

21  FORMER EMPLOYEES WHO DO SAY THAT THE CLOUD PRODUCTS THAT WERE

22  SOLD WERE SOLD TO CUSTOMERS WHO DIDN'T WANT THEM, DIDN'T INTEND

23  TO USE THEM, AND IN FACT WERE NOT USING THEM.

24        AND WHEN THEY CONTACTED THE CUSTOMERS TO SEE WHY THEY

25  WEREN'T USING THEM, THEY WERE TOLD THEY DIDN'T WANT THEM IN THE

1    FIRST PLACE AND THEY HAD ONLY PURCHASED THEM UNDER THREAT OF

2    AUDIT OR IN ORDER TO RECEIVE -- AS TO AN ON-PREMISES PRODUCT OR

3    TO RECEIVE A DISCOUNT FROM ON AN ON-PREMISES PRODUCT.

4         SO OUR EMPLOYEE REPORTS DO CORROBORATE THAT ALLEGATION,

5    AND THERE ARE MULTIPLE OF THEM.

6         THE COURT:  AND WE HAVE THE OTHER PROBLEM THAT IS

7    POINTED OUT IN THE OPENING PAPERS WITH THE TIMING.

8         AND SO I CERTAINLY AGREE WITH YOUR CITATION TO CASES THAT

9    HOLD THAT YOU CAN ALLEGE CIRCUMSTANCES THAT PREDATE THE CLASS

10   PERIOD, I GUESS OR EVEN POST-DATE, BUT THAT'S OUR CIRCUMSTANCE

11   HERE, IN ORDER TO GIVE CONTEXT AND TO DRAW INFERENCES ABOUT

12   WHAT MAY HAVE BEEN OCCURRING IN THE CLASS PERIOD.

13        BUT IN THIS CASE, ALL OF THE STUDIES AND THE REPORTS AND

14   THE NEWS ARTICLES REALLY, OR THE REALLY BOMBASTIC ONES, ARE

15   PRE-CLASS PERIOD.  AND THERE'S NOTHING, THE CW'S -- I NEED MORE

16   SPECIFICITY OF TIME, BECAUSE YOU MIGHT SAY GENERALLY DURING THE

17   CLASS PERIOD.  THAT'S SUCH A GENERAL STATEMENT, I'M KIND OF

18   STRUGGLING WITH THAT.

19        AND IT'S ONLY CW 1 AND CW 3 WHO TALKED ABOUT DURING THE

20   CLASS PERIOD.  CW 5 WORKED FOR THE COMPANY FROM 2016 TO

21   OCTOBER 2018, AND I DON'T REMEMBER THE ALLEGATION ON CW 5

22   ACTUALLY ALLEGING ANY FACTS THAT OCCURRED DURING THE CLASS

23   PERIOD.  CW 6 WORKED UNTIL JANUARY 2018, BUT STARTED IN

24   OCTOBER 2010.  AGAIN, I'M NOT SURE WHAT PERIOD OF TIME CW 6 IS

25   REFERRING TO.  I DON'T ACTUALLY -- AND THE SAME WITH CW 9,

1  WORKED FROM 2016 TO 2018, MOSTLY IN THE CLASS PERIOD, OR

2  PARTIALLY ANYWAY.  MY NOTES AREN'T ANY MORE CLEAR THAN THAT.

3       BUT I MEAN, CLEARLY YOU'VE IDENTIFIED WHEN THEY WORKED FOR

4  THE COMPANY.

5            MR. RIZIO-HAMILTON:  SO A COUPLE OF POINTS ON THAT.

6       WE DO THINK THAT THE COMPLAINT IS MORE DETAILED AS TO TIME

7  THAN DEFENDANTS GAVE IT CREDIT FOR IN THEIR OPENING BRIEF.

8  FORMER EMPLOYEE 1 IS QUITE SPECIFIC AS IT TIME, FORMER EMPLOYEE

9  1 STATES THAT 75 PERCENT OF HIS --

10            THE COURT:  WHAT PARAGRAPH ARE YOU LOOKING AT?

11            MR. RIZIO-HAMILTON:  LET'S SEE --

12            THE COURT:  IT'S A BIG COMPLAINT, I DON'T EXPECT YOU

13  TO MEMORIZE IT.

14            MR. RIZIO-HAMILTON:  YES.  TURNING TO MY NOTES, IF

15  YOU LOOK AT PARAGRAPH 102, FOR INSTANCE, FORMER EMPLOYEE 1

16  STATES THAT 75 PERCENT OF THEIR TEAM'S CLOUD SALES IN 2017 WERE

17  MADE TO CUSTOMERS UNDER THREAT OF LICENSE AUDITS WHO PURCHASED

18  THE PRODUCT SIMPLY TO AVOID THE HEFTY PENALTIES.  IN 2018, SUCH

19  SALES ACCOUNTED FOR 86 PERCENT OF HIS TEAM'S REVENUE.

20       SO THAT'S ONE EXAMPLE OF SPECIFICITY, YOUR HONOR.

21       FORMER EMPLOYEE 3, FOR INSTANCE, REPORTED THAT WHAT WE

22  CALL THE ABC TACTIC, THE AUDIT, BARGAIN, CLOSE, WAS AN ACTIVE

23  PRACTICE THAT WAS STEPPED UP INTO HIGH GEAR IN THE BEGINNING OF

24  FISCAL YEAR 2017.  AND FISCAL YEAR 2017, FOR ORACLE, BEGINS

25  JUNE 1ST, 2016, SO SHORTLY A FEW MONTHS --

1      THE COURT:  SO IT'S ONLY THREE MONTHS IN THE CLASS

2  PERIOD.

3      MR. RIZIO-HAMILTON:  WELL, IT CONTINUES THROUGH

4  MAY 31ST, 2017.  BUT, YOU KNOW --

5      THE COURT:  BUT THE CLASS PERIOD DOESN'T START UNTIL

6  MARCH OF 2017.

7      MR. RIZIO-HAMILTON:  AND IT WAS STEPPED UP TO HIGH

8  GEAR BEGINNING IN FISCAL YEAR 2017.

9      IT EXISTED PREVIOUSLY, BUT IT WAS REALLY ESCALATED AT THAT

10  PERIOD OF TIME.  AND THAT'S THE PERIOD OF TIME LEADING UP TO

11  THE CLASS PERIOD AND CONTINUING THROUGH THE EARLY PORTION OF

12  THE CLASS PERIOD.

13      AND YOU KNOW, WE HAVE OTHER FORMER EMPLOYEES WHO SPEAK

14  ABOUT THE PERCENTAGES OF THEIR TEAM'S REVENUES THAT WERE DRIVEN

15  BY THESE PRACTICES, SPECIFICALLY DURING THE CLASS PERIOD.

16      I UNDERSTAND THAT DURING THE CLASS PERIOD DOESN'T PUT A

17  SPECIFIC MONTH OR YEAR ON IT, BUT IT'S NOT A PARTICULARLY LONG

18  CLASS PERIOD.  AND WE THOUGHT THAT, YOU KNOW, COVERING THE

19  CLASS PERIOD WITH THE ALLEGATION WAS SUFFICIENTLY SPECIFIC.

20      THERE WERE A FEW OTHER POINTS THAT I WANTED TO COVER.  IF

21  YOUR HONOR HAS ANY OTHER QUESTIONS AT THE MOMENT, I'M HAPPY

22  TO --

23      THE COURT:  WE CAN MOVE ON.  THANK YOU.

24      MR. RIZIO-HAMILTON:  SO WITH RESPECT TO THE CHILEAN

25  REGULATOR AUDIT, BY THE WAY, THAT AUDIT, WHILE IT WAS BEGUN

1      BEFORE THE CLASS PERIOD, CALLING IT AN AUDIT IS PROBABLY

2      INACCURATE, INVESTIGATION WAS BEGUN BEFORE THE CLASS PERIOD.

3            IT CONTINUED THROUGH THE CLASS PERIOD INTO 2017.  AND THE

4      FINAL REPORT WASN'T ISSUED UNTIL APRIL OF 2018, ALSO DURING THE

5      CLASS PERIOD.  AND THE REPORT SPECIFICALLY FOUND THAT ORACLE

6      ENGAGED IN THESE PRACTICES.  AND THE CHILEAN REGULATOR

7      QUESTIONED AT LEAST, I BELIEVE, 51 ORACLE CUSTOMERS.

8            AND SO I THINK THAT THERE'S A FAIR INFERENCE THAT THAT

9      REPORT PERTAINS TO CONDUCT DURING THE CLASS PERIOD OR AT LEAST

10     SHORTLY BEFORE.  AND THAT IT CONTINUED THROUGHOUT.

11           THE CITY OF DENVER EXAMPLE THAT WE GAVE IN THE COMPLAINT,

12     AS I RECALL, AND I WOULD HAVE TO GO BACK TO MAKE ONE

13     HUNDRED PERCENT CERTAIN, BUT I BELIEVE THE FINAL SOLUTION THAT

14     WAS PROPOSED TO THE CITY OF DENVER ON THE AUDIT WAS PROPOSED IN

15     DECEMBER 2016 WHICH IS JUST A FEW MONTHS BEFORE THE CLASS

16     PERIOD BEGINS.

17           AND I THINK THAT THAT'S A FAIR -- THERE'S A FAIR INFERENCE

18     THERE THAT THAT'S CLOSE ENOUGH IN TIME, TEMPORALLY TO THE CLASS

19     PERIOD, TO BE INDICATIVE OF CONDUCT OCCURRING DURING THE CLASS

20     PERIOD, WHICH AGAIN BEGINS IN MARCH, JUST A FEW MONTHS LATER.

21           MOREOVER, YOUR HONOR, AND I THINK THIS IS AN IMPORTANT

22     POINT, IT WAS MENTIONED THAT THERE'S ANALYST AND MEDIA REPORTS

23     ON THIS ISSUE AND THAT THEY WERE BEFORE THE CLASS PERIOD.  BUT

24     THAT'S NOT ENTIRELY ACCURATE.  THERE ARE MANY ANALYST AND MEDIA

25     REPORTS DECRYING THIS ISSUE DURING THE CLASS PERIOD.  AND I

1        WOULD JUST LIKE TO JUMP TO A COUPLE OF THEM BECAUSE I THINK

2        THAT THEY ARE WORTH MENTIONING.

3            IN PARAGRAPH 157, FOR INSTANCE, WE HAVE A REPORT FROM

4        BUSINESS INSIDER, STATING THAT ORACLE'S CUSTOMERS ARE FED UP

5        WITH ITS HARD-NOSED SALES TACTICS.

6            WE ALSO QUOTE A REPORT FROM JMP ANALYSIS FROM DECEMBER OF

7        2017.  THE BUSINESS INSIDER REPORT WAS ALSO FROM DECEMBER OF

8        2017.  THE JMP ANALYSIS REPORTED THAT MANY CUSTOMERS ARE IRATE

9        AT ORACLE DUE TO FIST AUDITING PRACTICE AND HAVE ALREADY PLACED

10       THEIR BETS ON AMAZON, MICROSOFT OR GOOGLE CLOUD.

11           BEYOND THAT, WE HAVE ADDITIONAL MEDIA REPORTS, NOT JUST AT

12       THE END OF 2017 DURING THE CLASS PERIOD, BUT IN EARLY 2018 ALSO

13       DURING THE CLASS PERIOD.

14           THE COURT:  SO IT KIND OF RAISES THE ISSUE OF

15       COMPANIES CERTAINLY ENGAGE IN MISGUIDED TECHNIQUES TO INCREASE

16       THEIR SALES THAT ACTUALLY FAIL.  THAT'S NOT ACTIONABLE, THAT'S

17       JUST BAD BUSINESS JUDGEMENT.

18           MR. RIZIO-HAMILTON:  IN A VACUUM, INDEPENDENT OF ANY

19       STATEMENTS TO THE MARKET, YOU ARE ABSOLUTELY ONE HUNDRED

20       PERCENT CORRECT.

21           I THINK THE INTERESTING THING HERE ARISES WHEN YOU TAKE

22       WHAT, IN A VACUUM, WOULD JUST BE A MISGUIDED BUSINESS PRACTICE,

23       HOLD IT UP AGAINST THE STATEMENTS THAT WERE MADE, AND DO THAT

24       WHILE TAKING ACCOUNT OF THE GREATER CONTEXT OF THE MARKET AND

25       WHAT WAS SO IMPORTANT TO IT AT THE TIME TO MAKE A DETERMINATION

1    AS TO WHETHER IN THAT CONTEXT, TAKING THAT FULL PICTURE INTO

2    ACCOUNT, EVEN IF THE STATEMENTS WEREN'T FLATLY FALSE, WERE MAY

3    MISLEADING?

4        THAT'S THE QUESTION AT THE HEART OF THE CASE, I

5    RESPECTFULLY SUBMIT.  AND GIVEN THE CONTEXT THAT THESE

6    STATEMENTS WERE BEING MADE, GIVEN HOW CRITICAL THEY WERE TO

7    INVESTORS, GIVEN THAT THERE WERE MULTIPLE KINDS OF STATEMENTS

8    HERE, THESE WERE NOT JUST REVENUE FIGURES THAT WERE PUBLISHED

9    DETACHED AND STANDING ALONE.

10       THESE WERE REVENUE FIGURES THAT WERE PUBLISHED AND THEN

11   EMPHASIZED TREMENDOUSLY EMPHASIZED ON EVERY EARNINGS CALLED TO

12   INVESTORS AS PROOF OF THE COMPANY'S SUCCESS IN ACHIEVING THIS

13   SEMINAL TRANSFORMATION IN ITS BUSINESS.

14       THERE WERE ALSO --

15           THE COURT:  SO THOSE ARE THE FALSE STATEMENTS THAT I

16   WOULD WANT TO SEE.  UNFORTUNATELY, I DON'T THINK YOU ARE

17   ACTUALLY IDENTIFYING THOSE DURING THE CLASS PERIOD.  WHAT YOU

18   IDENTIFY IN THE FALSE STATEMENTS ARE THE ACTUAL NUMBERS, WHICH

19   ARE NOT FALSE.

20       AND YOU SAY, YOUR STATEMENT OF WHY THEY ARE FALSE IS THAT

21   THEY WERE NOT FLESHED OUT AS TO WHY YOU ORACLE MET GUIDANCE.

22   YOU DON'T HAVE ANY -- YOU HAVE -- YOU DO HAVE A COUPLE OF

23   STATEMENTS IN THERE THAT ATTRIBUTE THE SALES NUMBERS TO A GREAT

24   PRODUCT.

25           MR. RIZIO-HAMILTON:  YES.

```
 1              THE COURT:  OKAY.  YOU DO HAVE A COUPLE OF THOSE.
 2      BUT ALL THE OTHERS IN MY FIRST BUCKET OF STATEMENTS ABOUT
 3      REVENUE, I'M NOT SURE, I WILL LET YOU TRY, I DON'T KNOW THAT
 4      THOSE SURVIVE.
 5              BUT A STATEMENT OF THE -- I MIGHT BE INTERESTED IN SEEING
 6      WHAT YOU CAN DO IN DEVELOPING THE STATEMENT ABOUT THE CONTEXT
 7      OF THE STATEMENTS ABOUT WHY THE SALES FIGURES ARE SO ROBUST.
 8              AND I KNOW YOU HAVE A COUPLE AND WE COULD WALK THROUGH
 9      THEM, BUT I DON'T THINK, I'M NOT SURE THAT'S A GOOD USE OF OUR
10      TIME.
11              MR. RIZIO-HAMILTON:  FAIR ENOUGH.
12              SO THE REVENUE STATEMENTS AND THE EMPHASIS OF THE
13      SUSTAINED HYPERGROWTH, WE DO BELIEVE ARE MISLEADING FOR THE
14      REASONS I'VE ALREADY STATED, OKAY.  NOT NECESSARILY FALSE.
15              THE COURT:  SO HYPERGROWTH IS NOT A GAAP TERM, IT'S
16      HYPERBOLE.  I DON'T THINK IT'S ACTUALLY ACTIONABLE TO SAY
17      YOU'VE HAD HYPERGROWTH.  THE STATEMENT WAS ACTUALLY MADE WHEN
18      THE COMPANY HAD JUST EXPERIENCED A 58 PERCENT BUMP IN A
19      QUARTER.
20              AND I DON'T KNOW, I JUST DON'T -- YOU COULD SAY WELL,
21      MICROSOFT HAD 90 PERCENT, SO IN FACT THIS WAS MODEST.  BUT I
22      JUST THINK THAT'S PUFFERY.  HYPERGROWTH, IT'S JUST NOT A -- AND
23      IT'S BORNE OUT BY 58 PERCENT.  I MEAN, 58 PERCENT GROWTH AT ANY
24      TIME IS PRETTY REMARKABLE.
25              MR. RIZIO-HAMILTON:  WELL, THE 58 PERCENT THAT
```

1       SUPPORTED THAT STATEMENT, WE BELIEVE WAS DRIVEN BY --

2              THE COURT:  I UNDERSTAND THAT.  BUT THE STATEMENT WAS

3       "THIS IS HYPERGROWTH."  AND THERE WAS NO STATEMENT, AND WE ARE

4       GOING TO REPEAT THIS QUARTER OVER QUARTER.  IN FACT, IT'S

5       FOLLOWED BY GUIDANCE SHOWING THE STEPPED DOWN GROWTH.

6              MR. RIZIO-HAMILTON:  SO TWO POINTS, YOUR HONOR.

7          SO THE REVENUE STATEMENTS, AND WE DO HAVE A COUPLE

8       STATEMENTS TO THIS EFFECT, WERE USED TO DEMONSTRATE TO THE

9       MARKET THAT THE COMPANY HAD ACHIEVED THIS TRANSFORMATION.

10          AND THAT'S EXACTLY HOW THE MARKET REACTS TO THEM, BY THE

11      FALL OF 2017, WE ARE SEEING ANALYST REPORTS, AND THESE ARE PLED

12      IN THE COMPLAINT, WHERE THEY ARE SAYING THE COMPANY HAS CROSSED

13      THE CLOUD CAMP.  THE COMPANY HAS ROUND THE BEND IN ITS CLOUD

14      TRANSFORMATION.

15          AND YOU KNOW, DEFENDANTS, AT LEAST DEFENDANT CATZ, PERHAPS

16      DEFENDANT HURD, ARE TOUTING THESE REVENUE GROWTH METRICS AS

17      PROOF OF THEIR PIVOT TO THE CLOUD, AND THE COMPANY'S

18      TRANSFORMATION.  AND SO THAT'S THE CONTEXT IN WHICH IS THEY

19      WERE OFFERED TO THE MARKET.

20          AND GIVEN THE MARKET WAS SO CONCERNED ABOUT THIS ONE

21      ISSUE, STATEMENTS EMPHASIZING THAT REVENUE GROWTH WERE MATERIAL

22      AND MATERIALLY MISLEADING, THEIR STATEMENTS THAT THE MARKET --

23      THEY ARE STATEMENTS THAT THE MARKET TOOK VERY SERIOUSLY.

24          THE UNDERLYING 58 PERCENT GROWTH, WE SUBMIT, IS MISLEADING

25      WHEN THERE'S NO DISCLOSURE OF THE FACT THAT THE GROWTH WAS

1      ACHIEVED IN A WAY THAT WOULD BE OF GREAT CONCERN TO THE MARKET,

2      AND FAIRLY SO.

3              THE COURT:  SO WHERE IS THE LINE BETWEEN WHAT WOULD

4      BE CONCERNING TO THE MARKET AND WHAT'S JUST A NORMAL DOING

5      BUSINESS IN AN AGGRESSIVE WAY OF DISCOUNTING PRODUCTS AND

6      OFFERING A DEAL ON SOME OTHER PRODUCT?

7              MR. RIZIO-HAMILTON:  SO I THINK IT WOULD BE A REALLY

8      DIFFICULT CASE IF THE REVENUE FIGURES WERE JUST NOT GIVEN ANY

9      CONTEXT BY THE OTHER STATEMENTS, OKAY.

10      AND I WILL GET TO THE DENIALS MOMENTARILY.  WE HAVE OTHER

11     STATEMENTS THAT SURROUND THESE REVENUE GROWTH STATEMENTS THAT

12     PUT THEM INTO CONTEXT FOR THE MARKET, AND I THINK MAKE THEM

13     EVEN MORE MISLEADING.

14      WE HAVE STATEMENTS WHERE EVEN IF YOUR HONOR DOESN'T FIND

15     THEM TO BE FLAT DENIALS, THEY ARE SURELY TAMPING DOWN MARKET

16     CONCERNS THAT THESE PRACTICES WERE OCCURRING TO A MATERIAL

17     DEGREE.  THAT'S NUMBER ONE.

18              THE COURT:  YOU HAVEN'T ACTUALLY ALLEGED FACTS

19     SHOWING THAT THEY ARE OCCURRING TO A MATERIAL DEGREE.

20      THAT'S ONE OF MR. ETH'S COMMENTS IS THAT YOU HAVE SOMEONE

21     WHO WORKS IN NORTH AMERICAN SALES, BUT ALL SHE IS RELATING TO

22     IS THEIR OWN TEAM.  AND I DON'T KNOW WHETHER TEAMS HAVE SMALL

23     REGIONS OR I DON'T KNOW WHAT THEIR TERRITORY IS, I DON'T KNOW

24     ANYTHING.

25              MR. RIZIO-HAMILTON:  WELL, YOUR HONOR, WHEN YOU LOOK

1      AT THE COMPLAINT AS A WHOLE, I THINK THAT THERE ARE ENOUGH

2      PARTICULARIZED FACTS HERE TO GIVE RISE TO THE INFERENCE THAT

3      THE MISCONDUCT OCCURRED ON A MATERIAL LEVEL AND HAD A MATERIAL

4      IMPACT ON THE COMPANY.

5           WE HAVE MULTIPLE FORMER EMPLOYEES FROM VARIOUS REGIONS

6   ACROSS THE GLOBE.  WE HAVE FORMER EMPLOYEES FROM NORTH AMERICA,

7   FORMER EMPLOYEES FROM THE MIDDLE EAST AND AFRICA AND FROM

8   EUROPE, ALL OF WHOM GIVE REMARKABLY CONSISTENT ACCOUNTS WITH

9   RESPECT TO THE FACT THAT THESE PRACTICES ACCOUNTED FOR THE VAST

10  MAJORITY OF THE SALES THAT THEIR TEAMS ACHIEVED.

11          THEY ALSO GIVE REMARKABLY CONSISTENT ACCOUNTS OF THE DEAL

12  MECHANICS, AND THEY DESCRIBE A BUSINESS STRATEGY THAT REQUIRED

13  GLOBAL COORDINATION BETWEEN THE AUDITING FUNCTION AND THE SALES

14  FUNCTION.

15          BEYOND THAT, WE HAVE THE FINDINGS OF THE CHILEAN REGULATOR

16  WHO AGAIN LOOKED AT THIS ISSUE FOR YEARS, AND QUESTIONED 50

17  ORACLE CUSTOMERS.

18          BEYOND THAT, YOUR HONOR, WE HAVE MULTIPLE INDUSTRY

19  PARTICIPANTS, ADVISORY FIRMS, SUCH AS GARTNER, PALISADES AND

20  UPPER EDGE.  PALISADES, FOR INSTANCE, HAS ADVISED CLIENTS IN

21  700 AUDITS, ACTUALLY HUNDREDS OF AUDITS.  UPPER EDGE IS 700

22  AUDITS, AND GARTNER IS A WELL-RESPECTED WIDELY PUBLISHING AND

23  WIDELY READ ADVISORY FIRM.  AND ALL OF THOSE PARTICIPANTS SAID

24  THAT THIS OCCURRED TO A SIGNIFICANT DEGREE.

25          AND IN ADDITION TO THAT, YOUR HONOR, WE HAVE SUBSTANTIAL

1    MEDIA AND ANALYST REACTION DURING THE PERIOD OF TIME WHEN THE

2    REVENUE GROWTH WAS DECELERATING, ALL OF WHICH SAID THAT

3    CUSTOMERS WERE, MANY CUSTOMERS WERE FED UP WITH THESE TACTICS,

4    THESE TACTICS WERE PART OF THE CORE ORACLE PLAYBOOK WHICH ALSO

5    SUBSTANTIATES THAT THIS WAS A MATERIAL ISSUE AND OCCURRING TO A

6    MATERIAL DEGREE.

7         AND FINALLY, AT THE END OF THE CLASS PERIOD, WE HAVE THE

8    GROWTH RATES DECLINING FROM 51 PERCENT TO 20 PERCENT.

9              THE COURT:  AS SET FORTH IN THE GUIDANCE.

10             MR. RIZIO-HAMILTON:  I WILL JUST FINISH THE THOUGHT

11   AND THEN DIRECTLY ADDRESS THAT, WHICH FURTHER INDICATES THE

12   DEGREE TO WHICH THESE PRACTICES PROPPED UP REVENUE GROWTH

13   DURING THE CLASS PERIOD.

14             THE COURT:  SO I GUESS WHAT I'M NOT UNDERSTANDING, I

15   ACCEPT THE CONTEXT IN WHICH YOU PLACE ALL OF THIS THAT CLOUD

16   WAS TRANSFORMATIVE AND ALL BUSINESSES NEEDED TO ATTAIN MARKET

17   SHARE AND CLOUD SERVICES.  BUT ORACLE PARTICULARLY NEEDED TO

18   MAKE THE TRANSFORMATION BECAUSE OF ITS, YOU KNOW, ANY MATURE

19   COMPANY HAS TO WORRY THAT THE YOUNGINS ARE GOING TO TAKE THE

20   BUSINESS AWAY BECAUSE THEY ARE MUCH MORE NIMBLE AT DOING THAT,

21   AND THAT'S A CLASSIC BUSINESS PROBLEM.

22         BUT HERE, WHERE ORACLE TOLD THE MARKET, WE ARE GOING TO

23   START HERE, WE HAVE 58 PERCENT, AND WE ARE GOING DOWN, THE

24   MARKET KNOWS WHAT EVERYBODY ELSE IS DOING.  AND WHEN THEY SEE

25   THOSE NUMBERS GOING DOWN, I THINK THAT TELLS THE WHOLE STORY OF

1    THEIR FUTURE IN CLOUD.

2         AND SO FOR AN ANALYST TO SEE THE GUIDANCE, AND TO SAY THAT

3    ORACLE MADE THE TRANSFORMATION, THAT'S KNOWING THAT, I DON'T

4    KNOW WHERE THE LIMIT IS HYPERGROWTH VERSUS GOOD GROWTH OR

5    ORDINARY GROWTH, BUT IT WAS STEPPED DOWN, THAT ROAD MAP WAS

6    BEFORE THE ANALYST.

7         MR. RIZIO-HAMILTON:  SO TWO POINTS ON THE GUIDANCE.

8         THE FIRST IS THAT AS THE COMPANY'S GROWTH WAS ACCELERATING

9    IN THE CLOUD, THE THESIS OF THE COMPLAINT IS THAT THAT WAS

10    PROPPED UP BY THESE TACTICS ON THE FRONT END.

11         ON THE BACK END, SO I DON'T THINK THE GUIDANCE REALLY

12    HELPS THEM ON THE FRONT END.  ON THE BACK END WHEN THEY WERE

13    PROJECTING SLOWER GROWTH, THERE IS A MATERIAL DIFFERENCE TO AN

14    INVESTOR BETWEEN UNDERSTANDING WHY THE GROWTH IS DECELERATING.

15         SO, YOU KNOW, IF THE COMPANY HAD BUILT A HEALTHY CLOUD

16    BUSINESS BUT WAS EXPERIENCING DECELERATION IN THE PROJECTED

17    REVENUE DUE TO THE FACT THAT THERE WAS SEASONALITY, IT HAD

18    SATURATED ITS CUSTOMER BASE, IT WAS WORKING ON A NEW ITERATION

19    OF CLOUD THAT IT HADN'T YET ROLLED OUT, AND SO IT WAS HOLDING

20    BACK ON SALES IN THE CURRENT COUPLE OF QUARTERS UNTIL THE NEW

21    PRODUCT CAME ONLINE.

22         THAT'S ONE THING.

23         THE COURT:  AND YOU DO HAVE SOME ALLEGED FALSE

24    STATEMENTS OF ATTRIBUTING THE SLOWED DOWN SALES TO NEW PRODUCTS

25    COMING ONLINE, WHICH YOU CLAIM WERE FALSE, BECAUSE IN FACT THE

1    SLOW DOWN SALES WERE BECAUSE NOBODY WANTED THE PRODUCT.

2         MR. RIZIO-HAMILTON:  BECAUSE NOBODY WANTED THE

3    PRODUCT AND THE CUSTOMERS HAD JUST GOTTEN COMPLETELY FED UP

4    WITH THIS AND WEREN'T GOING TO TAKE IT ANYMORE.  THERE'S ALWAYS

5    A SATURATION POINT ON THAT.

6         AND I RESPECTFULLY SUBMIT THAT EVEN THOUGH THE COMPANY

7    PROJECTED THOSE GROWTH RATES TO THE MARKET, THERE'S A

8    MEANINGFUL DIFFERENCE TO AN INVESTOR IN UNDERSTANDING WHY THE

9    GROWTH RATES ARE DECLINING, IT COULD BE FOR SOMETHING THAT'S

10   NOT NECESSARILY TROUBLING, LIKE, WE ARE ABOUT TO DEVELOP A

11   GANGBUSTER'S NEW PRODUCT AND SO WE ARE PULLING BACK ON SALES

12   FOR THE NEXT TWO QUARTERS UNTIL WE ROLL THAT OUT.

13        IT COULD BE SOMETHING THAT IS VERY TROUBLING AND IS LIKELY

14   TO HAVE A MATERIAL NEGATIVE IMPACT ON THE STOCK PRICE, JUST

15   LIKE THE PRACTICES WE ALLEGE HERE FOR INSTANCE, WHICH IS TO

16   SAY, WE WERE NEVER SELLING PRODUCTS INTO REAL DEMAND IN THE

17   FIRST PLACE.

18        THOSE ARE TWO VERY DIFFERENT SCENARIOS, AND I THINK THAT

19   THE DISCLOSURE OF THE PROJECTIONS DOESN'T SOLVE FOR THAT

20   BECAUSE IT DOESN'T DISCLOSE THAT.

21         THE COURT:  DID YOU WANT TO MOVE INTO SCIENTER OR --

22         MR. RIZIO-HAMILTON:  TWO POINTS VERY BRIEFLY, AND

23   THEN I WILL MOVE INTO SCIENTER.

24        ON THE DENIALS POINT, I THINK THAT ONE THING THAT MR. BOND

25   SAID IN THE DENIAL THAT OCCURS EARLIER IN THE CLASS PERIOD IS

1    THAT YOU ARE GOING TO SEE THIS CONVERSATION GO AWAY AS WE MOVE

2    TO THE CLOUD.

3         THAT'S PART OF HIS STATEMENT SAYING THAT THIS IS ONE OF

4    THOSE THINGS WHERE THE STORY IS BIGGER THAN THE REALITY.

5             THE COURT:  SO I DON'T THINK THAT COMMENT IS

6    ACTIONABLE, THE STORY IS BIGGER THAN THE REALITY.  BECAUSE IN

7    FACT, THE ONLY REASONABLE INFERENCE TO DRAW FROM THAT IS BOND

8    SAYING YEAH, WE ARE DOING IT, BUT IT'S NOT AS BAD AS THEY SAY.

9         AND THEN THERE'S NOTHING MEASURABLE THERE.  THAT'S JUST

10   NOT A DENIAL.  YOU HAVE SOME OTHER STATEMENTS, BUT THAT ONE

11   REALLY STRUCK OUT.  HE DIDN'T SAY, WE DON'T DO THAT.  HE DIDN'T

12   SAY THAT.  HE SAID THE STORY IS BIGGER THAN THE REALITY.

13        HE OWNS UP, IN MY VIEW.  THE ONLY REASONABLE INFERENCE IS

14   HE OWNS UP TO THAT EXISTING TO SOME EXTENT.

15            MR. RIZIO-HAMILTON:  SO A COUPLE OF POINTS,

16   YOUR HONOR.

17        ONE IS THAT THE ESSENCE OF THE STATEMENT IS TO ALLEVIATE

18   CONCERN BY TELLING INVESTORS THAT THIS IS A SMALL THING, NOT A

19   BIG THING.  AND OUR ALLEGATION IS THAT IT WAS A MATERIAL AND

20   WIDESPREAD PRACTICE.  THAT'S POINT ONE.

21        POINT TWO IS THAT HE DOES SAY AT THE END OF HIS STATEMENT

22   THIS CONVERSATION IS GOING AWAY AS WE MOVE TO THE CLOUD, WHICH

23   IS TO SAY THAT THIS IS NOT A CONCERN IN THE CLOUD SPACE.

24            THE COURT:  BUT THIS WAS MADE IN THE CONTEXT -- I'M

25   SORRY.

1            MR. RIZIO-HAMILTON:  AND I'M LOOKING AT PARAGRAPH 72

2     NOW.  HE SAYS, THE KEY AS WE GO TO CLOUD, IS THIS CONVERSATION

3     IS GOING TO GO AWAY.

4            THE COURT:  I THINK THOSE ARE TWO DIFFERENT ALLEGED

5     FALSE STATEMENTS THEN.  OH, NO, I SEE IT.  OKAY.

6            MR. RIZIO-HAMILTON:  AND SO WE SUBMIT THAT THAT

7     BOLSTERS THE REPRESENTATION THAT THIS IS NOT AN ISSUE AS WE GO

8     TO CLOUD.

9         AND THE LAST POINT I WOULD --

10           THE COURT:  YOU KNOW, I GUESS I WILL HAVE TO GO BACK

11    AND FIND, I DON'T KNOW WHERE THIS STATEMENT -- YOU KNOW, ONCE

12    ALL CUSTOMERS SWITCH OVER TO CLOUD, THEY HAVE TO BE IN THE

13    CLOUD.

14       I'M NOT REALLY SURE WHAT THAT STATEMENT IS SAYING.  THE

15    TACTICS THAT YOU IDENTIFY WERE USED IN ORDER TO CONVERT NON

16    CLOUD CUSTOMERS INTO CLOUD CUSTOMERS.  BECAUSE THIS WAS AT THE

17    INFANCY OF CLOUD COMPUTING.

18           MR. RIZIO-HAMILTON:  FOR A SHORT TERM.

19           THE COURT:  WELL, AND THAT'S REALLY WHAT HE'S SAYING.

20        SO IN THE SHORT TERM, THESE TACTICS MIGHT WORK, BUT THEY

21    CAN'T WORK FOREVER.  I MEAN, BECAUSE EVERYONE WILL BE IN THE

22    CLOUD SOMEWHERE.  I MEAN, THE TACTIC WON'T EVEN WORK.

23           MR. RIZIO-HAMILTON:  WELL, YOU KNOW, I THINK WITHIN

24    THE CONTEXT OF WHAT'S GOING ON IN THE MARKETPLACE, AND WITHIN

25    THE CONTEXT OF THE COMPANY'S PRIOR STATEMENTS ON THIS SAME

1    ISSUE WHEN QUESTIONS AROSE, WE ARE ENTITLED TO A READING OF HIS

2    STATEMENT AT THE PLEADING STAGE WHICH SUGGESTS THAT HE WAS

3    ASSUAGING CONCERN.

4         THE COURT:  WELL, I DON'T ACTUALLY READ THE PSLRA

5    QUITE THAT GENEROUSLY FOR YOU BECAUSE I NEED TO LOOK AT THE

6    INFERENCE BEING MORE PLAUSIBLE THAN OTHER INFERENCES THAT SHOW

7    NO WRONGDOING.

8         MR. RIZIO-HAMILTON:  WELL, I THINK THAT'S TRUE WITH

9    RESPECT TO SCIENTER, BUT I'M NOT SO SURE THAT THAT'S

10   NECESSARILY THE SAME WITH RESPECT TO FALSITY.

11       I THINK WE ARE AT THE PLEADING STAGE, AND WE ARE ENTITLED

12   TO REASONABLE INFERENCES FROM ALLEGATIONS THAT CONCERN FALSITY.

13        THE COURT:  SO CERTAINLY MY READING OF THE CASES IN

14   THE NINTH CIRCUIT IS THAT THE NINTH CIRCUIT FOCUSES FAR MORE ON

15   SCIENTER AS BEING THE PIVOTAL AND OFTEN DECISIVE POINT IN

16   DISMISSING A CASE.

17       SO LET'S TALK A LITTLE BIT THE SCIENTER.  THERE'S SEVERAL

18   NAMED DEFENDANTS WHO I DON'T THINK YOU EVEN TOUCH ON SCIENTER.

19   AND I MENTIONED THOSE BECAUSE MR. ETH MENTIONED THEM IN HIS

20   REPLY.  ELLISON, KURIAN, BOND AND MIRANDA.  YOU JUST DON'T EVEN

21   MENTION THEM.

22        MR. RIZIO-HAMILTON:  OKAY.

23        THE COURT:  AND I WOULD LET YOU AMEND ON THAT, BUT DO

24   YOU THINK YOU MENTIONED THEM?

25        MR. RIZIO-HAMILTON:  SO WHAT WE DO WITH OUR SCIENTER

1    ALLEGATIONS IS WE SET FORTH A NUMBER OF SCIENTER POINTS THAT

2    APPLY TO ALL THE DEFENDANTS WITH THE EXCEPTION OF --

3            THE COURT:  WELL, BUT I'M NOT ACCEPTING THEY WERE

4    READING THE NEWSPAPER AND THEY KNEW THIS WAS GOING ON, BECAUSE

5    THAT DOESN'T TELL ME THAT THEY KNEW THE STATEMENTS WERE FALSE

6    WHEN THEY MADE THEM.

7            MR. RIZIO-HAMILTON:  SO I THINK THE SIGNIFICANCE OF

8    THAT ALLEGATION IS THAT THEY WERE AWARE THAT SIGNIFICANT

9    QUESTIONS HAD BEEN RAISED ABOUT THIS AND THE MARKET WAS

10   CONCERNED ABOUT IT.

11       AND SUBSEQUENTLY BEFORE THEY WENT OUT AND SPOKE ON THIS

12   SUBJECT, THEY HAD AN OBLIGATION TO INFORM THEMSELVES OF THE

13   TRUE FACTS.  AND FAILING TO DO THAT IS RECKLESS, PARTICULARLY

14   WITHIN THIS CONTEXT.

15           THE COURT:  THEN YOU HAVE TO SPEND A LITTLE BIT MORE

16   TIME ALLEGING.

17           MR. RIZIO-HAMILTON:  OKAY.

18       THAT IS THE THEORY.

19           THE COURT:  THE FACTUAL ALLEGATION, OF COURSE, NOT

20   JUST GENERALIZE THIS IS WHAT A GOOD CEO SHOULD DO.

21           MR. RIZIO-HAMILTON:  WELL, THAT'S THE CONCEPT BEHIND

22   ALLEGATION --

23           THE COURT:  BECAUSE YOUR CORE OPERATIONS THEORY, I

24   COULD HAVE MISS TODAY IF IT WASN'T IDENTIFIED IN THE OPENING

25   PAPERS, YOU DON'T REALLY DEVELOP THAT, IT'S ACTUALLY VERY

1  COMPLEX AND I THINK YOU JUST BRUSH OVER IT AS SAYING WELL, THIS

2  IS SO IMPORTANT THAT OF COURSE THEY KNOW ABOUT IT.

3      IT'S FINE, I'M GLAD TO ANALYZE CORE OPERATIONS, BUT RIGHT

4  NOW I CAN EASILY DISMISS WITH LEAVE TO AMEND BECAUSE YOU REALLY

5  HAVEN'T.  IT'S REALLY THE SAME THING WITH READING THE

6  NEWSPAPER.

7          MR. RIZIO-HAMILTON:  THE CORE OPERATIONS THEORY ISN'T

8  JUST THAT IT WAS IMPORTANT TO THE COMPANY, IT'S ALSO THAT THE

9  COMPANY EXECUTIVE STATED THAT THEY WERE PERSONALLY FOCUSED ON

10  THE ISSUE OF CLOUD SALES.

11      IT'S ALSO THAT THE INFORMATION ABOUT THE NATURE OF THE

12  CLOUD SALES WAS COLLECTED IN THE DEAL APPROVAL SYSTEM THAT WAS

13  AVAILABLE TO ALL OF THEM.

14      AND SO THE CORE OPERATIONS THEORY DOES HAVE GREATER

15  STRENGTH IN SUCH A CONTEXT AS THE CASES HAVE RECOGNIZED WHERE

16  THE EXECUTIVES SAY THEY ARE FOCUSED ON THE ISSUE AND THE

17  INFORMATION THAT IS ALLEGED TO RENDER THEIR STATEMENTS

18  MISLEADING IS AVAILABLE TO THEM IN A PARTICULAR SOURCE, AS IT

19  WAS HERE.

20      AND I WILL AGREE WITH YOU THAT THE SCIENTER ALLEGATIONS

21  ARE STRONGEST WITH RESPECT TO DEFENDANT'S HURD AND CATZ.  AND

22  IN PARTICULAR, THE ALLEGATIONS THAT THEY HAD TO SIGN OFF ON ALL

23  CLOUD DEALS IN EXCESS OF $5 MILLION OR WHERE A DISCOUNT OF

24  50 PERCENT OR GREATER WAS OFFERED THROUGH THE DEAL APPROVAL

25  SYSTEM.

1          AND THE FACT THAT THEY DID SO IS SIGNIFICANT FOR THE

2     SCIENTER ANALYSIS BECAUSE IT GAVE THEM KNOWLEDGE OF THE FACT

3     THAT THE SALES WERE GENERATED THROUGH THE MEANS ALLEGED.  AND I

4     THINK THAT THAT GIVES RISE TO AN INFERENCE OF KNOWLEDGE HERE.

5          AND SO I THINK THAT THOSE ARE THE PRINCIPLE SCIENTER

6     ALLEGATIONS AGAINST THOSE TWO DEFENDANTS.  AND THE OTHER

7     ALLEGATIONS THAT ARE SET FORTH IN THE SCIENTER SECTION

8     SUPPLEMENT THEM.

9          AND WHEN YOU LOOK AT THE PICTURE WHOLISTICALLY,

10    PARTICULARLY GIVEN THAT THEY HAD TO APPROVE ALL SIGNIFICANT

11    CLOUD DEALS AS DESCRIBED, THERE IS WITH RESPECT TO THOSE TWO

12    DEFENDANTS, A STRONG INFERENCE OF AT LEAST RECKLESSNESS.

13              THE COURT:  OKAY.  WELL, CERTAINLY YOU HAVE SOME

14     SPECIFIC FACTS AS TO THEM.

15              MR. RIZIO-HAMILTON:  WE DO.  WE DO.  AND THOSE ARE

16     SET FORTH IN THE COMPLAINT.  I DON'T NEED TO REHASH THEM.  WE

17     SUMMARIZED IN THE BRIEF.  I'M CERTAINLY HAPPY TO ANSWER ANY

18     QUESTIONS ABOUT THEM.

19          THERE IS ONE ISSUE YOUR HONOR RAISED THAT I DO WANT TO

20     BRIEFLY TOUCH ON.  YOU ASKED FOR, WHERE IS MR. MIRANDA'S

21     STATEMENT, AND IT'S IN PARAGRAPHS 252 AND 253, YOUR HONOR.

22          HE PROVIDES A STATEMENT THAT IS SIMILAR IN KIND TO THE

23     ALLEGED MISREPRESENTATION BY MR. HURD IN WHICH DESCRIBING THE

24     CAUSES OF THE COMPANY'S SUCCESS IN CLOUD.

25          AND WE ALLEGE THAT THAT WAS MISLEADING FOR FAILURE TO

1    DISCLOSE THE USE OF FINANCIALLY ENGINEERED DEALS WAS, IN FACT,

2    ANOTHER SIGNIFICANT DRIVER OF THE CLOUD SUCCESS.

3            THE COURT:  AND I HAD MARKED THESE, AND I'M SORRY I

4    HAD FORGOTTEN.

5        MR. MIRANDA TALKS ABOUT THE REASON THAT CUSTOMERS ARE

6    COMING OVER TO ORACLE.  "WHAT WE HEAR FROM OUR CUSTOMERS, AS

7    FAR AS THE REASONS WHY THEY CHOOSE US OVER THE COMPETITION."

8            SO, YOU KNOW, THIS IS COUCHED INTO WHAT MIRANDA IS HEARING

9    FROM THE CUSTOMERS.  YOU ARE ALLEGING THAT HE'S MADE THAT UP

10   ENTIRELY, THAT'S NOT WHAT HE'S HEARING?

11           MR. RIZIO-HAMILTON:  NO, THAT'S NOT THE ALLEGATION.

12       THE ALLEGATION IS THAT SUCH A STATEMENT IS MISLEADING

13   BECAUSE IT OMITS OTHER MATERIAL INFORMATION THAT IS CLEARLY

14   RELATED TO WHAT ORACLE IS HEARING FROM ITS CUSTOMERS AND WHAT

15   IS CLEARLY DRIVING ITS SUCCESS IN THE CLOUD.

16       AND MR. HURD, FOR HIS PART, MAKES A SIMILAR STATEMENT, YOU

17   KNOW, IN WHICH HE'S ASKED ABOUT THE DRIVERS OF THE COMPANY'S

18   SUCCESS IN THE CLOUD, AND HE BASICALLY SAYS WE ARE BETTER, WE

19   HAVE BETTER PRODUCTS, WE HAVE BETTER SALES FORCE, WE ARE JUST

20   BETTER AT EVERYTHING.  AND THAT MANIFESTS.

21           THE COURT:  EVERY CEO AND SALESMAN IS GOING TO SAY

22   THAT EVERY TIME.

23           MR. RIZIO-HAMILTON:  WELL, UNDER THE SECURITIES LAWS,

24   IF HE DOES, HE RUNS THE RISK OF GIVING A MISLEADING IMPRESSION

25   IF HE OMITS OTHER MATERIAL FACTORS DRIVING THE COMPANY'S

1    PERFORMANCE WHICH MR. HURD WAS ALLEGED TO DO HERE.

2         YOU KNOW HE'S FREE TO TOUT THE COMPANY'S SUPERIORITY SO

3    LONG AS HE IS ACCURATELY DISCLOSING ALL ADDITIONAL MATERIAL

4    INFORMATION ABOUT THAT SUBJECT.  AND HERE, HE DID NOT.

5              THE COURT:  OKAY.

6              MR. RIZIO-HAMILTON:  SO THAT'S ALL I'VE GOT RIGHT

7    NOW, YOUR HONOR.  I REALLY APPRECIATE YOU HEARING ME OUT.

8              THE COURT:  OH, NO, I WANT TO HEAR YOU OUT.

9         THESE CASES, I FULLY RECOGNIZE THAT WHEN A CASE LIKE THIS

10   CROSSES THE THRESHOLD OF THE MOTION TO DISMISS AND THE

11   DEFENDANT HAS TO ANSWER, THAT MOST CASES TERMINATE AT THAT

12   POINT AFTER LENGTHY NEGOTIATIONS INTO A SETTLEMENT.

13        AND SO CONGRESS HAS DIRECTED US TO HOLD YOU TO A HIGH BAR

14   IN PLEADING, YOU ARE USED TO THAT, THAT'S NOT NEW LAW AT THIS

15   POINT, IT'S 25 YEARS, MAYBE MORE, FOR THE PSLRA.  I THINK THIS

16   CAME IN IN THE 90'S, DIDN'T IT?

17             MR. ETH:  DECEMBER 22ND, 1995.

18             THE COURT:  AND I THINK BOTH OF YOU WERE PRACTICING

19   LAW WHEN IT CAME IN.  AND IT TOOK THE COURTS A LONG TIME TO GET

20   IT, I THINK, AND TO IMPOSE THESE HEIGHTENED BURDENS ON

21   PLAINTIFFS, BUT THE NINTH CIRCUIT HAS CERTAINLY SET THE

22   STANDARD THAT I FOLLOW.

23        SO LET ME -- I WANT TO HEAR FROM MR. ETH JUST TO FINISH UP

24   BECAUSE I THINK HE PROBABLY WANTS TO ADDRESS SOME OF YOUR

25   POINTS, MR. RIZIO-HAMILTON, AND THEN I WILL OF COURSE HAVE A

1    WRITTEN ORDER, BUT I THINK LARGELY YOU KNOW THE AREAS THAT I'M

2    CONCERNED ABOUT.

3              MR. RIZIO-HAMILTON:  THANK YOU VERY MUCH, YOUR HONOR.

4              THE COURT:  OKAY.

5              MR. ETH:  YOUR HONOR, I WILL BE BRIEF HERE, JUST

6    QUICKLY ADDRESS SOME OF THE POINTS.

7              THE COURT:  OKAY.  THANK YOU.

8              MR. ETH:  OBVIOUSLY THERE'S A LOT OF BACK AND FORTH,

9    WHERE'S THE LINE, WHAT'S THE RULE.  AND PLAINTIFF, IN OUR VIEW,

10   IS TRYING TO COME UP WITH NEW RULES TO GOVERN ALL OF THIS.

11        WE DO HAVE RULES, THEY ARE CALLED GAAP RULES, THEY ARE

12   CALLED ACCOUNTING RULES.  IT'S COMPLICATED, IT'S DENSE,

13   ESPECIALLY WHEN YOU START THINKING ABOUT SOFTWARE AND

14   MULTI-ELEMENT SALES AND DISCOUNTS AND RATEABLY AND SUBSCRIPTION

15   SERVICES AND SO ON.  WE DON'T NEED A WHOLE NEW SET OF RULES.

16   WE HAVE THOSE RULES.

17        WE HEARD ABOUT THE S.E.C. V. TODD CASE.  IT'S NOT A PSLRA

18   CASE, YOU CAN TELL THAT JUST FROM THE TITLE, IT'S S.E.C.  ALSO

19   IT WASN'T A PLEADING CASE, IT WAS AFTER A JURY TRIAL AND IT WAS

20   AFTER A VERDICT, AND THERE WAS A FINDING OF ACCOUNTING FRAUD IN

21   THAT CASE AND A GAAP VIOLATION, IT HAS NOTHING TO DO WITH THIS.

22        SOME OF THE OTHER CASES PLAINTIFF CITE ON PAGE 9, I THINK

23   IT IS IN PLAINTIFF'S BRIEF, THOSE ARE THE FEW THEY CITE THAT

24   ARE THE SO CALLED APPLES TO APPLES CASES WHERE A COMPANY WILL

25   SAY, WE ARE DOING SO MUCH BETTER THAN LAST YEAR.  WELL, YOU

1    CHANGED THE WAY YOU DO YOUR ACCOUNTING OR YOU CHANGED YOUR

2    BUSINESS MODEL AND SO IT'S NOT AN APPLES TO APPLES COMPARISON.

3         COUNSEL POINTED TO PARAGRAPHS 102 AND 103.  THAT'S FINE.

4    WE WILL LOOK AT THOSE.  THOSE EXEMPLIFY THE PROBLEM.  IT'S

5    83 PERCENT OF THE TEAM, OF THE DEALS THAT OUR TEAM DEALT WITH.

6    THAT'S THE BEST THEY CAN DO, 83 PERCENT OF WHAT THE TEAM DEALT

7    WITH, WHAT DOES THAT EVEN MEAN.

8         THE CASES, WE PREFER, OF COURSE, THAT ARE RIGHT ON POINT

9    ARE INTUITIVE, AND THIS COURT'S BAO V. SOLARCITY CASES AND SO

10   ON.

11        WE HEARD THAT CUSTOMERS WERE COMPLETELY FED UP WITH

12   ORACLE, COMPLETELY FED UP.  WELL, THE LINE WAS STILL GOING UP

13   AND TO THE RIGHT.  IT'S JUST DECELERATION, IT'S STILL GOING

14   UPHILL, SO I DON'T EVEN GET THAT.

15        AND THEN JUST KIND OF WRAPPING UP THE WHOLE IDEA HERE IS

16   WE HEARD COUNSEL SAY THIS IS INTERESTING, AND THE CONTEXT IS

17   INTERESTING.  AND IT MAY VERY WELL BE INTERESTING, IT MAY BE AN

18   INTERESTING STUDY OF CUSTOMER RELATIONS OR HARVARD BUSINESS

19   SCHOOL CASE STUDY OR LOTS OF THINGS TO TALK ABOUT, BUT IT'S NOT

20   SECURITIES FRAUD, IT'S NOT SECURITIES FRAUD.

21        AND THAT'S WHAT THEY HAVEN'T MET.  THE STANDARDS FOR

22   PLEADING SECURITIES FRAUD UNDER THE PSLRA.

23        OH, THERE'S ONE OTHER THING I WANTED TO MENTION.  WE ARE

24   ON FOR CASE MANAGEMENT.

25             THE COURT:  WE WILL GET TO THAT SO YOU DON'T HAVE TO

1    WAIT AROUND.  LET ME JUST WRAP THIS PART UP.

2         MR. RIZIO-HAMILTON, I'M GOING TO MAKE YOU AMEND THE

3    COMPLAINT.

4              MR. RIZIO-HAMILTON:  UNDERSTOOD.

5              THE COURT:  BUT I'M GOING TO ALLOW YOU TO AMEND ON

6    EVERYTHING.

7         AND I THINK YOU UNDERSTAND THE AREAS I'M MOST CONCERNED

8    ABOUT.  AND I DO THINK THAT SCIENTER IS THE BIGGEST HOLE IN

9    THIS COMPLAINT, ESPECIALLY AS TO THE INDIVIDUALS.

10        IF YOU WISH TO ASSERT THE CORE OPERATIONS THEORY, YOU

11   ACTUALLY HAVE TO ALLEGE FACTS TO SHOW IT, AND I DON'T THINK YOU

12   HAVE.  YOU'VE KIND OF WAIVED IT OUT THERE AS EXISTING, BUT I'M

13   NOT SATISFIED WITH PLEADING ON IT.

14        ON THE FALSE STATEMENTS WITH THE REVENUE, THE ONES THAT

15   ARE SIMPLY STATEMENTS OF WHAT THE REVENUE IS AND MEETING THE

16   GUIDANCE, I'M STRUGGLING WITH THOSE, AS I DON'T REALLY

17   UNDERSTAND YOUR THEORY, I GUESS, ON WHY A DUTY TO DISCLOSE

18   ARISES FROM TRUTHFULLY STATING THE REVENUE NUMBERS, ABSENT A

19   GAAP VIOLATION, AND IT SEEMS AS THOUGH THERE ISN'T ONE.

20        I WILL CERTAINLY GO BACK AND READ THOSE CASES ON PAGE 9 OF

21   YOUR BRIEF, I'M NOT SURE THAT'S GOING TO CURE OR SATISFY MY

22   CONCERN, BUT THOSE ARE AREAS THAT I'M VERY CONCERNED ABOUT.

23        AND OF COURSE THAT KIND OF COVERS THE WATERFRONT.  THERE

24   MAY BE A FEW STATEMENTS THAT I ELIMINATE AS PUFFERY, BUT THAT'S

25   NOT SIGNIFICANT, EVEN IN THE BRIEFING IT WAS ONLY A FEW AROUND

1    THE EDGES.

2         SO I HAVE SOME CASES WHERE THAT'S REALLY ALL THERE IS AND

3    THE WHOLE CASE IS IN JEOPARDY.

4         IT'S ALWAYS HARD TO MAKE PREDICTIONS, I'VE HAD CASES THAT

5    HAVE GONE THREE ROUNDS AND THEN I'VE LET THEM GO THROUGH WHERE

6    I THOUGHT THE CASE WAS HEADED INTO OBLIVION AND IT WASN'T

7    BECAUSE ONE OR TWO OF THE STATEMENTS CAME THROUGH.

8         I'M NOT GOING TO PREDICT, BUT RIGHT NOW I'M GIVING YOU

9    LEAVE TO AMEND BECAUSE YOU HAVE A LOT HERE AND YOU HAVE A LOT

10   OF THEORIES, BUT I DON'T WANT THIS TO JUST BE A CASE THAT'S

11   BASED ON PRE-CLASS PERIOD BAD PRESS FOR THE COMPANY WITHOUT ANY

12   SOLID EVIDENCE ALLEGATIONS DURING THE CLASS PERIOD.

13        IT IS NOTABLE THAT WE HAVE NOTHING FROM CUSTOMERS THAT

14   THEY WERE SO UNHAPPY, THEY CAN'T BE HARD TO FIND.

15        AND THE CW'S THEMSELVES PROBABLY KNOW WHO THESE CUSTOMERS

16   WERE THAT WERE SO UNHAPPY.  NOW MAYBE NOBODY WANTS TO SPEAK UP

17   AGAINST ORACLE, I GET THAT.

18             MR. RIZIO-HAMILTON:  THAT IS A REAL ISSUE.

19             THE COURT:  IT IS A REAL ISSUE, YES, I UNDERSTAND,

20    BECAUSE THEY MAY HAVE EXISTING CONTRACTS OR HOPE IN THE FUTURE

21    TO HAVE FAVORABLE OPPORTUNITIES.  SO I'M NOT SAYING THAT'S

22    NECESSARY, BUT IT IS NOTABLE, AS MR. ETH POINTS OUT.

23        ALL RIGHT.  AS I SAY, THERE WILL BE A WRITTEN ORDER.

24        WHEN YOU GET THE ORDER, AND I CAN'T PROMISE IT WILL BE

25    RIGHT AWAY, BUT I'M MORE THAN GLAD TO GIVE YOU AMPLE TIME TO

1    RESPOND IN AN AMENDED COMPLAINT.

2         SO FROM THE DATE I ISSUE THE ORDER, HOW MUCH TIME WOULD

3    YOU LIKE?

4              MR. RIZIO-HAMILTON:  60 DAYS.

5              THE COURT:  ANY OBJECTION TO THAT, MR. ETH?

6              MR. ETH:  NO, YOUR HONOR.

7              THE COURT:  I KNOW IT'S A LOT OF WORK.

8              MR. RIZIO-HAMILTON:  THANK YOU, YOUR HONOR.

9              THE COURT:  GOOD.  OKAY.

10        ON CASE MANAGEMENT, YOU SUGGEST THAT IT'S PREMATURE TO SET

11   DATES.  AND I DON'T DISAGREE WITH THAT IN THIS CASE BECAUSE I

12   THINK IN A CASE LIKE THIS, WELL, TYPICALLY CLASS CERTIFICATION

13   IS NOT ACTUALLY A BIG BATTLE, BUT I DON'T KNOW, I'VE ACTUALLY

14   NEVER HAD A CLASS CERTIFICATION ON A SECURITIES CASE, AND I

15   DON'T KNOW HOW THIS LOOKS, BUT WHAT I'M GOING TO DO IS I'M

16   GOING TO SET A FURTHER CASE MANAGEMENT CONFERENCE JUST FOR

17   TRACKING PURPOSES, 120 DAYS FROM NOW.

18        SO LET'S JUST GIVE YOU A DATE AND THEN IT WILL BE ON THE

19   DOCKET.

20             THE CLERK:  THAT WOULD BE FEBRUARY 20TH.

21             THE COURT:  OKAY.

22        NOW, IF THE AMENDED COMPLAINT HAS NOT BEEN FILED OR IT'S

23    BEEN FILED AND THERE'S A MOTION TO DISMISS, WOULD YOU JUST SEND

24    ME A STIP AND ORDER TO CONTINUE THE CASE MANAGEMENT?

25        MY GOAL IS TO HAVE THE NEXT CASE MANAGEMENT EITHER AFTER

1    THE ANSWER IS FILED OR THE NEXT TIME YOU ARE HERE ON A MOTION

2    TO DISMISS.  I FULLY EXPECT THERE WILL BE A MOTION TO DISMISS.

3    I DON'T THINK, MR. ETH, YOU ARE JUST GOING TO SAY OH, YOU'VE

4    HEARD EVERYTHING, LET'S GO.

5           MR. RIZIO-HAMILTON:  THAT WOULD BE A FIRST.

6           THE COURT:  IT WOULD BE A FIRST.

7           MR. ETH:  WELL, WE WILL WAIT AND SEE.

8           THE COURT:  WE WILL JUST KEEP MOVING.  ALL RIGHT.  I

9    THINK THAT TAKES CARE OF EVERYTHING.  THANK YOU BOTH.  I REALLY

10   APPRECIATE THE EXCELLENT ARGUMENT.

11          MR. RIZIO-HAMILTON:  THANK YOU, YOUR HONOR.

12          MR. ETH:  THANK YOU, YOUR HONOR.

13       (THE PROCEEDINGS WERE CONCLUDED AT 10:13 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4              **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9      REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10     THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11     FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12     CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14     CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15     CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16     SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17     HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18     TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24     _____
       SUMMER A. FISHER, CSR, CRR
25     CERTIFICATE NUMBER 13185          DATED: 10/23/19