**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, et al., | Case No. 18-cv-04844-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND** |
| ORACLE CORPORATION, et al., | [Re: ECF 44] |
| Defendants. | |

This is a putative class action for securities fraud brought against Oracle Corporation ("Oracle" or "Company") and its officers Safra A. Catz ("Catz"), Mark Hurd ("Hurd"), Lawrence J. Ellison ("Ellison") , Thomas Kurian ("Kurian"), Ken Bond ("Bond"), and Steve Miranda ("Miranda") ("Individual Defendants"), (collectively with Oracle, "Defendants"). Lead Plaintiff, Union Asset Management Holding AG, ("Plaintiff") has filed a Consolidated [Amended] Class Action Complaint (the "CAC") alleging that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* ECF 40 ("CAC"). Plaintiff also asserts that Catz, Hurd, and Ellison are liable for violations of federal securities laws as "control persons" of Oracle, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.* Finally, Plaintiff claims Kurian violated Section 20A of the Exchange Act by selling Oracle common stocks. *Id.*

## I. BACKGROUND

Oracle develops and markets database software and related technology. CAC ¶ 38. The Individual Defendants are six current or former Oracle executives: Safra A. Catz (co-CEO and a member of Oracle's Board of Directors); Mark Hurd (co-CEO, a member of Oracle's Board of Directors, and former co-president); Lawrence J. Ellison (co-founder, former CEO, current Chief

Technology Officer, and Chair of the Board of Directors); Thomas Kurian (former President, Product Development); Ken Bond (Senior Vice President of Investor Relations); and Steve Miranda (Executive Vice President of Oracle Applications Product Development). *Id.* ¶¶ 30- 35.

Oracle's business historically focused on selling licenses for its "on-premises" database software and products, which are installed locally, on a licensee's own computer and maintained on the user's own infrastructure and platforms. CAC ¶ 38. In contrast, "cloud-based" software allows licensees to store and access data over the internet. *Id.* ¶ 39. According to the CAC, companies such as Amazon, Google, and Microsoft introduced their cloud-based software between 2006 and 2010, while "Oracle was stubbornly refusing to acknowledge that customers were increasingly shifting towards cloud technology." *Id.* ¶¶ 40-41. Oracle's revenue growth and new software license sales declined between 2013 and 2016. *Id.* ¶ 47. Oracle "belatedly pivoted to the cloud in high gear." *Id.* ¶ 48. [1] On a March 15, 2016 Earnings Call, Catz announced that Oracle was "making the 'move to cloud' which would represent 'a generational shift in technology that [wa]s the biggest and most important opportunity in [the] Company's history.'" *Id.*

"As a late entrant in the cloud software market," Oracle had to develop (1) "a cloud product with competitive capabilities" and (2) "an effective sales and marketing strategy for its nascent cloud product." CAC ¶ 51. To overcome these challenges, the CAC alleges that Oracle engaged in "coercive sales practices." *See id.* ¶¶ 82-149. Oracle allegedly employed "two tactics to generate artificial cloud revenue," which Oracle employees coined as "financially engineered deals." *Id.* ¶¶ 13, 16.

First, Oracle allegedly employed a strategy called "Audit, Bargain, Close." CAC ¶ 14. Under this strategy, Oracle would first initiate an audit of an on-premises customer for violations of its on-premises software license. *Id.* If it found violations, Oracle would "threaten to impose large penalties unless the customer agreed to purchase a short-term cloud subscription." *Id.* The CAC

---

[1] The Court notes that it is unclear when Oracle's allegedly "belated" entry into the Cloud market began. On the one hand, the CAC alleges that as early as 2014, Oracle customers were reporting audit-based Cloud sales. CAC ¶¶ 54-58. On the other hand, the CAC alleges that because Oracle lacked "competitive cloud-based product offering," its revenue declined between 2013 and 2016. *Id.* ¶ 47.

alleges that customers "neither desired nor intended to use" the Cloud products but purchased them to avoid the hefty penalties. *Id.*

Second, Oracle allegedly engaged in a tactic known as "attached deal[s]." CAC ¶ 15. Oracle offered its customers "a significant discount" on its on-premises products, provided the customer also purchased a short-term cloud subscription – "even if the customer neither wanted nor intended to use the attached cloud product." *Id.*

The CAC alleges that the "Audit, Bargain, Close" and "Attached" deals (collectively, "Sales Practices") were not "true sales" of Cloud products but Oracle nonetheless touted them as such— and by doing so, misled investors because the revenues generated by these deals were "artificial and unsustainable." CAC ¶ 17. According to the CAC, in late 2017, many of the Cloud subscriptions generated through the Sales Practices began to expire and many customers declined to renew their Cloud subscriptions. *Id.* ¶ 18. Consequently, between December 14, 2017 and March 19, 2018, Oracle disclosed that its Cloud revenue growth rate had declined from 58% to 32%. *Id.* ¶ 19. The market reacted and Oracle's stock price fell from approximately $50 per share to approximately $46 per share, a decline of nearly 10%. *Id.* ¶ 21. On June 19, 2018, Oracle announced that it would no longer report financial results for its Cloud business separately. *Id.* ¶ 22.

Based on these allegations, Lead Plaintiff, Union Asset Management Holding AG[2] ("Union"), brings this lawsuit on behalf of itself, and other purchasers of Oracle stock between March 15, 2017 and June 19, 2018 (the "Class Period"), alleging that Defendants misrepresented Oracle's revenue growth within its Cloud segment and the drivers of that growth. *See* CAC ¶¶ 2-12.

### A. Confidential Witnesses

The CAC provides statements from nine former Oracle employees regarding the Sales Practices. CAC ¶¶ 37, 87-134.

Confidential Witness 1[3] ("CW1") was a Regional Sales Director for Middle East and Africa

---

[2] Union is the parent holding company of the Union Investment Group. CAC ¶ 28.

[3] The CAC refers to Confidential Witnesses as Former Employees or FEs.

from February 2009 to March 2018.  CAC ¶ 37.  CW1 sold Cloud and other Oracle products to customers and attended meetings at which Cloud sales were discussed.  *Id.*  CW1 stated that at least 80% of Middle East and Africa Cloud revenue was generated by "inserting cloud into compliance-based deals" and that it was "crystal clear these [sales] are fake" because "none of these deals are renewed."  *Id.* ¶¶ 87, 106.  Further, more than 75% of CW1's team's Cloud sales in 2017 were made to customers under threat of license audits, who purchased the product simply to avoid the hefty penalties.  *Id.* ¶ 102.  In 2018, such sales accounted for 86% of CW1's team's revenue.  *Id.*

CW1 also reported that he (and other sales teams) discussed their "audit-driven cloud deals" with Loic Le Guisquet, who sat on the Oracle Executive Management Committee during the Class Period and reported directly to Hurd.  CAC ¶ 112.  CW1 explained that, he prepared weekly slides concerning "sales volume and progress" and provided them to Le Guisquet for presentation to Hurd.  *Id.*  These slides, according to CW1, "would very clearly say" that Oracle's License Management Services division was engaged in "compliance deals."  *Id.*  In addition, CW1 attended meetings in which "executives were instructed to offer customers a 90% discount on on-premises licenses if they purchased $300,000 worth of cloud subscriptions" and "assure the customer that they did not need to use the product, and that the purchase of cloud products was merely a necessary condition to unlocking the on-premises discount."  *Id.*  According to CW1, sales and compliance teams coordinated to "use audits in order to sell unwanted cloud subscriptions."  *Id.* ¶ 89.

Confidential Witness 2 ("CW2") was a Vice President in North America Cloud sales from September 2015 to December 2018, who spoke with customers and sales personnel about sales of Oracle Cloud products.  CAC ¶ 37.  CW2 stated that "90-95% of the cloud deals [CW]2's team dealt with had no 'use cases' attached to them."  *Id.* ¶ 103[4].  CW2 learned from speaking with customers and sales personnel that "customers neither intended to use nor renew the cloud products."  *Id.* ¶ 104.  CW2 stated, he "saw presentations that went to Hurd's directs" and "the info they were receiving about deal quality and it was absolutely something that was discussed."  *Id.* ¶ 180.

---

[4] According to the CAC, Oracle generated "use case" for its "legitimate sale[s]" describing the customer's needs and the Oracle products or services that would be appropriate to meet those needs.  CAC ¶ 104.

4

Confidential Witness 3 ("CW3") was a Senior Technology and Cloud Sales Consultant in Southern California from 2012 to March 2017, who supported all of Oracle's Southern California Cloud sales. CAC ¶ 37. CW3 described an increase in the frequency of Oracle's audits in fiscal year 2017 and characterized the audit-based sales as "an active practice". *Id.* ¶ 109.

Confidential Witness 4 ("CW4") was Vice President of Global Sales Engineering, who served as General Manager of Sales Engineering in 2015 and reported to Miranda. CAC ¶ 37. CW4 sold the first iterations of Oracle's Cloud product. *Id.* CW4 also reported on the cooperation of audit and sales divisions in creating the audit-based sales. *Id.* ¶ 90. CW4 stated that most Cloud sales were driven by "extortion" through the audit process and that Oracle knew that customers were not planning on renewing their Cloud subscriptions and "sales leadership often expressly communicated to customers that they could "wash [their] hands" of Cloud products after the contract expired but keep the discounts for on-premises products. *Id.* ¶ 118.

Confidential Witness 5 ("CW5") was a Director of Cloud Customer Success at Oracle from 2016 to October 2018 and led the team responsible for Cloud customer success and renewal for Cloud products. CAC ¶ 37. CW5 stated that customers were forced to purchase Cloud products under threat of audits and that that these customers would be "irate" when the customer success team contacted them to ask how they could get them to "deploy and expand their Cloud footprint." *Id.* ¶ 87. According to CW5, many of the Cloud contracts were called "dead on arrivals" or "DOA[5]," because when it came time to renew, the customers would refuse. *Id.* ¶ 122. CW5 explained that "Oracle's renewal rate was 15-20% for certain quarters, and that the percent of DOA customers that did not renew was 90%." *Id.* ¶ 125.

Confidential Witness 6 ("CW6") was a Channel Sales Representative from October 2010 to January 2018 and worked with authorized resellers to engineer deals with customers in the Northeast Region. CAC ¶ 37. CW6 learned from vendor partners that Oracle customers were "made to purchase products under threats of audit" and that this was a "regular practice." *Id.* ¶ 92. CW6

---

[5] According to CW5 and CW9, at some point Oracle changed the nomenclature from "dead on arrival" to "no plan adoption" or "financial deal" because of the connotation that Oracle's sales teams were selling products that were not going to be used. CAC ¶ 122.

heard from sales representatives that Oracle "would bundle things together and push cloud subscriptions right through" and that customers did not "underst[and] what they were getting in terms of cloud." *Id.* ¶ 131.

Confidential Witness 7 ("CW7") was a Regional Technology Sales Director at Oracle from February 2013 to October 2018 and was responsible for Oracle's Cloud business in the Czech Republic, Hungary, and Slovakia. CAC ¶ 37. CW7 stated that 65% of his teams' Cloud sales were made through engineered sales, including Attached deals. *Id.* ¶ 116. CW7 stated that 90% of customers with Attached deals were not using their Cloud products "throughout 2017 and 2018." *Id.* ¶ 119.

Confidential Witness 8 ("CW8") was a Cloud Platform Sales Manager at Oracle from March 2013 to July 2018 and managed a North America Cloud sales team. CAC ¶ 37. CW8 stated that it was "extremely common to provide very steep discounts to on-premise licenses in exchange for a customer purchasing cloud subscriptions," estimating that more than 75% of CW8's Cloud revenue came from Attached deals. *Id.* ¶ 120. Less than 10% of CW8's clients renewed their Cloud subscriptions at the same level they initially signed up for. *Id.*

Confidential Witness 9 ("CW9") was a Director of Cloud Customer Success and Customer Experience at Oracle from 2016 to 2018, whose team was responsible for customer adoption and expansion of Cloud. CAC ¶ 37. CW9 also described the DOA deals and explained that customers told CW9's team that they subscribed to the Cloud product in order to get a better deal on another product. *Id.* ¶¶ 122-23. According to CW9, renewals for the Cloud product subscriptions would range from only 15%-25% and that 90% of the accounts that did not renew were DOA. *Id.* ¶ 125.

Additionally, CW1 stated that all deals worth more than $5 million dollars had to be approved by "HQ," meaning either Hurd or Catz. CAC ¶ 110. CW1 further stated that "he would see Hurd's and Catz's names on approvals of 'compliance' deals … and in approval notifications that were released once Hurd or Catz signed off on the deal." *Id.* Also, according to CW3, all software discounts in excess of 50% had to be approved by Hurd's office, and "80% of [CW3's] engineered deals went to Hurd's office for approval." CAC ¶ 134.

**B. Other Allegations Regarding Oracle's Sales Practices**

The CAC provides a few examples to corroborate allegations that Oracle engaged in the allegedly coercive Sales Practices.

First, Plaintiff alleges, based on documents obtained by a CBS reporter, that on July 27, 2016 (prior to the Class Period), Oracle initiated an audit of one of its on-premises customers: City of Denver. CAC ¶¶ 93-101. According to the CAC, an Oracle sales manager "pressured Denver to quickly make a deal to resolve the audit, telling Denver that further delay could result in a tripling of its audit penalties from approximately $3 million to 'in excess of $10M.'" *Id.* ¶ 96. On December 22, 2016, Oracle told Denver that it would need to pay an extra $2 million to "right size" its on-premises licensing, unless it purchased a one-year subscription to Oracle's Cloud. *Id.* ¶ 99.[6]

Second, CW1 reported that Oracle, at an unspecified time, "attached" $22 million dollars in "unwanted" Cloud products to a $120-million-dollars deal with Saudi Telecom Company. CAC ¶ 106. According to the CAC, local government regulations prevented Saudi Telecom Company from using Cloud data centers outside of the country and, at the time of the purchase, there were no in-country Oracle data centers. *Id.* ¶ 107. Saudi Telecom Company, nevertheless, purchased Oracle's Cloud products for 22 million dollars "effectively purchasing a discount on audit penalties." *Id.*

Third, on September 11, 2015 (prior to the Class Period), Chilean anti-competition regulators initiated an investigation into alleged anticompetitive conduct by Oracle. CAC ¶¶ 137-46. On March 28, 2018, the Chilean regulators issued a report finding links between audits and sale of Cloud products, which in their opinion constituted an "abuse of a dominant position." *Id.* ¶ 144. Oracle did not acknowledge any wrongdoing or that it engaged in the underlying practices but nevertheless agreed to implement a series of corrective measures recommended by the Chilean regulators. *Id.* ¶¶ 145-46.

Fourth, several advisory firms—specifically, UpperEdge (April 10, 2018), Gartner (May 23, 2018), and Palisade Compliance (January 2, 2019)—warned of Oracle's practice to use audits in order to sell Cloud products. CAC ¶¶ 147-49.

---

[6] It is unclear from the CAC whether the deal with Denver was finalized or closed.

Fifth, Clear Licensing Counsel, a European organization that advocates for the interests of software consumers, sent a letter on January 6, 2015 (prior to the Class Period) to Ellison and Oracle's Board of Directors, including Hurd and Catz. CAC ¶ 57. The letter (later released publicly) warned Oracle executives of "deep-rooted mistrust of [Oracle's] core customer base as a result of [Oracle's] auditing and licensing practices." *Id.* ¶¶ 58-59.

## C. Allegedly False or Misleading Statements

Plaintiff alleges that Defendants made a number of false and misleading statements within the Class Period. *See* CAC ¶¶ 209-74. Primarily, these statements fall into the following categories:

### 1. Statements related to the cloud-based products' revenue growth

Some of the alleged misstatements touted the rapid growth of cloud-based revenue. For example:

- "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4. This cloud hyper-growth is expanding our operating margins, and we expect earnings per share growth to accelerate in fiscal 2018." (CAC ¶ 229, statement by Catz on June 21, 2017).

- "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, putting us over our $2 billion ARR bookings goal for fiscal year 2017 . . . . We also delivered over $1 billion in quarterly SaaS revenue for the first time. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018." (CAC ¶ 230, statement by Hurd on June 21, 2017).

Plaintiff alleges that these statements were materially false and misleading when made, because Defendants stated that Oracle was experiencing "rapid adoption" of its Cloud products, "hyper-growth" of its Cloud business, and emphasized its large sales figures without disclosing that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶ 231.

Another set of the alleged misstatements relate to the sustainability of Cloud revenue growth. For example:

- "The sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher . . ." (CAC ¶ 242, statement by Catz).

- "So this is absolutely not a 1-year phenomena. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale. So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue -- of the recurring revenue business." (CAC ¶ 236. Statement by Catz, June 21, 2017)

Plaintiff claims that it was misleading for Catz to state that Oracle's Cloud business was experiencing "sustained hyper-growth" and to emphasize the Company's Cloud growth was "absolutely not a 1-year phenomena," while failing to disclose that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶¶ 243, 237.

Several of the alleged misstatements relate to Oracle customers' adoption of Cloud products. For example:

- "[a]s we move to cloud, the first thing that we see is we start to address more of the customer spend. The customers are willingly making a choice, where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle." (CAC ¶ 222, statement by Bond on May 9, 2017).

- "[w]hat do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, most customers today are moving to SaaS for speed. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption." (CAC ¶ 252, statement by Miranda on October 5, 2017).

Plaintiff alleges these statements were materially false and misleading when made because Defendants stated that "customers [] willingly making a choice" to abandon a "multi-vendor strategy" to consolidate with Oracle, or that Oracle's speed was causing its customers to adopt the Cloud products without disclosing that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶¶ 223, 253.

Finally, Plaintiff alleges that Defendants made false or misleading statements about the reasons Cloud revenue growth was decelerating. For example, on December 14, 2017 Ellison responded to an analyst question about the case of Oracle's revenue slowdown by stating "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database," a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to become available." CAC ¶ 264. In Plaintiff's view, this statement was misleading because "in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the [Sales Practices] to push its cloud products on customers who did not want them" and customers were not renewing the deals "they had previously been pushed into." *Id.* ¶ 265.

### 2. Statements related to the allegedly coercive Sales Practices

On May 9, 2017, an analyst asked Bond to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." CAC ¶ 224. In response, Bond made the following statements:

- "This is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities."

- "And we try to do it as best we can, in as gracious [a] way as we can."

- "[o]n the other hand, the key, as we go to cloud, is this conversation is going to go away."

- "[A]s we go to cloud, we don't have to worry about that anymore. Because when you're in

10

the cloud, you basically have a number of users that you've signed up for."

*Id.* Plaintiff alleges that these statements were materially false and misleading when made, because Bond "den[ied] that Oracle used audits to drive cloud sales, and that Oracle's audits were not coercive, without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' tactic." *Id.* ¶ 225.

As another example, on May 22, 2018, in response to a report by The Information, the Company stated:

- "Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services."

CAC ¶ 273. The CAC alleges that this statement was also misleading because Oracle "den[ied] that Oracle used audits to drive cloud sales, and state that Oracle had 'no reason to resort to scare tactics to solicit business,' without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' tactic." *Id.* ¶ 274.

The CAC also references a few statements that predate the Class Period. For example:

- On January 14, 2016, an Oracle executive in the United Kingdom (not an Individual Defendant) stated that "Oracle wants companies to move at their own pace to the cloud" and "[i]t would be wrong to force a company to do something that's against their will." CAC ¶ 64.

- On July 21, 2016, Bond, responded to a report that Oracle had used "some ugly tactics to sell its cloud and other products the customer didn't want" and stated "Responding to every rumor is never a productive endeavor.... Only color I can add is that if the conspiracy rumor were true, people would not use the cloud credit and there would be no renewal or revenue growth as a new business would replace cancelled business – not at all what we're expecting." CAC ¶ 65.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

## B.    Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701.  Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...." 15 U.S.C. § 78u-4(b)(1)(B).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).  "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original).  The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and

at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    DISCUSSION

### A.    Claim 1 - Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C.A. § 78j.  Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

#### 1.   Non-actionable statements and omissions

##### a.   Corporate Puffery

To adequately plead a material misrepresentation or omission under § 10(b), the PSLRA requires plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see also In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014). A material misrepresentation differs significantly from corporate puffery.  Puffery is an expression of opinion, while a misrepresentation is a knowingly

false statement of fact. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification"). Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Finally, "mildly optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation." *Id.* "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Stearns v. Select Comfort Retail Corp.*, No. 08-cv-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009).

Defendants argue that many of the statements identified in the CAC are non-actionable statements of optimism. *See* Mot. at 17 (citing CAC ¶¶ 220, 244, 247, 252, 254, 260). The Court agrees that some of the alleged misstatements amount to nothing more than puffery.

Specifically, on May 4, 2017, Kurian stated "[w]e continue to see tremendous growth across our cloud business." CAC ¶ 220. Because the fact that Oracle's Cloud business was growing is not in dispute, Kurian's characterization of that growth is incapable of "objective verification" and thus, non-actionable. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).

Additionally, on September 14, 2017, when asked about "momentum in [the] cloud," Hurd stated:

> just sort of every aspect of selling in the cloud, I think the company holistically is getting better at. We're better -- our products are better. Our sales force is better. Our ability to implement is better. Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon.

CAC ¶ 247. Hurd's description of the Company's improved (*i.e.*, "better") products and services is corporate optimism. Similarly, on December 14, 2017, Catz stated: "[c]ustomer adoption of our cloud products and services continues to be very strong, and what we have called our on-premise business remains robust. Bottom line, our transition to the to the (sic) cloud is going well." *Id.* ¶ 261. Catz's representation of Cloud's adoption as "very strong," the Company's on-premises business as "robust," and Cloud transition as "going well" are subjective and unverifiable assessments and therefore, non-actionable. *See In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F.

14

Supp. 2d 1059, 1077 (N.D. Cal. 2001) (finding non-actionable the statements using the words "strong," "robust," "well positioned," "solid," and "improved").

The remaining statements cited by Defendants (CAC ¶¶ 244, 252, 254) can be verified and thus are not corporate puffery.

### b. Safe Harbor

PSLRA's Safe Harbor precludes liability for forward-looking statements in either of two circumstances: "if they were identified as forward-looking statements and accompanied by meaningful cautionary language," or "if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading." *In re Cutera*, 610 F.3d at 1111–12; 15 U.S.C. § 78u-5(c)(1). A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A). Defendants reference several statements as forward-looking and protected under Safe Harbor. Mot. at 16 (citing CAC ¶¶ 229, 230, 236, 269, 280). The Court agrees that some of the alleged misstatements are protected under Safe Harbor. Specifically, as to the following statements:

- "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4. This cloud hyper-growth is expanding our operating margins, and we expect earnings per share growth to accelerate in fiscal 2018." (CAC ¶ 229, statement by Catz on June 21, 2017).

- "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, putting us over our $2 billion ARR bookings goal for fiscal year 2017 . . . . We also delivered over $1 billion in quarterly SaaS revenue for the first time. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018." (CAC ¶ 230, statement by Hurd on June 21, 2017).

- "the combination of faster sales and higher renewal rates should dramatically increase our growth rate in our SaaS business." (CAC ¶ 269, statement by Ellison on March 19, 2018).

- Cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency." (CAC ¶¶ 159, 280, statement by Catz on March 19, 2018).

absent a challenge to the accuracy of the financial reporting included in the statements, the forward-

looking portions of the statements (*e.g.*, CAC ¶¶ 229 ("we expect earnings per share growth to accelerate"), 230 ("we expect to sell a lot more")) are non-actionable under the Safe Harbor.

In addition, Defendants point to cautionary language such as "we cannot be certain that our customers will renew our cloud-based contract." ECF 45-8 at 15; *see also* ECF 45-15 at 15 ("customers may not purchase or subscribe to our software, hardware or cloud offerings or renew software support, hardware support or cloud subscriptions contracts."). Plaintiff does not dispute that these cautionary statements were disclosed to investors but instead argues that they were insufficient because they didn't warn of Oracle's "financially engineered deals" and cite to cases disregarding "boilerplate" and "vague" statements. Opp'n at 15. The Court agrees with Defendants that Oracle's warnings were specific and on-point with respect to Plaintiff's allegations (*i.e.*, Oracle's customers declining to renew their Cloud subscriptions) and thus, the above-mentioned challenged statements are protected by Safe Harbor.

Further, in the Company's June 21, 2017 earnings call, Catz was asked:

> You just reiterated the fiscal '18 double-digit earnings growth. And I guess, I think what's becoming more relevant is, do we think about this as a 1-year phenom bouncing off of the fiscal transition? Or how can we really be thinking about earnings growth beyond fiscal '18 into '19 and '20?

CAC ¶ 236. Catz responded:

> So this is absolutely not a 1-year phenomena. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale. So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue -- of the recurring revenue business.

*Id.* Defendants argue that Catz's statement is "a forward-looking statement on its face" and therefore protected by Safe Harbor. Mot. at 18. Plaintiff responds that this statement was misleading because it omitted that "Oracle relied upon unsustainable sales practices to artificially inflate the cloud growth metrics." Opp'n at 14. The Court agrees with Defendants that in the context of the specific question Catz was answering (*i.e.*, "Or how can we really be thinking about earnings growth beyond fiscal '18 into '19 and '20?"), this was a forward-looking statement and therefore

protected by the Safe Harbor.

Plaintiff further argues that even if Catz's statement was forward-looking, it "would still not be protected by the PSLRA's safe harbor" because "Catz knew that Oracle's cloud revenue was generated by financially engineered deals, and as such, the cloud growth was unsustainable." Opp'n at 15. This argument fails because Plaintiff's allegations in effect call on Oracle to predict future sales (*i.e.*, sustained growth) and such allegations do not state a claim under the securities laws. *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1485 (N.D. Cal. 1992), *aff'd sub nom. In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) (finding no claim when defendants failed to disclose that sales were "atypically large and that the future would not be as bright as the past" or that the company's sales were "boosted" by large one-time sales which would not recur in future quarters). Moreover, it is undisputed that Oracle's Cloud revenue, in fact, continued to grow by double digits—albeit more slowly—during the Class Period after Catz made the statement. *See* CAC ¶ 159 ("On March 19, 2018, Oracle issued its third quarter 2018 financial results, disclosing that the Company's cloud growth had slowed even more significantly to only 32%.").

### 2. Falsity

Viewing the CAC allegations in the light most favorable to Plaintiff for purposes of ruling on the present motion to dismiss, the Court assumes that Oracle engaged in the alleged Sales Practices.[7] With that in mind, the Court must now determine, whether the CAC specifies the reason or reasons why the alleged misstatements are false or misleading. *See* 15 U.S.C. § 78u-4(b)(1). In the Ninth Circuit, plaintiffs may establish falsity in three ways: "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 616. In order to plead falsity, a plaintiff must plead "specific facts indicating why" each statement at issue was false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th

---

[7] The Court notes, however, that the described "Attached deals" appear to be nothing more than offering a discount to an existing customer, if they agree to try the Company's new Cloud products. *See* CAC ¶ 15. The Court is not persuaded – and Plaintiff has not provided any authority to support – that there is anything improper with such a routine sales tactic. Securities laws' purpose is not to police customer discounts.

Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler*, 540 F.3d at 1070.

### a. Cloud Revenue Growth

Plaintiff alleges that the statements touting Oracle's Cloud revenue "hypergrowth" were misleading because Defendants failed to disclose that "Oracle's cloud revenue growth was driven in significant part by artificial transactions, in which customers were not truly purchasing cloud product, but rather were purchasing discounts on on-premises products or relief from audit penalties related to on-premises products." Opp'n at 8; *see also e.g.,* CAC ¶¶ 213-215, 229-231. Defendants, on the other hand, assert that the statements regarding Cloud revenue growth are not false or misleading because "Oracle sold real products for real money to real customers and reported real, audited results." Mot. at 10. Defendants further assert—and Plaintiff does not dispute—that Oracle met or exceeded its revenue projections every fiscal quarter of the Class Period as shown in the table reproduced below:

| TABLE 1[1] | 4Q17[5] | 1Q18 | 2Q18 | 3Q18 | 4Q18 |
|---|---|---|---|---|---|
| Actual Cloud Revenue[2] (in millions) | $1,411 | $1,492 | $1,528 | $1,571 | $1,700 |
| Projected Cloud Growth (year over year)[3] | 69%-73% | 48%-52% | 39%-43% | 21%-25% | 17%-21% |
| Actual Cloud Growth (year over year)[4] | 75% | 51% | 39% | 22% | 20% |

[1] All figures are reported in constant currency. (*See* Ex. 8 at 5 n.1.)
[2] Revenues are non-GAAP reported figures. (Exs. 8 at 6; 9 at 5; 10 at 5; 11 at 5; 6 at 5.)
[3] (Exs. 1 at 6; 2 at 6; 3 at 5; 4 at 6; 5 at 5.)
[4] (Exs. 2 at 5; 3 at 5; 4 at 5; 11 at 5.)
[5] For 4Q17 only, growth rates are for SaaS and PaaS only (a majority of Cloud revenue).

Mot. at 3.

According to Plaintiff, once Defendants chose to tout the growth in Cloud sales, they were "obligated to share information that diminished the weight of those results, including that those results were driven by coerced and artificial sales, and did not represent true customer demand." Opp'n at 8 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014-1015 (9th Cir. 2018)) (internal quotes omitted).

i. Omission of Oracle's Sales Practices

Oracle's concededly accurate financial reporting and projections is a tough hurdle for Plaintiff to overcome. In order to be actionable, an omission must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, Inc., 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017). Oracle's financials during the Class Period are consistent with the Defendants' statements on Cloud growth and with the state of affairs at Oracle: (1) revenues from Cloud sales were growing, (2) the growth was expected to slow down, and (3) the growth eventually slowed down at the same rate Oracle predicted and disclosed to its investors. *See* CAC ¶ 159 ("Oracle admitted that it expected additional deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are 'expected to grow 19% to 23% in USD, 17% to 21% in constant currency.'").

Put differently, "a duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements." *Retail Wholesale*, 845 F.3d at 1278. Thus, when Defendants discussed Oracle's Cloud revenue growth ***generally*** and absent an affirmative representation by Defendants regarding Oracle's allegedly coercive Sales Practices or attribution of Cloud revenue to other factors (both alleged by Plaintiff and discussed below), they had no duty to disclose the Sales Practices. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (rejecting allegations that a press release was misleading for failure to disclose a possible merger because it did not "affirmatively intimate[] that no merger was imminent," but instead "neither stated nor implied anything regarding a merger"); *Metzler*, 540 F.3d at 1071 (concluding that defendant was not required to immediately disclose government investigations into its business practices absent "some affirmative statement or omission by [defendant] that suggested it was *not* under any regulatory scrutiny). In sum, Defendants were not under an independent obligation to disclose their Sales Practices.

ii. Oracle's Cloud sales

Defendants challenge Plaintiff's characterization of Oracle's Cloud sales as "fake," "illusory," "artificial." Mot. at 9; *see also* CAC ¶¶ 1, 82, 87, 115. According to the CAC, Oracle's

19

Cloud sales were "illusory" because they were driven by "improper and extortionate tactics to coerce customers to buy short-term cloud subscriptions they did not want and did not renew." *Id.* ¶ 82. The Court disagrees with Plaintiff's characterization. Short-term subscriptions are not "fake" sales—they are short-term subscriptions. Plaintiff has not alleged that Oracle's financial reports are false or that Defendants made false or misleading representations regarding Oracle's sales renewal rates.

The Court agrees with Defendants that *Metzler* is instructive. 540 F.3d 1049. In *Metzler*, plaintiffs had alleged that "any positive financial statement released by the company created the decidedly false impression among investors" that company's success was due to "legitimate business means that could be expected to continue," when, in reality, the company's financial performance was "materially driven" by fraudulent practices. *Id.* at 1057. The Ninth Circuit explained that "this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of fraud generally." *Id.* at 1070. Instead, plaintiffs must sufficiently allege facts that demonstrate the falsity of the company's characterizations of its financial health and business practices during the class period. *Id.* at 1070-71. Similarly, here, Plaintiff's allegations of coercive Sales Practices do not render Oracle's financial reporting of its Cloud sales *per se* false or misleading. Plaintiff has failed to allege specific facts that demonstrate the falsity of Defendants' statements regarding Oracle's Cloud revenue growth – because that revenue was, in fact, growing throughout the Class Period as predicted.

*In re Redback Networks, Inc. Sec. Litig.* is also on point. No. C 03-5642JF(HRL), 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007), *aff'd*, 329 F. App'x 715 (9th Cir. 2009). The *Redback* plaintiffs had characterized defendants' sales as "improper" and "illegitimate" and result of bribery and *quid pro quo* arrangements. *Id.* at *1. The court, nonetheless, dismissed the claims because defendants had (just like Oracle) "sold real products for real money" and "revenues were accurately reported." *Id*. at *3. Plaintiff argues that *Redback* is distinguishable because *Redback* was a "pure omission case based on stated financials." Opp'n at 16. The Court disagrees because virtually all stated **reasons** for falsity in the CAC are Oracle's "failure to disclose" its Sales Practices – which

makes this case also "an omissions case." *See* CAC ¶¶ 211, 215, 219, 221, 223, 226, 228, 231, 235, 237, 241, 243, 246, 248, 251, 253, 255, 257, 262.

Plaintiff cites to *S.E.C. v. Todd* in support of their argument that the Cloud growth statements are actionable. 642 F.3d 1207, 1217 (9th Cir. 2011). Plaintiff's reliance on *Todd* is misplaced. In *Todd*, unlike here, the parties had presented evidence (to a jury) regarding the propriety of the defendants' accounting system and its compliance with Generally Accepted Accounting Principles ("GAAP") related to an "unusual" transaction. *Id.* at 1216-17. The Ninth Circuit found that "there was evidence to support a finding that booking the transaction as revenue was ... materially misleading to investors" because several witnesses testified that the revenue from the transaction at issue should not have been booked as revenue. *Id.* at 1217. No allegations of accounting impropriety have been made in the CAC.

Similarly, other cases cited by Plaintiff involve allegations of accounting errors that are not present in the CAC. In *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, defendants compared their revenue numbers from one quarter to another and "passed this off as an apples-to-apples comparison," when in reality, the company's numbers were "the product of a significant change" in how (and when) the revenue from contracts was recognized. 87 F. Supp. 3d 1075, 1082 (N.D. Cal. 2015). Similarly, in *Murphy v. Precision Castparts Corp.*, the company "worked aggressively to 'pull in' future sales, by persuading customers to accept early delivery of product that would ordinarily ship in a future quarter." No. 3:16-CV-00521-SB, 2017 WL 3084274, at *2 (D. Or. June 27, 2017), *report and recommendation adopted sub nom. Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017). As a result, the company was able to report higher sales and meet earnings targets in its current quarter, at the expense of future sales. *Id.* In contrast, the CAC does not challenge that Oracle sold, delivered, and received revenue for its one-year Cloud subscriptions in each quarter of the Class Period. The CAC alleges that Oracle customers declined to **renew** their Cloud subscriptions – not that the sales were not reported in the quarter they were made.

*In re Questcor* is also inapposite. No. SA CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013). There, plaintiffs alleged that defendants "mischaracterized the nature and results of

scientific tests" related to a drug in order to create the impression that the drug was a "successful and medically necessary method" of treating certain illnesses. *Id.* at *11-12. The court first found that plaintiffs had adequately alleged that defendants made misleading statements about the scientific basis for the drug. *Id.* at *12. Based on that finding, the court concluded that **to the extent** plaintiffs' allegation related to the misleading nature of the scientific reports are properly pled "so too were its statements about the company's financial success arising out of [the drug's] sales." *Id.* *14 (emphasis added). Similarly, in *Orexigen*, the company touted a drug's promising heart benefit when defendants had learned, and failed to disclose, new information that diminished the weight of a clinical study's earlier results. 899 F.3d at 1014-15. There no similar allegations in the CAC.

iii. CW allegations

Defendants also argue the CW allegations are "vague, conclusory, and lacking in specific time references." Mot. at 10-13. Plaintiff responds that the CAC "specifies the time as to which each former employee's report pertains" and the CWs provide "detailed accounts." Opp'n at 10-11. The Court notes two deficiencies with CW statements in the CAC.

First, the CW statements lack in particularity as to time. CW accounts must be "contemporaneous" with the alleged misstatements. *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015). This is crucial because "statement or omission must be shown to have been false or misleading *when made*." *In re Stac Elecs.*, 89 F.3d at 1404. Here, several CWs' employment with Oracle ended before the Class Period started or shortly thereafter. *See e.g.*, CAC ¶ 37 (CW3 worked at Oracle until March 2017; CW4's reports are limited to 2015; CW6 was a channels sales representative until January 2018). Pre-Class Period CW accounts can support and corroborate other statements regarding Oracle's Sale Practices. *See In re BofI Holding, Inc. Sec. Litig.*, No. 315CV02324GPCKSC, 2017 WL 2257980, at *8 n.6 (S.D. Cal. May 23, 2017) (finding pre-class period allegation "relevant insofar as they corroborate the allegations of other CWs and tend to indicate that [defendant] was engaged in a pattern of misconduct"). However, statements from employees who left Oracle before the alleged misstatements were made cannot substitute for reports during the Class Period, required to establish each statement was false **when made**.

22

Moreover, some of the CWs who were employed at Oracle during all or the majority of the Class Period, report on events within the Class Period *generally* without tying those reports to each alleged misstatement. For example, CW3 generally describes an increased frequency of Oracle's audits in fiscal year 2017. CAC ¶ 109. CW2, CW5, CW8, and CW9 provide no specific dates for their reports. *See e.g., id.* ¶ 103. Generally alleging wrongdoing during the CW's employment at the Company does not provide the particularity required under PSLRA. In short, CW reports must be specific in their time references to support that *each alleged misstatement* was false *when made*.

Second, the CW allegations do not provide enough facts to establish the materiality of Oracle's Sales Practices. Plaintiff argues that the CAC "features the accounts of nine former Oracle executives from across the globe who consistently recounted these [Sales Practices]." Opp'n at 4. The Court agrees with Plaintiff that the CW statements provide a plausible picture of the wide-spread nature of Oracle's Sales Practices in various regions. But the CW statements are limited to each CW's "team" and the CAC fails to otherwise allege that those "teams" had a significant impact on Oracle's overall revenue. *See Apollo,* 774 F.3d at 609 (Plaintiff "must show with particularity" how the company's practices "affected the company's financial statements and whether they were material in light of the company's overall financial position.").

For example, CW1 (a regional sales director for Middle East and Africa) states that that more than 75% of the Cloud sales in 2017 and 86% of Cloud Sales in in 2018 in *CW1's team* were tied to audits. CAC ¶ 102. Similarly, CW3 reports that 90% of Cloud revenue *CW3's territory* was generated through Attached deals. *Id.* ¶ 117. CW2 reported that 90-95% of the Cloud deals *CW2's team* dealt with had no "use cases" attached to them. *Id.* ¶ 103. PSLRA demands more particularity. Plaintiff argues that it does not have access to "Oracle's books and records," and thus is not required "to plead at this stage the precise amount of overall revenue affected by Oracle's improper sales practices." Opp'n at 11. Fair enough. But the CWs, who Plaintiff alleges were sales executives in various regions, should have been able to provide more detail on how large each of their teams' respective overall sales volumes were during the Class Period. For example, CW1, who reports that 75% of the Cloud sales in 2017 in CW1's team were tied to audits, should have also provided the overall sales volumes for that team in 2017—effectively answering the question: 75% of what?

23

In short, the CW accounts must provide additional facts to establish that the revenue generated through the allegedly coercive Sales Practices constituted a material portion of Oracle's Cloud revenue at the time each alleged misstatement was made.

### iv. Sustainability of Cloud revenue growth

The CAC alleges that Defendants mischaracterized Oracle's Cloud revenue growth as "sustained." Opp'n at 13-14. For example, on September 14, 2017, the Company announced its first fiscal quarter 2018 results, in which total Cloud revenue was up 51% to $1.5 billion. CAC ¶ 242. On the same day, Catz told the investors: "The sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher . . ." *Id.* Plaintiff does not allege that the revenue or growth reporting were false. Instead, it asserts that Catz's statement was misleading because "a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." CAC ¶ 243.

Defendants argue that "Oracle routinely provided Cloud revenue growth guidance—all of which was met or exceeded during the class period, including the last quarter when Oracle achieved 20% Cloud revenue growth, just as predicted." Mot. at 13. The Court agrees that because Oracle's Cloud revenue concededly grew as projected, the CAC allegations do not support the conclusion that Oracle's Cloud sales were "unsustainable" as Plaintiff claims. *See* Opp'n at 14.

Plaintiff discounts Oracle's growth guidance during the Class Period as "nonsensical" because, according to Plaintiff, "Defendants used coercive sales tactics to reach the guidance. And when Oracle's improper sales practices failed, Oracle ceased reporting cloud guidance to obfuscate the truth." Opp'n at 14 (citing CAC ¶ 171). The CAC challenges Oracle's stated reasons for the change in Cloud revenue reporting by providing several analysts' statements describing a general skepticism of those reasons. CAC ¶¶ 170-76. But the cited analyst statements appear to be conclusory opinions of those individuals or organizations and mostly speculative. In fact, Plaintiff does not specifically allege that Oracle's stated reasons were false or misleading. *See* CAC ¶¶ 209-74 ("DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS"). It appears, however, that Plaintiff might be able to augment its factual allegations to support its claim that Oracle's professed reasons for the change in its reporting of Cloud revenues

were misleading. In short, the CAC's factual allegations do not support Plaintiff's claim that Oracle's Cloud revenue growth was unsustainable.

v.   Drivers of Cloud revenue growth

The CAC alleges that Defendants made false or misleading statements describing the reasons for which Oracle's customers chose its Cloud products over the competition – for example: cost and innovation (CAC ¶ 254), speed, breadth of solutions, global reach, and security (*id.* ¶ 252). Plaintiff argues that when listing the "drivers" of Oracle's Cloud revenues, Defendants "failed to disclose that Oracle's coercive sales practices were, in reality, a material driver of cloud revenue growth." Opp'n at 13. As discussed above, companies do not have an independent duty to disclose their sales tactics. Nevertheless, once Defendants made statements about the drivers of Cloud revenue growth, the investors would have been interested to know that "a material driver" of Cloud Sales was Oracle's Sales Practices. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) ("[I]nvestors would also have been interested to know that millions of dollars of loans were not the result of organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly neutral platform, but were inflated artificially through self-dealing disguised as real transactions.").

That said, the "materiality" of Oracle's Sales Practices should have been alleged with more specifity. First, the CAC relies on CW statements to establish the materiality of Cloud revenue generated through Sales Practices. As discussed above, the CW accounts must provide more facts regarding the timing of their reports and the volume of sales generated in each of their respective teams.

Second, Plaintiff points to "the corroborating reports of regulators and industry participants that such practices were common." Opp'n at 12. But as Plaintiff admits, those reports (even if relevant and credible) are outside of the Class Period. Plaintiff claims that these reports are relevant because "they corroborate the allegations of fraud during the Class Period." Opp'n at 12. That may be true to the extent that Plaintiff relies on the reports to corroborate the existence or even prevalence of the Sales Practices. But Plaintiff may not use reports related to pre-Class Period sales to show that a material portion of Oracle's accurately-reported Cloud revenue during the Class Period was

25

tied to the Sales Practices.

Third, contrary to Plaintiff's assertion, the decline in Oracle's Cloud revenue growth (from 58% to 21%) does not "give[] a numerical indication of the severe extent to which these practices impacted Oracle's overall cloud revenue growth." *See* Opp'n at 12. This "numerical indication" is concededly consistent with what Oracle predicted and disclosed to its investors and thus, was not misleading.

Fourth, the Court is not persuaded that Oracle's decision to change its reporting of Cloud revenue can establish the materiality of Sales Practices in Oracle's overall revenue. *See* Opp'n at 12. "There are many potential reasons why a company might cease to report a metric and those reasons may have no relation to the prior falsity of that metric." *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1002 (N.D. Cal. 2017). In fact, the CAC provides for one such reason in this case: it was hard to distinguish Cloud revenue from more traditional on-premises revenue. *See* CAC ¶ 171.

### b. Deceleration of Cloud Revenue Growth

Plaintiff challenges Defendants' explanation for the deceleration in the Company's Cloud revenue growth. Opp'n 15-16. Defendants stated that Cloud revenue growth was decelerating because (1) customers were waiting for Oracle's next generation Cloud product, known as the "Autonomous Database" and (2) Oracle's "Bring Your Own License" or BYOL program allowed its customers to purchase software licenses that could flexibly be used in whatever medium the customer chose, either Cloud or on-premises. *See* CAC ¶¶ 264, 270. For example, Ellison explained: "With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue." *Id.* ¶ 271. Plaintiff argues that these statements were false because "in truth, Oracle's cloud revenues declined because customers refused to renew short-term subscriptions that had been forced on them." Opp'n at 15.

Defendants argue that "Plaintiff does not plead any contrary facts about the Autonomous

26

Database, BYOL, or Oracle's market share, nor does Plaintiff identify any customers who were then 'moving off' Oracle." Mot. at 15. The Court agrees that the factual allegations in the CAC do not paint the picture that Plaintiff describes. *See* reply at 8, ECF 49. The gist of the CAC allegations is that (1) Oracle engaged in aggressive sales tactics, (2) sold short-term (one-year) subscriptions to Cloud products that its customers did not want, (3) by the end of the Class Period, customers declined to renew those subscriptions, and (4) as a result, Oracle's Cloud sales revenue growth decelerated. *See* CAC ¶¶ 2, 18, 119-121. The CAC alleges that the Sales Practices started in 2014. *Id.* ¶ 54. Many of the allegations regarding the Sales Practices predate the Class Period by years: the investigation by the Chilean regulator started in 2015 (*id.* ¶ 137), audit of the City of Denver took place in 2016 (*id.* ¶ 93), Clear Licensing Counsel warned Oracle in 2014 (*id.* ¶ 181), and CW4's report pertains to 2015 (*id.* ¶ 87). Based on the facts alleged in the CAC, Oracle's Cloud revenue deceleration should have decelerated earlier than June 2018. Instead, the Cloud sales kept growing throughout the Class Period. Moreover, the CAC does not identify any Oracle customers who declined to renew their Cloud subscriptions after one year. It appears, however, that additional facts might be alleged to support Plaintiff's claim that Oracle's professed reasons for deceleration of its Cloud revenue were misleading.

### c. Sales Practices

Plaintiff claims that Defendants "falsely denied that Oracle was using financially engineered deals to generate artificial cloud revenue." Opp'n at 7. Plaintiff points to two statements in this category, made during the Class Period. First, on May 9, 2017, an analyst asked Bond to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." CAC ¶ 224. Bond responded that "I think this is one of those things where the story is a lot bigger than the realities" and "we try to do it as best we can, in as gracious [a] way as we can" and followed by "as we go to cloud, we don't have to worry about that anymore. Because when you're in the cloud, you basically have a number of users that you've signed up for." *Id.* According to Plaintiff, "Defendants' denials and statements minimizing Oracle's use of these tactics were false or, at minimum, misleading." Opp'n at 7.

The Court is not persuaded that Bond "deni[ed]" the existence of Sales Practices. If

anything, by stating that "the story is a lot bigger than the realities," he admitted that the practices do happen. *See* CAC ¶ 224. The cases Plaintiff cites are inapposite because they address *denial* of material facts, which is not present here. For example, in *Lloyd v. CVB Fin. Corp.*, the Ninth Circuit found actionable, a statement that "there was no basis for 'serious doubts'" about a loan repayment, when in fact, the company had known for two months that its largest borrower was unable to pay. 811 F.3d 1200, 1209 (9th Cir. 2016). Bond's statement, however, would be misleading for downplaying the Sales Practice *if* Plaintiff had alleged sufficient facts to show that the revenue generated by those tactics was material to Oracle *at the time* Bond made the statement. As discussed above, Plaintiff must plead the materiality of the Sales Practices with more specifity.

Second, the CAC alleges that on May 22, 2018, in response to an article by The Information about Oracle's Sale Practices, Oracle stated:

> Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services.

CAC ¶ 273. According to Plaintiff, this statement was "false and misleading" because Oracle "den[ied] that Oracle used audits to drive cloud sales," without disclosing that its revenue was driven by Sales Practices. CAC ¶ 274. Again, Plaintiff must allege with specifity that at the time Oracle released this statement, a material number of its Cloud sales were driven by the Sales Practices.

Plaintiff points to two pre-Class Period statements to boast its claims: (1) on January 14, 2016 an Oracle executive (not an Individual Defendant) stated "[i]t would be wrong to force a company to do something that's against their will" and (2) on July 21, 2016, Bond referred to Oracle's use of "ugly tactics" in selling Cloud products as "conspiracy rumors" that do not warrant a response. CAC ¶¶ 64-65. The Court agrees that statements made before or after the Class Period, although not actionable on their own, may be relevant to the extent that "they shed light on the truth

or falsity of Class Period statements." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1134 (N.D. Cal. 2017) (citation omitted). In any event, the two alleged misstatements within the Class Period (CAC ¶¶ 224, 273) are not false or misleading, unless Plaintiff alleges with particularity that the Sales Practices were material to Oracle's Cloud revenue at the time the statements were made.

\*\*\*

In sum, the CAC has failed to sufficiently plead that the alleged misstatements were false or misleading when made.

### 3. Scienter

Defendants next challenge the sufficiency of the allegations with respect to scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. *See* 15 U.S.C. § 78u–4(b)(2)(A); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014). A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint. *See Tellabs*, 551 U.S. at 324. Plaintiff must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id.* at 323. To demonstrate scienter, defendants must have contemporaneously made "false or misleading statements either intentionally or with deliberate recklessness." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), as amended (Feb. 10, 2009) (internal quotation marks omitted). "[M]ere recklessness or a motive to commit fraud and opportunity to do so" is not enough. *Reese*, 747 F.3d at 569. Rather, a plaintiff must show "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *See Zucco Partners*, 552 F.3d at 991 (internal quotation omitted). Courts must "assess all the allegations holistically," not "scrutinize each allegation in isolation." *Tellabs,* 551 U.S. at 326.

#### a. Confidential Witnesses

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to

29

satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted).

As an initial matter, Defendants noted and Plaintiff did not contest, that the CWs offer no allegations as to Ellison, Kurian, Bond, or Miranda, and therefore, the CW statements provide no basis from which their scienter may be inferred. *See* Mot. at 19; *see generally* Opp'n. Thus, the CWs' allegations of knowledge are limited to Catz and Hurd.

Defendants assert that the CW allegations do not support an inference of scienter. First, Defendants challenge the CWs' reliability because none of the CWs alleges any direct contact with Hurd or Catz and therefore their allegations are not based on personal knowledge. *See* Mot. at 19-20. Second, Defendants argue that the CW allegations themselves are not indicative of scienter because they fail "to link any Defendant's state of mind to a point in time." *Id.* at 20. Plaintiff responds that CWs provide relevant facts such as: (1) Hurd and Catz "personally approved" Cloud deals worth over $5 million and any deal where a discount in excess of 50% was offered on software, (2) CW1 personally prepared presentations for Hurd that "would very clearly say that [License Management Services] was engaged" on Cloud deals and that "they were compliance deals," and (3) CW2 described presentations prepared for Hurd "that went to Hurd's directs" and showed "90-95% of the Company's cloud deals were not driven by customer need." Opp'n 18-19.

The Court agrees with Defendants that because the CWs did not have any direct contact with Hurd or Catz, some of their reports cannot provide reliable insight into the Individual Defendants' states of mind. *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, No. 17-16895, 2019 WL 3020946, at *2 (9th Cir. July 10, 2019) ("Under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference that each defendant acted with scienter."). For example, CW1 prepared presentations "for Hurd's consumption." CAC ¶ 180. CW2 saw "presentations going to Hurd's direct reports." *Id.* ¶ 180. CW9 "understood" that customer-related information "would be summarized and presented at a higher level." *Id.* ¶ 127. The CWs lack

personal knowledge as to whether Catz or Hurd read or heard of the internal information and presentations—and therefore cannot be relied upon to establish scienter. *Bao v. Solarcity Corp.*, No. 14-CV-01435-BLF, 2016 WL 4192177, at *11 (N.D. Cal. Aug. 9, 2016), *aff'd sub nom. Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018). In other words, "merely speculative" awareness of Individual Defendants' knowledge is not enough. *See Bao*, 2016 WL 4192177, at *11.

Some of the CWs did, however, have personal knowledge that Hurd or Catz approved large sales tied to Oracle's Sales Practices. CW1 stated that all deals worth more than $5 million had to be approved by "HQ," meaning Hurd or Catz and states that he/she would see "Hurd's and Catz's names on approvals." CAC ¶ 110. CW1 explained that "the sequencing of [Oracle's approval system's] reports showed that [License Management Services] was engaged with the sales team and the client." CAC ¶ 110. Similarly, CW3 reported that all software discounts in excess of 50% had to be approved by Hurd's office. *Id.* ¶ 134. CW3 further stated that he personally had audit-based Cloud deals "clearly marked as such," that were approved by Hurd's office. *Id.* ¶ 111. But these CW allegations are not sufficient because (1) they do not establish **when** Hurd or Catz approved the deals, (2) **how** Hurd or Catz would have known—based on these deal approvals—that Sales Practices generated a material portion of Cloud revenues. As Defendants note, the allegations "reveal little about the approval process [and] nothing about any particular deals (timing, amounts, customer names)[.]" Reply at 12. It is unclear from the CW statements how or at what level of detail Catz or Hurd reviewed the deals they approved. More specific facts must be pled to support a strong inference of scienter as to what Catz or Hurd knew at the time they made the alleged misstatements. The inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.

      b.  Change in Oracle's Reporting System

Plaintiff argues that "Oracle's efforts to obscure its declining cloud revenue growth by radically changing the way it reported its cloud results further supports an inference of scienter." Opp'n at 21. Defendants, on the other hand, claim that there was "nothing nefarious" about Oracle's change in reporting and that the Company explained its reasons for changing its Cloud revenue reporting at the same time it announced the change. Mot. at 23. In its June 19, 2018 Earnings Call,

Oracle explained that its BYOL program "resulted in large database contracts where some licenses were to be deployed on premise, while others were to be used in the Cloud" making Oracle's new license revenue a combination of Cloud licenses and on-premises licenses. *See* Mot. at 23 (citing ECF 45-6 at 4).

Plaintiff takes issue with Defendants' reference to Oracle's explanation as "self-serving" and "improper application of judicial notice." Opp'n at 23-24. The Court disagrees. Incorporation-by-reference "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Orexigen*, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* Defendants may seek to invoke the incorporation-by-reference doctrine "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.*

Here, the CAC references the June 19, 2018 Earnings Call repeatedly to allege that Oracle changed its Cloud revenue financial reporting "to shield its flagging cloud revenues from public view." CAC ¶ 22; *see also id.* ¶¶ 169, 192, 286. Plaintiff's reference to the documents is both extensive and a basis for Plaintiff's claims of falsity and scienter. Therefore, Defendants can properly seek to incorporate the entire document. "[T]he incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs" – which is exactly what Plaintiff attempts to do here. *See Orexigen*, 899 F.3d at 1003. Because Plaintiff has relied on the June 19, 2018 Earnings Call as basis for its claims, it may not exclude Defendants from incorporating their reasons for the change in Oracle's financial reporting, stated in the same document.

That said, the Court does not assume that Oracle's stated reasons for change in its financial reporting are true—only that the Company provided a reason. In fact, Oracle's stated reason is referenced in the CAC. *See* CAC ¶ 171 ("it was hard to distinguish cloud revenue from more traditional on-premises revenue"). Scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314. The CAC has not established that the inference of scienter (*i.e.*, Oracle changed its financial reporting to hide its declining Cloud

revenue) is "at least as compelling" as that the reason the Company provided.

### c. Core Operations Doctrine

The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA." *S. Ferry*, 542 F.3d at 785.

"Allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785–86. "Proof under this theory is not easy." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. A plaintiff must produce either (1) "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," or (2) "witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (rejecting scienter under the core operations doctrine when plaintiffs pointed to "the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with [the company's] day-today operations" and were familiar with the contents of the certain

33

reports).

Plaintiff argues Oracle's "move to cloud" was "the biggest and most important opportunity" in its history, and the subject of greatest importance to the market. Opp'n at 22-23 (citing CAC ¶¶ 196-97). For that reason, in Plaintiff's view, "[t]he inference is strong that Defendants knew, or were deliberately reckless in not knowing, that the sales of the most important segment of Oracle's business were driven by engineered deals." Opp'n at 22. It may be true that moving to Cloud was a significant milestone for Oracle, but that fact does not make every piece of information within the Company related to its Cloud business critical to the business's core operations. As discussed, the CAC allegations are not sufficient to show that the revenue generated by Sales Practices were material. Thus, it is not "absurd" to suggest that the Individual Defendants were not aware of such materiality—especially in light of the Company's accurate reporting and projecting of its Cloud sales revenue growth. Moreover, as discussed, none of the CWs had access to the Individual Defendants to know about their involvement in sales reporting. The core operations doctrine is not sufficiently pled.

### d. Kurian's Stock Sales

During the Class Period, Kurian exercised his options and sold nearly 4 million shares for "over $191 million in gross proceeds." CAC ¶ 200. Plaintiff argues Kurian's stock sales further bolster the scienter inference as to him. Opp'n at 23. "While suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, such sales only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler*, 540 F.3d at 1066–67 (internal citation omitted). Courts consider three factors in this inquiry: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Id.* at 1067. The Ninth Circuit "typically require[s] larger sales amounts-and corroborative sales by other defendants—to allow insider trading to support scienter." *Id.*

The Court is not persuaded that Kurian's stock sales were suspicious. Defendants claim that Kurian's stock sales resulted in $53.7 million in net proceeds, not the $191.8 million alleged by

Plaintiff. Mot. at 22. Plaintiff does not dispute this but argues that Kurian sold at least one-third of his holdings, which according to Plaintiff is "unusual." Opp'n at 23. The Ninth Circuit has found similar amounts insufficient to establish scienter. *See Metzler*, 540 F.3d at 1067 (sale of 37% of total stock holdings did not establish scienter); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999), as amended (Aug. 4, 1999) (sale of 43.6 and 75.3 percent of executive' holdings failed to give rise to a strong inference of scienter) (superceded by statute on other grounds). Neither is the timing of Kurian's stock sales suspicions. Kurian sold stocks throughout the Class Period, before and after the alleged deceleration of the Cloud revenue growth. For example, Kurian's biggest sale occurred on January 18, 2018, ***after*** Oracle reported a slow-down on December 14, 2017. *See* CAC ¶ 201; 258 ("on December 14, 2017, … Oracle reported slowing cloud growth in the second quarter of 2018 that missed market expectations, and provided guidance for the further slowing of cloud growth that also fell below market expectations …"). Kurian continued to sell stocks after the second slow-down report on March 19, 2018. *See* CAC ¶¶ 201; 280.

The inference of scienter is further weakened by the fact that none of the other Individual Defendants are alleged to have sold Oracle stocks during the Class Period. "One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi*, 253 F.3d at 436. Here, only one of the six Individual Defendants is alleged to have sold stocks during the Class Period – not enough to establish a strong inference of scienter.

### e. Plaintiff's Remaining Arguments

Plaintiff argues that scienter can be inferred because Defendants were confronted with news articles and other outside reports regarding Sale Practices. Opp'n at 19-20 (citing CAC ¶¶ 60-63, 59-59, 135-47). Plaintiff also relies on CW statements in alleging that "Oracle's use of engineered deals was widespread and well-known within the Company." Opp'n at 20-21 (citing CAC ¶¶ 37, 87-134).

Plaintiff's allegations are insufficient because at best, they show that Individual Defendants were aware that the Sales Practices existed. That is not enough. The crux of the CAC is that despite

35

Oracle's accurate financial, Defendants misled investors regarding Oracle's revenue growth, its drivers, and the reasons for its deceleration by failing to disclose the Sales Practices. Thus, to establish that Defendants intentionally misled investors when they made statements about Cloud revenue growth, it is not enough to allege that Individual Defendants were aware that the Sales Practices were taking place. Plaintiff must also allege with particularity that **each Individual Defendant** knew that a material portion of the Company's Cloud revenue was tied to those practices – enough to make the nondisclosure of those practices a material omission. *See Tellabs,* 551 U.S. at 314; *see also See Zucco Partners*, 552 F.3d at 998 (finding "generalized claims about corporate knowledge" such as "[defendant] had to have known" or "project managers *knew*" are not sufficient to create a strong inference of scienter, because "they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state."); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681–82 (9th Cir. 2005) ("The allegation that [a fact] was 'common knowledge' … does not comport with the PSLRA's requirement that plaintiff alleges the required state of mind as to each Defendant who made an allegedly misleading statement and is therefore insufficient.").

Plaintiff's allegations are not "at least as compelling as [the] opposing inference of nonfraudulent intent" – that the Individual Defendants were accurately (and with understandable enthusiasm) reporting Oracle's Cloud revenue growth.

### f. Holistic Review

After having determined that none of Plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically. *See In re VeriFone*, 704 F.3d at 702–03; *Zucco Partners*, 552 F.3d at 992. The Court finds that taken together, the facts do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent. *Tellabs*, 551 U.S. at 323. Indeed, as the foregoing demonstrates, Plaintiff's reliance on CWs, outside reports, Oracle's change in financial reporting, Kurian's stock sales, and the core operations doctrine are unpersuasive. Particularly, the CAC fails to allege any direct knowledge of any Individual Defendants' state of mind. "The bar set by *Tellabs* is not easy to satisfy" because it requires Plaintiff to plead an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Webb*, 884 F.3d at 855 (citing *Tellabs*,

551 U.S. at 324.). Plaintiff has failed to do so here.

Furthermore, there are no allegations of motive to commit fraud. The Ninth Circuit has "recognized that a lack of stock sales can detract from a scienter finding." *Webb*, 884 F.3d at 856. Except for Kurian, none of the Individual Defendants is alleged to have sold any stocks. And most importantly, throughout the Class Period, Oracle accurately reported its Cloud sales, which continued to grow, consistent with the rate Oracle projected – these facts do not support a "strong inference of scienter" on behalf of Individual Defendants.

*** 

In sum, the CAC has failed to plead facts creating a strong inference of scienter that is cogent and at least as compelling as the alternative explanation, as required by the PSLRA. Accordingly, the Court GRANTS Defendants' motion to dismiss for failure to state a claim under section 10(b) or Rule 10b-5 WITH LEAVE TO AMEND.

### B.    Claims 2 and 3 - Sections 20(a) and 20A

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 (9th Cir. 1990)). To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Section 20A allows recovery against any person who violates the Exchange Act by trading securities "while in possession of material, nonpublic information." 15 U.S.C.A. § 78t-1.

"[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b 5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1033 n.15 (9th Cir. 2002). Because Plaintiff has failed to state a claim for a primary violation of the Exchange Act, it likewise has failed to state a claim for violation of Section 20(a) or Section 20A. Thus, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims under sections 20(a) and 20A WITH

LEAVE TO AMEND.

## IV.    JUDICIAL NOTICE

Defendants request that this Court consider Exhibits 1 to 21 (ECF 45-1 to 45-21) because they are properly subject to judicial notice. Mot. at 7. Exhibits 1 to 14 (ECF 45-1 to 45-14) and 16 to 20 (ECF 45-16 to ECF 45-20) are incorporated in the CAC by reference. Exhibits 15 (ECF 45-15) and 21 (ECF-21) are SEC filings and public stock price information.

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler*, 540 F.3d at 1064 n.7, and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Plaintiff does not oppose the request or dispute the authenticity of the documents but notes that "[t]he Court should decline Defendants' invitation to improperly accept the truth of their exhibits' contents to resolve disputed facts in their favor." Opp'n at 23-24. The Court agrees that it would be improper to take notice of facts that might reasonably be disputed, or to draw inferences from such documents. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (taking judicial notice of reports referred to in complaint for their "existence," but holding "we may not, on the basis of these reports, draw inferences or take notice of facts that might reasonably be disputed"); *Lee*, 250 F.3d at 688. The Court takes judicial notice of Exhibits 1-21 and considers these documents for the sole purpose of determining what representations Oracle made to the market. The Court does not take notice of the truth of any of the facts asserted in these documents.

## V.    ORDER

To successfully state a claim, Plaintiff must plead with particularity what statements were made, when they were made, why they were false at the time they were made, and how the Defendant who made the statement acted with scienter at the time the statements were made. Because Plaintiff fails to adequately plead that Defendants made any false or misleading statements

and that they did so with scienter, the motion to dismiss is GRANTED WITH LEAVE TO AMEND.

Any amended complaint shall be filed **on or before February 17, 2020**. The Court requests that the chambers copy of any amended complaint be a redlined version, in color. Failure to meet the deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal of Plaintiff's claims with prejudice.

For the amended complaint, pursuant to the PSLRA and the Federal Rules of Civil Procedure, and for the sake of clarity and efficient case management, Plaintiff is directed to set out in chart form their securities fraud allegations under the following headings on a numbered, statement-by-statement basis: (1) the speaker(s), date(s) and medium; (2) the false and misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter. The chart may be attached to or contained in the amended complaint, but in any event will be deemed to be a part of the amended complaint.

**IT IS SO ORDERED.**

Dated: December 17, 2019

_____
BETH LABSON FREEMAN
United States District Judge