BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
MARK LEBOVITCH (admitted *pro hac vice* )
JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
ABE ALEXANDER (admitted *pro hac vice*)
(markl@blbglaw.com)
(johnr@blbglaw.com)
(abe.alexander@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

*Counsel for Lead Plaintiff Union Asset Management Holding AG and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*In re Oracle Corporation Securities Litigation*

Case No. 18-cv-4844-BLF

ECF CASE

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

Dept: Courtroom 3, 5th Floor
Judge: Honorable Beth Labson Freeman

# TABLE OF CONTENTS


I. INTRODUCTION ........ 2

II. JURISDICTION AND VENUE ........ 11

III. PARTIES ........ 11

A. Lead Plaintiff ........ 11

B. Defendants ........ 11

IV. SUMMARY OF THE FRAUD ........ 14

A. Oracle Belatedly Pivots From Its Stagnating Legacy "On-Premises" Business To Focus On The Growing "Cloud" Market ........ 14

B. With Oracle's Cloud Business In Its Nascency, It Denies Early Rumors That It Generates Cloud Revenue Through Improper Sales Tactics ........ 17

C. Throughout The Class Period, Defendants Represented that Oracle Had Succeeded in Creating a Thriving Cloud Business, Which They Attributed To Oracle's Supposedly Superior Cloud Products and Business Practices ........ 22

D. In Reality, Oracle's Cloud Products Were Rife with Defects, Forcing the Company to Resort to Financially Engineered Deals to Inflate Cloud Revenue ........ 25

1. Although Defendants Publicly Touted Oracle's Cloud Technology, In Reality, the Company's Product was Rife With Defects, Forcing Oracle to Rely Heavily on Engineered Deals to Generate Revenue ........ 25

2. An Internal Oracle Email Corroborates FE 10's Report and Shows that Defendants Were Aware of Serious Defects with Oracle's Cloud Technology ........ 29

E. Oracle Generated Material Amounts of Revenue During the Class Period Through Financially Engineered Deals ........ 32

1. Oracle Coerced Customers To Subscribe To Cloud Products Under Threat Of Audit Penalties ........ 34

2. Oracle Also Used "Attached Deals" To Disguise Legacy On-Premise Revenue As All-Important Cloud Revenue And Pad The Company's Cloud Growth ........ 43

3. Industry Participants Further Confirm Oracle's Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle Cloud Product ........ 51

4. Oracle's Audit of the City and County of Denver Illustrates The Company's Use of the ABC Tactic to Drive Cloud Sales ..... 59

5. Regulator Findings Further Confirm Oracle's Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle Cloud Product..... 63

F. The Truth Emerges ..... 66

1. On December 14, 2017, Oracle Reports Stagnating Cloud Growth ..... 67

2. On March 19, 2018, Oracle Reports That Its Cloud Growth Slowed Even More Significantly ..... 68

3. On June 14, 2018, JPMorgan Releases a Large-Scale CIO Survey Showing That Oracle Is "Trailing In Cloud Computing Plans" ..... 73

4. On June 19, 2018, Oracle Reports Additional Cloud Slowdowns And Stuns Investors By Announcing It Will No Longer Report Cloud Business Financial Results ..... 74

V. ORACLE'S CLOUD BUSINESS CONTINUES TO COLLAPSE AFTER ORACLE IS FORCED TO ABANDON ITS FINANCIAL ENGINEERED DEALS ..... 77

VI. ADDITIONAL ALLEGATIONS OF SCIENTER..... 78

A. The Complaint Alleges a Strong Inference of Scienter as to Hurd..... 79

1. Hurd and His Direct Reports Drove the Use of ABC Sales, And Hurd and Catz Approved All Significant Financially Engineered Deals ..... 79

2. Oracle's Use Of Engineered Deals To Drive Cloud Sales Was Extremely Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units, and Accounting for the Vast Majority of Oracle's Cloud Revenue ..... 81

3. Prior To Making His Class Period Misstatements And Omissions, Hurd Knew Of Public Allegations That Oracle Generated Cloud Revenues Through Coercive Audits And Sales Tactics..... 82

4. Hurd and Others Falsely Attributed Oracle's Success to Supposedly Legitimate Factors, While Denying The Allegations That They Were Using Audits To Close Cloud Sales ..... 83

5. Defendants' Statements Touting Oracle's Cloud Transition And Growth Concerned The Single Most Important Issue Facing The Company During The Class Period ..... 85

6. Hurd And Defendants Stated That They Were Deeply Focused On Oracle's Cloud Revenues ... 86

7. Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Class Period, Underscoring Its Efforts To Obscure Declining Growth ... 87

8. Hurd Knew That Oracle's Cloud Technology Was Deeply Flawed ... 88

B. The Complaint Alleges a Strong Inference of Scienter as to Defendant Catz ... 89

C. The Complaint Alleges a Strong Inference of Scienter as to Defendant Kurian ... 91

D. The Complaint Alleges a Strong Inference of Scienter as to Defendant Bond ... 92

E. The Complaint Alleges a Strong Inference of Scienter as to Defendant Miranda ... 93

F. The Complaint Alleges a Strong Inference of Scienter as to Defendant Ellison ... 94

G. The Core Operations Doctrine Further Supports An Inference of Scienter as to All Defendants ... 95

H. Although Neither Insider Sales Nor "Motive And Opportunity" Allegations Are Required, Both Exist Here ... 99

1. Defendants' Compensation Plan Motivated Hurd, Catz, Ellison and Kurian to Inflate Cloud Revenues Through Financially Engineered Cloud Deals ... 99

2. Kurian, Hurd, and Catz Sold Substantial Oracle Stock During The Class Period ... 101

VII. DEFENDANTS' FAILURE TO DISCLOSE THAT ORACLE'S CLOUD REVENUE WAS INFLATED BY ENGINEERED DEALS VIOLATED GAAP ... 105

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 110

A. Defendants' Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017 ... 110

B. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017 ... 117

C. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018 ... 124

D. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Second Quarter 2018 ... 135

E. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018 ..... 139

IX. LOSS CAUSATION ..... 143

X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 147

XI. THE PRESUMPTION OF RELIANCE ..... 148

XII. CLASS ALLEGATIONS ..... 149

XIII. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ..... 150

COUNT I For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants) ..... 150

COUNT II For Violations Of Section 20(a) Of The Exchange Act (Against the Executive Defendants) ..... 152

COUNT III For Violation Of Section 20A Of The Exchange Act (Against Defendants Kurian and Catz and Hurd) ..... 155

XIV. PRAYER FOR RELIEF ..... 157

XV. JURY DEMAND ..... 157

Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff"), by and through its undersigned counsel, brings this action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Oracle Corporation ("Oracle" or the "Company") during the period from March 15, 2017 to June 19, 2018, inclusive (the "Class Period") and were damaged thereby (the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing investigation of its undersigned counsel, including from the following sources: (i) Oracle's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Oracle securities; (vii) accounts from former Oracle employees, some of whom were afraid to provide Lead Counsel with information for fear of retaliation by Oracle; (viii) documents obtained from the National Economic Prosecutor's Office of Chile (the "FNE") concerning its investigation; and (ix) additional materials and data concerning the Company and industry as identified herein. While Lead Counsel spoke with numerous sources who provided consistent accounts as discussed herein, many individuals and entities Lead Counsel interviewed declined to disclose the identities of Oracle customers who were subject to the financially engineered deals described herein because they still maintained relationships with Oracle and feared retaliation. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

---

[1] Lead Plaintiff recognizes that the Court's December 17, 2019 Order Granting Defendants' Motion to Dismiss the Consolidated Class Action Complaint (the "MTD Order") held that certain alleged misstatements were not actionable, others were not adequately alleged to be false or misleading, and other allegations were insufficient. In order to fully preserve its appeal rights,

## I. INTRODUCTION

1. Prior to the Class Period, Larry Ellison, Oracle's founder and strategic visionary, made a critical blunder by underestimating a fundamental shift in database technology that had serious implications for Oracle's revenue growth. By the time senior management recognized this tactical error, Oracle was years behind its competitors in creating and selling the new technology, causing its revenues to stagnate. In an effort to compensate for the weakness in its inferior product offerings and make up for market share it was losing, Oracle resorted to systematically coercing and bribing its existing customers into making so-called "purchases" of its flawed new product line. Throughout the Class Period, Defendants concealed these Company-wide sales tactics from investors, and made a host of statements representing that Oracle had successfully created a thriving business in this critical new market. Defendants attributed Oracle's successful transformation to supposedly legitimate factors, such as the purported superiority of Oracle's products and sales teams, while rebuffing any questions about whether Oracle engaged in improper sales tactics to boost its new revenue stream.

2. The truth, however, eventually emerged. By the end of the Class Period, customers were refusing to renew the short-term subscriptions that had been pushed on them under duress, and other customers were resisting the Company's strong-arm tactics. Oracle's sales growth declined precipitously, revealing to the market that the Company's purported transformation was not true. The Company's stock price plummeted. Shortly thereafter, senior management announced that they would no longer disclose critical information regarding Oracle's faltering new business, causing the stock price to decline sharply again.

3. This securities fraud class action arises from misrepresentations by Oracle and its senior executives concerning the most important initiative in Oracle's history – its purported transformation from a struggling "on-premises" database technology company into a high-growth

---

Lead Plaintiff is re-pleading these dismissed statements and other allegations. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.").

"cloud" computing enterprise. Historically, Oracle's principal business was selling "on-premises" database technology and software, which is installed and run within the physical confines of the customer's data center and computers. Several years before the Class Period, a new database technology began to emerge as a challenger to Oracle's historic business model – the "cloud." As the name suggests, cloud database technology was located remotely – in a "cloud computing platform" established by the vendor – and was accessed by the customer via the internet.

4. In a critical strategic error, Oracle dismissed the cloud for years. Defendant Ellison famously ridiculed cloud technology as "gibberish," "idiocy," and "nonsense." However, the cloud soon became an undeniable force in the database software field. Other companies, such as Amazon and Microsoft, that quickly embraced the new technology were soon generating billions of dollars in quarterly cloud-related revenue, reporting enormous growth rates as high as 90%.

5. Meanwhile, Oracle's on-premises business begin to stagnate and even decline. For a company in the technology field – where revenue growth is king – a stagnating revenue stream is tantamount to death in the eyes of the market. As one market commentator remarked, the "cloud has become a matter of existential importance to Oracle as its legacy business of selling [on-premises] software licenses and hardware products erodes."

6. Oracle therefore embarked on a "pivot to the cloud" in an effort to surmount the declines in its legacy business and remain relevant to investors. Given the stakes riding on this initiative, the market was keenly focused on Oracle's ability to create a successful cloud business. As Defendant Safra Catz, Oracle's then co-CEO explained, Oracle's "move to cloud" was "the biggest and most important opportunity in our Company's history."

7. Oracle faced a basic problem, however. Having dismissed cloud technology for so long, its cloud-based offerings were inferior and its business lagged behind competitors, forcing Oracle to scramble to play catch up. Throughout the Class Period, Defendants made a number of statements assuring investors that Oracle had successfully surmounted these issues and created a strong and thriving cloud business.

8. For instance, on the first day of the Class Period, March 15, 2017, Oracle announced that its cloud revenue had jumped 110% year-over-year, to $1.2 billion for the quarter.

Showing that Oracle's cloud growth more than made up for troubles in its legacy business, Catz asserted that "the increase in revenue from our cloud business has overtaken new software license declines on an annual basis," marking "a significant milestone in our transformation." Significantly, when asked what was driving results such as these, Defendants repeatedly emphasized that Oracle had created highly functional and even superior cloud products. Defendant Miranda, for instance, emphasized Oracle's "best-in-class applications," specifically highlighting the "substantially new user interface" as a key leap forward in Oracle's cloud technology, as well as the software's "speed of innovation." Other Defendants similarly attributed Oracle's success in the cloud market to advantages in "a reduction of total cost of ownership," the "innovation advantage" that Oracle's supposedly superior technology offered, and other legitimate business factors.

9. During the Class Period, questions surfaced from analysts and the press asking whether Oracle was boosting its cloud performance by auditing its on-premises customers, threatening them with large financial penalties, and forcing them to nominally "buy" cloud products to obtain a reduction of those penalties. Defendants rebuffed those reports, calling such suggestions "inaccurate accounts regarding a handful of customers," stating that "the story is a lot bigger than the realities," and assuring investors that these questions had no bearing on the cloud business, emphasizing that "the key, as we go to cloud, is this conversation is going to go away."

10. Based on Defendants' statements, the market concluded that Oracle had in fact built a legitimately thriving cloud business. William Blair analysts wrote, "At this point, it appears that ***Oracle has crossed the cloud chasm***." Macquarie analysts reported that "the company has weathered the worst of its transition to the cloud .... Critical metrics like cloud ARR, license revenues, total software revenues, billings, and margins all beat [consensus analyst estimates], making the quarter a solid turning point as management rounds the bend on a multiyear rapid cloud transition." *Barron's* reported that Oracle "wowed Wall Street with a financial report that ***put to rest fears of the company being rendered obsolete by cloud computing***."

11. Oracle's purported success in building a healthy cloud business propelled the Company's stock price from $42.79 just before the Class Period to a high of $52.97 during the

Class Period – an increase of nearly 24%. As *Dow Jones Institutional News* reported, Oracle's increasing share price was "credited mostly to [Oracle's] growing cloud business," and "left the shares at 17 times adjusted forward earnings – the highest multiple Oracle has fetched since 2008."

12. Unfortunately for investors, Defendants' representations that Oracle had created a legitimately strong cloud business, based on bona fide advantages in technology, were materially misleading in many respects. To start, the Company's cloud products were so deeply flawed that Defendants internally referred to them as "not tenable." FE 10 was Group Vice President of Cloud Application User Experience at Oracle from years prior to the start of the Class Period until February 2018, and was one of the most senior executives involved in the design of Oracle's cloud products. FE 10 reported that Oracle's cloud products suffered from widespread, critical functionality problems, and, as a result of these widespread failures, there was extremely poor demand for Oracle's cloud products. As FE 10 explained, many of Oracle's cloud products could not perform basic functions, like searches and navigation, and individual applications, such as finance and human resource tools, were not integrated with each other and could not function together, in contrast to competing products. Notably, FE 10 explained that many of these issues stemmed from the fact that Oracle's cloud platform was a "mishmash of native Oracle products and acquisitions" – a product the Company had been forced to cobble together as a result of its tardiness to the cloud market. FE 10 explained that these issues were endemic to Oracle's cloud products.

13. Oracle's senior management was well-aware that the Company's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and October 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor.

14. FE 10's report is corroborated by internal Oracle email obtained by Lead Counsel as part of its investigation, which reflects that Defendants Ellison, Hurd, Catz, Kurian and Miranda were well-aware of critical defects in Oracle's cloud technology, and repeatedly discussed them. In October 2017, Defendant Kurian, who headed Oracle's development of cloud technology, wrote to Defendant Miranda and other senior executives that the user interface for Oracle's human resources cloud software "was considered ***so atrocious***" that it was simply "***a disgrace***." This was a devastating defect because an "atrocious" user interface meant that the customer could not effectively use the cloud product, greatly impairing its quality and value. The flaws were so material to Oracle that its most senior executives were keenly focused on them. Kurian wrote: "***I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful***."

15. Oracle was largely unable to sell its defect-ridden cloud technology in bona fide transactions, as very few customers actually wanted to buy it. Yet the Company had to show burgeoning cloud sales in order to remain viable in the eyes of investors. Consequently, Oracle resorted to two improper tactics to create cloud transactions that Defendants could present to the market as so-called cloud "sales" that were proof of Oracle's successful transformation. FE 11, a Regional Vice President of Technology sales at Oracle throughout the full Class Period and one of the most senior Oracle executives responsible for cloud sales, put it succinctly: "Nobody was buying our stuff," so "[w]e would go in and hold customers over the barrel . . . . That was driven from the top."

16. First, Oracle employed a strategy called "Audit, Bargain, Close," or "ABC," to coerce cloud sales during the Class Period. Oracle would install its on-premises software in the clients' ecosystem with a variety of preferences automatically enabled that, unbeknownst to the customer, caused the customer to arguably—and unknowingly—exceed the limits of its license. After the customer fell into this trap, Oracle would audit the on-premises customer for violations of its on-premises software license. When it found violations, Oracle would threaten to impose extremely large penalties. Oracle would then offer to reduce or eliminate those penalties if the

customer agreed to accept a short-term cloud subscription that the customer neither desired nor intended to use.

17. Second, Oracle employed a tactic known as the "attached deal." When negotiating the sale of on-premises software, Oracle would offer the customer a significant discount on the on-premises products that the customer wanted and needed, so long as the customer agreed to receive a short-term cloud subscription – even though the customer neither wanted nor intended to use the attached cloud product.

18. Oracle's use of these tactics was so widespread that its employees coined internal terms for these transactions: "financially engineered deals" and "dead on arrival" deals. As discussed below, reports by numerous former Oracle cloud executives from all over the world demonstrate that the Company used these engineered deals to generate material amounts of cloud revenue during the Class Period. For example, one senior cloud executive (FE 2) reported that ***90-95% of Oracle's Company-wide cloud sales*** during the Class Period were generated through engineered deals. Likewise, another senior cloud sales executive in the Middle East and Africa region (FE 1) reported that at least 80% of Oracle's Middle East and Africa cloud revenue was generated through the use of the ABC tactic, yielding $178 million in cloud revenue, or 13% of Oracle's total cloud revenue, in fiscal year 2017 from this region alone.[2] Several additional North American cloud executives reported that approximately 90% of Oracle's North American cloud revenue during the Class Period was generated through engineered deals. This was undoubtedly a material percentage of cloud revenue because North America was Oracle's dominant business region, where the Company generated approximately half of its revenue during fiscal years 2017 and 2018 (*i.e.*, the two fiscal years during the Class Period). Corroborating these reports from former Oracle executives, multiple industry participants who represented clients in Oracle audits, such as Insight, B-Lay, and several others, independently confirmed that Oracle routinely used the ABC tactic to generate material amounts of cloud "sales" from their clients during the Class Period.

[2] Oracle's fiscal year includes the 12 months ended May 31 of that calendar year. Thus, for example, fiscal year 2017 comprised June 1, 2016 to May 31, 2017. Fiscal year 2018 comprised June 1, 2017 to May 31, 2018.

19. Oracle's most senior executives were well-aware that these tactics were driving the Company's cloud sales during the Class Period. FE 11 reported that the ABC tactic was an "edict" handed down by Hurd and implemented by his direct reports, including Rich Geraffo, Executive Vice President of North America Technology, who would instruct sales teams to "seed" major cloud deals on phone calls, meaning employ the ABC tactic. Further, all deals worth more than $5 million had to be approved by "HQ," which meant either Hurd or Catz, through Oracle's "Deal Approval System," or "DAS." FE 1 reported that he saw Hurd's and Catz's names on approvals of "compliance" deals in DAS, and in approval notifications that were released once Hurd or Catz signed off on the deal. FE 1 provided specific examples of audit-driven cloud deals closed in fiscal year 2017 to companies such as Oreedo QSC, Samba Financial Group, and National Water Company, through which Oracle collectively booked approximately $56 million in cloud revenue. Each of these deals were approved by Hurd through the DAS system, and each approved entry on the DAS system clearly indicated that the deal was generated through "cloud insertion," *i.e.*, through the use of the ABC tactic. Numerous other facts supporting a strong inference of knowledge or deliberate recklessness are set forth herein.

20. Oracle's use of coercion and "financial engineering" to boost its cloud revenues was highly misleading to investors. The sales generated through these tactics were not genuine purchases of Oracle cloud products by customers. Rather than truly purchasing cloud products through these transactions, as Defendant led investors to believe, customers were simply purchasing a discount on audit penalties related to an on-premise license, or a discount on the on-premises products that they actually wanted. In essence, Oracle was categorizing revenue related to on-premises audit and on-premises licenses as cloud revenue. Nevertheless, Defendants misleadingly reported the revenue generated by these tactics as legitimate cloud "sales;" misleadingly told investors that Oracle's cloud revenue growth was driven by only legitimate factors, such as the technological strength of the cloud offerings; and denied and minimized any suggestion of the ABC tactic when questions were asked by analysts and the financial press. Based on these misleading statements and omissions, Defendants deceived investors as to the true source, nature and quality of Oracle's all-important cloud revenue stream. They also represented to

investors that Oracle had achieved its seminal transformation and built a thriving cloud business—when, in truth, it had not.

21. In late 2017, many of the cloud subscriptions parceled out through these financially engineered deals began to expire. As would be expected when initial sales are achieved through coercion, very few of the customers on the receiving end of these engineered deals – ***"virtually zero"*** and ***"less than 15%"*** according to knowledgeable witnesses – renewed their cloud subscription when the initial term expired.

22. Consequently, in December 2017, Oracle was forced to begin disclosing that its cloud revenues were rapidly decelerating, revealing through a series of partial corrective disclosures that Oracle's purported cloud transformation was not as represented. As detailed herein, between December 14, 2017 and March 19, 2018, Oracle was forced to disclose that its cloud revenue growth rate had fallen precipitously, declining from a Class Period high of 110% to just 32% – which was a fraction of the growth rates that its competitors were reporting on much larger revenue bases.

23. Market participants connected Oracle's weak cloud growth to its flawed products and improper sales practices. Analysts reported that Oracle's cloud business was facing "fundamental challenges" stemming from its "auditing mentality." *Forbes* published an article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," in which it reported that Oracle had used an "'Audit Bargain Close' playbook . . . to pressure customers into cloud adoption." *Forbes* asked whether Oracle would reveal how much of its purported cloud success was real, and how much was artificial, writing: "[The Audit Bargain Close tactic] does lead to more sales in the cloud category, which is just what Oracle wants. But it leads to questions that should be disturbing to Oracle customers and possibly to Oracle employees and investors: Has Oracle shifted its core competency from creating technology products to running an enterprise sales staff that is expert in squeezing customers? Is Oracle's cloud technology less important to its revenues than its cloud promotion practices? Will Oracle ever reveal how much of its cloud sales are actually shelfware?"

24. As a result of these disclosures, the market started to recognize that Oracle's purported cloud success was not genuine, and Oracle's stock price fell from approximately $50 per share to approximately $46 per share, a decline of nearly 10%.

25. Rather than level with investors, Oracle attempted to shield its flagging cloud revenues from public view. On June 19, 2018, the last day of the Class Period, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business. Under pressure from analysts on a conference call that day, Defendant Catz was forced to disclose that total cloud revenue growth for the quarter had come in at a fraction of the growth rates reported by the Company's competitors. This news demonstrated that Oracle's cloud business had slowed to a crawl and made clear the impetus behind the Company's desire to hide its cloud results. Moreover, in another departure from its past disclosure practice, Oracle declined to provide separate guidance for cloud revenues going forward, further signaling a significant deceleration in its cloud business.

26. Oracle's decision to shield its cloud results from public view indicated that the Company had something to hide. In a June 20, 2018 report, William Blair analysts concluded that Oracle's maneuver was "***an attempt to pull the proverbial wool over investors' eyes—particularly related to cloud sales***." RBC analysts reported that Oracle's move was a "[r]adical change in disclosure," while Oppenheimer analysts reported that the change was "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business."

27. In the wake of these disclosures, market observers fully realized that Oracle's plummeting cloud growth reflected the shoddy technology and coercive sales tactics described herein. For instance, in an article entitled "What Oracle Doesn't Want You to Know," *The Upper Edge* reported that Oracle's "***Cloud Deals [were] Manufactured by Duress***" using the Audit, Bargain, Close and "attached deal" tactics because the product was deficient, as "***[c]ustomers who have adopted Oracle's application cloud solutions (SaaS) have had many challenges realizing the performance that was promised***."

28. As a result of Oracle's disclosures, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, destroying

substantial shareholder value. Based on the allegations set forth herein, Lead Plaintiff seeks relief for itself and all other similarly situated Oracle investors for violations of Sections 10(b) and 20(a) of the Exchange Act.

## II. JURISDICTION AND VENUE

29. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

30. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391 (b). Oracle maintains its corporate headquarters in Redwood City, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

31. Lead Plaintiff Union Asset Management Holding AG is the parent holding company of the Union Investment Group. The Union Investment Group, based in Frankfurt-am-Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients, with approximately $395 billion in assets as of October 9, 2018. As set forth in the certification filed with this Court (ECF No. 17-4), certain Union funds purchased Oracle common stock during the Class Period and were damaged by Defendants' conduct alleged herein.

### B. Defendants

32. Defendant Oracle is a technology company. Incorporated in Delaware, the Company maintains its corporate headquarters at 500 Oracle Parkway, Redwood City, California.

Oracle stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "ORCL." As of December 14, 2018, Oracle had approximately 3.59 billion shares of stock outstanding, owned by at least hundreds or thousands of investors.

33. Defendant Safra A. Catz ("Catz") was at all relevant times co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. Previously, Catz served as the Company's President from January 2004 to September 2014; Chief Financial Officer from April 2011 to September 2014 and November 2005 to September 2008; and interim Chief Financial officer from April 2005 to July 2005. Prior to being named President, Catz held various other positions at Oracle since 1999. During the Class Period, Catz signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy.

34. Mark Hurd died on October 18, 2019, and the Complaint names his Estate as a Defendant in his place: Paula R. Hurd, as Trustee of the Hurd Family Trust and as personal representative of the Estate of Mark Hurd. Mark Hurd ("Hurd") was at all relevant times co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. Previously, he served as the Company's Co-President from September 2010 to September 2014. As stated on Oracle's website, Hurd "manages corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support." Hurd's personal webpage profile states that he "helped shift the long-term strategy of the company toward the cloud." During the Class Period, Hurd signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy. Hurd also regularly spoke to investors about Oracle's business and cloud growth, professing to have detailed knowledge of those matters.

35. Defendant Lawrence J. Ellison ("Ellison") is, and was at all relevant times, Oracle's Chief Technology Officer, as well as the Chairman of the Company's Board of Directors. Ellison co-founded Oracle in 1977, was its CEO until 2014, and served as the Company's Chairman of the Board of Directors from May 1995 to January 2004. The Company's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings

are unmatched." Catz stated that Defendant Ellison "led the transformation to the cloud," and is still "in charge" at Oracle even after becoming the Company's Chief Technology Officer in 2014, noting "don't let titles fool you."[3] During the Class Period, Ellison regularly spoke to investors about Oracle's business and cloud growth, professing to have detailed knowledge of these subjects.

36. Defendant Thomas Kurian ("Kurian") served as Oracle's President, Product Development from January 2015 to September 2018. Kurian started working at Oracle in 1996, holding various product management and development positions. Beginning in 2008, Kurian reported directly to Ellison. According to his personal webpage profile, Kurian was responsible for "[l]ead[ing] [the] transformation of Oracle's products with [the] introduction of [a] leading suite of Cloud Services over 10 years." Kurian also spoke to investors about Oracle's business and cloud growth, professing to know what he was speaking about. On September 5, 2018, Oracle announced that Defendant Kurian was taking a voluntary "leave of absence," after which he resigned from the Company.

37. Defendant Ken Bond ("Bond") is, and was at all relevant times, Oracle's Senior Vice President of Investor Relations. Bond has served in this role since 2009. During the Class Period, Bond regularly spoke to investors about Oracle's business and the sources of its cloud revenues, professing to be a reliable source of information.

38. Defendant Steve Miranda ("Miranda") is, and was at all relevant times, Oracle's Executive Vice President, Oracle Applications Product Development. As stated on Oracle's public website, Defendant Miranda is "responsible for leading all aspects of product strategy, product development, and product delivery for the entire portfolio of Oracle Applications." Oracle's website further states that "Miranda's primary focus is on delivering the industry's most complete, proven, and innovative set of cloud solutions." Miranda has been with the Company since 1992, holding a variety of leadership positions within the development organization. During the Class Period, Miranda spoke to investors about Oracle's business and cloud growth, professing to be a reliable source of information.

[3] *https://www.youtube.com/watch?v=rh0denX3Bks*

39. Catz, Hurd, Ellison, Kurian, Bond, and Miranda are collectively referred to herein as the "Executive Defendants." The Executive Defendants each repeatedly spoke on behalf of the Company throughout the Class Period. The Executive Defendants each were involved in the day-to-day operations of, and exercised power and control over, Oracle's cloud business, cloud products, and cloud sales, and were able to and did control the content of its public statements to investors concerning those subjects, including in press releases issued during the Class Period. The Executive Defendants possessed the power and authority to control the contents of Oracle's press releases, SEC filings, and investor and media presentations, and were provided with copies of documents alleged to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

## IV. SUMMARY OF THE FRAUD

### A. Oracle Belatedly Pivots From Its Stagnating Legacy "On-Premises" Business To Focus On The Growing "Cloud" Market

40. Oracle achieved its past success in the database software and technology market by selling licenses for Oracle's "on-premises" products. "On-premises" software – in contrast with "cloud-based" software, discussed immediately below – is installed locally, on a licensee's own computer and maintained on the user's own infrastructure and platforms. Through its sale of on-premises products, Oracle became one of the most successful database technology and software companies in the world.

41. Over the last decade, however, numerous competitors introduced database software options that threatened to strip market share away from Oracle. Unlike Oracle, each of these competitors' new products were "cloud-based." In contrast with "on-premises" software, "cloud-based" software allows licensees to store and access data over the internet. Cloud-based products have certain attractive features, including that its users do not need to build and maintain expensive "on-premises" infrastructure and platforms.

42. In 2006, Amazon introduced its cloud-based software, Amazon Web Service, with analysts applauding that "Amazon was one of the first companies to launch a [cloud] product for the general public, and it continues to have one of the most sophisticated and elaborate set of

options."[4] Then, in 2008, Google released Google Cloud Platform, which led market commentators to proclaim that Google had instantly "become a player in the enterprise" space.[5] Finally, in 2010, Microsoft unveiled Azure, which *Forbes* heralded as providing "an attractive migration path for existing Windows applications for customers who want the economic or functional benefits of moving to Microsoft-hosted cloud servers."[6]

43. While Oracle's competitors were developing cloud-based software products to satisfy growing demand and snatch up market share, Oracle was stubbornly refusing to acknowledge that customers were increasingly shifting towards cloud technology.

44. Oracle's leadership, particularly Defendant Ellison, Oracle's co-founder, Chairman, and Chief Technology Officer, publicly ridiculed the new technology. For instance, at a September 2008 OpenWorld Conference, Oracle's annual business and technology conference, Ellison called cloud computing "complete gibberish" and wondered aloud when this "idiocy [was] going to stop." Again, in October 2009, Ellison referred to cloud-based software as "water vapor" and "nonsense."[7]

45. Despite Oracle and Ellison misconstruing its significance, cloud-based technology became the focus of the computing industry, with an importance that could not long be ignored. For example, *Forbes* recognized in a September 27, 2011 article that cloud-based software was the "ultimate disruptive innovation" and "spell[ed] very big trouble for the traditional enterprise software leaders who plainly know they need to make the leap, but don't have the business models, DNA, or dire necessity to support the change today."[8]

46. Oracle's competitors quickly began to reap the benefits of their investments in cloud-based infrastructure. By 2015, Amazon reported $2 billion each quarter in revenue and

---

[4] Peter Wayner, "Cloud versus cloud: A guided tour of Amazon, Google, AppNexus, and GoGrid," *InfoWorld* (July 21, 2008).

[5] Jon Brodkin, "10 cloud computing companies to watch," *NetworkWorld* (May 18, 2009).

[6] "In Pictures: 10 Cloud Computing Leaders," *Forbes* (June 4, 2010).

[7] Robin Wauters, "Oracle's Larry Ellison Rips into Cloud Computing 'Nonesense,'" *Seeking Alpha* (October 1, 2009).

[8] Aaron Levie, "Is the cloud the ultimate disruptive innovation," *Forbes* (Sep. 27, 2011)

dramatic year-over-year growth of 70-80% from its cloud-based software. Likewise, by the start of the Class Period, Google reported substantial cloud revenue each quarter and a growth rate in excess of 80%. Similarly, by the start of the Class Period, Microsoft reported billions in revenue each quarter and a growth rate of 93% for its cloud-based product, Azure.

47. Having bet the wrong way on the industry's future, Oracle's revenue growth suffered. In September 2015, Oracle announced that revenue for the first quarter fell by nearly 2% and that new software license sales had declined by 16%, which analysts blamed on Oracle not "moving fast enough to make up for declines in its traditional software sales."[9] Then, in May 2016, Oracle announced that the Company's annual revenue had fallen 3% for fiscal year 2016 – the first annual decline since the Company recovered from the tech industry meltdown in 2002.

48. Accordingly, Oracle belatedly pivoted to the cloud in high gear, announcing that it would refocus its efforts entirely on competing in this rapidly developing market. In an October 26, 2015 CNBC interview, Hurd affirmed that Oracle now was "determined to compete on every level of the cloud feature for feature." Likewise, Catz explained that Oracle finally was making the "move to cloud," which would represent "a generational shift in technology that [wa]s the biggest and most important opportunity in our Company's history." [10]

49. Oracle's pivot to the cloud was the single-most important issue impacting the Company, with the market keenly focused on its shift to this new technology and ability to open up a growing revenue stream. For example, *USA Today* stated that "Oracle's future and relevance is pinned on its ability to become a bigger player in cloud," noting that even small improvements in cloud sales "were enough … to pop the company's stock."[11] Market commentators noted that the "cloud has become a matter of existential importance to Oracle as its legacy business of selling

---

[9] Abhirup Roy, "Oracle Unveils Mixed Fiscal 1Q Earnings Results," *FoxBusiness* (September 16, 2015).

[10] Oracle Corp., Third Quarter 2016 Earnings Call, March 15, 2016.

[11] John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today* (April 26, 2017).

software licenses and hardware products erodes in the face of a growing enterprise preference for usage-based application and infrastructure subscriptions."[12]

50. Oracle leadership's slowness to acknowledge the growing importance of cloud, however, had caused the Company to fall far behind in this critical market. As analysts explained at the time, "[t]he rise of cloud computing … caught the software giant [Oracle] somewhat flat-footed, leaving the firm in scramble mode as it races its peers to the cloud." Indeed, as of September 2016, Amazon's cloud computing revenue dwarfed that of Oracle, with Oracle's cloud infrastructure business bringing in just $171 million in quarterly sales compared to Amazon's $2.89 billion. Analysts explained that it would take Oracle a long time to catch up with its cloud competitors, with one Deutsche Bank analyst writing in a September 2016 report that "Oracle talked up its 'next-gen' infrastructure as a cheaper rival to [Amazon's cloud product], but we don't believe it will be competitive anytime soon."

### B. With Oracle's Cloud Business In Its Nascency, It Denies Early Rumors That It Generates Cloud Revenue Through Improper Sales Tactics

51. From the outset of Oracle's cloud efforts, market watchers cautioned the Company's senior management not to play "catch up" by employing improper sales tactics to generate cloud revenues. In particular, market participants voiced early concerns that Oracle and its auditing department should not attempt to extract "cloud" revenues through their audits of its licensees' "on-premises" software licenses.

52. By way of background, Oracle's software license contracts gave it the right to audit its customers' compliance with the license and impose fees if it found violations. Oracle's License Management Services ("LMS") is a division within Oracle that is tasked with conducting audits of Oracle's on-premises licensees. The stated purpose of LMS's audits was to determine whether Oracle's licensees were using Oracle's software in accordance with the terms of the Company's on-premises license and, if not, issue a penalty for such non-compliance.

---

[12] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not infrastructure. Yet." *diginomica* (January 24, 2017).

53. As early as 2014, when Oracle was still just a bit player in the cloud market, certain industry participants expressed concern that Oracle may attempt to misuse LMS "audits" to push Oracle's cloud product on its existing on-premises customers base – which provided a potential rich revenue opportunity for Oracle's nascent cloud business. These industry participants included Clear Licensing Counsel, a prominent and independent European organization that advocates for the interests of software consumers.

54. As part of its investigation, Lead Counsel spoke with the Founder and Chairperson of Clear Licensing Counsel, Martin Thompson. In addition to his role as the head of Clear Licensing Counsel, Mr. Thompson is also a prominent author on software licensing issues and the owner and founder of The ITAM Review, a global resource for ITAM, SAM and Licensing professionals.

55. Mr. Thompson described how, on May 7, 2014, he participated in a scheduled two-hour meeting with Oracle representatives in Oracle's Thames Valley Park offices in Reading, United Kingdom. The meeting was attended by, among others, Debbie Wynne-Owen, Oracle's Senior Director of Global Operations within LMS. During the meeting, Clear Licensing highlighted to Oracle's executives that customers believed that the Company's auditing group, LMS, engaged in "questionable sales tactics," with "LMS activity leading to sales engagement." These findings were based on a survey conducted by Clear Licensing Counsel of 100 organizations located across the globe, including from the United States (29% of respondents), Europe (56% of respondents), Asia (9% of respondents) and Oceania (6% of respondents). Clear Licensing's findings were also corroborated by accounts provided during a roundtable session held on March 26, 2014 at the Home Office, UK Government, which included representatives of 15-20 major Oracle "on-premise" customers, including from both the public and private sector and some of the largest companies in the world. Following the meeting, in mid-October 2014, Mr. Thompson sent Oracle's Senior Director of Global Operations a written report documenting Clear Licensing Counsel's findings and provided Oracle's executives with an opportunity to respond.

56. Having received no meaningful response from Oracle to its report, Clear Licensing Counsel then sent a letter on January 6, 2015 to Defendant Ellison and Oracle's Board of Directors,

including Hurd and Catz. In that letter, Clear Licensing Counsel and Mr. Thompson specifically cautioned Ellison, Hurd and Catz that they needed "to take steps to improve the trust of your customers … if you wish to succeed in migrating them to your cloud computing services."

57. Clear Licensing Counsel's letter warned Oracle's executives that, based on its comprehensive survey and analysis, there was a "deep-rooted mistrust of [Oracle's] core customer base as a result of your auditing and licensing practices." According to the survey results, customers wondered whether potential violations of license agreements were just a pretext to generate cloud revenues. Clear Licensing Counsel cautioned Defendants that, "if Oracle does not address these concerns then the company's ability to meet its stated $1 billion cloud sales target next year, together with the longer-term outlook for its cloud computing business, will remain in doubt." The letter further stated that one of the "key issues" Clear Licensing Counsel identified in its November 2014 report was that "Oracle routinely moves the licensing goals posts to favour revenue streams over customer requirements." The letter concluded by stating that "for the sake of the company's long-term future and the success of its cloud computing services, we urge you to review these recommendations that have been validated by your customers."

58. Clear Licensing Counsel's letter to Ellison, Hurd, Catz, and Oracle's Board of Directors was publicly released on or about January 6, 2015. Following the letter's release, various media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's documented concerns. As one commentator explained in a report titled "Oracle Faces Withering Criticism of Its Licensing Practice," Clear Licensing Counsel's letter "received substantial attention in software-licensing circles" during the ensuing months after its publication.[13] Indeed, numerous media outlets published articles and reports about Clear Licensing Counsel's "scathing report" and letter to Defendants Ellison, Catz, Hurd, and Oracle's Board, "predict[ing] that Oracle will struggle to move to the cloud unless it changes its ways."[14]

---

[13] https://scottandscottllp.com/oracle_faces_withering_criticism/

[14] https://www.informationweek.com/software/enterprise-applications/oracle-must-reform-says-software-licensing-group/d/d-id/1318492

59. Months later, the financial press published additional reports questioning whether Oracle was misusing its "audit" process to manufacture purported cloud sales – precisely as Clear Licensing Counsel feared. For example, on June 18, 2015, *Forbes* published an article titled "Is Oracle Using Legal Pressure To Increase Cloud Sales?" In that article, *Forbes* pointed to accounts suggesting that Oracle was "indeed increasing the pressure on existing clients" through its "audits," but that the impact that "these new practices have on boosting Oracle's cloud earnings and possibly alienating its existing customer base is not easy to discern."

60. Five days later, on June 23, 2015, *CRN* published a report titled "Here's Why Some Partners Think Oracle Cloud Sales Numbers Are Misleading."[15] *CRN* explained that "Oracle says its cloud business is growing at a pace that will soon catapult it to the top of the heap in the enterprise software space, but some of its partners think it's just bombast." CRN referred to three unnamed Oracle customers, who claimed that Oracle salespeople were attempting to sell customers "cloud products they don't need," including by urging the customer into "buying cloud as a way to reduce their support renewal [for on-premises product], not necessarily because they want to use Oracle cloud products." For these reasons, according to one of CRN's unidentified sources, "Oracle's cloud numbers [reported to investors] are definitely misleading."

61. Oracle denied the accusations contained in *CRN*'s and the related reports. As discussed in the same *CRN* article, Oracle publicly assured investors that the allegations that Oracle customers are buying cloud that they did not want and would not use were "absolutely not true."

62. Over the next several months, additional media outlets published reports that continued to question the legitimacy of Oracle's sales practices for its nascent cloud product. For example, on September 11, 2015, *Business Insider* published an article titled "'I Felt Like We Were Being Extorted': Customer Says Oracle Tried To Strong-Arm Him Into a Cloud Sale." In that report, *Business Insider* explained how, according to one unidentified source, Oracle had "used some ugly tactics to sell its cloud and other products the customer didn't want." The report accused Oracle of threatening its customers with an "audit" of their on-premises license and then, to make

---

[15] CRN is a top technology news and information source for solution providers, IT channel partners, and value-added resellers (VARs).

"the threat go away," telling those customers that they could "buy credits for cloud services" that they did not otherwise want or intend to use.

63. Oracle again minimized these allegations and denied that they had merit. On January 14, 2016, the Senior Vice President of Oracle (UK), Dermot O'Kelly, publicly responded on behalf of Oracle to the "[r]eports last year [that] claimed that Oracle sales reps have used aggressive tactics to convince customers to move to the cloud through methods like tough software audits." In his response, Oracle's Senior Vice President "insisted Oracle wants companies to move at their own pace to the cloud." In denying the accusations, he publicly stated, in remarks published by *Cloud Pro* that "[i]t would be wrong to force a company to do something that's against their will."

64. Six months later, Oracle again assured industry and securities market observers that its cloud revenues were legitimate. On July 21, 2016, Pacific Square Research published a report summarizing "a number of stories in the press, such as [the] one from Business Insider," discussed above at paragraph 62, which asserted that Oracle "used some ugly tactics to sell its cloud and other products the customer didn't want," including the "nuclear option" of "audits" to "boost cloud." Oracle denied these allegations. The Pacific Square Research report quoted an Oracle spokesperson (who was Defendant Bond) as stating that these allegations were fictitious "conspiracy rumor" that did not even warrant a substantive response, explaining:

> Responding to every rumor is never a productive endeavor.... Only color I can add is that if the conspiracy rumor were true, people would not use the cloud credit and there would be no renewal or revenue growth as a new business would replace cancelled business – not at all what we're expecting.

65. Unknown to investors at the time, the accusations that Oracle deflected and rebuffed as "conspiracy rumor" were, in fact, not "conspiracy rumor" at all. As discussed further below, Oracle widely engaged in the very practices that its executives publicly shunned.

### C. Throughout The Class Period, Defendants Represented that Oracle Had Succeeded in Creating a Thriving Cloud Business, Which They Attributed To Oracle's Supposedly Superior Cloud Products and Business Practices

66. After denying that it was engaging in the practices noted above, Defendants represented to investors that Oracle had successfully transformed itself into a thriving cloud company by the start of the Class Period. Defendants also attributed Oracle's ostensible success to legitimate business factors.

67. During the Class Period, Oracle repeatedly reported outsized growth rates in its cloud revenues. As one example, on March 15, 2017, the first day of the Class Period, Oracle issued its earnings release for the third quarter of 2017, touting that cloud billings had jumped 110% year-over-year (versus 39% year-over-year growth the prior quarter) to $1.2 billion, driving overall financial results higher. Defendant Catz stated in the release that Oracle's successful cloud business was propelling the entire Company's results, stating "Our new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect; total revenue is up, margins are up, operating income is up, net income is up, EPS is up." On Oracle's third quarter earnings call that same day, Defendant Catz emphasized that, for the first time, the growth in Oracle's cloud business had overtaken the declines in its legacy "on-premises" business, stating "more importantly, the increase in revenue from our cloud business has overtaken new software license declines on an annual basis," and adding that, "This is a significant milestone in our transformation, where the combination of our cloud and new software license business added together are growing."

68. Analysts responded enthusiastically to Oracle's represented cloud growth, calling the results "***a material inflection point***" and a "***key milestone***" in Oracle's shift to the cloud. For instance, in a March 15, 2017 report issued following Oracle's earnings release and conference, Macquarie analysts raised their price target for Oracle shares and wrote, "Oracle reported a solid third quarter, one of its best reports in years, even as the [Company] heads towards ***the tipping point in its cloud transition*** when cloud growth and margin scale are offsetting declines in new license revenues." On March 16, 2017, Barclays raised their Oracle price target, writing, "With

***the company emerging on the other side of cloud transition*** …, we continue to like the long-term story. If the company is starting to show meaningful client wins for its database/IaaS offering (something management hinted at), we could see a re-rating of the name."[16]

69. When asked about the drivers of Oracle's cloud revenue growth, Defendants highlighted that a number of business advantages, including Oracle's purportedly high-quality cloud products, were driving that growth. For example, in a May 4, 2017 Oracle press release, Miranda touted the quality of Oracle's cloud platform as the driver of its growing adoption, stating that businesses were "increasingly selecting Oracle Cloud Applications" because they were "comprehensive and integrated," and "reduced costs." Likewise, on October 5, 2017, Defendant Miranda told investors that Oracle's customers were choosing Oracle's cloud software because of its technological advantages, stating that "most customers today are moving to SaaS for speed," because Oracle had "enhance[d] the technology," offered "the most complete SaaS suite of anybody in the market," rapidly pushed out comprehensive software updates with "unmatched" speed, and because Oracle had a number of competitive "strengths," in terms of cloud technology, "that we bring to bear [in its] best-in-class applications," including the platform's "user interface." On November 7, 2017, Defendant Bond stated that the "biggest drivers" of Oracle customers "moving on-premises loads to cloud" were cost savings, *i.e.*, "a reduction of total cost of ownership," as well as "innovation advantage[s]," which he explained was Oracle's ability to easily and effectively update its cloud software.

70. As one of the supposedly key drivers of Oracle's ability to capture cloud market share, the quality of Oracle's cloud products was of paramount importance to investors. Accordingly, Defendants issued numerous press releases throughout the Class Period touting new or enhanced features, capabilities, and user experience for Oracle's cloud platform. For instance, as discussed above, Defendants repeatedly claimed that Oracle's cloud platform provided both a broad and deep – "comprehensive and integrated" – cloud solution, highlighting the product's "user interface" as among its key competitive advantages. Moreover, because cloud

[16] "Re-rating" of Oracle refers to an expansion of the stock's earnings multiple, such that investors would be willing to pay more for each dollar of the Company's earnings.

costs increase with usage time, one of Oracle's key selling points was that the speed of its cloud platform would save customers money.

71. Meanwhile, Oracle rebuffed suggestions that its supposed cloud transformation was driven by coercive sales tactics. For example, on May 9, 2017, at a Jefferies Technology Group Investor Conference, Defendant Bond was asked about the importance of audits as a driver of cloud sales. An analyst asked if Bond could provide "some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." In response, Bond acknowledged that Oracle's senior executives were aware of the issue, but represented that it was nothing of significance, stating, "This is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities." Defendant Bond assured investors that Oracle used its audits properly, stating that "we try to do [audit] as best we can, in as gracious [a] way as we can." Bond also assured investors that cloud revenue was not being generated by audits, stating that with regard to questions about revenue associated with auditing, "the key, as we go to cloud, is this conversation is going to go away."

72. Investors and analysts relied upon Defendants' assurances to conclude that Oracle had built a truly successful cloud business. For example, on June 22, 2017, *Business Insider* published an article entitled "Oracle's blow-out earnings caused over 20 Wall Street analysts to raise price targets." The article reported, "OracleCloud computing really is starting to breathe new life into Oracle. … A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday before settling down to about $50 in the afternoon." Also, on June 22, 2017, Macquarie analysts again increased their price target, writing, "Oracle reported its best quarter in years as we believe the company has weathered the worst of its transition to the cloud .... Critical metrics like cloud ARR, license revenues, total software revenues, billings, and margins all beat [consensus analyst estimates], making the quarter a solid turning point as management ***rounds the bend on a multiyear rapid cloud transition***." In another June 22, 2017 report, William Blair analysts wrote, "At this point, it appears that ***Oracle has crossed the cloud chasm***, which will lead to higher sustained revenue growth . . . and double-digit non-GAAP EPS growth."

73. Buoyed by Defendants' reported success in the cloud, Oracle's stock price surged during the Class Period, rising from $42.79 on March 14, 2017 to a high of $52.97 on March 9, 2018 before the truth fully emerged – an increase of nearly 24%.

### D. In Reality, Oracle's Cloud Products Were Rife with Defects, Forcing the Company to Resort to Financially Engineered Deals to Inflate Cloud Revenue

74. Unbeknownst to investors, despite repeatedly claiming to have developed high-quality, and even superior, cloud technology, Oracle's cloud product was deeply flawed. As a former senior cloud technology executive explained, Oracle's attempt to hastily cobble together a cloud platform by acquiring companies that would each contribute a different piece of that platform failed to yield a coherent and useful product. The numerous critical flaws in Oracle's cloud products, and customers' inability to deploy or use those products effectively, was repeatedly discussed with Kurian, Hurd, Catz, and Miranda. Unable to market a competitive cloud product, Oracle employed financially engineered deals to generate very significant amounts of cloud revenue during the Class Period.

#### 1. Although Defendants Publicly Touted Oracle's Cloud Technology, In Reality, the Company's Product was Rife With Defects, Forcing Oracle to Rely Heavily on Engineered Deals to Generate Revenue

75. While Defendants touted the quality of Oracle's cloud technology as giving it a key advantage over competitors, in truth, Oracle, in a desperate bid to catch up to its rivals, rushed deeply flawed cloud products to market. FE 10 was Group Vice President of Cloud Application User Experience at Oracle for several years prior to the Class Period until February 2018, and was one of the most senior executives involved in the design of Oracle's cloud products.[17] FE 10 confirmed that, contrary to Defendants' statements that Oracle cloud offered "best-in-class applications," the Company's cloud products suffered from widespread, critical functionality problems and that even customers who wanted to use those products could not do so. FE 10

[17] For ease of comprehension and readability, the Complaint uses the pronoun 'he' and possessive 'his' in connection with the Former Employees. However, this convention is not meant to identify the actual gender of any of the Former Employees.

reported directly to Defendant Miranda, who reported to Defendant Kurian. As detailed below, FE 10 met routinely with Miranda, and had numerous meetings with Kurian – at least every two months between 2015 and October 2017 – in which they discussed the fact that Oracle's cloud products were not functional, that clients were not able to use or deploy the products, and that, as a result of these widespread failures, there was extremely poor demand for Oracle's cloud services.

76. FE 10 explained that Oracle's cloud products could not reliably perform basic functions, like simple searches and navigation. Moreover, FE 10 stated that different aspects of Oracle's cloud platform – applications for human resources, finances, customer service, etc. – were not integrated with one another, while Oracle's competitor's platforms were integrated. FE 10 explained that these issues were endemic to all of Oracle's cloud products. FE 10 said, "Customers saw our performance as inferior to our competitors. I had been telling Steve [Miranda] and Thomas [Kurian] for years about this but nothing changed. It was untenable."

77. As an example, FE 10 explained that some of the human resources ("HR") software could not even execute a simple search function. If an HR director wanted to find out the salary of a specific employee or the average salary of a department, there was no way to just do a simple query to find that information. According to FE 10, these were very basic functions that customers expected based on the abilities of other products within the market space, but Oracle could not deliver. FE 10 gave the following analogy: "In 2018 the expectation by customers is that any new car will have power windows. But Oracle was building cars that still had roll-down windows. Who is going to buy a car like that? Customers have certain expectations that weren't being met."

78. Likewise, FE 10 explained, a customer might have deployed Oracle products for HR management, finances, and customer management. A user may have to use all three of these applications as part of logging activities related to a single task. It would be reasonable to expect that they should be able to link these various products so the customer could use them all at the same time, but that was not the case. FE 4 independently corroborated that the cloud products were "difficult to navigate," and that this was a typical customer complaint.

79. FE 10 stated that many of these issues were a function of the fact that Oracle's cloud platform was a "mishmash of native Oracle products and acquisitions." In other words,

rather than build a product from the ground up, Oracle, pressed for time, simply cobbled different pieces of acquired and legacy technology together, "with no guarantee they would actually work once connected." According to FE 10, this created a host of "integration" issues, including issues concerning navigation. For instance, based on a user's experience in one part of the platform, he or she would expect that data would be saved when a page is exited, but this was not uniform across the platform, and so users would routinely lose data.

80. FE 10 stated that he reported the widespread lack of functionality in Oracle's cloud applications directly to Kurian and Miranda. FE 10 reported that he had repeated conversations with Kurian over his tenure at the Company – at least once every two months – detailing how the issues discussed above rendered Oracle's cloud product non-functional, that potential customers saw Oracle's products as inferior to competing cloud platforms, and that this was one of the reasons why Oracle's cloud product was not selling well. FE 10 reported that Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. Indeed, FE 10 stated that during his last meeting with Kurian in October 2017, Kurian acknowledged that competitors had a superior product and stated that he was facing increasing pressure from Catz to address the serious deficiencies in Oracle's cloud offering.

81. FE 10's team conducted numerous studies between 2015 and 2018 to elicit and analyze user feedback from customers who were either considering purchasing, or who had purchased, Oracle cloud products, and compiled spreadsheets detailing their findings. FE 10 reported that these spreadsheets detailed widespread structural issues with Oracle's cloud products, including loss of functionality when customers attempted to migrate on-premise solutions to the cloud. FE 10 provided these spreadsheets to both Kurian and Miranda.

82. In fact, FE 10 reported that both Kurian and Miranda were personally involved in engaging with large cloud sales targets when they complained about the functionality of Oracle products. For instance, FE 10 stated that Kurian called him after an October 2017 meeting with an on-premise client who was being targeted for Oracle cloud sales. FE 10 reported that Kurian said, "I was just in this meeting with a customer and they laid into me regarding CRM [a cloud

product]. They were very upset with their experiences about it." FE 10's team visited the customer and came back with a long list of features that were either not working or did not exist in the program, and this list was provided to Kurian.

83. FE 10 reported that Kurian was presented with detailed accounts of the serious problems with Oracle's cloud product in meetings before and during the Class Period. FE 10 recounted one meeting in 2015 with Kurian, in which, after a discussion concerning the seriousness of these problems, Kurian began shouting, "Do you know how much pressure I'm under?" Similarly, FE 10 reported that, at one point, Hurd's chief of staff, Doug Kehring, was brought down to the design lab and asked FE 10 to explain "why our customers say they have had bad experiences."

84. Over time, the bugs described above with Oracle's cloud product rapidly accumulated. While FE 10 urged Kurian to "get the basics together" and deal with the mounting list of deficiencies, Kurian was preoccupied with making sure Oracle was replicating any new feature released by a competitor. FE 10 reported that Kurian always wanted to chase the new feature rather than fix the legacy issues. FE 10 stated that by late 2016, "the wheels started coming off." By that time, "the number of bugs became so large it became too overwhelming to be able to fix." FE 10 explained that there were tens of thousands of bugs in the tracking system. "These bugs started gaining more and more mass until Kurian just didn't want to even look at them anymore," though FE 10 and others continued to brief him on the accumulating deficiencies.

85. In late 2016 and early 2017, FE 10's team developed a "top 40" list of flaws that were critical to the functionality of Oracle's cloud products. When presented with this list, Oracle's development team, which was responsible for coding the software, said it would take a year just to fix the top three items on the list. FE 10 stated, "There was no point discussing anything lower on the list because they couldn't even plan to try to fix it. New things were coming in all the time from customer complaints or enhancement requests and Thomas [Kurian] became very reactionary."

### 2. An Internal Oracle Email Corroborates FE 10's Report and Shows that Defendants Were Aware of Serious Defects with Oracle's Cloud Technology

86. An October 19, 2017 internal Oracle email from Defendant Kurian to Defendant Miranda and other senior Oracle executives corroborates FE 10's report, and illustrates that Defendants – including Hurd, Catz, and Ellison – were aware that Oracle's cloud product was "not tenable" and "awful." In this email, Kurian criticized his team for failing to secure a cloud sale to Rabobank (a large Dutch bank), despite the fact that "Rabobank is long time Oracle [on-premise] customer and very friendly to Oracle."

87. In the email, Kurian points to the same "user interface," or "UI", issues identified by FE 10. "User interface" is the interface through which the customer engages with the software, and it is essential for the interface to be high-quality or else the customer cannot effectively use the software and the product will not be desirable. As Oracle explains on its website, User Interface, also known as User Experience, "is an important component of how comfortable users are with their software, ultimately driving successful Cloud adoption." As FE 10 explained, functional UI is essential to a product's marketability because customers will simply not buy a product that they (and their employees) have difficulty using. And as Kurian's October 2017 email demonstrates, the UI of Oracle's cloud products was deeply important to customers, and therefore of serious concern to Oracle (including its most senior executives) and Oracle investors.

88. Kurian's October 19, 2017 email was sent to Miranda and other cloud executives. In it, Kurian stated:

> I want to make sure that the entire HCM dev[elopement] organization understands what ***a disgrace your UI [user interface] is*** and stop living in denial on that. ***I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable*** – that state is your collective responsibility and we should avoid pretending that there is not an issue . . . ***the core product UI [user interface] is awful***. Until you all collectively accept the mess you have made and the need to move quickly we are talking past one another.

89. Kurian also explained that the severely flawed interface was "so atrocious" that it caused Rabobank to reject the cloud product, and that the Company's latest software update – called R13 or Release 13 – had done nothing to solve the problem:

> This loss [of the sale to Rabobank] has nothing to do with the demos that were done in the past few weeks but with the fact that the UI [user-interface] ***was considered so atrocious even back in July that the bank questioned whether they could even put this in front of their employees***. I showed them R13 UI [Release 13, the latest cloud update] myself and ***the feedback was blunt that even that is not competitive***.

As discussed above, FE 10 made clear that these severe deficiencies persisted, at least, through February 2018 (the remainder of his tenure at Oracle), and that it would have taken a year to fix even just the top 3 most serious issues.

90. At the same time Defendants were internally acknowledging the debilitating flaws in Oracle's cloud products, they were continuing to publicly emphasize the superiority of Oracle's cloud technology, bolstered by impressive looking demonstrations presented throughout the Class Period at OpenWorld, a public showcase of Oracle products attended by consumers and investors. FE 10, whose team prepared these demonstrations, stated that the presentations were internally called "bridesmaids' dresses" because they "were loved for a day and then discarded." According to FE 10, Oracle never had the ability to convert the features presented in the demonstrations into actual products. Indeed, even though competitors were offering these features, Oracle did not have the ability to solve the technical and organizational issues required to make them happen. FE 4, who was also responsible for developing these product demonstrations, stated that, throughout his tenure, Oracle's actual cloud platform was "nowhere near a workable product."

91. FE 10's report makes clear that Defendants made numerous misleading statements about Oracle's cloud product, its functionality, and its competitive advantages during the Class Period. Defendants stated that Oracle's existing on-premises customer base afforded the Company a competitive advantage, because the Company could supposedly easily move those customers to the cloud. For example, on a March 19, 2018 earnings call, Hurd told investors that "The percent of our [existing] user base that is in our [cloud] pipeline now is getting to be fairly extensive . . . . ***[J]ust moving the user base does turn us into a very, very large SaaS business and to your point, very well accelerates our growth rate***." Contrary to Defendants' statements, FE 10 explained that it was actually complicated and expensive for Oracle on-premise customers to move to the Company's cloud products. Because of Oracle cloud's limited functionality, many on-premise customers were told they would have to "redo all of their tech stack" in order to move to Oracle's

cloud product. Accordingly, customers chose to keep their on-premise infrastructure, or redo "their tech stack" and "break the chains" with Oracle by moving to a competitor with a better product offering.

92. Moreover, while Defendants touted the speed of Oracle's cloud products and claimed that this speed translated into significant cost savings, FE 10's report makes clear such statements were misleading. For example, at Oracle's October 5, 2017 OpenWorld conference, Miranda told investors that "most customers today are moving to SaaS for speed." As FE 10 explained, because of the user interface issues plaguing Oracle's cloud products, the speed of the user response – the speed of a user completing a task – was inferior to Oracle's competitors. FE 10 explained "You need to get something done. It's not about compute time. It's about how long it takes for an individual user to be successful. That costs customers money and in large customers compounds exponentially." Notably, from at least 2015 through the remainder of his tenure at Oracle, FE 10's team periodically ran tests based on scenarios a customer provided to see how long it took a user to perform a task and any issues they encountered. The results of those tests, which showed users struggled to complete tasks, were discussed with Kurian and Miranda at the routine meetings described above.

93. Likewise, while Defendants repeatedly told investors that Oracle promptly addressed issues with their cloud products and quickly disseminated comprehensive updates, these statements were untrue. For instance, at Oracle's October 5, 2017 OpenWorld Conference, Miranda touted the pace and robustness of Oracle's cloud updates: "functionally the speed of innovation is unmatched. And so that's in part improvements from our engineers, but it's also in part the way the model used to work." Miranda stated that "[t]oday, in our SaaS ERP and SaaS HR and SaaS CRM, we update 100% of our customers twice a year," as compared with competitors "which are these 3-, 5-, 7-, 10-year, at best, upgrade cycles." FE 10 explained that such statements were not true because, in reality, by late 2016 at the latest, Oracle had a vast backlog of critical unfixed deficiencies and efforts to fix those deficiencies were being pushed back to add features introduced by competitors.

94. Defendants' own post-Class Period admissions, as well as independent news articles, corroborate the Former Employee reports concerning the weaknesses in Oracle's cloud product. For example, at Oracle's October 30, 2018 OpenWorld conference, Ellison conceded, "We had all of these features and functions. ***But to tell you the truth, it was not that – the UI just navigating our cloud wasn't that easy***. Amazon was way ahead in terms of ease of use of the cloud." Likewise, a May 29, 2018 *TechRepublic* article discussing a recent Gartner report noted that Oracle's cloud "remains a bare-bones 'minimum viable product' and it is arguably too minimal to be viable for a broad range of common cloud IaaS use cases."

### E. Oracle Generated Material Amounts of Revenue During the Class Period Through Financially Engineered Deals

95. Because Oracle's cloud products were severely deficient and did not generate sufficient demand, the Company resorted to financially engineered deals to manufacture so-called "purchases" of cloud product. First, many of Oracle's most senior executives during the Class Period confirmed that the "Audit, Bargain, Close" or "ABC" tactic was the vehicle through which the overwhelming majority of their teams' cloud sales were made. The mechanics of the ABC scheme worked as follows. Oracle installed its main on-premises products with extra options and management packs enabled by default, but did not inform its customers that these features had been installed and must be disabled in order to avoid license overages. Once a customer fell into this trap, Oracle's sales and LMS teams worked in a highly coordinated fashion to audit the client for its license violations and push cloud products.

96. In the typical ABC deal, Oracle's LMS auditing department would audit an existing on-premises client for violations of the software license, and present the client with a hefty bill – say, $10 million. Oracle sales would then intervene, offering to reduce the penalties significantly – by, for instance, $4 million – if the customer "purchased" $2 million in cloud subscriptions. These customers, who neither wanted nor needed the cloud products, were not truly "purchasing" a cloud subscription. Rather, they were simply purchasing a discount on audit penalties, and, of course, almost never renewed those cloud subscriptions. Oracle misleadingly reported these

purported "sales" as cloud revenue, and highlighted them as evidence that it had built a healthy cloud business, when, in fact, it had accomplished nothing of the sort.

97. Second, Oracle parceled cloud subscriptions to customers who did not want them, and in some cases could not even use them, through so-called "attached deals." In an "attached deal," Oracle would offer a customer who was only interested in renewing its "on-premises" services a sharp discount on those services if the customer agreed to tack on an unwanted one-year cloud subscription for no additional money. In many cases, the customer was told that it was receiving a free cloud "trial" subscription on top of a full-price on-premises contract, while Oracle internally booked the deal as a full-price cloud sale coupled with a discounted on-premises purchase. Again, these customers were not truly purchasing the cloud product; rather, they were buying a discount on an on-premises product. Thus, Oracle used these attached deals to disguise legacy on-premises revenue as all-important cloud revenue.

98. Through the widespread use of these tactics and their public statements (and omissions) about Oracle's cloud revenue, Defendants profoundly misled investors about the nature and quality of Oracle's cloud business, including what comprised the reported revenue stream, where it came from, and what it actually represented. In truth, Oracle was reclassifying fees that customers paid towards audit penalties and on-premise license renewals – fees that the customers would have paid to Oracle ***regardless*** of whether they received a cloud subscription (which they neither wanted nor needed) – as "cloud revenue." When Oracle, for example, reduced a customer's $10 million audit penalty to $7 million on the condition that they accept $2 million worth of Oracle's cloud product, Oracle did not generate cloud revenue, it simply relabeled $2 million the customer would have otherwise paid in audit penalties as supposed "cloud revenue." Oracle gave away its cloud products to such customers as a pretext to report cloud revenue that would have, and should have been, book as audit and on-premise revenue.

99. In addition, contrary to Defendants' representations, Oracle was not actually capturing a share of the "cloud market" because it was not selling its product to customers who were in the market for, and interested in using, Oracle's cloud products. When Oracle's competitors sold cloud products to *bona fide* customers who intended to use those cloud products

to run their businesses, the sale was a legitimate purchase of cloud product for use, and there was a meaningful expectation of ongoing revenue attributable to that actual use. That is what "market share" means to investors. With respect to Oracle's "engineered deals," however, there was no initial *bona fide* sale, and virtually no expectation of ongoing revenue attributable to actual use. Importantly, as the truth emerged, the market began to recognize the poor quality of Oracle's so-called cloud revenue – for example, as Deutsche Bank analysts stated in a March 20, 2018 report, Oracle's supposedly "strong [cloud] bookings are not translating to rev[enue] growth."

100. As detailed below, numerous former Oracle cloud sales executives and employees working all over the world reported that Oracle used these improper tactics to generate significant cloud revenue and that very few of the customers on the receiving end of these engineered deals renewed their cloud subscription.

**1. Oracle Coerced Customers To Subscribe To Cloud Products Under Threat Of Audit Penalties**

101. Numerous Former Employees reported that Oracle routinely used the ABC tactic to drive cloud transactions. FE 1 was a Regional Sales Director for Middle East and Africa at Oracle from February 2009 to March 2018. FE 1 reported to Abdulrahman Aldossary, Senior Vice President of Oracle Middle East & Africa, who reported to Alfonso Di Lanni, Senior Vice President of Sales at Oracle. Di Lanni reported to Loic Le Guisquet, Executive Vice President of EMEA (Europe, Middle East, and Africa) and Le Guisquet reported to Hurd. As part of FE 1's job responsibilities, FE 1 sold cloud and other Oracle products to customers and attended meetings at which cloud sales were discussed.

102. FE 1 explained that the ABC tactic was developed by Mark Hurd himself. FE 1 stated that Le Guisquet, Hurd's direct report, encouraged sales personnel to use this tactic to sell cloud. FE 1 confirmed that the sales teams and LMS closely coordinated to use audits in order to sell unwanted cloud subscriptions. FE 1 also stated that sales would direct LMS to target clients for audit. In particular, FE 1 stated that the sales team would "identify large clients they thought they could get more money out of and threaten them with audits," instructing LMS to say the Company had suspicions that they were out of compliance. FE 1 stated that the sales teams would

actually write out the threatening audit letters and give them to LMS to then send to the client. FE 1 stated that frequently, neither sales nor LMS had real evidence that customers targeted for audits were noncompliant, but that the mere threat of an audit would put the customers under so much pressure, because of the enormity of the potential penalties, that customers had no choice but to agree to Oracle's demands that the client purchase cloud products. FE 1 stated that once the cloud sale was complete, the sales team would tell LMS that the customer had trued up, and LMS would close the file without even following-up with the client (making clear that the audit was initiated as a mere pretext to push the cloud sale through). FE 1 stated that "any statements from Oracle that LMS was independent from sales are a lie."

103. FE 4, Vice President of Global Sales Engineering, who served as General Manager of Sales Engineering in 2015, independently corroborated reports by FE 1 about the close coordination between LMS and sales as part of the ABC scheme. FE 4 sold the first iterations of Oracle's cloud product and reported to Defendant Miranda, who reported to Defendant Kurian. FE 4 stated that the sales team would trigger audits, which LMS would run and then send back to the sales team for review. FE 4 explained that LMS would never send a letter to a customer without approval by the sales manager or account executive handling the customer.

104. FE 3 was a Senior Technology & Cloud Sales Consultant from 2012 to March 2017. FE 3 was responsible for supporting all of Oracle's Southern California cloud sales. FE 3 facilitated sales of Oracle products, including cloud, and attended meetings concerning cloud sales. FE 3 reported to an Oracle Vice President of Sales, who reported to Rich Geraffo, Executive Vice President of North America Technology, who reported to Hurd. FE 3 further corroborated his former colleagues' reports, stating that LMS worked with sales personnel to ensure that customers signed ABC-based deals: by the start of the Class Period, as Oracle pushed for higher cloud growth, LMS was given expanded authority to initiate audits, and sales would come in "to finish the deal." FE 3 referred to the ABC practice as "strong-arming customers" and "unethical."

105. Similarly, FE 6, a Channel Sales Representative from October 2010 to January 2018 who worked with authorized resellers to engineer deals with customers in the Northeast Region, confirmed that he learned from vendor partners that customers were made to purchase products

under threats of audit. FE 6 stated that it was a "regular practice" for sales representatives to contact LMS to start an audit when the customer was not going to buy cloud product, and tell LMS "[t]hey're not going to buy anything from me so let's just audit them." LMS would find a compliance violation, and the representative would start negotiating from there. FE 6 confirmed that these "extortive" tactics were a "common practice."

106. FE 11, a Regional Vice President of Technology Sales at Oracle throughout the full Class Period and one of the most senior Oracle executives responsible for IaaS and PaaS sales, further corroborated these reports. During his time as a Regional Vice President, including during calendar 2017, FE 11 led the country in technology cloud sales.

107. FE 11 reported that the use of the ABC tactic "was a direct edict from Hurd down to Geraffo. He knew what was going on. We were ordered to have white board sessions," *i.e.*, sales tutorials, "about [how to use those tactics]." FE 11 reported that Oracle implemented engineered deals, including the ABC tactic, because "[n]obody was buying our stuff." Accordingly, throughout the Class Period, "We would go in and hold customers over the barrel. We would audit them, tell them the audit came out to ten million dollars, and we'd clean it to five million if you buy two million in cloud. That was driven from the top." FE 11 reported that he was on calls with Geraffo when Oracle was targeting a big customer, and, on these calls, Geraffo would tell the sales force, "'Let's seed [the deal]. Let's seed it.' What he means is engineer the deal" through audits. Moreover, FE 11 reported that beginning in 2016, Catz significantly expanded Oracle's auditing and started ordering audits "across the board" of companies of all sizes.

108. Reports from senior former Oracle sales executives make clear that the use of audits to coerce clients was a primary vehicle through which Oracle achieved nominal cloud "sales." FE 1 confirmed that during the Class Period at least 80% of Middle East and Africa ("MEA") cloud revenue was generated by "inserting cloud into compliance-based deals." Specifically, FE 1 reported that the ABC tactic generated at least $178 million in cloud revenue during fiscal year 2017 (from June 1, 2016 to May 31, 2017) for the MEA region alone. During 2017, FE 1's vertical, made up of 11 people, booked $12 million in cloud revenue generated entirely through ABC deals.

FE 1 reported that audit-driven deals for the two remaining MEA verticals generated $74.75 million (with a team of almost 40 salespeople) and $92 million (with a team of more than 50 salespeople), respectively, during fiscal year 2017. FE 1 further reported that more than 75% of his team's cloud sales in calendar 2017 were made to customers under threat of license audits, who purchased the product simply to avoid the hefty penalties; in 2018 such sales accounted for 86% of his team's revenue.

109. FE 1 explained that the Vice Presidents of the verticals, Parsad Rai and Abdulrahman Aldossary, discussed how ABC deal revenue would be shared among the different verticals. Their agreements would be reviewed by Le Guisquet, who would, in turn, discuss the division of ABC deal revenue with Catz.

110. FE 1 reported that the ABC scheme was used to close huge cloud sales worth tens of millions of dollars, involving high-profile clients like Saudi Telecom Company, a $120 million deal that included $22 million in unwanted cloud. FE 1 explained that large compliance-based deals sometimes fulfilled the MEA region's sales quotas for the entire year. FE 1 explained that it was "crystal clear these [sales] are fake" because "none of these deals are renewed."

111. In fiscal year 2017 alone, for instance, MEA closed audit-driven deals with Oreedo QSC, generating approximately $15 million in cloud revenue; Samba Financial Group, generating approximately $23 million in cloud revenue; and National Water Company (Saudi Arabia), generating approximately $18 million in cloud revenue. As discussed below, each of these three deals, through which Oracle misleadingly booked approximately $56 million in cloud revenue, was approved by Hurd.

112. FE 2, a former Vice President in North America cloud sales from September 2015 to December 2018, reported that 90-95% of Company-wide cloud sales during fiscal years 2016 and 2017, at a minimum, were engineered deals, including ABC deals that were driven by "audits or the threat of audits." Specifically, as discussed below, FE 2 reported that presentations prepared for Hurd summarizing fiscal year 2016 cloud performance showed that 90-95% of the Company-wide IaaS and PaaS cloud deals had no "use cases" attached to them. In fiscal year 2016, IaaS and PaaS comprised approximately 30% of Oracle's annual cloud revenue ($852 million out of $2.85

billion). FE 2 further stated that executives in Oracle's SaaS business, including the Senior Vice President of SaaS Customer Success for North America, confirmed that "they had very similar observations" about the proportion of Company-wide SaaS deals without use cases during fiscal year 2016 (the twelve months ended May 31, 2016).

113. As background, when making a legitimate sale, Oracle generates a "use case" for each customer that describes the customer's needs and the Oracle products or services that would be appropriate to meet those needs. FE 2 explained that the absence of these "use cases" in connection with cloud deals was highly unusual: "Something like ninety to ninety-five percent of transactions that were closed did not have use cases attached to them, where a customer said, 'I'm buying with intent.' Why is the customer buying these products if there is no use case for them to get it?" FE 2 further explained that when a purchase is made without a "use case," *i.e.* a purpose or intent to use it, "the likelihood of recurring purchases is extremely low."

114. FE 2 reported that Oracle's Senior Vice President of Cloud Shawn Price and Executive Vice President of Cloud Business Group David Donatelli, both of whom reported directly to Hurd,[18] confirmed that 90-95% of all Company-wide cloud sales (across SaaS, PaaS, and IaaS) continued to have no "use cases" attached in fiscal year 2017 as well. FE 2 stated that these confirmations occurred as part conversations that took place during quarterly recap meetings throughout 2016 and 2017. FE 2 stated that Hurd's direct reports "had absolute awareness of the poor health of the cloud business." Indeed, FE 2 reported that, in conversation, these direct reports stated that the "poor health" of the cloud business, as demonstrated by the absence of use cases for the vast majority of Oracle's cloud deals, "was undesirable, but it is the reality."

115. Moreover, consistent with these Company-wide findings, FE 2 reported that 90-95% of the North America cloud deals FE 2's team dealt with throughout fiscal year 2016, which were comprised of IaaS and PaaS cloud products, likewise had no "use cases" attached to them. FE 2 stated that FE 2's team was responsible for total cloud revenue between $200 and $250

[18] In addition, in October of 2019, Ellison named Donatelli as a potential candidate to succeed Hurd as co-CEO.

million in fiscal year 2016 – between 23% and 29% of Oracle's Company-wide IaaS and PaaS cloud revenue that year.

116. When FE 2 followed up with customers and with sales personnel, FE 2 discovered that these deals were generated through the ABC tactic or were attached deals, and that customers neither intended to use nor renew the cloud products. Specifically, FE 2 stated that the sales team would hand FE 2 and colleagues a cloud deal and tell them that the customer had no intent to actually use the product, so now FE 2 and colleagues needed to try to convince them to do so. Moreover, customers told FE 2 that they had no intention of using the cloud credits they had purchased,[19] and that they either bought cloud credits as part of an ABC deal or did it to reduce their perpetual spend on legacy support costs (*i.e.*, an attached deal).

117. FE 11 corroborated FE 2's report, estimating that during the Class Period, approximately 90% of Oracle's North American IaaS and PaaS revenue was generated through engineered deals, including pervasive use of the ABC tactic. FE 11 likewise reported that, in 2017, the ABC tactic was used to close a large cloud sale to FINRA. FE 11 reported that FINRA was told that it was out of compliance by $150 million and would have to pay a $10 million penalty. Todd Pound, Oracle's Senior Vice President of North American Technology and Cloud at Oracle, instructed FE 11 to offer to reduce FINRA's penalty by $5 million, if it purchased $2.5 million in cloud.

118. Numerous Former Employees also reported that virtually none of the customers sold cloud products through engineered deals actually renewed their cloud subscriptions. FE 1 reported that less than 9% of the MEA region's cloud subscriptions were renewed, and many were never even used. In fact, FE 1 stated that, using the threat of an audit, cloud products were sold to numerous customers who not only did not, but could not, use them. In Saudi Telecom Company's case, for instance, government regulations prevented the client from using a cloud data center that was located outside the country. Saudi Telecom still purchased $22 million worth of cloud products, despite the fact that there were no Oracle data centers in-country at the time of that

[19] Customers who purchase "cloud credits" pre-pay to access Oracle cloud services; those credits are depleted as customers consume those services.

purchase, because it was not interested in using the cloud product, but, rather, was effectively purchasing a discount on audit penalties.

119. Corroborating these reports of dismal renewal rates associated with ABC deals, FE 5, a Director of Cloud Customer Success at Oracle from 2016 to October 2018, noted that his Customer Success team recorded when customers purchased cloud product under threat of an audit so that the team members would not waste their time contacting the customer about renewals.[20]

120. FE 3 reported that the use of the ABC scheme to coerce clients into purchasing cloud products was "an active practice" at Oracle and that the practice "was stepped up into high gear at the beginning of" calendar year 2017, corroborating FE 11's report. FE 3 stated that just before the start of the Class Period, the pace and frequency of Oracle's auditing increased exponentially: from 1 to 2 audits in FE 3's region prior to the Company's big cloud pivot to 5-6 audits per quarter – as much as a twenty-four-fold increase in audits. At that time, the Company began going after even the small and midsize customers who were in the $50,000-$75,000 range, and sent audit letters regardless of whether a salesperson was in an active sales cycle with that customer. FE 3 further stated that the Company "also went after customers who hadn't purchased any licenses in two years. If a customer was audited and they had not paid for a license, the Company would forget about the audit if they bought cloud."

121. FE 3 stated that ABC and attached deals accounted for at least 80% of Southern California SMB and enterprise cloud revenue during fiscal year 2017 (which, for Oracle, began June 1, 2016 and ended May 31, 2017), approximately $30-35 million. FE 3 stated that the use of the ABC tactic ramped up in the beginning of calendar 2017 because all of the customers closed through attached deals the previous year were not renewing their cloud service – after all, 80% of them had purchased the cloud product without any intention of even using it. FE 3 stated that according to emails from Group Vice President of Sales Carl Griffin, by mid-fiscal year 2018 (the

---

[20] FE 5 led the team responsible for cloud customer success and renewal for ERP, EPM and SCM product suites and would reach out to customers to check on the accounts. FE 5 reviewed documents and information reflecting customer renewal rates and attended meetings discussing these rates and the percentage of customers that were "Dead on Arrival" or "DOA." FE 5 reported to the Senior Director of Customer Success, Doug Rhoades.

end of calendar 2017), renewal rates were approximately 32% across Oracle's North America cloud business, compared with renewal rates of 90% or more at Oracle's competitors, including AWS. In the Southern California region, renewals were approximately 20%, and FE 3's region saw only $4 million in renewal revenue out of a potential $100 million. Indeed, FE 3 reported that even though Oracle management had set cloud renewal targets for North America far below industry standard renewal rates for 2017, the Company failed to meet even these modest goals.

122. FE 3 and colleagues discussed Oracle's failure to hit its renewal targets with Geraffo and told Geraffo that "the way the Company was selling cloud was not sustainable" and "the renewal rates the Company wanted and projected were 'not going to happen.'" FE 3 stated that they reviewed the attached deal numbers with Geraffo emphasizing that customers did not agree to the deal to get cloud, but instead to get the license discounts. "We went in there and said, 'these customers don't want to do this [renew].'" FE 3 stated that Geraffo responded that he knew this, but as sales personnel, FE 3 and others needed to drive up cloud purchases and renewal numbers "because Oracle needed these numbers to show investors." As the Company's ability to execute engineered deals became constrained in late 2017 and management became increasingly desperate to sustain the illusion of cloud success, Oracle told sales personnel to get the numbers up or there would be staffing "adjustments."

123. FE 3 further stated that when FE 3 and his colleagues would listen to Hurd and Catz tout Oracle's cloud business on the Company's investor conference calls, they would ask each other "'What are these guys smoking?' The sales model was crumbling from the inside."

124. Multiple former Oracle employees reported that Defendants Hurd and Catz personally approved engineered deals, including Audit, Bargain, Close deals. As FE 1 explained, sales teams had to request approval for all of their sales using the Deal Approval System (DAS). When inputting approval requests into DAS, Oracle employees were required to show whether the deal was a "cloud insertion" deal, and in particular that LMS was engaged as part of the sales process (*i.e.*, that audits were being used to facilitate the deal). FE 1 further explained that in ABC deals, the sequencing of DAS reports showed that LMS was engaged with the sales team and the client. FE 1 stated that all deals worth more than $5 million had to be approved by "HQ," which

meant either Hurd or Catz. FE 1 stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd or Catz signed off on the deal. For instance, each of the audit-driven cloud deals closed in fiscal year 2017 described above (*i.e.*, sales to Oreedo QSC, Samba Financial Group, and National Water Company), through which Oracle collectively booked approximately $56 million in MEA cloud revenue, were approved by Hurd through the DAS system, with each approved entry on the DAS system clearly indicating that the deal was generated through "cloud insertion," *i.e.*, through the use of ABC.

125. Like FE 1, FE 3 confirmed that cloud deals made using the ABC scheme were escalated to Hurd's office if a discount in excess of 50% was offered on software. FE 3 stated that 80% of FE 3's engineered deals went to Hurd's office for approval. FE 3 stated that he personally had "audit cloud deals," clearly marked as such, that were approved by Hurd's office.

126. FE 1 also reported that he and other EMEA sales teams routinely discussed the volume and size of their audit-driven cloud deals with Loic Le Guisquet, Oracle's President of EMEA, Asia Pacific, and Japan, who managed the Company's operations in these regions, sat on the Oracle Executive Management Committee during the Class Period, and reported directly to Hurd. FE 1 explained that, on a weekly basis, he prepared slides concerning EMEA sales volume and progress and provided them to Le Guisquet for presentation to Hurd. Le Guisquet routinely instructed FE 1 to ensure that the slides defined certain terms or included certain content so that Hurd would be able to follow them. FE 1 stated that these slides "would very clearly say that LMS was engaged [on cloud deals presented in the slides], and that they were compliance deals." In addition, FE 1 reported attending "QBR" or quarterly business review meetings, at which sales executives received instructions on how to generate engineered deals. For instance, FE 1 reported that executives were instructed to offer customers a 90% discount on on-premises licenses if they purchased $300,000 worth of cloud subscriptions. Likewise, FE 1 reported that executives were told at these meetings that, if a customer targeted for an engineered deal objects that they did not need, or will not use cloud products, sales personnel should assure the customer that they did not

need to use the product, and that the purchase of cloud products was merely a necessary condition to unlocking the on-premises discount.

127. FE 2 likewise explained that the metrics used in presentations going directly to Oracle's senior management made clear that Oracle's cloud revenue was driven by engineered deals. FE 2 stated that "[a]mong all of Hurd's direct reports there was absolute awareness of the quality of the cloud revenue." FE 2 stated, "I saw presentations that went to Hurd's directs. I saw the info they were receiving about deal quality and it was absolutely something that was discussed." FE 2 reported that at the end of fiscal year 2016 (*i.e.*, May 31, 2016), FE 2 reviewed presentations summarizing the Company's fiscal year 2016 cloud performance that were prepared for Hurd (as part of a year-end performance review), and sent to SVP of Cloud Shawn Price and EVP of Cloud Business Group David Donatelli. These presentations stated that 90-95% of Oracle's Company-wide IaaS and PaaS cloud deals, comprising about 30% of its overall cloud revenue, did not have use cases associated with them, demonstrating they were not driven by actual customer need. FE 2 also reported that FE 2 saw slides in draft presentations prepared for Hurd listing "attached" as the top "use case by customer" for North American IaaS and PaaS cloud purchases (*i.e.*, the reason they purchased cloud).

128. FE 3 also discussed his concerns about Oracle's engineered deals –*i.e.*, audit-driven and attached deals – being "borderline unethical" with Vice President of Sales Geraffo, another of Hurd's direct reports. FE 3 reported that Geraffo responded by stating that "cloud was the future of Oracle's business model, and that auditing was a part of Oracle's business and strategy to drive revenue."

**2. Oracle Also Used "Attached Deals" To Disguise Legacy On-Premise Revenue As All-Important Cloud Revenue And Pad The Company's Cloud Growth**

129. As noted above, Oracle also generated purported cloud growth through the use of "attached deals" – deals in a which a customer seeking to renew its "on-premises" contract was offered a sharp discount on those services if it agreed to accept a one-year cloud subscription that

it neither wanted nor needed. FE 3, FE 7, FE 8, and FE 4 all confirmed that Oracle relied heavily on this tactic throughout the Class Period to produce significant purported cloud "revenue."

130. FE 7, a Regional Technology Sales Director at Oracle from February 2013 to October 2018, who was responsible for Oracle's cloud business in the Czech Republic, Hungary, and Slovakia, reported that his teams relied heavily on "attached deals" to sustain Oracle cloud sales, which had "struggle[d] from the inception."[21] FE 7 explained that, in the typical "attached deal," a customer had a large on-premises contract for database or middleware products. In exchange for a lowered price on these on-premises contracts, the customer "filled the difference [between the full contract price and the discounted price] with cloud products." Because the customer's on-premises support and maintenance costs were calculated based on the total value of their on-premises licenses, the customer accepted the attached deal, since it would save on support maintenance. FE 7 gave the following example: if a client had $1 million worth of on-premises licenses, but ended up paying $900,000 through an attached deal, with the addition of $100,000 in cloud, this client would save more than $20,000 per year in support costs. As FE 7 explained, however, the problem was that because almost none of these customers ever wanted or needed cloud services in the first place, they "never renewed the cloud portion of their deals." Echoing FE 10 and FE 4, FE 7 stated, "The products did not work very well, and almost none of the customers actually wanted them. They simply agreed to the attached deals for the discount on their licenses and maintenance costs." FE 7 further reported that customers were often told that they were receiving a free cloud subscription on top of their on-premises renewal, while Oracle internally recorded the deal as a discounted on-premises contract and a full-price cloud sale. Notably, FE 1 likewise stated that many customers were not even aware that cloud products had been added to their contract. They were either told that it was a "free gift from Oracle" or it was never even mentioned to them and buried in a line item within the contract using vague language. FE 7 reported that at least 65% of his teams' cloud sales were made through engineered sales,

[21] FE 7 reported to Natalie Korhonen, who reported to Giovanna Sangiorgi, EMEA Vice President of Sales, Oracle. Sangiorgi reported to Le Guisquet, who, as noted above, reported to Hurd.

including attached deals, and that at least half of his teams' PaaS and IaaS cloud sales were attached deals.

131. FE 7 reported that, based on discussions with other Regional Sales Directors in Central Europe, Eastern Europe, and Turkey, FE 7 understood that almost all of Oracle's EMEA cloud revenue during the 2016 and 2017 calendar period were generated through engineered deals. FE 7 further reported that the Named Account sales team, which serviced Oracle's largest customers, used engineered deal tactics to close large sales. For instance, in early 2018, PFF Banka, a large Czech customer, purchased $1 million in cloud in order to receive a $5 million discount in on premise renewal, despite the fact that PFF Banka had no interest in using, or intention to use, the cloud product.

132. Corroborating other Former Employee reports, FE 7 noted that in the beginning of 2017, at the start of the Class Period, Oracle made a big push to drive cloud, and that, at that point, nothing other than cloud revenue mattered. Oracle management made clear on forecast and planning calls that even if the sales force's on-premise numbers were good, sales personnel would not "be successful" if they did not meet their cloud numbers. FE 7 reported that it was very clear from the top down communications that cloud was the future and Oracle would do anything to succeed there. This was accompanied by strong pressure on the salesforce to deliver.

133. FE 2, FE 3, and FE 4 all echoed FE 7's description of the mechanics of Oracle's attached deals and the abysmal renewal rates associated with them. FE 3 stated that 90% of cloud revenue in his territory during calendar 2016 was generated through attached deals. FE 3 stated that "[n]early every [cloud] deal" FE 3 was involved with was an attached deal. As discussed above, in early 2017, FE 3 stated that Oracle ramped up its use of the ABC tactic.

134. FE 4 likewise confirmed that attached deals were "commonplace," though FE 4 said that most cloud sales were driven by "extortion" through the audit process, described above. By using the attached deals, FE 4 explained, "[e]ssentially they were not growing their business or building additional licenses, they were just shifting revenues from one set of books [on-premise] to another [cloud]." According to FE 4, Oracle knew that customers were going to just let the cloud contract expire, and sales leadership often expressly communicated to customers that they could

"wash [their] hands" of cloud products after the contract expired but keep the other reduced support costs for on-premise products.

135. FE 3 confirmed that "the cloud subscription involved in the [attached] deal was only for one year of service. After that first year, most companies had no interest in renewing the cloud services but were enjoying the decreased maintenance and service costs on their $100,000 worth of [on-premises] software." FE 3 corroborated reports by Oracle's other former employees that sales personnel explicitly agreed with customers that they would not need to use or renew the cloud software as part of the attached deal. FE 3 reiterated that "[c]ustomers who were given this deal did not renew the cloud subscriptions once they ran out," and stated that FE 3 saw attached deals renewed less than 15% of the time. FE 3 stated that periodic reports detailing cloud utilization reviewed by FE 3 showed many of Oracle's customers who took attached deals were not using their cloud credits and had not even logged into their product. FE 7 stated that his teams would review customer cloud usage reports and see that "ninety percent of our attached deals were not using at all. I would say it was [throughout 2017 and 2018]. I had relationships with the other sales territories," including Austria, Poland, Russia, and Hungary, "and we were not an exception." FE 7 stated, "Almost no one was turning anything on. They weren't using their [cloud] credits."

136. FE 8, a Cloud Platform Sales Manager at Oracle from March 2013 to July 2018, who managed a North America cloud sales team, also corroborated these accounts, stating that it was "extremely common to provide very steep discounts to on-premise licenses in exchange for a customer purchasing cloud subscriptions," estimating that more than 75% of his cloud revenue came from attached deals during calendar 2016 and 2017. FE 8 confirmed that both Oracle and the customers on the receiving end of the attached deals understood that the cloud subscriptions would not be renewed after one year. FE 8 stated, "It just wasn't sustainable. Customers were purchasing a million dollars of cloud subscriptions but weren't planning on making that same purchase next year. They were not renewing." FE 8 reported that less than 10% of his clients renewed their cloud subscriptions at the same level they initially signed up for. If a client renewed for half of what they had originally been sold, he would be "ecstatic," but even that was rare. Most

just declined to renew any amount of cloud product. "They did it just for the deal and then would not renew the next year."

137. FE 2 likewise reported that both customers and sales personnel confirmed that Oracle sales personnel, when speaking with customers, would affirmatively acknowledge that the customers would not renew their cloud subscriptions after a year, in order to preserve the economic attractiveness of the engineered deal, whether an ABC or an attached deal. Indeed, FE 2 explained that given the structure of the attached deal, there was a strong economic incentive for customers not to renew after the one-year subscription was up, in order to maximize the benefit of the continuing discount on maintenance costs for on-premises product.

138. FE 9 and FE 5 were both Directors of Customer Success at Oracle from 2016 to 2018, whose teams were responsible for customer adoption and expansion of cloud in West and Midwest North America.[22] They both reviewed monthly and quarterly reports detailing cloud performance and product health across all of North America. FE 9 and FE5 related that many of the cloud contracts were called "dead on arrivals" or "DOA," because when it came time to renew, the customers would refuse and, instead, say that they only bought the cloud product because they got a discount on another product they actually wanted. According to both FE 9 and FE 5, at some point Oracle changed the nomenclature from "dead on arrival" to "no plan adoption" or "financial deal" because of the connotation that Oracle's sales teams were selling products that were not going to be used. Echoing FE 2, FE 9 stated that "DOA sales," *i.e.,* engineered deals, accounted for between 75% and 90% of all North American cloud revenue throughout 2016 and 2017.

139. FE 5's and FE 9's group was comprised of 30 Customer Success Managers who, again, were responsible for cloud sales in West and Midwest North America region. The group would reach out to customers approximately one quarter before they were up for renewal to check on the health of the account. They would hear that the customers had never used their cloud

[22] FE 9 reviewed documents and information reflecting customer renewal rates and attended meetings discussing these rates and the percentage of customers that were "Dead on Arrival" or "DOA." FE 9 reported to the Senior Director of Customer Success, Doug Rhoades.

products. FE 9 explained that customers would tell FE 9's group that they had gotten cloud product in order to get a better deal on another product. FE 9 corroborated the accounts of other former employees and stated that a customer would be quoted a high price for just an on-premises product and then quoted a lower price for the on-premises product combined with cloud. The customer would take the second option because it was cheaper even if they had no intention of using the cloud.

140. Enterprise Resource Planning (ERP) was one of Oracle's most important cloud products, with Hurd identifying it as the "most important application segment in the world" and stating that "ERP is one of those [cloud products] that we're particularly focused in on here." With regard to Oracle's ERP cloud product, customers told FE 9's group that they already had an ERP system and did not want to use Oracle's. FE 5 corroborated that customers would admit that they had only purchased cloud, including ERP, to get a discount on on-premises products. These customers, according to FE 5, "didn't have any intention to use it. They were just bundling it together to reduce their overall costs." FE 5 described how a lot of the cloud contracts and related revenue were from customers who neither wanted nor needed the cloud products. FE 9 stated that ERP employees were very vocal with Customer Success managers and directors about how the "renewal rates suck."

141. FE 9 stated that, throughout the Class Period, cloud ERP renewals would range from only 15%-30% and that 90% of the accounts that did not renew were DOA. For instance, FE 9 stated that the renewal rate for Q2FY17 was 29% and basically every other client that did not renew was classified as "never implemented," which was the same thing as "DOA." FE 5 similarly explained that Oracle's renewal rate was 15-20% for certain quarters, and that the percent of DOA customers that did not renew was 90%.

142. FE 9 further stated that customer health was measured as "green," "yellow," or "red." If customer health was "red," it meant that Oracle was anticipating that the account would "churn," or fail to renew, and Customer Success would have to provide a reason for said churn. According to FE 9 and FE 5, Oracle had an internal system called Customer Lifecycle Management ("CLM") that tracked the health of customer accounts and the reason for customer "churn." CLM

would show whether accounts were red, yellow, or green and the reasons for accounts not renewing. According to FE 5, red accounts were DOA and yellow accounts would need work to convince customers to renew. FE 5 stated that the health of the portfolio and the corresponding color was automatically assigned in CLM, and the information was accessible to renewal representatives, customer success managers, certain sales teams, and the implementation success managers responsible with getting customers to deploy products.

143. Corroborating FE 9's account, FE 5 stated that whether an account was DOA would be reflected in the CLM system and that team members would put in the customer's disposition notes that they were "DOA." Through these entries in the CLM system, FE 9 knew that ERP renewals were only 15-25% and that 90% of the accounts that did not renew were DOA. According to FE 9, only approximately 10% of the customers that were DOA could be convinced to use the product. FE 9 described that Customer Success reports based on information from CLM were discussed in meetings with the VP and SVP of Customer Success. Customer Success would put together these reports, which FE 9 understood would be summarized and presented at a higher level.

144. FE 9 was told each renewal rate for accounts marked red, yellow, and green during quarterly management meetings. FE 5 similarly described how the number of DOA cloud deals was common knowledge within the customer success team and that "[a]t every quarterly business review DOA rates would come up," with the statistics of each type of customer health ("red," "yellow," and "green") seen in spreadsheets distributed during these meetings and the DOA rates were "always an issue."

145. FE 5 explained that Doug Rhoades, the Senior Director of Customer Success, ran these meetings, and Steve McMillan, Senior Vice President of Customer Success attended the meetings as well. FE 5 and his peers often complained to Rhoades that the DOA rates were so high and that there was no chance of convincing DOA customers to renew their cloud contracts.

146. FE 7 stated that Oracle was "effectively hiding from customers the cloud portion [of the contract] because customers, in the beginning, didn't want to hear about cloud." FE 7 reported that "in many cases," cloud subscriptions would be added to a customer's contract even

though Oracle had never discussed that description with them. "Sometimes they would only find out when someone asked them to renew, or if automated email systems sent out information about their cloud credits."

147. FE 6 corroborated that customers often did not know cloud products were inserted in a deal or how to use those cloud products. FE 6 stated that he heard from many sales representatives that Oracle "would bundle things together and push cloud subscriptions right through" and that customers did not "underst[and] what they were getting in terms of cloud."

148. Similarly, in certain instances, FE 9 would reach out to customers to set up the product, the customer would ask what the product was and tell FE 9 that they were not going to pay for it. FE 9 would have to then report and justify why there was churn on the original product. When FE 9 raised these issues FE 9 "got [his] ass handed to [him] by the Sales VP and Sales."

149. The accounts of Oracle's former employees confirm that Defendants Hurd and Catz were well aware that a substantial volume of Oracle's cloud revenue was generated through these attached deals, and was therefore not generated through bona fide sales of product and did not represent actual capture of market share. For example, as numerous former Oracle employees stated, entries in Oracle's internal deal tracking system clearly noted when cloud sales were the product of engineered deals, and deals at or above the $5 million threshold required and received Hurd's approval.

150. Corroborating this point, FE 7 reported that entries on the DAS system would make clear when a deal was attached because the entry would request discounts to an Oracle on-premises contract in order to facilitate a cloud sale, and "notifications of larger deals would be sent to Catz's office for approval and to Hurd's office for inclusion in the [revenue] forecast." In particular, FE 7 reported that, during the Class Period, DAS entries seeking approval of attached deals would explicitly state that the customer would not purchase the cloud product unless a steep discount for on-premise software was provided. Likewise, as discussed above, FE 3 stated that software discounts in excess of 50% had to be approved by Hurd's office, and that virtually all attached deals involved on-premises discounts of this magnitude. FE 3 stated that 80% of his engineered deals went to Hurd's office for approval.

### 3. Industry Participants Further Confirm Oracle's Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle Cloud Product

151. The accounts provided by Oracle's former executives discussed above are also corroborated by the accounts of industry participants, including at Insight, B-Lay, House of Brick Technologies, TmaxSoft, Palisades Compliance, and License Fortress.

***Insight***

152. Insight is a public company based in Tempe, Arizona that assists customers in optimizing their cloud investments. Between May 2015 and June 2018, Fedrick Filipsson was the Executive Consultant – Oracle Practice Lead – at Insight EMA. During that time, Mr. Filipsson founded Insight Oracle LCS Advisory Services and delivered Oracle license advisory services to clients worldwide. Among other things, he delivered training courses in Oracle licensing, contracts, negotiation and vendor management, and was either the lead consultant or part of a team helping companies in Europe, Asia-Pacific and in North America with Oracle challenges, including License Audits, Compliance, ULA renewals/exits, and cost optimization projects. Mr. Filipsson consulted clients with approximately 50,000 to 200,000 employees and completed over 100 different Oracle engagements, including several Fortune 50 customers.

153. Prior to joining Insight EMA, Mr. Filipsson was an Oracle technology sales representative for over eight years, from August 2006 until May 2015. Mr. Filipsson sold Oracle cloud product during the later portion of his tenure with the Company. He explained that "most often [Oracle] cloud services were purchased by customers who simply wanted [] more on-premise licenses for their Oracle applications. The application sales reps simply discounted the on-premise licenses if you bought cloud services. So, you got the cloud services for the same price as you would if you only purchased licenses." Mr. Filipsson admitted that, in order to reach his sales targets, he would "find[] customers who were non-compliant" with their on-premises licenses and "I would simply discount the [on-premises] licenses they were required to purchase if they also purchased cloud." When at Oracle, he would tell the Oracle on-premise licensee that, if they bought cloud product, he could consider them in compliance. He further told the customer that they did not actually have to implement the Oracle cloud product, but that the cloud product just

had to be purchased to avoid Oracle cloud penalty. Following his departure from Oracle, Mr. Filipsson worked as a consultant at Insight EMA to help companies defend themselves against Oracle's sales tactics.

154. Lead Counsel spoke with Mr. Filipsson. Mr. Filipsson explained that, between March 2017 and June 2018 (i.e., the Class Period), he consulted approximately 30 clients who purchased Oracle cloud in connection with an audit of their on-premises licenses. He explained that, of these approximately 30 clients, 28 to 29 of them did not really want the cloud product they purchased in connection with the on-premises license audit. These clients simply bought the Oracle cloud product to get a reduced audit penalty or avoid an audit claim entirely. Mr. Filipsson recounted that these customers specifically told the Oracle sales representatives that they were buying the cloud product with no intention of using it. But they were explicitly told by the Oracle sales staff that they did not have to use the cloud product purchased. In total, Mr. Filipsson stated that Oracle generated approximately $50 million in cloud revenue from his clients alone during the Class Period through these audit-based cloud purchases.

***B-Lay***

155. B-Lay specializes in enterprise software and provides services around software compliance, software audits, software asset management tools and insight in software spending. B-Lay provides services to over 250 clients in 25 countries around the world. B-lay was founded in 2008, is headquartered in Utrecht, the Netherlands and has offices in the U.S. and Romania.

156. Richard Spithoven is one of the managing partners at B-lay. Mr. Spithoven holds a master's degree in IT, from University of Amsterdam in the Netherlands. He started to work in the license management industry in 2004 and worked for almost 10 years at Oracle as regional director of compliance. Mr. Spithoven uses his knowledge of enterprise software vendors (such as Oracle, SAP, IBM and Microsoft) to educate, equip and enable software end users in their challenges regarding proper software license management.

157. Lead Counsel spoke with Mr. Spithoven. Mr. Spithoven estimated that B-Lay helped 150-200 customers navigate audit compliance issues with Oracle during the Class Period. These customers included large organizations across the globe, and in various sectors including

retail, energy, public sector, and others. Mr. Spithoven explained that audit compliance cloud deals were offered in 90-95% of cases B-lay consulted on during the Class Period. Mr. Spithoven explained that this approach to generate cloud sales through "audits" was the general practice at Oracle, and occurred worldwide.

158. Mr. Spithoven explained that, due to the complexity of Oracle's licensing agreements, almost every on-premise end user is not in compliance because of all the little details they need to be aware of and a bunch of things that tend to get installed by Oracle without the user being aware. Mr. Spithoven explained that the Oracle sales representatives, in order to generate cloud sales, said that it would give these clients a discount on their compliance fee if they agree to buy cloud. Customers would take this option even though they never implemented the cloud products they purchased.

159. Mr. Spithoven explained that, during the Class Period, the vast majority of his clients bought cloud, despite having no intention of using it. Mr. Spithoven explained that Oracle generated approximately $50-55 million in revenue alone through these audit compliance deals from the 150-200 clients he assisted during the Class Period.

***House of Brick Technologies***

160. House of Brick Technologies, founded in 1998 and based in Omaha, Nebraska, is a consultancy firm that specializes in Oracle IT infrastructure performance, optimization, and architecture. House of Brick regularly assists Oracle on-premises licensees subject to audits.

161. Nathan Biggs joined House of Brick in the summer of 2008 and became a partner and CEO in the summer of 2009. Mr. Bigg's experience in the high-tech industry spans nearly 25 years, and includes software product development and IT consulting. In a phone interview with *The Register* in June 2019, Mr. Biggs explained that the allegations against Oracle in this Action aligned with what he has heard from Oracle's customers. As he explained to the *Register* the allegations are "validation of what we have seen constantly in our customer experience in defending against Oracle audits." "Oracle doesn't seem to use the audit as a compliance exercise. They seem to use it as a revenue generation exercise." Mr. Biggs told the *Register* that Oracle will present customers with a proposal and if they do not agree to buy what the salesperson wants, the

salesperson will contact the audit team to trigger an audit. These audits, which involve looking at Oracle software to see which billable features have been enabled – and they tend to be enabled by default – can potentially results in tens of millions, if not hundreds of millions, in non-compliance fees. Mr. Biggs told the *Register* that he's aware of one instance in which Oracle claimed that the customer owed half-a-billion dollars in fees. Mr. Biggs stated, "Oracle doesn't seem to expect to get that much, but they seem to expect to scare the customer. So when Oracle offers a sales deal of 25 per cent of that figure then includes the cloud, the customer is supposed to feel like they're getting a good deal."

162. Lead Counsel spoke with Mr. Biggs. Between March 2017 and June 2018 (i.e., the Class Period), Mr. Biggs estimated that his company was engaged with 90 customers who House of Brick helped with Oracle licensing issues. Mr. Biggs confirmed that, as the CEO of House of Brick, he was briefed on each of these clients.

163. Mr. Biggs explained that his clients would convey to Oracle sales people that they did not want the cloud being offered. They would tell sales people by phone, in person, and via email that the cloud products were not a fit for them. He said, "But Oracle was using the lever of huge and unwarranted fees to say if you don't buy this cloud offer, look at this big hammer that is about to fall on you and put you out of business." Clients felt forced to do something.

164. Mr. Biggs estimated that 75% or more of his firm's customers that purchased cloud product (i) bought short-term cloud subscriptions; (ii) have not renewed the cloud product; (iii) have not used the cloud product; and (iv) never actually intended to use the cloud product. Mr. Biggs' knowledge is based on his communications with the customers and his communications with the other House of Brick consultants working with the customers.

165. Mr. Biggs explained that, in each audit in which Oracle made an outsized claim of non-compliance, a subsequent proposal was made by Oracle sales people to reduce that claim that included a purchase of a cloud product.

166. Mr. Biggs explained that these tactics described above were done worldwide. He said, "The playbook is the same everywhere we go around the world."

167. Mr. Biggs confirmed that Oracle customers were tiring of Oracle's tactics by late 2017. Mr. Biggs knows this through his communications with his clients, as well as communications with prospective clients and through his speaking to Oracle customers at presentations at industry conferences.

***Upper Edge Consulting***

168. UpperEdge, based in Boston, Massachusetts, is an IT advisory firm. It has advised customers in over 700 Oracle audits. UpperEdge has consulted Fortune 500, Fortune 50, and smaller companies across the board in terms of industries, usually negotiating with Oracle's US LMS group. UpperEdge's customers typically have between $200 million and $1 billion in annual revenues.

169. Jeff Lazarto is a Principal at UpperEdge LLC and heads its California Office. Mr. Lazarto earned his B.S. in finance from Bentley University and his J.D. and is a member of the State Bar of California. Mr. Lazarto has also served as an adjunct professor of business law at both Bentley College and Boston University. Mr. Lazarto has explained that, based on his experience, if an Oracle "customer cannot develop a business case for migrating to Oracle's Cloud solutions, then Oracle will create one, and audits are one of the more common tactics we have seen effectively drive Cloud sales."[23]

170. Lead Counsel spoke with Mr. Lazarto. Mr. Lazarto explained that, if his clients said they were not interested in purchasing cloud product, the Oracle sales people would then conduct an audit and use that as leverage to get a cloud deal. Alternatively, Oracle staff would just come in, do an audit, and either find out they were out of compliance or make claims they were out of compliance. The sales staff would then explain that, if the client was willing to do a cloud deal, Oracle could waive the compliance fees. Mr. Lazarto explained that, from March 2017 to June 2018 (i.e., the Class Period), UpperEdge was engaged by at least a dozen clients regarding Oracle audits.

[23] Jeff Lazarto, "Oracle Gets Creative With Cloud Selling Tactics," *UpperEdge* (April 10, 2018).

171. Mr. Lazarto estimates that 80% of the clients he engaged with regarding Oracle audits were offered a cloud deal in exchange for waiving the audit penalties. Clients would generally take the cloud deal because it was the cheapest way out: they still got their on-premise licenses and the cloud deal would expire after a year. He explained that the clients did not intend to use the cloud. Mr. Lazarto reiterated that the clients were not interested in Oracle's cloud, but were just settling the audit and getting cheaper additional on-prem licenses.

***TmaxSoft***

172. Sanjeev Sanotra worked as an ISV Channel Manager at TmaxSoft from March 2017 to June 2018 and consulted with Oracle customers in assisting them to get away from Oracle's products. Prior to joining TmaxSoft, from January 2013 through September 2014, Mr. Sanotra worked at Oracle, as an LMS Senior Partner Consultant in UK, IE, and IL.

173. Lead Counsel spoke with Mr. Sanotra. Mr. Sanotra explained that, while at TmaxSoft, one of his major clients was Welsh Water, a water utility that was hit with a massive bill from Oracle after an audit. Mr. Sanotra explained that, during the audit of Welsh Water and others, the clients were offered to buy cloud in order to reduce their audit penalties for on-premises licenses. He reiterated that his clients that were defending Oracle audits were offered cloud in order to make the penalties go away. The standard approach by Oracle was that they thought the client was non-compliant, but if they add cloud at a certain rate, the Oracle sales representative could "brush it under the carpet." Of his three clients that accepted the audit compliance deal during the Class Period, he estimates the total cloud revenue generated was approximately $10 million.

***Gartner***

174. Founded in 1979, Gartner is a leading research and advisory company serving clients in 100 countries around the world. Technology research is Gartner's flagship service and its reports have been cited in Oracle press releases, blog posts, and conference calls on several occasions. In a May 2018 review, Gartner observed that that Oracle has used "high-pressure sales

tactics to sell its cloud IaaS offerings, including software audits or threatening to dramatically raise the cost of database licenses if the customer chooses another cloud provider."[24]

***Palisade Compliance***

175. Palisade Compliance is one of the leading independent providers of Oracle software and cloud licensing, contracting, cost reduction, and compliance advisory services, and has advised hundreds of Oracle licensees.

176. Lead Counsel spoke with Mr. Guarente, the CEO and Founder of Palisade Compliance and a Global Vice President, Contracts, Business Practices, and Migrations at Oracle from 1995 to 2011. Mr. Guarente has explained that Palisade Compliance has "seen many, many cases where Oracle had audited customers to get them to buy Oracle Cloud. And customers have bought Oracle Cloud with no intention of using it." In a May 22, 2018 report, Guarente stated that "Oracle is pushing cloud everywhere, even where customers don't want it and can't use it." Mr. Guarente has described how Oracle, through its audits, attempts "to rig the system so customers are forced to use [their] cloud."[25] Mr. Guarente has advised that, "[i]f you are an Oracle customer and you have been targeted for an Oracle audit, then you should look at the 'final report' from LMS as Oracle's opening salvo in their bid to get you to move to their cloud and spend more money with them."

***The ITAM Review***

177. Founded in 2008, The ITAM Review is an independent, non-profit global organization for worldwide licensing professionals. It provides independent industry news, reviews, and resources for software asset management and software licensing.

178. In December 2019, the ITAM Review conducted a survey to corroborate the allegations that Oracle licensees have been subject to the practice of coercive cloud-based "sales" through audits of on-premises licenses. The survey asked ITAM Review readers who are also current or prior Oracle customers whether Oracle ever threatened to impose large audit penalties

[24] Dennis Smith et al., "Magic Quadrant for Cloud Infrastructure as a Service, Worldwide," *Gartner* (May 23, 2018).

[25] *https://palisadecompliance.com/new-years-resolutions-oracle-should-make/* (January 2, 2019)

on them unless they agreed to purchase a short-term cloud subscription that they neither desired nor intended to use.

179. Numerous software licensing professionals responded that they, indeed, had been subject to this practice, including during the Class Period. For example, one respondent stated that, during an audit in late 2016, Oracle "threatened us with a fine of over 150,000 euros. They told us, that with the purchase of 50,000 euro oracle cloud licenses instead one would waive the penalty. We agreed to do so (We wasted so much time accompanying the audit and finally wanted to get rid of it) and fixed everything, got that certificate of compliance. We never used that oracle cloud because we did not need it and because that cloud was not technically effective."

180. Another respondent similarly stated that "Oracle conducted an audit and found that we were out of compliance with regards to Database and some of the optional features. They proposed two options. The first was to true up at a certain discount. The second was to true up at a greater discount but also sign up for a six figure one year Oracle Cloud Credits contract. We were not interested in this, but looking at the 5 year TCO it saved us over $1M to sign up for the Cloud credits for 1 year."

181. Yet another respondent stated that "Yes absolutely… I have work[ed] with Oracle LMS. The tactic describe above is the principal way to solve a gap found during an audit."

182. As described by ITAM review itself, these reader responses provided "damning evidence of Oracle artificially inflating their cloud sales through dodgy deals and spurious audit tactics."

***LicenseFortress***

183. According to the LicenseFortress website, it was developed in 2016 to "address Oracle's aggressive auditing tactics and to shed light on the dire situation that most companies face when using Oracle's products, especially in a cloud environment." LicenseFortress states that it "helps you take control of your license investment while removing the threat of being out of compliance" and "offers an array of services and products to work within your budget, reduce your risk, and eliminate the surprise factor." LicenseFortress states that its "clients range from Fortune 100 companies to government agencies."

184. Lead counsel spoke with Dean Bolton, Co-Founder of LicenseFortress. Mr. Bolton stated that during the Class Period, Oracle's audit group approached two of his customers claiming purported compliance gaps in their use of their license or their purportedly employing the product incorrectly. Oracle said there was, to his recollection, approximately $6 million in audit penalties for these purported violations. Oracle proposed, however, reducing the penalty amount if the customer purchased Cloud product.

185. Faced with the offer, the two customers accepted settlements of the audit penalty in the amount of $1.5 million, which included purchase of Cloud product. Specifically, one of the entity's settlement included purchase of $250,000 in cloud product, and the other entity's settlement included purchase of $75,000 in cloud product.

186. Both of these entities were commercial entities. One was in the manufacturing industry (the one that purchased $75,000 in cloud product); the other is a health care company (the one that purchased $250,000 in cloud product).

187. Based on his personal involvement and interactions, Mr. Bolton's understanding is that these clients did not want the Oracle Cloud they purchased, but purchased the cloud product to reduce an audit penalty.

188. Dean Bolton was personally involved in these audits, was the lead Oracle license consultant, and interacted frequently with Oracle.

### 4. Oracle's Audit of the City and County of Denver Illustrates The Company's Use of the ABC Tactic to Drive Cloud Sales

189. Oracle's audit of the City and County of Denver is an example of Oracle's deployment of the ABC tactic. As part of its investigation, Lead Counsel obtained documents concerning Oracle's audit of Denver from a CBS reporter, who obtained these documents through a FOIA request. The documents reflect that on July 27, 2016, Denver received a letter from Sean Cogliardi, an Oracle Senior License Consultant, stating that the Company would initiate an audit of its compliance with its license for on-premises products in three days, notwithstanding the fact that Denver's contract provided for a much longer notice period. *See* Figure 1, below.

190. Notably, while Denver requested that the parties maintain a documentary record of all audit-related discussions so that it could comply with Colorado's open records laws, Oracle resisted this request, insisting on face-to-face discussions and stating that if Denver did not capitulate, legal counsel would need to be involved. In an email to Cogliardi, Denver "reiterated [its] earlier request that all audit-related communications continue in writing." In response, Cogliardi claimed that Denver's contract required it to respond to unwritten audit communications and that "Michelle Cline, Oracle's Legal Counsel is copied on this email. Please provide contact information for City and County of Denver's attorney should the matter need to be handled by our respective Counsels."

> Dear Mr. Cardenas,
>
> My name is Sean Cogliardi and I am with Oracle License Management Services (LMS), a group within Oracle Finance that delivers services to govern, manage, and promote awareness of the proper use and distribution of Oracle solutions. LMS regularly conducts license audits as a part of its license management validation program under the rights contained in our agreements.
>
> I am contacting City and County of Denver to initiate a license audit to ensure that the organization's use of Oracle products is in accordance with the terms and conditions specified in its agreements.
>
> I will follow up with you in three business days to make sure you received my email, answer any questions you may have, go over the audit process and establish a project timeline. I would also like to schedule an in person meeting with you and your team at your earliest convenience. Please do not hesitate to reach out should you have any question.
>
> Best Regards,
>
> Sean Cogliardi

**Figure 1.** Excerpt from July 27, 2016 letter from Oracle to the City and County of Denver.

191. Next, Oracle LMS held an onsite (face-to-face) meeting with Denver on October 20, 2016. Consistent with reports by FE 1 that LMS did not close out sales-driven audits (but simply let sales swoop in once the customer had been sufficiently intimidated), Oracle did not deliver a final audit report to Denver detailing the manner in which the client was supposedly non-compliant and demanding payment for those violations.

192. Instead, on November 28, 2016, Denver discussed "'right sizing' [Denver's] licensing agreement," not with LMS, but with Richard Luby, an Oracle ***sales manager***. In an email dated December 2, 2016, Luby pressured Denver to quickly make a deal to resolve the audit, telling Denver that further delay could result in a ***tripling*** of its audit penalties from approximately

$3 million to "in excess of $10M." Specifically, Luby told Denver employees that the "sales group at Oracle [originally] believed we could resolve CCD's Oracle licensing issues for somewhere between $2.5-$3M." However, "[s]ince this time [Denver] sent LMS a detailed spreadsheet listing [Denver's] deployed Oracle environment, leading LMS to now believe the current over-deployment would require in excess of $10M to license. Our SVP has communicated extensively this week with the LMS director on this issue, and has been struggling to secure LMS' consent for a $3M agreement, but is only willing to do so if Denver is in agreement on the number."

193. Significantly, after Denver expressed it willingness to accede to Oracle's demands, that sales manager told Denver that the sales team would arrange for LMS to put the audit on hold while the sale was being negotiated: "Our Sr VP [of Oracle sales] will be talking with Oracle LMS today about holding/freezing the audit so we can go through this process. He asked me if a 6 week freeze will be sufficient . . . ." However, according to Luby, LMS would only agree to a freeze if Denver acted quickly on a deal. Specifically, Luby told Denver that LMS was "under increased internal pressure due to earlier delays" and that LMS "followed up with our VP Brent Mitchell agreeing to put their process on hold if the request goes to [Denver City] council before the holidays."

194. If Oracle's aim were to bring Denver into compliance, it would have first completed the audit before attempting to sell the client additional products in order to ensure that the client was purchasing whatever it needed in order to "right size" its licenses. But Oracle was ***not*** interested in bringing Denver into compliance – rather, it was interested in pushing cloud. Accordingly, Oracle froze the Denver audit, pivoted to sales, and left the threat of an audit hanging over the client while those sales negotiations were ongoing.

195. As noted above, at the time of the audit, Denver was strictly an on-premises customer of Oracle's and, as such, the audit concerned Denver's use of on-premises software. Accordingly, any legitimate "right sizing" of Oracle's on-premises licensure should have involved the acquisition of additional licenses for on-premises software. Instead, on December 22, 2016, Oracle told Denver that it would be forced to pay an extra $2 million to "right size" its on-premises licensing, unless it "purchased" a one-year subscription to Oracle's cloud. Specifically, Oracle

told Denver it had two options: pay $8 million in additional fees without a cloud subscription (including $3 million for the license and the remainder for new support and existing support), or pay $6 million with a one-year cloud subscription (including only $1.2 million for the license, $1.7 million for cloud, and the remainder for support). *See* Figure 2, below.

196. Importantly, Oracle's email explicitly states, "Please note that the list of products included within the [on-premises] Unlimited License Agreements (ULA) in both options is exactly the same." In other words, Denver would acquire the same on-premises licensing under either option – the only difference was that Oracle would provide a $2 million discount for "right-sizing" those licenses if Denver agreed to nominally "buy" a one-year cloud subscription.

Based on numerous discussions and meetings surrounding licensing for City and County of Denver I have collected the following information to provide you an easy to view summary of pricing. The below summary has two options intended to highlight the long-term savings of leveraging our Cloud Service option.

**1. ULA without Cloud Subscriptions**

Net License: $ 2,993,340
Net New Support: $ 658,535
Existing Support: $ 878,619

Year one Total: $ 4,530,494

**5 Year TCO: $8,043,254**

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|
| $4,530,494 | $1,537,154 | $658,535 | $658,535 | $658,535 |

**2. ULA with Cloud Subscription**

Net License: $ 1,247,365
Net Cloud Fee: $ 1,745,976
Net New Support: $ 274,420
Existing Support: $ 878,619

Year one Total: $ 4,146,380

**5 Year TCO: $6,122,680**

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|
| $4,146,380 | $1,153,039 | $274,420 | $274,420 | $274,420 |

**Figure 2.** Excerpt of a December 22, 2016 email in which Oracle tells Denver it will be charged an extra $2 million to acquire the exact same on-premises licenses, unless it buys a one-year cloud subscription.

197. Tellingly, Oracle only priced in a one-year subscription to cloud services when presenting Denver with a 5-year licensing proposal, demonstrating that Oracle had no expectation that Denver would use its cloud subscription beyond the first year.

198. Denver's contract with Oracle became effective on February 1, 2017 – just before the start of the Class Period.

### 5. Regulator Findings Further Confirm Oracle's Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle Cloud Product

199. The accounts provided by Oracle's former executives have been corroborated by the findings of one of the world's top anti-competition regulators, the National Economic Prosecutor's Office of Chile (the "FNE"). The FNE is Chile's chief "authority responsible for defending and promoting competition in all markets or productive sectors of the Chilean economy."[26]

200. The FNE has long been recognized as a top enforcement agency, with the Chairman of the U.S. FTC publicly stating in 2011 that "Chile has one of the most advanced antitrust systems in Latin America."[27] Further strengthening its capabilities, the FNE, the Department of Justice, and the FTC entered into a cooperation agreement that provides "for antitrust enforcement cooperation and coordination."[28]

201. On September 11, 2015, the FNE initiated an investigation into alleged anti-competitive conduct by Oracle. The investigation, which lasted over two-and-a-half years before its findings were made public and continued to investigate Oracle's conduct as it continued during the Class Period, was comprehensive in scope and included, among other things, the FNE (i) conducting a survey of 115 Oracle clients; (ii) gathering statements from 50 Oracle representatives and employees; (iii) collecting additional statements from Oracle's customers, competitors, former employees and experts; and (iv) reviewing policies and practices of the company and their impact on competition.

202. Oracle was advised of the FNE's investigation from the outset. On September 16, 2015, Vanessa Facuse Adreucci of the FNE sent Oracle's representative, General Manager Rodrigo

---

[26] http://www.fne.gob.cl/en/about-us/fiscalia-nacional-economica/

[27] https://www.justice.gov/opa/pr/department-justice-and-federal-trade-commission-sign-antitrust-cooperation-agreement-chile

[28] *Id.*

Astorga, a certified letter informing Oracle of the inception of its investigation. After advising Oracle of the investigation, the FNE and Oracle remained in regular contact about the regulator's inquiry and findings, with Oracle being provided a full opportunity to attempt to address and refute the allegations.

203. Throughout its investigation, FNE also requested information from Oracle that specifically pertained to the audit process and the ABC deals. For example, on March 31, 2016, FNE's Division Chief for Unilateral Abuse, Gaston Palmucci, sent a letter to Oracle requesting that Oracle produce a complete list of clients in Chile and their addresses whose licenses had been audited, analyzed and monitored by LMS between 2013 and 2016. On September 29, 2016, FNE requested from Oracle: (i) any document or internal presentation related to audit-driven sales of Oracle products for the years 2014-2016; (ii) any response to Oracle's LMS services quality survey for clients between 2014 and 2016; and (iii) sales policies relating to the promotion of Oracle products to clients negotiating with LMS between 2014 and 2016. On October 13, 2016, FNE also asked for certain Oracle employees to testify at an FNE hearing, including an LMS principal consultant and several sales personnel, including Territory and Account Managers and a Regional Sales Director. Further, on November 17, 2017, FNE submitted a letter to Oracle requesting information regarding the amount of sales generated through audits.

204. FNE also requested information and documents from Oracle's customers similarly pertaining to Oracle's audits and ABC deals. For example, on October 22, 2015, FNE's Division Chief for Unilateral Abuse, Gaston Palmucci, sent a letter to the General Manager of certain of Oracle's clients, such as Walmart and IBM, requesting the companies' representatives appear at a hearing and assist with FNE's investigation. Additionally, on April 28, 2016, FNE submitted a questionnaire to 34 Oracle clients asking various questions, including whether an audit occurred and an infraction was found, and whether the client acquired additional Oracle products as a result any ensuing negotiation. Next, on September 26, 2016, FNE submitted letters to 21 Oracle clients asking for: (i) documents related to Oracle's audits and the "true up" processes, including audit reports, presentations, and letters; and (ii) emails related to the negotiation process between Oracle's clients and Oracle's sales and/or LMS for fines or purchases of new products. Then, on

May 26, 2017, FNE submitted a letter to Oracle clients requesting further information regarding the auditing and negotiating processes, including: (i) whether, if an audit violation was found, the client had to obtain additional services or products from Oracle; (ii) all emails with Oracle's sales personnel or LMS related to negotiations, including emails pertaining to the purchase of new products.

205. Following its lengthy investigation, the FNE prepared a 30-page report outlining its findings (the "Report") and requiring Oracle to agree to various reforms. The Report was issued on March 28, 2018, and concerns Oracle's audit practices up through the date of the issuance of the report. The Report, which was first made public in April 2018, stated that, "in the case of Oracle, it can be said that audits are used with relative frequency."[29] The Chilean regulator found numerous customer complaints "in relation to Oracle's audit policy," with "clients repeatedly stat[ing] that contractual terms would appear in the audits that they did not know of." The Chilean regulator further found that Oracle's "clients described consistently the way Oracle acted in this process [of auditing] as especially tough, with surprising and costly results for the client companies, and in which [Oracle] applied contractual clauses that, the [Oracle] clients noted, they did not have any knowledge until they received the audit reports." The Chilean regulator emphasized how Oracle's audits frequently related to products that customers did not know they purchased, with 64% of Oracle's audits conducted on products that were "installed automatically."

206. The FNE further found that, after informing customers that they were being audited, members of Oracle's sales department would enter the "auditing" process and propose "sales solutions" that were ***not*** "related to the [audit] findings detected." Specifically, the FNE found that "'cloud' products or licenses that were neither wanted nor used by customers were incorporated into this [sale] solution." As the FNE explained in its Report, "in the commercial proposals that follow an audit, [Oracle] includes cloud services that were not always wanted by the clients."

---

[29] The FNE Report is in Spanish. The quotations in this Complaint are English translations of the Spanish text. U.S. media sources reported on the FNE investigation in July 2018.

207. The FNE further highlighted that Oracle's use of its audits constituted an "abuse of a dominant position" – a violation of Chilean fair competition laws – and that Oracle's practice of misusing the audit process to generate unwanted cloud sales "could lead to a sale in the market contravening free competition."

**F. The Truth Emerges**

208. Former Oracle employees have explained how Oracle's ability to deploy financially engineered deals slowed dramatically in late 2017, resulting in a slowdown in the Company's cloud revenue growth and decline in its stock price. As FE 1 stated, cloud sales declined in late 2017 because customers were "becoming more knowledgeable and hiring consultants that helped them fight back" when the Company attempted to use audits to drive a cloud deal. FE 1 said his own teams experienced this, and that his colleagues reported seeing this as well.

209. FE 1 stated that at the end of 2017, "[e]very single major ULA cloud agreement that had been signed was not renewed." FE 1 stated that at that point, all of the Company's regional leadership issued an internal announcement asking where all the compliance deals were. FE 1 explained that at that same time, Oracle statistics published internally showed 70% of SaaS contracts in 2017 were not renewed, which means they were not used at all. This was a particularly troubling statistic, because SaaS (software as a service) made up more than 70% of Oracle's fiscal year 2017 cloud revenue. In December 2017, following the internal publication of these abysmal statistics, Le Guisquet approached FE 1 for an explanation and asked "why customers were no longer falling for the audit tactics." FE 1 explained that customers had a higher awareness of the ABC tactic and were hiring consultants, primarily former senior LMS personnel, to fight back.

210. FE 3 likewise stated that engineered deals dramatically slowed at approximately the same time, and, as a result, the Southern California region had achieved only 20% of its $50 million annual target, making it almost impossible to achieve its revenue goals. FE 3 stated that cloud revenue began to decline in late 2017, as customers who had agreed to attached deals were refusing to renew the cloud portion of those deals. Even the "customers who tried it didn't like it" because "the product was not ready for prime time." At the same time, engineered deals were evaporating as the Company began to exhaust large ABC targets and generated less revenue from

smaller deals. Moreover, initiating the audit process took time, and while Oracle tried to push them through, savvy customers began to recruit third-party consultants to intervene. FE 3 stated that towards the end of 2017, they began to see these third-party consultants, including Palisade and House of Brick, at Oracle User Group meetings and at the Oracle Open World conference in October 2017. FE 3 stated that as these consultants became more visible and customers began to learn about Oracle's tactics, cloud revenue dried up.

211. FE 8 also stated that Oracle's use of engineered deals to drive cloud revenue ultimately led to plateauing cloud revenue growth towards the end of 2017. FE 8 said, "It just wasn't sustainable. Customers were purchasing a million dollars of cloud subscriptions but weren't planning on making that same purchase next year. They were not renewing. They did it just for the deal and then would not renew the next year." Without these renewals, Oracle's sales decelerated.

212. FE 11 further corroborated these reports, explaining that at the end of 2017, there was a slowdown in cloud revenue because Oracle's customers were not renewing their cloud subscriptions. "We had audited all these customers, so we burned through that layer throughout 2016 and 2017. As momentum builds, customers complained that Oracle was being heavy handed, so we throttle back and then these sales leaders are the fall guys for it even thought they were just doing what they were told."

213. As a result of these developments, beginning in December 2017, Oracle was forced to publicly report dramatically slowing cloud revenue growth.

### 1. On December 14, 2017, Oracle Reports Stagnating Cloud Growth

214. Leading up to the Company's second quarter 2018 earnings release on December 14, 2017, analysts and commentators continued to trumpet the tremendous cloud growth Oracle had reported throughout the year and repeat the Company's statements touting its cloud pipeline and renewals. For instance, Trefis analysts reported on December 12, 2017 that:

> Oracle's IaaS, PaaS, and SaaS revenues grew at high double digits through the year, with the trend expected to continue through fiscal 2018 as well. Oracle's cloud segment has been the only revenue stream to witness growth in recent years. Fiscal 2017 was termed as a turnaround year for Oracle in terms of transitioning its

> customers to cloud-based offerings, with revenues jumping 50% to $3.6 billion. The trend has continued in FY'18 thus far, with robust revenue growth across cloud services segments.

215. However, after the market closed on December 14, 2017, Oracle surprised investors by reporting that cloud revenue growth had decelerated, growing by less than 40%. Oracle's growth compared unfavorably to, among others, the 90% year-over-year growth reported by Microsoft less than two months earlier, and the 76% growth reported by Google Cloud. Oracle also reported disappointing cloud margins, which was a function of the fact that Oracle's cloud volume was ramping far less quickly than its competitors. Moreover, the Company reported significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a marked decline.

216. Analysts and the financial press expressed concern about Oracle's slowing cloud growth and the sustainability of its cloud business. For instance, BMO analysts lowered their price target for Oracle shares from $57 to $55 on December 15, 2017, reporting as a "key point" that "a major concern for investors is the long-term growth of cloud revenue, particularly the SaaS business, given the revenue miss and lower guide." *Dow Jones Newswires* also reported that "Disappointment over Oracle results triggers downgrade, price cuts," and "[a]nalysts were sounding some alarm after Oracle Corp. literally clouded up the view on a vital metric for growth, disappointing investors and analysts over both its results and forecast."

217. Investors and analysts also connected the disclosure to Oracle's sales practices, including the *Business Insider*, which noted in a December 15, 2017 article that "there are some signs that ***some of Oracle's customers are fed up with some of its hard-nosed sales tactics***." Additionally, JMP analysts noted in a December 15, 2017 report that "***many customers are irate with Oracle due to auditing practices*** on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

218. In response to Defendants' disclosures, Oracle stock declined by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15.

**2. On March 19, 2018, Oracle Reports That Its Cloud Growth Slowed Even More Significantly**

219. On March 19, 2018, Oracle issued its third quarter 2018 financial results, disclosing that the Company's cloud growth had slowed even more significantly to only 32%. Again, Oracle's reported cloud revenue growth stood in stark contrast to its competitors. In comparison, for the same quarter, Microsoft announced cloud growth of 98% and Google experienced 85% cloud revenue growth. Oracle's cloud margins were again disappointing, coming in at 58.1%, which is far from the 80% Defendants had assured investors Oracle would achieve. In addition, Oracle admitted that it expected additional deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," well below the market's expectations.

220. Analysts and commentators expressed deepening concern about Oracle's cloud business and were particularly troubled by the Company's disappointing cloud guidance. For instance, UBS analysts lowered their price target for Oracle stock in a March 19, 2018 report titled, "Cloud Growth Hits Another Reset in Q318." These analysts noted that Oracle missed consensus cloud revenue estimates for the quarter, and that "Cloud growth [guidance] in Q4 implies a further deceleration from 22% in Q3." RBC analysts likewise issued a March 19, 2018 report titled, "Earnings Up on Tax; But Guidance Points to Growth Deceleration," noting Oracle's disappointing cloud guidance: "decelerating cloud growth (F4Q18 guided to 17-21% Y/Y CC) means software and cloud revenue continues to decelerate." Given Oracle's dismal guidance, these RBC analysts modeled year over year revenue declines in the following quarter: "Guidance implies further deceleration in software and cloud growth – we now model -1% Y/Y CC software and cloud revenue in F4Q18."

221. In a March 20, 2018 report, Deutsche Bank analysts likewise highlighted Oracle's surprisingly poor cloud guidance: "Given the Street focus on Oracle as a 'cloud transition' story (a la Microsoft), the weak total cloud revs numbers (growth of 22%, low end of the 21%-25% guide, QF18 growth guide of 17%-21%, roughly low-20%' growth in 1QF19) should dent investor sentiment." Notably, the Deutsche Bank analysts recognized that Oracle's poor results demonstrated that, surprisingly, Defendants' claims of "strong" cloud "bookings" were not actually translating into cloud revenue growth because Oracle was clearly having trouble getting "cloud

customers" to actually use their cloud products: "There are other cloud issues . . . strong SaaS bookings are not translating to revs growth . . . . We conclude that either Oracle's ERP-heavy apps business is migrating to cloud options slowly . . . Oracle is losing SaaS share and/or that Oracle's reputation in its core database business is hampering it's ability to attract customers to its cloud suite."

222. Likewise, in a March 20, 2018 article entitled "Oracle's cloud biz heading in the wrong direction right now," *TechCrunch* reported that "Oracle's cloud numbers could be reason for concern . . . . [T]he general trend from Oracle seems contrary to the eye-popping growth numbers we have seen from other companies." In a March 20, 2018 report entitled, "Cloud Decelerates Again," Deutsche Bank analysts observed that apparently "strong SaaS bookings are not translating to rev[enue]s growth," in part because of what appeared to be "slow Cloud Machine deployments" by clients who purchased cloud – *i.e.*, despite reporting growing cloud sales, the Company did not appear to be achieving sustained revenue due to cloud customers not actually using the product. The market linked Oracle's faltering revenues to the use of the practices described herein, including in a March 20, 2018 JMP analyst report, which highlighted Oracle's "cloud weakness," including that there were "fundamental challenge[s]" in the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon."

223. In response to the Company's March 19, 2018 disclosures, Oracle stock price declined nearly 10%, from $51.95 per share on March 19 to $47.05 per share on March 20, on high volume.

224. At the same time, Defendants continued to issue false and misleading soothing statements to the market that tempered the market's reaction to Oracle's March 19, 2018 disclosures. On the Company's earnings call, Defendants misleadingly attributed the deceleration in Oracle's cloud revenue to Oracle's "bring your own license" or BYOL program. "BYOL" allowed clients to purchase software licenses that could be used in whatever medium the customer chose, either cloud or on-premises. Thus, if customers had existing Oracle software licenses for other Oracle legacy services, customers could reuse them when subscribing to Oracle cloud. On

the call, Ellison stated, "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

225. In addition, Defendants attributed the decline in cloud growth to a slowdown in older acquired SaaS businesses, which would reverse course as the Company's business mix moved towards more newly acquired products, like the Company's "Fusion HCM" human resources application – one of the same products that, unbeknownst to investors, Hurd, Ellison, Catz, and Kurian had all called "not tenable" just a few months earlier. For instance, on the Company's earnings call, Ellison attempted to explain away the decelerating cloud growth stating, "[W]e have some very high growth rate SaaS businesses like ERP and HCM. And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite."

226. Analysts credited Defendants' misleading soothing statements. For instance, while, in a March 20, 2018 report, Societe Generale analysts noted Oracle's "weak outlook vs consensus for the Cloud," they parroted Defendants' false reassurances about the Company's BYOL program. Likewise, the same Deutsche Bank analyst report mentioned above reiterated Defendants' misleading excuse that the slowdown was a function of a temporary reorientation in the cloud product mix, noting that "Oracle pinned the blame on" the fact that "[a]cquired SaaS companies (presumably Taleo, RightNow and Responsys among others) are now barely growing, and all SaaS growth is coming via the homegrown Fusion products."

227. In the months following this partial corrective disclosure, investors' questions about Oracle's coercive sales practices intensified. In a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," *Forbes* reported that Oracle was using its "'Audit Bargain Close' playbook" to "pressure customers into cloud adoption" and added that:

> That hardly seems like a great business retention strategy, but given Oracle's power over its customer base that comes from its licensing and compliance practices, it is a powerful tool. It does lead to more sales in the cloud category, which is just [what] Oracle wants. But it leads to questions that should be disturbing to Oracle customers and possibly to Oracle employees and investors: Has Oracle shifted its core competency from creating technology products to running an enterprise sales staff that is expert in squeezing customers? Is Oracle's cloud technology less important to its revenues than its cloud promotion practices? Will Oracle ever reveal how much of its cloud sales are actually shelfware?

228. Technology analysts also questioned whether Oracle's lackluster cloud revenues were the result of deficiencies in its cloud product. For example, in a May 29, 2018 report, *TechRepublic* discussed the reasons for the "tepid growth" in Oracle's cloud revenues for the quarter. Investors had reason to be concerned: "[e]ven as AWS accelerated growth to 49% on a massive installed base, Oracle told analysts it will be fortunate to grow 23% in Q4 2018, despite a Lilliputian base." *TechRepublic* cautioned that Oracle's coercive sales practices masked deficiencies in the Company's cloud product. On that subject, *TechRepublic* noted: "***One problem with [Oracle's use of coercive audits to generate cloud sales] is that it prevents Oracle from dealing with the real problem: The product***." *TechRepublic* highlighted how, even though Oracle's cloud product was released a year-and-a-half earlier, it remained "a bare-bones 'minimum viable product,' [that] is arguably too minimal to be viable for a broad range of common cloud IaaS use cases." *TechRepublic* concluded that it appeared that "***Oracle, quite simply, hasn't built a cloud product that the general market wants***."

229. Oracle, however, continued to deny that these concerns had merit. For example, on May 22, 2018, *The Information* published a report titled "***Oracle's Aggressive Sales Are Backfiring With Customers***." In the report, the authors quoted an anonymous Oracle employee, who accused Oracle of coercing customers to "strike [cloud service] deals to avoid expensive audits of how they were using Oracle software." The article also reported that Oracle had attempted to use the tactic to coerce toy-maker Mattel, Guardian Life Insurance, and Southern California Edison into doing large cloud deals, but they refused, choosing instead to pay steeper penalties. The article reported how Southern California Edison did not "see the 'ROI'-return on investment" in buying Oracle's cloud product, even if it meant that it would have to pay Oracle more in audit

penalties. The article further reported that, according to an Oracle employee, Mattel told Oracle that it "was 'not strategic' as a cloud partner" and chose to continue its relationship with Microsoft Azure.

230. Oracle denied *The Information's* report, claiming it was based on "inaccurate accounts" fabricated by "anonymous sources or competitors" and stated that "Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. ***We are disappointed that The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services***."

### 3. On June 14, 2018, JPMorgan Releases a Large-Scale CIO Survey Showing That Oracle Is "Trailing In Cloud Computing Plans"

231. On June 14, 2018, JP Morgan issued a report that – contrary to Oracle's statements to *The Information* and elsewhere – further indicated to the marketplace that Oracle's cloud business was suffering as a result of its coercive tactics. Specifically, JPMorgan issued a report announcing it was downgrading Oracle shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to their IT environment in the future."

232. JPMorgan reported that while, in the past Oracle "has been stable and received ~11% of the votes," the Company's standing in this latest poll dropped by ***more than 40%*** to a mere 6.5%. The analysts stated that these results made them "uncomfortable because the results of our CIO surveys over the years have been highly predictive" of sales trends. The JPMorgan analysts concluded:

> [W]e ask the following: if the largest-scale CIO survey shows ORCL now has negative spending intentions; and ORCL is lagging in Digital Transformation projects; and ORCL is trailing in Cloud Computing plans; and its criticality as a mega-vendor has fallen to new lows; and ORCL databases are being unplugged in favor of Microsoft and Amazon databases; and ORCL applications are being

> unplugged in favor of Salesforce and Workday applications; and customers are weary of ORCL's unpopular commercial tactics – then where is this business and this stock heading in the next couple of years?

233. JP Morgan further discussed the "Specific Reasons for Declining Oracle Spend," stating that reasons that the CIOs moved away from Oracle included that "they do not like Oracle's 'business practices and the difficulty of working with them in the past.'" JP Morgan further stated that the CIOs are "moving off of Oracle Business Intelligence Cloud Service because they have not found value in it."

234. On this news, the price of Oracle stock fell approximately 5%, from $48.27 per share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume.

#### 4. On June 19, 2018, Oracle Reports Additional Cloud Slowdowns And Stuns Investors By Announcing It Will No Longer Report Cloud Business Financial Results

235. On June 19, 2018, Oracle held its fourth quarter 2018 earnings call with investors. On that call, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business, and would, instead, consolidate those financial results into a combined "Cloud Services and License Support" line item so that investors could no longer see them. In addition, under pressure from analysts on the call, Catz disclosed that total cloud revenue growth for the quarter had come in at a lackluster 21%, demonstrating that Oracle's cloud business had slowed to a crawl, and making clear the impetus behind the Company's desire to hide its cloud results. Oracle also declined to provide separate guidance for cloud revenues going forward. PiperJaffray reported on June 20, 2018 that Oracle had informed it that the "reporting change was driven by Larry Ellison."

236. As the market immediately recognized, Oracle's decision to shield its cloud results from public view meant that the Company had something to hide, and that the welfare of that business was in jeopardy. In a June 20, 2018 report, William Blair analysts concluded that "it is an attempt to ***pull the proverbial wool over investors' eyes—particularly related to cloud sales***," and was "the main factor driving the stock down in the aftermarket, given the importance of cloud services growth (into which investors now have less visibility) to the bull thesis." RBC analysts reported on June 19 that Oracle's move was a "***[r]adical change in disclosure***," while

Oppenheimer analysts reported on June 20 that the change was "a ***red flag***" that "masks visibility and raises concerns about the performance and trajectory of the cloud business." JPMorgan analysts similarly reported on June 20 that "***Oracle's sudden decision to discontinue the disclosure of detailed cloud revenue obfuscates one of the most important metrics to gauge the cloud transition story***." (emphasis in original).

237. Analysts also reported that Oracle's stated rationale for the move – namely, that it was hard to distinguish cloud revenue from more traditional on-premises revenue – was not credible. For instance, *TechCrunch* reported on June 20, 2018 that John Dinsdale, an analyst with Synergy Research, a firm that analyzes the cloud market, stated, "when a company chooses to reduce the amount of financial detail it shares on its key strategic initiatives, that is not a good sign. I think one of the justifications put forward is that is becoming difficult to differentiate between cloud and non-cloud revenues. If that is indeed what Oracle is claiming, ***I have a hard time buying into that argument. Its competitors are all moving in the opposite direction***." Confirming the point, *TechCrunch* reported that "the bigger players have been more open about this. For instance, in its most recent earnings report, Microsoft reported its Azure cloud revenue grew 93 percent. Amazon reported its cloud revenue from AWS was up 49 percent to $5.4 billion in revenue, getting very specific about the revenue number."

238. Other analysts agreed that Oracle's explanation was not credible – and further reported that Oracle's radical disclosure change undermined Defendants' prior statements. For example, Deutsche Bank reported on June 20, 2018 that:

> The decision to stop disclosing any key cloud metric is ***at odds with Oracle's own multi-year effort to pitch itself as a leading cloud vendor*** and materially limits investor visibility into Oracle's growth engine . . . . ***We're not convinced by Oracle's explanation that the on-premise and cloud boundaries are blurring.*** … This move implies that Oracle's cloud growth is largely coming from <u>existing</u> database/apps migrations, not new logos or workloads . . . .

239. Similarly, on June 20, 2018, JMP analysts reported that, "We think it is worth remembering that, as little as three quarters ago on the F1Q18 earnings call, Oracle was focusing investors on cloud growth."

240. Notably, JMP further reported that the dramatic deceleration in Oracle's cloud growth was driven by the Company's treatment of its customers:

> We think Oracle would benefit from shifting its focus away from winning and toward customer success . . . . Last night, we spoke with an industry contact that underscored Oracle's lack of focus on customer success as he provided his perspective on ORCL's decision to deemphasize the cloud metrics. He stated: ***"No one is re-upping. There was a big incentive to sell cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was no customer success to say, 'Hey, you bought this, now let's get value from it.'"***

241. Similarly, *The Upper Edge* reported on June 27, 2018 that the fall-out from Oracle's coercive sales tactics was causing its plummeting cloud numbers. In an article entitled "What Oracle Doesn't Want You to Know," *The Upper Edge* reported that "[m]any analysts are speculating that the timing of this change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud growth, suggests that it may have something to hide." The article stated that Oracle had "Poor Cloud Application Performance," highlighting how ***"[c]ustomers who have adopted Oracle's application cloud solutions (SaaS) have had many challenges realizing the performance that was promised***," with customers finding that "their deployed solutions were not stable or did not work as advertised." *The Upper Edge* explained that "[w]e have worked with customers that have deployed Oracle's SaaS applications for a number of years and ***we have yet to hear a success story that did not require much more work than anticipated just to get the system running in production and stable, let alone delivering the expected business value***." *The Upper Edge* further noted that the deficiencies in Oracle's cloud product also interfered with the Company's ability to generate legitimate sales to potential new customers, as they were finding "Oracle's product demos to be unconvincing." *The Upper Edge* explained that Oracle resorted to coercive audits in order "to mask poor cloud performance." *The Upper Edge* further explained that Oracle's "Cloud Deals [were] Manufactured by Duress":

> Oracle claims there is a potential compliance issue that will cost the customer millions of dollars. This can be done either after an audit has been completed, even though the compliance claim may be in dispute, or prior to initiating an audit based on some sort of claim that Oracle believes there is a compliance issue. Oracle creates a big fuss and may even threaten to terminate licenses or launch into a full-scale audit unless the fees are paid immediately. Then the Oracle sales rep steps in and says they can significantly reduce the compliance fees owed or eliminate the audit if the customer makes a purchase that includes some sort of cloud service.

242. Further, the article stated that when a customer needs to purchase additional licenses for on-premise products, the "sales rep steps in and says they can significantly improve the pricing if the deal includes a cloud services purchase. We have seen a number of customers sign up for cloud services with no intention of ever using them simply because the overall cost was lower when compared to buying just the additional on-prem licenses they required." *The Upper Edge* article went on to state that:

> The issue with these two scenarios is that these deals do not represent customer demand for Oracle's cloud solutions. … These scenarios are what Oracle means when they refer to cloud sales to existing on-prem customers as new workstreams. It is code for an existing customer buying a cloud solution they did not require and that is not replacing a current Oracle on-premise licenses product set. Oracle's hope is that the customer will use the solution since they have the right to do so and will hopefully find value and renew and expand the service in the future. This is a key distinction between the true customer-driven demand vs. a coerced trial period that may lead to demand.

243. As a result of Oracle's revelations that its cloud business growth had ground to a near-halt, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume.

## V. <u>ORACLE'S CLOUD BUSINESS CONTINUES TO COLLAPSE AFTER ORACLE IS FORCED TO ABANDON ITS FINANCIAL ENGINEERED DEALS</u>

244. Following the end of the Class Period, after Oracle could no longer misleadingly inflate its cloud revenue through the use of engineered deals, the Company's cloud business continued to collapse. After Oracle announced sluggish growth of just 1% in the first quarter of fiscal year 2019, Citi Research analysts wrote that Oracle's cloud business "isn't growing fast enough to make up the difference" from its declining on-premise business. The Citi analysts concluded, "We continue to view Oracle as 'cheap for a reason.'" Indeed, in 2018, Oracle grabbed such a small share of the cloud computing and storage market that research firm Gartner did not even bother to break out Oracle's market share in a report that year and, instead, classified Oracle as a "niche player." Meanwhile, AWS remained the top provider, while Microsoft Azure and Google Cloud Platform continued to gain meaningful market share. Ultimately, by early 2019, Oracle was forced to abandon its ambition to become the leading cloud provider.

245. Among other things, in March and June of 2019 Oracle conducted major workforce cutbacks, eliminating approximately 2,000 positions in the Company's cloud business. As *Bloomberg* reported in an October 2019 article titled "Oracle Shelves Larry Ellison's Dream of Cloud Dominance," these cutbacks "struck at the heart of its cloud division." Also in March 2019, just months after Kurian's sudden departure, Oracle lost its then-most senior ranking cloud executive, Amit Zavery, who left for Google Cloud.

246. And despite Oracle's efforts to obfuscate the decline in its cloud business by changing its financial reporting, the business's weakness became undeniable. In March 2019, Oracle reported that during its third fiscal quarter its combined cloud license and on-premise license sales decreased 4 percent to $1.25 billion. As *Bloomberg* noted, "That drop is a sign the company is having a hard time persuading new customers to sign contracts."

247. In June 2019, Oracle further demonstrated the weakness in its business when it announced a partnership with cloud rival Microsoft. Under the deal, the two companies would connect their cloud services, so customers can use Oracle databases or applications tied to Microsoft's Azure cloud. While Oracle attempted to spin the partnership as a positive, as *Bloomberg* reported, the market saw it as a concession, "signaling Oracle knew it could no longer go it alone."

248. Indeed, after years of lagging behind, Oracle announced in September 2019 that it would give away a version of its cloud infrastructure services for free to software developers, students, and others to encourage them to build applications for its platform. *Bloomberg* characterized this as "a humbling step for a company that has already made an argument that it was the discount option for years."

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

249. Numerous facts, in addition to those discussed above, support a strong inference that Defendants knew, or were deliberately reckless in not knowing, that the health and success of Oracle's cloud business was not as represented, its growth and revenues were fueled by financially engineered deals, and its cloud products were not as represented.

### A. The Complaint Alleges a Strong Inference of Scienter as to Hurd

250. The facts summarized below (and detailed more fully above) give rise to a strong inference that, at the time Hurd made his false and misleading statements, he knew or was deliberately reckless in disregarding that a material portion of Oracle's cloud revenues were tied to financially engineered deals, and that its cloud products were deeply flawed.

#### 1. Hurd and His Direct Reports Drove the Use of ABC Sales, And Hurd and Catz Approved All Significant Financially Engineered Deals

251. Both Hurd and Catz knew and had access to information demonstrating that Oracle generated substantial cloud revenue growth through audits and attached deals. The ABC scheme was a "direct edict from Hurd," as reported by FE 11, a Regional Vice President of Technology Sale. This "edict" was then implemented by Hurd's direct reports. Rich Geraffo, Executive Vice President of North America Technology, who reported to Hurd, would tell the sales force on calls to "seed" a deal, meaning to financially engineer it. Similarly, FE 1 confirmed that the ABC tactic was developed by Hurd himself and that Le Guisquet, Executive Vice President of EMEA and Hurd's director report, encouraged sales personnel to use this tactic to sell cloud. FE 3 similarly reported that Geraffo stated that "cloud was the future of Oracle's business model, and that auditing was a part of Oracle's business and strategy to drive revenue," and that "Oracle needed these numbers to show investors."

252. As detailed above, numerous former Oracle employees, including FE 1, FE 3, and FE 7 explained that Defendants Hurd and Catz approved Oracle's engineered cloud deals through the DAS system. Deals in excess of $5 million, or involving a 50% or greater discount on software, had to be approved by Hurd or Catz.

253. As these former Oracle employees explained, entries on DAS made clear whether a cloud deal was closed using the ABC scheme, as well as whether it was an attached deal. DAS entries specified whether a deal was audit-driven, whether LMS was engaged as part of the sales process, and whether steep discounts were requested as part of an attached deal.

254. FE 1 further stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd

or Catz signed off on the deal. FE 1 provided specific examples of audit-driven cloud deals closed in fiscal year 2017 to companies such as Oreedo QSC, Samba Financial Group, and National Water Company, through which Oracle collectively booked approximately $56 million in cloud revenue. Each of these deals were approved by Hurd through the DAS system, and each approved entry on the DAS system clearly indicated that the deal was generated through "cloud insertion," *i.e.*, through the use of the ABC tactic. Likewise, FE 3 stated that 80% of FE 3's engineered deals went to Hurd's office for approval, that he personally had "audit cloud deals," clearly marked as such, and that the deals were approved by Hurd.

255. Multiple former Oracle executives also described presentations prepared for Hurd reflecting that a highly material percentage of cloud revenue was driven by financial engineered deals—and that Hurd's direct reports openly discussed this fact. FE 3 stated that Geraffo was told that the "renewals rates that Company wanted and projected were not going to happen," and that "the way the Company was selling cloud was not sustainable," and Geraffo stated that he knew this but that as a salesperson FE 3 needed to drive up cloud purchases and renewals because, as noted above, "Oracle needed these numbers to show investors."

256. According to FE 2, Hurd's other direct reports, including Senior Vice President of Cloud Shawn Price and Executive Vice President of Cloud Business Group David Donatelli, openly discussed the fact that 90-95% of all Company-wide cloud sales had no "use cases" attached in fiscal year 2017. FE 2 stated that these direct reports discussed the "poor health" of the cloud business in conversation. FE 2 further stated that he reviewed presentations prepared for Hurd at the end of fiscal year 2016 and sent to Price and Donatelli showing that 90-95% of Oracle's Company-wide IaaS and PaaS cloud deals, comprising about 30% of overall cloud revenue, did not have use cases associated with them. FE 2 stated that "[a]mong all of Hurd's direct reports, there was absolute awareness that there were issues with the quality of the cloud revenue." FE 2 stated, "I saw presentations that went to Hurd's directs. I saw the info they were receiving about deal quality and it was absolutely something that was discussed." FE 1 also described presentations he prepared specifically for Hurd's consumption that "would very clearly say that LMS was engaged" on cloud deals and that "they were compliance deals."

### 2. Oracle's Use Of Engineered Deals To Drive Cloud Sales Was Extremely Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units, and Accounting for the Vast Majority of Oracle's Cloud Revenue

257. Hurd oversaw Oracle's sales, and the use of financial engineered deals was ubiquitous at the Company – indeed, it was a key Oracle business strategy to generate cloud "sales." As discussed above, FE 2's report demonstrates that 90-95% of Oracle's Company-wide cloud sales during the Class Period were generated through engineered deals. A senior cloud sales executive in the MEA region (FE 1) reported that at least 80% of Oracle's Middle East and Africa cloud revenue was generated through the use of the ABC tactic, yielding $178 million in cloud revenue from this region alone in fiscal year 2017. Several additional North American cloud executives – the region which generated approximately 50% of Oracle's revenue – reported that approximately 90% of Oracle's North American cloud revenue during the Class Period was generated through engineered deals.

258. Numerous senior former sales executives in Oracle's North American operations (including FE 2, FE 3, FE 4, FE 6, FE 9, and FE 5), Middle East and Africa operations (FE 1), and European operations (FE 7) all gave highly corroborative accounts detailing the widespread use of the ABC scheme and attached deals to drive significant cloud revenue for Oracle. These accounts describe the same deal mechanics implemented widely across the Company by the entirety of Oracle's sales personnel, with detailed information about the substantial volume of ABC and attached deals all flowing towards Hurd and Catz (including through the DAS system) for years at a time. These reports are strongly corroborated by the accounts of industry participants, including Insight, B-Lay, House of Brick, and the others set forth above.

259. Moreover, Oracle's deployment of the ABC deals required a high degree of coordination between sales and LMS departments all over the world. The high degree of overlap, replication, and coordination in the implementation of the ABC and attached deal scheme, as well as the ubiquitous use of these tactics by an army of Oracle employees over different departments in different parts of the world for years on end, further strengthens the inference that Hurd, who

oversaw Oracle's cloud sales, knew or, at minimum, was deliberately reckless in not knowing of the misstated and omitted facts.

### 3. Prior To Making His Class Period Misstatements And Omissions, Hurd Knew Of Public Allegations That Oracle Generated Cloud Revenues Through Coercive Audits And Sales Tactics

260. Both prior to and during the Class Period, multiple sources informed Hurd of Oracle's illicit audit and sales activities designed to inflate the Company's cloud revenues. For example, as discussed above, on May 7, 2014, Clear Licensing representatives met with high-level Oracle executives, including Oracle's Senior Director Global Operations within LMS, and informed them of LMS's "questionable sales tactics," with "LMS activity leading to sales engagement." Later, on November 3, 2014, Clear Licensing sent Oracle's Senior Director of Global Operations a written report providing the results of Clear Licensing's survey of a hundred Oracle customers, together with summaries of customer accounts bolstering Clear Licensing's findings of LMS's abusive audit and sales practices. Thereafter, on January 6, 2015, after having received no meaningful response from the Company, Clear Licensing sent a letter to Defendant Ellison and Oracle's Board, including Hurd and Catz, informing them of the customer survey results, expressing concern that Oracle's audits were being used to improperly generate cloud revenues, and warning them of Oracle's inability to meet its stated $1 billion cloud sales target next year if these practices continued to go unaddressed.

261. Hurd also knew and had access to media reports published prior to and during the Class Period, which the Company denied, detailing Oracle's coercive audit and sales practices. For example, immediately following the public release of Clear Licensing's January 6, 2015 letter, multiple media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's "scathing report" and predicted "that Oracle will struggle to move to the cloud unless it changes its ways." Months later, the financial press published additional reports recounting allegations from various sources, including unnamed Oracle customers, that the Company was misusing its "audit" process to generate misleading cloud revenues, including pressuring customers to buy "cloud products they don't need.

262. Hurd was further informed of allegations of Oracle's coercive audit and sales tactics prior to the Class Period through the Chilean regulator FNE's comprehensive investigation, which ultimately found that Oracle pushed cloud-based products to resolve audits even when the customer did not want cloud. Specifically, in September 2015, the FNE informed Oracle that it had opened an investigation into Oracle's licensing and audit practices. During its investigation FNE specifically asked Oracle for information concerning its auditing practices and attached deals, including: (i) documents or internal presentations related to sales as a result of an audit; (ii) policies related to the promotion of Oracle products to customers negotiating with LMS; and (iii) information concerning the amount of sales generated through audits or "true up" processes. That Hurd made his misstatements and omissions in the face of all these accusations of wrongdoing further supports the scienter inference, particularly when coupled with the widespread nature of the misconduct.

### 4. Hurd and Others Falsely Attributed Oracle's Success to Supposedly Legitimate Factors, While Denying The Allegations That They Were Using Audits To Close Cloud Sales

263. The issue of whether Oracle used financially engineered deals to drive sales was one of prominence that Hurd and the other Defendants could not possibly have been ignorant of. Both prior to and during the Class Period, Defendants were asked about allegations regarding the Company's abusive sales and auditing practices to boost cloud revenue, and in response, the Company denied that there was any misconduct and falsely attributed the Company's cloud business growth to legitimate business factors.

264. As set forth above, prior to making their Class Period misstatements and omissions, Defendants were informed by, among others, Clear Licensing, media reports and the FNE of allegations of Oracle's improper licensing and audit practices. However, with each of these sources, Oracle denied the accusations. Indeed, Oracle told investors as early as June of 2015 that media reports regarding the Company's improper auditing practices were "absolutely not true" and "conspiracy rumor," assuring investors that "[i]t would be wrong to force a [customer] to do something that's against their will."

265. Defendants' pattern of making such false denials continued throughout the Class Period, including in response to analysts' specific inquiries. For example, on May 9, 2017, an analyst questioned Defendant Bond about the importance of audits as a driver of revenue growth and whether he could provide "some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." In response, Defendant Bond denied that the Company's audit practices were driving its revenue growth in any meaningful way, stating that "[t]his is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities." Defendant Bond further assured investors that Oracle did not use extortive audits, stating that "we try to do it as best we can, in as gracious [a] way as we can" and that "as we go to cloud, we don't have to worry about that anymore."

266. Similarly, during the Class Period, Oracle repeatedly denied media reports of Oracle's abusive auditing practices, consistently characterizing them as "inaccurate accounts." For example, following a May 22, 2018 report by *The Information* that Oracle used the threat of audits to drive cloud sales, the Company publicly responded that it had "no reason to resort to scare tactics to solicit business" and was "disappointed that *The Information* is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services."

267. Hurd himself assured investors that the cloud growth was due to customer interest in Oracle's product. For example, on the September 14, 2017 earnings call, Hurd claimed that the Company's cloud growth was due to the fact that "[w]e're better – our products are better. Our sales force is better. Our ability to implement is better." Likewise, at the November 7, 2017 industry conference, Defendant Bond explained why customers were purportedly moving from on-premise to cloud, stating that "from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early." Finally, throughout the Class Period, Defendants also falsely denied that Oracle's cloud growth was the product of short-term sales tactics, including when Catz stated on the June 21, 2017 earnings call that cloud revenue growth was "absolutely not a 1-year phenomena."

268. Defendants' repeated denials of wrongdoing in response to repeated analyst questions and media reports, coupled with their false assurances to investors of the Company's legitimate sales practices, further support a strong inference of scienter.

### 5. Defendants' Statements Touting Oracle's Cloud Transition And Growth Concerned The Single Most Important Issue Facing The Company During The Class Period

269. Oracle's "move to cloud" was, as Defendant Catz publicly told investors, "the biggest and most important opportunity in our Company's history." Defendant Catz echoed these sentiments at Oracle OpenWorld in the beginning of the Class Period, stating that "[m]oving to the cloud [wa]s the single largest opportunity and we have to face it."[30] Hurd likewise stated that "[t]he move to the cloud is not just a technical thing; this is a business model, generational change about how we think about IT."[31] Hurd further stated that the cloud market presented a "tremendous opportunity for us to grow and blow way past $10 billion" in revenue.[32] Likewise, Defendant Ellison told investors during the Company's November 2017 annual shareholders meeting that "[w]e expect the bulk of our business going forward, and the bulk of our growth will be driven by our public cloud business."

270. Oracle's need to generate revenues through its new cloud offerings was particularly acute because demand for its on-premises products was declining. Wall Street recognized the importance of Oracle's transition to the cloud. As the USA Today explained, "Oracle's future and relevance [wa]s pinned on its ability to become a bigger player in cloud."[33] In December 2017, *Forbes* further described how "Oracle's cloud segment has been the only revenue stream to witness growth in recent years," adding that the "trend is likely to continue in the coming years."[34] Media

[30] Sohini Bagchi, "Digital India Driving Growth For Oracle: CEO Safra Catz," *CXOtoday.com* (May 9, 2017).

[31] "Mark Hurd Chief Executive Officer" Oracle NetSuite company profile.

[32] Anita Balakrishnan, "Oracle CEO pushes back on challenge from Salesforce: 'Are you kidding me?'" *CNBC* (May 4, 2017).

[33] John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today* (April 26, 2017).

[34] Trefis Team, "Oracle Earnings Preview: Cloud-Based Segments To Continue To Drive Growth," *Forbes* (December 12, 2017).

reports additionally stated that the "cloud has become a matter of existential importance to Oracle as its legacy business of selling software licenses and hardware products erodes in the face of a growing enterprise preference for usage-based application and infrastructure subscriptions."[35] Analysts further explained that "[w]ithout aggressive action to significantly increase non-database [i.e., cloud] revenue, we do not believe Oracle can offset the oncoming decline in commercial database revenue fast enough to maintain its present valuation," adding that "Oracle needs an even more radical and rapid organizational and cultural shift toward 'cloud-first.'"[36] Finally, further demonstrating its importance to the Company and its investors, Oracle's cloud revenues were discussed by Defendants and investors on every earnings call during the Class Period, occupying the vast majority of the executives' discussion and analyst inquiry.

271. Given the "existential" import of cloud to Oracle and its future, Hurd and the other Defendants knew – or were deliberately reckless in not knowing – that material amounts of Oracle's cloud revenues were driven by "sales" completed through coercive audits and attached deals.

### 6. Hurd And Defendants Stated That They Were Deeply Focused On Oracle's Cloud Revenues

272. Hurd and other Defendants stated that they were acutely focused on the Company's cloud revenues. Beginning in late 2012, Defendant Ellison stated that "over the next couple of years senior management down to individual programmers and sales people are focused on one thing: selling applications in the cloud, selling our platform in the cloud and selling our infrastructure in the cloud," echoing that the Company was "laser-light focused" on cloud.[37] A

---

[35] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not infrastructure. Yet." *diginomica* (January 24, 2017).

[36] John Freeman et al., "The Death Of The Commercial Database: Oracle's Dilemma," *Seeking Alpha* (February 10, 2017).

[37] Steffanie Marchese, "CNBC EXCLUSIVE: CNBC TRANSCRIPT: ORACLE CEO LARRY ELLISON SITS DOWN ONE-ON-ONE WITH MARIA BARTIROMO TODAY ON CNBC," *CNBC (*October 2, 2012).

year later, Hurd reinforced to investors that "[w]e are very focused on the cloud."[38] Once again, in 2016, Defendant Catz told investors that, "as you know, our focus is now on cloud" and that "[w]e had leading products to begin with, but we started and rewrote them all, focused exclusively – really focused on the cloud." During the Class Period, the Company's executives continued to assure investors that they were singularly focused on "cloud revenues," with Hurd telling investors that his "focus" was on the "transformation to the cloud."[39] That Hurd and other Defendants were, by their own admissions, "very focused" and "laser-focused" on the Company's cloud business and revenues further strengthens the inference that they knew or were deliberately reckless in disregarding that material portions of cloud revenue were tied to financial engineered deals. This is particularly true as to Hurd, who headed the Company's sales operation.

#### 7. Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Class Period, Underscoring Its Efforts To Obscure Declining Growth

273. The manner in which Oracle attempted to conceal its deteriorating cloud revenues further supports the scienter inference as to Hurd. As discussed above, in June 2018, Defendants dramatically changed Oracle's financial reporting of cloud revenues. Specifically, Oracle stopped separately reporting financial results for its cloud business, instead consolidating those results into its legacy "on-premises" business. In so doing, they attempted to – and did – mask the Company's deteriorating cloud performance, which was no longer powered by a huge volume of deals completed through coercive sales tactics and audits.

274. Oracle's sudden and drastic change in its financial reporting is particularly suspicious when considered in the context of Oracle's prior decisions to report separately its cloud and non-cloud revenues. In September 2015, the Company heralded its decision to separately report its cloud and non-cloud revenues, as it would "better reflect how we look at the Company now that cloud has become a significant contributor to revenue." Then, in June 2017 the Company

---

[38] Rachel King, "Oracle's Hurd defends cloud strategy in light of exec shuffle," *ZDNet* (September 29, 2014).

[39] Steven Bertoni, "PODCAST: Oracle CEO Mark Hurd On How A Tech Giant Can Stay Nimble and Bet Big On Future Trends," *Forbes* (February 27, 2018).

announced that it would start disclosing additional details regarding its "cloud revenues," including breaking out cloud SaaS revenue separately from cloud PaaS/IaaS revenue. Oracle touted this additional "cloud" disclosure at the time as a "significant improvement in our financial reporting to align with how we are running the business now" because the "cloud has become our predominant growth vehicle." That Oracle would suddenly eliminate its critical "cloud" revenue disclosures – just twelve months after introducing additional disclosures to "significant[ly] improv[e]" in its financial reporting – further strengthens the scienter inference.

275. Oracle's top competitors – including Amazon, Microsoft, and IBM –separately reported (and continue to separately report) their "cloud" and "non-cloud" revenues, ensuring that investors are given "a clear view of [their] cloud growth." Such disclosure is valuable because "[s]oftware is moving to the cloud, and without explicit, easy to understand, non-changing data, it is going to be difficult for investors to correctly appraise the more valuable recurring Cloud business."[40]

276. Analysts' contemporaneous reaction to Oracle's about-face change in its financial reporting further demonstrates its suspicious nature. William Blair concluded the change was "an attempt to pull the proverbial wool over investors' eyes—particularly related to cloud sales." Oppenheimer identified the reporting change as "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business." JPMorgan similarly characterized the change as an attempt to "obfuscate[] one of the most important metrics to gauge the cloud transition story." *The Upper Edge* characterized the change as "suggest[ing] that [Oracle] may have something to hide." Analysts also correctly found Oracle's stated rationale for the move – i.e., that it is difficult to distinguish cloud revenue from traditional on-premises revenue – dubious, stating that they had "a hard time buying into that argument" and that they were "not convinced by Oracle's explanation," particularly given Oracle's "multi-year effort to pitch itself as a leading cloud vendor" and that Oracle's cloud competitors were all reporting these figures.

### 8. Hurd Knew That Oracle's Cloud Technology Was Deeply Flawed

[40] Jordan Novet, "Oracle Falls 7% After Company Reduced Visibility Into Its Cloud Business," *CNBC* (June 20, 2018).

277. The Complaint also gives rise to a strong inference that Hurd knew or was deliberately reckless in disregarding that Oracle's cloud technology was seriously flawed when he and other Defendants repeatedly emphasized its purported strength and superiority. As reported by FE 10, the Company's cloud technology was riddled with numerous fundamental deficiencies, and these severe deficiencies were discussed every other month with Defendants Kurian and Miranda. Internal Oracle email shows that Hurd was informed of, and focused on, significant defects with Oracle's cloud technology, namely, the user interface that was "so atrocious" that it was simply "a disgrace." The flaws were so material to Oracle that its most senior executives, including Hurd, Catz and Ellison, were keenly focused on them. As Kurian wrote: "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful."

**B. The Complaint Alleges a Strong Inference of Scienter as to Defendant Catz**

278. Numerous facts give rise to the inference that, at the time Catz made her false and misleading statements, she knew or was deliberately reckless in disregarding that a material portion of Oracle's cloud revenues were tied to financially engineered deals, and that its cloud products were deeply flawed.

279. Like Hurd, Defendant Catz knew and had access to information demonstrating that Oracle generated cloud revenue growth through audits and attached deals. As detailed above, numerous former Oracle employees, including FE 1, FE 3, and FE 7 explained that Defendants Hurd and Catz approved Oracle's engineered cloud deals through the DAS system. As these former Oracle employees explained, entries on DAS made clear whether a cloud deal was closed using the ABC scheme, as well as whether it was an attached deal. DAS entries specified whether a deal was audit-driven, whether LMS was engaged as part of the sales process, and whether steep discounts were requested as part of an attached deal. Moreover, multiple former Oracle employees independently confirmed that Defendants Hurd or Catz had to sign off on large deals and deals that included a steep discount, as virtually all attached deals did. FE 1 further stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in

approval notifications that were released once Hurd or Catz signed off on the deal. FE 1 provided specific examples of audit-driven cloud deals closed in fiscal year 2017 to companies such as Oreedo QSC, Samba Financial Group, and National Water Company, through which Oracle collectively booked approximately $56 million in cloud revenue. Each of these deals were approved by Hurd through the DAS system, and each approved entry on the DAS system clearly indicated that the deal was generated through "cloud insertion," *i.e.*, through the use of the ABC tactic.

280. Further, the remainder of the scienter allegations above alleged as to Hurd equally apply to Defendant Catz, including the facts that: (i) Oracle's use of engineered deals to drive cloud sales was extremely widespread throughout the Company (¶¶ 257–59); (ii) Catz knew of public allegations that Oracle generated cloud revenues through coercive audits (¶¶ 260–62); (iii) Defendants falsely attributed Oracle's success to supposedly legitimate factors, while denying the allegations that Oracle was using audits to close cloud sales (¶¶ 263–68); (iv) Oracle repeatedly changed the way it reported cloud revenue during the Class Period to obscure declining cloud sales (¶¶ 273–76); (v) the transition to cloud, and reporting growing cloud revenue, was the most important issue facing the Company (¶¶ 269–71); and (vi) Catz and other Defendants were deeply focused on Oracle's cloud revenues (¶ 272).

281. The Complaint also gives rise to a strong inference that Catz knew or was deliberately reckless in disregarding that Oracle's cloud technology was seriously flawed. As reported by FE 10, the Company's cloud technology was riddled with numerous fundamental deficiencies, and these severe deficiencies were discussed every other month with Defendants Kurian and Miranda. Internal Oracle email shows that Catz was informed of, and focused on, significant defects with Oracle's cloud technology, namely, the user interface that was "so atrocious" that it was simply "a disgrace." The flaws were so material to Oracle that its most senior executives, including Hurd, Catz and Ellison, were keenly focused on them. As Kurian wrote: "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful."

### C. The Complaint Alleges a Strong Inference of Scienter as to Defendant Kurian

282. The Complaint gives rise to a strong inference that Kurian knew or was deliberately reckless in disregarding that Oracle's cloud technology was untenable. According to FE 10, Defendant Kurian and FE 10 met every two months, and discussed that Oracle's cloud products were not functional, that clients were not able to use or deploy the products, and that these widespread failures were contributing to extremely low cloud subscription renewals. FE 10 said, for example, "Customers saw our performance as inferior to our competitors. I had been telling Steve [Miranda] and Thomas [Kurian] for years about this but nothing changed. It was untenable."

283. Internal Oracle email shows that Kurian was well aware of, and focused on, significant defects with Oracle's cloud technology. Kurian's October 2017 email demonstrates that he knew that the user interface for Oracle's cloud software "was considered so atrocious" that it was simply "a disgrace." The flaws were so material to Oracle that its most senior executives, including Hurd, Catz and Ellison, were keenly focused on them. As Kurian wrote: "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful."

284. Further, many of the scienter allegations pled as to Hurd and Catz apply equally to Defendant Kurian, and demonstrate that he knew, or was deliberately reckless in disregarding that material portions of Oracle's cloud revenue were generated through attached deals. These including the facts that: (i) Oracle's use of engineered deals to drive cloud sales was extremely widespread throughout the Company (¶¶ 257–59); (ii) Kurian knew of public allegations that Oracle generated cloud revenues through coercive audits (¶¶ 260–62); (iii) Oracle repeatedly changed the way it reported cloud revenue during the Class Period to obscure declining cloud sales(¶¶ 273–76); (iv) the transition to cloud, and reporting growing cloud revenue, was the most important issue facing the Company (¶¶ 269–71); and (v) Kurian and other Defendants were deeply focused on Oracle's cloud revenues (¶ 272).

### D. The Complaint Alleges a Strong Inference of Scienter as to Defendant Bond

285. As discussed above, Defendant Bond made misleading statements throughout the Class Period, including in response to analysts' specific inquiries. For example, on May 9, 2017, an analyst questioned Defendant Bond about the importance of audits as a driver of revenue growth and whether he could provide "some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." Defendant Bond acknowledged that this issue was well known by him and Oracle, but misleadingly minimized the extent to which, and manner in which, the Company's audit practices were driving its revenue growth, stating that "[t]his is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities." Defendant Bond further assured investors that Oracle did not use extortive audits and the audits were not an issue as to the cloud business, stating that "we try to do it as best we can, in as gracious [a] way as we can" and that "as we go to cloud, we don't have to worry about that anymore." Defendant Bond also falsely attributed Oracle's cloud business growth to legitimate business factors. At a November 7, 2017 industry conference, Defendant Bond explained why customers were purportedly moving from on-premise to cloud, stating that "from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early."

286. It was, at a bare minimum, deliberately reckless for Defendant Bond to make such statements when, in truth, Oracle was engaged in precisely the conduct he denied, and a highly material portion of cloud revenue was generated through financial engineered deals.

287. Further, many of the scienter allegations pled as to Hurd and Catz apply equally to Defendant Bond, including the facts that: (i) Oracle's use of engineered deals to drive cloud sales was extremely widespread throughout the Company (¶¶ 257–59); (ii) Bond knew of public allegations that Oracle generated cloud revenues through coercive audits, and falsely denied them (¶¶ 260–62); (iii) Oracle repeatedly changed the way it reported cloud revenue during the Class Period to obscure declining cloud sales (¶¶ 273–76); (iv) the transition to cloud, and reporting

growing cloud revenue, was the most important issue facing the Company (¶¶ 269–71); and (v) Defendants were deeply focused on Oracle's cloud revenues (¶ 272). Likewise, the scienter allegations with respect to the severe deficiencies in Oracle's cloud product apply to Defendant Bond. Given the prominent nature of those deficiencies, how much attention they received from Oracle's most senior executives, and how often those executives discussed them, there is a strong inference that Bond knew of those facts or was deliberately reckless as to them.

### E. The Complaint Alleges a Strong Inference of Scienter as to Defendant Miranda

288. The Complaint gives rise to a strong inference that Miranda knew or was deliberately reckless in disregarding that Oracle's cloud technology was untenable. According to FE 10, Defendant Kurian and FE 10 met every two months, and discussed that Oracle's cloud products were not functional, that clients were not able to use or deploy the products, and that these widespread failures were contributing to extremely low cloud subscription renewals. FE 10 said, for example, "Customers saw our performance as inferior to our competitors. I had been telling Steve [Miranda] and Thomas [Kurian] for years about this but nothing changed. It was untenable." Likewise, FE 3 stated that customers did not want to move to the Oracle Cloud because it was not ready for their production workload.

289. Internal Oracle email from Kurian to Miranda shows that Miranda knew of, and focused on, significant defects with Oracle's cloud technology. The October 2017 email from Kurian demonstrates that Miranda knew that the user interface for Oracle's cloud software "was considered so atrocious" that it was simply "a disgrace." The flaws were so material to Oracle that its most senior executives, including Hurd, Catz and Ellison, were keenly focused on them. As Kurian wrote to Miranda: "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful."

290. While in possession of this knowledge, Defendant Miranda made statements extolling the purported functionality and even superiority of Oracle's cloud technology.

291. Further, many of the scienter allegations pled as to Hurd and Catz apply equally to Defendant Kurian, and demonstrate that he knew or was deliberately reckless in disregarding that material portions of Oracle's cloud revenue were generated through attached deals. These including the facts that: (i) Oracle's use of engineered deals to drive cloud sales was extremely widespread throughout the Company (¶¶ 257–59); (ii) Miranda knew of public allegations that Oracle generated cloud revenues through coercive audits, and assured investors that Oracle's cloud performance was driven by purely legitimate business factors (¶¶ 260–62); (iii) Oracle repeatedly changed the way it reported cloud revenue during the Class Period to obscure declining cloud sales (¶¶ 273–76); (iv) the transition to cloud, and reporting growing cloud revenue, was the most important issue facing the Company (¶¶ 269–71); and (v) Miranda and other Defendants were deeply focused on Oracle's cloud revenues (¶ 272).

### F. The Complaint Alleges a Strong Inference of Scienter as to Defendant Ellison

292. As discussed above, multiple sources informed Defendant Ellison of Oracle's use of financially engineered deals to inflate the Company's cloud revenues, as set forth in detail above. As one example, Clear Licensing sent a letter to Defendant Ellison and Oracle's Board, informing him of the customer survey results, expressing concern that Oracle's audits were being used to improperly generate cloud revenues, and warning him of Oracle's inability to meet its stated $1 billion cloud sales target next year if these practices continued to go unaddressed.

293. Defendant Ellison also touted Oracle's cloud growth as the single most important issue facing the Company, and stated that he and other members of senior management were deeply focused on the Company's cloud revenue, as already shown. Defendant Ellison began stating in late 2012 that "over the next couple of years senior management down to individual programmers and sales people are focused on one thing: selling applications in the cloud, selling our platform in the cloud and selling our infrastructure in the cloud," echoing that the Company was "laser-light focused" on cloud. Defendant Ellison also told investors during the Company's November 2017 annual shareholders meeting that "[w]e expect the bulk of our business going forward, and the bulk of our growth will be driven by our public cloud business."

294. Further, many of the other scienter allegations pled as to Hurd and Catz apply equally to Defendant Ellison, and demonstrate that he knew or was deliberately reckless in disregarding that material portions of Oracle's cloud revenue were generated through attached deals. These include the facts that: (i) Oracle's use of engineered deals to drive cloud sales was extremely widespread throughout the Company (¶¶ 257–59); (ii) as noted, Ellison knew of public allegations that Oracle generated cloud revenues through coercive audits (¶¶ 260–62); (iii) Oracle repeatedly changed the way it reported cloud revenue during the Class Period to obscure declining cloud sales (¶¶ 273–76); (iv) the transition to cloud, and reporting growing cloud revenue, was the most important issue facing the Company (¶¶ 269–71); and (v) Ellison and other Defendants were deeply focused on Oracle's cloud revenues (¶ 272).

295. The Complaint also gives rise to a strong inference that Ellison knew or was deliberately reckless in disregarding that Oracle's cloud technology was seriously deficient and not as represented. As reported by FE 10, the Company's cloud technology was riddled with numerous fundamental deficiencies, and these severe deficiencies were discussed every other month with Defendants Kurian and Miranda. Internal Oracle email shows that Ellison was informed of, and focused on, significant defects with Oracle's cloud technology. The October 2017 email from Kurian to Miranda email demonstrates that it was well-known within Oracle that the user interface for Oracle's cloud software "was considered so atrocious" that it was simply "a disgrace." The flaws were so material to Oracle that its most senior executives, including Hurd, Catz and Ellison, were keenly focused on them. As Kurian wrote: "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful."

### G. The Core Operations Doctrine Further Supports An Inference of Scienter as to All Defendants

296. In conjunction with the scienter allegations set forth above, the core operations doctrine further supports an inference of scienter as to all Defendants with respect to Oracle's use of financially engineered deals, as well as the severe defects in Oracle's cloud offerings. Several factors support the core operations inference here.

297. First, Defendants had access to the information at issue. For example, financially engineered deals were recorded in the DAS system, and clearly marked as ABC or attached deals. Deals in excess of $5 million, or involving a 50% or greater discount on software, had to be approved by Hurd or Catz. FE 1 provided multiple examples of ABC deals that were approved by Hurd. In addition, FE 2 described how presentations were prepared for Hurd at the end of fiscal year 2016 showing that 90-95% of Oracle's Company-wide IaaS and PaaS cloud deals, alone comprising about 30% of overall cloud revenue, did not have any use cases associated with them.

298. FE 1 also reported that Hurd pioneered the ABC tactic. Former Employees reported that Hurd's direct reports carried out the tactic and widely discussed it. FE 11 reported that Hurd's direct report, Geraffo, specifically instructed the sales force to "seed" deals by using the ABC tactic. FE 3 similarly reported that Geraffo stated that "cloud was the future of Oracle's business model, and that auditing was a part of Oracle's business and strategy to drive revenue," and that "Oracle needed these numbers to show investors." FE 2 similarly reported that Hurd's direct reports (Shawn Price and David Donatelli) discussed the fact that 90-95% of the Company's cloud sales had no use cases associated with them in 2016 and 2017.

299. Similarly, Defendants had access to the information concerning Oracle's severe product defects. FE 10 met routinely with Miranda and Kurian – at least every two months between 2015 and October 2017 – to discuss the fact that Oracle's cloud products were not functional, that clients were not able to use or deploy the products, and that, as a result of these widespread failures, there was extremely poor demand for Oracle's cloud services. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor, as well that he was facing increasing pressure from Catz to address the serious deficiencies in Oracle's cloud offering. In addition, studies conducted by FE 10's team between 2015 and 2018 and provided to Kurian and Miranda detailed widespread, structural issues with Oracle's cloud products, including loss of functionality when customers attempted to migrate on-premise solutions to the cloud.

300. Kurian, who was in charge of developing Oracle's cloud products, reported to Ellison, who was in charge of technology at the Company. Kurian's October 19, 2017 email to

Miranda further demonstrates that those Defendants, as well as Hurd, Catz, and Ellison, were keenly attuned to and repeatedly discussed the significant defects in Oracle's cloud products.

301. Second, the use of financially engineered deals was ubiquitous at Oracle during the Class Period, which strengthens the core operations inference. Notably, Hurd oversaw Oracle's sales, and the use of the ABC tactic was an edict from Hurd that was implemented by his direct reports, such as Geraffo. As discussed above, FE 11 described how Oracle's salespeople were ordered to attend "white board sessions," *i.e.*, sales tutorials, on how to use the ABC tactic. Hurd's edict was implemented widely: FE 2's report demonstrates that 90-95% of Oracle's Company-wide cloud sales during fiscal year 2017 were generated through engineered deals. Several additional North American cloud executives – the region which generated 50% of Oracle's revenue – reported that approximately 90% of Oracle's North American cloud revenue during the Class Period was generated through engineered deals.

302. Third, Oracle's ability to build a high-quality cloud product and rapidly grow its cloud sales were the most prominent issues facing the Company during the Class Period, and the issues on which the market was closely focused. As noted above, Catz stated that Oracle's "move to cloud" was "the biggest and most important opportunity in our Company's history." Hurd, Catz and Ellison spent the large majority of their time on investor calls discussing the cloud, and Oracle's cloud growth was the driver of Oracle's stock price during the Class Period. The importance of these issues to Oracle and the market supports the inference that the Company's senior executives were aware of the key facts, including that the Company's cloud technology was severely deficient, and the vast majority of Oracle's cloud sales were tied to financially engineered deals.

303. Fourth, Defendants stated that they were personally focused on cloud sales. As noted above, Ellison stated that "over the next couple of years senior management down to individual programmers and sales people are focused on one thing: selling applications in the cloud, selling our platform in the cloud and selling our infrastructure in the cloud," echoing that the Company was "laser-light focused" on cloud. Hurd reinforced to investors that "[w]e are very focused on the cloud." Once again, in 2016, Defendant Catz told investors that, "as you know, our

focus is now on cloud" and that "[w]e had leading products to begin with, but we started and rewrote them all, focused exclusively – really focused on the cloud." Defendants' admitted focus on cloud products and cloud sales strengthens the inference that they knew of important and prominent facts concerning the source of the vast majority of cloud revenue (financially engineered deals) and the quality of the product.

304. Fifth, the issue of whether Oracle was employing audits to drive cloud sales was prominently discussed before and during the Class Period, and Defendants falsely denied and minimized it. For example, prior to the Class Period, the well-recognized industry group Clear Licensing Counsel sent a highly-publicized letter to Defendant Ellison and Oracle's Board of Directors, including Hurd and Catz, documenting Oracle's coercive sales tactics and warning that Oracle needed to cease such tactics "if you wish to succeed in migrating them to your cloud computing services." In addition, major media outlets – including *Forbes* and *Business Insider* – ran news stories with accusations that Oracle was generating its cloud revenues through coercive audits – not through legitimate sales. Further, the Chilean anticompetition regulator questioned Oracle and issued a finding that Oracle was misusing its license audits to generate cloud revenue from on-premise customers who neither wanted nor intended to use Oracle's cloud product. Simply put, this prominent issue was not something that could have escaped management's attention – because management was repeatedly questioned on it.

305. Finally, in conjunction with all the facts summarized above, Defendants' positions and roles at the company lend additional support to the core operations inference, because they were all well-positioned to know that Oracle's cloud revenue growth was driven by financially engineered deals, and/or its cloud products were severely deficient. For example, Hurd headed sales, and was therefore well-positioned to know the Company's principal sales strategy as to cloud, *i.e.*, financial engineered deals. Hurd has publicly touted how he "stay[s] close to the action,"[41] earning him the description as an executive that "digs into details and is a hands on

[41] Barb Darrow, "So, huge changes at Oracle with Ellison stepping down right? Wrong!" Gigaom, (September 18, 2014).

manager that examines every alternative."[42] As detailed above, both Hurd and Catz approved financially engineered cloud deals and discussed the deficiencies in Oracle's cloud product with Kurian, among others. Kurian headed the development of Oracle's cloud products and therefore was well-positioned to know about the quality of the cloud products. Kurian's colleagues described him as a hands-on manager, stating that he "likes to get involved in the minutia of various projects" and "does not sufficiently delegate responsibility."[43] He reported directly to Ellison, who headed Oracle's technology development and who, according to the Company's SEC filings, maintains a "knowledge of [Oracle's] technologies and product offerings" that was "unmatched." Miranda also reported to Kurian, worked in cloud product development, and received reports about deficiencies in the cloud product. Oracle's website acknowledges Miranda as "responsible for leading all aspects of product strategy, product development, and product delivery for the entire portfolio of Oracle Applications."

306. In light of the above facts, it would be absurd to think that Defendants were unaware of the undisclosed facts about Oracle's cloud product and the true sources of the Company's cloud revenues.

### H. Although Neither Insider Sales Nor "Motive And Opportunity" Allegations Are Required, Both Exist Here

307. As explained below, Hurd, Catz, Ellison, and Kurian were each highly motivated to misleadingly inflate Oracle's cloud revenues through the use of engineered deals (and artificially inflate its stock price) by virtue of the Company's compensation plan. Further, Kurian, Catz and Hurd sold substantial amounts of Oracle stock during the Class Period.

#### 1. Defendants' Compensation Plan Motivated Hurd, Catz, Ellison and Kurian to Inflate Cloud Revenues Through Financially Engineered Cloud Deals

308. As the Company increasingly realized that its success rose and fell with its cloud growth, it took steps to closely align executive compensation with that cloud growth. This

[42] Paul R. La Monica, "HP's Hurd mentality," *CNN Money* (March 29, 2005).

[43] Nadia Damouni, "Ellison's backing helps Kurian's star to rise at Oracle," Reuters (January 11, 2015).

alignment started in 2016 and increased over time. Consequently, Hurd, Catz, Ellison and Kurian were powerfully motivated to ensure that the cloud business and cloud sales appeared to be thriving, as massive amounts of their compensation depended on this.

309. Oracle's September 23, 2016 Proxy stated in a section titled "Transition to the Oracle cloud" that "Oracle customers are increasingly electing to run their IT environments using our suite of Oracle Cloud offerings" and "[w]e are aggressively pursuing the opportunities presented by this shift in customer preferences…." The September 23, 2016 Proxy announced that in fiscal year 2016, "the Compensation Committee sought to align key elements of our executive compensation with our transition to the Oracle Cloud." First, as stated in the Proxy "[s]tock options granted to our Chairman and Chief Technology Officer ("CTO") [Ellison] and our Chief Executive Officers ("CEOs") [Catz and Hurd] will expire after five years, rather than ten years, while maintaining a four-year vesting schedule, to closely align the term of these awards with Oracle's goal of accelerating growth in cloud-based revenue over the next five years." According to the proxy, for fiscal year 2016, Defendants Ellison, Catz and Hurd each received 2,250,000 stock options at a fair value of $18,103,275 at the time of the grant date. Defendant Kurian received 2 million stock options with a fair value as of the grant date of $15,490,000. For fiscal year 2017, Defendants Ellison, Catz and Hurd each received 2,250,000 in stock options at a fair value of $16,863,075 at the time of the grant date. Defendant Kurian received 2 million options at a fair value of $14,515,200 at the time of the grant date.

310. Further, in a September 5, 2017 press release, the Company stated that for fiscal year 2018, the "Compensation Committee granted each named executive officer (NEO) an equity award consisting entirely of performance-based stock options (Performance Options) that may be earned only upon the attainment of stock price, market cap and operational performance goals over a five-year performance period." These Performance Options would be earned "only if Oracle both (1) significantly grows its cloud business and (2) returns value to stockholders." In response, RBC Capital Markets noted in a September 11, 2017 analyst report that, "New performance based parameters for Oracle's NEOs highlight cloud growth ambitions while also requiring market cap thresholds to be met in order to trigger tranches."

311. For fiscal year 2018 (beginning on June 1, 2017 and ending on May 31, 2018) Oracle made significant compensation changes, including that "Performance Options [for Ellison, Catz, Hurd, and Kurian] will be earned only if Oracle both (1) significantly grows its cloud business and (2) returns value to stockholders." The Company based the "Performance Options" on seven different possible "tranches," six of which could be earned only if "Oracle satisfies a combination of (1) an operational performance goal tied to significant growth of Oracle's cloud business and (2) a substantial increase in Oracle's market capitalization." Six of the cloud-based operational goal options required to obtain Performance Options were as follows: (1) become the largest enterprise SaaS company as measured by an independent third-party report; (2) attain $20 billion in non-GAAP total cloud revenues in a fiscal year; (3) attain $10 billion in non-GAAP total SaaS revenues in a fiscal year; (4) attain $10 billion in non-GAAP total PaaS and IaaS revenues in a fiscal year; (5) attain non-GAAP SaaS gross margin of 80%; and (6) maintain non-GAAP PaaS/IaaS gross margin of at least 30% for three of the five fiscal years in the performance period. As stated in Oracle's Proxy, this meant that for performance-based compensation, the metric had changed from being based in fiscal 2017 on "revenue growth and cash flow growth" to "attainment of stock price, market capitalization and operational performance goals focused on cloud growth" in fiscal 2018.

312. At the grant date, the fair value of the Performance Options granted to Ellison, Catz and Hurd for fiscal 2018 was $103.7 million for each individual and the fair value of the Performance Option award for Kurian was $69.38 million. Accordingly, these individuals had very powerful incentives to inflate Oracle's cloud revenues and growth rates through financial engineered deals.

### 2. Kurian, Hurd, and Catz Sold Substantial Oracle Stock During The Class Period

313. Kurian, Hurd and Catz also sold substantial amounts of their personal shares during the Class Period. Trading information was not available for Bond and Miranda because they were not reporting persons.

314. Defendant Kurian sold over 2.4 million shares, reaping over $191 million in insider trades.

315. Defendant Kurian's sale transactions, which were made over the open market and not pursuant to any 10b5-1 plan, are set forth below:

| Defendant | Transaction Dates | Shares Sold | Price Per Share | Total Value ($) |
|---|---|---|---|---|
| **KURIAN** | 07/18/17 | 750,000 | $50.46 | $37,843,275 |
| **KURIAN** | 01/18/18 | 1,500,000 | $50.29 | $75,433,950 |
| **KURIAN** | 01/18/18 | 200,000 | $50.29 | $10,057,860 |
| **KURIAN** | 04/23/18 | 137,843 | $46.13 | $6,358,698 |
| **KURIAN** | 04/26/18 | 300,000 | $46.06 | $13,818,000 |
| **KURIAN** | 04/27/18 | 25,600 | $46.06 | $1,179,136 |
| **KURIAN** | 04/30/18 | 57,155 | $46.00 | $2,629,130 |
| **KURIAN** | 05/02/18 | 91,888 | $45.85 | $4,213,065 |
| **KURIAN** | 05/02/18 | 253,877 | $45.85 | $11,640,260 |
| **KURIAN** | 05/03/18 | 333,637 | $45.15 | $15,063,711 |
| **KURIAN** | 05/04/18 | 300,000 | $45.15 | $13,545,000 |
| **Totals** | | **3,950,000** | | **$191,782,084** |

316. Defendant Kurian's sales were unusual and suspicious in size and timing. For example, Kurian's sale on July 18, 2017 in which he sold 750,000 shares at over $50 per share, reaping over $37.8 million in gross proceeds, was made shortly after the Company announced positive fourth quarter fiscal year 2017 results on June 21, 2017, including that cloud revenues had increased by 58% to $1.4 billion, that sent the Oracle's shares to a historic high for the Company. For Kurian, this one sale represented nearly 7% of his entire holdings.

317. Similarly, with regard to the second transaction on January 18, 2018, Kurian sold 1.7 million shares again at a share price of over $50 for gross proceeds of approximately $85.5 million. This sale represented about 15% of Defendant Kurian's inventory at that time. This sale was made toward the end of the third quarter of fiscal year 2018, the period for which Defendants would later disclose – after Kurian unloaded his personal shares – that Oracle's cloud revenue

growth had stagnated and that the Company forecasted significantly slower sales growth for its cloud business than its competitors. When Oracle ultimately revealed this negative news to investors on March 19, 2018, the Company's shares plummeted by over 9.4% to $47.05. Thus, Defendant Kurian's January 2018 sales allowed him to avoid this loss and instead cash out on the artificially inflated stock price resulting from Defendants' misrepresentations and omissions.

318. Likewise, Kurian's flurry of sales made over the course of 10 trading days in late April and early May 2018, amounted to 1.5 million shares, or 15.6% of Kurian's holdings, for gross proceeds of over $68 million. Defendant Kurian made these sales at the end of the fourth quarter of fiscal year 2018, the period for which the public would later learn – after Kurian dumped his personal shares on the market – that Oracle's cloud growth had been misleadingly inflated as a result of the improper sales tactics described herein Significantly, Kurian's sales were executed at a weighted average price of $45.63, a stark difference from the close price at the end of the Class Period on June 20, 2018 of $42.82, thereby yielding Kurian an additional several million dollars as a result of Defendants' fraud.

319. Finally, Defendant Kurian's sales were inconsistent with his prior trading history. Defendant Kurian sold a higher percentage of his available shares during the Class Period than in the previous period of the same length. Indeed, Defendant Kurian sold 42.5% of his available shares during the Class Period – which was nearly three-times the percentage of shares that he sold in the prior period of equal length. Specifically, during the prior period of the same length Kurian sold only 1,104,300 shares, or 15.5% of his available shares, for gross proceeds of approximately $45.7 million.

320. Defendant Catz sold 5 million shares in insider trades, reaping $250 million in insider trades. While Defendant Catz's sales were enacted pursuant to a 10b5-1 trading plan, this does not show as a matter of law that the sales cannot support an inference of scienter.[44] The trading

[44] This is especially so given that even congress has realized that 10b5-1 is problematic given its "potential susceptibility to abuses that could facilitate insider trading by corporate insiders." *Congressional Research Service*, Reexamining the Rule 10b5-1 Trading Plan Defense to Insider Trading (January 31, 2019), at https://fas.org/sgp/crs/misc/LSB10249.pdf. For example, the Council of Institutional Investors has pointed to various characteristics of the 10b5-1 trading plans that might make them susceptible to exploitation, including "an insider's ability to adopt a plan

plan was enacted during the Class Period on October 12, 2017 while she was in possession of material non-public information; the terms of the trading plan are not known; and they easily could have given Catz every incentive to boost the Company's cloud sales and its stock price in the manner alleged herein.

321. Defendant Catz's insider trading was as follows:

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value ($) |
|---|---|---|---|---|
| CATZ | 1/16/2018 | 450,847 | $50.01 | $22,546,858 |
| CATZ | 1/17/2018 | 4,549,153 | $50.05 | $227,685,107 |
| **Totals** | | **5,000,000** | | **$250,231,965** |

322. Defendant Catz's sales were unusual and suspicious in size and timing. For example, on January 16 and January 17, 2018, Defendant Catz sold 5,00,000 shares for gross proceeds of over $250 million. This sale represented about 15% of Defendant Catz's shares at that time. This sale was made toward the end of the third quarter of fiscal year 2018, the period for which Defendants would later disclose – after Catz sold her personal shares - that Oracle's cloud revenue growth had stagnated and that the Company forecasted significantly slower sales growth for its cloud business than its competitors. When Oracle ultimately revealed this negative news to investors on March 19, 2018, the Company's shares plummeted by over 9.4% to $47.05. Thus, Defendant Catz's January 2018 sales allowed her to avoid this loss and instead cash out on the inflated stock price resulting from Defendants' misrepresentations and omissions.

323. Finally, Defendant Catz's sales were inconsistent with her prior trading history. Defendant Catz's sales during the Class Period equated to 17% percent of her available shares

shortly before the trading is to begin (e.g., within days), the ability to cancel or amend the plan at any time, and the lack of disclosure rules surrounding plan adoption and alterations. These potential weaknesses have raised suspicions among critics that insiders may in fact be strategically entering into or modifying the plans based on material nonpublic information (e.g., entering into a plan days before the announcement of a major corporate event), but still utilizing the plan as a mask for inappropriate trading activity." Thus, trading performed pursuant to a 10b5-1 plan is still supportive of scienter.

during the Class Period, while she sold only 12.8% of her available shares during the prior period of the same length.

324. During the Class Period, Hurd sold 1.4 million shares, reaping more than $62.5 million in total proceeds. While Hurd's sales were enacted pursuant to a pre-Class Period 10b5-1 plan, this does not show as a matter of law that the sales cannot support an inference of scienter. The terms of his trading plan are not known, and easily could have given Hurd every incentive to boost the Company's cloud sales and its stock price in the manner alleged herein. Hurd's sales were as follows:

| Defendant | Transaction Dates | Shares Sold | Price per Share | Total Value ($) |
|---|---|---|---|---|
| HURD | 3/16/17 | 700,000 | $46.44 | $32,508,000 |
| HURD | 4/3/17 | 350,000 | $44.84 | $15,694,000 |
| HURD | 7/3/17 | 350,000 | $49.76 | $17,416,525 |
| **Totals** | | **1,400,000** | | **$65,618,525** |

325. Hurd's sales were unusual and suspicious in size and timing. For example, Hurd's sale on July 3, 2017 in which he sold 350,000 shares at $49.76 per share, reaping over $17 million in gross proceed was made shortly after the Company announced positive fourth quarter fiscal year 2017 results on June 21, 2017, including that cloud revenues had increased by 58% to $1.4 billion, which sent Oracle's shares to a historic high price. Hurd's insider selling stopped near the time that Oracle's ability to generate cloud revenue through ABC and attached deals began to significantly wane, as numerous Former Employees reported. After this time, Hurd made no additional sales during the Class Period.

326. Finally, Hurd's sales were inconsistent with his prior trading history. Hurd sold no shares during the prior period of the same length (December 8, 2015 to March 14, 2017).

## VII. DEFENDANTS' FAILURE TO DISCLOSE THAT ORACLE'S CLOUD REVENUE WAS INFLATED BY ENGINEERED DEALS VIOLATED GAAP

327. As discussed above, the federal securities laws imposed a duty on Defendants to disclose the true character and quality of Oracle's cloud revenue – including that the Company's

cloud revenue was generated in significant part through the use of ABC and attached deals. This is because such disclosures were necessary in order to make Defendants' statements – including statements explicitly denying the use of ABC and attached deals to generate cloud revenue – not misleading. In addition to this duty, U.S. Generally Accepted Accounting Principles ("GAAP") imposed a duty on Defendants to disclose the true facts concerning the Company's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results in the Company's SEC filings throughout the Class Period.

328. When a company provides multiple products or services as part of a single arrangement, GAAP requires the company to account for such arrangements pursuant to the provisions of ASC 605-25, which governs so-called "multiple-element arrangements." These arrangements may range from a relatively simple transaction contemplating the delivery of multiple products on a single date (*e.g.*, when a retailer sells a personal computer and printer to a customer and delivers each concurrently) to customized arrangements designed to provide an integrated solution to a customer's business needs, such as Oracle's software supply and maintenance contracts.

329. A transaction is subject to ASC 605-25 when it contains "multiple deliverables." As guidance published by Oracle's own outside auditor, Ernst and Young, makes clear, the definition of "deliverables" is broad and includes any "vendor performance obligation that was bargained for as part of the arrangement." In particular, if the "inclusion or exclusion of the item in the arrangement reasonably would be expected to cause the arrangement consideration to vary by more than an insignificant amount," then the item is considered a distinct deliverable. Likewise, Ernst and Young's guidance states that an item should be "presumed to be a deliverable" if it "requires a distinct action by the vendor."

330. As discussed above, throughout the Class Period, Oracle generated significant cloud revenue through "engineered deals." These engineered deals were multiple element arrangements and thus governed by ASC 605-25. Oracle's ABC scheme was an arrangement comprised of multiple elements: customers purchased a discount on audit penalties, and received a cloud subscription (which they neither wanted nor needed). Likewise, Oracle's "attached deals"

were, as the nickname implies, comprised of multiple elements: customers purchased a substantial discount on renewed on-premise licenses and, once again, also received a cloud subscription (which they neither wanted nor needed).

331. That these engineered deals constituted multiple element arrangements is clear from the fact that, from the customers perspective, exclusion of the non-cloud component (the discounts on audit penalties or on-premise license renewals) from the deal would not only "be expected to cause the arrangement consideration to vary by more than an insignificant amount," the customer would be unwilling to even transact in the first instance. Conversely, from Oracle's perspective, exclusion of the cloud component of the engineered deals would not only "be expected to cause the arrangement consideration to vary by more than an insignificant amount," Oracle would be unwilling to even offer the discounts on on-premise renewals and audit penalties.

332. ASC 605-25-50-2 requires reporting companies to make detailed disclosures about their multiple element arrangements. Specifically, ASC 605-25-50-2 states that a reporting company "shall disclose," among other things, "The nature of its multiple-deliverable arrangements" and "[t]he significant deliverables within the arrangements." Accordingly, under GAAP, Defendants were required, but failed, to disclose both the existence of Oracle's ABC and attached deals and describe the deliverables comprising them, including that the receipt of heavy discounts on audit penalties and on-premise products were tethered to the nominal "purchase" of unwanted cloud products.

333. Moreover, ASC 605-25-50-2 states that a reporting company "shall" provide "[a] discussion of the significant factors, inputs, assumptions, and methods used to determine selling price (whether vendor-specific objective evidence, third-party evidence, or estimated selling price) for the significant deliverables." Accordingly, under GAAP, Defendants were required, but failed to disclose, that, as part of its ABC deals, Oracle determined the value of the audit penalty assessed based on the customer's willingness to take on unwanted cloud products. Likewise, under GAAP, Defendants were required, but failed to disclose, that, as part of Oracle's attached deals, it determined the value of the on-premise license renewal charged to customers based on the customer's willingness to take on unwanted cloud products.

334. Additionally, ASC 605-25-50-2 states that a reporting company "shall" disclose "[w]hether the significant deliverables in the arrangements qualify as separate units of accounting, and the reasons that they do not qualify as separate units of accounting, if applicable." Oracle treated the items comprising its engineered deals – audit penalties, on-premise license renewals, and cloud products – as "separate units of accounting," recording revenue for each item sold through these arrangements separately. Even assuming this accounting treatment was appropriate under GAAP, Defendants were required, but failed, to identify "the significant deliverables in the arrangements qualify[ing] as separate units of accounting" and explain why those deliverables should be accounted for separately. In other words, GAAP, again, required Defendants to disclose the existence and composition of its engineered deals and to explain why, for instance, the cloud component of the deal should be treated as a "separate unit of accounting" despite the fact that the customer attached no value to it, did not want it and would not use it. Defendants did not disclose this information.

335. Defendants were well aware of Oracle's obligation to report cloud revenue in compliance with ASC 605-25. In its SEC filings throughout the Class Period, signed by Defendants Hurd and Catz, Oracle specifically assured investors that "[o]ur revenue recognition policy for non-software deliverables including ***cloud SaaS, PaaS and IaaS offerings*** . . . ***is based upon the accounting guidance contained in ASC 605-25, Revenue Recognition, Multiple-Element Arrangements***."

336. In fact, on November 25, 2014, the SEC sent Defendant Catz a comment letter inquiring into Oracle's compliance with ASC 605-25 in connection with its reporting of cloud revenue.

337. Oracle responded in a letter dated December 5, 2014, signed by the Company's Chief Accounting Officer and copying Defendant Catz, specifically recognizing that its "cloud-based multiple elements [were subject to] ASC 605-25, *Revenue Recognition, Multiple Element Arrangements*." Moreover, in the letter, Oracle assured the SEC that "[i]n future filings, we will revise our disclosure to properly reflect our accounting policies with respect to our cloud-based multiple element arrangements."

338. Accordingly, by the start of the Class Period, Defendants were not only aware of their obligation to report revenue in compliance with the requirements of ASC 605-25, they had committed to the SEC that the Company would ensure compliance with its provisions when reporting revenue attributed to "cloud-based" arrangements.

339. Lead Plaintiff also consulted with Harris L. Devor, CPA, a partner of the national accounting firm Friedman LLP. Mr. Devor has 46 years of experience as an auditor and forensic accountant, and has served as an expert witness on the proper application of GAAP principles, including on behalf of the U.S. Department of Justice and Securities Exchange Commission, in some of the largest securities fraud cases in history, including *In re Worldcom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.); *In re AOL Time Warner, Inc. Securities Litigation*, No. 06-cv-0695 (S.D.N.Y.); and *In re Petrobras Securities Litigation*, No. 14-cv-9662 (S.D.N.Y.). Mr. Devor reviewed the Complaint and relevant accounting literature, including ASC 605-25, Revenue Recognition, Multiple-Element Arrangements.

340. Mr. Devor explained, "Assuming the truth of the Complaint's allegations that Oracle engaged in ABC and attached deals and the sales tied to those tactics were material, ASC 605-25-50 would have required Oracle to disclose the use of ABC and attached deals to generate and report cloud revenue in its Forms 10-K and 10-Q filed with the SEC during the Class Period."

341. More specifically, Mr. Devor confirmed that "ASC 605-25-50 would have required Oracle to disclose, among other things, both the nature/existence of Oracle's ABC and attached deals, including the cloud revenue associated with those deals, and 'the significant factors, inputs, assumptions, and methods used to determine selling price' of the deliverables included in these engineered deals."

342. Further, Mr. Devor explained that "ASC 605-25's requirement that a company disclose the nature of its material 'multiple-element arrangements' is a well-known, commonly-applied GAAP requirement, particularly in the software industry -- consistent with Oracle's own specific reference to compliance with that provision in its SEC filings."

# VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

## A. Defendants' Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017

343. The Class Period begins on March 15, 2017. On that day, Oracle issued a press release announcing its financial results for the third quarter of fiscal year 2017, and filed that press release with the SEC on Form 8-K. The press release stressed the Company's growing cloud revenue, stating that, "Total Cloud Revenues, including infrastructure as a service (IaaS), were $1.2 billion, up 62% in U.S. dollars [year-over-year] and up 63% in constant currency."

344. Oracle's March 15, 2017 press release also quoted Catz, who emphasized Oracle's "hypergrowth" in cloud – including 85% for two key cloud businesses, SaaS and PaaS – and the positive impact of this volume growth on "nearly every important non-GAAP business metric," including both cloud and total margins:

> The ***hyper-growth we continue to experience in the cloud has rapidly drive both our SaaS and PaaS businesses to scale*** . . . . [O]ur SaaS and PaaS businesses grew at the ***astonishing rate of 85%*** in Q3. … ***Our new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect***; total revenue is up, margins are up, operating income is up, net income is up, EPS is up. Take a look. Q3 was a very strong quarter.

345. These statements were materially false and misleading when made. It was misleading for Defendants to report that Oracle's cloud revenues were $1.2 billion, and to state that Oracle's cloud business had experienced "hypergrowth," including 62% growth in total cloud revenue year -over-year and "astonishing" 85% year-over-year growth in SaaS and PaaS while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

346. Also on March 15, 2017, Oracle held its fiscal third quarter 2017 earnings conference call. On that call, Catz trumpeted Oracle's achievement of a key milestone in cloud, namely that cloud growth was now outpacing declines in the legacy on-premises business:

> Our pivot to the cloud is now clearly in full swing. ***We continue to see out[sized] growth rates in our cloud business, especially when compared with our key competitors who are all seeing slowing growth***; but more importantly***, the increase in revenue from our cloud business has overtaken new software license declines on an annual basis*** . . . .

347. On that same call, Hurd also highlighted Oracle's cloud growth, stating, "Cloud revenue was up 72% and were now at an annualized $5 billion run rate . . . . SaaS/PaaS revenue was up 86%." Hurd further stated that Oracle was "***<u>the fastest-growing scale cloud business in the world</u>***…"

348. Finally, on Oracle's March 15, 2017 earnings call, Ellison also told investors that Oracle's cloud business was "growing rapidly." Ellison stated, "***SaaS and PaaS are large, rapidly growing businesses for us. Together SaaS and PaaS grew 85% this past quarter***, but soon infrastructure as a service will be growing even faster, and before long infrastructure as a service will become Oracle's largest cloud business. In summary, ***all of Oracle's cloud businesses are growing rapidly*** …."

349. These statements were materially false and misleading when made. It was misleading for Defendants to state that Oracle was seeing "out[sized] growth rates in its cloud business," was "the fastest-growing scale cloud business in the world," and was "growing rapidly," and to report revenue growth rates noted above, while failing to disclose that (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

350. Analysts and investors reacted positively to Defendants' misleading statements about Oracle's cloud growth. For instance, a Cannacord analyst report dated March 15, 2017, stated that "Oracle, as it always does, spoke bullishly about its push into IaaS to counter Amazon and for now investors are believers." A Macquarie analyst report dated March 15, 2017 stated that "Oracle reported a solid third quarter, one of its best reports in years, even as the co. heads towards the tipping point in its cloud transition when cloud growth and margin scale are offsetting declines in new license revenues." Similarly, a Barclays analyst report dated March 16, 2017 stated "An Inflection Point? Oracle has had a tough transition to the cloud. However, management is now guiding for double-digit EPS growth in FY18 (partly helped by cost benefits from the recent hardware restructuring) and talks about increasing momentum around its IaaS business." A BTIG analyst report dated March 16, 2017 stated of Oracle's delivered strong F3Q17 results, that "we are continuing to see signs that we are at a material inflection point" in the Company's transition to cloud, and we "expect to see meaningful earnings growth in FY18 for the first time in three fiscal years" as a result of Oracle's "strong cloud revenue growth."

351. As a result of Defendants' representations, Oracle's stock price significantly increased from $41.70 on March 15, 2017 to $44.29 on March 16, 2017. Deutsche Bank reported on March 16, 2017 that "[t]he ***key catalyst*** for the after-market rally in the stock is the Cloud growth."

352. On March 16, 2017, financial news network CNBC broadcast an interview with Hurd. In that interview, an anchor asked Hurd about Oracle's ability to grow its cloud business and surpass its competitors. In response, Hurd touted the quality of Oracle's cloud products as vastly superior to the Company's competitors' offerings. Hurd stated, "We're really the only ones that have a complete suite of applications. I do not believe customers are going to want to have 10 different cloud providers, 8 different cloud providers. They want to have as few as they possibly can so they can get as much leverage across their infrastructure as possible. We sit in a very, very advantageous position relative to being the one that can bring the full suite, not just in applications but also in platform, as well as infrastructure."

353. Hurd's statements were materially false and misleading when made. It was misleading for Hurd to tout the quality of Oracle's cloud platform and to state that Oracle was "the only" cloud provider offering "a complete suite of applications," which placed the Company "in a very, very advantageous position," when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. Indeed, as FE 10 explained, Oracle did not offer a "complete suite" of cloud applications because the Company's applications were not actually integrated with each other, in contrast to competing products. Moreover, Oracle cloud did not allow customers to "leverage across their infrastructure" because, as FE 10 explained Oracle cloud's limited functionality would have required many customers to "redo all of their tech stack."

354. On March 17, 2017, Oracle filed its financial results for the third quarter of fiscal 2017 with the SEC on Form 10-Q. Oracle's March 17, 2017 Form 10-Q was signed by Defendants Catz and Hurd. The Form 10-Q reported that total cloud revenues for the three months ended February 28, 2017 were $1.189 billion, and for the nine months ended February 28, 2017 were $3.211 billion. The Form 10-Q further reported cloud SaaS and PaaS revenues were $1.011 billion and cloud IaaS revenues were $178 million for the three months ended February 28, 2017.

355. These statements were materially false and misleading when made. It was misleading for Defendants to report these cloud revenue results, while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable. Moreover, Defendants' statements purporting to report Oracle's cloud revenue were misleading because, as discussed above, GAAP required Defendants to disclose Oracle's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results.

356. On May 4, 2017, Oracle held a press conference announcing the addition of new partners to its Oracle Network Cloud Service, during which Defendant Kurian told investors that Oracle "continue[s] to see tremendous growth across our cloud business." Defendant Kurian was quoted in a related press release from the same day as stating that "[w]e continue to see tremendous growth across our cloud business."

357. These statements were materially false and misleading when made. It was misleading for Defendant Kurian to state that Oracle "continue[s] to see tremendous growth across our cloud business" while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

358. On May 4, 2017, Oracle issued a press release titled, "Oracle Cloud Applications Drive Business Transformation Around the World." In that press release, Miranda touted the quality of Oracle's cloud platform as a driver of its growing adoption. Quoting Miranda, the press release stated, "With Oracle Cloud Applications, Oracle provides a comprehensive and integrated suite of modern business applications that enable increased business agility and reduced costs. ***As a result, organizations across every industry are increasingly selecting Oracle Cloud Applications to transform the way they do business.***"

359. Defendants' statements were materially false and misleading when made. It was misleading for Miranda to state that a driver of Oracle's cloud growth was the "comprehensive and integrated" character of its cloud product, which "increased business agility and reduced costs," while failing to disclose that: (1) a material driver of Oracle's cloud sales was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially engineered deals;" and (2) in these deals, customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products.

360. It was further misleading for Defendants to state that Oracle's cloud product was "comprehensive and integrated" and "increased business agility and reduced costs," when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. Indeed, as FE 10 explained, Oracle's cloud applications were ***not*** "integrated" with each other, in contrast to competing products. Moreover, contrary to Defendants' statements that Oracle cloud "reduced costs," the user interface issues plaguing Oracle's cloud products meant that the speed of the user response and task completion was inferior to Oracle's competitors, which, as FE 10 explained, "costs customers money and in large customers compounds exponentially."

361. On May 9, 2017, Oracle issued a press release announcing wider availability of its cloud platform. In that press release, Oracle stated, "Oracle ERP Cloud is a complete, modern, and proven financial platform delivered seamlessly through the Oracle Cloud. ***A modern user interface*** driven by the latest design innovations delivers embedded analytics, contextual social collaboration and a device-independent mobile experience that makes Oracle ERP Cloud ***familiar and easy to use***."

362. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Oracle's products were "complete," worked "seamlessly," provided a "modern user interface," making the platform "familiar and easy to use," when in truth Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. Likewise, an October 2017 email from Kurian to Miranda makes clear that Defendants – including Hurd, Catz, and Ellison – were all aware that Oracle's cloud product

was "not tenable," "awful," and that Kurian getting "extraordinary pressure" from Hurd, Catz, and Ellison to fix Oracle cloud's user interface as it was preventing the product from being competitive.

363. Additionally, on May 9, 2017, Defendant Bond presented at the Jefferies Technology Group Investor Conference. Defendant Bond told investors that Oracle's cloud growth was driven by customers "willingly making a choice" to abandon a multi-vendor IT strategy and consolidate their IT needs in Oracle, stating that "[a]s we move to cloud, the first thing that we see is we start to address more of the customer spend. The customers are willingly making a choice, where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle." Defendant Bond also told investors that "[t]he good news" was that "growth in cloud is actually getting bigger."

364. These statements were materially false and misleading when made. It was misleading for Defendant Bond to state that Oracle's cloud growth was being driven by "customers [] willingly making a choice" to abandon a "multi-vendor strategy" to consolidate with Oracle, and that these customer decisions were creating a "significant uplift in revenue for Oracle," without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

365. Defendant Bond was also asked by an analyst to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." In response, Defendant Bond denied that Oracle used audits to drive cloud sales, stating that: "This is one of those things where – gets talked about a lot. ***And I think this is one of those things where the story is a lot bigger than the realities***." Defendant Bond further assured investors that the Company was not using extortive or coercive techniques with regard to its audits, stating that "***And***

***we try to do it as best we can, in as gracious [a] way as we can.***" Defendant Bond further assured investors that could revenues were not being driven by the audits and, in fact, the transition to cloud would decrease any incidence of audits, stating that "[o]n the other hand, the key, as we go to cloud, ***is this conversation is going to go away***" and that ***"as we go to cloud, we don't have to worry about that anymore.*** Because when you're in the cloud, you basically have a number of users that you've signed up for."

366. These statements were materially false and misleading when made. It was misleading for Defendant Bond to deny or minimize Oracle's use of audits to drive cloud sales, and represent that Oracle's audits were not coercive, without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

367. On May 10, 2017, Kurian presented at Oracle OpenWorld in India and again highlighted Oracle cloud's growth, stating that "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers." This statement was materially false and misleading when made. It was misleading for Defendant Kurian to state that Oracle had a "very, very strong growth in customers" due to legitimate demand for Oracle's product while failing to disclose that: (1) a material portion of Oracle's growth in cloud customers was through "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; and (2) the customers obtained through these deals were misleading because they were not truly purchasing Oracle's cloud products, but were rather purchasing a discount on audit penalties or on-premises products.

### B. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017

368. On June 21, 2017, Oracle issued a press release announcing its fiscal fourth quarter and full year 2017 results, and filed that press with the SEC on Form 8-K. The press release emphasized that Oracle's year-over-year cloud fourth quarter cloud revenues had increased dramatically, stating that, "Total cloud revenues ***were up 58%*** [year-over-year] to $1.4 billion, and non-GAAP total cloud revenues ***were up 64%*** [year-over-year] to $1.4 billion." The press release

further highlighted that the Company's year-over-year cloud full-year cloud revenues had also increased dramatically, stating that, "Total cloud revenues ***were up 60%*** [year-over-year]to $4.6 billion. Non-GAAP cloud revenues ***were up 66%*** [year-over-year] to $4.7 billion."

369. These statements were materially false and misleading when made. It was misleading for Oracle to report that totally quarterly cloud revenues were up 58% to $1.4 billion, and total annual cloud revenues were up 60% to $4.6 billion, without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

370. The June 21, 2017 press release also quoted Catz, who stressed the "rapid adoption" of Oracle's cloud products and the "hyper-growth" of its business: "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . ***We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4***. This ***cloud hyper-growth is expanding our operating margins***, and we expect earnings per share growth to accelerate in fiscal 2018."

371. In that same press release, Hurd trumpeted the Company's cloud revenues, and, in particular, that Oracle had delivered on its ambitious promise to deliver $2 billion in annual recurring revenue for the 2017 fiscal year – with most of it supposedly booked during the Class Period. This achievement marked another critical milestone in Oracle's cloud transition that persuaded investors the Company's pivot to cloud was complete. "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, ***putting us over our $2 billion ARR bookings goal for fiscal year 2017*** . . . . ***We also delivered over $1 billion in quarterly SaaS revenue for the first time***. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018."

372. These statements were materially false and misleading when made. It was misleading for Defendants to state that Oracle was experiencing "rapid adoption" of its cloud products, "hyper-growth" of its cloud business, and to emphasize the purportedly ballooning cloud sales figures set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

373. Also on June 21, 2017, Oracle held its fiscal fourth quarter and full year 2017 earnings call with investors. On that call, Catz told investors, "As you can see, we had a tremendous quarter in just about every way, as cloud revenue, new software license and earnings were all much better than expected. ***The adoption by our customers of our products and services is at an all-time high*** . . . . ***The cloud has become our predominant growth vehicle***." Catz further stated, "our tremendous growth resulted in SaaS revenue crossing the $1 billion a quarter threshold in Q4, having grown 76% in constant currency . . . . Cloud PaaS and IaaS revenue for the quarter were $403 million, up 45% from last year." Catz further reported that "Total cloud revenues in the quarter were $1.4 billion, up 66% from last year," and that "cloud billings grew 42% in U.S. dollars this quarter."

374. Similarly, Hurd highlighted Oracle's growing cloud bookings, stating, "cloud bookings, $855 million. ***It's the best quarter we have ever had. It's up 43% over what was a very strong Q4 last year***. We had a goal of $2 billion in ARR, and we finished with nearly $2.1 billion. Next year, we will sell more . . . . As Safra said, cloud revenue growth at 66%, we're now at a $6 billion annualized run rate . . . . ***[w]ith revenue now at an annualized run rate of $6 billion and a growth rate of 66%, we're clearly the fastest-growing cloud company at scale***." Hurd stated that the success of Oracle's cloud business was exceeding expectations: "[w]e tracked ahead of virtually every metric that I track, whether it was cloud bookings, cloud revenue, EPS."

375. On that same June 21, 2017 earnings call, Ellison told investors that Oracle was outpacing its competitors in cloud growth and highlighted that growth as the driving force of Oracle's success: "Last fiscal year, ***we sold more than $2 billion in cloud annually recurring revenue***. … Our ***rapid SaaS growth*** is the driving force behind Oracle's revenue and earnings growth in Q4."

376. These statements were materially false and misleading when made. It was misleading for Defendants to state that Oracle was "clearly the fastest-growing cloud company at scale," that customer "adoption" of cloud products was "at an all-time high," and that "the cloud business has become our predominant growth vehicle," and to report the significant revenue growth and recurring revenue results described above while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

377. On the call, an analyst asked Defendants about the quality of Oracle's reported cloud revenue, and specifically whether the Company's cloud growth was sustainable or whether it was a "1-year phenomenon," asking: "You just reiterated the fiscal '18 double-digit earnings growth. And I guess, I think what's becoming more relevant is, do we think about this as a 1-year phenom bouncing off of the fiscal transition? Or how can we really be thinking about earnings growth beyond fiscal '18 into '19 and '20?" Catz responded by falsely denying that Oracle's reported cloud growth was driven by a short-term, "1-year" spike in revenue, but rather was built on a base of "recurring revenue":

> ***So this is absolutely not a 1-year phenomena***. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale.

378. These statements were materially false and misleading when made. It was misleading for Defendants Catz to emphasize the quality and sustainability of Oracle's cloud revenue, and state that the Company's cloud growth was "absolutely not a 1-year phenomena," without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

379. Additionally, on Oracle's June 21, 2017 earnings call, Ellison touted the superior speed of the Company's cloud product and that this speed would generate more cost-savings for customers than competitors could offer. Ellison stated, "So the storage is a huge component of what cloud providers are selling and we just have the better mouse trap. We have a better storage hierarchy system that they do. ***Therefore, we can provide very, very high performance at a dramatically lower cost to us than our competitors***."

380. Ellison's statements were materially false and misleading when made. It was misleading for Ellison to tout the supposed speed of Oracle's cloud and the cost-savings that speed would supposedly generate, when, in truth, the user interface issues plaguing Oracle's cloud products meant that the speed of the user response and task completion was inferior to Oracle's competitors, which, as FE 10 explained, "costs customers money and in large customers compounds exponentially."

381. Analysts and investors reacted positively to Oracle's announcement. *Tech Trader Daily* reported on June 22, 2017 that analysts were "ga-ga during the conference call following the report, responding to the results with phrases such as 'really phenomenal,' 'impressive,' 'very strong,' and 'really fabulous." In a June 26, 2017 article, *Barron's* stated that Oracle "last week wowed Wall Street with a financial report that put to rest fears of the company being rendered obsolete by cloud computing." On June 22, 2017, BTIG analysts reported that "Oracle delivered excellent F4Q17 results with on-premise license to cloud transition now charging ahead at full

steam" and "it's now clear that we're at a material inflection point and a trendline has formed." On June 22, 2017 *Business Insider* article noted that "OracleCloud computing really is starting to breathe new life into Oracle. The company had a blow-out Q4 2017 earnings Wednesday thanks to 58% year-over-year growth for the quarter in cloud. A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday[.]"

382. As a result of Oracle's disclosures, Oracle's stock price increased from $45.07 on June 21, 2017 to $48.93 on June 22, 2017. This included an increase of more than 10% in after-hours trading, which *Dow Jones Institutional News* called "the stock's biggest one-day gain in two-and-a-half years, following a strong earnings report for its fiscal fourth quarter credited mostly to its growing cloud business. That left the shares at 17 times adjusted forward earnings – the highlight multiple Oracle has fetched since 2008."

383. On June 27, 2017, Oracle filed its financial results for the fiscal year ended May 31, 2017 with the SEC on Form 10-K, which was signed by Defendants Catz and Hurd. The Form 10-K reported that total cloud revenues for the year ended May 31, 2017 was $4.57 billion. The Form 10-K further reported cloud SaaS and PaaS revenues were $3.211 billion and cloud IaaS revenues were $1.36 billion for the three months ended February 28, 2017.

384. This statement was materially false and misleading when made. It was misleading for Defendants to report these cloud revenue results while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable. Moreover, Defendants' statements purporting to report Oracle's cloud revenue were misleading because, as discussed above, GAAP required Defendants to disclose Oracle's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results.

385. On August 2, 2017, Oracle issued a press release titled, "Oracle Delivers Next-Generation Cloud applications" emphasizing, among other things, the "enhance[d] user experience" the Company was delivering through its latest cloud applications update, "R13." Oracle's press release stated:

> With the introduction of Oracle Cloud Applications Release 13, Oracle is ***further extending the industry's broadest, deepest, and fastest growing suite of cloud applications***. Innovations in the new release ***enhance the user experience*** and empower business users across the organization including customer experience, finance, HR, and supply chain professionals.

386. Oracle's press release further quoted Defendant Miranda, who stated, "With the latest release of Oracle Cloud Applications, we are introducing hundreds of new innovations. [W]e are introducing a brand new solution [to Oracle's supply chain management application] that enriches the customer experience by bridging the gap between sales and customer service. The new release also includes further advancements to the user experience and customer-driven changes for human resources and finance."

387. These statements were materially false and misleading when made. Contrary to Defendants' statements that Oracle's cloud platform was "the industry's broadest, deepest, and fastest growing" and that the R13 update had "enhance[d] user experience" when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. Likewise, an October 2017 email from Kurian to Miranda makes clear that Defendants – including Hurd, Catz, and Ellison – were all aware that Oracle's cloud product was "not tenable," "awful," that R13 in particular was "not even competitive," and that these quality issues prevented the Company from being competitive in the cloud market. The email makes clear that all the

named Defendants were deeply concerned about Oracle cloud's "user experience," as Kurian wrote "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI is not tenable."

### C. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018

388. On September 14, 2017, Oracle issued a press release announcing its fiscal first quarter 2018 results, and filed that press with the SEC on Form 8-K. The press release reported substantial increases in Company's year-over-year cloud growth, emphasizing that "Total Cloud Revenues were up 51% [year-over-year] to $1.5 billion." The Company also highlighted to investors that SaaS revenues were up 62% year-over-year to $1.1 billion and PaaS and IaaS revenues were up 28% year-over-year to $400 million. In addition, Catz highlighted to investors that Oracle was continuing to experience "sustained hyper-growth" in its cloud business: "***The sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher*** . . ."

389. These statements were materially false and misleading when made. It was misleading for Defendants to report that "Total Cloud Revenues were up 51% to $1.5 billion," and state that Oracle's cloud business was experiencing "sustained hyper-growth" that was driving Oracle's revenue and earnings higher, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

390. Also on September 14, 2017, Oracle held its fiscal first quarter 2018 earnings call with investors. On that call, Catz stressed the "very, very strong" customer adoption of Oracle's cloud products and stated that this drove the Company's outstanding revenue and earnings results: "[a]s you can see, we had another good quarter. ***Customer adoption of our cloud products and***

***services continue to be very, very strong***, and our on-premise business remains very resilient. The result was that total revenue were at the high end of my guidance, and earnings per share beat my guidance by $0.01."

391. Hurd also trumpeted Oracle's cloud growth during Oracle's September 14, 2017 earnings call with investors. Hurd stated, "Cloud revenue up 51% now at a $6 billion annual run rate." Hurd stated that SaaS revenue was "up 61%, as Safra said, accelerating from 55% growth last year" and that with regard to PaaS, Oracle's "revenue was up 28%." Hurd then highlighted Oracle's cloud bookings by stating, "[o]ur cloud bookings were executing well on a very big and growing pipeline. . . Revenue growth now at an annualized rate of $6 billion or growth rate of 51%, and we are the fastest growing cloud company at scale."

392. These statements were materially false and misleading when made. It was misleading for Catz to state that "[c]ustomer adoption of our cloud products and services continue to be very, very strong" and for Hurd to state that Oracle was "the fastest growing cloud company at scale," and to report the revenue figures and growth rates set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

393. On that same call, a Macquarie analyst noted Oracle's "momentum in [the] cloud." Hurd responded, attributing Oracle's success to its superior products, implementation, and salesforce: "just sort of every aspect of selling in the cloud, I think the company holistically is getting better at. We're better -- our ***products*** are better. Our ***sales force*** is better. Our ***ability to implement*** is better. Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

394. These statements were materially false and misleading when made. It was misleading for Hurd to state that Oracle's cloud growth was driven by its superior products,

implementation, and salesforce while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

395. It was additionally misleading for Hurd to state that Oracle's cloud "products were better" than its competitors' offerings, when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. Likewise, an October 2017 email from Kurian to Miranda demonstrates that Miranda and other Defendants – including Hurd, Catz, and Ellison – were aware of key deficiencies in Oracle's cloud products.

396. On Oracle's on September 14, 2017 earnings call, Ellison highlighted the quality and performance of Oracle's cloud platform, including its ERP and human resources applications, as driving the Company's cloud growth. Ellison stated, "Our Fusion ERP, Fusion HCM, which is the mid-market and the high-end of ERP and the mid-market and high end of HCM, these are all internally developed systems. They're -- HCM and ERP, I think, blended rate is growing triple digits. The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets."

397. Ellison' statements were materially false and misleading when made. It was misleading for Ellison to state that the quality of Oracle's products was "high-end," and that this quality would drive "organic growth," when, in truth, Oracle's cloud product was riddled with

serious flaws, was not competitive with alternative cloud products, and was generating poor demand. For instance, during numerous routine meeting between 2015 and November 2017, FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. An October 17, 2017 email from Kurian to Miranda demonstrates that Defendants – including Hurd, Catz, and Ellison – were all aware that Oracle's cloud product was "not tenable" and "awful."

398. It was also misleading for Ellison to state that the quality of Oracle's cloud product was a driver of cloud revenue growth, while failing to disclose that: (1) a material driver of Oracle's cloud sales was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially engineered deals;" and (2) in these deals, customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products.

399. Following Defendants' statements, on September 14, 2017, MUFG analysts reported that "the company had a solid quarter as it continues its transition to the cloud. We note the company's sustained a 50+% year-over-year (YoY) cloud revenue growth rates have persisted even as cloud revenues passed $1B in FY 2Q17." A September 15, 2017 Cowen report noted that "ORCL beat across the board, with total Cloud growth of 51%[.]" A September 15, 2017 Credit Suisse report stated that "[w]e maintain our Outperform rating and $62 target price following better than expected F1Q results, with organic cc revenue growth accelerating to ~3.5% y/y, its best rate in 2 years."

400. On September 18, 2017, Oracle filed its fiscal first quarter 2018 financial results with the SEC on Form 10-Q, which was signed by Defendants Catz and Hurd. In that Form 10-Q, Oracle reported that total cloud revenues were $1.467 billion for the three months ended August 31, 2017. The Form 10-Q further reported cloud SaaS revenues were $1.067 billion and cloud PaaS and IaaS revenues were $400 million for the three months ended August 31, 2017.

401. These statements were materially false and misleading when made. It was misleading for Defendants to report these cloud revenue results while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable. Moreover, Defendants' statements purporting to report Oracle's cloud revenue were misleading because, as discussed above, GAAP required Defendants to disclose Oracle's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results.

402. On October 2, 2017, Oracle issued a press release titled, "Oracle Makes HR Technology More Powerful, Smart, and Easy to Use." In that October 2, 2017 press release, Defendants touted Oracle's R13 update "to the Oracle Human Capital Management (HCM) Cloud portfolio," Oracle's human resources cloud application, including "major user experience enhancements." Oracle's press release stated: "Oracle has also introduced major user experience enhancements and significant additions to existing Oracle HCM Cloud modules. ***The new user experience puts the needs and experiences of users at the center of the design in a way that's consistent, simple, and intuitive***."

403. These statements were materially false and misleading when made. It was misleading for Defendants to tout the "major user experience enhancements" to Oracle human resources cloud application implemented through the Company's R13 update and to state that the update's new user interface was "consistent, simple, and intuitive," when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with

numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. An October 17, 2017 email from Kurian to Miranda demonstrates that Defendants – including Hurd, Catz, and Ellison – were all aware that Oracle's cloud product, including the human resources application touted in press release, was "not tenable," "awful," that R13 in particular was "not even competitive," and that these quality issues prevented the Company from being competitive in the cloud market. Indeed, the email makes clear that all the named Defendants were deeply concerned about Oracle cloud's "user experience," as Kurian wrote "I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI is not tenable."

404. On October 5, 2017, Defendants Bond, Hurd, Catz, Miranda, and Kurian, among other Oracle senior executives participated in Oracle's OpenWorld Financial Analyst Meeting. During that meeting, Defendant Miranda highlighted the reasons that Oracle's customers were choosing cloud. First, Miranda highlighted Oracle SaaS's speed, stating "[w]hat do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, ***most customers today are moving to SaaS for speed***. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption."

405. Second, Miranda highlighted the breadth of Oracle's product offering as the most cohesive, integrated cloud platform on the market. Miranda stated, "When you get into then Oracle SaaS, first of all, we have ***the most complete SaaS suite of anybody in the market***, not only because we have CRM, HCM, ERP, supply chain, but also in those areas, the depth of that solution."

406. Third, Defendant Miranda stated that Oracle had the "broadest" and "best of breed" set of cloud solutions, particularly touting the cloud platform's "user interface." Miranda stated, "Next and probably what gets overlooked is though ***we have the broadest, it doesn't mean we don't have the best of breed in every solution going forward***. So when we compete head to head

against HR, head to head against sales force automation, head to head in financials, ***we have strengths there that we bring to bear best-in-class applications. And part of that speed, the emerging technologies, which I'll talk about today, things we've delivered in the past as far as user interface*** . . . ."

407. Fourth, Miranda stressed Oracle's "global reach" of its products supporting globalization and broader infrastructure, stating "our global reach, not only the global reach in terms of the breadth of Oracle's products and supporting globalizations and local rules and regulations, but the global reach of our broader infrastructures: Oracle's consulting, Oracle's partners, the training that we can afford, the language we can do, support that can take global customers – really aligned for global customers today but also customers who are expanding globally."

408. Fifth, Miranda highlighted that the benefits for customers included "us doing the labor and hosting things" and that "we think it's more secure because we keep you always up to date. And we enhance the technology . . . [s]o there's substantial benefits." Miranda concluded by stating that "just functionally, the speed of innovation is unmatched . . . . Today, in our SaaS ERP and SaaS HR and SaaS CRM, we update 100% of our customers twice a year. And the importance of that is really borne out over the last couple of years."

409. These statements were materially false and misleading when made. It was misleading for Defendant Miranda to state that Oracle's speed, "broadest" and "best" set of solutions, "global reach," product updates, "user interface," the breadth and completeness of Oracle's cloud platform, and "speed" were causing Oracle's customers to adopt the Company's cloud products, while failing to disclose that: (1) a material driver of Oracle's cloud sales was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially engineered deals;" and (2) in these deals, customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products.

410. Miranda's statements touting Oracle's "user interface" were additionally false and misleading because Oracle's cloud product was riddled with severe deficiencies and, as Kurian

stated to Miranda and others in an October 2017 email, that Oracle's cloud product was "not tenable," "awful," and that Kurian getting "extraordinary pressure" from Hurd, Catz, and Ellison to fix Oracle cloud's user interface as it was preventing the product from being competitive.

411. It was further materially misleading for Miranda to tout Oracle cloud's speed when, as FE 10 explained, the speed of the user response and task completion was inferior to Oracle's competitors due to the severe problems with the Oracle cloud's user interface.

412. It was also materially misleading for Miranda to state that Oracle's cloud product was "the most complete SaaS suite of anybody in the market," when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. Far from being the "the most complete SaaS suite of anybody in the market," Oracle's cloud applications were not integrated with each other, in contrast to competing products, as FE 10 explained.

413. Miranda's statements that Oracle offered the "broadest," "best of breed," and "best in class" cloud platform were additionally misleading because Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. An October 2017 email from Kurian to Miranda demonstrates that Miranda and other Defendants – including Hurd, Catz, and Ellison – were aware of key defects in Oracle's cloud technology.

414. Also at Oracle's October 5, 2017 OpenWorld conference, Miranda emphasized the pace and robustness of Oracle's cloud updates: "functionally the speed of innovation is unmatched. And so that's in part improvements from our engineers, but it's also in part the way the model used to work." Miranda stated that "[t]oday, in our SaaS ERP and SaaS HR and SaaS CRM, we update

100% of our customers twice a year," as compared with competitors "which are these 3-, 5-, 7-, 10-year, at best, upgrade cycles."

415. Miranda's statements were materially false and misleading when made. It was misleading for Miranda to state that the speed of Oracle's cloud patching and updating process was "unmatched," when, in truth, the pace at which Oracle was addressing critical deficiencies in its cloud product was glacial. As FE 10 explained, in reality, Oracle had a vast backlog of critical unfixed deficiencies and efforts to fix those deficiencies were being pushed back to add features introduced by competitors.

416. In addition, at the October 5, 2017 OpenWorld conference, an analyst asked why Oracle had announced slowing guidance "why maybe the guidance is less of a sequential uptick than many of us may have had in our models." In response, Hurd reassured investors that customers were continuing to purchase cloud products, but were simply taking longer to set up their accounts. Hurd stated, "So depending on what got booked in what pillar where, there can be more implementation to do to get something. And the more ERP that we sell, this is good news, by the way, ***but short term, it is a longer provisioning time to provision ERP*** . . . . ***So there's different provisioning times***."

417. It was misleading for Hurd to state that any slowdown in revenue or delay in deployment was due to longer "provisioning times" for Oracle's cloud products, when in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. Further, Hurd's statement attributing Oracle's slowing cloud revenue to slower customer implementation was misleading because, in truth, the Company's "DOA" customers were not deploying the cloud product because they had no intent to use them in the first place.

418. At a November 7, 2017 Sanford C. Bernstein Technology Innovation Summit, Defendant Bond made additional false and misleading statements regarding the drivers of Oracle's cloud revenue growth. Specifically, Bond was asked about the "revenue impact of a client moving from an on-prem revenue license to cloud" and "what's the driver, the real biggest driver you think

of why they would be moving on-premise to SaaS?" Defendant Bond responded that Oracle's customers were moving from on-premises to cloud for two reasons. First, because "***by moving on-premise loads to cloud, you're going to see a reduction of total cost of ownership***," *i.e.*, the cloud product was less expensive. "That's the first primary advantage." Second, "***You'll also see customers who want to move toward cloud for what I'll call an innovation advantage***," *i.e.*, the cloud product made technology updates easier to install. Bond summed up: "***So from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early.***"

419. These statements were materially false and misleading when made. It was misleading for Defendant Bond to state that the drivers of Oracle's customers moving from on-premises to the cloud was a "reduction of total cost of ownership" and "an innovation advantage," while failing to disclose that: (1) a material driver of Oracle's cloud sales was Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially engineered deals;" and (2) in these deals, customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products.

420. It was additionally materially misleading for Bond to state that Oracle's existing on-premise customers were seeing "a reduction of total cost of ownership," when, in truth, FE 10 explained that it was actually complicated and expensive for Oracle on-premise customers to move to the Company's cloud products. Because of Oracle cloud's limited functionality, many on-premise customers were told they would have to "redo all of their tech stack" in order to move. Accordingly, customers chose to keep their on-premise infrastructure, or redo "their tech stack" and "break the chains" with Oracle by moving to a competitor with a better product offering.

421. It was further materially misleading for Bond to tout the "innovation advantage" of Oracle's cloud products, when, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. During numerous routine meeting between 2015 and November 2017 (occurring at least once every two months), FE 10 discussed the severe deficiencies in Oracle's cloud applications with both

Defendants Miranda and Kurian, and supplied them with numerous reports and spreadsheets detailing the vast backlog of critical, but unaddressed, issues in the Company's cloud products. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud products because the quality of the products was so poor. An October 2017 email from Kurian to Miranda demonstrates that Miranda and other Defendants – including Hurd, Catz, and Ellison – were aware of key defects in Oracle's cloud technology.

422. Also at the November 7, 2017 investor conference, a Sanford Bernstein analyst asked Bond about Oracle's slowing cloud growth as reflected in the Company's guidance. Bond replied that the slowing growth rate was a function of the fact that Oracle had already captured significant market share. Bond stated, "as the numbers get bigger, it does get harder to grow. It's law of large numbers."

423. Bond's statements were materially false and misleading when made. It was misleading for Bond to state that the slowdown in Oracle's cloud revenue was a product of the "law of large numbers" and a function of the fact that the Company had already captured significant market share when, in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. Moreover, it was misleading for Bond to state that Oracle had captured significant cloud market share when, in reality, the Company generated a material portion of its cloud revenue through the use of "engineered deals" with customers who were ***not*** in the market for cloud products, and would not use or renew their cloud subscriptions.

424. Bond further reassured investors that existing on-premise customers were moving to Oracle's cloud because they were "successful using [Oracle's] software" and so were motivated to stay with Oracle through that transition – that this loyalty was the "driver[] of what builds [the] pipeline." Bond stated, "the drivers of what builds pipeline is going to be a big part of customer success. Nothing -- in software, nothing works better than having your customers be successful using your software. And as we go further into this and you see more customers, basically with

enterprise in particular, starting to make that move from premise environments to cloud environments, this thing really starts to pick up momentum."

425. Bond's statements were materially false and misleading when made. It was misleading for Bond to state that the "driver" of Oracle's pipeline of on-premise customers moving to cloud was the fact that those on-premise customers had been "successful using [Oracle's] software," when, in truth, the manner in which Oracle "moved" these customers to the cloud was through the use of financially engineered deals, including coercive ABC deals. Further, these "DOA" customers did not "move" to Oracle's cloud, as Bond misleadingly claimed, because, in truth, exceedingly few of them actually used the Company's cloud products and did not intend to renew their short-term subscriptions.

### D. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Second Quarter 2018

426. On November 15, 2017, Oracle held its Annual Meeting of Stockholders. Defendants continued to discuss Oracle's explosive cloud growth at that meeting. Ellison stated, "Where we deliver ***the applications in the public cloud is growing very, very, very rapidly*** and really subsuming, taking over our application business . . . . ***Our SaaS applications business has been growing in excess of 50%, been growing very, very, very rapidly***."

427. These statements were materially false and misleading when made. It was misleading for Defendant Ellison to state that Oracle's SaaS business "has been growing in excess of 50%" and "very, very rapidly," while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

428. As discussed above, on December 14, 2017, the corrective disclosure period began. On that day, Oracle held its fiscal second quarter 2018 earnings call with investors. Oracle reported

slowing cloud growth in the second quarter of 2018 that missed market expectations, and provided guidance for the further slowing of cloud growth that also fell below market expectations. These occurrences were a function of the fact that the Company was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. This partially revealed to the market that the Company's cloud revenue was unsustainable. As a result of Defendants' announcements, Oracle's stock priced dropped approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, 2017.

429. Nevertheless, Defendants made a number of soothing statements that continued to conceal the full truth from investors and partially mollified their concern about Oracle's cloud business.

430. On the December 14, 2017 earnings call, Catz told investors that total cloud revenues in the quarter were $1.5 billion, up 39% from the previous year, and stated that "[c]loud SaaS revenue for the quarter were $1.1 billion, up 47% from last year. Fusion cloud revenue was 56% for the quarter. Cloud PaaS and IaaS revenue for the quarter was $398 million, up 20% from last year." Catz also told investors that "[a]s for cloud margins, our SaaS business continues to scale and grow, and the gross margin has expanded to 66%, up from 59% last Q2."

431. Catz further told investors that "[c]ustomer adoption of our cloud products and services continues to be very strong, and what we have called our on-premise business remains robust. Bottom line, our transition to the to the cloud is going well."

432. These statements were materially false and misleading when made. It was misleading for Defendant Catz to report that "customer adoption of our cloud products" "continues to be very strong" and that the "transition to the cloud is going well," and to report the revenue metrics set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from

clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

433. On Oracle's December 14, 2017 earnings call, a MoffettNathanson analyst asked Defendants to explain why cloud revenue growth was slowing and, specifically, whether customers were not deploying Oracle cloud products: "I think what some of us are trying to reconcile is, is the cloud guidance is a little bit slower than it has been. So it looks like something might be decelerating a little bit. And I just wanted to understand, is there a gap as people maybe buy licenses on-prem, and then maybe it's a quarter or 2 before they deploy in the cloud?" Catz responded by falsely denying that customers were not declining to deploy cloud products, but were, rather, strategically timing that deployment and "mov[ing] to [Oracle's] cloud when it makes sense for them."

434. Addressing the same analyst question about the cause of Oracle's revenue slowdown, Ellison also falsely stated that the slowdown was merely due to the fact that "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database," a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to become available." Ellison further reassured investors that "***the capabilities in the cloud are so much better, the economics in the cloud are so much better than what's available on-premise*** that we think our customers are going to move very, very rapidly to the cloud."

435. These statements were materially false and misleading when made. It was misleading for Defendants to state that any slowdown in revenue or delay in deployment was due to "customers "waiting for the Autonomous Database just to become available," or to customer's strategic deployment decisions, when in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.

436. It was further misleading for Ellison to state that "the capabilities in [Oracle's] cloud are so much better, the economics in the cloud are so much better than what's available on-

premise." In truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. Indeed, as FE 10 explained, Oracle cloud had limited functionality relative to the Company's on-premise applications, and it was not economical for Oracle's customers to move to the cloud, given the severe deficiencies in Oracle's products.

437. In response to analyst questions about "competitors and surveys saying customers are moving off Oracle," Ellison denied that customers were "moving off Oracle," instead challenging the analyst to "go ahead. You tell me who's moving off of Oracle." Hurd also responded to the same question by stating that "I'd like to just go back to the math and just go back to the numbers, right? I mean, we've got sort of every other database being used, just in share terms, is ours. And when you see us throwing up yet again another growth rate above market, it's just any of these sort of stories, anecdotes -- by the way, I've heard them for 7 years, right, that -- yes and predates me. So everyone's, 'Oh, everyone's moving off the Oracle Database . . . . I'd just love somebody show up with something more than a story. Just show up with a number . . . certainly, nobody gaining share over us . . . when you just look at overall numbers, we're gaining share in Database.'"

438. These statements were materially false and misleading when made. It was misleading for Defendants to state that Oracle customers were not "moving off [] Oracle" and to emphasize Oracle's "growth rate above market," while failing to disclose that a material portion of Oracle's cloud customers were declining to renew the "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics.

439. On December 18, 2017, Oracle filed its fiscal second quarter 2018 financial results with the SEC on Form 10-Q, which was signed by Defendants Catz and Hurd. In that Form 10-Q, Oracle reported that total cloud revenues were $1.519 billion for the three months ended November 30, 2017. The Form 10-Q further reported cloud SaaS revenues were $1.123 billion and cloud PaaS and IaaS revenues were $396 million for the three months ended November 30, 2017.

440. These statements were materially false and misleading when made. It was misleading for Defendants to report these cloud revenue results, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable. Moreover, Defendants' statements purporting to report Oracle's cloud revenue were misleading because, as discussed above, GAAP required Defendants to disclose Oracle's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results.

### E. Defendants' Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018

441. On March 19, 2018, Oracle held its fiscal third quarter 2018 earnings call with investors. As discussed above, Oracle reported even more significant slowdowns in its cloud revenue and margin growth than it had in December 2017, again missing market expectations, and provided guidance for further slowing cloud growth below market expectations. These occurrences were a function of the fact that the Company was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. This partially revealed to the market that the Company's cloud revenue was unsustainable. As a result of Defendants' announcements, Oracle's stock price declined nearly 10%, from $51.95 per share on March 19, 2018 to $47.05 per share on March 20, 2018.

442. Nevertheless, as before, Defendants made a number of soothing statements that continued to conceal the full truth from investors and partially mollified their concern about Oracle's cloud business. For instance, Defendants assured investors that Oracle's cloud renewal rates remained highly positive and would drive additional revenue expansion. Ellison stated, "the

combination of faster sales and higher renewal rates should dramatically increase our growth rate in our SaaS business."

443. Ellison also attributed the decline in Oracle's cloud revenue growth to Oracle's "bring your own license" or BYOL program. "BYOL" allowed clients to purchase software licenses that could be flexibly used in whatever medium the customer chose, either cloud or on-premises. Thus, if customers had existing Oracle software licenses for other Oracle legacy services, customers could reuse them when subscribing to Oracle PaaS.

444. Ellison stated, "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

445. These statements were materially false and misleading when made. It was misleading for Ellison to attribute the decline in Oracle cloud revenue growth to its BYOL program, when, in truth, the deceleration was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.

446. In addition, Defendants attributed the decline in cloud growth to a slowdown in older acquired SaaS businesses, which would reverse course as the Company's business mix moved towards more newly acquired products, like the Company's "Fusion HCM" human resources application. For instance, on the Company's earnings call, Ellison attempted to explain away the decelerating cloud growth by stating, "[W]e have some very high growth rate SaaS businesses like ERP and HCM. And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite." Ellison further stated, "Fusion becoming a more and more -- a larger and larger percentage of our total SaaS

business, then the change in mix. You've got -- right now you certainly have a very large Fusion SaaS business growing at a high rate, which then dwarfs the slower growing acquired businesses. So the reacceleration, again, to quote Mark, is just a matter of math."

447. Ellison's statements that Oracle's cloud revenue was decelerating because of the "mix" of its legacy slower-growing SaaS business, and assurances that such a slow-down was only temporary as the mix changed, were materially misleading because, in truth, the deceleration was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into. Further, Ellison's assurance that Fusion cloud products were "growing at a high rate" and driving the Company's cloud growth were misleading because, as Hurd, Catz, Kurian, Miranda and "LJE himself" had all acknowledged just a few months earlier, Oracle's Fusion products were "not tenable," "atrocious," and "awful."

448. Also on Oracle's March 19, 2018 earnings call, an analyst asked Defendants about Oracle's ability to leverage its existing on-premise customer to gain cloud share. Hurd responded that Oracle enjoyed a significant advantage in the marketplace because of its existing customer base, and that this advantage was a driver of Oracle's cloud growth. Hurd stated, "The percent of our [existing] user base that is in our [cloud] pipeline now is getting to be fairly exten[sive], meaning it's multiple 10s percent of our user base. And to your point, when we convert . . . a traditional on-premise application to SaaS, we typically get 3x the revenue . . . . ***[J]ust moving the user base does turn us into a very, very large SaaS business and to your point, very well accelerates our growth rate***."

449. These statements were materially false and misleading when made. It was misleading for Hurd to tout Oracle's supposed success in moving the "pipeline" of existing on-premise users to cloud market, and to state that Oracle's progress in moving those users to the cloud "does turn us into a very, very large SaaS business," without disclosing that the manner in which Oracle "moved" these customers to the cloud was by engaging in coercive, financially engineered deals. Further, these "DOA" customers did not "move" to Oracle's cloud, as Hurd

misleadingly claimed, because, in truth, exceedingly few of them actually used the Company's cloud products and did not intend to renew their short-term subscriptions.

450. It was additionally misleading for Hurd to tout the supposed advantage Oracle's on-premise user base afforded the Company in capturing cloud market share while failing to disclose that, in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. Indeed, as FE 10 explained, Oracle cloud had limited functionality relative to the Company's on-premise applications, and it was not economical for Oracle's customers to move to the cloud, given the severe deficiencies in Oracle's products.

451. On March 21, 2018, Oracle filed its fiscal third quarter 2018 financial results with the SEC on Form 10-Q, which was signed by Defendants Catz and Hurd. In that Form 10-Q, Oracle reported that total cloud revenues were $1.566 billion for the three months ended February 28, 2018. The Form 10-Q further reported cloud SaaS revenues were $1.151 billion and cloud PaaS and IaaS revenues were $415 million for the three months ended February 28, 2018.

452. These statements were materially false and misleading when made. It was misleading for Defendants to report these cloud revenue results, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable. Moreover, Defendants' statements purporting to report Oracle's cloud revenue were misleading because, as discussed above, GAAP required Defendants to disclose Oracle's use of engineered deals to generate material cloud revenue in connection with their statements purporting to report Oracle's cloud revenue results.

453. Additionally, on May 22, 2018, in response to a report by *The Information* that Oracle customers were resisting the Company's efforts to use audits to drive cloud deals, the Company put out a response that:

> Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that ***The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services.***

454. These statements were materially false and misleading when made. It was misleading for Oracle to deny that Oracle used audits to drive cloud sales, and state that Oracle had "no reason to resort to scare tactics to solicit business," without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

## IX. LOSS CAUSATION

455. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Oracle's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Oracle securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Oracle securities to decline.

456. The artificial inflation created by Defendants' alleged misrepresentations and omissions regarding Oracle's cloud sales and product quality were removed from Oracle's share price in response to information revealed in a series of disclosures, and the materialization of the risks concealed by Defendants' material misstatements and omissions. As set forth below, these

disclosures and materializations divulged or revealed information that gradually corrected Defendants' prior misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented and omitted that were a substantial factor in causing investors' economic loss.

457. On December 14, 2017, after the market closed, Defendants issued Oracle's second quarter 2018 financial results and disclosed that Oracle revenue growth had decelerated, growing by less than 40%. The Company also reported significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a marked decline.

458. Following these revelations, the price of Oracle stock declined by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, on high trading volume of 75,176,000 shares versus the class period average of 14,856,931 shares.

459. The market connected these disclosures to Oracle's sales practices. For example, a *Business Insider* article dated December 15, 2017 noted that "there are some signs that some of Oracle's customers are fed up with some of its hard-nosed sales tactics." Additionally, JMP analysts noted in a December 15, 2017 report that "many customers are irate with Oracle due to auditing practices on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

460. Defendants, however, prevented the stock from falling further by falsely stating that "customer adoption of our cloud products" "continues to be very strong" and that the "transition to the cloud is going well." Defendants further told investors that the cloud margins had underperformed because, "a lot of customers are waiting for the Autonomous Database just to become available." Defendants' damage control worked. For example, a December 15, 2017 Jefferies report entitled "Patience Grasshopper" stated that "[w]e understand investor frustration with the unwinding complexity of this model as it evolves, but we continue to believe that the business momentum in the field continues to build and this will translate into meaningful cash flow growth over time."

461. On March 19, 2018, after the market closed, Oracle issued its third quarter 2018 financial results, again disclosing that the Company's cloud growth had slowed even more

significantly to only 32%. Oracle admitted that it expected further deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," well below the market's expectations.

462. In response to the Company's March 19, 2018 disclosures, Oracle stock declined nearly 10%, falling from $51.95 per share on March 19 to $47.05 per share on March 20, on high volume of 68,601,000 shares.

463. The market connected these disclosures to Oracle's undisclosed financially engineered deals and extortive tactics. For example, a JMP analyst report dated March 20, 2018 highlighted Oracle's "cloud weakness," including that there were "fundamental challenge[s]" in the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon." And, in the months following this partial corrective disclosure, investors' questions about Oracle's coercive sales practices intensified. For example, in a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," *Forbes* reported that Oracle was using its "'Audit Bargain Close' playbook" "to pressure customers into cloud adoption" and in a May 22, 2018 article, *The Information* reported that large Oracle customers were resisting the Company's efforts to use audits to drive cloud deals. In addition, investors questioned whether deficiencies in Oracle's cloud product contributed to the Company's lackluster results. In a May 29, 2018 article, for example, *TechRepublic* opined that the "problem" with Oracle's use of coercive audits to generate cloud sales was "that it prevent[ed] Oracle from dealing with the real problem: the product," which was "a bare-bones 'minimum viable product'" that was not competitive with other companies' cloud products.

464. Defendants, however, prevented the stock from falling further by issuing a number of soothing statements to investors. For example, Defendants attributed the falling cloud revenue growth to Oracle's BYOL program, with Ellison stating that "there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

465. In addition, Defendants attributed the decline in cloud growth to a slowdown in older acquired SaaS businesses, which would reverse course as the Company's business mix

moved towards more newly acquired products, like the Company's "Fusion HCM" human resources application – one of the same products that, unbeknownst to investors, Hurd, Ellison, Catz, and Kurian had all called "not tenable" just a few months earlier. For instance, on the Company's earnings call, Ellison attempted to explain away the decelerating cloud growth stating, "[W]e have some very high growth rate SaaS businesses like ERP and HCM. And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite."

466. Again, Defendants' assurances worked. For example, on March 19, 2018, MUFG analysts issued a report entitled "BYO License Artificially Dampens Cloud Growth: Thesis Still Intact."

467. On June 14, 2018, JPMorgan issued a report announcing it was downgrading Oracle shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to their IT environment in the future." JPMorgan reported that while in the past Oracle "has been stable and received ~11% of the votes," the Company's standing in this latest poll dropped by more than 40% to 6.5%. JPMorgan connected this drop in CIO ranking to Oracle's coercive practices, stating that reasons that CIOs moved away from Oracle included that they "do not like Oracle's business practices and difficulty of working with them in the past." Investors were focused on this article. For example, Data Centre stated in a June 15, 2018 article that the JP Morgan report "may come as no surprise to customers who have long been frustrated with Oracle's strong-arm tactics to get them to shift to the fluffy stuff, as the legacy database vendor becomes increasingly desperate to catch up to other cloud vendors."

468. On this news, the price of Oracle stock fell approximately 5%, from $48.27 per share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume of 37,001,300 shares.

469. On June 19, 2018, Oracle held its fourth quarter 2018 earnings call with investors after the market closed. On that call, Oracle shocked the market by announcing that it would no

longer separately report financial results for its cloud business, and would, instead, consolidate those financial results into a combined "Cloud Services and License Support" line item so that investors could no longer see them. In addition, Catz disclosed that total cloud revenue growth for the quarter had come in at just 21%.

470. On this news, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume of 59,129,000 shares.

471. The market immediately connected the June 19, 2018 disclosure and the decrease in transparency with "red flags" at Oracle. For example, JMP reported that the dramatic deceleration in Oracle's cloud growth was driven by the Company's treatment of its customers and that an industry contact told them that ***"No one is re-upping. There was a big incentive to sell cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was no customer success to say, 'Hey, you bought this, now let's get value from it.***" Similarly, *The Upper Edge* reported on June 27, 2018 that "[m]any analysts are speculating that the timing of this change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud growth, suggests that it may have something to hide" and noted that Oracle's "Cloud Deals [were] Manufactured by Duress." The *Upper Edge* further reported that Oracle resorted to these coercive sales tactics to "mask poor cloud performance": Oracle's cloud product "did not work as advertised," and its cloud solutions "were not stable" and were "unconvincing."

472. All told, the stock declined 19% percent from its Class Period high of $52.97 to $42.82 on June 20, 2018.

## X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

473. Oracle's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

474. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Oracle who knew that the statement was false. None of the historic or present tense statements

made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI. THE PRESUMPTION OF RELIANCE

475. At all relevant times, the market for Oracle stock was an efficient market for the following reasons, among others:

(a) Oracle stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Oracle filed periodic public reports with the SEC and NYSE;

(c) Oracle regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Oracle was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

476. As a result of the foregoing, the market for Oracle stock promptly digested current information regarding Oracle from all publicly available sources and reflected such information in the price of Oracle stock. Under these circumstances, all purchasers of Oracle stock during the Class Period suffered similar injury through their purchase of Oracle stock at artificially inflated prices and the presumption of reliance applies.

477. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action

involves Defendants' failure to disclose material adverse information regarding revenue growth in Oracle's cloud segment—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Oracle's cloud business, as set forth above, that requirement is satisfied here.

## XII. CLASS ALLEGATIONS

478. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Oracle stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Oracle and their families and affiliates.

479. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Oracle has approximately 3.59 billion shares of stock outstanding, owned by at least hundreds or thousands of investors.

480. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or were deliberately reckless in disregarding that their statements and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of Oracle stock;

(f) Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g) The extent of harm sustained by Class members and the appropriate measure of harm.

481. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

482. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

483. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

### For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

484. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

485. This Count is asserted on behalf of all members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

486. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

487. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others

similarly situated in connection with their purchases of Oracle common stock during the Class Period.

488. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Oracle common stock, which were intended to, and did deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the reasons for Oracle's cloud revenues and growth.

489. Defendant Oracle is liable for all materially false and misleading statements made during the Class Period, as alleged above. The Executive Defendants, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. The Executive Defendants are liable for the false and misleading statements they personally made and/or signed, as alleged above.

490. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Oracle stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

491. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Oracle common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the Class would not have purchased Oracle common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

492. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Oracle common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act (Against the Executive Defendants)

493. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

494. This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

495. During their tenures as officers and/or directors of Oracle, each of the Executive Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Oracle, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Oracle during the Class Period thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

496. In their capacities as senior corporate officers of the Company, the Defendants named in this count had direct involvement in the day-to-day operations of the Company. Specifically, the Executive Defendants had the following roles and responsibilities:

497. Defendant Bond was at all relevant times Oracle's Senior Vice President of Investor Relations and, in that role, served as the Company's senior spokesperson to the marketplace, including by speaking for the Company at numerous investor conferences during the Class Period. Throughout the Class Period, Bond had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, and, as alleged in detail above,

repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth throughout the Class Period, including statements denying that Oracle employed "engineered" ABC or attached deals to generate material cloud revenue.

498. Defendant Catz is, and was at all relevant times, co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. During the Class Period, Catz signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy. In September 2014, Ellison described Catz as "[v]ery details-oriented," "the No. 2 person for some time," and "our first- ever, de facto chief operating officer." Throughout the Class Period, Catz had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, as alleged in detail above, and repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth. During the Class Period, Catz signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy.

499. Hurd was at all relevant times co-Chief Executive Officer of Oracle, as well as a member of the Company's Board of Directors. As stated on Oracle's website, Hurd "manage[d] corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support." Hurd's personal page states that he "helped shift the long-term strategy of the company toward the cloud" and "[a]dapting to this new business model." Throughout the Class Period, Hurd had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, as alleged in detail above, and repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth. During the Class Period, Hurd signed and certified each of the Company's quarterly and annual SEC filings, attesting to their purported accuracy.

500. Defendant Ellison is, and was at all relevant times, Oracle's Chief Technology Officer, as well as the Chairman of the Company's Board of Directors. The Company's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched." According to Catz, Defendant Ellison "led the transformation

to the cloud," and is still "in charge" at Oracle even after becoming the Company's CTO in 2014, noting "don't let titles fool you." Throughout the Class Period, Ellison had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, and, as alleged in detail above, repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth. In addition, Ellison signed the Company's 2017 Annual Report as a member of the Company's Board of Directors.

501. Defendant Kurian served as Oracle's President, Product Development from January 2015 to September 2018, was the most senior executive responsible for the development and functionality of Oracle's cloud products, and reported directly to Ellison throughout the Class Period. According to his personal webpage profile, Kurian was responsible for "[l]ead[ing] [the] transformation of Oracle's products with [the] introduction of [a] leading suite of Cloud Services over 10 years." Throughout the Class Period, Kurian had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, and, as alleged in detail above, repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth.

502. Defendant Miranda is, and was throughout the Class Period, Oracle's Executive Vice President, Oracle Applications Product Development, and reported directly to Kurian. As stated on Oracle's public website, Defendant Miranda is "responsible for leading all aspects of product strategy, product development, and product delivery for the entire portfolio of Oracle Applications." Oracle's website further states that "Miranda's primary focus is on delivering the industry's most complete, proven, and innovative set of cloud solutions." Throughout the Class Period, Miranda had the authority to control, and did control Oracle's statements to investors about the Company's cloud business, and, as alleged in detail above, repeatedly made statements to investors about Oracle's business, cloud products, and cloud growth.

503. As a result of the foregoing, the individuals named in this Count, as a group and individually, were controlling persons of Oracle within the meaning of Section 20(a) of the Exchange Act.

504. As set forth above, Oracle violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

505. By virtue of their positions as controlling persons of Oracle and as a result of their own aforementioned conduct, Catz, Hurd, Ellison, Miranda, Kurian and Bond are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Oracle common stock. As detailed above, during the respective times these individuals served as officers and/or directors of Oracle, each of these individuals was culpable for the material misstatements and omissions made by Oracle.

506. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Oracle common stock.

## COUNT III

### For Violation Of Section 20A Of The Exchange Act (Against Defendants Kurian and Catz and Hurd)

507. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

508. This Count is asserted pursuant to Section 20A of the Exchange Act against Kurian, Catz, and Hurd on behalf of all persons who purchased Oracle common stock contemporaneously with any sales of Oracle common stock by Kurian, Catz, and Hurd during the Class Period.

509. As set forth in the paragraphs above, and as further set forth in the chart below, Kurian, Catz, and Hurd committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Oracle common stock while in the possession of material, adverse, nonpublic information about, among other things, Oracle's severely deficient cloud technology, and widespread use of financially engineered deals. This conduct violated Section 20A of the Exchange Act.

510. Lead Plaintiff purchased shares of Oracle common stock contemporaneously with the sales of Oracle common stock made by Kurian, Catz, and Hurd while Kurian, Catz, and Hurd were in possession of material, adverse, nonpublic information, as set forth in the chart below. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | | Lead Plaintiff's Purchases | | |
|---|---|---|---|---|---|---|
| **Defendant** | **Sale Date** | **Shares Sold** | **Price** | **Purchase Date** | **Shares Purchased** | **Price** |
| **KURIAN** | 7/18/17 | 750,000 | $50.46 | 7/19/17 | 205,000 | $50.99 |
| | | | | | 115,800 | $50.99 |
| | | | | | 28,000 | $50.99 |
| | | | | | 3,600 | $50.99 |
| | | | | | 2,600 | $50.99 |
| | | | | 7/28/17 | 48,000 | $50.18 |
| | 1/18/18 | 1,500,000 | $50.29 | 1/22/18 | 10,000 | $50.45 |
| | | 200,000 | $50.29 | | | |
| **CATZ** | 1/16/2018 | 450,847 | $50.01 | 1/16/18 | 2,200 | $49.73 |
| | 1/17/2018 | 4,549,153 | $50.05 | 1/22/18 | 10,000 | $50.45 |
| **HURD** | 7/3/17 | 350,000 | $49.76 | 7/6/2017 | 182,000 | $49.16 |
| | | | | 7/6/2017 | 49,400 | $49.16 |
| | | | | 7/6/2017 | 6,500 | $49.16 |
| | | | | 7/6/2017 | 1,200 | $49.16 |
| | | | | 7/11/2017 | 4,999 | $49.88 |
| | | | | 7/12/2017 | 650,200 | $50.23 |
| | | | | 7/12/2017 | 363,100 | $50.23 |
| | | | | 7/12/2017 | 87,500 | $50.23 |
| | | | | 7/12/2017 | 12,800 | $50.23 |
| | | | | 7/12/2017 | 8,270 | $50.23 |

511. Numerous other Class members also purchased Oracle common stock contemporaneously with Kurian, Catz, and Hurd's sales of stock during the Class Period based on material, adverse, nonpublic information.

512. By virtue of their knowledge of material, adverse, nonpublic information, Kurian, Catz, and Hurd were duty bound not to benefit therefrom, a duty which they violated by selling his shares at inflated prices.

513. Accordingly, under Section 20A of the Exchange Act, Kurian, Catz, and Hurd are liable to Lead Plaintiff and the Class for all profits gained and losses avoided by them as a result of their stock sales.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensation to Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: February 17, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton

MARK LEBOVITCH (admitted *pro hac vice*)
JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
ABE ALEXANDER (admitted *pro hac vice*)
(markl@blbglaw.com)
(johnr@blbglaw.com)
(abe.alexander@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

JONATHAN D. USLANER (Bar No. 256898)
(JonathanU@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

*Counsel for Lead Plaintiff Union Asset Management Holding AG and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, John Rizio-Hamilton, hereby certify that on February 17, 2020 I caused a true and correct copy of the foregoing AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
JOHN RIZIO-HAMILTON