1   JORDAN ETH (CA SBN 121617)
    JEth@mofo.com
2   MARK R.S. FOSTER (CA SBN 223682)
    MFoster@mofo.com
3   DAVID J. WIENER (CA SBN 291659)
    DWiener@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone:   415.268.7000
6   Facsimile:   415.268.7522

7   Attorneys for Defendants
    ORACLE CORPORATION, SAFRA A. CATZ, PAULA R.
8   HURD, AS TRUSTEE OF THE HURD FAMILY TRUST,
    LAWRENCE J. ELLISON, THOMAS KURIAN, KEN BOND,
9   and STEVE MIRANDA

10  JAMES C. MAROULIS (CA SBN 208316)
    Jim.Maroulis@oracle.com
11  ORACLE CORPORATION
    500 Oracle Parkway
12  Mail Stop 5OP7
    Redwood City, California  94065
13  Telephone:   650.506.5200
    Facsimile:   650.506.7114
14
    Attorneys for Defendant
15  ORACLE CORPORATION

16              UNITED STATES DISTRICT COURT

17           NORTHERN DISTRICT OF CALIFORNIA

18                  SAN JOSE DIVISION

| | |
|---|---|
| | Case No. 5:18-cv-4844-BLF |
| | **CLASS ACTION** |
| *In re Oracle Corporation Securities Litigation* | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | Date:   September 24, 2020<br>Time:  9:00 a.m.<br>Ctrm:  3, Fifth Floor |
| | Judge:  Hon. Beth Labson Freeman |
| | Date Action Filed:  August 10, 2018 |

1

## NOTICE OF MOTION AND MOTION

2    TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

3         PLEASE TAKE NOTICE that on September 24, 2020, at 9:00 a.m., before the Honorable

4    Beth Labson Freeman in the San Jose Courthouse of the United States District Court for the

5    Northern District of California, 280 South 1st Street, San Jose, CA 95113, Fifth Floor, Courtroom

6    3, Defendants Oracle Corporation ("Oracle"), Safra A. Catz, Paula R. Hurd, as trustee of the Hurd

7    Family Trust, Lawrence J. Ellison, Thomas Kurian, Ken Bond, and Steve Miranda will and

8    hereby do move to dismiss Plaintiff's Amended Consolidated Class Action Complaint for

9    Violations of the Federal Securities Laws (the "SAC," ECF 68).  Defendants seek dismissal

10   pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities

11   Litigation Reform Act of 1995 (the "Reform Act").

12        This motion is based upon this Notice of Motion and Motion, the Memorandum of Points

13   and Authorities in support hereof, the Declaration of David J. Wiener ("Decl.") and the Exhibits

14   attached to it ("Ex."), all other pleadings and papers on file herein, and such other argument and

15   evidence as may be presented to the Court before the Motion is taken under submission.

16

17   Dated:  April 23, 2020                    MORRISON & FOERSTER LLP

18

19                                             By:   /s/ Jordan Eth
                                                    Jordan Eth
20
                                               Attorneys for Defendants
21                                             ORACLE CORPORATION, SAFRA A.
                                               CATZ, PAULA R. HURD, AS TRUSTEE
22                                             OF THE HURD FAMILY TRUST,
                                               LAWRENCE J. ELLISON, THOMAS
23                                             KURIAN, KEN BOND, and STEVE
                                               MIRANDA
24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ......................................................................................................................... 5

I.   PLAINTIFF FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING
     STATEMENT. ............................................................................................................. 5

     A.   Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues,
          Growth Rates, Or Products. ................................................................................ 5

          1.   Plaintiff fails to show that reported Cloud revenue or growth
               stemmed from improper sales practices. .................................................. 5

               a.   CW speculation does not show material falsity. ........................... 6

               b.   Anecdotes from "industry participants" do not show falsity. ........... 8

          2.   Plaintiff fails to show that Defendants misled investors about the
               sustainability of Cloud growth. ................................................................ 9

          3.   GAAP did not impose a duty to disclose. ................................................ 10

     B.   Plaintiff's Product Defect Allegations Do Not Render Any Statement False
          Or Misleading. ................................................................................................... 11

     C.   Plaintiff Fails To Show That Any Defendant Misled Investors About The
          Reasons For The Deceleration Of Cloud Growth. ............................................ 14

     D.   Many Challenged Statements Are Non-Actionable For The Additional
          Reason That They Are Statements Of General Corporate Optimism. ............... 15

     E.   The Safe Harbor Further Protects The Forward-Looking Statements. ............... 16

II.  PLAINTIFF FAILS TO PLEAD A "STRONG INFERENCE" THAT ANY
     DEFENDANT INTENDED TO DECEIVE INVESTORS. ........................................ 16

     A.   The CW Allegations Do Not Support Any Scienter Inference. ........................... 17

          1.   The old CWs offer nothing new giving rise to any scienter inference ....... 17

          2.   The new CW allegations do not give rise to any scienter inference. .......... 18

               a.   The allegations from CWs 10 and 11 are not reliable. ................... 18

               b.   Allegations from CWs 10 and 11 are not indicative of
                    scienter. ......................................................................................... 19

     B.   The October 2017 Email Does Not Support Any Scienter Inference. ................. 20

     C.   The Stock Sale Allegations Do Not Support Any Scienter Inference. ................. 21

     D.   The Compensation Allegations Do Not Support Any Scienter Inference. ........... 22

     E.   The Court Has Already Rejected Plaintiff's Remaining Allegations. .................. 23

     F.   Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge
          That Their Forward-Looking Statements Were False When Made. .................... 23

     G.   Holistically Considered, Plaintiff's Fraud Theory Is Not Cogent. ..................... 23

III. PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A. ............. 25

CONCLUSION ...................................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Bodri v. GoPro, Inc.*,
5     252 F. Supp. 3d 912 (N.D. Cal. 2017) ........................................................................24

6 *Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ....................................................................25

7

*Brodsky v. Yahoo! Inc.*,
8     630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................................................7, 8

9 *Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ....................................................................................10
10

*In re Cisco Sys. Inc. Sec. Litig.*,
11     No. C 11-1568 SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) .......................24

12
*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
13     856 F.3d 605 (9th Cir. 2017) ....................................................................................10

14 *In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ..................................................................................23
15

*In re Fusion-io, Inc. Sec. Litig.*,
16     Case No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............7

17
*In re Hansen Natural Corp. Sec. Litig.*,
18     527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................24

19 *In re Intel Corp. Sec. Litig.*,
    No. 18-CV-00507-YGR, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ................16
20

*Jui-Yang Hong v. Extreme Networks, Inc.*,
21     No. 15-CV-04883-BLF, 2017 WL 1508991 (N.D. Cal. Apr. 27, 2017)...............7, 23

22
*Lipton v. Pathogenesis Corp.*,
23     284 F.3d 1027 (9th Cir. 2002)...................................................................................25

24 *Lopes v. Fitbit, Inc.*,
    No. 18-CV-06665-JST, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) ...................13
25

*McGovney v. Aerohive Networks, Inc.*,
26     No. 18-CV-00435-LHK, 2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)......................8

27
*Metzler Inv. GmbH v. Corinthian Colls.*,
28     540 F.3d 1049 (9th Cir. 2008).............................................................................10, 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014)..................................................................................................10

*In re OmniVision Techs., Inc. Sec. Litig.*,
  937 F. Supp. 2d 1090 (N.D. Cal. 2013) ...................................................................................11

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014).....................................................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)...................................................................................................16

*In re Read-Rite Corp.*,
  335 F.3d 843 (9th Cir. 2003) ......................................................................................................5

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)......................................................................................................22

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)..........................................................................................5, 14, 23

*Sgarlata v. PayPal Holdings, Inc.*,
  409 F. Supp. 3d 846 (N.D. Cal. 2019) ......................................................................................11

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002)....................................................................................................13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012)......................................................................................................21

*Webb v. SolarCity*,
  884 F.3d 844 (9th Cir. 2018)......................................................................................................24

*Welgus v. TriNet Grp., Inc.*,
  No. 15-CV-03625 BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)....................................21

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).........................................................................6, 7, 18, 19, 22, 25

## **ISSUES TO BE DECIDED**

First, whether the Court should dismiss the § 10(b) claim given Plaintiff's failure to plead particularized facts showing that any challenged statement was false when made.

Second, whether the Court should dismiss the § 10(b) claim for the additional, independent reason that Plaintiff has failed to plead particularized facts giving rise to a "strong inference" that each Defendant acted with scienter, much less for each challenged statement.

Third, whether the Court should dismiss the § 20(a) and § 20A claims because the predicate § 10(b) claim fails.

Fourth, whether the Court should dismiss the § 20A claim for the additional, independent reason that Plaintiff fails to allege any adverse material non-public information known to Defendants Catz, Hurd, and Kurian, at the time of their trading decisions.

1

**INTRODUCTION**

2   This Court dismissed the consolidated complaint because Plaintiff failed to "plead with

3   particularity what statements were made, when they were made, why they were false at the time

4   they were made, and how the Defendant who made the statement acted with scienter at the time

5   the statements were made."  Plaintiff's second amended complaint has the same fatal flaws and

6   should be dismissed for the same reasons.

7   Plaintiff's allegations concerning Oracle's alleged Cloud product sales practices have not

8   overcome the most fundamental defect recognized by the Court.  Oracle still sold real products

9   for real money and—in every quarter during the class period—met or exceeded the Cloud

10   revenue guidance given to investors.  Still unable to challenge Oracle's audited Cloud revenue

11   figures, Plaintiff's amendments fail to show that any statement was materially misleading.

12   One amendment is a line edit.  Before, CW2 said that "90-95%" of his "team's" sales

13   were "financially engineered." Now, CW2 says that estimate applies to "company-wide" sales,

14   but does not offer any supporting facts nor explain how he made his estimate.  Plaintiff does not

15   distinguish between discounts and allegedly "improper" sales tactics.  At most, then, the

16   allegation confirms that many customers did not pay list prices.  That is not a news flash.  As the

17   Court ruled, the "Securities laws' purpose is not to police customer discounts."

18   A second amendment is one sentence from an "expert" who says that Oracle was required

19   under GAAP to make additional disclosures about its sales practices.  Plaintiff's proffered expert

20   has not reviewed a single Oracle disclosure, accounting policy, invoice, journal entry, or customer

21   contract, and, therefore, has no basis to opine about the propriety of Oracle's accounting or

22   disclosures.  His opinion is nothing but a speculative rubber-stamp of Plaintiff's claim.

23   A third amendment is a new theory.  Plaintiff now conjures up a product defect case

24   supported by vague allegations of unspecified "problems" and "bugs" in products within Oracle's

25   Cloud product suite.  Plaintiff builds its theory around one email from October 2017.  In that

26   email, Kurian used some pointed language criticizing Oracle's developers and telling them to

27   improve the user interface for one of Oracle's many Cloud products.  The email shows no falsity

28   and is not contemporaneous with any challenged statement.  Indeed, the last challenged statement

made by Kurian was made *five months* before the email was sent, and the challenged statements made after the email have nothing to do with the issues Kurian discussed in the email.  That Oracle's products (like any cutting-edge software) could be improved and made more competitive does not make a lie of Defendants' positive statements about Oracle's Cloud products.

Plaintiff's amended allegations also fail to give rise to an inference of scienter.  The few new allegations from CWs continue to lack particularity as to time, provide vague hearsay accounts of the "absolute awareness" of individuals who reported to the Defendants, and are not based on interactions between the CWs and the vast majority of the Defendants.

Plaintiff previously left out the new trading allegations against Hurd and Catz for good reason.  Hurd's and Catz's stock sales were not suspicious in timing or amount and were completed pursuant to 10b5-1 trading plans.  Moreover, the lack of trading allegations against Ellison, Miranda, and Bond continues to negate any inference of scienter, especially given Ellison's ownership of around $50 billion worth of Oracle shares during the class period. Plaintiff's scienter allegations still fail to reckon with the fact that Oracle met or exceeded the Cloud revenue guidance provided to investors throughout the class period.  It makes no sense that Defendants would engage in fraud to conceal "poor demand" for Oracle's Cloud product while at the same time accurately forecasting to investors expected deceleration of Cloud revenue growth.

The Court should dismiss this case again—this time with prejudice.

## BACKGROUND

This Court's December 17, 2019 Order (ECF 65) summarized the relevant factual background of this securities class action.  Plaintiff claims that Oracle coerced its customers to purchase its Cloud products, making Oracle's reported Cloud sales and growth between March 15, 2017, and June 19, 2018, "illusory."  In dismissing Plaintiff's consolidated amended complaint (the "CAC," ECF 40), the Court detailed multiple pleading defects.  (*See* Order.)

On February 17, 2020, Plaintiff tried a third time, filing the SAC.  The SAC challenges 50 statements made by Defendants during the class period, 34 of which Plaintiff also challenged in the CAC.  (*See* Appendix 1.)  As in the CAC, most of the statements Plaintiff challenges in the SAC relate to Oracle's reported or projected Cloud revenues (Stmts. 1, 7, 14, 16, 22, 25, 30, 44,

49[1]), reported or projected Cloud growth (Stmts. 2-5, 8, 13, 15-20, 26-27, 29, 37-38, 47-48), and statements made between October 2017 and March 2018 about why Cloud revenues and growth rates, while still positive, were decelerating relative to earlier periods (Stmts. 33, 35, 39-40, 42-43, 45-46).  Plaintiff also challenges statements that generally describe positive characteristics of some of Oracle's Cloud products and provide Defendants' opinions about why and when Oracle customers would adopt Cloud products.  (Stmts. 6, 9-12, 21, 23-24, 28, 31-32, 34, 36, 41, 50.)

Plaintiff continues to allege that Oracle's reported financial results and descriptions of success during the class period were "fake."  Plaintiff claims that Cloud sales were driven by "improper" and "extortive tactics" to coerce customers to buy short-term subscriptions "that had been pushed on them under duress." (*E.g.*, ¶¶ 2, 95-207.)  Plaintiff makes no claim that customers were obligated to renew these subscriptions, nor does Plaintiff claim that Oracle made any false statements about its renewal rates.

Plaintiff also still does not challenge the financial guidance Oracle provided in each quarter of the class period and does not dispute that Oracle met or exceeded its Cloud revenue projections every fiscal quarter of the class period, as shown below:

| TABLE 1[1] | **4Q17**[5] | **1Q18** | **2Q18** | **3Q18** | **4Q18** |
|---|---|---|---|---|---|
| Actual Cloud Revenue[2] (in millions) | $1,411 | $1,492 | $1,528 | $1,571 | $1,700 |
| Projected Cloud Growth (year over year)[3] | 69%-73% | 48%-52% | 39%-43% | 21%-25% | 17%-21% |
| Actual Cloud Growth (year over year)[4] | 75% | 51% | 39% | 22% | 20% |

[1] All figures are reported in constant currency.  (*See* Ex. 1 at 5 n.1.)
[2] Revenues are non-GAAP reported figures.  (Exs. 1 at 6; 2 at 5; 3 at 5; 4 at 5; 5 at 5.)
[3] (Exs. 6 at 6; 7 at 6; 8 at 5; 9 at 6; 10 at 5.)
[4] (Exs. 7 at 5; 8 at 5; 9 at 5; 4 at 5.)
[5] For 4Q17 only, growth rates are for SaaS and PaaS only (a majority of Cloud revenue).

The SAC largely repeats Plaintiff's accusations about Oracle's allegedly "aggressive," "high-pressure," and "strong-arm" sales tactics.  The SAC rephrases a handful of CW accounts that now purport to quantify some of Oracle's sales teams' use of "engineered deals"—which

---

[1] References to "Statement" or "Stmt." are to those identified in Appendix 1 to this Motion.

Plaintiff defines as Cloud purchases that were either "audit driven" or provided discounts.  (*E.g.*, ¶¶ 117-21.)  Citing two CWs, Plaintiff alleges that "90-95% of Company-wide cloud sales during fiscal years 2016 and 2017, at a minimum, were engineered deals."  (¶¶ 112-14.)  Plaintiff also presents additional statements from third-party consultants who allegedly assisted customers negotiate with Oracle before and during the class period.  (¶¶ 151-88.)

The SAC adds two new CWs.  CW10—a Group Vice President of Cloud Application User Experience—provides vague descriptions of "critical flaws" that were "endemic" in Oracle's Cloud products beginning before the class period.  (¶¶ 74-85.)  Plaintiff alleges that these "fundamental" defects resulted in unquantified decreased demand from unspecified customers at unspecified times.  Plaintiff contends that these allegations are "corroborated" by an October 19, 2017 email thread involving Kurian and Miranda.  (¶¶ 86-94.)  In the email, Kurian notes that a customer chose one of Oracle's Cloud products (CRM) over a competitor's offering but found the user interface of another Cloud product (HCM) "not competitive."  (*Id.*)  The email observes (in a portion that the SAC excludes) that the customer "was very positive about [Oracle's] Commercial proposition and the One-Oracle approach."  (Ex. 11.)

CW11—a Regional Vice President of Technology Sales without any alleged contact with any Individual Defendant—provides a vague, unsourced, and uncorroborated opinion that Oracle's sales practices were the result of an "edict" from Hurd to his direct reports and that Catz "significantly expanded Oracle's auditing" of customers "beginning in 2016."  (¶ 107.)  Plaintiff alleges that CW11 "led" an unspecified "country" in "technology cloud sales" in 2017.  (¶ 106.)

Plaintiff also says it "consulted" with an "expert," Harris L. Devor, who says Oracle was required to disclose its sales practices under ASC 605-25-50, the GAAP rule applicable to "multiple element arrangements."  (¶ 340.)  Devor did not review any Oracle accounting disclosures, policy, invoice, journal entry, or customer contract in reaching his opinion.  (¶¶ 339-342.)  He apparently just reviewed the SAC's allegations in isolation.  (*See id.*)

The redline that Plaintiff submitted to the Court with the SAC is a sea of red and blue that reflects the flood of repetition, not the rewrite it appears at first glance.  For example, variations of the "new" CW quantifications appear more than 10 times; allegations attributed to CW10

appear more than 20 times; and the October 2017 email is cited more than 15 times. The repetitive allegations are obvious in the chart Plaintiff attached as SAC Exhibit A, which presents a handful of formulaic allegations of falsity and scienter that are deployed with little variation to challenge all 50 statements made on 20 different dates. The chart illustrates that Plaintiff's allegations are the antithesis of particularity.

## ARGUMENT

The Court's Order set forth the heightened pleading standards applicable to Plaintiff's claims, as well as the standards for incorporation by reference. (Order at 11-13, 38.) Applying these standards again, this Court should consider Exhibits 1 through 31, all of which the SAC incorporates by reference, and dismiss this action for two independent reasons: Plaintiff fails to plead falsity and scienter in compliance with Rule 9(b) and the Reform Act.

## I.    PLAINTIFF FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT.

A complaint must plead "contemporaneous statements or conditions" showing the "misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); (Order at 17). The particularized facts must be "necessarily inconsistent" with the challenged statements. *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003).

### A.    Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues, Growth Rates, Or Products.

Plaintiff still contends that Defendants' statements reporting Cloud revenues and growth were false and misleading for failing to disclose that Oracle was engaged in "improper sales tactics" to boost sales of "flawed" products. (¶¶ 1-2.) As this Court held in rejecting this theory previously, "Oracle's concededly accurate financial reporting and projections is a tough hurdle for Plaintiff to overcome." (Order at 19.) The SAC does not overcome that hurdle.[2]

#### 1.    Plaintiff fails to show that reported Cloud revenue or growth stemmed from improper sales practices.

Plaintiff continues to attack Oracle's reported Cloud numbers as "fake," "artificial," and

---

[2] Arguments presented in this section apply to Statements 1-32, 34, 36-38, 41, 44, 47-49, and 50.

1  the result of alleged sales practices that Plaintiff labels as "improper" "coercion" that "forced"

2  customers to buy short-term subscriptions they "did not want," "would not use," and "did not

3  intend to renew." (*E.g.*, ¶¶ 20, 97, 110, 425.)  The Court's Order rejected substantively identical

4  allegations, finding that "[s]hort-term subscriptions are not 'fake' sales—they are short-term

5  subscriptions." (Order at 20-22.)  The Court highlighted that "allegations of coercive Sales

6  Practices do not render Oracle's financial reporting of its Cloud sales *per se* false or misleading"

7  and held that Plaintiff failed to "allege facts that demonstrate the falsity of the company's

8  characterizations of its financial health and business practices during the class period." (*Id.*)

9        Nothing has changed.  Oracle still sold real products for real money, properly recognized

10  the revenue generated by these sales, and met or exceeded its Cloud guidance in each quarter

11  during the class period.  Defendants' statements still accurately described that "(1) revenues from

12  Cloud sales were growing, (2) the growth was expected to slow down, and (3) the growth

13  eventually slowed down at the same rate Oracle predicted and disclosed to its investors." (*Id.* at

14  19.) Ernst & Young LLP audited all of Oracle's financial statements, which have never been

15  restated. (Ex. 12 at 79-80; Ex. 13 at 72-73.)  Nor has Plaintiff presented any statements by

16  Defendants that affirmatively created an impression that denied the existence of the alleged sales

17  practices. (Order at 27-29.)

18        The SAC makes two relevant amendments.  First, Plaintiff offers statements from CWs

19  purporting to quantify revenue attributable to "engineered deals."  Second, Plaintiff alleges that

20  accounts from "industry participants" confirm that engineered deals were Oracle's "general

21  practice" and "occurred worldwide."  Neither allegation shows the falsity of any statement.

22            **a.    CW speculation does not show material falsity.**

23        CWs must be "described with sufficient particularity to support the probability that a

24  person in the position occupied by the source would possess the information alleged." *Zucco*

25  *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).[3]  Courts look to "the level

26  of detail provided by the confidential sources, the corroborative nature of the other facts alleged

27  ───────────────

28  [3] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

1   (including from other sources), the coherence and plausibility of the allegations, the number of

2   sources, the reliability of the sources, and similar indicia." *Id*.  Second, the CW "statements . . .

3   must themselves be indicative of scienter [or falsity]." *Jui-Yang Hong v. Extreme Networks, Inc.*,

4   No. 15-CV-04883-BLF, 2017 WL 1508991, at *10 (N.D. Cal. Apr. 27, 2017) (citing *Zucco*, 552

5   F.3d at 995).  CW accounts are "insufficient" to "support [a plaintiff's] claim of falsity" where

6   they rely on hearsay, fail to provide information "contemporaneous" with the challenged

7   statements, or fail to provide "sufficient factual support" to indicate their reliability.  *In re*

8   *Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18-20 (N.D. Cal. Feb. 12, 2015).

9        Plaintiff alleges that CW2 "reported that 90-95% of Company-wide cloud sales during

10   fiscal years 2016 and 2017, at a minimum, were engineered deals," which Plaintiff defines to

11   include discounts to customers or sales that were "audit-driven." (¶¶ 16-18, 112.)  Plaintiff

12   asserts that CW11 corroborated this estimate.  (¶ 117.)  Plaintiff also repeats CW1's contention

13   that "at least 80% of Middle East and Africa cloud revenue was generated by inserting cloud into

14   compliance-based deals" and adds that this amounted to "at least $178 million" in FY 2017 cloud

15   revenue.  (¶ 108.)  These allegations fail for two reasons.

16        First, Plaintiff has failed to allege particularized facts establishing the CWs' reliability and

17   personal knowledge as to these quantifications.  There are no allegations showing that CW2 or

18   CW11—both regional sales executives—had personal knowledge of companywide Cloud sales,

19   including the negotiation history of each transaction, that would allow them to determine whether

20   these transactions qualified as "financially engineered."  Moreover, there are no allegations

21   showing that any CW had any involvement in Oracle's process for recognizing revenue, such that

22   they could reliably estimate the revenue recognized in any given period and how this revenue was

23   allocated between Cloud and on-premise products.

24        *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009), is right on point,

25   supporting rejection of the CWs' unfounded estimates.  There, the plaintiff alleged that the

26   defendant company engaged in "click fraud" to inflate its reported advertising revenue.  The

27   plaintiff relied on multiple CWs who estimated the revenues generated through the alleged

28   scheme.  The court rejected the allegations because there were no allegations that the CWs had

"personal knowledge of Yahoo!'s revenue recognition process" such that they could reliably support claims of misleading revenue reporting.  *Id.* at 1114-16; *see also McGovney v. Aerohive Networks, Inc.*, No. 18-CV-00435-LHK, 2019 WL 8137143, at *14 (N.D. Cal. Aug. 7, 2019) (rejecting CW quantification where the plaintiff "failed to establish [the CW's] reliability and personal knowledge" or "explain how [the CW] arrived at" the estimate).  This Court should reject Plaintiff's allegations for the same reason.

Second, even crediting the CW's purported quantifications, Plaintiff does not show that Defendants' statements were rendered misleading by these allegations.  As the Court held, "'[a]ttached deals' appear to be nothing more than offering a discount to an existing customer. . . Securities laws' purpose is not to police customer discounts."  (Order at 17 n.7.)  Plaintiff has not alleged particularized facts that would allow the Court to determine what portion of "financially engineered deals" were included in Plaintiff's purported quantification as a result of such routine discounts provided to customers.  These allegations fail for this additional reason.

> **b.     Anecdotes from "industry participants" do not show falsity.**

Plaintiff also augments the CAC's allegations attributed to industry consultants who assisted customers in negotiations with Oracle before and during the class period.  (¶¶ 151-188.) Plaintiff alleges these consultants collectively advised approximately 300 to 400 customers (few of which are named) in connection with audits during the class period and that Oracle generated approximately $115 million to $120 million in Cloud revenue from these customers.  (*Id.*)

None of these consultants has any alleged knowledge of Oracle's revenue recognition associated with the alleged sales made to the customers with whom they consulted.  They offer no more than speculation as to the timing of Oracle's revenue recognition or how revenue was allocated between the Cloud and on-premise portions of transactions.  Moreover, even accepting the estimates, the approximately $120 million in revenue to which they refer represents an immaterial amount:  1.6% of Oracle's ***$7.7 billion*** of class period Cloud revenue.  (*See* Table 1.)

Additionally, Plaintiff's allegations amount to nothing more than hearsay and vague opinions about what Oracle's customers "really wanted."  The vast majority of statements attributed to the consultants do not provide factual allegations regarding specific transactions

1   necessary to corroborate these statements.  The only consultant naming a specific customer

2   (¶ 173) does not provide any details about the transaction.

3        Plaintiff's other allegations refer generally to the number of audits in which the

4   consultants participated, state that Oracle offered discounts on license penalties resulting from

5   those audits, and provide the consultants' "recollection" of the value of "audit compliance" deals

6   completed by the consultants' clients.  Oracle was contractually entitled to (and did) conduct

7   licensing audits of customers, as Plaintiff concedes (¶ 52).  This was no secret, as is obvious from

8   the press accounts Plaintiff cites discussing the practice before and during the class period and the

9   fact that an industry of consultants exists to assist Oracle's customers with these audits.  That

10  Oracle offered discounts in connection with those audits does not render any statement false.

11              **2.      Plaintiff fails to show that Defendants misled investors about the
                          sustainability of Cloud growth.**

12

13       The Order held that "because Oracle's Cloud revenue concededly grew as projected, the

14  CAC allegations do not support the conclusion that Oracle's Cloud sales were 'unsustainable' as

15  Plaintiff claims."  (Order at 24.)  The SAC repeats and repackages the CAC's CW allegations

16  about low renewal rates on "engineered" deals that this Court has already rejected.  Plaintiff does

17  not even attempt to reconcile the alleged renewal rates of "virtually zero" or "less than 15%"

18  (¶ 21) for these transactions, which purportedly represented 90-95% of Oracle's Cloud sales, with

19  the fact that Oracle's Cloud revenue ***grew 20%*** even in the final quarter of the class period.

20  (Table 1.)  Nor does Plaintiff contend that Defendants made any statements misrepresenting

21  customer renewal rates during the class period.

22       Unable to overcome Oracle's concededly accurate financial guidance during the class

23  period, Plaintiff resorts to alleging that the unsustainability of Oracle's growth is shown by

24  slowing growth in Oracle's Cloud sales in fiscal year 2019 and workforce reductions in March

25  and June 2019—nearly one year ***after*** the end of the class period.  (¶¶ 244-248.)  There are no

26  particularized allegations tying these events to the alleged fraud.  Moreover, the fact that Oracle

27  continued to ***grow*** Cloud revenue (albeit at a lower rate) months after the end of the class period

28  (¶ 244) is fundamentally inconsistent with Plaintiff's theory that "cloud revenue dried up" in late

2017 as customers began to resist "financially engineered" deals and declined to extend short-term contracts that they had no intention to renew.  (¶¶ 208-213.)

### 3.    GAAP did not impose a duty to disclose.

Plaintiff alleges that Generally Accepted Accounting Principles ("GAAP") created a duty to disclose the alleged sales practices.  While Plaintiff does not contend that Oracle improperly recognized revenue, Plaintiff cites the opinion of its expert, Devor, who opines that ASC 605-25-50 "would have required Oracle to disclose the use of" the sales practices.  (¶¶ 340-41.)

GAAP does not, standing alone, create an affirmative disclosure duty for purposes of Section 10(b) and Rule 10b-5.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  Rather, a duty to disclose under Section 10(b) "must be separately shown according to the principles set forth by the Supreme Court in *Basic* and *Matrixx Initiatives*."  *Id.*

Applying the principles set forth by the Supreme Court and interpreted by the Ninth Circuit in *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017); and *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1071 (9th Cir. 2008), the Court's Order held that "when Defendants discussed Oracle's Cloud revenue growth ***generally*** and absent an affirmative representation by Defendants regarding Oracle's allegedly coercive Sales Practices or attribution of Cloud revenue to other factors . . . they had no duty to disclose the Sales Practices."  (Order at 19 (emphasis in original).)  Thus, assuming Plaintiff could allege (and, as shown above, it has not) that the sales practices were material and widespread during the class period, there was no duty to disclose them.

Plaintiff has not adequately pleaded a GAAP violation in any event.  ASC 605-25-50 applies to certain transactions involving provision of more than one product or service, which are referred to as "multiple-element [or deliverable] arrangements."  The provision generally requires a company to disclose "[t]he nature of its multiple-deliverable arrangements" and calls for disclosure of "the significant factors, inputs, assumptions, and methods used" to allocate the consideration paid between the elements of the transaction.  (¶¶ 332-33.)

Oracle's disclosures did just that.  Oracle disclosed that its "revenue recognition policy for

non-software deliverables including cloud SaaS, PaaS and IaaS offerings" was "based upon the accounting guidance contained in ASC 605-25" and that revenue from Cloud sales was recognized "ratably over the contract term." (Ex. 12 at 45.)  Oracle reported that it entered into "multiple element arrangements" and described in detail the multi-step process used to allocate revenue appropriately between each element of such transactions.  (*Id.* at 45-47.)

Plaintiff does not challenge (or even address) Oracle's detailed disclosures.  Instead, Plaintiff's argument rests entirely on Devor's one-sentence conclusion.  Devor, however, has no basis to opine about the propriety of Oracle's accounting.  Plaintiff does not allege, for example, that Devor reviewed any Oracle accounting policy, invoice, journal entry, customer contract, or even Oracle's disclosures relating to its revenue recognition policies.  (¶¶ 339-342.)

Devor's opinion is the precise type of unreliable and speculative "expert" opinion that courts consistently reject.  *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846 (N.D. Cal. 2019), is on point.  There, the plaintiff's complaint included statements from an expert regarding the defendant company's cybersecurity practices and the information that would have been available to the company regarding the scope of a data breach.  409 F. Supp. 3d at 859-60.  The court rejected the expert allegations, finding that there was "no allegation that [the expert] was familiar with, much less had knowledge of, the specific security architecture of Defendants' privacy network," "did not actually talk to employees" at the defendant company, "nor did he review documents" in forming his opinions.  *Id.*  The court held that the expert's opinion, therefore, was "merely a guess" and lacked any basis in personal knowledge about what occurred.  *Id.*; *see also In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1108 (N.D. Cal. 2013) (rejecting expert allegation where plaintiff did not allege the "factual basis supporting [the expert's] ability to speak about" the specific products at issue in the litigation).  Devor's opinion here suffers from the same fatal flaws.  His opinion does not show material falsity.

### B.    Plaintiff's Product Defect Allegations Do Not Render Any Statement False Or Misleading.

Besides the minimal and unsuccessful amendments described above, Plaintiff tries a new theory:  alleging that Oracle's Cloud products were "riddled" with "problems" and "bugs."

1   (¶¶ 13, 74-94.)  Plaintiff relies primarily on statements attributed to CW10, who Plaintiff alleges

2   "was one of the most senior executives involved in the design of Oracle's cloud products."  (¶

3   12.)  Plaintiff alleges CW10 reported that certain aspects of Oracle's Cloud platform "could not

4   reliably perform basic functions" and were riddled with performance "bugs" that caused

5   customers to reject Oracle's products because "the quality of the products was so poor."  (¶¶ 75-

6   85.)  Plaintiff also points to an October 19, 2017 email from Kurian to Miranda and others that

7   criticizes the user interface of HCM, one of Oracle's Cloud products.  (¶¶ 86-94.)

8   　　　　Based on these allegations, Plaintiff challenges ten new statements (in addition to those

9   challenged in the CAC) making generally positive or optimistic remarks regarding various

10   aspects of Oracle's Cloud products.  (*See* Stmts. 6, 9, 10, 21, 23, 24, 29, 31, 41, 46.)  These

11   statements generally describe Oracle's "advantageous position relative to being the one that can

12   bring the full suite" of Cloud products (Stmt. 6); Oracle's "comprehensive and integrated suite of

13   modern business applications" (Stmt. 9); Oracle's Cloud ERP product's "modern user interface"

14   (Stmt. 10); Oracle's superior "storage hierarchy system" that allowed for "very high performance

15   at a dramatically lower cost" (Stmt. 21); and innovations that Defendants believed would

16   "enhance the user experience" (Stmt. 23) and "put[] the needs and experiences of users at the

17   center of the design" of Oracle's Cloud products (Stmt. 31).

18   　　　　As discussed below in Part I.D, nearly all of these statements are non-verifiable statements

19   of corporate optimism that are not actionable under the federal securities laws.

20   　　　　Moreover, even if the statements were actionable, Plaintiff's CW allegations lack the

21   particularity required by the Reform Act.  While CW10 talks of product "bugs" and describes

22   Oracle's products as "inferior" and "not functional," Plaintiff does not allege particularized facts

23   contradicting Defendants' statements.  CW10 does not mention, for example, Oracle's Cloud

24   ERP or Autonomous Database products, much less describe with particularity specific product

25   defects that rendered Defendants' statements about these products false.  Nor are there any

26   allegations of product recalls, mass returns, or any other particularized allegation of customer

27   dissatisfaction to corroborate Plaintiff's vague allegations that "widespread failures" were

28   "endemic" to Oracle's products beginning years before the class period.

1    Plaintiff also ignores Oracle's significant growth in Cloud revenue before and during the

2    class period—the same time at which CW10 claims that "there was extremely poor demand for

3    Oracle's cloud services" due to "widespread failures" with Oracle's products.  (¶ 75.)  Oracle's

4    undisputed years-long growth in Cloud sales—before, during, and after the class period—belies

5    Plaintiff's vague and conclusory claims that Oracle's Cloud products were "not functional."

6        The Ninth Circuit's opinion affirming dismissal in *In re Vantive Corp. Sec. Litig.*, 283

7    F.3d 1079, 1085-86 (9th Cir. 2002), is instructive.  There, the plaintiff challenged statements that

8    the company's software was "substantially differentiated from competitors' products" due to

9    "high quality" and "superior functionality."  The plaintiff claimed these statements were false

10   based on allegations that the company's products "were not substantially differentiated," "did not

11   have superior functionality," were "not commercially viable due to defects," and were based on

12   technology that was "much less architecturally flexible" than its competitors', leading customers

13   to refuse orders after completing product pilot programs.  The Ninth Circuit found that the

14   "vagueness of these allegations needs no elaboration; there are no facts alleged to show how the

15   imprecise deficiencies asserted to hamper the product affected Vantive's competitive position" or

16   facts showing Vantive was "non-competitive in fact."  *Id*. at 1088-1089.

17       The same is true here.  The SAC provides no objective metrics to corroborate CW10's

18   general statements that "users struggled to complete tasks," almost no specifics about which of

19   Oracle's many Cloud products "lacked functionality," no particulars about how these "bugs"

20   affected products actually sold to customers during the class period, or any specific customer

21   complaints about these alleged "critical" flaws in "the functionality of Oracle's cloud product."

22   Customers and product developers will always identify improvements, particularly in cutting-

23   edge enterprise software.  That improvement is possible does not support an inference of fraud.

24   *Lopes v. Fitbit, Inc.*, No. 18-CV-06665-JST, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020)

25   ("If that were the case, the federal securities laws would prevent . . . companies from making any

26   positive statements about new software.").

27       Plaintiff's selective quotations of an October 19, 2017 email thread similarly fail to show

28   that any challenged statement was false when made.  The email does not discuss "serious defects

1  with Oracle's Cloud technology," as Plaintiff claims.  (SAC § IV.D.2.)  Rather, Kurian criticized

2  one aspect (the user interface) of one of Oracle's many Cloud products (HCM) and insisted in

3  pointed language that the team responsible for that product make improvements.  (Ex. 11.)

4  　　　　Moreover, the email is not a "contemporaneous statement[] or condition[]" showing the

5  misleading nature of any statements "when made."  *Ronconi*, 253 F.3d at 432; (Order at 17-18).

6  The only challenged statement even mentioning HCM after the date of the email (Stmt. 46) has

7  nothing to do with product quality, much less the quality of HCM's user interface.  In that

8  statement, made nearly five months later, Ellison stated that HCM was a "very high growth rate"

9  product and predicted that growth in HCM and other organically-developed products would

10  "dwarf[] the slower growing acquired businesses" as Oracle's product mix changed.  Plaintiff

11  offers no factual allegations contradicting these optimistic, forward-looking assessments.  The

12  three remaining challenged statements addressing HCM pre-date the October 19 email.  (Stmts.

13  29, 31-32.)  Statements 29 and 32 do not even mention HCM's user interface, while Statement 31

14  reflects a subjective discussion of "enhancements and significant additions to existing Oracle

15  HCM Cloud modules" that "put[] the needs and experiences of users at the center of the design."

16  This is a quintessential non-actionable statement of corporate optimism.  (*See* Part I.D.)

17  　　　C.　　**Plaintiff Fails To Show That Any Defendant Misled Investors About The
          Reasons For The Deceleration Of Cloud Growth.**

18

19  　　　　Plaintiff also attacks Defendants' statements attributing slowing Cloud growth to

20  (i) "longer provisioning times" with customers who purchased Oracle's Cloud ERP product,

21  (ii) Oracle's Bring Your Own License (BYOL) program, (iii) customers waiting to adopt Oracle

22  Cloud pending rollout of Oracle's then-forthcoming "Autonomous Database" service, and (iv) a

23  change in product "mix" within Oracle's SaaS products.  (Stmts. 33, 35, 39-40, 42-43, 45-46.)

24  According to Plaintiff, Oracle failed to disclose that Cloud revenue growth was actually

25  decelerating because "Oracle was finding it increasingly difficult to use the ABC tactic or

26  attached deals to push its cloud products on customers who did not want them."  (*E.g.*, ¶ 417.)

27  　　　　The Court rejected nearly identical allegations in the Order.  The Court noted that Plaintiff

28  failed to allege particularized facts contradicting Defendants' statements about the Autonomous

Database, BYOL program, or Oracle's market share and "did not identify any Oracle customers who declined to renew their Cloud subscriptions." (Order at 26-27.)

Plaintiff has not cured these defects. The only new allegations Plaintiff presents on this point are a statement from CW1 that "every single major ULA cloud agreement that had been signed was not renewed" as of the end of 2017; a statement from CW3 that "engineered deals dramatically slowed" in the Southern California region in late 2017 due to third-party consultants, including those discussed above, becoming more active; a statement from CW8 that some unidentified customers "were not renewing"; and from CW11 that Oracle began to "throttle back" the use of engineered deals at the end of 2017. This Court rejected substantively identical allegations. (*Compare* Order at 27:3-27:7, CAC ¶¶ 2, 18, 119-21, 125, 127, 150-53 *with* SAC ¶¶ 2, 21, 135-137, 209-212.)

Plaintiff still does not plead particularized facts providing any quantification of changes in renewal rates over time or objective measures showing changes in Oracle's use of attached deals or "audit-driven" sales practices. Nor does Plaintiff allege any facts comparing changes in these practices to the impact of BYOL, the Autonomous Database, or the changing product mix that Defendants described in the challenged statements. Absent such allegations, Plaintiff cannot show that Defendants' explanations for decelerated growth were false when made.

Plaintiff's allegations are also internally inconsistent. Plaintiff alleges that decelerated growth in FY18 was actually caused by Oracle no longer being able to "coerce" customers into using attached deals and "audit-driven" sales practices because customers "began to recruit third-party consultants to intervene." (¶ 210.) At the same time, however, Plaintiff affirmatively alleges that these same third-party consultants continued to accept numerous "audit-driven" deals on behalf of ***nearly all*** of the customers they assisted ***throughout the class period***. (¶¶ 151-188.)

### D.   Many Challenged Statements Are Non-Actionable For The Additional Reason That They Are Statements Of General Corporate Optimism.

The Order held that three challenged statements (Stmts. 8, 28, and 38) were non-actionable statements of corporate optimism. (Order at 13-15.) The SAC adds others in the same category: that Oracle "s[a]t in a very, very advantageous position" (Stmt. 6), that Oracle's

product offerings were "comprehensive" and "integrated" (Stmt. 9), were "familiar," "easy to use" (Stmt. 10),  "very, very high performance" (Stmt. 21), "enhance[d] the user experience" (Stmt. 23), or were "high end" (Stmt. 29).  (*See also* Stmts. 24, 31-32, 36.)  These vague statements about the quality and competitiveness of Oracle's product are precisely the sort of "subjective" and "unverifiable" assessments that courts within the Ninth Circuit have routinely found non-actionable as a matter of law.  *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014); *In re Intel Corp. Sec. Litig.*, No. 18-CV-00507-YGR, 2019 WL 1427660, at *9, 12 (N.D. Cal. Mar. 29, 2019).

### E.    The Safe Harbor Further Protects The Forward-Looking Statements.

The Court held that five challenged statements were forward-looking statements that were accompanied by meaningful cautionary language and protected by the Reform Act's Safe Harbor. (Order at 15-17.)  Four of the new challenged statements are also forward-looking and protected by the Safe Harbor.  (Stmt. 29, 41, 46, 48.)  Ellison's statements that "we think we'll be able to … meet our targets" (Stmt. 29) and "we think our customers are going to move very, very rapidly to the cloud" (Stmt. 41) are on their face forward-looking discussions of future growth.  The same is true of Ellison's statement that growth would accelerate "as the [product] mix changes," with higher-growth products beginning to "dwarf[] the slower growing acquired businesses" (Stmt. 46).  Similarly, Hurd's statement that "[j]ust moving the user base . . . very well accelerates our growth rate" (Stmt. 48) was made in response to an analyst question that "***Couldn't the company grow even faster in SaaS*** given that you have a significant [optionality] ***ahead of you***?"

The Safe Harbor protects these forward-looking statements because they were accompanied by the cautionary language that the Court previously found adequate.  (Ex. 8 at 4; Ex. 9 at 4; Ex. 10 at 4; *see* Order at 16.)

## II.    PLAINTIFF FAILS TO PLEAD A "STRONG INFERENCE" THAT ANY DEFENDANT INTENDED TO DECEIVE INVESTORS.

The SAC should again be dismissed for the independent reason that Plaintiff fails to plead particularized facts giving rise to a "strong inference" of scienter as to each Defendant, as is required under the rigorous Reform Act standards the Court has outlined.  (*See* Order at 29-30.)

1    The SAC largely repeats the allegations that the Court has already rejected.  The few new

2    allegations do not give rise to any inference of scienter, individually or holistically.

3         **A.      The CW Allegations Do Not Support Any Scienter Inference.**

4         The SAC's CW allegations do not give rise to any scienter inference.  They are neither

5    reliable, nor indicative of scienter.  (Order at 29-30.)

6              **1.      The old CWs offer nothing new giving rise to any scienter inference.**

7         The Court held that the nine CWs "offer[ed] no allegations as to Ellison, Kurian, Bond, or

8    Miranda" and "provide[d] no basis from which their scienter may be inferred."  (Order at 30.)

9    With respect to Catz and Hurd, the Court found that the CWs "lack[ed] personal knowledge as to

10   whether Catz or Hurd read or heard of the internal information and presentations" described by

11   the CWs.  The Court also found that the CW allegations related to Oracle's deal approval system

12   were not reliable because "(1) they do not establish *when* Hurd or Catz approved the deals,

13   (2) *how* Hurd or Catz would have known—based on these deal approvals—that Sales Practices

14   generated a material portion of Cloud revenues."  (*Id.* at 31.)

15        Plaintiff's changes to the allegations attributed to these CWs do not cure these

16   deficiencies.  Plaintiff now contends that CW1 "explained that the ABC tactic was developed by

17   Mark Hurd himself."  (¶ 102.)  Plaintiff does not allege the basis for this allegation, much less

18   show that CW1 bases it on personal knowledge or interactions with Hurd.  Similarly, CW1 lacks

19   personal knowledge to support the contention that specified executives would discuss "ABC deal

20   revenue" with another executive, who would then discuss these figures with Catz.  (¶ 109.)  Such

21   hearsay allegations reveal nothing more than "speculative awareness of Individual Defendants'

22   knowledge" that cannot be credited under the Reform Act.  (Order at 31.)

23        CW2 now alleges that two of Hurd's direct reports "had absolute awareness of the poor

24   health of the cloud business" and confirmed that 90-95% of Company-wide Cloud sales did not

25   have "use cases" attached to them in fiscal year 2017.  (¶ 114.)  CW2 does not purport to have

26   interacted with any Defendant or to have any insight into any Defendant's mental state.  Also

27   missing are particularized allegations stating the basis for these speculative figures.

28        CW3 is now alleged to have told Oracle executive Mr. Geraffo (at some unspecified time)

1    that "the way the Company was selling cloud was not sustainable" and that the renewal rate

2    targets set by Mr. Geraffo "were not going to happen." (¶ 122.) But, as with CW1 and CW2,

3    there are still no allegations that CW3 (who left Oracle in March 2017) interacted with Hurd or

4    Catz or had any insight into their knowledge at the time any challenged statement was made.

5         Plaintiff has also failed to cure the allegations regarding the DAS system that the Court

6    rejected. Plaintiff now alleges that (1) CW1 stated that three Cloud transactions (totaling

7    approximately $56 million) completed at unspecified times in FY17 (a year in which Oracle

8    reported approximately $4.57 billion in Cloud revenue) "were approved by Hurd" and that the

9    DAS entries indicated that the deals involved "cloud insertion" (¶¶ 124, 254) and (2) CW7

10   reported that DAS entries for unidentified transactions would state that the unidentified customer

11   "would not purchase the cloud product unless a steep discount for on-premise software was

12   provided." (¶ 150.) While Plaintiff now provides customer names for three transactions that

13   CW1 references, Plaintiff provides no such details from CW7. Plaintiff also fails to allege

14   particularized facts showing the process that "Hurd's office" used to approve these transactions,

15   much less showing that a notation that a transaction involved "cloud insertion" revealed to Hurd

16   that a transaction was the result of improper sales tactics. (*Compare* CAC ¶ 110 *with* SAC ¶ 124;

17   CAC ¶ 134 *with* SAC ¶ 150; *see* Order at 31.)

18          **2.**     **The new CW allegations do not give rise to any scienter inference.**

19             **a.**     **The allegations from CWs 10 and 11 are not reliable.**

20        The new CWs, like those previously rejected by the Court, did not have direct contact

21   with most of the Defendants. CW10 does not purport to have had any direct contact with Hurd,

22   Catz, Ellison, or Bond. CW11 is not alleged to have had direct contact with ***any*** Defendant, and

23   Plaintiff fails to specify the country in which CW11 worked. As in the CAC, Plaintiff's "CW

24   statements provide no basis from which [Defendants'] scienter may be inferred." (Order at 30.)

25        Additionally, the allegations from CW10 and CW11 that do reference an Individual

26   Defendant are vague, conclusory, speculative and, in many instances, unreliable hearsay. *Zucco*,

27   552 F.3d at 997 & n.4. CW10 provides vague and conclusory allegations about "widespread

28   failures," "bugs," and "problems" beginning years before the start of the class period, as well as

1   vague assertions about unspecified Oracle Cloud products being "inferior" to their competition.

2   (¶¶ 75-85.)  CW10 contends these issues were raised with Kurian and Miranda "for years" but

3   that "nothing changed" before CW10 left Oracle in February 2018.  Vague and conclusory

4   allegations like these are inadequate.  *See Zucco*, 552 F.3d at 997-98.

5        Plaintiff does not show which Oracle products were affected by "bugs," when these

6   "widespread failures" occurred, the extent to which they continued during the class period, which

7   customers "were not able to use or deploy" Oracle's products because of the alleged defects, what

8   "bad experiences" customers had, or how any of these issues, in fact, rendered Oracle's full suite

9   of Cloud products "untenable" and "non-competitive."  Moreover, Plaintiff's colorful adjectives

10  are contradicted by common sense.  If Oracle's Cloud products were consistently "not functional"

11  beginning years before the start of the class period, where are the allegations of customer

12  complaints, refunds, and recalls?  To the contrary, Oracle's Cloud sales grew ***20% in the last***

13  ***quarter of the class period*** and more than doubled between FY 2016 and FY 2018.  (Table 1.)

14       Plaintiff attributes allegations to CW11 that are similarly speculative, vague, and based on

15  unreliable hearsay.  Plaintiff alleges that CW11 reported that Catz was responsible for expanding

16  use of licensing audits in 2016 and that the "ABC tactic was an 'edict' handed down by Hurd."

17  (¶¶ 107, 301.)  But Plaintiff does not allege that CW11 ever spoke with Catz or Hurd about audits

18  or anything else.  Nor does Plaintiff allege the source for CW11's belief that Oracle's auditing

19  practices were driven by Catz or that Hurd issued an "edict."  Generalized claims of a

20  Defendant's "knowledge" without such factual allegations "are not sufficient to create a strong

21  inference of scienter, since they fail to establish that the witness reporting them has reliable

22  personal knowledge of the defendants' mental state."  *Zucco*, 552 F.3d at 998.

23            **b.       Allegations from CWs 10 and 11 are not indicative of scienter.**

24       Even if the CWs were reliable and had personal knowledge, the allegations must

25  themselves be indicative of scienter.  *Zucco*, 552 F.3d at 995-96.  Plaintiff fails this second test,

26  failing to link any Defendant's mental state to any point in time or any challenged statement.

27       As in the CAC, the new CW allegations in the SAC lack particularity as to time.  Plaintiff

28  alleges that CW10 discussed product issues "for years" with Kurian and Miranda at periodic

meetings.  No specifics are offered regarding any meeting that allegedly occurred during the class period.  Indeed, only two specific interactions are referenced.  The first meeting *occurred in 2015*, two years before the class period.  (¶ 83.)  The only other alleged conversation for which Plaintiff provides an approximate date is a conversation occurring in October 2017, in which Kurian allegedly stated that Oracle's competitors "had a superior product" and that a customer was "very upset with their experiences" with one of Oracle's Cloud products.  (¶¶ 80, 82.)  What does that mean?  To which product was Kurian referring?  Which competitors?  Were the problems technical?  Commercial?  How did these "bad experiences" render any challenged statement made by Kurian—the last of which was made *five months before this conversation* (Stmt. 13)—knowingly false or misleading?

Plaintiff also alleges that CW10 "conducted numerous studies" of user feedback and "tests" on unspecified products between 2015 and 2018 and provided spreadsheets summarizing these studies to Kurian and Miranda.  Plaintiff does not, however, allege when these spreadsheets were provided or any specifics about the "critical" and "widespread structural issues" contained in any report provided at any time.  That a product development executive informed Kurian and Miranda that products could be improved is not indicative of scienter.

## B.   The October 2017 Email Does Not Support Any Scienter Inference.

Plaintiff asserts that the October 19, 2017 email thread involving Kurian and Miranda gives rise to a strong inference of scienter as to all Defendants because it indicates that Defendants "regularly discussed key deficiencies in Oracle's cloud technology."  The email shows no such thing.  As discussed above, the email shows that one Oracle customer chose one of Oracle's Cloud products over a competitor's product but was also dissatisfied with one aspect of another Oracle Cloud product.  There is no discussion regarding widespread "key deficiencies in Oracle's cloud technology."  Kurian's statement that he was under "pressure" to improve the user interface of one of Oracle's Cloud products does not show that Hurd, Catz, and Ellison were "informed of, and focused on, significant defects with Oracle's cloud technology."  (¶ 277.)  Rather, it shows that Oracle, like any company developing cutting-edge enterprise software, sought to improve its product.

1  Plaintiff also fails to tie its allegations to any Defendant's state of mind at the time any

2  challenged statement was made.  Plaintiff does not challenge a single statement made by Kurian

3  or Miranda—the only Defendants on the email chain—after the date of this email.  The

4  challenged statements made by the other Defendants are unrelated to any issues raised by Kurian.

5  (*See* Stmts. 34-50.)  Indeed, the only statement even mentioning the HCM product after the date

6  of this email has nothing to do with product quality or HCM's user interface.  (Stmt. 46.)

7  **C.  The Stock Sale Allegations Do Not Support Any Scienter Inference.**

8  In the CAC, Plaintiff alleged that Kurian's class period sales of approximately 4 million

9  shares raised an inference of scienter.  The Court held that it "[was] not persuaded that Kurian's

10  stock sales were suspicious," as Kurian's sales were not unusual in amount and timing.  (Order at

11  34-35.)  The SAC adds no new allegations on this point.  (¶¶ 313-319.)

12  Plaintiff now alleges that sales by Hurd and Catz support an inference of scienter.

13  (¶¶ 320–326.)  Plaintiff left those sales out of the CAC for good reason.

14  Plaintiff alleges that Hurd sold a total of 1.4 million shares during the class period, with

15  total proceeds of approximately $65 million.  (¶¶ 324-25.)  These sales represented ***less than 8%***

16  of Hurd's then-available holdings.  (Ex. 14 at 26.)  As the Court found with respect to Kurian's

17  even larger sales, courts "require[] larger sales amounts" to support an inference of scienter.

18  (Order at 34-35.)  Moreover, as Plaintiff concedes, Hurd's sales were made pursuant to a 10b5-1

19  trading plan adopted months before the start of the class period.  (¶ 324.)  Stock sales that "[take]

20  place under preexisting trading plans" do "not by themselves support an inference of scienter."  *In*

21  *re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 n.2 (9th Cir. 2012); *see Welgus v.*

22  *TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 6466264, at *18 (N.D. Cal. Dec. 18, 2017).

23  Plaintiff alleges that Catz sold 5,000,000 shares for approximately $250 million between

24  January 16 and 17, 2018, representing ***"about 15%"*** of her shares at that time.  (¶¶ 320-22.)

25  Again, courts "require[] larger sales amounts" to support an inference of scienter.  (Order at 34-

26  35.)  Plaintiff also concedes that Catz sold a similar proportion of her available shares (12.8%) in

27  the fifteen months before the fifteen-month class period.  (¶ 323.)  The class period sales,

28  therefore, are not "dramatically out of line with prior trading practices[,]" and cannot give rise to

a scienter inference.  *Metzler*, 540 F.3d at 1066-67.  Additionally, the timing of Catz's sales—
which were also made pursuant to a 10b5-1 plan—is not suspicious and does not support an
inference of scienter.  As the Court found with Kurian, Catz's sales occurred in "January [] 2018,
*after* Oracle reported a slow-down on December 14, 2017."  (Order at 35.)

### D.   The Compensation Allegations Do Not Support Any Scienter Inference.

Plaintiff alleges that Hurd, Catz, Ellison, and Kurian were "motivated to ensure that the
Cloud business and Cloud sales appeared to be thriving" because "massive amounts of their
compensation depended" on the success of Oracle's Cloud products.  (¶ 308.)  No false
appearance was created.  The business did thrive.  Nowhere does Plaintiff challenge the accuracy
of Oracle's reported Cloud revenue.  Plaintiff's motive allegations thus fail out of the gates.

It is, of course, "common for executive compensation, including stock options and
bonuses, to be based partly on the executive's success in achieving key corporate goals."  *In re
Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).  Courts "will not conclude that
there is fraudulent intent merely because a defendant's compensation was based in part on such
successes."  *Id.*  Dismissal is routinely affirmed where a "complaint fails to provide specifically,
with comparisons to prior years' bonuses, the correlation between [defendants'] compensation
and [the company's] bottom line."  *Zucco*, 552 F.3d at 1004.  "Generalized assertions" about a
defendant's compensation being tied to company success are "inadequate."  *Id.* at 1004-05.

Generalized allegations are all Plaintiff offers here about the change in the expiration of
stock options granted in FY 2016 from ten years to five years (¶ 309) and changes to the FY 2018
compensation program, which granted performance-based options that were partially tied to
significant long-term growth of Oracle's Cloud business.  (¶ 311.)  Plaintiff has failed to
adequately compare Oracle's class period compensation program with its prior compensation
programs.  Beyond noting the expiration term of Defendants' options, Plaintiff offers no facts
about the compensation program in effect at the beginning of the class period.  (¶ 309.)  Plaintiff
also provides no factual allegations regarding Oracle's compensation plans before the class
period.  Plaintiff states only that "the metric had changed from being based in fiscal 2017 on
'revenue growth and cash flow growth' to 'attainment of stock price, market capitalization and

1    operational performance goals focused on cloud growth' in fiscal 2018." (¶ 311.)  That is not

2    enough, as this Court has previously ruled.  *See Extreme Networks*, 2017 WL 1508991, at *23.

3          Moreover, Plaintiff's compensation theory is inconsistent with the nature of the alleged

4    fraud.  The "operational performance goal[s]" contained in the FY 2018 compensation plan were

5    not short term—they required sustained Cloud growth and success over a period of ***years***.

6    (¶ 311.)  Plaintiff does not even attempt to reconcile these long-term incentives with the

7    inherently short-term nature of the alleged fraud during the class period.

8          **E.    The Court Has Already Rejected Plaintiff's Remaining Allegations.**

9          Plaintiff repeats without substantive modification many of the same scienter arguments

10   considered by the Court in the Order.  Plaintiff continues to argue that (1) the "core operations"

11   inference applies (¶¶ 296-306); (2) reports and communications from Chilean regulators and

12   Clear Licensing Counsel "informed [Defendants] of Oracle's illicit audit and sales activities" (¶¶

13   260-262); and (3) scienter can be inferred from Oracle's announcement at the end of the class

14   period that it would cease separate reporting of Cloud licensing revenues (¶¶ 273-276).  Each of

15   these theories was rejected in the Order.  (Order at 27, 31-36.)  There is nothing new.

16         **F.    Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge**
            **That Their Forward-Looking Statements Were False When Made.**
17

18         Plaintiff does not even attempt to show that any Defendant had actual knowledge that any

19   forward-looking statements were false or misleading.  *In re Cutera Sec. Litig.*, 610 F.3d 1103,

20   1112 (9th Cir. 2010); *Ronconi*, 253 F.3d at 429.  This separately bars Plaintiff's challenge to the

21   Defendants' forward-looking statements discussed in Part I.E above.  (*See* Stmts. 29, 41, 46, 48.)

22         **G.    Holistically Considered, Plaintiff's Fraud Theory Is Not Cogent.**

23         Considering the scienter allegations together and holistically, the SAC still fails to plead a

24   theory of fraud that is "cogent" and "compelling."  (Order at 29, 36.)

25         Plaintiff's theory is not even coherent, let alone cogent and compelling.  According to

26   Plaintiff, Oracle's products were riddled with defects for years before the class period.  To hide

27   this, Defendants "bribed" and "coerced" customers to purchase short-term subscriptions under the

28   threat of licensing penalties and with the promise of substantial discounts.  Defendants

1    supposedly knew, however, that customers would not renew their one-year subscriptions, and that

2    demand was "evaporating" when it became time to renew.

3        If this were the case, why did Oracle's Cloud revenue grow *for years* before the class

4    period and continue to grow during and after the class period (albeit at a slower rate)?  Oracle had

5    400,000 customers, yet Plaintiffs do not allege a single customer complaint or provide any

6    indication of the precipitous decline in revenue one would expect if Oracle's products were "not

7    functional" for many years.  If Plaintiff's allegations were true, and Defendants were attempting

8    to conceal decelerating growth that was bound to reveal itself, why did Oracle accurately forecast

9    this same slowing growth to investors?  As the Court held, "the factual allegations in the

10   [complaint] do not paint the picture that Plaintiff describes."  (Order at 26-27.)

11       Plaintiff also still fails to allege any coherent motive for the alleged fraud.  Plaintiff does

12   not allege suspicious or coordinated trading by Defendants or trading timed to maximize personal

13   benefit from non-public information.  Hurd traded pursuant to a 10b5-1 plan adopted *months*

14   *before* the start of the class period.  Catz's trades, like Kurian's, were made "*after* the alleged

15   deceleration of the Cloud revenue growth."  (Order at 35.)  Moreover, Ellison and the other

16   Individual Defendants collectively owned around $50 billion worth of Oracle shares during the

17   class period (Ex. 14 at 26), and suffered the same alleged "losses" as Plaintiff.  *Cf. In re Hansen*

18   *Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("[A]ny inference of scienter

19   is defeated when an insider sells only a portion of his stock holdings and ends up reaping the

20   same large losses as did Plaintiff when the stock price dropped.").  This "lack of stock sales can

21   detract from a scienter finding."  *Webb v. SolarCity*, 884 F.3d 844, 856 (9th Cir. 2018).

22       Oracle's repurchase of over $12 billion worth of its shares during the class period (Ex. 17

23   at 27; Ex. 15 at 26) [4] further "support[s] an inference of innocence."  *SolarCity*, 884 F.3d at 856.

24   It is "illogical that [Oracle] would have been repurchasing its shares had it been aware of facts

25   that would indicate the price would fall."  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D.

26   Cal. 2017); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013).

27

28   _____

[4] The SAC incorporates these exhibits by reference.  (*E.g.*, ¶¶ 35, 309, 312, 500.)

1    Further, given that Plaintiff's case is predicated on claims of "illusory" financial results

2    based on alleged sales practices that industry critics had complained of publicly since 2014 at the

3    latest, the absence of any issues with Oracle's independent auditors cuts against inferring scienter.

4    *Metzler*, 540 F.3d at 1068-69.  As does the absence of a restatement.  *Zucco*, 552 F.3d at 997 n.5.

5    Plaintiff's theory is not cogent or more compelling than the opposing, nonculpable

6    inference that the Court can draw.  Oracle launched and promoted a new product line in a

7    competitive market, achieving impressive results and strong growth rates that grew at a lower rate

8    over time, consistent with the "law of large numbers."  (Ex. 16 at 7.)  Yet even at the end of the

9    class period—indeed, months ***after*** the class period (¶ 244)—Oracle's Cloud revenues continued

10   to grow as Defendants projected to investors, just not as fast as before.  That is not fraud.  That is

11   why Oracle's Cloud business did not evaporate into thin air and Oracle's stock price did not

12   plummet as one would expect if Oracle's Cloud business were as illusory as Plaintiff claims.

13   **III.    PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A.**

14   Plaintiff's other claims under §§ 20(a) and 20A also fail.  Section 20A allows recovery

15   against someone who violates the Exchange Act by trading securities "while in possession of

16   material, nonpublic information" by a person who traded contemporaneously with the insider.

17   *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1033 n.10 (9th Cir. 2002).

18   To "prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege

19   a violation of § 10(b) or Rule 10b 5."  *Id.* at 1035 n.15.  As shown above, the SAC fails to plead a

20   predicate violation under Section 10(b).  That is fatal.  *Id.*; *Zucco*, 552 F.3d at 990; *Or. Pub.*

21   *Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 610 (9th Cir. 2014).  The § 20A claim fails for a

22   second reason:  Plaintiff fails "to identify any specific material nonpublic information in the

23   possession of [defendants] at the time of a specific trade."  *Brodsky*, 592 F. Supp. 2d at 1207-08.

24                                       **<u>CONCLUSION</u>**

25   Defendants respectfully request that the Court grant the Motion to Dismiss with prejudice.

26   Dated:  April 23, 2020                       MORRISON & FOERSTER LLP

27                                                By:  */s/ Jordan Eth*

28                                                Attorneys for Defendants

Appendix 1

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 1 | March 15, 2017<br><br>Press Release<br><br>Oracle | On March 15, 2017, Oracle stated "Total Cloud Revenues, including infrastructure as a service (IaaS), were $1.2 billion, up 62% in U.S. dollars [year-over-year] and up 63% in constant currency." | ¶¶ 8, 68, 209 | ¶¶ 8, 67, 343, 345 | Ex. 18 |
| 2 | March 15, 2017<br><br>Press Release<br><br>Defendant Catz | In Oracle's March 15, 2017 press release, Defendant Catz touted Oracle's cloud business and cloud revenues. Specifically, Defendant Catz was quoted as stating "The ***hyper-growth we continue to experience in the cloud has rapidly driven both our SaaS and PaaS businesses to scale . . .*** [O]ur SaaS and PaaS businesses grew at the astonishing rate of 85% in Q3. … ***Our new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect;*** total revenue is up, margins are up, operating income is up, net income is up, EPS is up. Take a look. Q3 was a very strong quarter." | ¶¶ 8, 68, 210-11 | ¶¶ 67, 344–45 | Ex. 18 |

---

[1] The content included in columns labeled "Date, Medium, and Speaker" and "Allegedly False and Misleading Statement" are reproduced verbatim from Exhibit A filed with Plaintiff's SAC (Dkt. No. 68-1).  For the Court's convenience and ease of reference, Defendants have numbered the allegedly false and misleading statements identified by Plaintiff and have provided references to the paragraphs of the CAC and SAC in which each statement is quoted.

[2] Exhibit references are to the exhibits attached to the Declaration of David J. Wiener In Support Of Defendants' Motion To Dismiss Consolidated Class Action Complaint, filed concurrently herewith.

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 3 | March 15, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's March 15, 2017 earnings call, Defendant Ellison touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Ellison stated that "***SaaS and PaaS are large, rapidly growing businesses for us. Together SaaS and PaaS grew 85% this past quarter***, but soon infrastructure as a service will be growing even faster, and before long infrastructure as a service will become Oracle's largest cloud business. In summary, ***all of Oracle's cloud businesses are growing rapidly*** …." | ¶¶ 214–15 | ¶¶ 348-49 | Ex. 6 |
| 4 | March 15, 2017<br><br>Earnings Call<br><br>Defendant Catz | On Oracle's March 15, 2017 earnings call, Defendant Catz touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Catz stated "Our pivot to the cloud is now clearly in full swing. ***We continue to see out[sized] growth rates in our cloud business, especially when compared with our key competitors who are all seeing slowing growth; but more importantly, the increase in revenue from our cloud business has overtaken new software license declines on an annual basis . . .***" | ¶¶ 8, 69, 212 | ¶¶ 8, 346 | Ex. 6 |
| 5 | March 15, 2017<br><br>Earnings Call<br><br>Mark Hurd | On Oracle's March 15, 2017 earnings call, Hurd touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Hurd stated Oracle is "***the fastest-growing scale cloud business in the world.***" | ¶¶ 8, 69, 213, 215 | ¶¶ 347, 349 | Ex. 6 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 6 | March 16, 2017<br><br>CNBC Interview<br><br>Mark Hurd | During Hurd's March 16, 2017 CNBC interview, Hurd touted the quality and performance of Oracle's cloud product. Specifically, Hurd stated "***We're really the only ones that have a complete suite of applications***. I do not believe customers are going to want to have 10 different cloud providers, 8 different cloud providers. They want to have as few as they possibly can so they can get as much leverage across their infrastructure as possible. ***We sit in a very, very advantageous position relative to being the one that can bring the full suite, not just in applications but also in platform, as well as infrastructure.***" | N/A | ¶¶ 352–53 | N/A |
| 7 | March 17, 2017<br><br>Form 10-Q,<br><br>Defendant Catz, Hurd | In Oracle's Form 10-Q, filed on March 17, 2017 and signed by Defendant Catz and Hurd, Oracle stated that the Company's total cloud revenues for the three months ended February 28, 2017 were $1.189 billion, and for the nine months ended February 28, 2017 were $3.211 billion. The Form 10- Q further reported that cloud SaaS and PaaS revenues were $1.011 billion and cloud IaaS revenues were $178 million for the three months ended February 28, 2017. | ¶¶ 218, 219 | ¶¶ 354-55 | Ex. 19 |
| 8 | May 4, 2017<br><br>Press Release<br><br>Defendant Kurian | In Oracle's May 4, 2017 press release, Defendant Kurian touted the growth of Oracle's cloud business. Specifically, Defendant Kurian was quoted as stating "We continue to see tremendous growth across our cloud business." | ¶¶ 220, 221 | ¶¶ 356-57 | Ex. 20 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 9 | May 4, 2017<br><br>Press Release<br><br>Defendant Miranda | In Oracle's May 4, 2017 press release, Defendant Miranda touted the Company's cloud products. Specifically, Defendant Miranda stated "With Oracle Cloud Applications, Oracle provides a ***comprehensive and integrated suite of modern business applications that enable increased business agility and reduced costs. As a result, organizations across every industry are increasingly selecting Oracle Cloud Applications to transform the way they do business.***" | N/A | ¶¶ 69, 70, 358-360 | Ex. 21 |
| 10 | May 9, 2017<br><br>Press Release<br><br>Oracle | In Oracle's May 9, 2017 press release, the Company touted the quality and performance of its cloud products. Specifically, Oracle stated "Oracle ERP Cloud is a complete, modern, and proven financial platform delivered seamlessly through the Oracle Cloud. ***A modern user interface*** driven by the latest design innovations delivers embedded analytics, contextual social collaboration and a device-independent mobile experience that makes Oracle ERP Cloud ***familiar and easy to use.***" | N/A | ¶¶ 361-62 | Ex. 22 |
| 11 | May 9, 2017<br><br>Jefferies Technology Group Investor Conference<br><br>Defendant Bond | At the May 9, 2017 Jefferies Technology Group Investor Conference, Defendant Bond touted the growth of Oracle's cloud business. Specifically, Defendant Bond stated that Oracle's cloud growth was driven by customers ***"willingly making a choice"*** to abandon a multi-vendor IT strategy and consolidate their IT needs in Oracle, stating that "[a]s we move to cloud, the first thing that we see is we start to address more of the customer spend. ***The customers are willingly making a choice,*** where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle." Defendant Bond also told investors that "[t]he good news" was that ***"growth in cloud is actually getting bigger."*** | ¶¶ 222-23 | ¶¶ 363-64 | Ex. 23 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 12 | May 9, 2017<br><br>Jefferies Technology Group Investor Conference<br><br>Defendant Bond | At the May 9, 2017 Jefferies Technology Group Investor Conference, Defendant Bond falsely denied or minimized Oracle's use of coercive audit tactics to sell its cloud products. Specifically, Defendant Bond was asked by an analyst to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." In response, Defendant Bond denied or minimized Oracle's use of audits to drive cloud sales, stating "This is one of those things where – gets talked about a lot. ***And I think this is one of those things where the story is a lot bigger than the realities.***" Defendant Bond assured investors that "***And we try to do it as best we can, in as gracious [a] way as we can.***" Defendant Bond also assured investors that cloud revenues were not being driven by the audits and, in fact, the transition to cloud would decrease any incidence of audits, stating that "[o]n the other hand, the key, as we go to cloud, ***is this conversation is going to go away*** " and that "***as we go to cloud, we don't have to worry about that anymore.*** Because when you're in the cloud, you basically have a number of users that you've signed up for." | ¶¶ 72, 186, 224 | ¶¶ 9, 71, 265, 285, 365 | Ex. 23 |
| 13 | May 10, 2017<br><br>Oracle Open World<br><br>Defendant Kurian | At the Oracle Open World, on May 10, 2017, Defendant Kurian touted Oracle's cloud growth. Specifically, Defendant Kurian stated "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers." | ¶ 226 | ¶ 367 | N/A |

5

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 14 | June 21, 2017<br><br>Press Release<br><br>Oracle | On June 21, 2017, Oracle stated "Total cloud revenues ***were up 58%*** [year-over-year] to $1.4 billion, and non-GAAP total cloud revenues ***were up 64%*** [year-over-year] to $1.4 billion." Oracle further highlighted that the Company's year-over-year cloud full-year cloud revenues had also increased dramatically, stating that, "Total cloud revenues ***were up 60%*** [year-over-year] to $4.6 billion. Non-GAAP cloud revenues ***were up 66%*** [year-over-year] to $4.7 billion." | ¶¶ 73, 227-28 | ¶¶ 368-69 | Ex. 1 |
| 15 | June 21, 2017<br><br>Press Release<br><br>Defendant Catz | In Oracle's June 21, 2017 press release, Defendant Catz touted Oracle's cloud business and cloud revenues. Specifically, Defendant Catz was quoted as stating "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . ***We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4***. This ***cloud hyper-growth is expanding our operating margins***, and we expect earnings per share growth to accelerate in fiscal 2018." | ¶¶ 229, 231 | ¶¶ 370, 372 | Ex. 1 |
| 16 | June 21, 2017<br><br>Press Release<br>Mark Hurd | In Oracle's June 21, 2017 press release, Hurd touted Oracle's cloud business and cloud revenues. Specifically, Hurd trumpeted that Oracle had delivered on its ambitious promise to deliver $2 billion in annual recurring revenue for the 2017 fiscal year, stating, "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, ***putting us over our $2 billion ARR bookings goal for fiscal year 2017*** . . . . ***We also delivered over $1 billion in quarterly SaaS revenue for the first time***. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018." | ¶ 230 | ¶ 371 | Ex. 1 |

6

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 17 | June 21, 2017<br><br>Earnings Call<br><br>Defendant Catz | In Oracle's June 21, 2017 press release, Defendant Catz touted Oracle's cloud business and cloud revenue growth. Specifically, Defendant Catz was quoted as stating "As you can see, we had a tremendous quarter in just about every way, as cloud revenue, new software license and earnings were all much better than expected. ***The adoption by our customers of our products and services is at an all-time high*** . . . . ***The cloud has become our predominant growth vehicle***." Catz further stated, "our tremendous growth resulted in SaaS revenue crossing the $1 billion a quarter threshold in Q4, having grown 76% in constant currency . . . Cloud PaaS and IaaS revenue for the quarter were $403 million, up 45% from last year." Catz further reported that "Total cloud revenues in the quarter were $1.4 billion, up 66% from last year," and that "cloud billings grew 42% in U.S. dollars this quarter." | ¶¶ 9, 74, 193, 232, 235 | ¶¶ 274, 373, 376 | Ex. 7 |
| 18 | June 21, 2017<br><br>Earnings Call<br><br>Mark Hurd | On Oracle's June 21, 2017 earnings call, Hurd touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Hurd stated that "cloud bookings, $855 million. It's the best quarter we have ever had. ***It's up 43% over what was a very strong Q4 last year***. We had a goal of $2 billion in ARR, and we finished with nearly $2.1 billion. Next year, we will sell more . . . As Safra said, cloud revenue growth at 66%, we're now at a $6 billion annualized run rate . . . . *[w]ith revenue now at an annualized run rate of $6 billion and a growth rate of 66%, we're clearly the fastest-growing cloud company at scale*." Hurd also stated that the success of Oracle's cloud business was  exceeding expectations: "[w]e tracked ahead of virtually every metric that I track, whether it was cloud bookings, cloud revenue, EPS." | ¶¶ 233, 235 | ¶¶ 374, 376 | Ex. 7 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 19 | June 21, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's June 21, 2017 earnings call, Defendant Ellison touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Ellison stated "Last fiscal year, ***we sold more than $2 billion in cloud annually recurring revenue***. … Our ***rapid SaaS growth*** is the driving force behind Oracle's revenue and earnings growth in Q4." | ¶¶ 74, 234 | ¶ 375 | Ex. 7 |
| 20 | June 21, 2017<br><br>Earnings Call<br><br>Defendant Catz | On Oracle's June 21, 2017 earnings call, Defendant Catz touted Oracle's cloud business and rapid cloud revenue growth. Specifically, when asked whether Oracle's cloud revenue growth was sustainable or a "1-year phenom," Catz responded by falsely denying that Oracle's reported cloud growth was driven by a short-term, "1-year" spike in revenue, stating: "***So this is absolutely not a 1-year phenomena***. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale." | ¶¶ 75, 188, 236-37 | ¶¶ 267, 377-78 | Ex. 7 |
| 21 | June 21, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's June 21, 2017 earnings call, Defendant Ellison touted the quality and performance of Oracle's cloud products. Specifically, Defendant Ellison stated "So the storage is a huge component of what cloud providers are selling and we just have the better mouse trap. We have a better storage hierarchy system that they do. ***Therefore, we can provide very, very high performance at a dramatically lower cost to us than our competitors***." | N/A | ¶ 379 | Ex. 7 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 22 | June 27, 2017<br><br>Form 10-K<br><br>Defendant Catz, Hurd | In Oracle's Form 10-K, filed on June 27, 2017 and signed by Defendant Catz and Hurd, Oracle stated that the Company's total cloud revenues for the fiscal year ended May 31, 2017 were $4.57 billion. The Form 10-K further reported that cloud SaaS and PaaS revenues were $3.211 billion and cloud IaaS revenues were $1.36 billion for the three months ended February 28, 2017. | ¶¶ 240–41 | ¶ 383 | Ex. 12 |
| 23 | August 2, 2017<br><br>Press Release<br><br>Oracle | In Oracle's August 2, 2017 press release, Oracle touted the quality and performance of Oracle's cloud product. Specifically, Oracle stated "With the introduction of Oracle Cloud Applications Release 13, Oracle is ***further extending the industry's broadest, deepest, and fastest growing suite of cloud applications.*** Innovations in the new release ***enhance the user experience*** and empower business users across the organization including customer experience, finance, HR, and supply chain professionals." | N/A | ¶¶ 385, 387 | Ex. 24 |
| 24 | August 2, 2017<br><br>Press Release<br><br>Defendant Miranda | In Oracle's August 2, 2017 press release, Defendant Miranda touted the quality and performance of the Oracle's cloud product. Specifically, Defendant Miranda stated "With the latest release of Oracle Cloud Applications, we are introducing hundreds of new innovations. [W]e are introducing a brand new solution [to Oracle's supply chain management application] that enriches the customer experience by bridging the gap between sales and customer service. The new release also includes further advancements to the user experience and customer-driven changes for human resources and finance." | N/A | ¶ 386 | Ex. 24 |

9

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 25 | September 14, 2017<br><br>Press Release<br><br>Oracle | In Oracle's September 14, 2017 press release, Oracle stated that its "[t]otal Cloud Revenues were up 51% [year-over-year] to $1.5 billion." Oracle further highlighted that SaaS revenues were up 62% year-over-year to $1.1 billion and PaaS and IaaS revenues were up 28% year-over-year to $400 million. | ¶¶ 242-43 | ¶¶ 388-89 | Ex. 2 |
| 26 | September 14, 2017<br><br>Earnings Call<br><br>Defendant Catz | On Oracle's September 14, 2017 earnings call, Defendant Catz touted Oracle's cloud business and cloud revenues. Specifically, Defendant Catz was quoted as stating "As you can see, we had another good quarter. ***Customer adoption of our cloud products and services continue to be very, very strong***, and our on-premise business remains very resilient. The result was that total revenue were at the high end of my guidance, and earnings per share beat my guidance by $0.01." | ¶¶ 244, 262, 279 | ¶¶ 390, 432, 460 | Ex. 8 |
| 27 | September 14, 2017<br><br>Earnings Call<br><br>Mark Hurd | On Oracle's September 14, 2017 earnings call, Hurd touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Hurd stated that "cloud revenue up 51% now at a $6 billion annual run rate." and that SaaS revenue was "up 61%, as Safra said, accelerating from 55% growth last year." With regard to PaaS, Oracle's "revenue was up 28%." Hurd also highlighted Oracle's cloud bookings by stating, "[o]ur cloud bookings were executing well on a very big and growing pipeline . . . Revenue growth now at an annualized rate of $6 billion or growth rate of 51%, and we are the fastest growing cloud company at scale." | ¶ 245 | ¶ 391 | Ex. 8 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 28 | September 14, 2017 Earnings Call Mark Hurd | On Oracle's September 14, 2017 earnings call, Hurd touted the purported quality and performance of Oracle's cloud products and sales forces. Specifically, Hurd stated that "just sort of every aspect of selling in the cloud, I think the company holistically is getting better at. We're better -- our **products** are better. Our **sales force** is better. Our **ability to implement** is better. Our ability to do all of these things has just continued to improve quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon." | ¶¶ 10, 79, 188, 207, 247 | ¶¶ 267, 393 | Ex. 8 |
| 29 | September 14, 2017 Earnings Call Defendant Ellison | On Oracle's September 14, 2017 earnings call, Defendant Ellison touted the quality and performance of Oracle's cloud products and Oracle's cloud growth. Specifically, Defendant Ellison stated "Our Fusion ERP, Fusion HCM, which is the mid-market and the high-end of ERP and the mid-market and high end of HCM, these are all internally developed systems. They're -- HCM and ERP, I think, blended rate is growing triple digits. The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets." | N/A | ¶¶ 396-97 | Ex. 8 |
| 30 | September 18, 2017 Form 10-Q, Defendant Catz, Hurd | In Oracle's Form 10-Q, filed on September 18, 2017 and signed by Defendant Catz and Hurd, Oracle stated that the Company's total cloud revenues were $1.467 billion for the three months ended August 31, 2017. The Form 10-Q further reported cloud SaaS revenues were $1.067 billion and cloud PaaS and IaaS revenues were $400 million for the three months ended August 31, 2017. | ¶¶ 250-51 | ¶ 400 | Ex. 25 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 31 | October 2, 2017<br><br>Press Release<br><br>Oracle | In Oracle's October 2, 2017 press release, Oracle touted the quality and performance of the Company's cloud products. Specifically, Oracle stated that the HCM cloud product update included "major user experience enhancements." Oracle also stated that, "Oracle has introduced major user enhancements and significant additions to existing Oracle HCM Cloud modules. ***The new user experience puts the needs and experiences of users at the center of the design in a way that's consistent, simple, and intuitive.***" | N/A | ¶¶ 402-03 | Ex. 26 |
| 32 | October 5, 2017<br><br>Oracle Open World<br><br>Defendant Miranda | During Oracle's Open World on October 5, 2017, Defendant Miranda highlighted the reasons that Oracle's customers were choosing the Company's cloud products. Specifically, Defendant Miranda touted the quality and performance of the cloud products, stating that: (i) "[w]hat do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, ***most customers today are moving to SaaS for speed***. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption"; (ii) "we have ***the most complete SaaS suite of anybody in the market***, not only because we have CRM, HCM, ERP, supply chain, but also ***in those areas, the depth of that solution***"; (iii) "[n]ext and probably what gets overlooked is though ***we have the broadest, it doesn't mean we don't have the best of breed in every solution going forward***"; (iv) our global reach, not only the global reach in terms of the breadth of Oracle's products and supporting globalizations and local rules and regulations, but the global reach of our broader infrastructures: Oracle's consulting, Oracle's partners, the training that we can afford, the language we can do, support that can take global customers – really aligned for global customers today but also customers who are expanding globally"; and (v) just functionally, the ***speed of innovation is unmatched*** . . . . Today, in our SaaS ERP and SaaS HR and SaaS CRM, ***we update 100% of our customers twice a year***," as compared with competitors "which are these 3-, 5-, 7-, 10-year, at best, upgrade cycles." | ¶¶ 252-53 | ¶¶ 8, 69, 92-93, 404-15 | Ex. 27 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 33 | October 5, 2017<br><br>Oracle Open World<br><br>Hurd | During Oracle's Open World on October 5, 2017, Hurd falsely attributed Oracle's slowing cloud revenue growth to logistical timing. Specifically, Hurd stated that "So depending on what got booked in what pillar where, there can be more implementation to do to get something. And the more ERP that we sell, this is good news, by the way, ***but short term, it is a longer provisioning time to provision ERP . . . So there's different provisioning times***." | N/A | ¶¶ 416-17 | Ex. 27 |
| 34 | November 7, 2017<br><br>Sanford C. Bernstein Technology Innovation Summit<br><br>Defendant Bond | During the Sanford C. Bernstein Technology Innovation Summit on November 7, 2017, Defendant Bond touted the quality and performance of Oracle's cloud product. Specifically, Defendant Bond stated that Oracle's customers were moving from on-premise because "***by moving on-premise loads to cloud, you're going to see a reduction of total cost of ownership***," *i.e.*, the cloud products were less expensive. Defendant Bond also stated, "***You'll also see customers who want to move toward cloud for what I'll call an innovation advantage***," *i.e.*, the cloud products made technology updates easier to install. Bond summed up: "***So from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early.***" | ¶¶ 80, 188, 254-255 | ¶¶ 8, 69, 267, 285, 418-21 | Ex. 16 |
| 35 | November 7, 2017<br><br>Sanford C. Bernstein Technology Innovation Summit<br><br>Defendant Bond | During the Sanford C. Bernstein Technology Innovation Summit on November 7, 2017, Defendant Bond falsely attributed Oracle's slowing cloud revenue growth rate to the "law of large numbers." | N/A | ¶¶ 422-23 | Ex. 16 |

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 36 | November 7, 2017<br><br>Sanford C. Bernstein Technology Innovation Summit<br><br>Defendant Bond | During the Sanford C. Bernstein Technology Innovation Summit on November 7, 2017, Defendant Bond touted Oracle's cloud growth. Specifically, Defendant Bond stated that customers were moving to Oracle's cloud because they were "successful using [Oracle's] software" and were motivated to stay with Oracle through that transition. Defendant Bond stated that this loyalty was the "driver[] of what builds [the] pipeline." | N/A | ¶¶ 424-25 | Ex. 16 |
| 37 | November 15, 2017<br><br>Annual Meeting of Stockholders<br><br>Defendant Ellison | During the Oracle's annual meeting of stockholders on November 15, 2017, Defendant Ellison touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Ellison stated "Where we deliver ***the applications in the public cloud is growing very, very, very rapidly*** and really subsuming, taking over our application business . . . . ***Our SaaS applications business has been growing in excess of 50%, been growing very, very, very rapidly***." | ¶ 256 | ¶¶ 426-27 | Ex. 28 |

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 38 | December 14, 2017<br><br>Earnings Call<br><br>Defendant Catz | On Oracle's December 14, 2017 earnings call, Defendant Catz touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Catz stated "Customer adoption of our cloud products and services continues to be very strong, and what we have called our on-premise business remains robust. Bottom line, our transition to the cloud is going well."<br><br>Defendant Catz also stated that Oracle's total cloud revenues in the quarter were $1.5 billion, up 39% from the previous year, and that "cloud SaaS revenue for the quarter were $1.1 billion, up 47% from last year. Fusion cloud revenue was 56% for the quarter. Cloud PaaS and IaaS revenue for the quarter was $398 million, up 20% from last year." Catz also told investors that "[a]s for cloud margins, our SaaS business continues to scale and grow, and the gross margin has expanded to 66%, up from 59% last Q2." | ¶¶ 260-62, 279 | ¶¶ 430-32, 460 | Ex. 9 |
| 39 | December 14, 2017<br><br>Earnings Call<br><br>Defendant Catz | On Oracle's December 14, 2017 earnings call, Defendant Catz falsely attributed Oracle's slowing cloud revenue growth to customers waiting to deploy to the cloud. Specifically, when asked to explain why cloud revenue growth was slowing and, whether customers were not deploying Oracle cloud products, Defendant Catz responded by falsely denying that customers were declining to deploy cloud products, explaining that customers were, rather, strategically timing that deployment and "mov[ing] to [Oracle's] cloud when it makes sense for them." | ¶ 263 | ¶ 433 | Ex. 9 |
| 40 | December 14, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's December 14, 2017 earnings call, Defendant Ellison falsely attributed Oracle's slowing cloud revenue growth to customers waiting for the "Autonomous Database." Specifically, when asked to explain why cloud revenue growth was slowing and, whether customers were not deploying Oracle cloud products, Defendant Ellison stated that "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database," a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to become available." | ¶¶ 264-65, 279 | ¶¶ 434-35, 460 | Ex. 9 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 41 | December 14, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's December 14, 2017 earnings call, Defendant Ellison touted the quality and performance of Oracle's cloud product. Specifically, when asked to explain why cloud revenue growth was slowing and whether customers were not deploying Oracle cloud products, Defendant Ellison stated that "***the capabilities in the cloud are so much better, the economics in the cloud are so much better than what's available on-premise*** that we think our customers are going to move very, very rapidly to the cloud." | N/A | ¶¶ 434, 436 | Ex. 9 |
| 42 | December 14, 2017<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's December 14, 2017 earnings call, Defendant Ellison falsely denied that customers were "moving off Oracle," instead challenging the analyst who initially raised the question to "go ahead. You tell me who's moving off of Oracle." | ¶¶ 266-67 | ¶¶ 437-38 | Ex. 9 |
| 43 | December 14, 2017<br><br>Earnings Call Mark Hurd | On Oracle's December 14, 2017 earnings call, Hurd falsely denied that customers were "moving off Oracle," stating that "I'd like to just go back to the math and just go back to the numbers, right? I mean, we've got sort of every other database being used, just in share terms, is ours. And when you see us throwing up yet again another growth rate above market, it's just any of these sort of stories, anecdotes -- by the way, I've heard them for 7 years, right, that -- yes and predates me. So, everyone's, 'Oh, everyone's moving off the Oracle Database.' . . . I'd just love somebody show up with something more than a story. Just show up with a number . . . certainly, nobody gaining share over us . . . when you just look at overall numbers, we're gaining share in Database." | ¶ 266 | ¶ 437 | Ex. 9 |

16

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 44 | December 18, 2017<br><br>Form 10-Q,<br><br>Defendant Catz, Hurd | In Oracle's Form 10-Q, filed on December 18, 2017 and signed by Defendant Catz and Hurd, Oracle stated that the Company's total cloud revenues were $1.519 billion for the three months ended November 30, 2017. The Form 10-Q further reported cloud SaaS revenues were $1.123 billion and cloud PaaS and IaaS revenues were $396 million for the three months ended November 30, 2017. | N/A | ¶ 439 | Ex. 29 |
| 45 | March 19, 2018<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's March 19, 2018 earnings call, Defendant Ellison falsely attributed Oracle's slowing cloud revenue growth to Oracle's "bring your own license" or BYOL program, stating "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue." | ¶¶ 270-72, 283 | ¶¶ 224, 443-45, 464 | Ex. 10 |
| 46 | March 19, 2018<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's March 19, 2018 earnings call, Defendant Ellison falsely attributed Oracle's slowing cloud revenue growth to older, acquired business, and assured investors that revenue growth would return as the business mix turned towards newly acquired products like the Company's "Fusion HCM" human resources application. Specifically, Defendant Ellison stated, "[W]e have some very high growth rate SaaS businesses like ERP and HCM. ***And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago.*** As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite." Ellison further stated, "Fusion becoming a more and more -- a larger and larger percentage of our total SaaS business, then the change in mix. ***You've got -- right now you certainly have a very large Fusion SaaS business growing at a high rate, which then dwarfs the slower growing acquired businesses. So the reacceleration, again, to quote Mark, is just a matter of math.***" | N/A | ¶¶ 225, 446-47, 465 | Ex. 10 |

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 47 | March 19, 2018<br><br>Earnings Call<br><br>Defendant Ellison | On Oracle's March 19, 2018 earnings call, Defendant Ellison touted Oracle's cloud business and rapid cloud revenue growth. Specifically, Defendant Ellison stated, "the combination of faster sales and higher renewal rates should dramatically increase our growth rate in our SaaS business." | ¶ 269 | ¶ 442 | Ex. 10 |
| 48 | March 19, 2018<br><br>Earnings Call Mark Hurd | On Oracle's March 19, 2018 earnings call, Hurd touted Oracle's leverage to turn on-premise customers into cloud customers. Specifically, Hurd stated that "[t]he percent of our [existing] user base that is in our [cloud] pipeline now is getting to be fairly exten[sive], meaning it's multiple 10s percent of our user base. And to your point, when we convert . . . a traditional on-premise application to SaaS, we typically get 3x the revenue *[J]ust moving the user base does turn us into a very, very large SaaS business and to your point, very well accelerates our growth rate.*" | N/A | ¶¶ 91, 448-50 | Ex. 10 |
| 49 | March 21, 2018<br><br>Form 10-Q,<br><br>Defendant Catz, Hurd | In Oracle's Form 10-Q, filed on March 21, 2018 and signed by Defendant Catz and Hurd, Oracle stated that the Company's total cloud revenues were $1.566 billion for the three months ended February 28, 2018. The Form 10-Q further reported cloud SaaS revenues were $1.151 billion and cloud PaaS and IaaS revenues were $415 million for the three months ended February 28, 2018. | N/A | ¶ 451 | Ex. 30 |

*In re Oracle Corporation Securities Litigation*, Case No. 18-CV-4844-BLF (N.D. Cal.)
**Appendix 1: Challenged Statements**

| Stmt. No. | Date, Medium, and Speaker | Allegedly False and Misleading Statement[1] | Reference in CAC | Reference in SAC | Exhibit No.[2] |
|---|---|---|---|---|---|
| 50 | May 22, 2018<br><br>Public Response<br><br>Oracle | On May 22, 2018, Oracle falsely denied a report by *The Information* that Oracle used audits to drive cloud deals and customers were resisting the Company's efforts. Specifically, Oracle stated "Oracle, like virtually every other software company, ***conducts software audits in limited circumstances to ensure that our products are used as licensed.*** We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready.<br><br>Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that The *Information* is presenting ***inaccurate accounts regarding a handful of customers,*** based on anonymous sources or competitors who seek to enhance their own consulting services." | ¶¶ 164, 187, 273 | ¶¶ 9, 230, 266, 453 | Ex. 31 |