1

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

2

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)

3

2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067

4

Tel:      (310) 819-3472

5

          -and-

6

MARK LEBOVITCH (admitted *pro hac vice*)
(markl@blbglaw.com)

7

JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
(johnr@blbglaw.com)

8

ABE ALEXANDER (admitted *pro hac vice*)
(abe.alexander@blbglaw.com)

9

1251 Avenue of the Americas
New York, NY 10020

10

Tel:      (212) 554-1400
Fax:      (212) 554-1444

11

12

*Counsel for Lead Plaintiff Union Asset*
*Management Holding AG and Lead*
*Counsel for the Class*

13

**UNITED STATES DISTRICT COURT**

14

**NORTHERN DISTRICT OF CALIFORNIA**

15

**SAN JOSE DIVISION**

16

17

IN RE ORACLE CORPORATION
SECURITIES LITIGATION

18

19

20

21

22

)
)
)
)
)
)
)
)
)
)
)

Case No. 5:18-cv-04844-BLF

CLASS ACTION

**LEAD PLAINTIFF'S OPPOSITION**
**TO DEFENDANTS' MOTION TO**
**DISMISS THE AMENDED**
**CONSOLIDATED CLASS ACTION**
**COMPLAINT**

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................ 1

II.   THE AC INCLUDES NEW FACTS REQUESTED BY THE COURT .............................. 1

    A.   The New Report from an Oracle Executive and an Internal Oracle Email ............ 1

    B.   Oracle's Coercive Sales Tactics Drove Material Cloud Revenue ......................... 3

    C.   The AC Identifies Specific Engineered Deals ...................................................... 4

    D.   Defendants Hurd And Catz Personally Approved Large Engineered Deals .......... 5

    E.   Oracle's Cloud Revenue Decelerated Due to Declining Engineered Deals ........... 6

    F.   The Denver Sale and the Chilean Regulator's Investigation Are Relevant ............ 7

    G.   Attached Deals Were Not Standard Customer Discounts ....................................... 7

III.  THE AC ADEQUATELY ALLEGES MATERIAL MISSTATEMENTS ........................... 8

    A.   Defendants Misleadingly Downplayed the Use of Audits to Drive Sales .............. 8

    B.   Defendants Misled Investors About the Drivers of Cloud Growth ...................... 10

    C.   Defendants Violated GAAP by Failing to Disclose Engineered Deals ................ 11

    D.   Defendants' Statements About Cloud Growth Were Misleading ......................... 12

    E.   Defendants Misled Investors About the Cause of Decelerating Cloud Growth ................................................................................................................. 13

    F.   Defendants Misled Investors About Oracle's Cloud Technology ....................... 14

IV.   THE AC ADEQUATELY ALLEGES SCIENTER ................................................... 17

V.    THE COMPLAINT ALLEGES CLAIMS UNDER SECTIONS 20A AND 20(a) .............. 25

VI.   CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)....................................................................20

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................................22

*Bielousov v. GoPro, Inc.*,
2017 WL 3168522 (N.D. Cal. July 26, 2017)....................................................................16

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...............................................................................9

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................................................20, 22, 25

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ..........................................................................................11

*In re Diamond Foods, Inc., Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..................................................................25

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..............................................................................12

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................................15

*Johnson v. Costco Wholesale Corp.*,
2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ..............................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................................25

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................................25

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ....................................................................................20, 21

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ..........................................................................................23

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   78 F. Supp. 3d 1215 (N.D. Cal. 2015) ...................................................................11

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ...............................................................20, 21

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................23

*Pensions & Death Benefits v. CSK Auto Corp.*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007) ...............................................................18

*Robb v. Fitbit, Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ................................17, 18, 20, 21

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ...............................14, 16, 20

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................15

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...............................................................23

*Smilovits v. First Solar, Inc.*,
   2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ...................................... *passim*

*In re The Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ...............................................................15

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)...............................................13

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...............................................................17

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...............................................................21

## I.     INTRODUCTION

In its Order, the Court explained that while the Complaint painted a "plausible picture" of Oracle's "widespread" use of engineered deals to generate cloud revenue, additional facts concerning materiality and scienter were required. Plaintiff redoubled its investigative efforts to unearth the required facts. As explained below, the Amended Complaint ("AC") provides these new facts, including: (1) a new report from a former high-ranking Oracle executive who regularly informed two named Defendants of severe deficiencies in Oracle's cloud products that contradicted Oracle's public statements (¶¶75–85); (2) an internal Oracle email corroborating this report and further demonstrating that Defendants Ellison, Hurd, Catz, Kurian and Miranda were aware of key deficiencies that made Oracle's products "untenable," while publicly stating that the products were superior to competitors' (¶¶86–89); (3) reports demonstrating that the vast majority of Oracle's cloud sales—upwards of 90%—were generated by engineered deals (¶¶112–4); (4) reports identifying specific engineered deals approved by Hurd during the Class Period (¶¶111, 124, 254); (5) additional facts showing that senior Oracle executives, including Hurd's direct reports, regularly discussed that engineered deals drove the majority of Oracle's cloud "sales" (¶¶126–28); (6) reports by consultants who advised hundreds of Oracle clients on coercive, audit-driven transactions during the Class Period (¶¶151–76); (7) additional facts substantiating that Oracle's constrained ability to use the "Audit, Bargain, Close" tactic (the "ABC tactic") was a material driver of its revenue deceleration at the end of the Class Period (¶¶101–11); and (8) new allegations that Oracle's financial reporting violated GAAP and was therefore misleading (¶¶327–42). For the reasons set forth below, Defendants' motion to dismiss should be denied.

## II.     THE AC INCLUDES NEW FACTS REQUESTED BY THE COURT

### A.  The New Report from an Oracle Executive and an Internal Oracle Email

The AC now includes additional reports of former Oracle employees who had "direct contact" with named Defendants. Order at 30. Throughout the Class Period, Defendants issued statements touting Oracle cloud's "best-in-class applications," emphasizing the superiority of its "modern user interface," its status as "the only" "complete" and "integrated" platform, the superior speed of its technology (and concomitant cost savings), and the ease and effectiveness of its

frequent software updates. Defendants attributed Oracle's cloud results to the quality and competitiveness of its cloud offering, responding, for instance, to an analyst's question about the drivers of Oracle's cloud growth by stating, "our products are better." ¶¶352, 358, 361, 393, 406. The AC includes the new account of a high-ranking former Oracle executive who communicated with two named Defendants, and an email involving multiple named Defendants, demonstrating that they knew or recklessly disregarded that these statements were misleading.

FE 10 was Oracle's former Group Vice President of Cloud Application User Experience, one of the most senior executives involved in the design of Oracle's cloud products, and reported directly to Defendant Miranda. ¶75. He reported that Oracle's cloud products were rife with serious defects throughout the Class Period (*e.g.*, inability to perform basic functions like search, integration failures across products, UI failures, functionality loss when transitioning from on-premise), and as a result of these widespread failures, there was extremely poor demand for those products. ¶¶76–79. He further explained that, during regular meetings between 2015 and October 2017, occurring at least once every two months, he discussed the severe deficiencies in Oracle's cloud applications with Defendants Miranda and Kurian, discussed their adverse impact on sales (supported by consumer testing), and supplied them with reports and spreadsheets detailing the vast backlog of critical, unaddressed issues in Oracle's cloud products, including a running list of tens of thousands of bugs, the top three of which would take a year to fix. ¶¶80–81, 85. Kurian was distressed by the severity and volume of these problems and acknowledged during these meetings that potential customers were not buying cloud because quality was so poor. ¶¶82–83.

FE 10's account is corroborated by an October 2017 email from Defendant Kurian, which further demonstrates that Defendants Ellison, Hurd, Catz, Kurian and Miranda knew of the critical defects in Oracle's cloud technology. ¶¶86–89. Kurian, who headed Oracle's development of cloud technology, wrote to Miranda and others that Oracle's human resources cloud software ("HCM")—a critical component of Oracle's cloud platform—"was considered ***so atrocious*** even back in July [2017]" that it was "***a disgrace***." ¶¶ 88–89. Kurian's email highlighted the same kind of defects in the cloud product's "core" user interface that FE 10 reported were endemic to the platform. ¶87. These defects were devastating because an "atrocious" user interface meant that the

customer could not effectively use the cloud product, greatly impairing its quality and value. *Id.*

The flaws were so material that Oracle's most senior executives were keenly focused on them. Kurian wrote: "*I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable … the core product UI [user interface] is awful.*" ¶88. Notably, just weeks earlier, Oracle stated that the HCM product's user interface was "consistent, simple, and intuitive" (¶402), while Ellison told investors that Oracle's HCM product was "growing triple digits," served an "enormous" market, and would allow Oracle to meet its cloud growth targets (¶¶396–98).

### B. Oracle's Coercive Sales Tactics Drove Material Cloud Revenue

The AC contains new facts demonstrating that Oracle's "coercive Sales Practices constituted a material portion of Oracle's Cloud revenue" when Defendants' misstatement were made. Order at 23–24. As reported by FE 2, a former Vice President in Oracle's North America cloud sales during the Class Period, Oracle used ABC and attached deals to generate *90–95% of its Company-wide* cloud sales in 2016 and 2017. ¶¶112–16. FE 2 provided a detailed basis for this report, including: (1) his review of year-end FY 2016 performance presentations prepared for Defendant Hurd, which showed that 90–95% of Oracle's IaaS and PaaS deals (which accounted for 30% of Oracle's cloud revenue in FY 2016) had no "use cases" attached to them; and (2) his participation throughout 2016 and 2017 in quarterly meetings with Oracle's top executives, during which Oracle's Senior Vice President of Cloud and Oracle's Executive Vice President of Cloud Business, both of whom directly reported to Defendant Hurd, confirmed that that 90–95% of the Company's cloud sales—across all products (SaaS, PaaS, and IaaS)—continued to have no use cases attached to them. *Id.* In these meetings, these senior executives acknowledged that the "poor health" of the cloud business, as demonstrated by the absence of use cases for the vast majority of Oracle's cloud deals, "was undesirable, but it is the reality." ¶¶112–15.

Reports from several additional former Oracle executives further demonstrate that Oracle used engineered deals to generate the vast majority of its cloud revenue in North America and EMEA, the two geographic regions responsible for approximately 80% of Oracle's total revenue during the Class Period. FE 11 reported that approximately 90% of Oracle's North American IaaS

and PaaS revenue was generated through engineered deals during the Class Period, including pervasive use of the ABC tactic; FE 9 reported that that "DOA sales," i.e., engineered deals, accounted for between 75% and 90% of all North American cloud revenue throughout 2016 and 2017. ¶¶117, 138. Oracle generated approximately half of its revenue during fiscal years 2017 and 2018 in North America. ¶18. Accordingly, this was a material percentage of cloud revenue.

As to the critical MEA market, FE 1, a Regional Sales Director for the region, clarified that at least 80% of Oracle's cloud sales in the region derived from ABC tactics, accounting for $178 million in revenue in fiscal year 2017 alone. ¶108, 257. FE 7, a Regional Sales Director in Europe similarly reported that "almost all of Oracle's EMEA cloud revenue during the 2016 and 2017 calendar period were generated through engineered deals," which was significant because EMEA accounted for 30% of Oracle's overall revenue during FY2017. ¶131.

### C.  The AC Identifies Specific Engineered Deals

The Court indicated that the Complaint should cite additional examples of customers who "purchased" cloud through engineered deals and "identify . . . Oracle customers who declined to renew their Cloud subscriptions after one year." Order at 27. The AC identifies such customers. FE 1 reported that Oracle used the ABC tactic in fiscal year 2017 with customers who neither wanted nor used (and, indeed, some who *could not* use) the cloud products, including: Oreedo QSC, Samba Financial Group, and National Water Company (Saudi Arabia). ¶124. Oracle booked approximately $56 million in cloud revenue through these three deals, and each was approved by Hurd via DAS system entries clearly identifying the deals as "cloud insertion," *i.e.*, audit-driven. *Id.* Likewise, both FEs 7 and 11 identified specific customers subject to large ABC and engineered cloud deals during 2017 and 2018. ¶¶117, 130–31,

The AC also includes corroborative reports from numerous consultants. ***First***, Insight reported that 28 of its 30 clients who "purchased" Oracle cloud products during the Class Period did so under threat of audit penalties. These customers *told* Oracle they did not want, and would not use, the products. These sales accounted for $50 million in cloud revenue. ¶¶152–54. ***Second***, a principal at B`Lay, a Dutch enterprise software consulting group who worked with 150–200 Oracle customers under audit during the Class Period, reported that 90–95% of those clients were

offered ABC deals, through which Oracle generated $50–55 million in cloud revenue during the Class Period. ¶¶155–59. **Third**, a partner at House of Brick, which assisted approximately 90 Oracle customers during the Class Period, stated that all of his audited clients were told that audit penalties would be reduced if they accepted Oracle cloud products, despite the fact that these customers told the Oracle sales personnel that they did not want, would not use, and would not renew the cloud products. House of Brick estimated that 75% of its clients who purchased Oracle cloud did so under threat of audit penalty and have neither used nor renewed their subscriptions. ¶¶160–67. The AC includes similar reports from several other market participants. ¶¶168–88.

### D.  Defendants Hurd And Catz Personally Approved Large Engineered Deals

The Court found that "[s]ome of the CWs [identified in the FAC] did . . . have personal knowledge that Hurd or Catz approved large sales tied to Oracle's Sales Practices," but requested that Plaintiff include additional facts concerning "***when*** Hurd or Catz approved the deals [and] ***how*** Hurd or Catz would have known—based on these deal approvals—that the Sales Practices generated a material portion of Cloud revenues." Order at 31. The AC includes that information.

**First**, throughout the Class Period, Hurd or Catz were required to approve deals in excess of $5 million, or involving a 50% or greater discount on on-premise software through Oracle's "Deal Approval System," or "DAS." ¶¶124–25. As FEs 1 and 7 explained, fields in the DAS entry stated whether the deal was audit-driven (and that LMS, Oracle's audit division, was involved in the sale), or that deal was "attached" and the customer would not purchase the cloud product unless a steep discount for on-premise software was provided. ¶¶124, 149–50. FE 1 provided specific examples of audit-driven deals that Hurd approved in 2017—each of which clearly indicated that the deal was generated through "cloud insertion." *i.e.*, through the ABC tactic. ¶124. These three deals alone accounted for more than 25% of MEA's ***total*** 2017 cloud revenue. Further, FE 3's account reflects that Hurd approved 80% of Southern California's engineered deals. ¶125.

**Second**, two former executives reviewed or prepared slides for Hurd prior to and during the Class Period, showing engineered deals were responsible for material amounts of cloud revenue. ¶¶125–27. These included: (1) a fiscal year-end 2016 (as of May 31, 2016) presentation showing that 90–95% of Oracle's Company-wide IaaS and PaaS revenue was engineered (¶127),

and (2) weekly sales volume presentations prepared by FE 1 from before the start of the Class Period until March 2018 showing that at least 80% of MEA's cloud revenue was audit-driven (¶126). **Third**, knowledge that engineered deals were responsible for 90–95% of Oracle's 2016-2017 cloud revenue was widespread among Hurd's direct reports, who repeatedly discussed this fact at quarterly meetings throughout 2016 and 2017. ¶¶255–56. **Fourth**, FE 1 reported that throughout the Class Period until at least March 2018, Catz personally signed off on plans for dividing audit targets amongst MEA's sales teams, showing she knew audits were being used to generate cloud revenue. ¶¶108–09. **Fifth**, FE 1 and FE 11 reported that Oracle routinely conducted tutorials and "white-board sessions" during the Class Period at which sales executives received instructions. ¶102, 107. **Sixth**, FE 11 explained (and FE 3's report corroborates) that prior to the start of the Class Period, Catz expanded Oracle's auditing. ¶107, 120. **Seventh**, the AC's allegations that 90–95% of Oracle's cloud revenue was generated through engineered deals render implausible the proposition that Hurd and Catz were unaware of it.

### E.  Oracle's Cloud Revenue Decelerated Due to Declining Engineered Deals

The AC includes additional support for the allegation "that Oracle's professed reasons for deceleration of its Cloud revenue were misleading." Order at 27. Former Oracle employees and consultants have explained that, by the end of 2017: (1) renewal rates were very low; and (2) Oracle's ability to use the ABC tactic became increasingly constrained by (a) the proliferation of consultants who helped customers resist it, as reported by FE 1 and FE 3 (¶¶208–10); and (b) the scarcity of new significant audit targets (¶¶211–12). FE 1 reported that by the end of 2017 "[e]very single major ULA cloud agreement that had been signed was not renewed." ¶209. FE 1 stated that Oracle internally published statistics showing that 70% of Oracle's SaaS contracts, which made up 70% of Oracle's overall cloud revenue in 2017, had not been renewed. *Id.* FE 3 reported that by the end of calendar year 2017, renewal rates for Oracle's cloud business in North America were 32%, compared with renewal rates of 90% or more for Oracle's competitors like AWS. ¶121. Likewise, both FE 9 and FE 5 reported that only 15–30% of Oracle's lucrative ERP contracts in 2017 were renewed. ¶¶140–41. In December 2017, after the internal publication of poor renewal rates, Le Guisquet asked FE 1 for an explanation of "why customers were no longer falling for the

audit tactics." FE 1 explained that customers were now hiring consultants to push back against Oracle's efforts to use ABC tactics to drive sales. ¶¶208-09.

FE 3 echoed FE 1, stating that as third-party consultants became increasingly visible, savvy customers began recruiting them to intervene. ¶210. House of Bricks' CEO confirmed that by late 2017 Oracle's customers became increasingly resistant to the ABC tactics. ¶¶160–67. FEs 3 and 11 also reported that Oracle's engineered deals were evaporating as Oracle began to exhaust large ABC targets and generated less revenue from smaller deals. ¶¶210–12. As FE 11 explained, "We had audited all these customers, so we burned through that layer throughout 2016 and 2017." ¶212.

The expanded reports from FEs 1, 3, 7, 11, and others also address the Court's concern that Oracle's cloud revenue "should have decelerated earlier than June 2018." Order at 27. The AC explains that approximately by the start of 2017, attached deals were failing to renew and were no longer substantial enough to provide the volume of revenue Oracle needed, so Oracle turned even more aggressively to ABC deals, but had exhausted most significant audit targets by the end of 2017, leading to the deceleration. *See, e.g.*, ¶¶120–21, 208–12.

### F.  The Denver Sale and the Chilean Regulator's Investigation Are Relevant

The Court stated that the investigation by the Chilean regulator and the audit of Denver pre-dated the Class Period. Order at 27. The AC alleges that the regulator's findings concerned Oracle sales practices extending into the Class Period (¶¶205–06), and the contract with Denver became effective February 2017, a month before the Class Period (¶198), which support the allegation that these tactics continued during the Class Period.

### G.  Attached Deals Were Not Standard Customer Discounts

In Oracle's "attached deals," Oracle gave **on-premise customers** a steep discount on **on-premise licensing** if they agreed to accept Oracle's **cloud** product, despite the fact that, as on-premise customers, they had no need for, did not use, and did not renew, those cloud products. The Court was concerned that such transactions "appear to be nothing more than offering a discount to an existing customer." Order at 17 n.7. The AC details how attached deals differed from traditional discounts and explains why it was misleading, and violated GAAP, for Oracle to characterize such transactions as representing cloud revenue growth when, in truth, they were "giveaways" of cloud

based on the discounted purchase of a totally different product.

The AC explains that attached deal customers were not "buying" cloud products; Oracle used attached deals as a device to reclassify on-premise license fees—fees that customers would have paid *regardless* of whether they received a cloud subscription—as "cloud revenue." ¶98. Likewise, Oracle was not "selling" its cloud product to such customers; it was effectively *paying* customers to accept "shelfware." ¶¶97–98, 222, 227. A company can give away its product—it can even pay people to take its product, as Oracle did. But under the securities laws, it cannot represent to investors that these transactions are successful *sales* of its product, and it certainly cannot falsely attribute those "sales" to the supposed quality of that product.

The AC alleges that Oracle's accounting for attached and ABC deals violated GAAP. ¶¶327–42. The AC explains, and Defendants do not dispute, that, under GAAP, Oracle's engineered deals were "multiple element arrangements," and thus, Oracle was required to disclose "[t]he nature of its multiple-deliverable arrangements" and "significant deliverables within the arrangements." ¶332. Oracle was required to disclose the existence of its ABC and attached deals and describe the deliverables comprising them, including that the receipt of heavy discounts on audit penalties and on-premise products were tethered to unwanted cloud products. In violation of GAAP, Oracle failed to do so, rendering its reported cloud revenue misleading.

## III.   THE AC ADEQUATELY ALLEGES MATERIAL MISSTATEMENTS

### A.  Defendants Misleadingly Downplayed the Use of Audits to Drive Sales

Defendants denied and downplayed Oracle's use of audits to coerce on-premises customers into "purchasing" cloud products that they did not want or need. Oracle denied as "inaccurate" an article in *The Information* accusing Oracle of using audits to generate cloud revenue. ¶266. In response to an analyst's questions about the "percentage of revenue and margin is associated with auditing practices of customers" Bond misleadingly stated that "the story" was bigger than "the realities," that Oracle audited "in as gracious way as we can," and that as "we go to cloud, [] this conversations is going to go away," failing to disclose that Oracle was actually using audits to generate cloud revenue. ¶265. The Court found that that these statements "downplaying the Sales Practice" would be misleading "if Plaintiff had alleged sufficient facts to show that the revenue

generated by those tactics was material to Oracle at the time." Order at 28 (emphasis excluded).

Defendants incorrectly argue that the AC does not allege that the ABC tactic independently (as opposed to all engineered deals) drove material revenue. Upwards of 90% of cloud revenue was driven by engineered deals, and the ABC tactic was a centerpiece of this strategy that was expanded soon before the Class Period as the attached deal tactic waned. ¶¶107, 120. Further: (1) at least 80% of Oracle's MEA region cloud revenue during fiscal 2017 was audit-driven (¶108); (2) at least 90% of Oracle's North American IaaS and PaaS revenue (30% of Oracle's overall cloud revenue) was driven by "pervasive" use of the ABC tactic (¶117); (3) industry consultants confirmed Oracle's widespread use of the ABC tactic (¶¶151–73); (4) Oracle's inability to consummate ABC deals at the end of 2017, including because it had exhausted many audit targets, materially impacted it growth rate (¶¶208–12); and (5) Catz assigned audit targets to sales teams, which underscores the materiality of the ABC tactic (¶¶108–09).

Relying on *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009), Defendants incorrectly argue that the accounts of FEs 1 and 2 and the industry consultants are unreliable. Mot. at 6–8. FEs 1 and 2 are highly-placed former Oracle employees who were personally involved in numerous cloud deals driven by the improper practices, authored or reviewed internal reports detailing the extent of the practices (including reports delivered to Hurd), and recounted specific cloud deals driven by Oracle audits. ¶¶108–16. Defendants claim that FE 2 lacks personal knowledge, but he explained that his team was responsible for a significant volume of Oracle's global cloud revenue (between 7%–9%), and described the contents of presentations he reviewed and results discussed at meetings he attended. Defendants object that FE 2 was not involved in revenue recognition, but that is not required. Further, the industry consultants had first-hand knowledge of the deals they described. ¶¶152–76.

Defendants also incorrectly argue that the consultants reported "minimal" audit-driven revenue, so their reports do not support a plausible inference of materiality. Mot. at 8. Defendants count cloud revenue reported by only three of these consultants; while other consultants were unable to report specific revenue figures, they stated that ***virtually every client they had*** who had purchased Oracle cloud (amounting to hundreds of clients) did so under threat of audit. ¶¶152–76.

1   Further, the consistent reports from seven different consultants, especially when coupled with the

2   reports from former Oracle employees and industry groups, yield an inference of materiality.

3   **B.  Defendants Misled Investors About the Drivers of Cloud Growth**

4   Defendants misleadingly attributed Oracle's cloud revenue growth to the quality and

5   competitiveness of its cloud offering, while failing to disclose that engineered deals were a material

6   driver of those results. For instance, Hurd stated that Oracle's cloud growth was driven by the fact

7   that Oracle's "products are better," "sales force is better," and "ability to implement is better" than

8   competitors'. ¶267. Defendants stated that the "biggest drivers" of Oracle cloud adoption were the

9   "comprehensive and integrated" suite of products, the "speed" of product (and concomitant cost

10  savings), the ease and effectiveness of its frequent software updates, and "competitive strengths,"

11  including "user interface." *Id.*; ¶¶358, 361, 418, 424. As the Court explained, "once Defendants

12  made statements about the drivers of Cloud revenue growth, the investors would have been

13  interested to know that 'a material driver' of Cloud Sales was Oracle's Sales Practices." Order at

14  25. As set forth above, the AC alleges that engineered deals ***were*** a material driver of Oracle's

15  cloud revenue. *See supra* at 3.

16  Defendants again incorrectly argue that the AC fails to allege materiality because it does

17  not parse out the revenue impact of ABC versus attached deals. ***First***, as discussed in the preceding

18  section, the AC alleges that ABC deals were material. *Supra* at 9; ¶¶107–09, 117, 120, 151–73,

19  208–12. ***Second***, the AC alleges that Oracle's attached deals were not standard discounts, the

20  omissions concerning these deals violated GAAP, and Oracle's use of this practice rendered its

21  statements touting cloud "sales" and the drivers of those sales misleading. *Infra* at 11–13.

22  Defendants argue that Oracle "met or exceeded the Cloud revenue guidance given to

23  investors" even at the end of the Class Period. Mot. at 1. This argument has no bearing on whether

24  Oracle's statements about the drivers of cloud growth, or its other statements, were misleading.

25  Meeting guidance does not cure other falsehoods. *Supra* at 3. Moreover, Oracle met its guidance

26  ***because*** it used engineered deals to boost cloud sales. When the illusion that Oracle had captured

27  legitimate market share began to collapse, Oracle was forced to significantly adjust and ultimately

28  pull its guidance, which served as corrective disclosures. ¶¶215, 219, 235. Oracle then misled the

market by highlighting misleading excuses for Oracle's cloud growth deceleration. *Infra* at 14. Contrary to what Defendants suggest, investors did not cheer Oracle at the end of the Class Period. Analysts and others stated that Oracle's anemic growth rate was "contrary to the eye-popping growth numbers" of its competitors; the dramatic deceleration in Oracle's cloud growth showed it was having trouble turning "sales" into revenue; and linked the decelerating growth to problems with the quality of Oracle's product and its use of coercive tactics to force existing customers to accept cloud "shelfware." ¶¶222, 227–28, 237–38, 241–42.

### C.  Defendants Violated GAAP by Failing to Disclose Engineered Deals

Oracle's reporting of cloud revenue violated GAAP and was misleading. Defendants do not dispute that, under GAAP, Oracle's audit driven and attached deals constituted "multiple element arrangements" —*i.e.*, a single transaction comprised of multiple products or services. Nor do Defendants dispute that GAAP required Oracle to disclose, among other things, "[t]he nature of its multiple-deliverable arrangements" and "[t]he significant deliverables within the arrangements." In other words, Oracle was required to disclose both the existence of its ABC and attached deals and describe the deliverables comprising them, including that Oracle's cloud "sales" were contingent on the Company's provision of heavy discounts on audit penalties and on-premise products. Oracle failed to make these GAAP-mandated disclosures, despite the fact that such arrangements comprised the vast majority of its cloud revenues. ¶209. Contrary to what Defendants contend, "[f]inancial statements … which are not consistent with GAAP are presumed misleading." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015); *see also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005).

ASC 605-25 ensures that investors understand how a company is generating the revenue it reports, including whether it is tying unwanted products to products with significant demand, as Oracle did. These GAAP requirements belie the central premise of Defendants' motion that all revenue is the same and investors don't care where it came from or how it was generated.

While Defendants do not dispute that engineered deals were subject to these GAAP disclosure requirements, they incorrectly assert that Oracle complied with them. Mot. at 10–11. But they ignore many of the requirements, including the obligation to disclose "[t]he nature of its

1    multiple-deliverable arrangements" and the "*significant deliverables within the arrangements*."

2    Defendants do not—and cannot—seriously argue that Oracle satisfied these requirements.

3          The AC's allegations are bolstered by the opinion of an experienced auditor and forensic

4    accountant, Harris Devor, who explained that, if Oracle generated a material portion of cloud

5    revenue through engineered deals, ASC 605-25 would require Oracle to, among other things,

6    disclose the existence and character of those deals (and that these requirements are well-known

7    and applied frequently in the software industry). ¶¶339–42. *See Hatamian v. Advanced Micro*

8    *Devices, Inc.*, 87 F. Supp. 3d 1149, 1159–60 (N.D. Cal. 2015) (falsity allegations were "plausible

9    . . . in light of allegations based on" expert analysis). Defendants assert that this opinion is

10   "speculative" because Devor did not review Oracle's accounting policies, invoice, journal entries,

11   or customer contracts. Mot. at 11. To start, even without Devor's opinion, the GAAP allegations

12   are sufficiently specific. ¶¶327–38. Moreover, Defendants fail to explain why a review of internal

13   Oracle documents—which is impossible at this stage—should change Devor's opinion that

14   engineered deals, *as described in the AC*, are multiple element arrangements (which Defendants

15   do not even contest) or that ASC 605-25 is "well-known" in Oracle's industry.

16               **D.  Defendants' Statements About Cloud Growth Were Misleading**

17         Defendants misleadingly touted Oracle's cloud revenue "hypergrowth," telling investors,

18   among other things, that Oracle was "the fastest-growing scale cloud business in the world,"

19   favorably comparing Oracle's cloud revenue growth to its competitors, and emphasizing "rapid"

20   customer "adoption" of Oracle cloud. ¶¶370, 373. The AC includes new allegations explaining

21   why Defendants' statements emphasizing Oracle's cloud growth were misleading, including

22   allegations explaining that engineered deals are not "sales," and Oracle's accounting for "cloud

23   revenue" violated GAAP. ¶¶20, 327–42. Significantly, the AC now makes clear that Defendants'

24   statements that Oracle's cloud growth was based on customer "adoption" of its products were

25   misleading at minimum. ¶¶138, 371–72. Far from "adopting" Oracle's products, a material portion

26   of cloud customers "never used that Oracle cloud" (¶179), did not want Oracle's cloud products

27   (¶163), and in some cases did not know they had Oracle cloud products (¶147).

28         Defendants incorrectly insist that Oracle "sold real products for real money." Mot. at 1. In

truth, Oracle was not "selling" its cloud products; it **was effectively paying** people to take **unwanted** cloud **shelfware** off its hands. GAAP required disclosure that the "real money" Oracle collected was, in essence, audit and on-premise revenue that Oracle simply shifted to the "cloud column." *Supra* at 11–12. Defendants' assumption that investors simply did not care how much Oracle "cloud sales" were audit-driven "shelfware" transactions is belied by analyst commentary wondering just that. ¶¶23, 222, 227–33, 240–42. As that commentary demonstrates, there is a world of difference between selling real products to customers who want them and using discounts to effectively pay on-premise customers to accept cloud shelfware. The former translates into actual capture of cloud market share; the latter does not. This key difference is why GAAP required Oracle to disclose the nature and components of these transactions.

### E.  Defendants Misled Investors About the Cause of Decelerating Cloud Growth

In late 2017, Defendants denied that customers were "moving off of Oracle [cloud]," and stated that revenues had decelerated due to Oracle's "Bring Your Own License" program, among other reasons. ¶¶224, 255, 416. The Court explained "that additional facts might be alleged to support Plaintiff's claim that Oracle's professed reasons for deceleration of its Cloud revenue were misleading." Order at 27. The AC contains such facts. The material drivers of the deceleration included that: (1) customers refused to renew short-term subscriptions that had been forced on them (¶¶138–44); (2) customers, with the assistance of consultants, increasingly resisted the ABC tactic (¶¶151–73); and (3) Oracle "burned through" many audit targets by the end of 2017 (¶¶208–13). *See Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *10 (C.D. Cal. Aug. 4, 2017) (statements about the "causes of the [sales] declines" actionable).

Defendants argue the AC must somehow show that Oracle's constrained ability to consummate engineered deals was a **more** material driver of Oracle's declining growth than their proffered reasons. Mot. at 15. Not so. As the Court explained in connection with Defendants' statements describing the drivers of **increasing** cloud growth, "investors would have been interested to know that" Oracle's challenges in generating engineered deals were "'a material driver' of" declining revenue growth. Order at 25. Accordingly, the AC need only allege that the decline in engineered deals had a material impact on revenue, which it does. ¶¶135–50.

Defendants also argue that the AC's allegations that "Oracle could not coerce further cloud sales" conflicts with the supposed allegation that third-party consultants accepted audit driven deals "for nearly all [their] customers." Mot. at 15. Defendants mischaracterize the AC. The AC nowhere alleges that consultants advised clients to accept engineered deals, but rather that consultants reported their clients had accepted such deals "during the Class Period." ¶¶151–88. Importantly, the AC specifically alleges that: (1) by the end of 2017, consultants and customers were able to increasingly counter Oracle's tactics; and (2) Oracle had "burned through" many audit targets by the end of 2017. ¶¶167, 208–12.

## F. Defendants Misled Investors About Oracle's Cloud Technology

Defendants made misleading statements about the quality and competitiveness of Oracle's cloud platform. Defendants stated that Oracle offered "the only" "complete" and "integrated" cloud platform, touted the product's "speed" (which "reduced costs"), the "innovation advantage" provided by Oracle's frequent and effective software updates, and its "competitive strengths," including a "modern user interface" that was "familiar and easy to use," and put "the needs and experiences of the users at the center of the design." ¶¶352, 358, 361, 379, 385–86, 393, 404–08, 414, 434. Defendants also touted the competitiveness of key components of the cloud platform, including the HCM product, which they stated was "growing triple digits," specifically trumpeting the product's user interface as "consistent, simple, and intuitive." ¶¶396, 402.

These statements were materially misleading. As FE 10, one of the most senior executives involved in the design of Oracle's cloud products (and Miranda's direct report) described, Oracle's entire cloud platform was rife with serious defects throughout the Class Period and these defects severely impacted organic demand. Contrary to Defendants' statements, FE 10 reported that Oracle's applications were not "integrated" with each other, and far from being "complete," could not perform basic functions. ¶¶76–79; *see Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9 (N.D. Cal. Apr. 28, 2020) (statement that product was "connective tissue between your CRM and ERP" was materially misleading where products "were not integrated").

Likewise, while Defendants told investors that Oracle cloud made it easy for on-premise

customers to move to cloud (giving Oracle a competitive advantage), FE 10 reported that because of the platform's limited functionality, it was actually complicated and expensive for customers to move. ¶76. FE 10 further reported that, contrary to Defendants' statements touting the speed of Oracle cloud, repeated product testing shared with Kurian and Miranda showed that interface defects made the speed of user response inferior to competitors' products. ¶92. Further, contrary to Defendants' statements touting Oracle cloud's frequent and comprehensive updates, efforts to fix the vast backlog of the platform's critical unfixed deficiencies were severely delayed and ineffective. ¶¶83–85; *see Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *3 (D. Ariz. Dec. 17, 2012) (statement that defendants had "fairly high confidence that our product is delivering in the field" was misleading when defendants knew about "increasingly severe product defects").

FE 10's report is corroborated by an October 19, 2017 email from Kurian to Miranda highlighting the same kind of defects in the cloud product's "core" user interface that FE 10 reported were endemic to the platform. Kurian wrote that Oracle's human resources (HCM) cloud software "was considered *so atrocious* even back in July [2017]" that it was "*a disgrace*," and he "continue[d] to get extraordinary pressure from *our two CEOs* [Hurd and Catz] and *LJE himself* [Ellison] that the UI [user interface] is *not tenable* … the core product UI [user interface] is *awful*." ¶¶88–89. Notably, less than three weeks earlier, Oracle had stated that the HCM product's user interface was "consistent, simple, and intuitive." ¶402; *see In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 833-34 (N.D. Cal. 2014) (statement about product's "ease of use" misleading).

*Vantive* (an abrogated case that imposed a "too demanding" standard, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)) is inapposite. In *Vantive*, there were "no facts alleged to show how the imprecise deficiencies asserted to hamper the product affected Vantive's competitive position." 283 F.3d 1079, 1089 (9th Cir. 2002). Here, the AC identifies specific defects, and details internal reports and acknowledgements (including from named Defendants) that the defects negatively impacted demand. ¶¶75–94. Further, unlike in *Vantive*, Defendants here made statements touting specific features of the cloud platform. ¶¶358, 361, 402.

Defendants argue that Kurian's email was written after the last alleged misleading statement concerning Oracle's products. Mot. at 14. Defendants ignore FE 10's report that he

routinely discussed the severe product defects with Miranda and Kurian *during, and even prior to, the Class Period*. ¶¶75–85. Consistent with this report, Kurian's email states that that the UI was "atrocious *even back in July* [2017]" and that Kurian "*continue[d]* to get extraordinary pressure" from Hurd, Catz, and Ellison, establishing that these executives had known about the deficiencies for some time. ¶¶88–89. And Defendants' suggestion that Oracle's cloud products suddenly went from "best-in-class," as they publicly claimed, to "untenable" and "a disgrace" in just a few months, defies common sense. In fact, just a month before the email was written, Ellison touted the HCM product's "triple digit growth" as the "horse" Oracle could "ride" to meet its cloud growth targets—when, as Kurian's email demonstrates, he knew it was "not tenable." ¶¶88, 396.

Defendants also incorrectly argue their statements are inactionable puffery. Mot. at 15–16. Defendants' specific statements emphasizing verifiable features of Oracle's most important product are not mere "corporate optimism," including promoting the product's "speed," and stating that products were "integrated" and had a user interface that was "easy to use." Courts have found similar statements actionable. *See Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (statement that camera captured "amazingly smooth" imagery not puffery); *Zuora*, 2020 WL 2042244, at *9 (stating that a product had "seamless" "integration" was not puffery).

Defendants ask why there were no "complaints, refunds or recalls." Mot. at 19. But: (1) there *were* complaints and ample negative consumer feedback presented to Kurian (¶89); (2) Kurian's email shows that customers tested the cloud product before purchasing it and declined to buy it (¶¶81–82, 89); and (3) the vast majority of cloud sales were engineered deals, wherein the customers had no interest in using the product in the first place (¶¶135–50).

Finally, Defendants incorrectly contend that four of the new statements are forward-looking and protected by the safe harbor. Mot. at 16. These are present statements of historical fact. *See, e.g.*, ¶396 (stating HCM product "*is* growing triple digits" and "*we think* we'll be able to ride that horse" when he *knew* product was "not tenable"); ¶434 (stating "the capabilities" and "economics in the cloud *are* so much better"). Further, there was no specific cautionary language stating that the products were severely deficient and, in any event, Defendants knew that these statements were misleading when they made them, as explained below.

**IV.     THE AC ADEQUATELY ALLEGES SCIENTER**

"Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). The AC alleges facts that, considered holistically, yield an inference of severe recklessness that is at least as likely as Defendants' opposing inference. ***First***, FE 10's report and Kurian's October 2017 email to Miranda (implicating Hurd, Catz and Ellison), show that Defendants knew that Oracle's cloud product was deeply flawed and this was impeding sales. *Supra* at 2–3. FE 10 repeatedly discussed Oracle cloud's severe deficiencies with Miranda and Kurian, and supplied them with numerous reports detailing the vast backlog of critical issues. ¶¶80–85. Kurian acknowledged during these meetings that potential customers were not buying Oracle's cloud product because of its poor quality and stated he was facing increasing pressure from Hurd, Catz and Ellison to address the product's serious deficiencies. ¶¶82–83. These allegations give rise to a strong inference that Ellison, Kurian, Hurd, Miranda, and Catz knew or recklessly disregarded that Defendants' statements (1) touting the quality of Oracle's cloud products and (2) attributing Oracle's positive cloud results thereto, were misleading. *See, e.g.*, *Robb v. Fitbit Inc.*, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (scienter pled where employee reported product deficiencies to senior executive).

Moreover, Defendants' knowledge that Oracle's products were seriously deficient bolsters the inference of scienter as to Oracle's use of engineered deals. Knowing that the products were "untenable" and "not competitive," it was severely reckless to fail to investigate how Oracle generated revenue growth (including "triple digit growth" of HCM). ¶¶88, 396.

While Defendants repeat their argument that Kurian's October 17, 2017 email was written after the last alleged misleading statement, as discussed above, this argument ignores FE 10's report, the text of the email, and Defendants' statements. *Supra* at 16. Defendants also incorrectly argue that FE 10's report does not show scienter because he "only" had direct contact with Kurian and Miranda, and Kurian's email does not communicate global deficiencies with cloud. Mot. at 18. Kurian's email shows that Hurd, Catz, and Ellison: (1) knew about the serious UI problems FE 10 reported; (2) were exerting "extraordinary pressure" to address deficiencies affecting particular

products; and (3) discussed defects in Oracle's cloud platform with Kurian, all of which support an inference that they were apprised of the significant global deficiencies FE 10 repeatedly discussed with Kurian and Miranda. ¶88; *see Fitbit*, 2017 WL 219673, at *6–7 ("[T]here is no equally strong inference that the shortcomings of a new technological feature of a company's product would deliberately have been kept secret from the company's CEO, CFO, and CTO."). Especially when coupled with the AC's other allegations—including Kurian's statement to FE 10 that he was under "increasing pressure from Catz" to address the global deficiencies FE 10 described (¶80), the pervasiveness of those deficiencies (¶¶75–85), and Defendants' statements about cloud quality (¶¶358, 361, 402)—the inference exists that Hurd, Catz, and Ellison knew of, or recklessly disregarded, the severe deficiencies globally affecting Oracle's cloud platform.

Defendants try to downplay Kurian's email as merely showing Oracle's product could be "improved," but the flaws were so serious that both co-CEOs and Ellison were exerting "extraordinary pressure" to fix them. ¶88. While Defendants quibble that Rabobank eventually found one product passable, this was not true until October 2017, and even then, this "friendly" company still found the key HCM product to be severely deficient.

Defendants also contend that FE 10's descriptions of product defects are too "vague," but FE 10 describes the nature of the defects (*e.g.*, inability to perform basic functions like search, integration failures across products, UI defects, functionality loss when transitioning from on-premise); gives examples involving specific products and features; identifies reports in which defects were memorialized; explains that the defects were endemic to all cloud products, existed before the Class Period and persisted at least until his departure in February 2018; and the AC cites an email corroborating this account authored by a named Defendant, sent to another, that describes communications with three others. ¶¶75–89. Also sufficiently particular are the allegations that FE 10 met with Kurian at least every two months from 2015 to October 2017, reviewed the widespread defects he detailed, discussed their adverse impact on sales, and provided, among other things, a running list of thousands of bugs (the top three of which would take a year to fix) to which Kurian reacted with distress. ¶¶80–84. Courts hold that far less detailed reports support an inference of scienter at the pleading stage. *See, e.g., Commc'ns Workers of Am. Plan for Emps.' Pensions &*

1  *Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (strong inference

2  from CW reports though "somewhat lacking in detail"); *see also* authority cited *supra* at 17.

3        Finally, Defendants assert that it "make[s] no sense" that Oracle would generate cloud

4  revenue if its products were uncompetitive, but ignore the allegations that Oracle relied heavily on

5  engineered deals to generate cloud revenue. Defendants point to Oracle's 20% revenue growth at

6  the end of the Class Period, but ignore that this abysmal result represented a steep decline in

7  Oracle's growth rate, while competitors were growing cloud revenue ***by 80% or more***. ¶¶221–22.

8  Far from "mak[ing] no sense," analysts and commentators tied Oracle's decelerating growth to

9  problems with the quality of its cloud product and its use of coercive tactics to force existing

10  customers to accept "shelfware." ¶¶23, 222, 227–33, 240–42. Defendants suggest that Oracle's

11  cloud revenue should have gone to zero, but the AC alleges that Oracle's ability to generate "sales"

12  through engineered deals became significantly constrained, not that it disappeared entirely.

13        ***Second***, Defendants' approval of engineered deals through the DAS system strongly

14  supports an inference of scienter. Order at 34. Contrary to Defendants' assertions, the AC alleges

15  "when" Hurd and Catz issued DAS approvals: throughout the Class Period for all deals in excess

16  of $5 million or involving a 50% or greater discount on on-premise software. ¶¶19, 124–25, 149–

17  50. The AC also explains "how" based on those approvals Hurd and Catz knew, or recklessly

18  disregarded, that the deals were engineered and generated material cloud revenue: required fields

19  in the management-approved DAS entry stated whether the deal was audit-driven (and involved

20  LMS) or attached. ¶¶126, 254. Taking just FE 1's three examples of large Hurd-approved deals,

21  Hurd knew that more than 25% of the total cloud revenue for the entire MEA region for all of

22  fiscal 2017 was audit-driven. ¶124. FE 3 reported that Hurd approved 80% of the Southern

23  California region's engineered deals. ¶125.

24        ***Third***, the AC alleges new facts demonstrating that Defendants had "actual access" to

25  copious information detailing the high volume of Oracle's engineered deals, which support a

26  strong inference of recklessness. Order at 33. FEs 1 and 2 reviewed or prepared presentations for

27  Hurd prior to and during the Class Period showing engineered deals were responsible for material

28  amounts of cloud revenue. ¶¶111–12. FE 1 reported Le Guisquet reviewed the volume of EMEA

1   "compliance" deals with Hurd weekly during the Class Period. ¶126. FE 1 further reported that

2   Catz approved plans for dividing audit targets amongst MEA's sales teams during the Class Period

3   (and thus would have known that 80% of the region's cloud revenue was audit-driven in 2017).

4   ¶¶108–09. FE 11 reported that, in the months before the Class Period, Catz expanded Oracle's

5   auditing tactic. ¶107. It was severely reckless for Hurd and Catz to attribute Oracle's cloud results

6   to product quality and competitiveness while failing to investigate the revenue impact of

7   engineered deals, including by reviewing materials on the subject prepared for them or conferring

8   with their direct reports, who discussed that 90–95% of Oracle's cloud revenue was driven by

9   engineered deals (and this recklessness is particularly severe since Hurd and Catz approved

10  significant engineered deals). *See, e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F.

11  App'x 480, 485 (9th Cir. 2019) (scienter where CW stated his superior provided reports to

12  defendant undermining statements); *Zuora*, 2020 WL 2042244, at *10-11 (scienter where

13  defendants had "access to minutes, documents, and emails evidencing negative customer feedback

14  due to integration failures"); *Fitbit*, 2017 WL 219673, at *6 (scienter where CW prepared report

15  his superior presented to defendant); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *17 (C.D.

16  Cal. Aug. 4, 2014) (scienter where defendant had "access to an internal document questioning"

17  statements, even though complaint did not allege he "actually saw the report").

18       Defendants urge the Court to ignore these allegations, contending that confidential witness

19  allegations cannot show scienter absent direct contact with a named defendant. Mot. at 18. Scienter

20  allegations must be viewed holistically, and there is no requirement that a CW have direct contact

21  with a named defendant. *See LifeLock*, 780 F. App'x at 484–85 n.5 (refusing to discount CW

22  allegations that defendant received reports because CW lacked direct contact with that defendant);

23  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (same); *Zuora*, 2020 WL 2042244,

24  at *10 (rejecting argument that CW allegations could not support scienter as to software

25  deficiencies because they lacked "direct contact with the defendants"); *Fitbit*, 2017 WL 219673,

26  at *6; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008)

27  (scienter pled where CWs had not "spoken or had other contact with" directors).

28       Moreover, the AC details the accounts of multiple witnesses who had contact with one or

more Defendants, either directly or through DAS. Those allegations are appropriately buttressed by allegations such as those here concerning reports prepared for defendants, widespread knowledge of the misconduct throughout senior ranks, the issue's significance to the company, denials of wrongdoing, and others discussed below. ¶¶111–12, 126; *infra* at 23. Defendants are wrong that these allegations may be ignored because the FEs did not look over Hurd's shoulder while he read the reports prepared for him; Hurd's and Catz's access to copious information detailing the volume of Oracle's engineered deals is sufficient to plead recklessness, particularly in light of the allegations that they personally approved engineered deals. ¶¶108–09, 124–25, 149–50. Nor is the fact that the FEs rely, in part, on facts relayed to them by Defendants' own direct reports grounds for rejecting them. *Lifelock*, 780 F. App'x at 485 n. 5 (refusing to reject CW report based on hearsay); *Lloyd*, 811 F.3d at 1208 (same).

**Fourth**, and relatedly, the AC alleges that Oracle's pervasive use of engineered deals to generate material cloud revenue was common knowledge among Oracle's most senior executives. FE 2 reported that the heads of cloud sales at Oracle, both of whom reported to Hurd, acknowledged in meetings during the Class Period that engineered deals were responsible for 90–95% of cloud revenue, demonstrating the "poor health" of the revenue stream. ¶114. FE 3 and FE 11 also reported that Geraffo, another of Hurd's reports, directed the use of the ABC tactic for large deals. ¶¶107, 122. The same was true of Le Guisquet, another of Hurd's direct reports; FE 1 and his colleagues provided Le Guisquet with data showing 80% of MEA's Class Period cloud sales were engineered and Le Guisquet knew that Oracle's cloud revenue decelerated because of difficulties in deploying the ABC tactic. ¶¶108–09. FE 10 personally reported to Defendant Miranda. ¶75. As *Fitbit* explained, the PSLRA does not require the Court to assume that Oracle's C-suite concealed material information from Defendants. 2017 WL 219673, at *6–7; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (strong inference where revenue issues "were well known throughout the Company"). These detailed allegations are unlike the "generalized claims of corporate knowledge" rejected in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009).

Moreover, even putting aside allegations of widespread knowledge among senior

---

management, the AC's allegations that engineered deals were in "widespread" use and generated material Company-wide cloud revenue independently support scienter. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (scienter where issue had material impact on revenue); *Countrywide*, 554 F. Supp. 2d at 1058 (widespread relaxation of underwriting standards across branches supported scienter); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("widespread" nature of misconduct was "powerful circumstantial evidence of scienter"). The AC alleges that that Oracle conducted tutorials and "white-board sessions" at which sales executives received instructions (¶107); it is implausible that Hurd and Catz believed Oracle's use of engineered deals was immaterial when their executives attended Company-organized classes on the subject.

*Fifth*, the AC's allegations that Defendants were informed of and repeatedly denied or downplayed allegations of audit-driven sales support a strong inference of scienter. It was reckless for Defendants to issue their statements while failing to investigate the materiality of the engineered deals that were the subject of letters addressed to Hurd and the Oracle Board, ongoing governmental investigations, and media reports. Had Defendants read the reports prepared for them, talked to their own direct subordinates, or reviewed the DAS data they monitored, they would have discovered that engineered deals drove material cloud revenue. *Supra* at 5.

*Sixth*, Oracle's abrupt reversal of the way it reported cloud revenue underscores its efforts to obscure declining growth and supports a strong inference of scienter. Defendants' assertion that Oracle changed its reporting to accommodate an influx of BYOL customers is not more plausible than the competing inference. The AC now includes detailed allegations that it was the erosion of Oracle's ability to deploy the ABC tactic, coupled with the low renewal rates among existing customers, that drove Oracle's poor cloud revenue results at the end of the Class Period. ¶¶208–12. Moreover, Defendants' timeline makes no sense. If Defendants believed the BYOL program's "mixed-use" character would make it difficult to report cloud revenue, why would Oracle promise even more detailed reporting of cloud revenue just three months before BYOL was officially launched? And Oracle did not change its accounting until ***nine months after*** rolling out the BYOL program; Defendants make no effort to explain this delay, asking the Court to fill in the details

with guesswork. By contrast, the accounting change follows closely on the heels of FE reports of customer resistance to engineered deals and dismal first quarter 2018 cloud growth. This is why analysts were dubious of Oracle's stated reasons for the change.

**Seventh**, the AC's "core operations" allegations support an inference of scienter. ¶¶296–306. The AC includes "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements." Order at 33. FE 10's report demonstrates that Kurian and Miranda, consistent with their job responsibilities, closely "monitor[ed]" the deficiencies in Oracle's cloud products, had routine meetings on the subject, and were presented with information undermining Oracle's public statements. ¶¶82–85. Kurian's email demonstrates that Hurd, Catz, and Ellison "monitor[ed]" deficiencies in Oracle's cloud platform, even at the individual product level, and exerted "extraordinary pressure" to address them. ¶88. The AC also alleges that Hurd and Catz "actually did monitor the data" relating to Oracle's engineered deals, personally approved engineered deals involving significant cloud revenue through DAS, and Catz approved the allocation of audit targets among, at least, the MEA sales teams. ¶¶108–09, 124–25. The AC also alleges "actual access to the disputed information" through the presentations and meetings detailed above, widespread knowledge among Defendants' direct reports, and letters and investigations raising red flags. ¶¶107–09, 114, 122, 199–207. Finally, it would be "absurd" to suggest that Hurd and Catz did not know where the large bulk of Oracle's cloud revenue came from.

**Eighth**, although "a motive is not required to plead securities fraud," *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *21 n.18 (W.D. Wash. Nov. 26, 2019), Kurian's insider sales bolster the inference of his scienter. Kurian sold nearly three times as much stock during the Class Period than he did during the Control Period, which distinguishes this case from *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) and *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999). ¶319. The sales were suspiciously timed: the largest occurred in mid-January 2018, before the three remaining disclosures and after internal expressions of concern about the erosion of engineered deals. Kurian sold his final block of shares in April and May 2018, before two of the four alleged corrective disclosures. ¶¶316–18; *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a short time before

a negative public announcement are suspiciously timed."). While the Court previously held that the absence of sales by other Defendants weakens the inference of Kurian's scienter, the AC alleges Hurd and Catz sold more than $65 million and $250 million in Oracle stock during the Class Period. ¶¶320–26. Defendants highlight Ellison's $50 billion in Oracle stock, but ignore that this provided a huge incentive to stave off the market's perception that Oracle's business was obsolescing and create the illusion of a successful cloud business to power growth.

Further, just before the Class Period, Oracle tied Defendants' performance compensation to "significantly grow[ing]" the cloud business, giving them a motive to inflate cloud revenue. ¶¶310–11. These awards were worth more than $100 million each for Ellison, Hurd, and Catz, and nearly $70 million for Kurian. ¶312. Defendants assert that this plan did not motivate them to boost short-term revenue, but they: (1) exaggerate the long-term nature of the plan, which mostly consists of annual or time-independent milestones; (2) ignore that Oracle *did* use engineered deals for *multiple years*; and (3) ignore that, in all events, the plan incented them to maintain the appearance of growth as long as possible. Even if these allegations do not independently plead scienter, they avoid the exculpatory inference the Court previously drew from their absence.

***Ninth***, Defendants fail to raise a more cogent non-culpable inference. The AC alleges a cogent theory: Oracle, desperate to catch up to its competitors, hastily cobbled together an uncompetitive cloud product. To compensate for poor quality, Oracle resorted to financially engineered deals to manufacture so-called "cloud sales." ¶¶112–14, 120–22. In late 2017, Oracle's ability to generate engineered deals waned, and this showed in Oracle's dramatically decelerating revenue growth. ¶¶208–12, 215, 220. Defendants misled investors about why revenue was decelerating and, when the market grew skeptical, changed Oracle's financial reporting altogether, blaming a program that had been rolled out almost a year earlier—an explanation the market understandably found not credible. ¶224.

Defendants ask the Court to ignore the AC's allegations and accept, as a matter of law, their surmise that Oracle's deceleration was only a function of the "law of large numbers." Mot. at 25. Even putting aside the FE reports (which the Court cannot do), this argument ignores that Oracle's competitors—even those with far *larger* cloud revenues than Oracle—reported growth

rates *four or more times higher* than Oracle's. ¶215. Analysts reported that Oracle was the odd man out, "heading in the wrong direction," with results "contrary to the eye-popping growth numbers we have seen from other companies." ¶222. Defendant also ignore the significant stock price decline caused by Oracle's deceleration, and market commentary that these results were unexpected and tied to quality and auditing issues—not the natural plateauing of a large revenue stream. ¶¶316–17. And contrary to what Defendants assert, Oracle's cloud business cratered after the Class Period, causing analysts to report that Oracle was "cheap for a reason." ¶244.

*Finally*, Defendants' remaining arguments fail. As the Court recognized before, Defendants' argument about the buybacks violates the limits on judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). Further, Defendants deserve no credit for spending *corporate* money to prop up Oracle's stock price, and buybacks can be an attempt to "keep the ball rolling" as the fraudulent practice "began taking its toll on the Company[]." *Countrywide*, 554 F. Supp. 2d at 1068. A restatement is not required to plead securities fraud because: (1) "[t]he lack of a restatement [does] not mean that [Oracle] only engaged in legitimate conduct," *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245–46 (N.D. Cal. 2008); and (2) it raises fact issues about what the auditor was told and "what . . . was hidden," *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012).

## V.     THE COMPLAINT ALLEGES CLAIMS UNDER SECTIONS 20A AND 20(a)

For the reasons stated above, Plaintiff has pled a violation of Section 10(b) and identified material nonpublic information in Defendant Kurian's possession at the time of his trades.

## VI.    CONCLUSION

Defendants' motion to dismiss should be denied. However, if the Court grants it, Plaintiff should be afforded an opportunity to replead its claims.

Dated: June 30, 2020

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: */s/ John Rizio-Hamilton*

Attorneys for Lead Plaintiff