1  JORDAN ETH (CA SBN 121617)
   JEth@mofo.com
2  MARK R.S. FOSTER (CA SBN 223682)
   MFoster@mofo.com
3  DAVID J. WIENER (CA SBN 291659)
   DWiener@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California  94105-2482
   Telephone:   415.268.7000
6  Facsimile:    415.268.7522

7  Attorneys for Defendants
   ORACLE CORPORATION, SAFRA A. CATZ, PAULA R.
8  HURD, AS TRUSTEE OF THE HURD FAMILY TRUST,
   LAWRENCE J. ELLISON, THOMAS KURIAN, KEN BOND,
9  and STEVE MIRANDA

10 JAMES C. MAROULIS (CA SBN 208316)
   Jim.Maroulis@oracle.com
11 ORACLE CORPORATION
   500 Oracle Parkway
12 Mail Stop 5OP7
   Redwood City, California  94065
13 Telephone:   650.506.5200
   Facsimile:    650.506.7114
14
   Attorneys for Defendant
15 ORACLE CORPORATION

16                    **UNITED STATES DISTRICT COURT**

17                    **NORTHERN DISTRICT OF CALIFORNIA**

18                               **SAN JOSE DIVISION**

| | |
|---|---|
| *In re Oracle Corporation Securities Litigation* | Case No. 5:18-cv-4844-BLF<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:  September 24, 2020<br>Time:  9:00 a.m.<br>Ctrm:  3, Fifth Floor<br><br>Judge:  Hon. Beth Labson Freeman<br><br>Date Action Filed:  August 10, 2018 |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...........................................................................................................................1

ARGUMENT .................................................................................................................................2

I. PLAINTIFF FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT. ..................................................................................................................2

    A. Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues, Growth Rates, Or Products. ...................................................................................2

        1. Plaintiff fails to show that reported Cloud revenue or growth stemmed from improper sales practices. ............................................................2

            a. CW speculation does not show material falsity. ...............................2

            b. Anecdotes from "industry participants" do not show falsity. ...........3

        2. Plaintiff fails to show that Defendants misled investors about Cloud growth's sustainability. ................................................................................4

        3. GAAP did not impose a duty to disclose. .......................................................5

    B. Plaintiff's Product Defect Allegations Do Not Show Material Falsity. ..................6

        1. CW10's unreliable allegations do not show material falsity. ........................6

        2. The October 19, 2017 email does not show material falsity. .........................7

    C. Plaintiff Fails To Show That Any Defendant Misled Investors About The Reasons For The Deceleration Of Cloud Growth. .................................................8

    D. Many Challenged Statements Are Non-Actionable For The Additional Reason That They Are Statements Of General Corporate Optimism. ...................9

    E. The Safe Harbor Further Protects The Forward-Looking Statements. .................10

II. PLAINTIFF FAILS TO PLEAD A "STRONG INFERENCE" OF SCIENTER. ...............10

    A. The CW Allegations Do Not Support Any Scienter Inference. ............................10

        1. The old CWs offer nothing new giving rise to any scienter inference. ........10

        2. The new CW allegations do not give rise to any scienter inference. ..........11

    B. The October 2017 Email Does Not Support Any Scienter Inference. ..................13

    C. The Stock Sale Allegations Do Not Support Any Scienter Inference. .................14

    D. The Compensation Allegations Do Not Support Any Scienter Inference. ...........14

    E. The Court Has Already Rejected Plaintiff's Remaining Allegations. ..................14

    F. Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge That Their Forward-Looking Statements Were False When Made. .....................15

    G. Holistically Considered, Plaintiff's Fraud Theory Is Not Cogent. .......................15

III. PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(A) AND 20A. ............15

CONCLUSION ............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bielousov v. GoPro, Inc.*,
   No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017)........................................9

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...................................................................................3

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005).................................................................................................5

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) .....................................................................................5

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) .....................................................................................10

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016)...............................................................................................11

*Lopes v. Fitbit, Inc.*,
   No. 19-cv-06665-JST, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) ........................................8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).................................................................................................6

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   78 F. Supp. 3d 1215 (N.D. Cal. 2015) .....................................................................................5

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020)....................................................................................... 1, 12, 15

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ..........................................................................................11

*In re OmniVision Techs., Inc. Sec. Litig.*,
   937 F. Supp. 2d 1090 (N.D. Cal. 2013) ...................................................................................5

*Pensions & Death Benefits v. CSK Auto Corp.*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007)....................................................................................12

*In re Pivotal Sec. Litig.*,
   No. 3:19-cv-0359-CRB, 2020 WL 4193384 (N.D. Cal. July 21, 2020) ....................................6

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...............................................................................................11

# TABLE OF AUTHORITIES

Page(s)

*Roberts v. Zuora, Inc.*,
    No. 19-cv-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................................. 6, 7, 11

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................................................... 13

*S. Ferry LP No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................................. 6

*Smilovits v. First Solar, Inc.*,
    No. C-12-00555-PHX-DGC, 2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ............................... 8

*Sgarlata v. PayPal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019) .................................................................................... 5

*Turocy v. El Pollo Loco Holdings, Inc.*,
    No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ..................... 9

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................................................... 6

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) ....................................................................................... 3, 11, 12

# INTRODUCTION

Plaintiff's Opposition mimics the SAC's strategy of trying to mask a lack of particularity with density: recycling a host of defective claims that this Court already rejected and repeating a handful of new allegations that fail to plead securities fraud. Most striking is Plaintiff's failure to line up any allegation with any challenged statement or any Defendant's state of mind at any time contemporaneous with their public statements. Plaintiff's shotgun pleading misses all targets. Plaintiff fails to plead falsity and scienter with the particularity required by the Reform Act and Ninth Circuit cases like *Intuitive*, *NVIDIA*, *Rigel*, *Ronconi*, *Vantive*, and *Zucco*.

With respect to the sales practices, Plaintiff repeatedly relies on CW allegations about "engineered" deals, a term that includes deals with discounts. Plaintiff never pleads any facts showing that the allegedly improper ABC tactic generated a material portion of Oracle's revenue. Plaintiff doubles-down on its conclusory GAAP arguments based on the opinion of its expert Devor, but admits that Devor did not review any transaction, accounting policy, or disclosure.

Plaintiff's new product-defect theory fares no better. The email at the core of Plaintiff's new theory is untethered to any challenged statement. Far from being "rife with serious defects" that rendered it "untenable," the only specific product Plaintiff mentions (HCM) was a success. Documents that the SAC incorporates by reference show that HCM grew over 50% in each of the quarters of the class period after the email, even faster than Oracle's overall Cloud business.

The Opposition also fails to address any Defendant's state of mind at the time of any challenged statement. And, as in the Ninth Circuit's recent decision in *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020), Plaintiff's conclusory CW allegations are "high on alarming adjectives," but "short on the facts" that would establish a strong inference of scienter.

Plaintiff still fails to offer a cogent and compelling theory of fraud. Oracle provided accurate financial guidance to investors that warned of the slowing Cloud growth that Plaintiff insists Defendants concealed. There are also still no allegations of motive—no coordinated or suspiciously timed stock sales by Catz, Hurd, and Kurian—and no allegations of ***any*** trading by Bond, Ellison, or Miranda. Nothing has changed.

The SAC should be dismissed. This time, with prejudice.

# ARGUMENT

## I. PLAINTIFF FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT.

Plaintiff still does not dispute that Oracle accurately recognized and reported its Cloud revenue throughout the class period and met or exceeded the financial projections it provided to investors in each class-period quarter. Once again, these concessions are fatal to Plaintiff's claim that Oracle's Cloud revenue, growth rate, and product statements were materially misleading.

### A. Plaintiff Fails To Show The Falsity Of Statements About Cloud Revenues, Growth Rates, Or Products.

#### 1. Plaintiff fails to show that reported Cloud revenue or growth stemmed from improper sales practices.

Plaintiff contends that two purportedly "new" allegations show that Oracle issued false statements about Cloud growth: that "upwards of 90% of cloud revenue was driven by engineered deals" and that seven industry consultants' anecdotes "yield an inference of materiality" because "virtually every client they had" purchased Cloud products "under threat of audit." (Opp. 8-10.) Neither allegation shows the material falsity of any statement. (MTD 6-9.)

##### a. CW speculation does not show material falsity.

The "engineered deals" that Plaintiff complains of include discounts that the securities laws do "not [] police," as this Court ruled. (MTD 6-8; Order at 17 n.7.) Put to the test, Plaintiff distorts CW11's allegations, arguing that 90% of revenues were "driven by the 'pervasive use' of the ABC tactic." (Opp. 9:4-8, citing ¶ 117.) Yet paragraph 117 actually just says 90% of revenues were "generated through engineered deals, *including* pervasive use of the ABC tactic."[1] Plaintiff does not say whether ABC was a sliver or measurable part of that 90%, or plead the amount driven by discounts. (Opp. 9:4-8, citing ¶¶ 107, 117, 120.) The allegations from CW2 and CW11 are as unspecific as those that the Court rejected. (Order at 3-6, 8-10, 23; MTD 6-8.)

That leaves Plaintiff to recycle defective allegations about MEA and North American IaaS and PaaS revenue (Opp. 9; CAC ¶¶ 87, 102-103, 113), which this Court rejected (Order at 3-4, 23-24), along with Plaintiff's contention that attached deals were not a "traditional discount" and

---

[1] Unless otherwise noted, all emphasis is added and all internal quotations marks are omitted.

were "effectively paying customers to accept 'shelfware.'" (*Compare* Opp. 7-8 *with* Order at 7:10-15, 8:23-27, 10:6-10.)  There is nothing new, let alone anything showing material falsity.

Plaintiff's failure of particularity is not the only problem.  Plaintiff also fails to establish the reliability of the CWs' estimates.  Plaintiff does not dispute that Oracle's Cloud sales often involved complex, multi-element and multi-year contracts.  (MTD 7-8.)  But Plaintiff makes no effort to show when Oracle recognized revenue from any contract or how this revenue was allocated among products and specifically to Cloud.  What's more, Plaintiff concedes that the CWs were "not involved in revenue recognition."  (Opp. 9:21-22.)  This is fatal.  (MTD 7-8.) Citing no authority, Plaintiff asserts that revenue recognition knowledge "is not required," while brushing aside *Brodsky v. Yahoo! Inc.*, and the other cases that reject CW challenges to undisputed revenue figures when the CWs played no revenue recognition role.  *See Brodsky*, 630 F. Supp. 2d 1104, 1114-16 (N.D. Cal. 2009) (citing *Zucco,* 552 F.3d at 986-98).

Plaintiff contends the estimates from CWs 1 and 2 are reliable because they were "personally involved in numerous cloud deals" and "authored or reviewed internal reports detailing the extent of the practices."  (Opp. 9.)  As Plaintiff acknowledges, revenue recognition is complicated:  a sales person makes a "sale"; how, when, and during what quarters revenue is recognized is a separate matter.  At most, the SAC offers conclusory allegations that CW2 believed that 90-95% of Oracle's Cloud sales did not have "use cases" (¶¶ 112-115) and that CW1's regional sales team completed "audit-driven" deals in fiscal year 2017 (¶¶ 108-111). Plaintiff does not connect any of this to reported revenues or growth as of any quarter.  For good reason, the Court already rejected these allegations. (*Compare id. with* Order at 4, citing CAC ¶¶ 103-104 [use case allegations] and CAC ¶¶ 87, 106, 112 [allegations about CW1's team].)

      **b.**  **Anecdotes from "industry participants" do not show falsity.**

Plaintiff's arguments regarding industry consultant allegations fail for similar reasons. Plaintiff concedes that only three of the consultants even purported to "report specific revenue figures."  (Opp. 9.)  Even accepting those figures as true (and setting aside Plaintiff's failure to translate those figures into recognized revenue as of specific quarters), they represent just 1.6% of Oracle's Cloud revenues during the class period, an immaterial amount.  (MTD 8:25.)

The remaining statements attributed to consultants do not include any particularized allegations regarding specific transactions or customers.  Plaintiff argues that the SAC alleges that "hundreds of clients" purchased Oracle Cloud "under threat of audit." (Opp. 9.)  The SAC does not allege that.  With the exception of the transactions identified by Defendants (MTD 8), the SAC alleges only that Oracle "offered" discounts for the purchase of Cloud products in connection with audits and does not allege any specifics regarding the number of Oracle customers that accepted these offers, much less the timing or terms on which they did so.  (*See, e.g.*, ¶¶ 162-164, 170-71.)  Further, Plaintiff's arguments still ignore Defendants' showing that, like the CWs, none of these consultants has any alleged knowledge of Oracle's revenue recognition, nor can they allege that Oracle's reported revenue figures were materially false or misleading at any time.  (MTD 8-9.)

### 2. Plaintiff fails to show that Defendants misled investors about Cloud growth's sustainability.

Plaintiff argues that Defendants misled investors by implying that Oracle's "better" products, sales force, and ability-to-implement fueled Cloud growth.  (Opp. 10.)  Plaintiff argues that Oracle's concededly accurate financial guidance has "no bearing" on whether statements regarding Cloud growth were misleading because Oracle met its guidance only by using "engineered deals to boost cloud sales" and the "illusion" of growth "began to collapse" when engineered deals were no longer an option.  (*Id.*)  The Court rejected this argument:  "[B]ecause Oracle's Cloud revenue concededly grew as projected, the CAC allegations do not support the conclusion that Oracle's Cloud sales were 'unsustainable' as Plaintiff claims." (Order at 24.)

Moreover, the SAC's allegations contradict Plaintiff's argument that "the illusion" of Cloud growth "began to collapse" as a result of low renewal rates on engineered deals.  (Opp. 10, citing ¶¶ 215, 219, 235.)  Oracle reported Cloud revenue ***growth*** of approximately ***40%*** in 2Q2018 (¶ 215); ***32%*** in 3Q2018 (¶ 219); and ***21%*** in 4Q2018, the final quarter of the class period (¶ 235).  Plaintiff does not even try to square that growth with alleged renewal rates of "virtually zero" or "less than 15%" (¶ 21) for "engineered" transactions, which purportedly represented 90-95% of Oracle's Cloud sales before and during the class period.  (MTD 9.)

### 3. GAAP did not impose a duty to disclose.

Plaintiff does not contend that Oracle recognized revenue in violation of GAAP or that Oracle's accounting disclosures were misleading. (*See* SAC § VIII.) Instead, relying entirely on its expert, Devor, Plaintiff argues that GAAP required Oracle to disclose "audit-driven" and "attached deals" as multiple element arrangements under ASC 605-25. (Opp. 11-12.) Plaintiff cannot bolster its deficient CW allegations with the conclusory and circular opinion of an expert who does nothing more than assume Plaintiff has already pleaded securities fraud.

Plaintiff concedes that Devor did not review a single Oracle accounting policy, invoice, journal entry, customer contract, or Oracle's disclosures relating to its revenue recognition policies. (MTD 10-11; Opp. 12.) Plaintiff ignores on-point authority rejecting similarly deficient expert allegations at the pleading stage. (MTD 11, citing *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846 (N.D. Cal. 2019); *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090 (N.D. Cal. 2013).) In Plaintiff's case, *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159-60 (N.D. Cal. 2015), the expert opined about "typical" industry production practices as foundational evidence, not the legal issue of whether there is a duty to disclose, as Devor does.

While Plaintiff asserts that Defendants "cannot seriously argue that Oracle satisfied" GAAP, Plaintiff ignores Oracle's disclosures on this issue entirely. (MTD 10-11.) Plaintiff cites no authority applying ASC 605-25 to similar transactions, fails to analyze Oracle's disclosures, and ignores that Ernst & Young LLP independently audited Oracle's financial statements, which have never been restated. Plaintiff's cases undermine its argument. (Opp. 11.) Both *Daou* and *Montage* involved particularized allegations about specific transactions that were accounted for improperly under GAAP, and demanded that GAAP claims be supported by facts missing here: "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the [] transaction; (3) the dates of any of the transactions; or (4) the identities of . . . the customers or [] employees involved in the transactions." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005); *see In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224-25 (N.D. Cal. 2015) (allegations identifying percentage of revenue attributable to undisclosed related party transactions).

**B.     Plaintiff's Product Defect Allegations Do Not Show Material Falsity.**

Plaintiff pivots to an equally flawed product defect theory that challenges statements generally describing Oracle's "comprehensive" suite of products, "modern business applications," and "high performance" Cloud products.  Plaintiff's arguments do not show material falsity.

**1.     CW10's unreliable allegations do not show material falsity.**

Plaintiff does not substantively address Defendants' showing that CW10's allegations lack the particularity that the Reform Act requires.  Plaintiff attempts to wish away the Ninth Circuit's on-point decision in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), by claiming that it was "abrogated" for imposing a standard that was "too demanding."  (Opp. 15.)  Not so. While *S. Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), recognized that *Vantive*'s segmented scienter analysis was potentially inconsistent with the holistic analysis required by *Tellabs*, the Ninth Circuit has continued to rely on *Vantive*'s falsity analysis.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

CW10's vague allegations about product issues are similar to those that *Vantive* rejected. CW10's allegations are a litany of conclusions and adjectives about "bugs," "critical" flaws in the "functionality" of Oracle's Cloud product, allegedly inferior "speed of user response," a "vast backlog" of "unfixed deficiencies" that do not specify which products were affected, when, or how they compared to products offered by competitors, and a vague assertion that unspecified "users struggled to complete tasks," at unspecified times.  None of this would plead a product defect case.  It certainly does not plead securities fraud.  As in *Vantive*, the "vagueness of these allegations needs no elaboration; there are no facts alleged to show how the imprecise deficiencies asserted to hamper the product affected [Oracle's] competitive position." 283 F.3d at 1088-89; *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *11 (N.D. Cal. July 21, 2020) (applying *Vantive* to reject similarly vague CW allegations about supposedly flawed cloud products).

Plaintiff's allegations are like those rejected in *Vantive* and *Pivotal* and fall well short of those in *Roberts v. Zuora, Inc.*, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020).  There, the plaintiff presented particularized allegations about product defects that led to complaints from five "major Zuora customers who were material to Zuora's financial health" and who later "refus[ed] to pay

Zuora due to integration[] problems." *Id.* at *5, *9.

As with the sales practice claim, Plaintiff does not attempt to square Oracle's objectively verifiable and unchallenged Cloud revenue growth—before, during, and after the class period—with CW10's vague allegations that "there was extremely poor demand for Oracle's cloud services" because of "widespread failures" with Oracle's Cloud products. Indeed, Plaintiff only *strengthens* Defendants' point by arguing that "customers tested the cloud product before purchasing it." (Opp. 16.) How then did Cloud revenue consistently grow at double digits if products were "not functional" as CW10 claims? Plaintiff's only answer is to fall back on its defective sales practice theory. (Opp. 16:20-21.) Both theories lead to a dead end.

### 2. The October 19, 2017 email does not show material falsity.

Kurian's October 19, 2017 email does not save Plaintiff's claim. (MTD 13-14.) In that email, Kurian criticized one aspect (the user interface) of one of Oracle's many Cloud products (HCM) and insisted that his team make improvements. His blunt language shows how he communicated with his team one day, but Plaintiff entirely fails to demonstrate that his email contradicted any challenged statement (let alone with deceptive intent, as discussed in § II.B).

Plaintiff does not point to any part of Kurian's email that contradicts any statement. Instead, Plaintiff splices the words from two challenged statements with four separate sets of quotation marks interspersed with Plaintiff's rhetoric. (Opp. 16:5-6, 16:7-8.) Plaintiff implies that Defendants represented that HCM's user interface was "best-in-class" and that, as a result, Oracle would "ride" HCM to meet its Cloud growth targets. (*Id.*) The challenged statements do not say that. In the first statement (Stmt. 32), made two weeks *before* the email, Miranda stated that Oracle had "the most complete SaaS suite of anybody in the market not only because we have CRM, HCM, ERP, supply chain, but also in those areas, the depth of that solution." (Ex. 27 at 4.) Miranda also stated that Oracle's Cloud products had "strengths there that we bring to bear [with] best-in-class applications." (*Id.*) Kurian's assertion that HCM's user interface should be improved is not inconsistent with Oracle's product suite being the "most complete."

Similarly, Plaintiff makes no effort to explain how Kurian's email contradicts Ellison's statement one month earlier that Oracle's Fusion ERP and Fusion HCM products' "blended rate

is growing triple digits.  The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets." (Stmt. 29.)  Plaintiff does not allege that Ellison misstated the growth rate of these products or that the markets they addressed were not, in fact, "enormous."  Indeed, Plaintiff fails to square its allegations that the HCM product was "not tenable" with the fact that revenue from HCM alone ***grew over 50%*** in the quarters *after* Kurian's email, according to reports the SAC incorporates.  (Ex. 9 at 6; Ex. 10 at 6; Ex. 5 at 2.)  Oracle achieved its Cloud revenue guidance in each of these quarters, posting growth rates of 39%, 32%, and 21%.  (¶¶ 430, 461, 469.)  Thus, HCM grew even ***faster*** than Oracle's overall Cloud business and helped Oracle achieve its guidance—just as Ellison predicted.

Plaintiff also argues that Kurian's email shows there was "ample negative consumer feedback" communicated about Oracle's Cloud products.  (Opp. 15-16.)  That Plaintiff identifies only one prospective customer's complaint over a fifteen-month class period highlights the absence of any product recalls, mass returns, or any other widespread customer dissatisfaction one would expect if product failures were "endemic" to Oracle's products beginning years before the class period as Plaintiff claims.  The SAC is, therefore, nothing like *Smilovits v. First Solar, Inc.*, where a company recalled product and incurred hundreds of millions of dollars of defect remediation costs.  2012 WL 6574410, at *3-4 (D. Ariz. Dec. 17, 2012) (Opp. 15).

Customers and product developers will always identify improvements that can be made in cutting-edge enterprise software.  (MTD 13.)  *Lopes v. Fitbit, Inc.*, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) (MTD 13), which Plaintiff ignores, is on point.  There, the defendants touted the "all-day activity tracking" and "steps and distance tracking" features in the defendant company's smartwatch device.  *Id.* at *6.  The plaintiff alleged that these statements were false because software bugs diminished the product's accuracy.  *Id.*  The court ruled:  "[t]hat a new program has kinks does not make a positive statement about the program false."  *Id.*  The same is true here.

### C.   Plaintiff Fails To Show That Any Defendant Misled Investors About The Reasons For The Deceleration Of Cloud Growth.

Plaintiff argues that it has shown that "challenges in generating engineered deals were 'a material driver of' declining revenue growth."  (Opp. 13.)  Plaintiff's argument is unsupported.

Plaintiff does not quantify changes in renewal rates over time or provide any objective measures showing changes in Oracle's use of attached deals or "audit-driven" sales practices. The SAC paragraphs Plaintiff cites add nothing of substance. (*Compare* SAC ¶¶ 138-144 *with* CAC ¶¶ 122-129, *and* SAC ¶¶ 208-213 *with* CAC ¶¶ 18, 106-108, 116, 120, 150-53.) This Court already rejected these allegations and should again. (MTD 14-15 (citing Order at 26-27).)

Plaintiff also argues that Cloud growth decelerated because "customers, with the assistance of consultants, increasingly resisted the ABC tactic." (Opp. 13:18-19, 14.) The SAC actually alleges that "28 to 29" of "approximately 30" and the "vast majority" of customers assisted by consultants accepted financially engineered transactions during the class period. (*See* ¶¶ 154, 159.) There are no particularized allegations showing a decline attributable to these consultants at any time, let alone at the end of 2017, as Plaintiff claims. (Opp. 14:1-8.) Plaintiff's speculation does not show the falsity of Oracle's explanations for deceleration. (MTD 15.)

Plaintiff's case highlights what is missing here. In *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *8-9 (C.D. Cal. Aug. 4, 2017), the defendants publicly attributed slowing sales to "the timing of New Year's Eve" and "marketing confusion." Internal communications made "no mention" of these issues and, instead, stated that the company experienced "lower total sales ***from pricing***." *Id.* Plaintiff does not show any contradiction here.

### D. Many Challenged Statements Are Non-Actionable For The Additional Reason That They Are Statements Of General Corporate Optimism.

The Opposition does not show that vague, optimistic statements about the "high performance" of Oracle's "comprehensive" and "integrated" Cloud products are "objectively verifiable," as Ninth Circuit law requires. (*See* Stmts. 6, 9-10, 21, 23-24, 29, 31-32, 36.) Ignoring Defendants' cases, Plaintiff argues that Oracle's statements "promoting" its products are "statements emphasizing verifiable features." (Opp. 16.) Plaintiff's cited authority reinforces that the statements are not actionable. In *Bielousov v. GoPro, Inc.*, 2017 WL 3168522 (N.D. Cal. July 26, 2017), the court found that statements that the company's drone product "was capable of flight time of eighteen minutes" were an "objectively verifiable promise[]" rendered false by allegations that the "drones crashed before the eighteen-minute mark." *Id.* at *6. Similarly, *In re*

*Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014), involved statements that "could be objectively assessed" through "peer reviewed studies" and medical device safety reports. The vague, optimistic statements about Oracle's Cloud products are not like that here.

### E. The Safe Harbor Further Protects The Forward-Looking Statements.

The Safe Harbor protects four of the new challenged statements. (MTD 16.) Plaintiff's argument that these statements were "present statements of historical fact" (Opp. 16) ignores the statements' plain language. (MTD 16.) Plaintiff's argument that Oracle's cautionary language was inadequate ignores that the Court already held it sufficient. (Order at 16; *see* MTD 16.)

## II. PLAINTIFF FAILS TO PLEAD A "STRONG INFERENCE" OF SCIENTER.

Plaintiff's failure to plead a strong inference of scienter is an additional dismissal ground.

### A. The CW Allegations Do Not Support Any Scienter Inference.

#### 1. The old CWs offer nothing new giving rise to any scienter inference.

Plaintiff argues that the SAC now alleges "when" and "how" Hurd and Catz issued DAS approvals, by alleging that (1) approvals were required "for all deals in excess of $5 million or involving a 50% or greater discount on on-premise software"; and (2) "required fields" stated "whether the deal was audit-driven (and involved LMS) or attached." (Opp. 19:13-23.) These allegations are substantively identical to the CAC's, which this Court rejected. (*Compare* CAC ¶ 110 *with* SAC ¶ 124; CAC ¶ 134 *with* SAC ¶ 150; *see* Order at 31:6-16.) Plaintiff still does not plead facts showing "how or at what level of detail Catz or Hurd reviewed the deals they approved." (Order at 31:18-21.) Moreover, Plaintiff does not dispute that the SAC identifies customers and dollar values for only ***three transactions*** from unspecified times in FY17 that accounted for only $56 million of Oracle's ***$4.57 billion*** of Cloud revenue in FY17. (MTD 18.) Beyond this, the SAC, like the CAC, "reveal[s] little about the approval process [and] nothing about any particular deals (timing, amounts, customer names)." (Order at 31:16-18.)

Plaintiff's reliance on CWs 1 and 2 "reviewing" or "preparing" presentations for Hurd (Opp. 19-20) fails because "[t]he CWs lack personal knowledge as to whether Catz or Hurd read or heard of the internal information and presentations—and therefore cannot be relied upon to establish scienter." (Order at 30:21-31:5.) Plaintiff attacks the Order, quipping that the CWs

cannot be expected to "look over Hurd's shoulder while he read the reports." (Opp. at 21:4-8.) True, but the CWs need personal knowledge of Defendants' state of mind, which is still lacking.

Plaintiff's assertion that the "pervasive use of engineered deals to generate material cloud revenue was common knowledge among Oracle's most senior executives" does not remedy the defects identified in the Order. The Court rejected substantively identical allegations in the CAC, including (i) CW1's allegations that Hurd's direct report received "weekly slides" outlining "audit-driven cloud deals" and was aware that "compliance deals" accounted for 75%-86% of CW1's team's class period sales (Order at 3-4); and (ii) CW2's allegations that Hurd's direct reports received presentations that "showed [that] 90-95% of the Company's cloud deals were not driven by customer need." (Order at 30:19-20.)

The Opposition offers nothing new. The Court should, therefore, again reject Plaintiff's argument that "widespread" use of "engineered deals" "independently support[s] scienter." (Opp. 21-22.) Plaintiff still fails to show that "*each Individual Defendant* knew that a material portion of the Company's Cloud revenue was tied to those practices – enough to make the nondisclosure of those practices a material omission." (Order at 36.) That is fatal again.

### 2. The new CW allegations do not give rise to any scienter inference.

Defendants showed that the allegations attributed to CWs 10 and 11 are vague, conclusory, speculative and, in many instances, unreliable hearsay. (MTD 18-19.)

While implicitly conceding that the new CWs did not have contact with most Defendants—including Hurd, Catz, and Ellison—Plaintiff again argues that "there is no requirement that a CW have direct contact with a named defendant." (Opp. 20, citing *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Zuora*, 2020 WL 2042244, at *10.) The Court already rejected that argument, finding that "merely speculative awareness of Individual Defendants' knowledge is not enough" under Ninth Circuit law. (Order at 30-31; *see also Zucco*, 552 F.3d at 995-96; *Intuitive*, 759 F.3d at 1063.) Nothing has changed.

Plaintiff also argues that CW10's allegations regarding his interactions with Kurian are "sufficiently particular." (Opp. 18:23-27.) Plaintiff's argument that even CW allegations

"somewhat lacking in detail" are sufficient flouts Ninth Circuit law.  (Opp. 18-19, citing *Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116 (D. Ariz. 2007).)  The Ninth Circuit's recent decision in *Nguyen v. Endologix, Inc.* is instructive.  There, the plaintiff alleged that the defendants misled investors about the safety and efficacy of its medical device product.  The plaintiff cited CWs who alleged a "stream of complaints and incident reports" that indicated that "migration" of the device within patients was a "serious problem" and that the individual defendants received "thousands of pages of paper" detailing the issues.  962 F.3d at 409-10.  The Ninth Circuit found that the CW allegations were "high on alarming adjectives—'serious and unsolvable,' 'dangerous,' 'urgent,' and so on.  But they are short on the facts about [] migration that would establish a strong inference that defendants' later statements . . . were intentionally false or made with deliberate recklessness." *Id.* at 416-17.  The allegations were insufficient because "[n]owhere does CW1 identify, for example, the number of European patients that experienced device migration, how much Nellix was migrating in these patients, whether the alleged device migration led to any further medical issues, whether the patients had particular conditions that exacerbated the migration, and whether the patients were within or outside either the original or revised" indications for use.  *Id.*

        CW10's allegations have similar defects.  The SAC does not contain particularized allegations showing which Oracle products were affected by CW10's "running list of tens of thousands of bugs," when these "widespread failures" occurred, the extent to which they continued during the class period, which customers "were not able to use or deploy" Oracle's products because of the alleged defects, what "bad experiences" customers had, or how any of these issues, in fact, rendered Oracle's full suite of Cloud products "untenable" and "non-competitive."  Plaintiff's reliance on general descriptions of "reports in which defects were memorialized" and conclusory statements that problems were "endemic" to "all Cloud products" (Opp. 18) fails under *Nguyen*, 962 F.3d at 416-17, and *Zucco*.  (MTD 18-19.)

        Plaintiff also argues that CW11's allegations establish that Catz "expanded Oracle's auditing tactic" before the class period (Opp. 20) and that one of Hurd's reports "directed the use of the ABC tactic" (Opp. 21).  Plaintiff, however, does not dispute that CW11 never spoke with

Catz or Hurd about audits or anything else. CW11 provides no factual basis for his statement that Oracle's auditing practices were driven by Catz or that Hurd was involved in "direct[ing] the use of the ABC tactic." It is undisputed that the SAC fails to identify even the country in which CW11 worked. (MTD 18.) This Court already rejected similar vague allegations from CWs who "did not have any direct contact with Hurd or Catz." (Order at 30-31.) It should do so again.

Plaintiff also fails to show that the allegations attributable to CWs 10 and 11 are themselves indicative of scienter. (MTD 19-20.) The CW allegations lack particularity as to time and are untethered to any challenged statement. (*Id.*) Plaintiff ignores these arguments.

### B. The October 2017 Email Does Not Support Any Scienter Inference.

Plaintiff also fails to tie the October 2017 email to any Defendant's state of mind at the time of any challenged statement, much less explain how it shows scienter for **all** Defendants and **all** challenged statements. *See Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) ("[T]he complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."). Plaintiff's contention that Kurian's email "support[s] an inference that [Hurd, Catz, and Ellison] were apprised of the significant global deficiencies [CW10] repeatedly discussed with Kurian and Miranda" is simply incorrect. CW10's allegations do not show "significant global deficiencies," and there is no discussion of "global deficiencies" in the email thread. The email reflects Kurian's desire to improve the HCM interface—that is not inconsistent with any challenged statement. (MTD 20-21.)

Moreover, Plaintiff does not dispute that Kurian and Miranda—the only Defendants on the October 2017 email chain—did not make **any** challenged statements after the email. It thus is not "contemporaneous" with their challenged statements and provides no basis for inferring scienter under *Ronconi*, 253 F.3d at 432. Plaintiff does not dispute that the challenged statements made by the other Defendants after the email are unrelated to any issues that the email discusses. Plaintiff argues that the email supports a finding of scienter "even back in July [2017]," but does not connect the issues discussed by Kurian with any challenged statement in July or after. (Opp. 16:2-3.) Indeed, Kurian did not make any challenged statement after *May 2017*. (Stmt. 13.)

Without explanation, Plaintiff argues that Defendants' argument "ignores" the text of the email and "Defendants' statements." (Opp. 17.) Plaintiff's argument is unsupported by even the out-of-context snippets of the only two challenged statements Plaintiff cites. (*See supra* § I.B.2.) Additionally, as discussed above, that revenue from HCM continued to grow refutes Plaintiff's conclusory argument that HCM was "untenable" and "not competitive." (Ex. 9 at 6; Ex. 10 at 6.)

### C. The Stock Sale Allegations Do Not Support Any Scienter Inference.

The Opposition (Opp. 23) continues to rely on unchanged allegations about Kurian's stock sales that this Court rejected in the Order. (MTD 21; Order at 34-35.) Plaintiff argues that "Hurd and Catz sold more than $65 million and $250 million in Oracle stock during the Class Period." (Opp. 24.) Yet Plaintiff ignores that Hurd and Catz sold stock pursuant to 10b5-1 plans and consistent with their pre-class period trades. (MTD 21-22.) No stock sales were suspicious.

### D. The Compensation Allegations Do Not Support Any Scienter Inference.

Plaintiff's conclusory arguments about compensation are defective, too. Plaintiff does not even attempt to compare the class period compensation with prior compensation programs, as required by cases that Plaintiff ignores. (MTD 22-23.) Plaintiff argues that Defendants "exaggerate the long-term nature of the plan," but the SAC alleges the plan was based on the attainment of market capitalization, revenue, and margin goals over a "five-year performance period." (¶¶ 310-311.) The plan did not, therefore, incentivize Defendants to "maintain the appearance of growth" in the short term; it incentivized them to ***actually grow the Cloud business***. Defendants succeeded in doing so. (MTD 22-23.)

### E. The Court Has Already Rejected Plaintiff's Remaining Allegations.

The Opposition repeats many of the same scienter arguments considered—and rejected—by the Court, including that scienter can be inferred from (1) the "core operations" inference; (2) letters from Clear Licensing Counsel addressed to the Oracle Board and "ongoing governmental investigations, and media reports"; and (3) Oracle's change in reporting methodology at the end of the class period. (Opp. 22-23.) The Opposition cites nothing new; rather, it repeats with little substantive modification the rejected arguments Plaintiff previously made. (*Compare* Opp. 22-23 *with* ECF No. 48 at 19:22-20:16, 21:22-22:16.) All of these arguments fail again.

**F.     Plaintiff Does Not Even Try To Show Defendants Had Actual Knowledge That Their Forward-Looking Statements Were False When Made.**

Plaintiff makes no effort to show that any Defendant had actual knowledge that any forward-looking statement was false or misleading when made. This independently forecloses Plaintiff's challenge to Defendants' forward-looking statements. (MTD 23.)

**G.     Holistically Considered, Plaintiff's Fraud Theory Is Not Cogent.**

Plaintiff still lacks a cogent fraud theory. Plaintiff cannot explain why Oracle accurately forecasted slowing growth to investors at the same time that Plaintiff contends Defendants were attempting to conceal it. Plaintiff's theory "depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" when the scheme collapsed. *Nguyen*, 962 F.3d at 415. As *Nguyen* held, "the theory might have more legs" if "defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium." *Id.* As in *Nguyen*, however, Plaintiff alleges no such thing here. The SAC does not allege suspicious or coordinated trading by Defendants. Meanwhile, Ellison—who alone owned around $50 billion worth of Oracle shares during the class period—did not sell any stock. Plaintiff also cannot explain why Oracle would knowingly repurchase its stock at artificially inflated prices. Instead, Plaintiff argues that considering "the buybacks violates the limits on judicial notice." (Opp. 25.) Plaintiff, however, ignores that Oracle's repurchase program is described in the very documents that the SAC incorporates by reference. (MTD 24 and n.4.) Plaintiff also cannot explain why Oracle's Cloud revenue grew *for years* before the class period and continued to grow during and after the class period despite Oracle allegedly selling a product that was "not functional." None of it makes any sense.

**III.   PLAINTIFF ALSO FAILS TO STATE CLAIMS UNDER §§ 20(a) AND 20A.**

Plaintiff fails to meaningfully address Defendants' arguments on the §§ 20(a) and 20A claims. These claims fail for the reasons stated in Defendants' Motion. (MTD 25.)

**CONCLUSION**

Defendants respectfully request that the Court grant the Motion to Dismiss with prejudice.

| | | |
|---|---|---|
| 1 | Dated: July 30, 2020 | MORRISON & FOERSTER LLP |
| 2 | | By: */s/ Jordan Eth* |
| 3 | | Attorneys for Defendants |