IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, | ) | CV-18-4844-BLF |
| | ) | SAN JOSE, CALIFORNIA |
| PLAINTIFF, | ) | |
| | ) | SEPTEMBER 24, 2020 |
| VS. | ) | |
| | ) | PAGES 1-32 |
| ORACLE CORPORATION ET AL, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFF: `
BY: JOHN J. RIZIO-HAMILTON
BERNSTEIN LITOWITZ BERGER AND GROSSMANN LLP
1251 AVENUE OF THE AMERICAS
44TH FL.
NEW YORK, NY 10020

FOR THE DEFENDANT:
BY: JORDAN ETH
MORRISON & FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO, CA 94105

OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SAN JOSE, CALIFORNIA SEPTEMBER 24, 2020

P R O C E E D I N G S

(COURT CONVENED AT 10:30 A.M.)

THE CLERK: WE ARE GOING TO BE MOVING ON TO THE CITY OF SUNRISE VERSUS ORACLE CASE NEXT.

COUNSEL, WOULD YOU PLEASE RAISE YOUR HANDS.

THE COURT: OKAY. WELCOME. AND I'M SORRY THAT YOU HAD TO WAIT SO LONG. I CAN SAY THAT I CAN MOVE THINGS ALONG MORE QUICKLY IN MY COURTROOM THAN I CAN ON ZOOM, SO THANK YOU FOR WAITING.

LET'S CALL THE CASE AND GET YOUR APPEARANCES, THEN WE WILL JUMP RIGHT INTO THE ARGUMENT.

THE CLERK: CALLING CASE 18-4844. CITY OF SUNRISE VERSUS ORACLE.

COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES. AND IF WE COULD BEGIN WITH PLAINTIFF AND THEN DEFENDANT.

THANK YOU.

MR. RIZIO-HAMILTON: THANK YOU VERY MUCH.

GOOD MORNING, YOUR HONOR. MY NAME IS JOHN RIZIO-HAMILTON, BERNSTEIN LITOWITZ BERGER AND GROSSMANN, FOR THE LEAD PLAINTIFF.

THE COURT: GOOD MORNING.

MR. RIZIO-HAMILTON: GOOD MORNING.

MR. ETH: GOOD MORNING, YOUR HONOR.

JORDAN ETH FOR THE DEFENDANTS. AND WITH ME IN THE GALLERY

TODAY, BUT NOT ON THIS SCREEN, FROM ORACLE, ARE DEBORAH MILLER, SENIOR VICE PRESIDENT, ASSOCIATE GENERAL COUNSEL, AND JAMES MAROULIS, SENIOR MANAGING COUNSEL.

THE COURT: GOOD MORNING, AND WELCOME TO THE ORACLE REPRESENTATIVES. I GREATLY APPRECIATE YOU TAKING THE INTEREST IN LISTENING IN OR WATCHING THESE PROCEEDINGS, I THINK THAT'S IMPORTANT AND I APPRECIATE THAT.

ALL RIGHT. WELL, THIS IS OUR SECOND GO-AROUND. TYPICALLY THIS WOULD BE THE FINAL DISCUSSION AT THE MOTION TO DISMISS LEVEL, AND EITHER THE CASE MOVES FORWARD OR IT MOVES UP TO THE NINTH CIRCUIT, SO THAT'S REALLY WHAT WE WILL BE TALKING ABOUT HERE. YOU ALL KNOW THAT WELL.

MR. RIZIO-HAMILTON, I CERTAINLY AGREE THAT YOU HAVE APPARENTLY PUT A LOT OF WORK INTO REVISING THE PLEADING, AND I APPRECIATE THAT.

I WILL SAY THAT I -- THERE ARE SOME THINGS THAT I THINK YOU PROBABLY HAVE ADDRESSED SATISFACTORILY. FOR EXAMPLE, I THINK THAT YOUR EVIDENCE -- NOT EVIDENCE, BUT YOUR ALLEGATIONS AND YOUR CONFIDENTIAL WITNESSES DO SUPPORT A REASONABLE INFERENCE THAT UPWARDS TO 90 PERCENT OF CLOUD SALES WERE ENGINEERED SALES.

THE DEFICIENCY, THOUGH, IS WHERE THE PROBLEM IS HERE. I DON'T KNOW WHAT PERCENT OF ENGINEERED SALES ARE DISCOUNTS, WHICH I'M NOT CONCERNED ABOUT, EVEN THOUGH YOU TRY TO CLAIM THAT THOSE ARE FAKE, I'M NOT BUYING THAT, OR WHETHER THEY WERE

BASED ON THIS ABC SCHEME OF ESSENTIALLY COERCING EXISTING CUSTOMERS TO PURCHASE ONE-YEAR CLOUD SALES.

SO THAT'S THE PROBLEM. AND I THOUGHT THAT MR. ETH'S ARGUMENT, AND IT GOES INTO THE GAAP, AND THAT'S G-A-A-P, ARGUMENT IS ALSO IMPORTING BECAUSE I HAVE NO CONFIDENTIAL WITNESSES WHO HAVE ANY FIRSTHAND KNOWLEDGE OR ANY REMOTE KNOWLEDGE OF THE MANNER IN WHICH ORACLE WAS ACCOUNTING FOR THIS REVENUE. THE FACT THAT THEY EVEN IF I TAKE THAT THERE WERE A LOT OF ABC SALES, I DON'T KNOW HOW THOSE WERE COUNTED. AND SO I THINK THAT'S REALLY A VERY -- THAT'S A PROBLEM WITH WHETHER THESE STATEMENTS, THEMSELVES, ARE MISLEADING.

HOWEVER, I THINK WHAT I'M MOST CONCERNED ABOUT HERE IS THAT I DON'T THINK YOU HAVE SURMOUNTED THE BARRIER OF SCIENTER. IT IS THE HARDEST THING TO DO, AND I THINK MR. ETH WAS CORRECT IN HIS BRIEFING THAT YOU HAVE FAILED TO CONNECT ANY OF THE ALLEGATIONS OF KNOWLEDGE OF THE FALSITY. AND HERE, YOU ALLEGE IT TO BE EXTREME RECKLESSNESS TO THE STATEMENTS MADE AND THE SPEAKER MAKING THE STATEMENT.

I THOUGHT THAT THE NINTH CIRCUIT'S NEWEST CASE, THE NGUYEN CASE WAS INSTRUCTIVE. IT'S A MEDICAL CASE, AND THOSE HAVE A SPECIAL -- OR A MEDICAL DEVICE CASE -- AND I KNOW THAT'S A LITTLE BIT OF A DIFFERENT EMPHASIS THERE, BUT I THOUGHT THE NINTH CIRCUIT HAD SOME REALLY IMPORTANT DISCUSSION, AS POINTED OUT IN THE BRIEFING BY MR. ETH, ABOUT WHAT YOU HAVE TO ALLEGE ABOUT PRODUCT DEFECT TO SHOW THAT THE DEFENDANT ACTUALLY HAD

KNOWLEDGE, SUFFICIENT TO MAKE THEIR STATEMENTS FALSE.

BUT YOU ARE NOT LINING THEM UP. AND SO THAT'S A PROBLEM FOR ME. I DON'T ACTUALLY SEE THIS AS A NEW THEORY OF A PRODUCT DEFECT CASE, ALTHOUGH CERTAINLY IF THERE WERE STATEMENTS TOUTING A PARTICULAR CAPABILITY OF A PRODUCT THAT WAS IN FACT FALSE, THAT WOULD BE A CONCERN. BUT I DON'T ACTUALLY SEE THAT HERE, TO SAY THAT WE ARE BEST IN CLASS. I DON'T KNOW HOW BAD EVERYBODY ELSE'S PRODUCTS WERE. AND SO IT'S COMPARATIVE, THAT'S WHY IT'S PUFFING, WE ARE THE BEST, EVEN THOUGH BACK AT THE SHOP I'M YELLING AT EVERYBODY TO MAKE US BETTER. I DON'T THINK THAT'S REALLY ENOUGH.

SO I'M REALLY CONCERNED THAT, AT THIS POINT, I HAVE SOME PROBLEMS WITH THE OVERALL THEORY ON ENGINEERED SALES, BUT I'M MOST CONCERNED WITH THE FAILURE ON SCIENTER.

SO WITH THAT, MR. ETH, THIS IS YOUR MOTION, I'M GOING TO LET YOU GET STARTED. I'M TIGHT ON TIME, SO I'M GOING TO GIVE EACH OF YOU 15 MINUTES TO GIVE ME YOUR BEST ARGUMENT ON IT. YOUR BRIEFING WAS REALLY QUITE WELL DONE, AND I APPRECIATE THAT.

MR. ETH: THANK YOU VERY MUCH, YOUR HONOR.

AND I WOULD LIKE TO RESERVE A FEW MINUTES IN CASE THERE ARE QUESTIONS AFTER MR. RIZIO-HAMILTON GOES.

THE COURT: SURE.

MR. ETH: SO THE COURT'S ORDER NINE MONTHS AGO WAS VERY CLEAR ABOUT WHAT'S REQUIRED, WHO, WHEN, HOW MUCH, NAMES,

DATES, FACTS, FIGURES, AND ON TOP OF THAT, LINKING, AS THE COURT JUST SAID, LINKING THOSE PARTICULARS TO SPECIFIC STATEMENTS AND INDIVIDUAL DEFENDANTS.

AND THAT'S NOT WHAT WE HAVE HERE. WHAT WE HAVE IS INFORMATION ABOUT PRE-CLASS PERIOD, NOW INFORMATION ABOUT POST-CLASS PERIOD, SHOWING THE GROWTH CONTINUED. WE HAVE ADJECTIVES, MAJORATIVES, EXAGGERATIONS, AND WE STILL HAVE THIS KIND OF JUMBLE OF A BUNCH OF STATEMENTS, A BUNCH OF FACTS.

AND THE FUNDAMENTALS REMAIN THE SAME. THEY HAVEN'T CHANGED AT ALL. NO FALSE FINANCIALS, REVENUE ACCURATE AT ALL TIMES. PLAINTIFF STILL SAYS FAKE, BUT WE DON'T EVEN KNOW IF IT'S A DOLLAR THAT WAS FAKE, OR A HUNDRED DOLLARS, OR A BILLION, OR A THOUSAND. AND THIS IS AFTER PLAINTIFFS CONSULTED AN ACCOUNTING EXPERT.

IT'S ACTUALLY QUITE INTERESTING THAT THEY WOULD CONSULT AN ACCOUNTING EXPERT WHO DIDN'T SAY, YOU KNOW, I READ THROUGH THE WHOLE COMPLAINT AND IT ADDS UP TO THIS NUMBER. NO MISGUIDANCE. ORACLE ACTUALLY PROJECTED ITS GROWTH RATE, ITS DECELERATING RATE, AND IT GREW QUARTER AFTER QUARTER, NO RESTATEMENT.

SO TALKING A LITTLE BIT ABOUT THE FAKE SALES PROBLEM, I WILL QUICKLY WALK THROUGH FIVE DIFFERENT CATEGORIES OF PROBLEMS, EACH IS FATAL.

NUMBER ONE, AND THE COURT MENTIONED THIS, IS REVENUE RECOGNITION. THIS IS ABOUT REVENUE. PLAINTIFFS SAY THAT. THEIR NEW PARAGRAPH 20 SAYS, IN ESSENCE, ORACLE WAS

CATEGORIZING REVENUE RELATED TO ON-PREMISES AUDIT AND ON-PREMISES LICENSES TO ITS CLOUD. THERE'S NO WITNESS, NO DOCUMENT, NO DISCUSSION ABOUT ACCOUNTING. AND JUDGE WILKENS'S DECISION IN BRODSKY IS EXACTLY ON POINT, THERE'S ACTUALLY A STRONGER PLAINTIFF CASE BECAUSE IN THAT CASE WHICH INVOLVED YAHOO, YAHOO WAS ACCUSED OF CLICK FRAUD, CHANGING THE FILTERS. THE COURT IS FAMILIAR WITH THE CASE.

THERE WAS ACTUALLY AN EXPERT IN THAT CASE, PLAINTIFF'S EXPERT, WHO SAID WELL, THAT ADDS UP TO 680 MILLIONS DOLLARS IN REVENUE. AND THE COURT SAID LOOK, YOU'VE GOT SALES PEOPLE, CREDIT ANALYSTS, ENGINEERS, WHERE'S THE ACCOUNTING PEOPLE, WHERE'S THE DISCUSSION OF THE ACCOUNTING PROCESS.

FOR THESE THINGS TO CARRY ANY WEIGHT, YOU HAVE TO TALK ABOUT THAT. AND HERE, WE HAVE 11 CW'S, NONE IN ACCOUNTING. NONE TALK ABOUT ACCOUNTING, NONE TALK ABOUT ACCOUNTING PERSONNEL, NONE TALK ABOUT THE PRINCIPAL ACCOUNTING OFFICER, OR THE CONTROLLER, OR THE PROCESS, OR AUDITORS, OR ANY OF THAT, OR EVEN THE EXPERT.

AND WE KNOW, AND THE COURT KNOWS, HOW TO PLEAD AN ACCOUNTING CASE, AND THEY DON'T COME CLOSE.

SECOND IS TIMING, WHICH THE COURT POINTED OUT LAST TIME. WE HAVE -- THE COURT SAID IT WAS CRUCIAL, OF COURSE IT'S CRUCIAL.

PLAINTIFFS SAID WELL, YOU KNOW WHAT, WE CAME UP WITH SOME SPECIFIC TRANSACTIONS. AND THEY REPEAT THESE TRANSACTIONS IN

PARAGRAPH 111, 124, A BUNCH OF PLACES IN THEIR BRIEF.

THESE TRANSACTIONS OCCURRED BY ALLEGATION, SOME TIME BETWEEN JUNE 2016 AND MAY 2017. THE CLASS PERIOD BEGINS MARCH 2017. SO THE FEW TRANSACTIONS THEY COME UP WITH BY NAME INVOLVING COMPANIES NAMED ORIYA, SAMBA AND NATIONAL WATER, THOSE PARAGRAPHS I MENTIONED, THE FEW TRANSACTIONS BY NAME, THEY DON'T EVEN PLEAD THEY WERE IN THE CLASS PERIOD.

AND OF COURSE THERE ARE OTHER CW'S, AS THE COURT POINTED OUT LAST TIME, CW3, CW4, WHO WEREN'T THERE DURING THE CLASS PERIOD. AND THEN THEY MENTION FIELDS OUTSIDE THE CLASS PERIOD AND SO ON.

ANOTHER BASIS IS JUST A GENERALITY OF A LOT OF THE PLEADING. DURING THE CLASS PERIOD AND SO ON.

AND THEN SOMETHING ELSE THE COURT POINTED OUT LAST TIME IS HOW DO WE GO FROM REGIONAL MANAGER TO COUNTRYWIDE -- EXCUSE ME, COMPANY WIDE, COMPANY WIDE. AND THERE'S NO CURE FOR THAT. WE STILL HAVE SOMEONE FROM THE MIDDLE EAST, SOMEONE FROM THE CZECH REPUBLIC. WE HAVE SOMEONE NOW WHO IS A REGIONAL VP, WE DON'T EVEN KNOW WHAT CONTINENT.

AND THEN THERE WAS A PROBLEM THE COURT POINTED OUT LAST TIME WITH CW2. THE COMPLAINT SAID THAT A CERTAIN PERCENTAGE OF HIS TEAM'S DEALS WERE OF ENGINEERED DEALS. THE COURT SAID WELL, HIS TEAM, HOW DO WE KNOW WHAT THAT IS?

SO THE AMENDED COMPLAINT DOES WHAT? IT CROSSES OUT HIS TEAM AND PUTS IN THE WORD "COMPANY-WIDE." I MEAN, THEY CAN

EDIT WHATEVER THEY WANT, BUT THEY CAN'T EDIT THE GUY'S POSITION. AND THE GUY'S POSITION IS STILL A REGIONAL VP, SO THAT DOESN'T CUT IT.

AND THEN OF COURSE THERE'S ENGINEERED DEALS, AS THE COURT JUST MENTIONED. WE KEEP HEARING ENGINEERED DEALS, ENGINEERED DEALS, ENGINEERED DEALS. WELL, PARAGRAPH 17 AND 18 SAYS IT INCLUDES DISCOUNTS. AND IF WE GET TO THE POINT WHERE DISCOUNTS ARE A PROBLEM, WELL, FORGET IT FOR EVERY COMPANY.

THE PLAINTIFFS ACTUALLY MAKE AN ARGUMENT, THEY SAY WELL, THESE AREN'T STANDARD DISCOUNTS, THEY ARE A DIFFERENT KIND OF DISCOUNTS.

I DON'T REALLY KNOW WHAT THAT MEANS. I THINK WHAT THEY MEAN IS MAYBE BUNDLING DOESN'T COUNT. WELL, I DON'T THINK THAT'S TRUE. IT'S THE MOST COMMON WAY TO GIVE DISCOUNTS. IF I ACCEPT A GOLF CHANNEL ON CABLE TV, IT'S CHEAPER THAN IF I DON'T. I MEAN, IT'S PRETTY COMMON.

SO THOSE ARE REASONS WHY ALL OF THAT FAILS, MULTIPLE REASONS, AND THEY NOW ADD "INDUSTRY PARTICIPANTS." IN OTHER WORDS, PLAINTIFF'S COUNSEL TALKED TO CERTAIN CONSULTANTS WHO TOLD COUNSEL ABOUT WHAT SOME CUSTOMERS "REALLY WANTED." SO MULTIPLE LAYERS OF HEARSAY AND SPECULATION FROM WHAT PEOPLE REALLY, REALLY WANTED.

AND THEY DON'T IDENTIFY ONE SPECIFIC TRANSACTION DURING THE CLASS PERIOD. AND THEY HAVE NO BASIS, AGAIN, FOR REVENUE. IT'S LIKE WELL, THE INVOICE WAS FOR THIS AND THE PERCENTAGE OF

MY BUSINESS WAS THAT, AND SO ON.

AND THE COURT WONDERED LAST TIME, WELL WHY COULDN'T YOU FIND A CUSTOMER? THERE ARE ONLY 400,000 OF THEM. STILL DON'T SHOW UP, STILL DON'T SHOW UP.

IN TERMS OF THE ISSUES ABOUT PRODUCTS, AS THE COURT SAID LAST TIME, YOU KNOW, VAGUE STATEMENTS ABOUT VERY, VERY GOOD AND REALLY, REALLY SUPER, AND ALL OF THAT, AND VANTIVE IS RIGHT ON POINT. PLAINTIFFS SAY IT WAS ABROGATED. I DON'T THINK JUDGE BREYER, WHO APPLIED IT A FEW MONTHS AGO, THOUGHT IT WAS ABROGATED. AND THERE'S THE NGUYEN V. ENDOLOGIX CASE, WHICH AS THE COURT POINTS OUT, IT'S A DIFFERENT CONTEXT, BUT I THINK IT'S APPLICABLE HERE.

THE CASES THE PLAINTIFFS POINT TO IN TERMS OF STATEMENTS, YEAH, IF WE SAID THE GOPRO DRONE CAN FLY FOR 18 MINUTES AND IT DOESN'T, WELL THAT'S SOMETHING SPECIFIC. AND HERE, IT'S NOT SPECIFIC AND THEY HAVEN'T IDENTIFIED WITH SPECIFICITY, ANYTHING TO UNDERMINE IT ANYWAY.

THEN I WILL TURN TO SCIENTER, BECAUSE AS THE COURT POINTED OUT LAST TIME AND THIS TIME, THAT'S -- WE THINK THIS FAILS ON FALSITY. BUT SCIENTER IS OBVIOUSLY WHERE A LOT OF THESE CASES, WHERE THE RUBBER MEETS THE ROAD.

WE THINK THAT THE CLAIM IS EVEN WEAKER ON SCIENTER AND THEY HAVE DONE EVEN LESS TO MEET THE REQUIREMENTS. THE INDEPENDENT GROUND HAS TO BE INDIVIDUAL BY INDIVIDUAL, OF COURSE.

AND I WILL START WITH MOTIVE. FOR KURIAN STOCK SALES, THE COURT RULED ON IT LAST TIME, HE DIDN'T GO BACK AND RETROACTIVELY CHANGE HIS SALES, SO IT WASN'T ENOUGH LAST TIME, IT'S NOT ENOUGH NOW. PLAINTIFFS DIDN'T INCLUDE HURD AND CATZ'S SALES LAST TIME. THE REASON THEY WEREN'T INCLUDED LAST TIME, 8 PERCENT FOR HURD, 15 PERCENT FOR CATZ, BOTH HAD 10B5-1 CLAIMS. THERE WERE NO SALES BY ANYBODY ELSE, SO LARRY ELLISON AND OTHERS COMBINED, HELD $50 BILLION WORTH OF STOCK FOR THAT.

AND THEN WE'VE GOT AN ALLEGATION OF COMPENSATION THAT, YOU KNOW, I GUESS WE SHOULD BE SHOCKED THAT PEOPLE -- THAT THE EXECUTIVES ARE COMPENSATED TO REPORT GOOD RESULTS, AND THAT IS THEIR JOB AFTER ALL. SO THERE'S NOTHING SUSPICIOUS, AND THERE ARE MULTIPLE NINTH CIRCUIT CASES ABOUT THAT, ZUCCO AND SO ON.

DO THEY LINE UP THE SPEAKERS AND STATEMENTS? THE COURT WAS PRETTY CLEAR. GIVE ME A CHART, NUMBERED STATEMENTS, WHAT LINES UP. WHAT THEY GAVE THE COURT AND US INSTEAD WAS 58 PAGES THAT BASICALLY SAY, READ THE COMPLAINT, YOU FIGURE IT OUT.

THAT'S NOT -- IT ACTUALLY -- WHAT IT SHOWS IS IT'S JUST A WHOLE BIG MESS, AND THAT'S WHAT IT'S ABOUT. SO THERE'S NO LINKING ON THEM.

THIRD POINT WHICH I MENTIONED BEFORE IS THE ACCOUNTING. WHICH ONE OF THESE WITNESSES KNEW THAT THERE WAS SOME PROBLEM WITH ACCOUNTING AND THE REVENUE WAS MATERIAL LAYOFF? THEY DON'T EVEN TRY TO TALK ABOUT IT. THEY THROW IN THIS EXPERT WHO SAYS, YOU KNOW, IF THE PLAINTIFFS ARE RIGHT AND IT'S MATERIAL,

THAT WOULD BE A PROBLEM. WELL, OBVIOUSLY THAT'S CONCLUSORY. AND PAYPAL AND OTHER CASES WE CITED ADDRESS THAT.

AND THEN IN TERMS OF THE FEW NEW ALLEGATIONS THEY HAVE FROM CW'S, CW1 SAID THE ABC TECH WAS DEVELOPED BY MARK HURD. WELL, HOW DOES HE KNOW THAT, FOUR LEVELS REMOVED, AND WHAT DOES THAT EVEN MEAN THAT IT WAS DEVELOPED?

WE HAVE CW1 ALSO SAY OTHERS IN THE COMPANY DISCUSSED HOW TO SHARE THE OLD REVENUE, THOSE WOULD BE REVIEWED BY YET SOMEONE ELSE, AND THEN ULTIMATELY THAT WOULD BE DISCUSSED WITH SAFRA CATZ.

OKAY, MAYBE, MAYBE, BUT WHAT DOES THAT EVEN MEAN, WHAT DOES THAT ADD UP TO?

WE TALKED ABOUT THE TIMING PROBLEM WITH CW3. WE TALKED ABOUT THE DEALS THAT HURD APPROVED, WHICH THEY DON'T EVEN PLEAD WERE IN THE CLASS PERIOD. WE HAVE CW2 SAYING THAT HURD'S DIRECT REPORTS HAD "ABSOLUTE AWARENESS" OF THE POOR HEALTH OF THE CLOUD BUSINESS. I DON'T KNOW WHAT THAT MEANS. AND I DON'T KNOW WHY HIS DIRECT REPORTS, WELL, THAT MEANS HE HAD ABSOLUTE AWARENESS, AND EVEN THAT, I DON'T KNOW WHAT THAT ADDS UP TO.

SO WHEN YOU LOOK AT THIS HOLISTICALLY, AND I'M TRYING TO BE MINDFUL OF THE TIME HERE, YOUR HONOR, WHEN YOU LOOK AT THIS HOLISTICALLY, WHAT WE ARE LEFT WITH TWO YEARS IN, TWO YEARS IN IS A CASE THAT DOESN'T MAKE SENSE AND HAS NEVER MADE SENSE BECAUSE THE CLAIM IS THAT ORACLE KNOWINGLY ABUSED AND/OR BRIBED, EITHER EXTORTED OR BRIBED, SOPHISTICATED BUSINESSES AND

GOVERNMENTS, HUNDREDS OF THOUSANDS OF THEM, AND THEY DID THIS FOR YEARS, AND THEY DID THAT TO GET THEM TO ACCEPT PRODUCTS THAT ORACLE KNEW DIDN'T WORK. THAT'S THE CLAIM.

AND THEN FOR SOME UNKNOWN REASON, ALL THE SUDDEN BECAME MORE DIFFICULT TO ABUSE THEM AND MORE DIFFICULT TO BRIBE THEM. I GUESS THEY WEREN'T ACCEPTING DISCOUNTS ANYMORE. AND THAT HAPPENED TO TENS OF THOUSANDS OF CUSTOMERS.

MEANWHILE, ORACLE ACCURATELY RECORDED AND PROJECTED BILLIONS OF DOLLARS IN REVENUE AND GREW THROUGHOUT THE CLASS PERIOD, AND NOW THANKS TO PLAINTIFF'S ALLEGATIONS, EVEN AFTER THE CLASS PERIOD.

SO I WOULD LIKE TO JUST CONCLUDE WITH THAT.

YOU KNOW, GOING BACK TO THE NGUYEN V. ENDOLOGIX CASE, AND THE CASE SAYS THERE'S NO BASIS IN LOGICAL COMMON EXPERIENCE. AND THAT APPLIES TO THIS CLAIM AS WELL, TWO YEARS IN, OUR NEXT STOP SHOULD BE 7TH AND MISSION.

SO, YOUR HONOR --

THE COURT: MANY OF MY CASES HAVE ENDED UP THERE, MR. ETH.

MR. ETH: I THINK YOU HAVE A GOOD TRACK RECORD, YOUR HONOR.

THE COURT: WELL, IN THE SECURITIES FIELD I DO.

ALL RIGHT. MR. RIZIO-HAMILTON, THIS WHOLE CASE BECOMES VERY DIFFICULT WHEN ORACLE ACCURATELY REPORTED ITS REVENUE AND ITS DECLINING GROWTH RATE FOR THE CLOUD SERVICES. AND FRANKLY,

ONE WOULD EXPECT WITH THE NEW TECHNOLOGY, THAT THERE ARE ONLY SO MANY CUSTOMERS, AND AT A CERTAIN POINT, THE GROWTH RATE CAN'T KEEP GOING AT THE SAME -- EVEN IF REVENUE IS INCREASING, YOU END UP -- THE LOW HANGING FRUIT GETS TAKEN FIRST, AND THAT'S WHY IT STARTS OUT SO HIGH, AND THEN IT GETS HARDER AND HARDER.

SO STARTING OFF ON UNDISPUTEDLY TRUTHFUL DISCLOSURES ABOUT REVENUE AND RATE, THIS BECOMES -- YOU ARE GOING DOWN A LEVEL INTO HOW THEY GOT THERE, THAT I'M NOT REALLY PERSUADED, AS A GENERAL THEORY, IS SUPPORTED.

BUT I THINK THIS CASE MAY ULTIMATELY REALLY BOTTOM OUT ON THE DEFICIENCY OF THE SCIENTER ALLEGATION.

SO I'M CERTAINLY INTERESTED IN HEARING YOUR ARGUMENT ON IT.

MR. RIZIO-HAMILTON: SURE, YOUR HONOR.

THANKS VERY MUCH. SO THE COMPLAINT CONTAINS SIGNIFICANT NEW FACTS THAT RELATE TO THE SCIENTER ANALYSIS.

FIRST, WE PLED NEW FACTS DEMONSTRATING THAT THE REVENUE GENERATED BY THESE ENGINEER DEALS WAS QUITE MATERIAL. IN FACT, IT WAS THE MAIN WAY THAT ORACLE GENERATED REVENUE IN ITS CLOUD SETTING.

WE HAVE ALLEGATIONS THAT ARE SUPPORTED WHICH DEMONSTRATE THAT 90 PERCENT, OR THEREABOUTS, OF COMPANY-WIDE CLOUD REVENUE WERE GENERATED THROUGH THESE ENGINEERED DEALS. THAT'S EXTREMELY SIGNIFICANT FOR SCIENTER PURPOSES BECAUSE WHAT IT

DEMONSTRATES IS THAT DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THE FACT THAT THE COMPANY'S ENTIRE CLOUD WAS BUSINESS WAS BASED ON THESE TACTICS. IT'S HARD TO SAY THAT A DEFENDANT WHO SPEAKS ON THE SUBJECT, DOESN'T KNOW THAT OR SHOULDN'T KNOW THAT, WHEN THE PERCENTAGE OF REVENUE BEING GENERATED BY THESE TACTICS IS THAT HIGH.

THE COURT: WELL, BUT THAT'S NOT THE PROBLEM.

AND YOU KNOW, I THINK YOU HAVE MADE SUFFICIENT ALLEGATIONS THAT YOUR CATEGORY OF ENGINEERED DEALS WAS REACHING UP TO 90 PERCENT, AS YOU SAY IN YOUR OPPOSITION. THE PROBLEM IS THAT THAT'S NOT ENOUGH, BECAUSE YOU DEFINE ENGINEERED DEALS AS BOTH DISCOUNTS AND THE COERCIVE TECHNIQUES. AND YOU DON'T TELL ME HOW MUCH OF IT IS THE COERCIVE TECHNIQUES, AND YOU DON'T TELL ME HOW THE COMPANY ACCOUNTED FOR IT.

IF THE COERCIVE DEALS WERE NOT ACCOUNTED FOR IN THESE NUMBERS, THEN IT'S NOT MATERIAL WHAT THEY ARE DOING TO GET THE SALES. I CAN'T -- I CAN'T DRAW THE LINE, FROM YOUR ALLEGATIONS, TO WHAT YOU NEED TO PUT FORTH.

MR. RIZIO-HAMILTON: SO I THINK THERE ARE A NUMBER OF FACTS IN THE COMPLAINT WHICH GIVE RISE TO A REASONABLE AND VERY FAIR INFERENCE OF THAT 90 TO 95 PERCENT, A HIGHLY MATERIAL PORTION OF IT WAS DRIVEN EXCLUSIVELY BY THE ABC TACTIC, WHICH WAS OF SOME CONCERN TO YOUR HONOR, EVEN SETTING ASIDE THE ATTACHED DEAL TACTICS.

SO LET'S START WITH THE BASICS HERE. IF WE TAKE AS THE

FIRST PROPOSITION THAT WE'VE ADEQUATELY ALLEGED 90 TO 95 PERCENT OF THE REVENUE WAS DRIVEN BY ENGINEERED DEALS, THE BROADER CATEGORY, AND WE KNOW THAT THE ABC TACTIC WAS A CENTERPIECE OF THE ENGINEERED DEAL STRATEGY, FROM THAT ALONE --

THE COURT: OKAY, LET'S STOP THERE.

SO WE KNOW, AND TELL ME WHAT ALLEGATIONS YOU HAVE THAT WE KNOW THIS.

MR. RIZIO-HAMILTON: OKAY.

SO FIRST OF ALL, FORMER EMPLOYEE 1 REPORTED THAT 80 PERCENT OF THE REVENUE FROM ORACLE'S MIDDLE EASTERN AND AFRICA REGION WAS PRODUCT-DRIVEN. THERE'S NO REASON TO THINK THAT THAT WASN'T THE REPRESENTATIVE SAMPLE. THAT'S PARAGRAPH 108.

FORMER EMPLOYEE 11, WHO WORKED IN NORTH AMERICA, REPORTED THAT 90 PERCENT OF ORACLE'S NORTH AMERICAN IAAS AND PAAS REVENUE, WHICH WAS 30 PERCENT OF OVERALL CLOUD REVENUE, WAS DRIVEN BY ENGINEERED DEALS, AND HE DESCRIBED THE USE OF ABC TACTIC AS "PERVASIVE."

MULTIPLE INDUSTRY PARTICIPANTS, WE ARE TALKING ABOUT THE CONSULTANTS WHO CONSULTED WITH HUNDREDS OF ORACLE CLIENTS THROUGHOUT THE CLASS PERIOD, VIRTUALLY ALL OF THEM, THERE'S APPROXIMATELY SEVEN IN THE COMPLAINT, SAID THAT VIRTUALLY ALL OF THEIR CUSTOMERS WERE SUBJECT TO THE ABC AUDIT TACTIC, AND THEY, THEMSELVES, SAID THAT IN THEIR EXPERIENCE, TWO OF THEM SAID THAT THERE WAS, COLLECTIVELY, ABOUT A HUNDRED MILLION

DOLLARS REVENUE DRIVEN THROUGH THOSE ABC PACKAGES DURING THE CLASS PERIOD. BUT THEY WERE ALL UNANIMOUS SAYING THAT THIS WAS UBIQUITOUS AMONG THEIR CLIENTS, VIRTUALLY ALL OF THEM.

IN ADDITION, FORMER EXECUTIVES REPORTED THAT ORACLE SIGNIFICANTLY INCREASED THE USE OF THE AUDIT TACTIC RIGHT BEFORE 2017. THAT IS A FEW MONTHS BEFORE THE START OF THE CLASS PERIOD, BECAUSE THE ATTACHED DEAL TACTIC WAS WANING IN EFFECTIVENESS. THAT'S PARAGRAPH 120, FOR EXAMPLE.

IN ADDITION, WE HAVE ALLEGATIONS THAT MR. RICH GERAFFO, WHO DIRECTLY REPORTED TO DEFENDANT HURD, PERSONALLY INSTRUCTED SALES EXECUTIVES TO USE THE ABC TACTIC ON SIGNIFICANT CUSTOMERS BY DOING WHAT HE CALLED "SEEDING THE DEAL." THAT'S PARAGRAPH 107.

ALSO IN THAT SAME PARAGRAPH, WE HAVE THE ALLEGATION THAT THE COMPANY CONDUCTED WHITE BOARD SESSIONS ON USING THE TACTIC, WHICH FURTHER DEMONSTRATES ITS WIDESPREAD NATURE.

NOW I AGREE WITH YOU, I CAN'T CONTEST THE FACT THAT WE DON'T PUT A SPECIFIC NUMBER ON HOW MUCH OF THE 90 TO 95 PERCENT WAS ABC DRIVEN. I RESPECTFULLY SUBMIT, YOUR HONOR, THAT ORACLE DIDN'T KEEP UP, NECESSARILY, A RUNNING SPREADSHEET BREAKING IT DOWN THAT WAY. I CERTAINLY WOULDN'T HAVE ACCESS TO IT AT THIS POINT IN TIME IF IT DID.

BUT WHAT WE HAVE PLED IS A NUMBER OF FACTS, THAT TAKEN TOGETHER AND CONSIDERED HOLISTICALLY, GIVE RISE TO AN INFERENCE THAT THE USE OF THE ABC TACTIC BY ITSELF, WAS MATERIAL TO THE

COMPANY'S CLOUD REVENUE GENERATION.

NOW, WITH THAT, I THINK YOUR HONOR WAS ALSO CONCERNED ABOUT THIS POINT RELATING TO REVENUE RECOGNITION. TWO POINTS HERE. IF 90 TO 95 PERCENT OF THE COMPANY'S CLOUD REVENUE WAS DRIVEN THROUGH ENGINEERED DEALS, IT IS IMPLAUSIBLE TO THINK THAT THE REVENUE RECOGNITION POLICY WOULD MAKE A DIFFERENCE HERE.

SUBSTANTIALLY, ALL THE REVENUE WAS DRIVEN THIS WAY, NO MATTER HOW IT'S RECOGNIZED, IS IRRELEVANT. SO I DON'T REALLY UNDERSTAND HOW ONE COULD DRAW THE INFERENCE THAT THE MANNER IN WHICH FIVE TO TEN PERCENT OF REVENUE WAS RECOGNIZED, SOLVES THE PROBLEM. IT DOESN'T, BECAUSE THAT PERCENTAGE IS TOO SMALL.

NOW, THOSE ARE SIGNIFICANT POINTS IN RESPONSE TO WHAT I THINK MR. ETH'S TWO MAIN POINTS ARE, AND I DO THINK THEY RELATE TO THE SCIENTER ANALYSIS.

I WOULD ADD THAT WITH RESPECT TO NGUYEN, VERY DIFFERENT CASE. YOUR HONOR RECOGNIZED IT'S A MEDICAL DEVICE CASE, AND THOSE ARE PARTICULARLY DIFFICULT BECAUSE IN THOSE CASES, REALLY THE STATEMENTS AT THE HEART OF THOSE CASES TURN ON A PREDICTION ABOUT WHETHER THE FDA IS GOING TO APPROVE THE DEVICE.

THE COURT: RIGHT.

MR. RIZIO-HAMILTON: AND PARTICULARLY IN A FIELD OF COMPLEX MEDICAL SCIENCE, WHICH IS, BY DEFINITION, EXPERIMENTAL AND UNKNOWN, THOSE ARE VERY, VERY TOUGH CASES, LET ME PUT IT THAT WAY.

AND THAT'S NOT THE KIND OF CASE THAT WE HAVE HERE. BUT BEYOND THAT, THERE ARE TWO POINTS RELATED TO NGUYEN THAT I THINK ARE MEANINGFUL AND DIFFERENTIATED.

FIRST IS THAT I WOULD NOTE IN NGUYEN, THE DEFENDANTS HAD PRODUCED A DECLARATION FROM THE CRITICAL CONFIDENTIAL WITNESS IN WHICH THE WITNESS DISAVOWED MANY OF THE ALLEGATIONS.

THE COURT: WELL, BUT MR. RIZIO-HAMILTON, THE NINTH CIRCUIT MADE IT CLEAR THAT BOTH THE DISTRICT COURT AND THE NINTH CIRCUIT DISREGARDED THAT DOCUMENT. SO IF YOU ARE SUGGESTING IT REMAINED IN THEIR MINDS, I CAN'T READ THAT INTO THE CLEAR STATEMENT, I THINK IT WAS JUDGE BRESS WHO WROTE THE DECISION.

MR. RIZIO-HAMILTON: FAIR ENOUGH.

BUT THE SECOND POINT THAT I WOULD MAKE ABOUT NGUYEN WOULD REMAIN, WHICH IS THIS: THE CENTRAL ALLEGATION IN THE CASE IS THAT APPROVAL OF THE DEVICE, AT LEAST ON THE TIMELINE THAT THE COMPANY HAD PROMULGATED, WAS COMPLETELY HOPELESS, THERE WAS LIKE A ZERO PERCENT CHANCE IT WAS GOING TO HAPPEN, AND THE COMPANY KNEW IT, AND NEVERTHELESS UNDERTOOK THESE PURPORTEDLY FALSE PREDICTIONS.

THE COURT: WELL, I THINK THE NGUYEN CASE IS MOST APPROPRIATELY CONSIDERED IN LINE OF YOUR NEW ALLEGATIONS ABOUT WHAT THE COMPANY MAY HAVE KNOWN ABOUT THE PROBLEMS WITH ITS VARIOUS PRODUCTS.

THAT'S WHERE I REALLY THINK THAT THE NINTH CIRCUIT GIVES

ME SOME GUIDANCE THERE. OF COURSE THEY GIVE ME GUIDANCE ON EVERYTHING I HAVE TO FOLLOW WHAT THEY SAY, BUT THAT'S WHAT I TAKE FROM THE NGUYEN CASE.

MR. RIZIO-HAMILTON: SO LET ME ADDRESS THAT.

HERE, WE HAVE A VERY DIFFERENT THEORY, WHICH ISN'T THE PRODUCT WAS COMPLETELY HOPELESS AND THEY WERE NEVER GOING TO MAKE ANY EFFORTS TO IMPROVE IT.

THE CONCEPT IS THAT ORACLE WAS FACED WITH A VERY FUNDAMENTAL PROBLEM WHEN IT BEGAN TO ENTER THE CLOUD MARKET, WHICH IS THAT IT WAS WAY BEHIND AND IT REALLY DIDN'T HAVE A COMPETITIVE PRODUCT. SO IT HASTILY COBBLED TOGETHER PRODUCTS RELATED TO ACQUISITIONS THAT HAD BEEN MADE, AND THE LIKE, INTO AN OFFERING THAT WAS ULTIMATELY LEADING UP TO AND DURING THE CLASS PERIOD, UNCOMPETITIVE.

AND IN ORDER TO GENERATE SOME APPEARANCE OF GROWTH IN THIS CRITICAL MARKET, WHICH WAS THE MOST IMPORTANT FACTOR AFFECTING COMPANY STOCK PRICES AT THE TIME, AND THE MOST CRITICAL ISSUE IN THE EYES OF HIS INVESTOR, IT WAS UP TO THESE TACTICS TO GENERATE WHAT IT DESCRIBED AS SALES IN AN EFFORT TO BUY ITSELF TIME TO FIX THE PROBLEM WITH THE PRODUCT.

THAT'S REALLY THE KIND OF SITUATION THAT WE HAVE HERE. IT DIDN'T WORK OUT FOR THEM. THE GROWTH RATE CRATER, THE COMPANY'S ABILITY TO GENERATE SO CALLED "SALES" IN THIS FASHION WANED. AND THE COMPANY HADN'T, BY THAT POINT IN TIME, COME UP WITH AN OFFERING THAT WAS REALLY COMPETITIVE ENOUGH TO GENERATE

ORGANIC DEMAND.

AND THAT'S WHY WE SAW THE DECELERATION, THE PRONOUNCED DECELERATION IN THE GROWTH RATE TO BE UNDER THE CLASS PERIOD.

SO THAT'S A DIFFERENT SITUATION IN NGUYEN.

THE COURT: I THINK WHAT I'M HUNG UP ON IS THAT THEY MET THEIR GUIDANCE FOR EVERY QUARTER IN THE CLASS PERIOD.

SO, YOU KNOW, I WILL ACCEPT THAT THEIR GROWTH RATE WAS NOT LIKE THEIR COMPETITORS, BUT THEY WEREN'T HIDING THAT. AND THEY ACCURATELY REPORTED THEIR REVENUE AND THEY ACCURATELY REPORTED THE ANTICIPATED DECREASE IN THE RATE OF GROWTH.

I MEAN, THEY WERE SPOT ON IN EVERY QUARTER, IT WAS ACTUALLY PRETTY IMPRESSIVE TO SEE HOW THEY MET THEIR GUIDANCE EVERY SINGLE TIME IN THE CLASS PERIOD.

MR. RIZIO-HAMILTON: BUT IT'S NOT A GUIDANCE CASE, YOUR HONOR. IF IT WERE, IT WOULD BE DEAD IN THE WATER.

THE COURT: RIGHT. YOU CAN'T IGNORE THAT.

MR. RIZIO-HAMILTON: YOU KNOW, IT'S A CASE ABOUT REPRESENTATIONS CONCERNING REVENUE, CONCERNING GROWTH RATE, CONCERNING THE FACTORS DRIVING THAT GROWTH RATE, AND CONCERNING THE QUALITY OF THE PRODUCT, AS WELL AS EXPLANATIONS THAT WERE MISLEADING FOR THE REVENUE DECELERATION THAT OCCURRED AT THE END OF THE CLASS PERIOD.

ACCURATELY NEEDING GUIDANCE DOES NOT CURE THOSE DIFFERENT ALLEGED FALSEHOODS. THAT'S THE PROBLEM WITH THE GUIDANCE ARGUMENT, IT ONLY GOES SO FAR.

THE COURT: OKAY.

MR. RIZIO-HAMILTON: IT DOESN'T FIX OTHER STATEMENTS THAT WERE MISSTATEMENTS.

THE COURT: SO I NEED YOU TO ADDRESS WHAT I THINK IS A FAILURE TO LINE UP THE FALSE STATEMENTS WITH THE KNOWLEDGE OF THE SPEAKER AT THE TIME THE STATEMENT WAS MADE.

IT IS A TEDIOUS JOB. IT'S TEDIOUS FOR ME TO READ IT, IT MUST BE EXCRUCIATING FOR YOU AND YOUR COLLEAGUES TO WRITE THESE, AND TO DEVELOP THE FACTS, BUT THE NINTH CIRCUIT MAKES IT CLEAR THAT'S WHAT YOU HAVE TO DO, AND I DON'T SEE THAT.

I SEE A LOT OF DIFFERENT ALLEGATIONS OF WHY THESE THINGS ARE INCORRECT, BUT I NEED YOU TO LITERALLY TAKE THE SPEAKER, THE STATEMENT, AND THE STATEMENTS MADE CONTEMPORANEOUSLY, OR FACTS KNOWN CONTEMPORANEOUSLY WITH THE STATEMENT, AND I DON'T HAVE THAT.

MR. RIZIO-HAMILTON: WELL, I MEAN, LET ME MAKE A COUPLE OF GENERAL POINTS, AND THEN MAYBE GIVE A SPECIFIC EXAMPLE OR TWO.

THE COURT: OKAY.

MR. RIZIO-HAMILTON: SO FIRST, ON THE PRODUCT SIDE, FORMER EMPLOYEE 10 REPORTED THAT THE SEVERE PRODUCT DEFICIENCIES WERE WELL KNOWN AND REPORTED THROUGHOUT THE COMPANY, FROM 2015 UP THROUGH OCTOBER 2017, BECAUSE FORMER EMPLOYEE 10 MET DURING THAT TIME PERIOD EVERY TWO MONTHS WITH DEFENDANTS MIRANDA AND KURIAN, TO INFORM THEM OF REALLY

SIGNIFICANT PRODUCT DEFICIENCIES THAT WERE ENDEMIC TO THE CLOUD PLATFORM.

THE COURT: SO WHAT STATEMENT IS CONTRIBUTED TO MIRANDA AND KURIAN DURING THE CLASS PERIOD THAT WOULD BE FALSE?

SEE, I'M NOT GOING TO DO THIS CHART FOR YOU, THAT'S NOT MY -- YOU KNOW, I'M NOT GOING TO GO INTO A WAREHOUSE OF INFORMATION AND TRY TO FIGURE OUT WHAT YOU'RE TALKING ABOUT.

MR. RIZIO-HAMILTON: OKAY.

WELL, YOU KNOW, TO GIVE YOU ONE EXAMPLE, PARAGRAPH 385, IT'S AN AUGUST 2ND, 2017, STATEMENT, IT'S AN ORACLE PRESS RELEASE, IT QUOTES DEFENDANT MIRANDA.

THE PRESS RELEASE STATES THAT WITH THE INTRODUCTION OF ORALLY CLOUD APPLICATIONS RELEASE 13, AND LET PUT A PIN IN RELEASE 13, OTHERWISE KNOWN AS R13, FOR ONE MOMENT, BECAUSE I WILL TURN TO THAT AFTER I READ THIS STATEMENT, "ORACLE IS FURTHER EXTENDING THE INDUSTRY'S BROADEST, DEEPEST AND FASTEST GROWING SUITE OF CLOUD APPLICATIONS."

AND IN PARAGRAPH 386, MIRANDA IS QUOTED IN THAT PRESS RELEASE AS STATING, "WITH THE LATEST RELEASE OF ORACLE CLOUD APPLICATIONS," THAT'S ALSO A REFERENCE TO R13, "WE ARE INTRODUCING HUNDREDS OF NEW INNOVATIONS."

WE HAVE AN E-MAIL IN THE COMPLAINT SENT FROM THE DEFENDANT KURIAN TO DEFENDANT MIRANDA AND OTHERS, IN WHICH DEFENDANT KURIAN TELLS DEFENDANT MIRANDA THAT AS FAR BACK AS JULY, THE COMPANY'S HCM PRODUCT WAS KNOWN TO BE ATROCIOUS AND THAT THE

R13 UPDATE DIDN'T DO ANYTHING TO FIX THAT PROBLEM BECAUSE R13, ITSELF, WAS NOT COMPETITIVE.

SO HERE WE HAVE, IN THAT TIME PERIOD, DEFENDANT MIRANDA ISSUING A STATEMENT TOUTING THE HUMAN RESOURCES SOFTWARE AND THE SUPPOSED BENEFICIAL IMPACT OF THE R13 UPDATE. WHEN CONTEMPORANEOUS INTERNAL DOCUMENTS DEMONSTRATE THAT THE COMPANY'S SENIOR EXECUTIVES KNEW THAT THE HCM SOFTWARE WAS DEFECTIVE AND THAT THE R13 UPDATE HAD NOT SOLVED THAT PROBLEM.

THE E-MAIL ALSO GOES ON TO STATE THAT DEFENDANT KURIAN HAD CONTINUED TO RECEIVE PRESSURE FROM DEFENDANTS ELLISON, CATZ AND HURD, TO IMPROVE WHAT HE TERMED, THE AWFUL USER INTERFACE.

THE COURT: SO I GUESS I'M FINDING A LITTLE DISCONNECT.

IF YOU ARE SUGGESTING THAT A PRESS RELEASE TOUTING THAT WE HAVE HUNDREDS OF NEW INNOVATIONS IS RECKLESSLY FALSE BECAUSE -- OR THAT KURIAN OR MIRANDA WAS RECKLESS IN MAKING THE STATEMENT BECAUSE HE KNEW OF THESE SUPPOSED HUNDREDS OF NEW INNOVATIONS THAT THEY WEREN'T WORKING, BUT YOU'VE ONLY RELATED IT TO THE HCM PRODUCT, AND I DON'T KNOW HOW MANY OTHER PRODUCTS WERE ON THE MARKET THAT MIRANDA MIGHT HAVE BEEN REFERRING TO WHEN HE SAID HUNDREDS OF NEW INNOVATIONS. AND HUNDREDS OF NEW INNOVATIONS IS NOT A PROMISE THAT WE ARE DOING THINGS NEW, AND IT'S NOT A GUARANTEE OF THESE OTHER ISSUES.

BUT I GUESS, MR. RIZIO-HAMILTON, WHERE I'M REALLY HUNG UP IS YOU DIDN'T WALK ME THROUGH THIS IN YOUR COMPLAINT. YOU

DIDN'T LINE THESE UP, AND I'M NOT GOING TO DO IT. IT'S JUST A DEFICIENCY, IT'S JUST NOT THERE.

MR. RIZIO-HAMILTON: WELL --

THE COURT: OR SHOW ME IN THIS ENORMOUS AMOUNT OF WORK OF PUTTING THIS CHART TOGETHER THAT I ASKED FOR, WHERE YOU'VE LINED UP THE DATES. BECAUSE YOU'VE GIVEN ME GENERAL ALLEGATIONS OF SHOWING THE SCIENTER. I MEAN, YOU FILLED OUT PAGES, BUT I CAN'T RELATE THEM IN TIME.

MR. RIZIO-HAMILTON: YOUR HONOR, IF YOU LOOK AT PAGE 26 OF OUR CHART --

THE COURT: I HAVE IT HERE. OKAY.

MR. RIZIO-HAMILTON: WE SET FORTH THE STATEMENT I JUST READ IN THE SECOND TO LEFT-HAND COLUMN THERE. AND IN THE FARTHEST RIGHT-HAND COLUMN, WE REFERENCE THE E-MAIL THAT I JUST SPOKE ABOUT AS WELL AS THE REPORT OF REGULAR INFORMATION CONCERNING THE CLOUD DEFECT BEING RELATED TO DEFENDANT MIRANDA.

THE COURT: WELL, BUT WHAT YOU SAY IS THAT KURIAN AND MIRANDA WERE REGULARLY INFORMED. AND THAT DOESN'T TELL ME ANYTHING ABOUT AUGUST 2, 2017, OF SERIOUS FLAWS AND LACK BASIC FUNCTIONALITY.

MR. RIZIO-HAMILTON: WELL, YOU KNOW, IN THE PARAGRAPHS THAT WE REFERRED TO HERE IN THE CHART, WE DESCRIBE IN MUCH GREATER DETAIL, THE TIMING OF THE MEETINGS AND THEIR CONTENT.

THE COURT: OKAY. THAT'S FAIR.

MR. RIZIO-HAMILTON: IT'S -- AS A FACTUAL MATTER, IT'S VERY HARD FOR US TO DISTILL ALL THE INFORMATION IN CHART FORM WITHOUT IT BECOMING OVERWHELMING.

THE COURT: WELL, THAT'S A FAIR POINT. THAT'S FAIR.

MR. RIZIO-HAMILTON: WE TRIED TO SOLVE THAT PROBLEM BY INSERTING CROSS REFERENCES TO THE PARAGRAPHS IN THE COMPLAINT. IF THAT'S NOT GOOD ENOUGH, WE WOULD BE HAPPY TO REDO THE CHART IN A WAY THAT MIGHT MAKE IT EASIER FOR YOU TO NAVIGATE.

THE COURT: WELL -- AND, YOU KNOW, I'M NOT TRYING TO SLOUGH OFF MY JOB, I HAVE A JOB TO DO HERE, BUT -- AND MR. ETH AUGMENTED THE -- WELL, HIS DEALS WITH FALSE STATEMENTS AND GAVE ME SOME PARAGRAPH NUMBERS, BUT ALL RIGHT.

WELL, I THINK THAT HELPS ME IN WORKING THROUGH YOUR CHART. BUT OBVIOUSLY, THE PLEADING ITSELF IS WHAT I'M LOOKING FOR.

ALL RIGHT. THANK YOU.

OTHER ISSUES YOU WANT TO ADDRESS?

MR. RIZIO-HAMILTON: YOUR HONOR, YOU KNOW, UNLESS YOU HAVE ANY OTHER PARTICULAR COMMENTS, NOT AT THIS TIME. I THINK THAT I UNDERSTAND YOUR PERSPECTIVE, AND WE CERTAINLY RESPECT YOUR VIEWS.

THE COURT: THAT'S VERY KIND.

YOU KNOW, I THINK THIS IS AN IMPORTANT JUNCTURE IN THE CASE BECAUSE IT'S THE RARE CASE, ALTHOUGH I'VE DONE IT WHERE THERE'S A THIRD OR EVEN A FOURTH AMENDMENT, AND YOU ARE NOT

ASKING FOR THAT, AND I MEAN, REALLY, AS I SAID, I ACTUALLY THINK THAT I PROBABLY HAVE ENOUGH TO DRAW A REASONABLE INFERENCE THAT THE ENGINEER DEALS WERE PERVASIVE. I JUST DON'T KNOW THE MAKEUP OF THEM, BETWEEN DISCOUNTS AND THE ABC COERCIVE ARRANGEMENTS.

YOU POINT OUT SOME IMPORTANT FACTS THAT THE REVENUE RECOGNITION COULD NOT POSSIBLY TAKE CARE OF THIS ISSUE, AND I APPRECIATE THAT I THINK IT'S A FAIR ARGUMENT, BUT I THINK MY FOCUS IS GOING TO BE ON THE SCIENTER HERE.

SO YOU'VE HELPED ME TO WORK WITH YOUR CHART, I WILL DO THAT AND USE YOUR PARAGRAPH DESIGNATIONS AS MY GUIDE IN LINING THEM UP BY DATE.

IT'S ALSO HARD WHEN A STATEMENT IS MADE IN AUGUST AND THE EVIDENCE OF THE KNOWLEDGE OF THE SPEAKER OCCURRED IN OCTOBER AFTER THAT. THAT BECOMES A LITTLE BIT DIFFICULT. THAT'S ONE THING I NOTED THERE, BUT I WILL LOOK A LITTLE BIT MORE CAREFULLY AT YOUR PLEADING, BECAUSE THE CHART IS ONLY THE GUIDE FOR ME, IT'S NOT THE PLEADING ITSELF.

MR. RIZIO-HAMILTON: THE LAST THING I WILL SAY JUST TO FOLLOW UP TO YOUR HONOR'S MOST RECENT COMMENTS, AND I KNOW YOU ARE PRESSED FOR TIME, AND I APPRECIATE YOU GIVING US THE TIME.

THE COURT: WELL, I'M SORRY THAT I AM, YEAH.

MR. RIZIO-HAMILTON: NO, IT'S OKAY. IT'S LIFE.

THE COURT: RIGHT. IT IS.

MR. RIZIO-HAMILTON: TWO POINTS.

THE E-MAIL, ITSELF, ALTHOUGH WRITTEN IN OCTOBER, REFERENCES KNOWLEDGE OF THE PROBLEMS WITH THE SPECIFIC PRODUCT DATING BACK TO JULY.

AND SECOND, THE REPORT OF FORMER EMPLOYEE 10 ENCOMPASSES THE ENTIRE TIME PERIOD FROM 2015, UP THROUGH AND INCLUDING OCTOBER 2017, WHERE HE HELD BIMONTHLY MEETINGS WITH DEFENDANTS MIRANDA AND KURIAN.

THE COURT: YEAH.

ALL RIGHT. MR. ETH, IT'S YOUR MOTION, I'M GOING TO LET YOU FINISH UP.

MR. ETH: OKAY. THANK YOU VERY MUCH.

THERE'S ONE THING IN PARTICULAR WHERE I COMPLETELY AGREE WITH MR. RIZIO-HAMILTON, AND IT'S WHEN HE SAID IT'S VERY HARD FOR US. THAT'S CORRECT. THAT'S THE STATUTE. THAT'S THE WAY IT IS. IT'S VERY HARD FOR THEM. AND HE DOESN'T MEET THAT, ESPECIALLY GIVEN THE HURDLES THAT THE COURT LAID OUT BEFORE.

IN TERMS OF ENGINEERED DEALS, THE COURT POINTED OUT IN PARAGRAPH 17 TO 18, ENGINEERED DEALS INCLUDE DISCOUNTS. COUNSEL SAID HE DOESN'T HAVE ANY SPECIFIC NUMBER FOR IMPROPER REVENUE, HE DOESN'T EVEN HAVE A GENERAL NUMBER EITHER.

SO IT'S NOT LIKE, WELL, WE HAVE AN ESTIMATE OF 100 MILLION OR 50 MILLION, IT'S JUST NOTHING AT ALL. AND OBVIOUSLY PLAINTIFFS WILL ALLEGE AS MUCH AS THEY CAN, AND THERE'S NOTHING IN THERE ABOUT DISCOUNTS, THERE'S NOTHING ABOUT REV. REC. REV.

REC. FOR CLOUD IS DONE AND IT'S COMPLICATED AND EVERYONE ACKNOWLEDGES THAT. BUT THE ANSWER CAN'T BE, WELL, IT'S COMPLICATED, AND WE SAY IT WAS PERVASIVE.

THE COURT: AND MR. ETH, FOR THE RECORD, THAT'S REVENUE RECOGNITION, WHEN YOU SAY REV. REC.

MR. ETH: I'M SORRY.

THE COURT: WELL, IT WILL LOOK FUNNY ON THE TRANSCRIPT.

MR. ETH: ESPECIALLY IF IT'S SPELLED W-R-E-C-K. YES, YOU ARE CORRECT.

THEN WE HEARD THERE WAS A REFERENCE TO A PARAGRAPH 107. IT'S VERY INTERESTING WHEN YOU STUDY THAT PARAGRAPH, GERAFFO, WHO OF COURSE ISN'T THE DEFENDANT, SAID, THIS IS A QUOTE, "LET'S SEED THE DEAL, LET'S SEED IT." THEN PLAINTIFFS SAY, "WHAT HE MEANS IS ENGINEER THE DEAL." THEN THE QUOTE STOPS. AND IT SAYS, "THROUGH AUGUST."

SO THE ONLY QUOTE IS, ENGINEERED A DEAL. SO WE GO BACK TO ENGINEERING AND WHAT THAT'S ALL ABOUT.

YOU KNOW, WE HAVE THE PLAINTIFFS IN THEIR COMPLAINT SAYING THAT THE END OF THE CLASS PERIOD CLOUD SALES CRATERED. WELL, I DON'T KNOW, UP ONE PERCENT AFTER THE CLASS PERIOD, UP 20 PERCENT AS PREDICTED DOESN'T SOUND LIKE CRATERED TO ME.

AND THEN THERE IS THIS HUGE PROBLEM WITH BOTH THE VAGUENESS OF THE STATEMENTS ABOUT BUGS AND SO ON, AND THEN THE VAGUE OPTIMISTIC STATEMENTS THAT DON'T LINE UP IN TIME ANYWAY,

ABOUT PRODUCT CAPABILITIES.

I THINK FOR ALL THOSE REASONS, MULTIPLE REASONS, THIS SHOULD BE THE LAST STOP ON THIS.

THE COURT: ALL RIGHT. WELL, THIS IS THE LAST STOP FOR THE PLEADINGS, IT MAY NOT BE THE LAST STOP FOR THE CASE. I DON'T WANT YOU TO TAKE FROM THIS DISCUSSION, THAT I'VE GIVEN YOU A TENTATIVE RULING. I GAVE YOU MY IMPRESSION. YOU MADE GOOD POINTS, MR. RIZIO-HAMILTON.

AND MR. ETH, I DON'T WANT YOU TO GET AN ORDER AND READ IT AND SAY, WAIT A MINUTE, IS THAT THE SAME HEARING I WENT TO?

SO PLEASE, YOU KNOW, THESE CASES, IT'S A BIG RESPONSIBILITY FOR A DISTRICT JUDGE ON THESE CASES, BECAUSE THEY TEND TO END AT THE PLEADING STAGE, AND SO I HAVE TO LIVE UP TO THAT OBLIGATION. AND I THINK MR. RIZIO-HAMILTON HAS REALLY POINTED A MANNER IN WHICH I NEED TO LOOK MORE CAREFULLY AT HIS SCIENTER ALLEGATIONS, AND I PROMISE YOU I WILL DO THAT.

AND, YOU KNOW, IF IT'S STATEMENT-BY-STATEMENT AND THERE ARE FIFTY OF THEM, THEN THAT'S WHAT WE WILL DO. AND THE NINTH CIRCUIT DOESN'T SHY AWAY FROM EXTRAORDINARILY LONG AND DETAILED ORDERS EITHER, SO YOU GOT A PRETTY LONG ONE FROM ME LAST TIME, SO SOME OF IT WILL BE SIMILAR. AND I TRIED TO COME UP WITH A WAY TO MAKE IT SHORT LAST TIME, AND I COULDN'T, SO YOU GOT SOMETHING THAT WAS LONG.

ANYWAY. THANK YOU BOTH. IT'S GOING TO TAKE ME A WHILE. I THINK YOU UNDERSTAND IT TAKES TIME TO WORK THROUGH THESE, SO

THANK YOU.

MR. RIZIO-HAMILTON: THANK YOU, YOUR HONOR.

MR. ETH: THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 11:16 A.M.)

**CERTIFICATE OF REPORTER**

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.



______________________________
SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185 DATED: 10/2/20