**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, et al., Plaintiffs, v. ORACLE CORPORATION, et al., Defendants. | Case No. 18-cv-04844-BLF **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** [RE: ECF 72] |

This is a putative class action for securities fraud brought against Oracle Corporation ("Oracle" or "Company") and its officers Safra A. Catz ("Catz"), Mark Hurd ("Hurd"), Lawrence J. Ellison ("Ellison"), Thomas Kurian ("Kurian"), Ken Bond ("Bond"), and Steve Miranda ("Miranda") ("Individual Defendants") (collectively with Oracle, "Defendants"). On December 17, 2019, the Court dismissed the action without prejudice, holding that certain alleged misstatements were not actionable, others were not adequately alleged to be false or misleading, and other allegations were insufficient. MTD Order, ECF 65.

Lead Plaintiff, Union Asset Management Holding AG, ("Plaintiff") has since filed a Second Amended Class Action Complaint (the "SAC") alleging that between March 15, 2017 to June 19, 2018 Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* ECF 68 ("SAC"). Plaintiff also asserts that Catz, Hurd, Ellison, Kurian, Miranda, and Bond are liable for violations of federal securities laws as "control persons" of Oracle, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.* Finally, Plaintiff claims Catz, Hurd, and Kurian violated Section 20A of the Exchange Act by selling Oracle common stocks. *Id.*

## I.   BACKGROUND

Oracle develops and markets database software and related technology. SAC ¶ 40. The Individual Defendants are six current or former Oracle executives[1]: Safra A. Catz (co-CEO and a member of Oracle's Board of Directors); Mark Hurd (co-CEO, member of Oracle's Board of Directors, and former co-president)[2]; Lawrence J. Ellison (co-founder, former CEO, current Chief Technology Officer, and Chair of the Board of Directors); Thomas Kurian (former President, Product Development); Ken Bond (Senior Vice President of Investor Relations); and Steve Miranda (Executive Vice President of Oracle Applications Product Development). Id. ¶¶ 33- 38.

Oracle's business historically focused on selling licenses for its "on-premises" database software and products, which are installed locally, on a licensee's own computer and maintained on the user's own infrastructure and platforms. SAC ¶ 40. In contrast, "cloud-based" software allows licensees to store and access data over the internet. Id. ¶ 41. According to the SAC, companies such as Amazon, Google, and Microsoft introduced their cloud-based software between 2006 and 2010, while "Oracle was stubbornly refusing to acknowledge that customers were increasingly shifting towards cloud technology." Id. ¶¶ 42-43. Accordingly, Oracle's revenue growth and new software license sales declined in 2015 and 2016. Id. ¶ 47. Oracle "belatedly pivoted to the cloud in high gear." Id. ¶ 48. On a March 15, 2016 Earnings Call, Catz announced that Oracle was "making the 'move to cloud' which would represent 'a generational shift in technology that [wa]s the biggest and most important opportunity in [the] Company's history.'" Id.

The SAC alleges that, in the face of this need to pivot its business model, Oracle engaged in "coercive sales practices." SAC ¶¶ 95-150. Because "Oracle was largely unable to sell its defect-ridden cloud technology in bona fide transactions," it allegedly employed two tactics to "show burgeoning cloud sales in order to remain viable in the eyes of investors." Id. ¶ 15. Oracle employees coined these sales "financially engineered" or "dead on arrival" deals. Id. ¶ 18.

---

[1] This Order denotes the positions of each executive during the Class Period.
[2] Hurd died in October 2019—after Plaintiff filed the action but before he filed the SAC. SAC ¶ 34. The SAC names his Estate as a Defendant in his place. Id.

United States District Court
Northern District of California

First, Oracle allegedly employed a strategy called "Audit, Bargain, Close," also referred to as "ABC." SAC ¶¶ 16, 95-128. Under this strategy, Oracle would install its software on on-premise client ecosystems "with a variety of preferences automatically enabled that, unbeknownst to the customer, caused the customer to arguably—and unknowingly—exceed the limits of its license." *Id*. ¶ 16. The company would then initiate an audit of an on-premises customer for violations of its on-premises software license. *Id.* When it found violations, Oracle would "threaten to impose extremely large penalties" that it would abate only if "the customer agreed to accept a short-term cloud subscription." *Id.* The SAC alleges that customers "neither desired nor intended to use" the cloud products but purchased them to avoid the hefty penalties. *Id.* ¶¶ 16, 151-198. Second, Oracle allegedly engaged in a tactic known as "attached deal[s]." *Id.* ¶¶ 17, 129-150. Oracle offered its customers "a significant discount" on its on-premises products, provided the customer also agreed to receive a short-term cloud subscription – "even though the customer neither wanted nor intended to use the attached cloud product." *Id.* ¶ 17. The SAC alleges that the attached deals thus served to disguise legacy on-premise revenue as cloud revenue. *Id.* ¶¶ 129-150.

Starting in 2014, "market participants voiced early concerns that Oracle and its auditing department should not attempt to extract 'cloud' revenues through their audits of its licensees' 'on-premises' software licenses." SAC ¶¶ 51, 54-60, 62, 64. Oracle executives, however, denied that the company was misusing its audit process to gin up purported cloud sales, *id*. ¶¶ 61, 63, 64, instead tracing sales successes to Oracle's superior cloud products and business practices, *id*. ¶¶ 66-71. Oracle's stock price rose almost 24% between 2017 and 2018 as investors and analysts celebrated the strength of Oracle's cloud business. *Id*. ¶¶ 72-73. The representations of Oracle executives stood in stark contrast to reality according to the SAC, *id*. ¶¶ 74-94, as Oracle's cloud products were "deeply flawed," limiting customer' ability to use the products effectively and forcing the company to lean on financially engineered deals, *id*. ¶ 74, 95.

The SAC alleges that the ABC and attached deals (collectively, "Sales Practices") were not "genuine purchases" of cloud products as customers did not want, need, or intend to use the cloud products. SAC ¶ 20, 60-61. Nonetheless, Oracle touted them as such—and by doing so, misled

investors because "the true source, nature and quality of Oracle's all-important cloud revenue stream." *Id*. The SAC further purports that Oracle's concerted and coordinated use of the two tactics allowed the company to prolong its deployment of coercive sales practices. For example, after customers under attached deals declined to renew their cloud product subscriptions, Oracle "ramped up" its use of ABC deals in 2017. *Id*. ¶¶ 121, 133.

According to the SAC, in late 2017, many of the cloud subscriptions generated through the Sales Practices began to expire and many customers declined to renew their cloud subscriptions. *Id.* ¶¶ 21, 208-09. Consequently, between December 14, 2017 and March 19, 2018, Oracle disclosed that its cloud revenue growth rate had declined from "a Class Period high of 110% to just 32%." *Id.* ¶¶ 22, 214-215, 219. On March 19, 2018, Oracle's stock price fell almost 10% from approximately $50 per share to approximately $46 per share. *Id*. ¶¶ 24, 223. Nonetheless, the SAC alleges that Oracle continued to issue misleading statements about the reasons for this deceleration, such as the classification of cloud revenue as licensing revenue. *Id*. ¶¶ 223-225. At the same time, financial analysts continued to speculate about Oracle's "coercive" sales practices and the "deficiencies in its cloud product." *Id*. ¶¶ 227-228; *see also id*. ¶¶ 231-234. On June 19, 2018, Oracle announced that it would no longer report financial results for its cloud business separately, explaining that it was difficult to differentiate between cloud and non-cloud revenue. *Id*. ¶¶ 25, 235-37.

Based on these allegations, Lead Plaintiff, Union Asset Management Holding AG[3] ("Union"), brings this lawsuit on behalf of itself, and other purchasers of Oracle stock, alleging that Defendants misrepresented Oracle's revenue growth within its cloud segment and the drivers of that growth. *See* SAC ¶¶ 2-12.

### A. Confidential Witnesses

The SAC provides statements from eleven former Oracle employees. SAC ¶¶ 101-150.

Confidential Witness 1[4] ("CW1") was a Regional Sales Director for Middle East and Africa from February 2009 to March 2018. SAC ¶ 101. According to CW1, Hurd developed Oracle's audit-

---

[3] Union is the parent holding company of the Union Investment Group. CAC ¶ 28.
[4] The SAC refers to Confidential Witnesses as Former Employees or FEs.

United States District Court
Northern District of California

based sales tactic. *Id*. ¶ 102. CW1 sold cloud and other Oracle products to customers and attended meetings at which cloud sales were discussed. *Id.* CW1 stated that at least 80% of Middle East and Africa cloud revenue was generated by "inserting cloud into compliance-based deals" and that it was "crystal clear these [sales] are fake" because "none of these deals are renewed." *Id.* ¶¶ 108, 110. More than 75% of CW1's team's cloud sales in 2017 were made to customers under threat of license audits, who purchased the product simply to avoid the hefty penalties. *Id.* ¶ 108. In 2018, such sales accounted for 86% of CW1's team's revenue. *Id.* In late 2017, Oracle published internal statistics that indicated 70% of SaaS contracts—which made up more than 70% of Oracle's cloud revenue—were not renewed. *Id.* ¶ 209.

CW1 stated that all deals worth more than $5 million dollars had to be approved by "HQ," meaning either Hurd or Catz. SAC. ¶ 110. CW1 also reported that he (and other sales teams) discussed their "audit-driven cloud deals" with Loic Le Guisquet, who reported directly to Hurd. *Id*. ¶ 102. CW1 explained that he prepared weekly slides concerning "sales volume and progress" and provided them to Le Guisquet for presentation to Hurd. *Id.* ¶ 126. These slides, according to CW1, "would very clearly say" that Oracle's License Management Services ("LMS") division was engaged in "compliance deals." *Id.* In addition, CW1 attended meetings in which "executives were instructed to offer customers a 90% discount on on-premises licenses if they purchased $300,000 worth of cloud subscriptions" and "assure the customer that they did not need to use the product, and that the purchase of cloud products was merely a necessary condition to unlocking the on-premises discount." *Id.* According to CW1, sales and compliance teams coordinated to "use audits in order to sell unwanted cloud subscriptions." *Id.* ¶ 102.

Confidential Witness 2 ("CW2") was a Vice President in North America cloud sales from September 2015 to December 2018 and spoke with customers and sales personnel about sales of Oracle cloud products. SAC ¶ 112. CW2 stated that in 2106 "90-95% of the Companywide IaaS[5]

---

[5] Infrastructure as a service.

United States District Court
Northern District of California

and PaaS[6] cloud deals had no 'use cases' attached to them." *Id.* ¶ 103[7]; *see also id.* ¶ 18. CW2 learned from speaking with customers and sales personnel that "customers neither intended to use nor renew the cloud products." *Id.* ¶ 116. CW2 also stated he "saw presentations that went to Hurd's directs." *Id.* ¶ 127. These presentations included information "about deal quality" and confirmed that "90-95% of Oracle's Company-wide IaaS and PaaS cloud deals, comprising about 30% of its overall cloud revenue, did not have use cases associated with them, demonstrating they were not driven by actual customer need." *Id.*

Confidential Witness 3 ("CW3") was a Senior Technology and Cloud Sales Consultant in Southern California from 2012 to March 2017 and supported all of Oracle's Southern California cloud sales. SAC ¶ 104. CW3 characterized audit-based sales as "an active practice" in fiscal year 2017. *Id.* ¶ 120. CW3 also explained the relationship between Oracle's attached and audit-based deals: Oracle's use of audit-based sales increased in 2017 because, at that point, the attached deals customers had committed to previously had expired without being renewed. *Id.* ¶ 121. To this end, CW3 noted that, according to emails from Group Vice President of Sales Carl Griffin, Oracle's cloud renewal rate in North America at the end of 2017 was about 32%, while that number was about 90% at Oracle competitors. *Id.* CW3 discussed Oracle's failure to renew cloud customers with colleagues such as Rich Geraffo, the Executive Vice President of North America Technology who reported directly to Hurd. *Id.* ¶ 122. During these conversations, Geraffo acknowledged to CW3 that customers did not want to purchase Oracle cloud subscriptions and that the company's sales tactics were not sustainable. *Id.* CW3 also explained that Oracle's ability to deploy its Sales Practices declined at the end of 2017 as "savvy customers began to recruit third-party consultants to intervene" and "customers began to learn about Oracle's tactics." *Id.* ¶ 210.

Confidential Witness 4 ("CW4") was Vice President of Global Sales Engineering, served as General Manager of Sales Engineering in 2015, and reported to Miranda. SAC ¶ 103. CW4 sold the first iterations of Oracle's cloud product. *Id.* CW4 also reported on the cooperation of Oracle's

---

[6] Platform as a service

[7] According to the SAC, Oracle generated a "use case" for each customer's "legitimate sale." SAC ¶ 113. The use case described "the customer's needs and the Oracle products or services that would be appropriate to meet those needs." *Id.*

auditing and sales divisions in closing audit-based sales. *Id.* ¶¶ 103, 133. CW4 stated that most cloud sales were driven by "extortion" through the audit process and Oracle knew that customers were not planning on renewing their cloud subscriptions. *Id.* ¶ 134. According to CW4, "sales leadership often expressly communicated to customers that they could "wash [their] hands" of cloud products after the contract expired but keep the discounts for on-premises products. *Id.*

Confidential Witness 5 ("CW5") was a Director of Cloud Customer Success at Oracle from 2016 to October 2018 and led the team responsible for cloud customer success and renewal for Oracle's ERP[8], EPM[9], and SCM[10] product suites. SAC ¶¶ 119 fn. 20, 138. CW5 "reviewed monthly and quarterly reports detailing cloud performance and product health across all of North America." *Id.* ¶ 138. CW5 explained that much of Oracle's cloud revenue was from customers who "neither wanted nor needed" the cloud product but had purchased it rather "to reduce their overall costs." *Id.* ¶ 140. According to CW5, "Oracle's [cloud] renewal rate was 15-20% for certain quarters, and that the percent of DOA customers that did not renew was 90%." *Id.* ¶ 141.

Confidential Witness 6 ("CW6") was a Channel Sales Representative from October 2010 to January 2018 and worked with authorized resellers to engineer deals with customers in the Northeast Region. SAC ¶ 105. CW6 learned from vendor partners that Oracle customers were "made to purchase products under threats of audit" and that this was a "regular practice." *Id.* This was particularly true, CW6 alleges, when sales representatives were aware that a customer did not intend to purchase Oracle's cloud products. *Id.* CW6 heard from sales representatives that Oracle "would bundle things together and push cloud subscriptions right through" and that customers did not "underst[and] what they were getting in terms of cloud." *Id.* ¶ 147.

Confidential Witness 7 ("CW7") was a Regional Technology Sales Director at Oracle from February 2013 to October 2018 and was responsible for Oracle's cloud business in the Czech Republic, Hungary, and Slovakia. SAC ¶ 130. CW7 stated that 65% of his teams' cloud sales were made by using the Sales Practices. *Id.* CW7 alleged that, based on conversations with regional sales

---

[8] Enterprise Resource Planning.
[9] Enterprise Performance Management.
[10] Supply Chain Management.

directors in Europe and Turkey, "almost all" of Oracle's cloud revenue in Europe, the Middle East and Africa in 2016 and 2017 were generated from engineered deals. *Id.* ¶ 131. This included Oracle's largest customers, such as PFF Banka. *Id.* CW7 also reported that, starting in 2017, Oracle management made clear on forecast and planning calls that the success of sales personnel turned on their ability to meet cloud revenue targets. *Id.* ¶ 132.

Confidential Witness 8 ("CW8") was a Cloud Platform Sales Manager at Oracle from March 2013 to July 2018 and managed a North America cloud sales team. SAC ¶ 136. CW8 stated that it was "extremely common to provide very steep discounts to on-premise licenses in exchange for a customer purchasing cloud subscriptions" and estimated that more than 75% of CW8's cloud revenue came from attached deals during 2016 and 2017. *Id.* Less than 10% of CW8's clients renewed their cloud subscriptions at the same level they initially signed up for. *Id.*

Confidential Witness 9 ("CW9") was a Director of Cloud Customer Success and Customer Experience at Oracle from 2016 to 2018 whose team was responsible for customer adoption and expansion of cloud in North America. SAC ¶ 138. Like CW5, CW9 "reviewed monthly and quarterly reports detailing cloud performance and product health across all of North America." *Id.* CW9 described Oracle's Sales Practices and explained that customers told CW9's team that they only purchased Oracle's cloud products in order to get a better deal on other products. *Id.* ¶¶ 138-140. According to CW9, renewals for Oracle's ERP—"one of Oracle's most important cloud products"—during the Class Period ranged from 15%-30%. *Id.* ¶ 141. 90% of the accounts that did not renew were allegedly DOA. *Id.* This information was gleaned from Oracle's Customer Lifecycle Management ("CLM") system, which tracked the health of customer accounts, to include whether an account was DOA. *Id.* ¶¶ 142-143. Summaries of CLM data was presented "at a higher level" according to CW9. *Id.* ¶ 143.

Confidential Witness 10 ("CW10") was Group Vice President of Cloud Application User Experience at Oracle from years before the Class Period began through February 2018 and was "one of the most senior executives involved in the design of Oracle's cloud products." SAC ¶¶ 12, 75. CW10 reported directly to Miranda and met semimonthly with Kurian between 2015 and 2017. *Id.*

¶ 75. During these meetings, CW10 informed Miranda and Kurian that Oracle's cloud products lacked even basic functionality and that, due to this failure, demand for the product was very low. *Id*. ¶¶ 75-76, 80, 83. The cloud products, according to CW10, also suffered from integration issues. *Id*. ¶ 76. CW10 received an email in October 2017 from Kurian to Miranda and other senior Oracle executives criticizing the "atrocious" user interface of Oracle's HCM[11] product. *Id*. ¶¶ 86-89. In the email, Kurian allegedly stated:

> I want to make sure that the entire HCM dev[elopement] organization understands what a disgrace your UI [user interface] is and stop living in denial on that. I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable – that state is your collective responsibility and we should avoid pretending that there is not an issue . . . the core product UI [user interface] is awful. Until you all collectively accept the mess you have made and the need to move quickly we are talking past one another.
>
> . . .
>
> This loss [of the sale to Rabobank] has nothing to do with the demos that were done in the past few weeks but with the fact that the UI [user-interface] was considered so atrocious even back in July that the bank questioned whether they could even put this in front of their employees. I showed them R13 UI [Release 13, the latest cloud update] myself and the feedback was blunt that even that is not competitive

*Id*. 88-89.

Confidential Witness 11 ("CW11") was a Regional Vice President of Technology at Oracle during the entire Class Period and "one of the most senior Oracle executives responsible for IaaS and PaaS sales." SAC ¶ 106. CW11 also described Oracle's use of engineered deals and explained that the ABC tactic was "a direct edict from Hurd." *Id*. at ¶ 107. CW11 explained that Oracle deployed engineered deals due to a lack of customer demand for its cloud product and that throughout the Class Period, Oracle "would go in and hold customers over the barrel" by auditing them. *Id*.

---

[11] Human Capital Management.

**B.    Industry Participants**

The SAC provides new accounts of industry participants to further corroborate Plaintiff's allegations that customers were not interested in purchasing Oracle cloud products. SAC ¶¶ 151-188. For example, an executive consultant at Insight, a company helping businesses optimize their cloud investments, reported that 28 or 29 of his 30 clients who purchased Oracle cloud products did not want the products and only purchased them to "get a reduced audit penalty or avoid an audit claim entirely." *Id*. ¶¶ 152-154. The consultant estimates that Oracle generated $50 million in cloud revenue from auditing these clients. The SAC provides similar accounts from B-Lay, House of Brick Technologies, TmaxSoft, Palisades Compliance, and License Fortress. *See, e.g., id*. ¶ 164 ("Mr. Biggs estimated that 75% or more of his firm's customers that purchased cloud product (i) bought short-term cloud subscriptions; (ii) have not renewed the cloud product; (iii) have not used the cloud product; and (iv) never actually intended to use the cloud product.").

**C.    Other Allegations Regarding Oracle's Sales Practices**

The SAC provides examples to corroborate allegations that Oracle engaged in the allegedly coercive Sales Practices.

First, Plaintiff alleges, based on documents obtained by a CBS reporter, that on July 27, 2016 (prior to the Class Period), Oracle initiated an audit of one of its on-premises customers: City of Denver. SAC ¶¶ 189-198. According to the SAC, an Oracle sales manager "pressured Denver to quickly make a deal to resolve the audit, telling Denver that further delay could result in a tripling of its audit penalties from approximately $3 million to 'in excess of $10M.'" *Id*. ¶ 192. On December 22, 2016, Oracle told Denver that it would need to pay an extra $2 million to "right size" its on-premises licensing, unless it purchased a one-year subscription to Oracle's cloud. *Id*. ¶ 195. Denver's contract with Oracle became effective February 1, 2017. *Id*. ¶ 198.

Second, CW1 reported that Oracle, at an unspecified time, "attached" $22 million dollars in "unwanted" cloud products to a $120-million-dollars deal with Saudi Telecom Company. SAC ¶ 110. According to the SAC, local government regulations prevented Saudi Telecom Company from

using cloud data centers outside of the country and, at the time of the purchase, there were no in-country Oracle data centers. *Id.* ¶ 118. Saudi Telecom Company, nevertheless, purchased Oracle's cloud products for 22 million dollars "effectively purchasing a discount on audit penalties." *Id.* CW1 also identified multiple customers against whom Oracle deployed its allegedly coercive Sales Practices in 2017, resulting in sales of cloud products that were unwanted or unused. *Id.* ¶¶ 111 (CW1 identifying sales); *see also id.* ¶ 131 (CW7 identifying sale).

Third, on September 11, 2015 (prior to the Class Period), Chilean anti-competition regulators initiated an investigation into alleged anticompetitive conduct by Oracle. SAC ¶¶ 199-207. Throughout the investigation, which carried into at least 2017, investigators requested numerous documents from Oracle including those pertaining to Oracle's audit-driven sales practices and other sales policies and the quality of Oracle's products. *Id.* ¶¶ 203-04. On March 28, 2018, the Chilean regulators issued a report finding links between audits and sale of cloud products, which in their opinion constituted an "abuse of a dominant position." *Id.* ¶¶ 205-07. The report also found that customers "neither wanted nor used" the cloud products that Oracle proposed as audit solutions. *Id.* ¶ 205.

Fourth, Clear Licensing Counsel, a European organization that advocates for the interests of software consumers, sent a letter on January 6, 2015 (prior to the Class Period) to Ellison and Oracle's Board of Directors, including Hurd and Catz. SAC ¶¶ 55-56. The letter (later released publicly) warned Oracle executives of "deep-rooted mistrust of [Oracle's] core customer base as a result of [Oracle's] auditing and licensing practices." *Id.* ¶¶ 56-57.

### D.   Allegedly False or Misleading Statements

Plaintiff alleges that Defendants made fifty false and misleading statements within the Class Period. *See* SAC ¶¶ 343-454; *see also* ECF 68-1 (chart of statements). These statements generally fall into the following categories:

#### 1.   Statements related to the cloud-based products' revenue growth

Some of the alleged misstatements touted the rapid growth of cloud-based revenue. For example:

- "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4. This cloud hyper-growth is expanding our operating margins, and we expect earnings per share growth to accelerate in fiscal 2018." (SAC ¶ 370, statement by Catz on June 21, 2017).

- "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, putting us over our $2 billion ARR bookings goal for fiscal year 2017 . . . . We also delivered over $1 billion in quarterly SaaS revenue for the first time. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018." (SAC ¶ 371, statement by Hurd on June 21, 2017).

- "Our Fusion ERP, Fusion HCM, which is the mid-market and the high-end of ERP and the mid-market and high end of HCM, these are all internally developed systems. They're -- HCM and ERP, I think, blended rate is growing triple digits. The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets." (SAC ¶ 396, statement by Ellison on September 14, 2017).

Plaintiff alleges that these statements were materially false and misleading when made, because Defendants stated that Oracle was experiencing "rapid adoption" of its cloud products, "hyper-growth" of its cloud business, and emphasized its large sales figures without disclosing that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶ 372.

Another set of the alleged misstatements relate to the sustainability of cloud revenue growth. For example:

- "The sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher . . ." (SAC ¶ 388, statement by Catz).

- "So this is absolutely not a 1-year phenomena. In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow. And so this should really accelerate. And understand that in our PaaS-IaaS

12

business, we're not even at scale. So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue -- of the recurring revenue business." (SAC ¶ 377. Statement by Catz, June 21, 2017).

- Customers were moving to Oracle's cloud because they were "successful using [Oracle's] software" and were motivated to stay with Oracle through that transition. This loyalty was the "driver[] of what builds [the] pipeline." (SAC ¶ 424. Statement by Bond, November 7, 2017).

Plaintiff claims that it was misleading for Catz to state that Oracle's cloud business was experiencing "sustained hyper-growth" and to emphasize the Company's cloud growth was "absolutely not a 1-year phenomena," while failing to disclose that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶¶ 389, 378.

Several of the alleged misstatements relate to Oracle customers' adoption of cloud products. For example:

- "As we move to cloud, the first thing that we see is we start to address more of the customer spend. The customers are willingly making a choice, where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle." (SAC ¶ 363, statement by Bond on May 9, 2017).

- "What do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, most customers today are moving to SaaS for speed. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption." (SAC ¶ 404, statement by Miranda on October 5, 2017).

Plaintiff alleges these statements were materially false and misleading when made because Defendants stated that "customers [] willingly making a choice" to abandon a "multi-vendor strategy" to consolidate with Oracle, or that Oracle's speed was causing its customers to adopt the

cloud products without disclosing that: "(1) a material portion of Oracle's cloud revenue was driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable." *Id.* ¶¶ 364, 369.

Finally, Plaintiff alleges that Defendants made false or misleading statements about the reasons cloud revenue growth was decelerating. For example, on December 14, 2017 Ellison responded to an analyst question about the case of Oracle's revenue slowdown by stating "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database," a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to become available." SAC ¶ 434. In Plaintiff's view, this statement was misleading because "in truth, the deceleration of cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the [Sales Practices] to push its cloud products on customers who did not want them" and customers were not renewing the deals "they had previously been pushed into." *Id.* ¶ 435.

### 2. Statements related to the allegedly coercive Sales Practices

On May 9, 2017, an analyst asked Bond to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." SAC ¶ 365. In response, Bond made the following statements:

- "This is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities."

- "And we try to do it as best we can, in as gracious [a] way as we can."

- "[o]n the other hand, the key, as we go to cloud, is this conversation is going to go away."

- "[A]s we go to cloud, we don't have to worry about that anymore. Because when you're in the cloud, you basically have a number of users that you've signed up for."

*Id.* Plaintiff alleges that these statements were materially false and misleading when made, because Bond denied that Oracle used "audits to drive cloud sales, and that Oracle's audits were not coercive, without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' tactic." *Id.* ¶ 366.

As another example, on May 22, 2018, in response to a report by The Information, the Company stated:

- "Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services."

SAC ¶ 453. The SAC alleges that it was misleading for Oracle "to deny that Oracle used audits to drive cloud sales, and state that Oracle had 'no reason to resort to scare tactics to solicit business,' without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by 'financially engineered deals' that were based on Oracle's use of the coercive 'Audit, Bargain, Close' tactic." *Id.* ¶ 454.

### 3. Statements related to the technical adequacy or superiority of cloud products

Many of the newly alleged statements celebrate the success of Oracle's cloud technology. For example:

- "We're really the only ones that have a complete suite of applications. I do not believe customers are going to want to have 10 different cloud providers, 8 different cloud providers. They want to have as few as they possibly can so they can get as much leverage across their infrastructure as possible. We sit in a very, very advantageous position relative to being the one that can bring the full suite, not just in applications but also in platform, as well as infrastructure." (SAC ¶ 352, statement by Hurd on March 16, 2017).

- "With Oracle Cloud Applications, Oracle provides a comprehensive and integrated suite of modern business applications that enable increased business agility and reduced costs. As a result, organizations across every industry are increasingly

selecting Oracle Cloud Applications to transform the way they do business." (SAC ¶ 358, statement by Miranda on May 4, 2017).

- "With the latest release of Oracle Cloud Applications, we are introducing hundreds of new innovations. [W]e are introducing a brand new solution [to Oracle's supply chain management application] that enriches the customer experience by bridging the gap between sales and customer service. The new release also includes further advancements to the user experience and customer-driven changes for human resources and finance." (SAC ¶ 386, statement by Miranda on August 2, 2017).

Plaintiff alleges that these statements were materially false and misleading when made, because they "touted the quality of Oracle's cloud platform" when "in truth, Oracle's cloud product was riddled with serious flaws, was not competitive with alternative cloud products, and was generating poor demand. SAC ¶ 353. Plaintiff also alleges the statements were misleading because they attributed Oracle's cloud growth to the product's technical capabilities, such as its "comprehensive and integrated" character, "while failing to disclose that (1) a material driver of Oracle's cloud sales was Oracle's use of the coercive 'Audit, Bargain, Close' and 'attached' deal tactics to create 'financially engineered deals;' and (2) in these deals, customers were not truly purchasing Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises products." *Id*. ¶ 359.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient

16

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.    Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    DISCUSSION

### A.    Claim 1 - Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C.A. § 78j.

Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

Defendants' motion to dismiss is predicated on the first two requirements. *See* Mot. at 5-16 (material misrepresentation or omission), 16-25 (scienter).

### 1. Non-actionable statements and omissions

#### a.   Corporate Puffery

To adequately plead a material misrepresentation or omission under § 10(b), the PSLRA requires plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014). A material misrepresentation differs significantly from corporate puffery. Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification"). Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Finally, "mildly optimistic, subjective assessment[s] . . . [do not]

amount[ ] to a securities violation." *Id.* "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Stearns v. Select Comfort Retail Corp.*, No. 08-cv-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009).

"The line between puffery and a misleading statement is often indistinct, and requires an analysis of the context in which the statements were made." *In re Wells Fargo & Company Shareholder Derivative Litigation*, 282 F.Supp.3d 1074 at 1097 fn. 21 (citing *Mulligan v. Impax Labs., Inc.*, 36 F.Supp.3d 942, 966 (N.D. Cal. 2014)). "Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because 'there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'" *Mulligan*, 36 F.Supp.3d at 966. (quoting *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F.Supp.2d 260, 310 (S.D.N.Y.2010)).

Defendants argue that many of the statements identified in the SAC are non-actionable statements of optimism. *See* Mot. at 15-16 (citing SAC ¶¶ 352, 356, 358, 361, 379, 385, 386, 393, 396, 402, 404, 424, 430)[12]. The Court previously concluded that SAC ¶¶ 356, 393, and 430[13] fell into this category. MTD Order at 13-15. The Court now concludes that some of the newly alleged misstatements amount to nothing more than puffery.

Specifically, on May 9, 2017, Oracle released a press release stating

> Oracle ERP Cloud is a complete, modern, and proven financial platform delivered seamlessly through the Oracle Cloud. A modern user interface driven by the latest design innovations delivers embedded analytics, contextual social collaboration and a device independent mobile experience that makes Oracle ERP Cloud familiar and easy to use.

SAC ¶ 361. Oracle's statements that its ERP Cloud product has a "modern user interface" and is "easy to use" are subjective and unverifiable assessments and therefore, non-actionable. *See In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (finding non-

---

[12] This corresponds to statements 6, 8, 9, 10, 21, 23, 24, 28, 29, 31, 32, 36, and 38. These numerical references to the individually asserted false statements are taken from Defendants' Appendix A, ECF 72 at 32-51.

[13] Statements 8, 28, and 38.

actionable the statements using the words "strong," "robust," "well positioned," "solid," and "improved"). Statements in Oracle's October 2, 2017 press release that the company released "major user enhancements" that put "the needs and experience of users at the center of the design" are similarly subjective. *Id.* ¶ 402; *see also id.* ¶¶ 352 ("We sit in a very, very advantageous position relative to being the one that can bring the full suite, not just in applications but also in platform, as well as infrastructure"), 385 ("Oracle is further extending the industry's broadest, deepest, and fastest growing suite of cloud applications"), 386 ("[W]e are introducing a brand new solution [to Oracle's supply chain management application] that enriches the customer experience by bridging the gap between sales and customer service. The new release also includes further advancements to the user experience and customer-driven changes for human resources and finance."). Ellison's statement on June 21, 2017 that Oracle has "a better storage hierarchy system" and can provide "very high performance at a dramatically lower cost" also falls into this category. *Id.* ¶ 379.

The remaining statements cited by Defendants (SAC ¶¶ 358, 396, 404, 424)[14] can be verified and are not otherwise corporate puffery. *See also* MTD Order at 15 (concluding SAC ¶ 404—then referred to as CAC ¶ 252—was not corporate puffery).

### b. Safe Harbor

PSLRA's Safe Harbor precludes liability for forward-looking statements in two circumstances: "if they were identified as forward-looking statements and accompanied by meaningful cautionary language," or "if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading." *In re Cutera*, 610 F.3d at 1111–12; 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021). A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A). The Court previously concluded that statements SAC ¶¶ 370, 371, 377, 442, 461[15] were protected by the Safe Harbor. MTD Order at 15-

---

[14] Statements 9, 29, 32, and 36.

[15] Statements 15, 16, 20, and 47. The statement at SAC ¶ 461 does not appear in Appendix 1 or in Defendants' chart mapping each statement between the FAC and SAC.

16. Defendants identify several new statements as forward-looking and protected under the Safe Harbor. Mot. at 15-17 (citing SAC ¶¶ 396, 434, 446, 448).[16]

The Court agrees that the newly alleged misstatements are protected under Safe Harbor. Specifically, as to the following statements:

- "Our Fusion ERP, Fusion HCM, which is the mid-market and the high-end of ERP and the mid-market and high end of HCM, these are all internally developed systems. They're--HCM and ERP, I think, blended rate is growing triple digits. The size of these markets are enormous, and we think we'll be able to ride that horse, pursue that organic growth and meet our targets." (SAC ¶ 396, statement by Ellison on September 14, 2017).

- "[T]he capabilities in the cloud are so much better, the economics in the cloud are so much better than what's available on-premise that we think our customers are going to move very, very rapidly to the cloud." (SAC ¶ 434, statement by Ellison on December 14, 2017).

- "[W]e have some very high growth rate SaaS businesses like ERP and HCM. And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite . . . Fusion becoming a more and more -- a larger and larger percentage of our total SaaS business, then the change in mix. You've got -- right now you certainly have a very large Fusion SaaS business growing at a high rate, which then dwarfs the slower growing acquired businesses. So the reacceleration, again, to quote Mark, is just a matter of math." (SAC ¶ 446, statement by Ellison on March 19, 2018).

- "The percent of our [existing] user base that is in our [cloud] pipeline now is getting to be fairly exten[sive], meaning it's multiple 10s percent of our user base. And to your point, when we convert . . . a traditional on-premise application to SaaS, we typically get 3x the revenue. [J]ust moving the user base does turn us into a very, very large SaaS business and to your point, very well accelerates our growth rate." (SAC ¶ 448, statement by Hurd on March 19, 2018).

absent a challenge to the accuracy of the statistics referenced in the statements, the forward-looking portions of the statements (*e.g.*, SAC ¶¶ 396 ("we think we'll be able to ride that horse, pursue that organic growth and meet our targets"), 434 ("we think our customers are going to move very, very rapidly to the cloud"), 446 ("right now you certainly have a very large Fusion SaaS business growing at a high rate, which then dwarfs the slower growing acquired businesses"), 448 ("just moving the

---

[16] Statements 29, 40, 46, and 48.

user base does turn us into a very, very large SaaS business and to your point, very well accelerates our growth rate")) were made in response to forward-looking questions or were otherwise accompanied by meaningful cautionary language and are thus non-actionable under the Safe Harbor. *See* ECF 73-8 (transcript of earnings call); ECF 73-9 (same); ECF 73-10 (same); *see also Wochos*, 985 F.3d at 1190 ("[T]he PSLRA's safe harbor does not apply in an all-or-nothing fashion, because some statements about the future may combine non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements.").

### 2. Falsity

Viewing the SAC allegations in the light most favorable to Plaintiff for purposes of ruling on the present motion to dismiss, the Court first considers whether the SAC specifies the reason or reasons why the alleged misstatements are false or misleading. *See* 15 U.S.C. § 78u-4(b)(1). In the Ninth Circuit, plaintiffs may establish falsity in three ways: "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 616. In order to plead falsity, a plaintiff must plead "specific facts indicating why" each statement at issue was false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler*, 540 F.3d at 1070. In order to be actionable, an omission must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, Inc., 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017).

The SAC forwards new allegations regarding Generally Accepted Accounting Principles ("GAAP") violations, the materiality of the Sales Practices, cloud product defects, and the reasons underpinning cloud revenue deceleration. *See* Opp. at 1-7. Despite these amendments, Defendants argue that Plaintiff has failed to plead materially false or misleading statements. Defendants argue

22

that (1) Plaintiff fails to show falsity of statements about Oracle's cloud revenue, growth rates, and products, Mot. at 5-10; (2) Plaintiff's newly pled product defect allegations do not render any statements false or misleading, Mot. at 11-14; and (3) Plaintiff fails to show that Defendants misled investors about the reasons underpinning Oracle's cloud growth deceleration, Mot. at 14-15.

Before addressing Defendants' argument, the Court acknowledges at top that Plaintiff has dedicated significant investigative resources in the operative complaint. These efforts are not in vain. As explained below, Plaintiff has adequately pled a narrow omission-based theory of fraud. Although some of the surviving statements pose a close call, the Court opts to allow them to proceed and be reviewed with the benefit of a more developed record.

### a. Cloud Revenue and Growth

#### i. GAAP Allegations

The SAC contains new allegations that Oracle's financial reporting violated GAAP and was therefore misleading. SAC ¶¶ 327–42. Financial statements filed with the SEC which are not consistent with GAAP are presumed misleading. 17 C.F.R. § 210.4–01(a)(1). Plaintiff alleges Oracle's accounting for attached and ABC deals violated GAAP. SAC ¶¶ 327–42. Specifically, the SAC alleges that Oracle's engineered deals were "multiple element arrangements" subject to ASC 605-25, which required Oracle disclose "[t]he nature of its multiple-deliverable arrangements" and "significant deliverables within the arrangements." *Id.* ¶¶ 328, 332.

Under ASC 605-25:

> In an arrangement with multiple deliverables, the delivered item or items shall be considered a separate unit of accounting if all of the following criteria are met:
>
> > a. The delivered item or items have value to the customer on a standalone basis. The item or items have value on a standalone basis if they are sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), this criterion does not require the existence of an observable market for the deliverable(s).
> >
> > b. There is objective and reliable evidence of the fair value of the undelivered item(s).

United States District Court
Northern District of California

c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item or items is considered probable and substantially in the control of the vendor.

In support of these allegations, the SAC includes the opinion of Harris L. Devor, CPA, a partner of a national accounting firm with 46 years of experience. SAC ¶ 339. Devor states that "[a]ssuming the truth of the Complaint's allegations that Oracle engaged in ABC and attached deals and the sales tied to those tactics were material, ASC 605-25-50 would have required Oracle to disclose the use of ABC and attached deals to generate and report cloud revenue in its Forms 10-K and 10-Q filed with the SEC during the Class Period." *Id*. ¶ 340.

Defendants argue that GAAP does not, standing alone, create an affirmative disclosure duty for purposes of Section 10(b) and Rule 10b-5. Mot. at 10 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014)). They also argue that Oracle made appropriate disclosures under GAAP and discount the opinion of Devor as speculative. *Id*. at 10-11. Plaintiff responds that "ASC 605-25 ensures that investors understand how a company is generating the revenue it reports, including whether it is tying unwanted products to products with significant demand, as Oracle did." Opp. at 11. Plaintiff also argues that "even without Devor's opinion, the GAAP allegations [within the SAC] are sufficiently specific" and that Devor properly based his opinion on those allegations. *Id*. at 12.

As an initial matter, Defendants' reliance on *Sgarlata v. PayPal Holdings, Inc*. to discredit Devor's opinion is misplaced. 409 F. Supp. 3d 846, 859 (N.D. Cal. 2019), *aff'd sub nom.*, *Eckert v. PayPal Holdings, Inc.*, No. 19-16869, 2020 WL 7399009 (9th Cir. Dec. 17, 2020). In *Sgarlata*, investors brought a securities class action against PayPal Holdings, Inc. ("PayPal") and PayPal executives for failing to fully disclose the seriousness of a cybersecurity breach that occurred within a PayPal subsidiary. *Id*. at 850-51. To bolster their showing of scienter, plaintiffs submitted allegations of a cybersecurity expert "about what information was likely available to [the defendants] regarding the scope of potential compromise of [the subsidiary] customers' data at the time the breach." *Id*. at 859. After reviewing public statements made by the defendants, statements

24

set forth in the complaint, and publicly available information about the security breach, the expert concluded that the "[defendants'] conduct in response to the breach indicates that they were likely aware that all customer data had been potentially compromised as of November 10th." *Id*. at 860. The court concluded that the expert's opinion failed to "sufficiently strengthen the inference of scienter" and that there was "no allegation that [the expert] was familiar with, much less had knowledge of, the specific security architecture of Defendants' privacy network." 409 F. Supp. 3d at 860.

Here, Plaintiff's use of expert opinion goes to falsity, not scienter—a key distinction given expert testimony about scienter inherently runs the risk of speculation. What's more, Devor reviewed detailed allegations about Oracle's sales practices—documents that, unlike in *Sgarlata*, were directly related to the ultimate opinion he offered. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159–60 (N.D. Cal. 2015) (finding it plausible that statements were false based on a semiconductor industry expert's opinion about the "typical computer chip production supply chain timeline").

Nonetheless, Devor's opinion is insufficient to establish that Oracle ran afoul of ASC 605-25. The SAC alleges that "Devor reviewed the Complaint and relevant accounting literature, including ASC 605-25, Revenue Recognition, Multiple-Element Arrangements." SAC ¶ 339. Noticeably absent from this list is Oracle's publicly released Forms 10-K and 10-Q. In other words, Devor's opinion does not incorporate whether Oracle in fact made proper disclosures pursuant to ASC 605-25. And, indeed, Oracle's 2017 10-K includes ASC 605-25 disclosures related to its cloud offerings:

> *Revenue Recognition for Multiple-Element Arrangements—Cloud SaaS, PaaS and IaaS Offerings, Hardware Products, Hardware Support and Related Services (Non-software Arrangements)*
>
> We enter into arrangements with customers that purchase non-software related products and services from us at the same time, or within close proximity of one another (referred to as non-software multiple-element arrangements). Each element within a non-software multiple-element arrangement is accounted for as a separate unit of accounting provided the following criteria are met:

United States District Court
Northern District of California

the delivered products or services have value to the customer on a standalone basis; and for an arrangement that includes a general right of return relative to the delivered products or services, delivery or performance of the undelivered product or service is considered probable and is substantially controlled by us. ***We consider a deliverable to have standalone value if the product or service is sold separately by us or another vendor or could be resold by the customer***.

. . .

ECF 73-12 at 45-47. (Oracle 2017 10-K) (emphasis added).

While Devor may offer an opinion about the allegations within the SAC, his opinion rings hollow in light of Oracle's actual disclosures to the SEC. On its face, this disclosure complies with ASC 605-25—and neither the allegations within the complaint nor the opinion of Devor suggests otherwise. *See also* Reply at 3 ("Plaintiff ignores Oracle's disclosures on this issue entirely. Plaintiff cites no authority applying ASC 605-25 to similar transactions, fails to analyze Oracle's disclosures, and ignores that Ernst & Young LLP independently audited Oracle's financial statements . . . " (internal citation omitted)).

Plaintiff has failed to plead sufficient facts, taken as a whole, to support an inference that Oracle did not comply with GAAP's requirement that companies account for "multiple-element arrangements" pursuant to the provisions of ASC 605-25.

ii.     Cloud Revenue and Growth

Plaintiff again contends that Defendants' statements about cloud revenue and growth were false and misleading because they failed to disclose that Oracle was engaged in "improper sales tactics" to boost sales of "flawed" products. SAC ¶¶ 1-2. Defendants argue that the SAC, just like the CAC, falls short in this respect. Mot. at 5-9.

As the Court acknowledged in its prior order, Oracle's concededly accurate financial reporting and projections is a tough hurdle for Plaintiff to overcome. MTD Order at 19. In support of this conclusion the Court explained:

In order to be actionable, an omission must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech*., Inc., 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), aff'd, 856 F.3d 605 (9th Cir. 2017).

United States District Court
Northern District of California

1
2
3
4
5
6

Oracle's financials during the Class Period are consistent with the Defendants' statements on Cloud growth and with the state of affairs at Oracle: (1) revenues from Cloud sales were growing, (2) the growth was expected to slow down, and (3) the growth eventually slowed down at the same rate Oracle predicted and disclosed to its investors. *See* CAC ¶ 159 ("Oracle admitted that it expected additional deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are 'expected to grow 19% to 23% in USD, 17% to 21% in constant currency.'").

7
8
9
10
11
12
13
14
15
16

Put differently, "a duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements." *Retail Wholesale*, 845 F.3d at 1278. Thus, when Defendants discussed Oracle's Cloud revenue growth generally and absent an affirmative representation by Defendants regarding Oracle's allegedly coercive Sales Practices or attribution of Cloud revenue to other factors (both alleged by Plaintiff and discussed below), they had no duty to disclose the Sales Practices. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (rejecting allegations that a press release was misleading for failure to disclose a possible merger because it did not "affirmatively intimate[] that no merger was imminent," but instead "neither stated nor implied anything regarding a merger"); *Metzler*, 540 F.3d at 1071 (concluding that defendant was not required to immediately disclose government investigations into its business practices absent "some affirmative statement or omission by [defendant] that suggested it was not under any regulatory scrutiny). In sum, Defendants were not under an independent obligation to disclose their Sales Practices.

17
18
19
20
21
22
23
24
25

MTD Order at 19. Similarly, with respect to Oracle's cloud sales, the Court concluded that "Plaintiff has not alleged that Oracle's financial reports are false or that Defendants made false or misleading representations regarding Oracle's sales renewal rates." *Id.* at 20. In this same section, the Court addressed Defendants' attack on the CAC's use of CW reports; the Court agreed with Defendants' assessment that the CW allegations were "vague, conclusory, and lacking in specific time references" and concluded that "the CW accounts must provide additional facts to establish that the revenue generated through the allegedly coercive Sales Practices constituted a material portion of Oracle's Cloud revenue at the time each alleged misstatement was made." *Id.* at 22-24.

United States District Court
Northern District of California

It is within this context that the Court addresses Plaintiff's amendments. The SAC alleges "new facts demonstrating that Oracle's 'coercive Sales Practices constituted a material portion of Oracle's Cloud revenue.'" Opp. at 3 (citing MTD Order at 23-24). These new facts come in the form of CW and industry member allegations. For the reasons detailed below, the Court finds that the CW and industry allegations are particularized and reliable; nonetheless, the Court concludes that the allegations are insufficient to overcome the shortcomings the Court detailed in its prior Order. *See In re Redback Networks, Inc. Sec. Litig.*, No. C 03-5642JF(HRL), 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007), *aff'd*, 329 F. App'x 715 (9th Cir. 2009) (dismissing claims where defendants "sold real products for real money" and "revenues were accurately reported.").

***CW Allegations***. Defendants argue that "Plaintiff has failed to allege particularized facts establishing the CWs' reliability and personal knowledge as to these quantifications." Mot at 6. Facing a similar argument while considering the previous motion to dismiss, the Court "agree[d] with Plaintiff that the CW statements provide a plausible picture of the wide-spread nature of Oracle's Sales Practices in various regions" but noted that the CW testimony was "limited to each CW's 'team' and the SAC fails to otherwise allege that those 'teams' had a significant impact on Oracle's overall revenue." MTD Order at 23. (citing *Apollo,* 774 F.3d at 609 (Plaintiff "must show with particularity" how the company's practices "affected the company's financial statements and whether they were material in light of the company's overall financial position.")).

The CW accounts detailed in the SAC provide the requisite additional facts to establish that the revenue generated through the Sales Practices constituted a material portion of Oracle's cloud revenue at the time each alleged misstatement was made. For example, CW2, a former Vice President in North America cloud sales from September 2015 to December 2018, reported that 90-95% of Company-wide cloud sales during fiscal years 2016 and 2017, at a minimum, were engineered deals." SAC ¶ 112; *see also* Mot. at 7. CW2 explained that this statistic was included in a year-end presentation for Hurd and was confirmed during quarterly meetings in 2016-2017 by Senior Vice President of Cloud Shawn Price and Executive Vice President of Cloud Business Group David Donatelli, both of whom reported directly to Hurd. *Id.* ¶¶ 112, 114. This statistic was also

confirmed to CW2 by executives in Oracle's SaaS business, including the Senior Vice President of SaaS Customer Success for North America. *Id.*

This report is further corroborated by CW1, a Regional Sales Director for Middle East and Africa at Oracle, who alleged that during the Class Period at least 80% of Middle East and Africa cloud revenue was generated by "inserting cloud into compliance-based deals"; CW11, a Regional Vice President of Technology at Oracle, who alleged that "90% of Oracle's North American IaaS and PaaS revenue was generated through engineered deals"; CW 3, a Senior Technology and Cloud Sales Consultant, who reported that "use of the ABC tactic ramped up in the beginning of calendar 2017 because all of the customers closed through attached deals the previous year were not renewing their cloud service – after all, 80% of them had purchased the cloud product without any intention of even using it"; and CW9, a Director of Cloud Customer Success and Customer Experience, who explained that "engineered deals[] accounted for between 75% and 90% of all North American cloud revenue throughout 2016 and 2017." *Id.* ¶¶ 108, 117, 121, 138.

Buttressing these accounts are allegations about Oracle's internal Customer Lifecycle Management ("CLM") system that "tracked the health of customer accounts and the reason for customer "churn." SAC ¶ 142 (attributing information to CW5 and CW9).

> [W]hether an account was DOA would be reflected in the CLM system and that team members would put in the customer's disposition notes that they were "DOA." Through these entries in the CLM system, [CW9] knew that ERP renewals were only 15-25% and that 90% of the accounts that did not renew were DOA. According to [CW9], only approximately 10% of the customers that were DOA could be convinced to use the product. [CW9] described that Customer Success reports based on information from CLM were discussed in meetings with the VP and SVP of Customer Success. Customer Success would put together these reports, which [CW9] understood would be summarized and presented at a higher level.

*Id.* ¶ 143. According to CW5, much of this information was readily available to "renewal representatives, customer success managers, certain sales teams, and the implementation success managers responsible with getting customers to deploy product." *Id.* ¶ 142.

*Brodsky v. Yahoo! Inc*. does not save Defendants from this conclusion. 630 F. Supp. 2d 1104 (N.D. Cal. 2009). In *Brodsky*, the plaintiff alleged that the defendant company engaged in "click fraud" to inflate its reported advertising revenue and relied upon multiple CWs who estimated the revenues generated through the alleged scheme. The court rejected the allegations because there were no allegations that the CWs had "personal knowledge of Yahoo!'s revenue recognition process" such that they could reliably support claims of misleading revenue reporting. *Id*. at 1114-16. As the Court explained above, it finds that Plaintiff has established that the CWs have sufficient personal knowledge of Oracle's sales practices by virtue of their job roles and Oracle's CLM system.

The CW allegations in the SAC are "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 995 (9th Cir. 2009). Accordingly, the CW allegations serve to establish the pervasiveness of Oracle's Sales Practices.

***Industry Participant Allegations***. Defendants also argue that "[n]one of these consultants has any alleged knowledge of Oracle's revenue recognition associated with the alleged sales made to the customers with whom they consulted" and that "[t]hey offer no more than speculation as to the timing of Oracle's revenue recognition or how revenue was allocated between the Cloud and on-premise portions of transactions." Mot. at 8. This criticism misses the mark. The industry participant allegations were not offered to uncover a complex revenue recognition scheme; rather, they speak to Oracle's widespread use of auditing to generate cloud revenue. The Court also rejects Defendants challenge that the industry participant allegations are flawed as they only account for $120 million of Oracle's $7.7 billion in cloud revenue. *Id*. Construing these allegations in a light favorable to Plaintiff, the industry statements establish a representative sample of what a given Oracle cloud customer might experience. The industry participant allegations, like those of the CWs, serve to establish the pervasiveness of the Sales Practices.

But while the SAC provides new facts that fortify allegations about Oracle's pervasive use of the Sales Practices, it does not provide any allegations to overcome the Court's prior holding that Oracle had no duty to disclose these practices. *See* MTD Order at 19 ("when Defendants discussed

30

Oracle's Cloud revenue growth generally . . . they had no duty to disclose the Sales Practices.") Aside from new allegations that Defendants ran afoul of GAAP—which this Court has rejected— Plaintiff does not suggest that Oracle's financial reporting is false. Just as in *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464, this poses an impassable barrier to Plaintiff. In *Redback*, plaintiffs characterized defendants' sales as "improper," "illegitimate," and the result of bribery and quid pro quo arrangements. *Id.* at *1. The court, nonetheless, dismissed the claims because defendants "sold real products for real money" and "revenues were accurately reported." *Id.* at *3. *See also* MTD Order at 23-24. So too here. While Plaintiff can insist that Oracle "was effectively paying people to take unwanted cloud shelfware off its hands," Oracle, like the defendant in *Redback*, "sold real products for real money." Opp. at 13.

iii.    Drivers of Cloud Revenue

Plaintiff also contends that Defendants misleadingly attributed Oracle's cloud revenue growth to the quality and competitiveness of its cloud offering, while failing to disclose that engineered deals were a material driver of those results. *See* SAC ¶ 267, 358, 361, 418, 424; *see also* Opp. at 10-11. As the Court explained in its prior order: [O]nce Defendants made statements about the drivers of Cloud revenue growth, the investors would have been interested to know that "a material driver" of Cloud Sales was Oracle's Sales Practices. MTD Order at 25. However, the Court ultimately found that Plaintiff failed to establish the materiality of Oracle's Sales Practices. *Id.*

The SAC has overcome this hurdle. Plaintiff has provided additional allegations from the CWs along with new allegations from industry members that establish the materiality of revenue generated through Sales Practices. *See* Order at 27-30 ( "CW Allegations" and "Industry Member Allegations"). Oracle does not have an independent duty to disclose its sales tactics; nevertheless, once Defendants made statements about the drivers of cloud revenue growth, investors would have been interested to know that Oracle's allegedly coercive sales practices were "a material driver" of cloud sales. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) ("[I]nvestors would also have been interested to know that millions of dollars of loans were not the

result of organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly neutral platform, but were inflated artificially through self-dealing disguised as real transactions."). At this stage, allegations relating to the reasons for which customers adopted Oracle's cloud products over the competition are adequate to state an omission-based claim under Section 10.

### b. Cloud Product Defects

Plaintiff alleges ten new statements concerning the quality and competitiveness of Oracle's cloud products. *See* SAC ¶¶ 352, 358, 361 379, 385, 386, 396, 402, 434, 446.[17] Defendants argue that Plaintiff's allegations about cloud product defects are too vague to be rendered false or misleading. Mot. at 11-14. Plaintiff rejects this characterization. Opp. at 14-16.

The majority of these statements are non-actionable because they are either corporate puffery or fall within the PSLRA's Safe Harbor. *See* SAC ¶¶ 352, 361, 379, 385, 386, 402, 434. That leaves the Court to consider just two statements: SAC ¶¶ 358, 396.[18] Applying the Ninth Circuit's reasoning in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), the Court concludes that Plaintiff's theory of liability cannot rest solely on the falsity of these statements. In *Vantive*, plaintiffs alleged that Vantive Corporation, its officers, and its directors made knowingly false and misleading statements about the competitive prospects of the company's customer relationship management software. 283 F.3d at 1084. Plaintiffs challenged statements that Vantive Corporation "'experienced good demand for its Vantive Enterprise/Sales product in the U.S.' and that its 'products were differentiated from competitors' products by their high quality and superior functionality'" *Id*. at 1088. Plaintiffs alleged that these statements were misleading because "Vantive's [core] products were not substantially differentiated from the products of its competitors and did not have superior functionality or technological features . . . resulting in slow sales of these products" and that "'Vantive's salesforce automation products . . . all suffered from technological and performance shortcomings compared to competitive products.'" *Id*. at 1088-89. The Ninth Circuit found that the "vagueness of these allegations needs no elaboration; there are no facts alleged

---

[17] Statements 6, 9, 10, 21, 23, 24, 29, 31, 41, and 46.
[18] Statements 29 and 46.

to show how the imprecise deficiencies asserted to hamper the product affected Vantive's competitive position" or facts showing Vantive Corporation was "non-competitive in fact." *Id*.

Just as in *Vantive*, Plaintiff alleges that the Defendants deliberately misled investors about the technological prowess of Oracle's cloud products. But the allegations within the SAC are not detailed enough to render the identified statements false or misleading. Many of these allegations are sorely lacking in detail. For example, the SAC alleges that Oracle's cloud products suffered from "user interface issues," which caused customers to "struggle[] to complete tasks" and that "Oracle had a vast backlog of critical unfixed deficiencies and efforts to fix those deficiencies were being pushed back." SAC ¶¶ 92, 93. Elsewhere, the SAC offers some factual particularities about how flaws manifested in Oracle's cloud products. For example, according to CW10, Oracle's human resources software "could not even execute a simple search function. If an HR director wanted to find out the salary of a specific employee or the average salary of a department, there was no way to just do a simple query to find that information." *Id*. ¶ 77.

But even where the alleged flaws are grounded by some factual particularities, the SAC fails to connect those flaws to Oracle's competitors or competitive position. *See Vantive*, 283 F.3d at 1089 ("there are no facts alleged to show how the imprecise deficiencies asserted to hamper the product affected Vantive's competitive position . . or whether the result rendered Vantive non-competitive in fact"). To this end, the SAC alleges that a hypothetical customer who "deployed Oracle products for HR management, finances, and customer management . . . may have to use all three of these applications as part of logging activities related to a single task." SAC ¶ 78. According to the SAC, "[i]t would be reasonable to expect that they should be able to link these various products so the customer could use them all at the same time, but that was not the case." *Id*. While the SAC argues that integration between cloud products was a "very basic function[] that customers expected based on the abilities of other products within the market space," Plaintiff offers no facts to support such a conclusion, such as a comparison to the level of integration offered by Oracle's competitors.

33

In sum, Plaintiff fails to plead falsity with respect to Defendants' statements about the technological strength of Oracle's cloud products.

### c. Cloud Growth Deceleration

Finally, the SAC alleges that Defendants misled investors about the reasons underpinning Oracle's cloud growth deceleration. *See, e.g.,* ¶¶ 224, 255, 416; *see also* Opp. at 13-14. Defendants stated that cloud revenue growth was decelerating because (1) customers were waiting for Oracle's next generation cloud product, known as the "Autonomous Database" and (2) Oracle's "Bring Your Own License" program allowed its customers to purchase software licenses that could flexibly be used in whatever medium the customer chose, either cloud or on-premises. *See* SAC ¶¶ 434, 443. Plaintiff argues that, in actuality, customers refused to renew short-term subscriptions that had been forced on them, *id.* ¶¶ 138–44, customers, with the assistance of consultants, increasingly resisted the ABC tactic, *id.* ¶¶ 151–73, and Oracle "burned through" many audit targets by the end of 2017, *id* ¶¶ 208–13. Opp. at 13 (citing *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *10 (C.D. Cal. Aug. 4, 2017) (statements about the "causes of the [sales] declines" actionable)).

Considering a similar theory in the CAC, the Court concluded:

> The Court agrees that the factual allegations in the CAC do not paint the picture that Plaintiff describes. *See* reply at 8, ECF 49. The gist of the CAC allegations is that (1) Oracle engaged in aggressive sales tactics, (2) sold short-term (one-year) subscriptions to Cloud products that its customers did not want, (3) by the end of the Class Period, customers declined to renew those subscriptions, and (4) as a result, Oracle's Cloud sales revenue growth decelerated. *See* CAC ¶¶ 2, 18, 119-121. The CAC alleges that the Sales Practices started in 2014. *Id.* ¶ 54. Many of the allegations regarding the Sales Practices predate the Class Period by years: the investigation by the Chilean regulator started in 2015 (*id.* ¶ 137), audit of the City of Denver took place in 2016 (*id.* ¶ 93), Clear Licensing Counsel warned Oracle in 2014 (*id.* ¶ 181), and CW4's report pertains to 2015 (*id.* ¶ 87). Based on the facts alleged in the CAC, Oracle's Cloud revenue deceleration should have decelerated earlier than June 2018. Instead, the Cloud sales kept growing throughout the Class Period.

MTD Order at 27.

The SAC offers new allegations about Oracle customers who declined to renew their cloud subscriptions after one year. For example, CW1 identifies several companies which Oracle closed audit-driven deals within fiscal year 2017: "Oreedo QSC, generating approximately $15 million in cloud revenue; Samba Financial Group, generating approximately $23 million in cloud revenue; and National Water Company (Saudi Arabia), generating approximately $18 million in cloud revenue." SAC ¶ 111. The SAC also provides allegations that explain the timeline of Oracle's cloud growth deceleration:

> Moreover, initiating the audit process took time, and while Oracle tried to push them through, savvy customers began to recruit third-party consultants to intervene. [CW]3 stated that towards the end of 2017, they began to see these third-party consultants, including Palisade and House of Brick, at Oracle User Group meetings and at the Oracle Open World conference in October 2017. [CW]3 stated that as these consultants became more visible and customers began to learn about Oracle's tactics, cloud revenue dried up.

¶ 210; *see also id*. ¶¶ 151-188 (industry participant allegations).

The Court, again, emphasizes that Oracle does not have a stand-alone duty to disclose its sales practices. However, as with Defendants' statements about drivers of cloud growth, once Defendants made statements about the reasons underpinning cloud growth deceleration, investors would have been interested to know that the dwindling efficacy of Oracle's sales practices had a material impact on this decline. *See LendingClub*, 254 F. Supp. 3d at 1118. At this stage, the allegations relating to cloud growth deceleration are adequate to state an omission-based claim under Section 10.

***

Plaintiff has successfully pled a narrow omission theory of securities fraud. This theory centers on Defendants' statements about Oracle's cloud growth deceleration and the drivers of cloud growth. Statements at FAC ¶¶ 363, 367, 390, 404, 416, 418, 422, 424, 433, 434, 443, 446, and 453[19]

---

[19] Statements 11, 13, 26, 32-36, 39-40, 45-46, and 50.

United States District Court
Northern District of California

support this theory. The Court emphasizes that this theory is not based on a stand-alone duty to disclose allegedly coercive sales tactics; rather, Oracle's affirmative representations about cloud growth deceleration and drivers of cloud growth "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. This is particularly true during a Class Period where the nascent cloud market exploded and Oracle competitors enjoyed robust growth. With the exception of this theory and associated statements, the Court DISMISSES the SAC.

### 3. Scienter

A defendant is liable for making false statements under Section 10(b) and Rule 10b-5 when he acts with scienter, a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 705 (9th Cir. 2016) (internal citation and quotation marks omitted). "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id*. (quoting *Zucco Partners*, 552 F.3d at 991). As such, "[f]acts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701. A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint. *See Tellabs*, 551 U.S. at 324. Plaintiff must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id*. at 323. In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material holistically, not "scrutinized in isolation." *VeriFone Holdings*, 704 F.3d at 701.

United States District Court
Northern District of California

Defendants challenge the sufficiency of Plaintiff's scienter allegations. Mot. at 16-25. They argue that the confidential witness allegations do not establish scienter and are otherwise unreliable; that an October 2017 email does not support a scienter inference; that alleged stock sales by Kurian, Hurd, and Catz do not support a scienter inference; that the alleged compensation structure of Hurd, Catz, Ellison, and Kurian does not support a scienter inference; and that Plaintiffs' allegations, when considered holistically, fail to support a scienter inference. *Id*.

The Court has reviewed all of Plaintiff's allegations separately and holistically to determine whether Plaintiff has alleged sufficient facts to support scienter. *Tellabs*, 551 U.S. at 323. The allegations within the SAC give rise to a strong inference of scienter with regard to Hurd, Catz, Ellison, Bond, and Oracle. *See In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 475–76 (9th Cir. 2015)* ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of [Section 10(b) and Rule 10b–5] when those senior officials were acting within the scope of their apparent authority."). Plaintiff's allegations against Kurian and Miranda, however, fail short in this regard.

Plaintiff's core claim is that Oracle knowingly foisted inferior cloud products on unwilling customers by threatening license audits that could produce penalties in excess of the price of the cloud products. While Oracle earned real revenue from these sales, unused and non-renewed one-year cloud subscriptions dwindled over time as Oracle exhausted the list of customers it was able to strong-arm. When questioned why Oracle's cloud sales rates skyrocketed at first and later slowed, Defendants affirmatively and falsely attributed Oracle's success and subsequent slowed sales rates to false reasons, masking the material impact of engineered sales on cloud growth.

### a. Plausibility

At the outset, the Court addresses Defendants' argument that Plaintiff's fraud theory lacks cogency. Mot. at 23-25. Defendants argue that Plaintiff "fails to allege any coherent motive for the

alleged fraud" and that "Oracle's repurchase of over $12 billion worth of its shares during the class period further supports an inference of innocence." *Id.* at 24 (internal marks and citations omitted).

The Ninth Circuit recently highlighted the importance of holistically considering the plausibility of fraud theories. *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). In *Nguyen*, the Ninth Circuit reviewed allegations that a medical device corporation and its officers promised the market that the FDA would approve an aneurysm sealing product, despite the fact that they allegedly "knew the FDA would eventually figure out that [the product] could not be approved due to 'intractable' and 'unresolvable' . . . problems" *Id.* at 415. After emphasizing that plausibility was equally relevant to non-fraud and fraud pleading standards, the panel concluded that "the notion that a company would promise FDA approval that it knew would not materialize does not, without more, create a strong inference of intent to deceive or deliberate recklessness," explaining that "[t]he theory does not make a whole lot of sense. It depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the product's] 'unsolvable' migration problem was revealed." *Id.*

The Court finds the overall fraud theory alleged in the SAC plausible, cogent and compelling. Unlike in *Nguyen*, Plaintiff does not allege that Defendants engaged in a fraud scheme to cover up the inevitable reveal of a critical problem. Instead, Plaintiff alleges that Defendants attempted to buy themselves time to improve their flagging cloud products by deploying coercive sales practices and obfuscating that these practices were material drivers of cloud product growth and deceleration. Indeed, under this theory, it would not be implausible that Oracle would simultaneously decide to repurchase $12 billion in shares while it launched its struggling cloud services. Corporate optimism about the eventual success of the cloud products makes this at least as plausible as Plaintiff's spin. Plausibility is not a death knell for Plaintiff.

### b.  CW and Factual Allegations

### i. Hurd and Catz

Hurd and Catz made the following statements during the Class Period about drivers of cloud growth and cloud growth deceleration:

- Statement 26, Defendant Catz, September 14, 2017 during Earnings Call: "As you can see, we had another good quarter. Customer adoption of our cloud products and services continue to be very, very strong, and our on-premise business remains very resilient."

- Statement 33, Defendant Hurd, October 5, 2017 at OpenWorld Financial Analyst Meeting: In response to the question "why maybe [Oracle's slowing] guidance is less of a sequential uptick than many of us may have had in our models?", Hurd stated "[s]o depending on what got booked in what pillar where, there can be more implementation to do to get something. And the more ERP that we sell, this is good news, by the way, but short term, it is a longer provisioning time to provision ERP . . . . So there's different provisioning times."

- Statement 39, Defendant Catz, December 14, 2017 during Earnings Call: In response to the question "I think what some of us are trying to reconcile is, is the cloud guidance is a little bit slower than it has been. So it looks like something might be decelerating a little bit. And I just wanted to understand, is there a gap as people maybe buy licenses on-prem, and then maybe it's a quarter or 2 before they deploy in the cloud?", Catz responded "mov[ing] to [Oracle's] cloud when it makes sense for them."

The CW allegations within the SAC give rise to a strong inference that co-CEOs Hurd and Catz acted with at least deliberate recklessness when they made the identified statements between September and December 2017. "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted). The Court has already concluded that the CW statements meet this first requirement; it now turns to whether the CW allegations serve to establish the second requirement.

United States District Court
Northern District of California

The Court previously found that the then-nine CWs "did . . . have personal knowledge that Hurd or Catz approved large sales tied to Oracle's Sales Practices," but requested that Plaintiff include additional facts concerning "*when* Hurd or Catz approved the deals [and] *how* Hurd or Catz would have known—based on these deal approvals—that the Sales Practices generated a material portion of Cloud revenues." MTD Order at 31. The SAC is replete with allegations that create a strong inference that Catz and Hurd were both aware before September and December 2017 that the allegedly coercive sales practices were a dominant factor in cloud growth and deceleration. First, CW11, corroborated by CW1 and CW3, alleges that Hurd pioneered the ABC tactic while Catz expanded it use in 2016. SAC ¶¶ 102, 107, 120, 124. Second, according to CW1 and CW3, either Hurd or Catz was required to approve deals in excess of $5 million, or involving a 50% or greater discount on on-premise software through Oracle's internal Deal Approval System ("DAS"). *Id*. ¶¶124–25. As a result of this system, CW3 alleged that Hurd approved 80% of Southern California's engineered deals. *Id*. ¶ 125. Similarly, CW1 alleged that he saw Hurd's and Catz's names on approvals for compliance deals in the DAS system. *Id*. ¶ 279. The SAC also identified several specific deals that Hurd approved under this system in 2017—Oreedo QSC, Samba Financial Group, and National Water Company—that were generated using the ABC tactic. *Id*. ¶¶ 19, 111, 124. The SAC alleges that Hurd and Catz would have been aware of these deal were engineered because required fields in the DAS entry stated whether the deal was audit-driven (and involved LMS) or attached. *Id*. ¶¶ 126, 252, 254, 279.

Fourth, the CWs reported that Hurd regularly attended meetings about cloud sales and the use of the Sales Practices to close cloud deals. CW2 reported that presentations prepared for Hurd summarizing fiscal year 2016 cloud performance showed that 90-95% of the companywide IaaS and PaaS cloud deals had no "use cases" attached to them. *Id*. ¶¶ 112, 127. CW2 further reported that multiple of Hurd's direct reports confirmed that a similar proportion of companywide IaaS,

PaaS, and SaaS deals had no "use cases" attached to them in fiscal year 2017. *Id.* ¶ 114. These confirmations occurred during quarterly recap meetings in 2016 and 2017. *Id.* Similarly, CW1 reported that "he and other EMEA sales teams routinely discussed the volume and size of their audit-driven cloud deals with Loic Le Guisquet, Oracle's President of EMEA, Asia Pacific, and Japan, who managed the Company's operations in these regions, sat on the Oracle Executive Management Committee during the Class Period, and reported directly to Hurd." *Id.* ¶ 126. CW1 prepared weekly slides concerning EMEA sales and provided them to Le Guisquet for presentation to Hurd. *Id.* According to the SAC, these slides "would very clearly say that LMS was engaged [on cloud deals presented in the slides], and that they were compliance deals." *Id.* 126.

The CW reports establish that Hurd and Catz were aware of the material, pervasive nature of Oracle's sales practices because (1) they approved engineered cloud sales and/or (2) received regular briefings on this topic before they made the identified statements in September-December 2017. In light of this information, Catz and Hurd were highly unreasonable in omitting information about the materiality of the sales practices. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) ("[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers"). In sum, the CW allegations raise a strong inference that Hurd and Catz were, at a minimum, deliberately reckless in their statements about the drivers of cloud growth and cloud growth deceleration. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

### ii. Bond

Bond made four statements on May 9 and November 7, 2017 about the drivers of cloud product adoption:

- Statement 11, Defendant Bond, May 9, 2017 at Jefferies Technology Group Investor Conference: "As we move to cloud, the first thing that we see is we start to address

more of the customer spend. The customers are willingly making a choice, where they're forgoing their traditional multi-vendor strategy, spending money on software, then another vendor for hardware, another for labor and so on to going to a single vendor. And that product provider, in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle."

- Statement 34, Defendant Bond, November 7, 2017 at Sanford C. Bernstein Technology Innovation Summit: When asked about the "revenue impact of a client moving from an on-prem revenue license to cloud" and "what's the driver, the real biggest driver you think of why they would be moving on-premise to SaaS?", Bond responded "by moving on-premise loads to cloud, you're going to see a reduction of total cost of ownership. That's the first primary advantage . . . You'll also see customers who want to move toward cloud for what I'll call an innovation advantage . . . So from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early."

- Statement 35, Defendant Bond, November 7, 2017 at Sanford C. Bernstein Technology Innovation Summit: "[A]s the numbers get bigger, it does get harder to grow. It's law of large numbers."

- Statement 36, Defendant Bond, November 7, 2017 at Sanford C. Bernstein Technology Innovation Summit: "[T]he drivers of what builds pipeline is going to be a big part of customer success. Nothing -- in software, nothing works better than having your customers be successful using your software. And as we go further into this and you see more customers, basically with enterprise in particular, starting to make that move from premise environments to cloud environments, this thing really starts to pick up momentum."

Plaintiff's allegations give rise to a strong inference that Bond was deliberately reckless to the truth or falsity of his statements about drivers of cloud growth. This inference is cogent and equally as compelling as the competing inference that Bond, Oracle's Senior Vice President of Investor Relations, made these comments without any meaningful knowledge about the material nature of the sales practices to Oracle's cloud growth. *See Zucco Partners*, 552 F.3d at 1007. Plaintiff alleges that, as early as July 2016, Bond was aware of public allegations that Oracle generated cloud revenues through coercive audits. SAC ¶¶ 64-65. And, concurrently to the November 2017 statements, Bond *himself* acknowledged that he was aware of public allegations that Oracle extensively deployed coercive sales tactics, stating that "[t]his is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger

42

than the realities." *Id.* ¶ 285. Despite this acknowledgement, Bond went on to make extensive statements downplaying and omitting the role of the sales practices in Oracle's cloud growth. *Id.*

### iii.  Ellison

Ellison made three statements on December 14, 2017 and March 19, 2018 about the reasons (1) customers adopted Oracle's cloud products and (2) Oracle's cloud revenue growth began to decline:

- Statement 40, Defendant Ellison, December 14, 2017 during Earnings Call: In response to the question "I think what some of us are trying to reconcile is, is the cloud guidance is a little bit slower than it has been. So it looks like something might be decelerating a little bit. And I just wanted to understand, is there a gap as people maybe buy licenses on-prem, and then maybe it's a quarter or 2 before they deploy in the cloud?", Ellison stated that the slowdown was merely due to the fact that "a lot of customers are waiting for the Autonomous Database just to become available."

- Statement 45, Defendant Ellison, March 19, 2018 during Earnings Call: "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

- Statement 46, Defendant Ellison, March 19, 2018 during Earnings Call: "[W]e have some very high growth rate SaaS businesses like ERP and HCM. And we have some that we've developed organically, and we have some slower growth rate SaaS businesses that we've acquired many years ago. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite. As the mix changes, all the growth is coming from Fusion ERP, Fusion HCM, NetSuite . . . Fusion becoming a more and more -- a larger and larger percentage of our total SaaS business, then the change in mix."

Plaintiff's allegations give rise to a strong inference that Ellison was deliberately reckless as to his statements about drivers of cloud growth and cloud growth deceleration. This inference is cogent and equally as compelling as the competing inference that Ellison, Oracle's Chief Technology Officer and Chairman of the Company's Board of Directors, made the December 2017 and March 2018 comments without any meaningful knowledge about the material nature of the sales practices to Oracle's cloud growth. *See Zucco*, 552 F.3d at 1007. Plaintiff alleges that based on a

43

letter from a group of industry participants, Ellison was aware of public concerns that Oracle would rely on coercive auditing practices to rocket its cloud product growth as early as January 2015. SAC ¶¶ 51-58. Further supporting an inference that Ellison had significant knowledge about Oracle's cloud program and associated sales practices, Plaintiff alleges that Ellison "spent the large majority of their time on investor calls discussing the cloud." *Id*. ¶ 302.

### iv.  Kurian and Miranda

Kurian and Miranda made the following statements about drivers of Oracle's cloud growth:

- Statement 13, Defendant Kurian, May 10, 2017 at Oracle OpenWorld in India: "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers."

- Statement 32, Defendant Miranda, October 5, 2017 at OpenWorld Financial Analyst Meeting: "What do we hear from our customers as far as the reasons why they choose us over competition? First and foremost, across the board, most customers today are moving to SaaS for speed. It's all about speed of innovation, speed of reaction, speed of either disrupting others in their industry or speed to be avoided in that disruption."

Plaintiff has failed to establish scienter with respect to Kurian and Miranda. Plaintiff's scienter allegations against Kurian largely relate to his knowledge about functionality and superiority of Oracle's cloud products—not his knowledge about the sales practices. SAC ¶¶ 10, 75-76, 80-82, 88, 282-284. These allegations fail to give raise to an "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *VeriFone Holdings*, 704 F.3d at 701 (quotation marks omitted). Plaintiff's scienter allegations against Miranda fail for similar reasons. SAC ¶¶ 69, 74-76, 80-82, 88, 288-291 (allegations about the technical capabilities of Oracle cloud products).

### c.  October 2017 email

Plaintiff asserts that an October 19, 2017 email involving Kurian and Miranda gives rise to a strong inference of scienter as to all Defendants because it indicates that Defendants "regularly discussed key deficiencies in Oracle's cloud technology." This email plays a starring role in the

SAC, *see* ¶¶ 14, 87-89, 283, 289, 295, 362, 387, 395, 410, 413, 421; however, Plaintiff argues more than the email delivers. According to the SAC, Kurian sent the email in October 2017 to Miranda and other cloud executives. *Id*. ¶ 88. Plaintiff believes this email demonstrates that "the UI of Oracle's cloud products was deeply important to customers, and therefore of serious concern to Oracle (including its most senior executives) and Oracle investors." *Id*. ¶ 87. The SAC excerpts the email as follows:

> I want to make sure that the entire HCM dev[elopement] organization understands what a disgrace your UI [user interface] is and stop living in denial on that. I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable – that state is your collective responsibility and we should avoid pretending that there is not an issue . . . the core product UI [user interface] is awful. Until you all collectively accept the mess you have made and the need to move quickly we are talking past one.
>
> . . .
>
> This loss [of the sale to Rabobank] has nothing to do with the demos that were done in the past few weeks but with the fact that the UI [user-interface] was considered so atrocious even back in July that the bank questioned whether they could even put this in front of their employees. I showed them R13 UI [Release 13, the latest cloud update] myself and the feedback was blunt that even that is not competitive.

*Id*. ¶¶ 88-89. Even ignoring the fact that this email only discusses one of Oracle's numerous cloud products, it cannot support a finding of scienter. As the Court concluded in its discussion of falsity, Plaintiff's theory of liability cannot rest solely on the technical deficiencies of Oracle's cloud products. This email does not discuss, or even mention, the Sales Practices at the heart of this complaint. Internal criticism of a product is commonplace, especially in a super competitive arena where a company is always watching what its competitors are bringing to market. Thus, even this harsh rebuke is insufficient to support an inference of scienter. As such, this email in insufficient to establish scienter without more.

### d. Stock Sales

Stock sales made by Hurd, Catz, and Kurian do not support an inference of scienter. The Court previously rejected Plaintiff's argument that Kurian's Class Period sales of approximately 4 million shares raised an inference of scienter. MTD Order at 34-35. Specifically, the Court held that it "[was] not persuaded that Kurian's stock sales were suspicious," as Kurian's sales were not unusual in amount and timing. *Id*. The SAC adds no new allegations on this point. *See* SAC ¶¶ 313-19. As such, the Court adopts and incorporates that reasoning here.

The SAC adds new allegations about stock sales made by Catz and Hurd. S*ee* SAC ¶¶ 320–326. Plaintiff alleges Hurd sold 1.4 million shares during the Class Period, with proceeds totaling approximately $65 million. *Id*. ¶¶ 324-26. According to the SAC, these sales "were unusual and suspicious" because some of the sales occurred after Oracle announced positive results. *Id*. ¶ 325. For example, on July 3, 2017, Hurd "sold 350,000 shares at $49.76 per share, reaping over $17 million in gross proceed[s] was made shortly after the Company announced" positive fourth quarter results in 2017. *Id*. Moreover, Hurd's "insider selling stopped near the time that Oracle's ability to generate cloud revenue through ABC and attached deals began to significantly wane, as numerous Former Employees reported." *Id*. The SAC also alleges Hurd's Class Period sales were inconsistent with Hurd's prior sales habits; he allegedly sold no shares during the prior period of the same length. *Id*. ¶ 326.

Meanwhile, Plaintiff alleges Catz sold 5,000,000 shares for approximately $250 million between January 16 and 17, 2018, representing "about 15%" of her shares at that time. *Id*. ¶¶ 320-23. According to Plaintiff, these sales "were unusual and suspicious" as they were "made toward the end of the third quarter of fiscal year 2018, the period for which Defendants would later disclose –after Catz sold her personal shares—that Oracle's cloud revenue growth had stagnated and that the Company forecasted significantly slower sales growth for its cloud business than its competitors."

*Id.* ¶ 322. While Catz purportedly sold 17% of her shares during the Class Period, she purportedly sold "only 12.8%" during the prior period of the same length. *Id.* ¶ 323.

Hurd's sales alone do not support a finding of scienter. The Court rejects Defendants' reliance on *In re VeriFone Holdings* for the proposition that stock sales that "[take] place under preexisting trading plans" do "not by themselves support an inference of scienter." In *VeriFone Holdings*, the Ninth Circuit said that trades that "took place under preexisting trading plans and were not out of line with prior trading volume . . . do not by themselves support an inference of scienter." 704 F.3d at 704 fn.2 Here, although the SAC clearly alleges that Hurd's sales represented a stark departure from the Control Period, the timing of the sales is not inherently suspicious. Indeed, that Hurd sold his shares after Oracle announced positive results suggests little about Hurd's intent to deceive or manipulate the market about Oracle's cloud product and revenue. The SAC also fails to allege what proportion of shares Hurd sold during the Class Period. As this Court reminded the Plaintiff in its prior Order, *see* MTD Order at 34-35, courts "require[] larger sales amounts" to support an inference of scienter. *See Metzler*, 540 F.3d at 1067 (sale of 37% of total stock holdings did not establish scienter); *Silicon Graphics*, 183 F.3d at 987, *as amended* (Aug. 4, 1999) (sale of 43.6 and 75.3 percent of executive' holdings failed to give rise to a strong inference of scienter) (superseded by statute on other grounds).

The timing of Catz' sales—right before Oracle acknowledged a slowdown in cloud revenue—is more indicative of scienter. However, Plaintiff concedes that Catz sold a similar proportion of her shares in the fifteen months before the fifteen-month Class Period. SAC ¶ 323. The similarity between these two figures—around 17% and 12.8%— counteracts Plaintiff's allegations. *See Metzler*, 540 F.3d at 1066-67. In sum, Catz's alleged stock sales alone are not so "dramatically out of line with [her] prior trading practices" to give rise to a finding of scienter. *Id.* (internal quotation marks omitted).

### e. Compensation Structure

The compensation structure of Catz, Hurd, Ellison and Kurian does not support an inference of scienter. *See* SAC ¶¶ 307-12. The SAC alleges that "[a]s the Company increasingly realized that its success rose and fell with its cloud growth, it took steps to closely align executive compensation with that cloud growth . . . Catz, Hurd, Ellison and Kurian were powerfully motivated to ensure that the cloud business and cloud sales appeared to be thriving, as massive amounts of their compensation depended on this. " *Id.* ¶ 308. The SAC highlights the following changes: the expiration of stock options granted in FY 2016 shortened from ten years to five years, *id.* ¶ 309; the grant of performance-based stock options in FY 2018 that would be earned "only if Oracle both (1) significantly grows its cloud business and (2) returns value to stockholders," *id.* ¶ 310; and the change to condition the grant of FY 2018 performance options on if "Oracle satisfies a combination of (1) an operational performance goal tied to significant growth of Oracle's cloud business[20] and (2) a substantial increase in Oracle's market capitalization," *id.* ¶ 311.

"A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco Partners*, 552 F.3d at 1004. However, for executive compensation to support the inference of scienter, "the allegations in the complaint must demonstrate a strong correlation—including comparisons to previous years' [compensation]—between the [compensation] and the company's

---

[20] According to the SAC,

> Six of the cloud-based operational goal options required to obtain Performance Options were as follows: (1) become the largest enterprise SaaS company as measured by an independent third-party report; (2) attain $20 billion in non-GAAP total cloud revenues in a fiscal year; (3) attain $10 billion in non-GAAP total SaaS revenues in a fiscal year; (4) attain $10 billion in non-GAAP total PaaS and IaaS revenues in a fiscal year; (5) attain non-GAAP SaaS gross margin of 80%; and (6) maintain non-GAAP PaaS/IaaS gross margin of at least 30% for three of the five fiscal years in the performance period.

SAC ¶ 311.

'bottom line.'" *In re Downey Sec. Litig.* (*Downey II*), No. CV-08-3261, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) (citing *Zucco Partners*, 552 F.3d at 1005).

Here, Plaintiffs have failed to provide the requisite particularity the Ninth Circuit has found persuasive in the past. *See, e.g., No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (2003) (noting that because "none of the [defendant's] executive officers received options awards in 1997 ... [but defendant] awarded [thousands of options to executive officers] in March 1998 [for performance allegedly increased by misrepresentations] ... a strong inference of scienter can be inferred"). Although Plaintiff alleges that Hurd, Catz, Ellison and Kurian received stock option grants based on Oracle's cloud performance, the SAC fails to detail specifically, with comparisons to prior incentive schemes, the correlation between executive compensation and Oracle's cloud performance. Such generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of the PSLRA. *See Zucco Partners*, 552 F.3d at 991. If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

### f. Core Operations

The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."

*Metzler*, 540 F.3d at 1068. On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA." *S. Ferry*, 542 F.3d at 785. "Allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785–86. "[S]uch assertions are usually insufficient, standing alone, to adequately allege scienter." *Zucco Partners*, 552 F.3d at 998.

"Proof under this theory is not easy." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. A plaintiff must produce either (1) "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," or (2) "witness accounts demonstrating that executives had actual involvement in creating false reports." *Id*. (rejecting scienter under the core operations doctrine when plaintiffs pointed to "the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with [the company's] day-today operations" and were familiar with the contents of the certain reports).

Plaintiff's core operations allegations are insufficient standing alone to raise an inference of scienter as to Catz, Hurd, and Ellison, but clearly contribute to a holistic finding of scienter. SAC ¶¶ 296-306. At the outset, the Court highlights that it rejected this theory in its prior Order on the

basis that "the CAC allegations are not sufficient to show that the revenue generated by Sales Practices were material." MTD Order at 34. Plaintiff's amendments rectify this deficiency. And the allegations of these Defendants' involvement in day-to-day corporate decision-making regarding cloud products add heft to the inference of scienter and contribute to the holistic review discussed below.

According to Plaintiff, Oracle's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched." SAC ¶ 35. Plaintiff also alleges that Catz explained that Ellison "led [Oracle's] transformation to the cloud," and was still "in charge" at Oracle even after becoming the company's Chief Technology Officer in 2014, noting "don't let titles fool you." *Id*. And the October 2017 email, discussed above, evinces that Ellison was intimately involved with Oracle's cloud products. *Id*. ¶ 88 ("I continue to get extraordinary pressure from our two CEOs [Hurd and Catz] and LJE himself [Ellison] that the UI [user interface] is not tenable"). As to Hurd and Catz, the CW allegations within the SAC establish Catz and Hurd's regular exposure to information about cloud sales and associated sales practices. As discussed in the CW and Factual Allegation Section, Hurd and Catz were involved in the minutia of the company's cloud sales and "actually did monitor the data" relating to Oracle's engineered deals and personally approved engineered deals involving significant cloud revenue. *Id.* ¶¶ 108–09, 124–25. These allegations are fairly general and not of a sort to distinguish these high-level executives' knowledge from run of the mill involvement of top employees. That said, the allegations do provide evidence to support an inference of scienter when coupled with the CW statements.

The SAC does not support a finding of scienter under the core operations doctrine as to Bond, Miranda, and Kurian. The allegations Plaintiff forwards against Miranda and Kurian establish their involvement in product defects—not sales practices. *See, e.g.*, ¶¶ 82-85; *see also* MTD Order

at 34. And Plaintiff points to no allegations that illustrate that Bond, the Senior Vice President of Investor Relations, was intensely involved with Oracle's deployment of the alleged sales practices. *See* Opp. at 23.

### g. Plaintiff's Remaining Arguments

Plaintiff argues that scienter can be grounded in Defendants' motivation to gain financially. Opp. at 23-24. The Court disagrees. As explained above, in light of Defendants' theory of the case, Defendants' stock sales were not suspiciously timed, and their compensation was not suspiciously structured. Allegations of motive to commit fraud cannot ground a finding of scienter here.

Plaintiff also argues that Oracle's decision to change its cloud reporting system is indicative of scienter. Opp. at 22-23. For the reasons detailed in the Court's prior order, the Court disagrees. MTD Order at 31-32. Specifically, the SAC has not established that the inference of scienter—that Oracle changed its financial reporting to hide its declining cloud revenue—is "at least as compelling" as the reason Oracle provided—that "it was hard to distinguish cloud revenue from more traditional on-premises revenue." *Tellabs*, 551 U.S. at 314; SAC ¶ 237.

### h. Holistic Review

The Court now considers the allegations holistically. *See In re VeriFone*, 704 F.3d at 702–03; *Zucco Partners*, 552 F.3d at 992. As the Court detailed above, multiple kinds of evidence individually support a finding of, at the very least, deliberate recklessness as to Hurd, Catz, Ellison, and Bond. *Tellabs*, 551 U.S. at 323. A holistic review of the evidence confirms this conclusion. Although not every kind of evidence individually supports a finding of scienter, Plaintiff's factual and CW allegations against Hurd, Catz, Ellison, and Bond are highly compelling. And while the core operations doctrine rarely succeeds, here it adds modestly to support the evidence supplied by the CWs given the centrality of engineered sales to Oracle's bottom line and allegations of Hurd, Catz, Ellison, and Bond's roles in the company and involvement in cloud sales. When viewed

United States District Court
Northern District of California

holistically, even Plaintiff's compensation structure and stock sales allegations have some teeth to them. In sum, the inference that Hurd, Catz, Ellison, and Bond were deliberately reckless as to the truth of their public statements is "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314.

The same cannot be said for Kurian and Miranda. The Court did not find that any individual allegations supported an inference of scienter as to these two Defendants. This conclusion is unchanged by a holistic review, which adds only slight additional support that is insufficient to push the claims over the threshold. The Court finds that, taken together, the facts do not evince fraudulent intent or deliberate recklessness as to make the inference of scienter cogent. *Tellabs*, 551 U.S. at 324. The scienter allegations against Kurian and Miranda largely focus on their knowledge of product defects—not the sales practices at the heart of Plaintiff's theory.

\*\*\*

The Court DENIES Defendants' motion to dismiss for failure to state a claim under section 10(b) or Rule 10b-5 with respect to the claims against Hurd, Catz, Ellison, Bond, and Oracle and GRANTS the motion WITH PREJUDICE with respect to the claims against Kurian and Miranda.

### B.  Claims 2 and 3 - Sections 20(a) and 20A

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 (9th Cir. 1990)). To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Section 20A allows recovery against any person who violates

United States District Court
Northern District of California

the Exchange Act by trading securities "while in possession of material, nonpublic information." 15 U.S.C.A. § 78t-1.

"[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b 5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1033 n.15 (9th Cir. 2002). Defendants' only ground to dismiss Plaintiff's claims under § 20(a) and § 20A is that the SAC fails to plead a predicate violation under Section 10(b). Mot. at 25. Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's Section 20(a) against Hurd, Catz, Ellison, and Bond and Section 20A claims against Hurd and Catz.

Because the SAC has failed to state a claim for a primary violation of the Exchange Act with respect to Kurian and Miranda, it likewise has failed to state a claim for violation of Section 20(a) or Section 20A. Thus, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims against Kurian and Miranda under Section 20(a) and claim against Kurian under Section 20A WITH PREJUDICE.

## IV.    ORDER

As a result of this motion, the Court is only allowing a narrow omissions theory limited to Defendants' stated reasons for cloud revenue growth and explanations for the subsequent slowing of that growth in light of alleged contrary factual circumstances known to them at the time. Whether this is enough to support Plaintiff's claims will be determined on a more developed record. The Court DENIES the motion to dismiss with respect to the claims against Hurd, Catz, Ellison, Bond, and Oracle. The Court GRANTS the motion to dismiss WITH PREJUDICE with respect to the claims against Kurian and Miranda. Defendants shall file their answer within thirty days of this Order.

**IT IS SO ORDERED**

Dated: March 22, 2021

_____
BETH LABSON FREEMAN
United States District Judge