BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
MARK LEBOVITCH (admitted *pro hac vice*)
(markl@blbglaw.com)
JOHN RIZIO-HAMILTON (admitted *pro hac vice*)
(johnr@blbglaw.com)
ABE ALEXANDER (admitted *pro hac vice*)
(abe.alexander@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (858) 793-0070
Fax: (858) 793-0323

*Counsel for Lead Plaintiff Union Asset Management Holding AG and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *In re Oracle Corporation Securities Litigation* | <u>CLASS ACTION</u><br><br>Case No. 18-cv-04844-BLF<br><br>**LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF LAW IN SUPPORT**<br><br>Date: March 3, 2022<br>Time: 9:00 a.m.<br>Ctrm: Courtroom 3 – 5th Floor<br>Judge: Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

I. INTRODUCTION ....2

II. FACTUAL BACKGROUND ....4

A. Background of the Case ....4

B. Proposed Class Representative ....8

III. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CERTIFICATION PURSUANT TO RULE 23 ....8

A. Numerosity is Established ....9

B. Commonality Is Established ....10

C. Typicality is Established ....10

D. Adequacy Is Established and Lead Counsel Satisfies the Requirements of Rule 23(g) ....12

E. The Requirements of Rule 23(b)(3) Are Satisfied ....13

1. The Class is entitled to the *Basic* presumption of reliance ....14

2. Damages will be calculated using a common methodology consistent with the Class-wide theory of liability ....19

IV. A CLASS ACTION IS A SUPERIOR METHOD OF ADJUDICATING UNION'S CLAIMS ....20

V. CONCLUSION ....21

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................13

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)....................9, 14

*In re Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018)....................16

*Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*,
270 F.R.D. 488 (N.D. Cal. 2010)....................9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................3, 14

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975)....................10

*Booth v. Strategic Realty Tr., Inc.*,
2015 WL 3957746 (N.D. Cal. June 28, 2015)....................8

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)....................15, 16, 17, 18

*City of Miami Gen. Emps.' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)....................19

*In re Cooper Cos. Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009)....................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009)....................18

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013).................... passim

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................14

*Ferrari v. Gisch*,
225 F.R.D. 599 (C.D. Cal. 2004)....................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................14

*Harris v. Palm Springs Alpine Ests., Inc.*,
329 F.2d 909 (9th Cir. 1964) ....................9, 13

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)....................10, 18, 19

*In re Heritage Bond Litig.*,
2004 WL 1638201 (C.D. Cal. Jul. 12, 2004)....................11

*In re HiEnergy Techs., Inc. Sec. Litig.*,
2006 WL 2780058 (C.D. Cal. Sept. 26, 2006) ....................9

*Hodges v. Akeena Solar, Inc.*,
274 F.R.D. 259 (N.D. Cal. 2011)....................10

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)....................15, 19, 20

*In re Juniper Networks, Inc. Sec. Litig.*,
264 F.R.D. 584 (N.D. Cal. 2009)....................16

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009)....................11

*In re Lendingclub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ....................10

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2001) ....................12

*Milbeck v. TrueCar, Inc.*,
2019 WL 2353010 (C.D. Cal. May 24, 2019) ....................12

*Mild v. PPG Indus.*,
2019 WL 3345714 (C.D. Cal, July 25, 2019)....................11

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ....................15

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ....................10, 11

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015)....................18

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)....................18

*In re Pilgrim Sec. Litig.*,
1996 WL 742448 (C.D. Cal. Jan. 23, 1996) ....................11

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ....................15

*Roberts v. Heim*,
42 F.3d 1401 (9th Cir. 1994) ....................8

*Schaefer v. Overland Exp. Fam. of Funds*,
169 F.R.D. 124 (S.D. Cal. 1996) ....................11

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ....................9, 13

*Siemers v. Wells Fargo & Co.*,
243 F.R.D. 369 (N.D. Cal. 2007) ....................20

*In re Silver Wheaton Corp. Sec. Litig.*,
2017 WL 2039171 (C.D. Cal. May 11, 2017) ....................11, 12

*In re Teva Sec. Litig.*,
2021 WL 872156 (D. Conn. Mar. 9, 2021) ....................19

*Todd v. STAAR Surgical Co.*,
2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ....................2, 8, 16, 17

*In re UTStarcom, Inc. Sec. Litig.*,
2010 WL 1945737 (N.D. Cal. May 12, 2010) ....................9

*In re VeriSign, Inc. Sec. Litig.*,
2005 WL 7877645 (N.D. Cal. Jan. 13, 2005), *amended*, 2005 WL 226154 (N.D. Cal. Jan. 31, 2005) ....................8, 9, 12

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ....................15, 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .................... passim

H.R. Conf. Rep. 104-369 (1995) ....................12

**NOTICE OF MOTION AND MOTION**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 3, 2022, at 9:00 a.m., before The Honorable Beth Labson Freeman, United States District Court for the Northern District of California, Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113, Lead Plaintiff Union Asset Management Holding AG ("Union" or "Lead Plaintiff") will, and hereby does, respectfully move this Court for entry of an Order in the above-captioned action (the "Action"): (1) certifying a class of investors in the common stock of Oracle Corporation ("Oracle" or the "Company"), as defined below; (2) appointing Union as Class Representative; and (3) appointing Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel. This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of John Rizio-Hamilton in Support of Lead Plaintiff's Motion for Class Certification (the "Rizio-Hamilton Decl."), and accompanying exhibits, including the expert report of Dr. David Tabak ("Rept.") attached as Ex. J to the Rizio-Hamilton Declaration, the papers and pleadings filed in this action, and such further argument and matters as may be offered at the time of hearing on this Motion.[1]

**STATEMENT OF THE ISSUES**

The issues to be decided on this Motion are:

1. Whether to certify the proposed Class (defined below) pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3);
2. Whether to appoint Union as Class Representative; and
3. Whether to appoint BLB&G as Class Counsel.

---

[1] Unless otherwise noted in this submission, (i) all capitalized terms have the same meanings ascribed to them in the Amended Complaint ("Complaint") (ECF No. 34); (ii) all references to "¶_" are to paragraphs in the Complaint; (iii) all references to "Ex._" are to exhibits to the accompanying Declaration of John Rizio-Hamilton; (iv) all references to "Rept." are to the Expert Report of David Tabak, Ph.D.; and (v) all emphasis is added and internal quotations are omitted.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

"As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *3 (C.D. Cal. Jan. 5, 2017). This case is no exception. This action asserts: (1) claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Defendants Oracle, Estate of Mark Hurd, Safra Catz, and Ken Bond, and (2) "control person" claims under Section 20(a) against Defendants Hurd, Catz, and Bond. The action arises from Defendants' misleading statements and omissions attributing Oracle's apparently meteoric growth in the "cloud computing" market to supposedly legitimate factors, such as the purported superiority of Oracle's products and sales teams, while rebuffing questions about whether Oracle engaged in improper sales tactics to boost its new revenue stream. In truth, Oracle drove sales of its cloud products using threats of large audit penalties and by offering steep discounts on other products, redeemable only if the customer purchased its cloud product—even if they would never use it. The truth about Oracle's cloud business was revealed through a series of disclosures, between December 14, 2017 and June 19, 2018, when Oracle reported contracting cloud revenue growth as its ability to deploy "financially engineered deals" slowed dramatically, and the Company stunned investors by announcing that it would no longer separately report financial results for its cloud business.

Lead Plaintiff seeks to certify a class of investors pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) consisting of all persons who purchased or acquired Oracle common stock from May 10, 2017 until June 20, 2018, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are: (1) Defendants; (2) any current or former officers or directors of Oracle; (3) the immediate family members of any Defendant or any current or former officer or director of Oracle; and (4) any entity that any Defendant owns or controls, or owned or controlled, during the Class Period.

Like the many other securities fraud cases that are routinely certified across the country, this case is well-suited for class treatment under Rule 23. Certification is appropriate if: "(1) the

class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The proposed Class readily satisfies each of these requirements.

Numerosity is satisfied because the Class includes many thousands of investors. Over 4 billion shares of Oracle traded during the Class Period, at an average weekly trading volume of 63.1 million shares. Commonality is satisfied because there are numerous legal and factual questions common to the Class, including falsity, materiality, scienter, loss causation, and damages. Typicality is satisfied because Lead Plaintiff was harmed by the same alleged false and misleading statements and omissions, and suffered the same or similar injury, as other Class members. Lead Plaintiff and Lead Counsel are adequate. Lead Plaintiff is a sophisticated institutional investor with significant experience successfully leading securities class action litigation, whose interests in prosecuting this Action are squarely aligned with the Class's interests. Lead Plaintiff's chosen counsel is one of the most experienced securities class action law firms in the country.

This action also satisfies Rule 23(b)(3)'s predominance requirement because numerous common issues of fact and law are subject to common proof and predominate over any individual issues. Moreover, class-wide reliance is presumed for purchasers of securities that traded in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). Here, as expert financial economist Dr. David Tabak demonstrates in his accompanying report, Oracle stock traded in an efficient market throughout the Class Period. *See* Rept. at ¶¶13-56. Further establishing predominance, Dr. Tabak also explains that damages may be calculated based on a class-wide methodology that is consistent with Lead Plaintiff's theory of liability. *Id.* at ¶¶57-62.

Finally, a class action is the superior method for adjudicating this case because the Class is comprised of thousands of geographically dispersed investors, many of whom have suffered

damages that are too small to warrant individual actions. There is no difficulty in maintaining this case as a class action.

Accordingly, Lead Plaintiff requests certification of the Class defined above, the appointment of Lead Plaintiff as Class representative, and the appointment of Lead Counsel as counsel for the Class.

## II. FACTUAL BACKGROUND

### A. Background of the Case

This case arises from Defendants' misleading statements and omissions concerning the drivers of Oracle's cloud revenue. Throughout the Class Period, Defendants attributed Oracle's meteoric cloud growth to a variety of legitimate business factors and conditions, such as organic demand and the quality of Oracle's products and sales teams. Defendants stated, for instance, that "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers," and that "customers … choose [Oracle cloud] over competition" because "[f]irst and foremost, across the board, most customers today are moving to SaaS for speed." ¶¶367, 404. In addition, Defendants misled investors about the reasons for Oracle's cloud revenue deceleration at the twilight of the Class Period. Among other things, Defendants denied that Oracle used audits to generate cloud revenue, calling such allegations "inaccurate," and assuring investors that Oracle "has no reason to resort to scare tactics to solicit business." ¶453.

In reality, Defendants used so-called "financially engineered" or "DOA" (*i.e.*, "dead on arrival") deals to generate a substantial portion of the Company's cloud revenue. Oracle employed two tactics to generate financially engineered deals: (1) Audit, Bargain, Close ("ABC"), through which Oracle leveraged audits of its on-premise products to "sell" cloud products in exchange for reductions of audit penalties; and (2) "attached deals" in which Oracle offered customers steep discounts on their on-premise product renewals as long as the customer also purchased subscriptions to Oracle cloud products, regardless of the customers' actual need or interest. *See* ¶¶95-207. In both cases, customers had no intention to meaningfully use the product or renew their subscriptions. Accordingly, Defendants' statements misleadingly omitted that Oracle's cloud growth was driven, in substantial part, by the Company's efforts to

effectively pay on-premise customers to take unwanted cloud "shelfware" off Oracle's hands, either by using audits to coerce the customers to accept the cloud products or massive discounts on unrelated products to entice them to do so. *See* ¶¶343-454.

[redacted]

[redacted]

---

[redacted]

The undisclosed facts about Oracle's cloud business emerged or materialized through a series of disclosures beginning on December 14, 2017, when Oracle announced that its cloud growth had slowed dramatically. Investors were concerned by Oracle's slowing cloud growth. ¶¶214-18. BMO analysts stated that "a major concern for investors is the long-term growth of cloud revenue, particularly the SaaS business, given the revenue miss and lower guide." ¶216. Others in the financial press connected Oracle's disclosure to the Company's cloud sales practices. A December 15, 2017 *Business Insider* article noted that "there are some signs that some of Oracle's customers are fed up with some of its hard-nosed sales tactics." On this news, Oracle common stock fell from $50.19 per share to $48.30. ¶218. Nevertheless, Oracle misleadingly assured investors that the slowing growth was due to the fact that customers were merely "waiting" for the imminent release of new Oracle cloud products. ¶¶433-36, 458-60.

Then, on March 19, 2018, Oracle issued its third quarter 2018 financial results, disclosing that the Company's cloud growth had slowed even more significantly to just 32% - well below the 85%-plus revenue growth reported by Oracle's competitors. ¶219. Analysts and investors noted that Oracle's slowing growth raised questions about the quality of its cloud revenue and whether the Company was able to get its customers to actually use its products. ¶220. For instance, Deutsche Bank analysts observed that apparently "strong SaaS bookings are not translating to rev[enue]s growth," in part because of what appeared to be "slow Cloud Machine deployments" by clients who purchased cloud. ¶221. In response to this news, Oracle's stock price declined nearly 10%. ¶223. Defendants, however, continued to issue misleading soothing statements to the market, including attributing the deceleration in Oracle's cloud revenue to Oracle's "BYOL" program. ¶224-26.

On June 14, 2018, J.P. Morgan issued the results of a large-scale corporate survey further indicating that Oracle's customers were unhappy with its coercive tactics and the Company's business was suffering as a result. ¶¶231-33. Oracle stock fell from $48.27 per share to $45.90 in response. ¶234.

Finally, on June 17, 2018, Oracle shocked the market by announcing that it would no longer separately report financial results for its cloud business. ¶235. In addition, under pressure

from analysts on the call, Catz disclosed that total cloud revenue growth for the quarter had come in at a lackluster 21%, demonstrating that Oracle's cloud business had slowed to a crawl, and making clear the impetus behind the Company's desire to hide its cloud results. *Id.* Analysts recognized that these disclosures raised glaring warning signals about the health of Oracle's cloud business. ¶¶236-40. In a June 20, 2018 report, William Blair analysts characterized the accounting change as "an attempt to pull the proverbial wool over investors' eyes—particularly related to cloud sales." ¶236. Likewise, Oppenheimer analysts reported on June 20 that the change was "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business." *Id.* In response, Oracle stock fell approximately 7.5%. ¶243.

### B. <u>Proposed Class Representative</u>

Lead Plaintiff Union is the parent holding company of the Union Investment Group. The Union Investment Group, based in Frankfurt-am Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients, with approximately $501.4 billion in assets as of October 9, 2018. Ex. M at ¶2. Union purchased over 4.3 million shares of Oracle common stock at artificially inflated prices during the Class Period and suffered losses as a result of the disclosures at issue in this case. *Id.* The Court appointed Union as Lead Plaintiff on December 21, 2018. ECF No. 22. Union and its Counsel, BLB&G, have diligently prosecuted this action by, among other things, filing a thoroughly researched Complaint, successfully opposing Defendants' motion to dismiss the Amended Consolidated Complaint, and propounding and negotiating discovery. *Id.* at ¶4. Union has also communicated regularly with Lead Counsel concerning the progress of the case and strategic decisions. *Id.*

## III. <u>THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CERTIFICATION PURSUANT TO RULE 23</u>

"[A]ctions involving alleged fraud in connection with the sale of securities are particularly suitable for class certification." *Roberts v. Heim*, 42 F.3d 1401 (9th Cir. 1994); *see also Booth v. Strategic Realty Tr., Inc.*, 2015 WL 3957746, at *9 (N.D. Cal. June 28, 2015) (same); *Todd*, 2017 WL 821662, at *3; *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009); *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13,

2005), *amended*, 2005 WL 226154 (N.D. Cal. Jan. 31, 2005) ("In a securities case, the requirements of Rule 23 should be liberally construed in favor of class actions."). Indeed, "class certification is routine" in cases alleging securities fraud. *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

Rule 23(a) has four requirements—numerosity, commonality, typicality, and adequacy. A class must also satisfy Rule 23(b). Union seeks certification under Rule 23(b)(3), which requires that common questions "predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Instead, "[i]n reviewing a motion for class certification, the court generally is bound to take the substantive allegations of the complaint as true." *In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *3 (N.D. Cal. May 12, 2010).

As discussed below, the requirements of Rule 23 are readily satisfied here.

**A. <u>Numerosity is Established</u>**

Numerosity is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied." *In re HiEnergy Techs., Inc. Sec. Litig.*, 2006 WL 2780058, at *3 (C.D. Cal. Sept. 26, 2006). "As a general rule, classes numbering greater than forty individuals satisfy the numerosity requirement." *Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*, 270 F.R.D. 488, 493 n.2 (N.D. Cal. 2010).

Here, the proposed Class includes many thousands of investors. Over 3.6 billion shares of common stock were outstanding during the Class Period and Oracle common stock was actively traded on the NYSE and the NASDAQ. ¶449. Additionally, over 4 billion shares of

Oracle stock traded during the Class Period, at an average weekly trading volume of 63.1 million shares. Ex. J; Rept. ¶¶17-18. At the start of the Class Period, over 1,900 institutions collectively held over 2.4 billion shares of Oracle. *Id.* at ¶25. Courts have consistently found numerosity on far more modest trading metrics. *See In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1178 (N.D. Cal. 2017) (numerosity met where company had over 394 million outstanding shares); *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *3 (N.D. Cal. Dec. 22, 2016) (numerosity met where company had 34.1 million to 37.1 million shares outstanding during the class period).

**B. Commonality Is Established**

It is well-established that "[s]o long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014); *see also In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 246 (N.D. Cal. 2013) ("The existence of shared legal issues with divergent factual predicates is sufficient" to satisfy commonality).

Here, there are numerous legal and factual questions common to the Class, including: (i) whether Defendants made materially false and misleading statements and omissions during the Class Period; (ii) whether Defendants acted with scienter; (iii) whether Defendants' alleged misrepresentations and omissions were material; and (iv) whether Defendants' alleged misconduct caused investors to suffer damages. Courts in this District have recognized that commonality is easily satisfied in securities fraud actions because "for each member of the putative class, the core factual and legal issues are the same." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 266 (N.D. Cal. 2011); *see also Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975); *Lendingclub*, 282 F. Supp. 3d at 1179 (commonality established where common questions exist regarding whether investors were defrauded by the same statements over the same time period and suffered similar losses as a result).

**C. Typicality is Established**

Under Rule 23(a)(3)'s "permissive standards" for typicality, "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be

substantially identical." *Parsons*, 754 F.3d at 685. "[I]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of the factual differences." *In re Heritage Bond Litig.*, 2004 WL 1638201, at *7 (C.D. Cal. Jul. 12, 2004); *see also In re Pilgrim Sec. Litig.*, 1996 WL 742448, at *4 (C.D. Cal. Jan. 23, 1996) (finding class representatives typical where their claims "arise from the same course of conduct: Defendants' alleged misrepresentations and omissions ... during the class period, and is based upon the same legal theories as the claims of the class members"). Accordingly, "differences in the amount of damages, the size or manner of purchase, the nature of the purchase, and even the specific document influencing the purchase will not render a claim atypical in most securities cases." *Schaefer v. Overland Exp. Fam. of Funds*, 169 F.R.D. 124, 129 (S.D. Cal. 1996); *see also In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("[P]otential complications regarding the computation of damages do not" defeat class certification).

Here, Union alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making materially false and misleading public statements and omissions. Union, like all other Class members, purchased Oracle common stock at prices that were artificially inflated due to Defendants' material misrepresentations and omissions. Union, along with the Class, was damaged when the concealed facts emerged or materialized, and that artificial inflation was removed from Oracle's stock price. Accordingly, Union's, and all other Class members', claims arise from the same alleged course of conduct that give rise to other Class members' claims, are based on the same legal theory, and will be proven by the same set of operative facts. *See Mild v. PPG Indus.*, 2019 WL 3345714, at *3 (C.D. Cal, July 25, 2019) (finding typicality when "claims arise from the same alleged conduct by Defendants," such as when class members "purchased PPG common stock at artificially inflated prices because Defendants, in violation of federal securities laws, issued materially false or materially misleading statements during the Class Period"); *Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *2 (C.D. Cal. May 24, 2019) (same); *In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *7 (C.D. Cal. May 11, 2017) (finding typicality when "like all members of the proposed Class, plaintiffs purchased

Silver Wheaton common stock during the Class Period and were allegedly damaged by the same misstatements and omissions by Silver Wheaton”).

### D. Adequacy Is Established and Lead Counsel Satisfies the Requirements of Rule 23(g)

A class representative is “adequate” if it “will fairly and adequately protect the interests of the class.” Fed. R. Civ. P. 23(a)(4). “The two key inquiries are (1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class.” *Diamond Foods*, 295 F.R.D. at 252 (*citing Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003)). Here, both requirements are satisfied.

Union and BLB&G have no conflicts of interest with other class members. As noted above, their interests are aligned with those of the absent class members. *See Verisign*, 2005 WL 7877645, at *8 (no conflict between lead plaintiff’s claims and unnamed class members’ claims because, as here, they all arise out of the same set of facts).

Further, Union is a large institutional investor that understands its fiduciary duties to the Class (Riechwald Decl. ¶¶3, 5), and is precisely the kind of plaintiff Congress intended to serve as a class representative. *See Ferrari v. Gisch*, 225 F.R.D. 599, 606 (C.D. Cal. 2004) (“[I]nstitutional investors and others with large losses will, more often than not, satisfy the typicality and adequacy requirements.”); H.R. Rep. No. 104-369, at 32 (1995) (Congress enacted the PSLRA to “increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff’s counsel”).

Moreover, Union has worked diligently to protect the Class’s interests, has supervised this litigation, and will continue to actively participate in its prosecution and take all necessary steps to discharge its fiduciary duties. Ex. M at ¶4; *see also Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (“The record indicates clearly that [lead plaintiff] understands his duties and is currently willing and able to perform them. The Rule does not require more.”). Union has reviewed drafts of pleadings and motions, it receives routine updates on the litigation from, and confers with, Lead

Counsel, and is actively participating in discovery. Ex. M at ¶4. Through Lead Counsel, Union has, so far, investigated and filed two Amended Complaints, successfully opposed a motion to dismiss in part, negotiated a case schedule, negotiated a protective order and discovery protocol, propounded discovery on Defendants and multiple third parties, and is producing documents in response to Defendants' requests, among other things. *Id.* Union satisfies the adequacy requirement.

Lead Counsel BLB&G also satisfies the adequacy requirement. BLB&G has substantial experience in securities class action litigation and has successfully prosecuted class actions in federal and state courts throughout the United States, including in the Ninth Circuit. *See* Ex. K at 10-15. BLB&G has recovered more than $33 billion for investors in the last 35 years. *Id.* Because BLB&G has devoted substantial time and resources to the litigation and will continue to do so, it satisfies Rule 23(g) and should be appointed as Class Counsel.

### E. **<u>The Requirements of Rule 23(b)(3) Are Satisfied</u>**

Rule 23(b)(3) is satisfied if "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As the Ninth Circuit observed:

> [Rule 23] does not require that all the members of the class be identically situated, if there are substantial questions either of law or fact common to all. [Rule 23 is] based on the assumption that the economy of time, effort, and expense which will result from a common trial of substantial common issues exceeds the additional burden which may be imposed upon the court and the parties by the necessity of also determining in the common litigation those issues which may be several.

*Harris*, 329 F.2d at 914-15.

The Supreme Court has explained that predominance "is a test readily met in certain cases alleging [] securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Schleicher*, 618 F.3d at 682 ("When a company's stock trades in a large and efficient market, the contestable elements of the Rule 10b-5 claim reduce to falsehood, scienter, materiality, and loss. Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine."). Notably, "Rule 23(b)(3)

requires a showing that ***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis in original).

Because the Supreme Court has held that falsity, materiality, and loss causation are class-wide issues, (*Id.* at 474-75) "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). Reliance here is based on the presumption of class-wide reliance established in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), and repeatedly reaffirmed by the Court, which provides that a proposed class representative may

> satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). To invoke the *Basic* presumption of reliance, a plaintiff must show: (1) the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Halliburton I*, 563 U.S. at 811. These elements are met here.

### 1. The Class is entitled to the *Basic* presumption of reliance

First, with respect to publicity, Union alleges that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or maintained the market price of Oracle's common stock. *See, e.g.*, ¶¶221-304. Second, with respect to market timing, Union alleges that it (and the Class) purchased shares between the time the misrepresentations were made and the time the truth was revealed or the concealed facts materialized. ¶¶455-472. Finally, because Oracle stock traded in an efficient market, as demonstrated below, all prerequisites for the fraud-on-the-market presumption are satisfied.

To assess market efficiency, courts in this Circuit and across the country rely on the indicators adopted in *Cammer v. Bloom*, 711 F. Supp. 1264, 1254 (D.N.J. 1989). *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *11 n.12 (N.D. Cal. Dec. 22, 2016); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *8 (N.D. Cal. Apr. 21, 2016). "The *Cammer* factors examine '1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.'" *Granite Constr.*, 2021 WL 229310, at *6. A plaintiff need not demonstrate that all of the *Cammer* factors are satisfied to demonstrate market efficiency because, as numerous Circuits have explained, these factors are an "analytical tool," not a "checklist." *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 n.30 (2d Cir. 2017) (collecting cases).

As set forth in the expert report of financial economist Dr. David Tabak, analysis of the *Cammer* factors shows that Oracle common stock traded in an efficient market during the Class Period. Dr. Tabak received Master's and Ph.D. degrees in economics from Harvard University and is a managing director of the securities and finance practice at the economic consulting firm NERA. *See, e.g.*, Rept. ¶¶4-5. Dr. Tabak has frequently appeared as a financial economics expert in securities litigation on behalf of both plaintiffs and defendants, and courts have repeatedly relied on his opinions. *Id.* at Exhibit 1. Dr. Tabak analyzed each *Cammer* factor (as well as several other factors cited by courts) and concluded that the market for Oracle's common stock was efficient during the Class Period. *See, e.g.*, Rept. ¶¶13-56.[3]

[3] As set forth in his Report, Dr. Tabak also analyzed additional indicators of efficiency, including the three factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (i) Oracle's market capitalization; (ii) the size of the float of Oracle common stock; and (iii) the size of the bid-ask spread for Oracle's common stock. *See* Rept. ¶¶46-50; *see also Granite Constr.*, 2021 WL 229310, at *6 (considering *Krogman* factors). As detailed in Dr. Tabak's Report, he opined that each of these factors supported the conclusion that Oracle common stock traded in an open, well-developed and efficient market throughout the Class Period. Rept. ¶¶46-50.

*a. High Weekly Trading Volume*

High trading volume indicates substantial investor interest in the security, and thus increases the likelihood that newly available public and private information will be rapidly incorporated into the security price through trading. *See* Rept. ¶17; *Diamond Foods*, 295 F.R.D. at 247; *Cammer*, 711 F. Supp. at 1293. The relatively high trading volume for Oracle's common stock supports efficiency. Rept. ¶18.

During the Class Period, Oracle had an average weekly trading volume of 63.1 million shares, or 1.53% of shares outstanding during the Class Period. *Id.* Turnover at, or in excess of, "one percent" of shares outstanding "justif[ies] a ***substantial presumption***" of market efficiency. *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 649 (C.D. Cal. 2018).

*b. Numerous Securities Analysts Covered and Reported on Oracle During the Class Period*

Securities analyst coverage of a company supports efficiency because analysts facilitate the dissemination of information, increasing the likelihood that the price of the security reflected, and investors therefore relied upon, information released by a company. *See* Rept. ¶19; *Diamond Foods*, 295 F.R.D. at 247; *Cammer*, 711 F. Supp. at 1286. Dr. Tabak found that "hundreds" of analyst reports concerning Oracle were published over the Class Period, including reports from major firms providing substantive coverage of the Company, including, among others, Bank of America, Barclays, Credit Suisse, Deutsche Bank, J.P. Morgan, Morgan Stanley, Oppenheimer, and UBS. ¶22. As Dr. Tabak explains, the significant number of analysts and news reports covering Oracle indicates a greater likelihood that investors relied on information provided about the Company and, therefore, supports a finding that the market for Oracle shares during the Class Period was efficient. *Id.* at ¶¶21-22; *see also, e.g.*, *Todd*, 2017 WL 821662, at *7 (coverage by six analysts supports efficiency); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) (coverage by four analysts supports efficiency).

*c. Oracle Stock Had Numerous Market Makers and Arbitrageurs*

"The existence of market makers and arbitrageurs would further provide a mechanism through which the market could be expected to receive information and fully incorporate it into

the stock price of a security, as these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Diamond Foods*, 295 F.R.D. at 248; *Cammer*, 711 F. Supp. at 1286-87; Rept. ¶24. Since Oracle common stock was listed and traded on the New York Stock Exchange ("NYSE"), which is one of the largest and most liquid exchanges in the world, Oracle was assigned a Designated Market Maker. *Id.* at ¶23. Oracle common stock also traded on the NASDAQ exchange, another open, efficient, and highly-developed exchange. *Id.*; *Todd*, 2017 WL 821662, at *6 ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."). In addition, Dr. Tabak found significant presence and activity of arbitrageurs in Oracle, demonstrating that "investors were able to, and did, take and change positions in Oracle shares to reflect their views, the core mechanism by which financial markets are driven to efficiency." *Id.* at ¶28.

*d. Oracle was eligible to file on Form S-3s*

Eligibility to register securities with the SEC on Form S-3 supports a finding of market efficiency because it indicates that: (1) there is a significant amount of material information about the issuer available to the marketplace; and (2) there are a significant number of market participants who would assimilate that information and impound it into the market price. Generally, an issuer is entitled to register securities on Form S-3 when, among other things, it has filed Exchange Act reports for 12 months and has a public float of at least $75 million. *Cammer*, 711 F. Supp. at 1271 n.5, 1287. As Dr. Tabak explains, Oracle met all of the S-3 eligibility requirements, and thus, the fourth *Cammer* factor is satisfied. Rept. ¶¶29-30.

*e. Oracle common stock reacted to new, Company-specific information during the Class Period*

The fifth and final *Cammer* factor asks whether during the Class Period, Oracle's common stock price quickly responded to the release of new Company-specific "unexpected" news. *Cammer*, 711 F. Supp. at 1287. As the *Cammer* court explained, empirical facts "showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price" would be helpful to the efficiency

analysis. *Id.*; *see also Hayes*, 2016 WL 7406418, at *6 (this factor requires "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."). While not required to demonstrate market efficiency,[4] the fifth *Cammer* factor supports such a finding.

Dr. Tabak has shown through empirical analyses based on the results of an "event study" that Oracle's stock price reacted in an efficient manner to new information about the Company. *See* Rept. ¶¶31-44. "Event studies are by far the most common test for a causal connection" between stock price movements and firm-specific news. *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) (same). Dr. Tabak performed empirical analyses based on the generally-accepted and commonly-utilized event study methodology to determine whether Oracle common stock had a greater frequency of statistically significant price movements on "news days"—days on which there were Oracle-related news announcements—than on more typical "non-news days." Rept. ¶¶32-44. To conduct the study, Dr. Tabak first compared the behavior of Oracle common stock on earnings and revenue announcement dates to its behavior on other days. *Id.* at ¶35. Then, Dr. Tabak performed further analyses comparing Oracle stock's behavior on days when there was some mention of Oracle in the news to its behavior on all other days. *Id.* at ¶¶36-37.

Dr. Tabak found a pattern of more frequent statistically significant stock price movement on "news days" than "non-news days," which provides further evidence that the market for Oracle common stock was informationally efficient during the Class Period. *Id.* at ¶¶40-44. For instance, Oracle's common stock price exhibited a statistically significant abnormal price reaction on 100% of "earnings announcement days" compared to just 2.2% of "non-news days." *Id.* at ¶40. In other words, Oracle stock was more than forty times more likely to have a

---

[4] *See, e.g.*, *Waggoner*, 875 F.3d at 96-97 ("We conclude that direct evidence of price impact under *Cammer* 5 is not always necessary to establish market efficiency and invoke the *Basic* presumption[.]"); *In re Petrobras Sec.*, 862 F.3d 250, 277-278 (2d Cir. 2017).

statistically significant abnormal return on "earnings announcement days" than on "non-news days." This difference was highly statistically significant, with a p-value of less than .01, which means that one can reject with more than 99% confidence the conclusion that this result is the product of chance. *Id.* Moreover, even when the definition of "news days" is expanded to include any day on which an article was published featuring Oracle in its headline or lead paragraph, Oracle's common stock price exhibited a statistically significant abnormal price reaction on a highly statistically significantly greater proportion of "news days" versus "non-news days," with a p-value that is, again, at or below 0.01. *Id.* at ¶42. Accordingly, the results of these empirical analyses further support a finding of market efficiency. *Id.* at ¶¶43-44; *see Diamond Foods*, 295 F.R.D. at 248 (relying on the same event study methodology used here to conclude that security's reaction to new information supported finding market efficiency); *Hayes*, 2016 WL 7406418, at *10 (same); *In re Teva Sec. Litig.*, 2021 WL 872156, at *36 (D. Conn. Mar. 9, 2021) ("Dr. Tabak's *Cammer* 5 tests support market efficiency.").

In sum, Dr. Tabak found that each of the *Cammer* factors, as well as the additional factors he analyzed, support a finding of market efficiency. Thus, Union and the Class may rely on the "fraud-on-the-market" presumption to establish reliance.

**2. Damages will be calculated using a common methodology consistent with the Class-wide theory of liability**

The "out of pocket" damages model Dr. Tabak proposes to use to measure damages in this case (*see* Rept. ¶¶57-62) is the universally-accepted method for calculating damages arising from claims under Section 10(b), and is used to calculate damages in virtually every securities class action across the country. *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action," and collecting cases). While Rule 23 does ***not*** require that "proponents of class certification must rely upon a classwide damages model to demonstrate predominance," *Intuitive Surgical*, 2016 WL 7425926, at *17, Union has

done so here, as its proposed model calculates class-wide damages by using an event study to measure the amount of artificial inflation in Oracle stock on each day of the Class Period. Rept. ¶¶57-62.

## IV. A CLASS ACTION IS A SUPERIOR METHOD OF ADJUDICATING UNION'S CLAIMS

Rule 23(b)(3) requires a plaintiff demonstrate that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy" by assessing the following factors:

> (a) the class members' interests in individually controlling the prosecution ... of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by ... class members; (c) the desirability ... of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Each of these factors demonstrates that a class action is the superior method to adjudicate the Class's claims in this case.

First, Union seeks to represent a Class consisting of a large number of geographically dispersed purchasers of Oracle common stock whose individual damages are likely small enough to render individual litigation prohibitively expensive. *See Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D. Cal. 2007) ("The amounts involved are modest per investor. No single investor could hope to recover more than it would cost to prosecute an individual suit."). Second, Union is aware of no other litigation asserting these claims on behalf of any individual class members. Third, "it seems undisputed that this venue, being the home of [Oracle], is a desirable and convenient place to concentrate the litigation, no other venue having been suggested." *Id.* Last, managing this case as a class action presents no unusual difficulties that would preclude certification. Litigating each claim separately would be wasteful and preclude numerous investors from obtaining redress.

## V. CONCLUSION

For the forgoing reasons, Union respectfully requests that the Court: (a) certify this action as a class action pursuant to Federal Rules of Civil Procedures 23(a) and 23(b)(3); (b) appoint Union as the representative of the proposed Class; and (c) appoint BLB&G as Class Counsel.

Dated: October 8, 2021

/s/ *John Rizio-Hamilton*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
MARK LEBOVITCH (*pro hac vice)*
(markl@blbglaw.com)
JOHN RIZIO-HAMILTON (*pro hac vice)*
(johnr@blbglaw.com)
ABE ALEXANDER (*pro hac vice)*
(abe.alexander@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

JONATHAN D. USLANER (Bar No. 188574)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars
Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

*Counsel for Lead Plaintiff*
*Union Asset Management Holding AG and*
*Lead Counsel for the Class*