# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

- - -

IN RE: ORACLE CORPORATION

SECURITIES LITIGATION

Case No. 5:18-CV-4884-BLF

- - -

November 23, 2021

- - -

Remote videotaped deposition of DAVID I. TABAK, Ph.D., conducted at the location of the witness in New York, New York, commencing at 12:30 p.m. EST, on the above date.

Magna Legal Services

866-624-6221

www.MagnaLS.com

Marie Foley

RMR, CRR

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
BY: ABE ALEXANDER, ESQUIRE
JOHN RIZIO-HAMILTON, ESQUIRE
JONATHAN USLANER, ESQUIRE
RYAN DYKHOUSE, ESQUIRE
1251 Avenue of the Americas
New York, New York 10020
212.554.1400
abe.alexander@blbglaw.com
Counsel for Lead Plaintiff Union
Asset Management Holding AG and Lead
Counsel for the Class

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

MORRISON & FOERSTER LLP
BY: JORDAN ETH, ESQUIRE
MARK R.S. FOSTER, ESQUIRE
DAVID J. WEINER, ESQUIRE
425 Market Street
San Francisco, California 94105-2482
415.268.7000
JEth@mofo.com
Counsel for Oracle Corporation, Safra A. Catz, Paula R. Hurd, as Trustee of the Hurd Family Trust, Lawrence J. Ellison and Ken Bond

ALSO PRESENT REMOTELY:
James C. Maroulis, Esquire
Oracle Corporation

VIDEOGRAPHER:
Paige Snellen

\- - -

TRANSCRIPT INDEX

PAGE
APPEARANCES....................... 2 - 3
INDEX OF EXHIBITS................. 5
EXAMINATION OF DAVID I. TABAK, Ph.D.:
BY: MR. ETH...................... 7
SIGNATURE PAGE.................... 167
ERRATA............................ 168
REPORTER'S CERTIFICATE............ 165

EXHIBITS WITH ORIGINAL TRANSCRIPT

\- - -

- - -

E X H I B I T S

- - -


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Tabak Exhibit 1 | Expert Report of David I. Tabak, Ph.D. | 30 |
| Tabak Exhibit 2 | July 2002 A NERA Working Paper, Inflation Methodologies in Securities Fraud Cases: Theory and Practice | 118 |
| Tabak Exhibit 3 | Tabak article, Risk Disclosures and Damages Measurement in Securities Fraud Cases | 130 |
| Tabak Exhibit 4 | Spreadsheet | 145 |

- - -

12:31 p.m.

- - -

THE VIDEOGRAPHER: We are now on the record. This begins videotape number 1 in the deposition of David Tabak in the matter of MIC In Re: Oracle Corp. Securities Litigation.

Today is Tuesday, November 23rd, 2021, and the time is 12:31 p.m.

This deposition is being taken remotely. The videographer is Paige Snellen of Magna Legal Services and the court reporter it Marie Foley of Magna Legal Services.

Appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - -

DAVID I. TABAK, Ph.D., the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

- - -

THE VIDEOGRAPHER: Thank you. You may proceed.

EXAMINATION BY
MR. ETH:

Q. Good morning, Dr. Tabak. Or, I guess in your case, good afternoon.
A. Good morning to you, Mr. Eth.
MR. ETH: And I just want to say that today it's Jordan Eth for the defendant. We also have on, or at least observing, is Jim Maroulis from Oracle.
Q. So, Dr. Tabak, you're able to hear me okay?
A. I can, yes.
Q. And see me and all that?
A. Yes, I see you fine.
Q. Great.

You've been deposed before, I assume?
A. I have.
Q. How many times would you estimate?
A. I'd estimate a little over three dozen.
Q. All right.
You understand all the rules of depositions?
A. I think well enough. Maybe not in every legal detail, but I think well enough.
Q. Okay. Great.
You understand that we shouldn't speak over each other, correct?
A. I will do my best, yes.
Q. And if you don't understand the question, just ask me to just try again.
All right?
A. That sounds good.
Q. All right.
And if you need to take a break at any time, just ask me. Especially with

screens and so forth, I know people need to take breaks from time to time. So just ask and it shouldn't be a problem.
All right?
A. That sounds good. Thank you, Mr. Eth.
Q. Great.
Any other questions about the procedure?
A. No questions.
Q. Great.
Have you ever testified at trial?
A. Yes.
Q. What trial or trials have you testified at?
A. The most recent one was in Delaware Chancery Court involving, I forgot the -- some initials Schulman, S-C-H-U-L-M-A-N, a plastics manufacturer. A bankruptcy trial in I believe the Southern District of New York involving Nextera, N-E-X-T-E-R-A, and, I guess, the estate or whatever for Adelphia,

A-D-E-L-P-H-I-A, Corporation.
Then there were some before that. I just don't remember offhand. But they're in my CV.
Q. And the CV that you're referring to is the one attached to your report?
A. That is correct.
Q. Were any of those trials jury trials?
A. I think there was one very early one that was a jury trial.
Q. When you say "very early," you don't mean like early in the day. You mean like many years ago, right?
A. That's correct.
Q. Okay.
Can you give me your best estimate of when that jury trial occurred?
A. Fifteen to 20 years ago.
Q. What was the subject of that jury trial?
A. I don't remember. I had a small portion. It wasn't -- I wasn't like a main damages expert or anything. So I

really don't remember the details.
Q. Was it a securities class action?
A. I don't know.
I think, if you look at my CV, I think it was like 5B versus Klein, or something like that. But I just don't remember the case.
Q. The Delaware Chancery Court case you referred to, when was that trial?
A. Maybe 2019, give or -- it certainly wasn't during -- oh, I'm sorry. That was one, the Schulman one.
And then there's another Delaware Chancery one that actually was during COVID, and that was -- that was in July of, I believe, of this year.
Q. July of -- you mean just a few months ago?
A. Yes.
Q. Was that a jury trial?
A. In Delaware Chancery Court, no.
Q. I didn't think so. Just confirming.

So, the one in July, who retained you?
A. Counsel for certain investors of unit holders of a company called CVRR.
Q. What was the subject of your testimony?
A. It was -- well, the issue there is that the, kind of, parent corporation exercised a call write, and it was on the economics of the call write and if liability were found, damages to the unit holders whose units were taken away, or taken away from them or purchased as a result of the call write being exercised.
Q. Would you say that, is it accurate to say that the subject was damages?
A. It was two parts. One was the economics of the call write, and the other was damages.
Q. Did you prepare a damages report in that case?
A. I prepared a report that covered both topics.

MR. ALEXANDER: I don't know if you can hear me.
Okay.
MR. ETH: I can hear you, Abe. I can hear you.
MR. ALEXANDER: I've interposed just a few objections.
MR. ETH: Actually, I only -- I didn't hear a few. That's for sure.
MR. ALEXANDER: It's okay.
Why don't we -- the moving hand writes, and having writ moved on. Let's -- you know, I'll try to speak up.
But, David, also let me -- let me get a chance before you answer.
THE WITNESS: I'll do my best.
MR. ALEXANDER: Okay. Thank you.
MR. ETH: Yeah. If you have an objection, Abe, just feel free to state it.
BY MR. ETH:
Q. Okay.

So, in the CVR case, part of your assignment, part of what you testified about was damages, correct?

A. That is correct.

MR. ALEXANDER: Objection.

BY MR. ETH:

Q. And you prepared -- one of the things you prepared was a damages report, correct?

MR. ALEXANDER: Objection.

A. Again, the report was on two topics, one of which was damages.

Q. So, that was the CVR case.

There was another case that you testified in in -- at trial in Delaware Chancery Court that you referred to a few minutes ago?

A. That's correct.

Q. What's that other case?

A. Again, it's Schul -- I think it's AC Schulman.

If you like, I can -- I have a hard copy of my report with no annotations, though it does have my CV, if

you want me to give you the exact cite.
But Schulman is the company.
Q. Sure. If you've got your report there, let's take a look. Yeah, let's just get it right.
(Pause.)
A. Okay.
So, if you look at Exhibit 2 to my report, and I'm going to go to page 4. You can let me know.
Q. I'm there. Thank you.
A. Okay.
Actually, I think we have to go to page 5.
(Pause.)
Actually, page 6. It's the next to last entry in page 6 of my Exhibit 2.
Q. I see. So that's the A. Schulman.
That's not Allen Schulman, is it?
A. It's a plastics company. It says A, so.
Maybe it -- I don't -- I think

it was named after someone many, many
years ago.
Q. Okay. I said that for Abe's
benefit.
A. Schulman versus Citadel
Plastics Holdings, LLC, is that the one
you're referring to?
A. That is correct.
Q. What was the subject of your
testimony in that matter?
A. Damages.
Q. Did you prepare a damages report
in that matter?
A. I did.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Who retained you in that matter?
A. Counsel for A. Schulman, which
was Skadden.
Q. Who at Skadden did you work
with?
A. Main person was George
Zimmerman, and then of course there was a
team.

Q. Were you retained -- were they counsel for the plaintiff or the defendants?
A. I said for Schulman. So plaintiffs.
Q. Plaintiffs, okay.
All right.
You mentioned a bankruptcy trial in the Southern District of New York?
A. Yes.
Q. What was the subject of your testimony in that case?
A. The subject -- well, so, this dealt with the -- with Adelphia, which had I think -- I think it's accepted they had engaged in a massive fraud, and the question was had the, that I addressed was, had the market known of the extent of the fraud, would Adelphia still have been able to obtain financing, and that went into the solvency question because the case in question I was dealing with was a case involving a claim of a fraudulent conveyance.

Q. Was that -- did you testify about damages in that case?
A. No. I mean, I testified to something that fed into the solvency question.
Q. Who retained you in that case?
A. George Zimmerman of Skadden.
Q. Okay.
Were there any other matters in which Zimmerman from Skadden -- well, let me make it more broader than that.
That Skadden retained you?
A. Do you mean which I testified?
Q. Any at all.
How many times have you been retained by Skadden? Rough estimate, best estimate.
A. Over a dozen. Probably two dozen. Maybe more.
I mean, I have to think back over many years.
Q. Your best estimate is couple of dozen times?
A. Yeah, that sounds about right.

I mean, there's a lot of uncertainty there over time.

Q. Have your opinions in any matter - I'm switching topics slightly here - have your opinions in any matter ever been excluded?

MR. ALEXANDER: Objection.

A. Not on Daubert or related grounds.

I'll say in the Adelphia trial, the judge said that a couple of the statements in my written direct went beyond the scope of my report and deposition and didn't include them.

And then recently in a case, the lawyers made a motion to in -- you know, file something that included a report by me, but basically it was a rebuttal report. And the judge said that he wasn't granting the other side's motion, so including my rebuttal would be moot. So it wasn't accept -- you know, it wasn't filed.

Q. You used the -- the word

"Daubert."
I take it you're familiar with motions to exclude experts on grounds of reliability and so forth?
MR. ALEXANDER: Objection.
A. I'm not a lawyer, but generally, yes.
THE WITNESS: And for the court reporter, D-A-U-B-E-R-T.
MR. ETH: Thank you.
Q. For this deposition, what was your -- how did you prepare?
A. I reviewed my report. I reviewed some of the documents that underlie my report, and I had two Zoom, or at least -- I think they were Zoom, but, whatever, virtual calls or meetings with counsel.
Q. You said you reviewed documents underlying your report.
What documents did you review?
A. The Complaint, the order on the Motion to Dismiss, and several news stories.

Q. The Complaint, which Complaint did you review?

A. I hope it's the operative Complaint and the one I defined as "the Complaint" in my report.

Q. So that's the amended -- it's the one that you list in your report as having considered?

A. Yes.

Q. Okay. So let me just -- let me just make sure we've got that pinned down here.

So, that's the one referred to in Exhibit 2 to your report, Amended Consolidated Class Action Complaint dated February 17, 2020?

A. I believe that's correct. That's the one I have in my files.

Q. You said you had a couple of Zoom meetings with counsel?

A. That's correct.

Q. Who?

A. Mr. Alexander, Mr. Rizio-Hamilton, Mr. Uslaner, and Mr.

Dykhouse.
Q. When?
A. One was last Thursday and one was yesterday.
Q. For how long?
A. The first one probably went about three hours and the second one maybe one hour.
Q. All right. I'm going to ask you some questions about your -- about your experience, which you lay out, as you indicated before, in an attachment to your CV.
Can you estimate for me or give me your best estimate of the number of securities class --
MR. ETH: Whoa. Something happened there for a second on the screen, but it's gone.
Q. Can you give me an estimate, best estimate, of the number of securities class actions you've worked on?
A. Well over a hundred.
Q. How many -- in securities class

actions, how many reports, best estimate, have you authored?

A. You can find that after you go through my Exhibit 2. I just don't know offhand, but --

Q. Well, would you say it's -- is it -- is it a hundred or so or five hundred or so or a thousand or so or three or what? Give me your best estimate.

A. Couple of dozen. Maybe three dozen.

But you can go through my Exhibit 2 and that would be more accurate.

Q. Okay. I don't think your Exhibit 2 identifies which ones are securities class action, so that's why I'm asking.

A. It doesn't all the time, but when the title of the case is "securities class action," that would cover it.

So most of them are defined that way. There may be a few that are not.

Q. Okay.

Then in your -- in your work at

NERA, do you also review reports other experts within NERA prepare? Is that something that you do in the course of your work?

A. You mean like a peer review before they go out?

Q. Yeah. Or a supervisory or a peer review.

A. Usually it's peer review. But yes.

Q. Is that something that you regularly do?

MR. ALEXANDER: I'm just going to object.

Jordan, are you talking about reports issued in litigation, or are you talking about white papers issued by NERA, or both?

MR. ETH: I'm talking about damages reports that a NERA person winds up preparing and --

MR. ALEXANDER: For purposes of litigation, okay.

MR. ETH: For purposes of

litigation.

MR. ALEXANDER: Gotcha. Okay.

BY MR. ETH:

Q. And so, Dr. Tabak, in light of that definition, do you, and you called it a peer review, do you do peer reviews of reports prepared by other -- damages reports by other people at NERA?

A. Yes.

Q. Is that a regular part of your work?

A. I think that's fair to say.

Q. All right.

Now, in terms of your recent work, which is -- recent experience, which is again listed starting on page 4, which is actually 34 of 110 of your report in this matter, you list work you've done from September '20 and before. You filed the report on October 8th.

I want to ask you about recent work. There's nothing, obviously, listed for October and November because you submitted this October 8th.

What would you add in terms of expert reports and testimony for the months of October and November?
A. Other than, obviously, the report and now this deposition, I don't think there are any.
Q. Okay.
So, you did a -- according to your exhibit here, you did a reply report for the Teva Securities Litigation September 20, 2021.
Is that accurate?
A. Yes.
Except pronounced Teva (different pronunciation) with a short E.
Q. Teva. Teva. Thank you.
So, you did a reply report for the Teva Securities Litigation September 20, 2021.
Since then, you have submitted no expert reports other than in this matter?
A. I believe that's right. I mean, I'd have to -- none come to mind. I don't

remember submitting any other than this one.
Q. And any testimony in the period from September 20, 2021 until today other than today?
A. I believe not.
Q. I want to ask you a little bit about Teva.
So, who retained you in Teva?
A. It was counsel for the class, which was Bleichmar Fonti. B-L-E-I-C-H-M-A-R and F-O-N-T-I.
Q. What is the subject of your reports in Teva?
A. Well, two reports on September 20, as it says on page 4, one is on damages and the other is on negative causation.
Q. Did you prepare a damages report in Teva?
A. I did.
Q. Negative causation, is that a Section 11 case?
A. That is correct, Mr. Eth.

Q. What was your opinion on negative causation in the Teva Securities Litigation?

MR. ALEXANDER: Objection.

A. It's a rebuttal report. I don't know what's public. So let me simply say that on areas where I disagreed with defendant's expert, I pointed out my disagreements.

Q. I want to ask just a couple questions about the case immediately preceding that in time, which is the General Electric case.

Who retained you in the General Electric case?

A. Counsel for investors, which was Kessler Topaz.

Q. Who at Kessler Topaz?

MR. ALEXANDER: Objection.

A. I would say -- I mean, I don't know who exactly retained me, but I would say primarily I worked with Sharan Nirmul. S-H-A-R-A-N and then last name N-I-R-M-U-L.

Q. What's the subject of your testimony in that case?
And by "that case" I mean General Electric.
A. I understand.
Loss causation.
Q. Loss causation.
What was your -- and you were retained by the, sounds like I think you said, by the plaintiff class?
A. By counsel for the plaintiff class, yes.
MR. ETH: Okay.
Let's take a look, and maybe we should now just formally mark this document we've been talking about, or at least show it to you, although you have it with you, is your expert report.
So it will show up on your screen too. But you can look at it on your screen. You can look at it in hard copy. Whatever's convenient for you, all right.

THE WITNESS: Given that I'd have to switch to another screen to see the document, I'll keep looking at you, Mr. Eth, than deal with the hard copy.

MR. ETH: Yeah. Well, I'm not going to make any comment about what you're looking at, but anyway.

All right. Let's -- okay. At least on my -- so, for everybody else, is that document showing now?

MR. ALEXANDER: Yes.

MR. ETH: You've got it, Abe? You can see it?

MR. ALEXANDER: I can see it, absolutely.

MR. ETH: Great.

So that's Exhibit 1.

(Tabak Exhibit 1, Expert Report of David I. Tabak, Ph.D., was marked for identification, as of this date.)

THE WITNESS: I can see it too.

MR. ETH: All right. Great.

BY MR. ETH:
Q. So, let's see. I want to look at paragraph 4.
A. Okay.
Q. So, paragraph 4, the last sentence says -- lists your fields of expertise.
Do you see that?
A. Lists my fields of expert -- fields of expertise where I published.
Q. Okay.
You said: I've published in my fields of expertise on subjects such as.
Well, the screen -- every now and then the screen blanks out entirely and then comes back, but we'll just have to bear with that.
All right. It says: I have published in my fields of expertise on subjects.
So, what is your -- so, sounds like there's an overarching field, or maybe there are fields of expertise?
MR. ALEXANDER: Objection.

BY MR. ETH:
Q. I'm trying to figure out exactly what this -- is this -- are you listing here your fields of expertise, or are you listing the fields of expertise on which you've published?
A. Well, it does say such as. So I'm listing fields of expertise on which I've published. I don't think that's every area on which I've published.
Q. Do you list these in any particular order?
A. Not intentionally.
Q. So, like, subconsciously did you do it that way?
MR. ALEXANDER: Object --
A. Well, they are listed in -- Mr. Eth, they are listed in some order.
MR. ALEXANDER: Sorry.
Marie, I feel -- okay. I feel like you're missing my objections here. It's not a big deal.
THE STENOGRAPHER: I'm not hearing it.

MR. ALEXANDER: Okay. Maybe I need to make the microphone louder.

MR. WEINER: Yeah. In fairness, I am actually -- I'm hearing you speak now perfectly clearly, but I'm not hearing the objection.

MR. ALEXANDER: I don't know why that would be.

MR. WEINER: I don't know. I don't know if there's a delay or something. I don't know.

MR. ALEXANDER: Could be.

Okay. Well, I interposed the question about whether he was doing it, whether Dr. Tabak actually was doing it subconsciously.

BY MR. ETH:

Q. So, Dr. Tabak, I just want to understand, is there any reason behind the sequence in which these things -- in which these areas are listed?

A. No.

Q. So, I noticed damages is not listed.

A. That's correct.
Q. Why is that?
A. No particular reason. It's -- I think damages is something that flows from other things. So I didn't think of listing it. But it's also very broad in that I think it would go beyond securities litigation. So I don't -- probably why it didn't come to mind, but there's no particular reason one way or the other for it not being there.
Q. Well, I mean, statistics seems pretty broad to me.
Isn't statistics a broad subject?
A. It is.
Q. Is it that you haven't published in the area of damages?
A. That's an interesting question.
I have published in the area of damages for options in securities litigation, but I don't think I've published -- I don't know how much I've published on damages. I believe I've

published some.
But it wasn't intentionally omitted.
Q. But it didn't come to mind when you were listing your fields of expertise?
MR. ALEXANDER: Objection.
A. That's fair.
Q. All right.
So, you list here, let's see. Going to your CV, which is an exhibit, right? It's Exhibit 1.
So, you've been working at NERA, and this is page 32 of 110, for 26 years.
Is that right?
I'm sorry. Is that right?
A. Very close. 25 and a few months.
Q. 25 and a few months, okay.
And, let's see. You've been managing director at NERA for close to, it rounds to 16 years?
A. Yes. There was a title change in the middle, but in substance, yes.
I'd say probably a -- yeah,

that's fair.
Q. What do you do as the managing director at NERA Economic Consulting?
A. Let me just correct that to say "a" managing director rather than "the" managing director. It's similar to saying partner.
It basically means that I'm in charge of my own group of staff. So I attempt to bring in work. I work for clients, and I have various management responsibilities, managing my own staff and contributing to the management of the practice and the firm.
Q. You mentioned your staff.
Currently how many people are on your staff?
A. Besides me, I believe there are seven others.
Q. Does your staff include Ph.D.'s?
A. No. Other than me, of course.
Q. Does your staff include -- well, I'm going to skip that.
You had said one of the things

you do is bring in business; is that right?

A. Hopefully, yes.

Q. Right, yes. Okay.

A. And I'm available if you have a case, Mr. Eth.

Q. Well, we might -- actually, I think you did work on a case I was on a number of years ago. I remember hearing you discuss issues relating to the defense of that case and damages models and so forth.

A. Can you remind me?

Q. Well, I'll just ask you straight out.

Did you do any work on the Countrywide Financial case?

A. Oh, yes. Absolutely.

Q. Who did you -- who retained you in that case?

A. I wasn't the one retained. I believe that it was Dr. Carron, C-A-R-R-O-N, who was retained, and I was supporting him.

Q. Which side retained him?
A. Defendants retained NERA in that case.
Q. So you worked on the Countrywide case.
That's the case in which Countrywide was accused of falsely stating its underwriting practices; is that right?
MR. ALEXANDER: Objection.
A. To the best of my recollection, that's correct.
Q. And NERA's opinion was that -- do you recall what NERA's opinion was in that case?
A. I think Dr. Carron -- it's not NERA's opinion because it's not the firm offering the opinion, but I believe Dr. Carron testified on market efficiency for bonds. I remember that.
There's probably a lot more because I think that case is, what, over 15 years old.
Q. Probably not that much, but -- but it's -- it's probably more like ten.

But anyway. Okay.
Let's switch now to your -- back to this case.
So, when were you hired in this case?
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. When were you retained in this case? How about that.
A. I just don't recall. Probably a few months ago.
Q. So, it was some time around the summer, would you say, of 2021?
A. I believe so. At least to the best of my recollection.
Or, actually, I think we -- it was probably in the spring that we started, but either spring or summer.
Q. Spring or summer of 2021, correct?
A. I believe that's correct. I mean, maybe we did a little work earlier, but the best of my recollection, it was spring of this year.

Q. Who retained you?
MR. ALEXANDER: Objection.
A. The Bernstein Litowitz firm.
Q. What were you retained to do?
MR. ALEXANDER: Objection.
Jordan, are you talking about this report, or do you mean something else?
BY MR. ETH:
Q. I want to know what you were retained to do. That's what I want to know.
You were hired to do something. What were you hired to do?
MR. ALEXANDER: So, to the extent that you're asking a question beyond the scope of this report, I'm going to object that that's beyond the scope of the report.
MR. ETH: Fine.
MR. ALEXANDER: David, if you want to talk about the purpose of your report, go ahead.

BY MR. ETH:
Q. I'm asking what you were retained to do. That's what I'd like an answer to.
A. Certainly ultimately to investigate market efficiency and to, if I found that Oracle stock traded in an efficient market, to write a report on that.
Q. Were you asked to do anything else?
A. I don't recall being asked to do anything else other than talk to counsel about it and just discuss the case.
Q. Were you -- did you on your own do anything else?
MR. ALEXANDER: Objection.
A. Not that wasn't ostensibly related to this report somehow.
Q. Were you retained to put together a damages model?
A. I don't believe so. I certainly don't recall doing it.
Q. Okay.

Have -- do you know if anyone else has been retained to put together a damages model?

MR. ALEXANDER: Objection.

A. I do not know.

Actually, let me say I'm just not sure because I know we looked at price movements, but I just don't recall whether we actually calculated damages. So, we did some of the work that would go into damages. I just don't recall whether we came up with an ultimate figure.

Q. Do you remember how you came up with whatever damages number you came up with?

MR. ALEXANDER: Objection; misstates his testimony; outside the scope.

MR. ETH: Let me see. Actually, let me take a look see exactly what he said, because I didn't quite get it.

Actually, I don't see it up here on my screen.

Hold on a second. Someone's

going to show me.
Okay. Hold on.
(Pause.)
BY MR. ETH:
Q. Okay.
So, what you said is, and this is reading from the testimony: We did some of the work that would go into damages.
What -- but you also said you don't recall whether you actually calculated.
So: We did some of the work that would go into damages.
What work was that? What were you referring to when you said "some of the work"?
A. We did price reactions. I know that.
I'm -- event studies or price reactions on the corrective disclosure dates.
I'm guessing that we probably did a damages analysis, but I just sitting

here don't recall actually doing it. That's the type of work that would ordinarily be done for a damages analysis.

You know, if you told me we did a damages analysis or you told me we didn't, I wouldn't be surprised either way.

Q. Whatever you did didn't work its way into your report though, did it?

MR. ALEXANDER: Objection.

A. Some of the stuff would overlap in terms of the market model that feeds into the event studies, but the actual damages work, to the extent there was any, did not get into this report.

Q. Now, looking at the -- hold on one second. I've got to move something out of the way here.

(Pause.)

Q. Okay. So, going back to your report, I just want to ask you a little bit about compensation.

So, you're billing -- you say you're billing at your usual rate of

$1,050 per hour; is that correct?
A. That is correct.
Q. How many hours, best estimate, have you spent on this matter?
A. Probably close to a hundred, around a hundred.
Q. Let me see if I can do the math. A hundred times a thousand, that sounds like a hundred thousand dollars.
A. It does sound like that, Mr. Eth.
Q. Okay. So, if it weren't for the math, maybe I would have gone into your field. But, anyway.
Who -- who else did -- did people assist you, people at -- any people at NERA assist you on the work on this matter?
A. Yes.
Q. Who?
A. The members of my staff.
Q. Okay.
Their names are what?
A. Okay.

One would be Edward Flores, F-L-O-R-E-S. Second would be Vlad Lee, V-L-A-D L-E-E. A third is Wen Wen, W-E-N and W-E-N. We've got Hoa Duong, H-O-A then D-U-O-N-G. We've got Catherine Zhu, last name Z-H-U. Shulav Nuepane. It's S-H-U-L-A-V for the first name and N-U-E-P-A-N-E. And then finally Andrew Perlowin, P-E-R-L-O-W-I-N.

And then we may have had some, you know, incidental assistance from librarians or something like that gathering information.

Q. So, I counted seven members of your staff who assisted you on this matter.

A. I assume they all did because we'd break up the tasks, as there are many tasks under the Cammer and Krogman factors. So C-A-M-M-E-R and K-R-O-G-M-A-N.

But sitting here I can't say with certainty who did what or even if, you know, maybe one or two of them didn't

work on this matter.
Q. Did anyone, other than these people from NERA or anywhere else, provide substantive assistance to you on this matter?
A. No.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Did you consult with any of your colleagues on this matter?
A. No.
Q. Best estimate, what is the total amount that you have billed for this matter?
A. I don't have a good estimate offhand.
Q. In fact, let me change it from billed to, like, total amount of expense in -- total amount incurred, because that includes things that you haven't yet sent out bills for.
MR. ALEXANDER: Objection.
A. I understand.
If I said $300,000 with a

reasonable range around that, that would be my best estimate.

Q. Okay. Thank you.

Now, you referred earlier to the Complaint, and we identified that as the Amended Consolidated Complaint which was filed -- well, your report says dated February 17th, 2020.

Did you have any involvement in the preparation of that Complaint?

A. Absolutely not.

Q. Did you have any role in determining what the alleged misstatements are in that Complaint?

A. I think the answer's no, and that follows from the prior question.

Q. It does. It does. But I'm going to ask it anyway. Even though it's like 99.9999 percent sure, I'm going to ask it anyway.

How about identifying the alleged corrective disclosures in the Amended Consolidated Class Action Complaint, did you have any role in that?

MR. ALEXANDER: Objection.
A. No.
And I had no role whatsoever in anything that entered that Complaint.
Q. And that includes the loss causation part of that Complaint?
MR. ALEXANDER: Objection.
A. That is correct.
Q. All right.
Now, you read -- you said you've -- you read the Amended Consolidated Class Action Complaint; is that correct?
A. That's correct.
Q. What is the plaintiff's theory of liability in that -- in that document?
MR. ALEXANDER: Objection.
A. So, I'm going to -- I'll focus a little more on the one that's sustained, and then I'll try to remember the ones that have been thrown out.
But the -- my understanding of the theory that was sustained is that Oracle downplayed or denied the reasons

for, first, the increase or acceleration and then the deceleration of its cloud revenues, misleading the market as to the reasons for that acceleration and deceleration.

Q. What theories did the court reject?

MR. ALEXANDER: Objection.

A. Well, broadly anything that didn't directly lead to that, and my understanding -- my memory's a little less clear on that 'cause I didn't pay as much attention. But the quality of their cloud services and I think also, in substance, the fact of various schemes, we can call them, to get revenues except to the extent that those were described in relation to the acceleration and deceleration of revenues.

So in other words, my recollection is the court said that there's no liability, for example, for what's called the ABC scheme in and of itself other than misleading the market as

to how that affected revenues.
Q. So, you used the word "scheme."
Why are you calling it a scheme?
A. I'm happy if you've got another word.
Strategy.
Q. How about alleged practice?
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. All right. Now, let me -- a few more things here about the complaint and so forth.
Are you -- are you making any assumptions about plaintiff's -- in your report, do you make any assumptions about plaintiff's case?
MR. ALEXANDER: Objection.
A. I don't think so other than, obviously, very broadly in what we can call the Comcast section at the end, that liability will ultimately have to be proved in order for there to be damages.
Q. Right.
Without liability there's no

damages, right? So you're -- right.
So --
A. I'm not a legal scholar, but that is my understanding, Mr. Eth.
Q. I guess that's mine too.
So, but are you -- you're not assuming that any of the alleged misleading statements are, in fact, misleading, are you?
MR. ALEXANDER: Objection.
A. Well, for the purpose -- not certainly for the purpose of market efficiency. Not for the purpose of what we can call the Comcast section other than to assume that, at some point, either at least one will be miss -- determined to be misleading or, as we said, there's no point in a damages analysis.
Q. And in terms of the corrective disclosures, you're not assuming -- are you assuming that the alleged corrective disclosure actually corrected something?
MR. ALEXANDER: Objection.
A. Again, that's irrelevant to the

market efficiency analysis, and for the damage -- discussion of damages, only the very broad sense that, again, at least one corrective disclosure will have to actually be corrected or there are no damages.

Q. All right. Let's stick with your report.

So, does your report contain all of the opinions that you have in this matter?

A. As of this point in time, yes.

Q. Who wrote this report?

A. I did. Although some of it is taken from a recent market efficiency report that I did, and obviously quotes are from whoever originally made certain statements.

Q. You said some of it is taken from another market efficiency report you recently wrote.

Is that what you just said?

A. That is correct.

Q. What report is that?

A. I believe it was the Teva market efficiency report.

Q. So, some of this was -- so, some -- for some of this you looked at Teva and you took what you did in Teva and put it in here for some of it?

MR. ALEXANDER: Objection.

A. Well, I want to be careful with -- I mean, when you say what I did in -- first of all, some of it it's background material on the theory of market efficiency. That doesn't change.

When you say what I did in Teva, obviously not the particular calculations, but many of the procedures or tests were the same and then I applied data from Oracle.

Q. Sure. And I got it.

I just want to -- the -- a -- one source you used for putting together this report was material that you also cited in Teva?

MR. ALEXANDER: Objection.

A. Yes. There's certain materials

that are cited in both cases, if that's what you're asking.

Q. Did you -- did you yourself read every word of this report?

A. I wrote every word of this report.

Q. Okay.

So, did -- do you -- at the very end of the report you say you reserve the right to modify or extend your opinion in light of any new information. That's the last line on page 30 of 110.

Do you see that?

A. If you say it's in the report. It looks like it's on 29 in the hard copy, but I see what you're saying.

Q. When I say 30 of 110, I'm referring to the numbers at the top. I don't know if your copy has those numbers.

A. No, because I've had my original report. I assume this is when the -- when it's filed, okay.

Q. Yeah, and they're off by one. So I'll use the ones at the bottom, if

that helps you. That's fine.
So, the question is simple here.
Is there anything you want to add to this report at this time?
A. No.
Q. Anything that you want to correct from this report?
A. No.
Q. Anything you want to modify from this report?
A. No, Mr. Eth.
Q. Were any limits placed on you in doing your work for this report?
MR. ALEXANDER: Objection.
I don't know what that means.
A. No.
Q. You know, you weren't told you could only spend ten hours? There's no, like, hours limit, was there?
A. No.
Q. Or monetary limit?
A. No.
Q. Or you can't -- you shouldn't do this type of analysis or that type of

analysis. There were no limits of any -- of those kinds, or any other kind, placed on --

A. I would like to see them try to limit the types of analysis I did.

No.

Q. Okay. All right.

Let's -- let's now take a look at paragraph 2.

A. I'm sorry. I missed the paragraph number.

Q. Two. Two. Due. Two.

So, you find that Oracle's common stock traded in an efficient market over the Class Period.

Correct?

A. That is correct.

Q. And then roughly the next 26 pages or so back that up; is that right?

A. That's correct.

Q. I just have a few -- few questions about efficiency to make sure I understand what you mean by it. I think I do, but I want to make sure.

So, does efficiency mean that the market, and I'm taking this right from your report, but I just want to make sure I understand it, quickly and fully incorporates all public information?

MR. ALEXANDER: Objection.

A. That is kind of the ideal of efficiency, yes.

Q. And that a change in a company's stock price should only reflect new information?

MR. ALEXANDER: Objection.

A. Also correct.

Q. And that in an efficient market, the stock price incorporates all public news?

MR. ALEXANDER: Objection.

A. Again, for a perfectly efficient market or, you know, the ideal, yes.

Q. Okay. Now, you're referring to the ideal.

You say that -- I think you said that -- that there are different types of efficiency and the efficiency that you

found is what's called semi-strong efficiency.
Is that right?
A. That's right, but that's different than talking about the ideal. It's -- you're on different frames of reference.
Q. Okay.
So, when you say that the market -- had traded in an efficient market, do you mean it traded in a semi-strong efficient market?
A. Yes, I do.
Q. Okay. So, let me go back over those things I just asked you because you may have answered them for -- what's the difference between an ideal efficient market and a semi-strong efficient market?
A. Those are two different frames of reference. So let me start, kind of, with the end.
In terms of forms of efficiency in the financial economics literature, they are generally broken down into three

forms: weak form efficiency, which means a market incorporates all prior prices of the stock or security at issue; semi-strong form, which means it incorporates all public information; and then strong form which would mean that it also incorporates private information. Although to be clear, most people think of that as more of a theoretical concept than one that tends to exist in the real world.

Q. All right. So I just asked you a few questions about whether an efficient market here means that quickly and fully incorporates all public information.

And the efficient market that you found here for Oracle, is that -- does that statement hold true?

MR. ALEXANDER: Objection.

A. To the best of my knowledge, yes.

Q. And that a change in Oracle's stock price should only reflect new information?

MR. ALEXANDER: Objection.

A. Same answer.
To the best of my knowledge, yes.
Q. Okay.
Now, your study -- you did a study that looked at the difference between news days and non-news days, correct?
A. I did, I believe, several versions of that study.
But yes.
Q. In determining what's a news day, did you look at any of the alleged misstatements here?
A. No. What I did was I had a procedure that was independent of whatever was alleged as a misstatement in the Complaint.
Q. Why did you do it that way?
A. Well, for one thing, as mentioned, I've done various versions of that test that way for a number of years, and I've even published on that as far back as, I believe, 2004.

Second, I think that to specifically select alleged misstatements could be problematic in the sense that I would expect in general, not talking this case, but in general, that if plaintiffs see a large price increase with a -- associated with a statement that they think might be actionable, they're going to highlight that. So there would be a bias towards writing the Complaint to highlight dates with particular news and large price movements.

Q. So, what -- what criteria did you use for including something as a news day?

A. Well, why don't we go to Exhibit 8a in my report so we can go through it --

Q. Sure.

A. -- systematically.

Q. Okay.

So, 8a is, just for the record, page 98 of 110 on the file version of this document of Exhibit 1.

All right. So we're there.
Why don't you tell us what criteria you used for including something as a news day?

A. Sure.
So, I have, as I said earlier, a number of different versions. I've got six versions. In the first version, news day are earnings announcement dates.
In the second and third versions, I include as potentially news dates dates that are tagged as relating to Oracle by the data vendor, which is Factiva, F-A-C-T-I-V-A. They tag news stories as relating to a company. So, in the first of those two, I took all stories tagged by Factiva as relating to Oracle, and in the second of those two, I only counted stories that were outside of market hours, so outside of 9:30 to -- a.m. to 4 p.m. Eastern Time.
And finally, for the, I guess, fourth, fifth and six stories I had my staff perform a text search for Oracle.

And that particular footnote 10 I believe should have the information for exactly how that was done and was looking for either Oracle Corp. or the ticker ORCL, and the search covered the option in Factiva that covered headlines and first paragraphs. Within that set, all those stories were counted for the fourth analysis. Only the ones published outside of market hours for the fifth analysis and then for the sixth analysis basically we ranked those dates by the number of stories published on each date. And when I say those dates, those were already limited to those outside of market hours. And took just the top 10 percent of those dates.

Q. Okay. Thank you.

So, this was done independently of the allegations in the Complaint, correct?

MR. ALEXANDER: Objection.

A. Correct. Only thing that mattered was the class period.

Q. So, do you have an opinion about whether the alleged misstatements were incorporated into the stock price?
MR. ALEXANDER: Objection.
A. I'm not offering an opinion one way or the other on that in this report.
Obviously to the extent that you have an expert that talks about that, I'd be happy to respond, but it's not an affirmative opinion in this report.
Q. So, you do find there's semi-strong efficiency though, right?
A. That is correct.
Q. So, if something is public information, it would be fully incorporated into the stock price?
MR. ALEXANDER: Objection.
A. Yes.
Q. So, what about, like, SEC files, do they get -- does that fit into -- under semi-strong efficiency, is that information in an SEC filing fully incorporated into the stock price?
MR. ALEXANDER: Objection;

incomplete hypothetical.
A. Barring something really unusual, yes, it would be incorporated.
Q. And why is that? Why would it be fully incorporated?
A. Basically, you know, we may have mentioned this a little bit in terms of ideal. When we say something's public, it's public, easily available, easy to digest, then it's fully incorporated.
SEC filings are clearly public. They're known about. It's not as if, you know, it's published somewhere obscure and people aren't expecting it. So, it's the type of information one would generally expect to be incorporated into a stock price in an efficient market.
Q. Does that hold true for company press releases as well?
MR. ALEXANDER: Objection.
A. Yes, for -- particularly for a company that's followed by analysts that would pay attention to those press releases. So yes.

Q. How about comments at an analyst conference?

MR. ALEXANDER: Objection.

A. In a transcript or just made and never reported publicly?

Q. Why don't we do each one of them.

Let's say they're in a transcript.

MR. ALEXANDER: And just to clarify, I'm sorry. In each one of these examples, Jordan, you're specifically talking about new material information in each of these? You're not saying -- you're not asking David whether or not everything in a 10-K gets impounded whether or not it's material or new?

MR. ETH: Well, I'm asking on anything, I mean.

MR. ALEXANDER: So I have -- that's my objection.

MR. ETH: Okay. That's fine.

BY MR. ETH:
Q. Dr. Tabak, you said that the market quickly and fully incorporates all public information, and I just want to know what that applies to, what you mean by "public."
And we've started talking about and now I'm asking for examples. I'm asking for specific examples, and you broke down analyst calls into two categories. One is if it's in a transcript. So let's talk about that.
If an analyst conference and a transcript is created, does the --
A. Hold on, sir.
You seem to have moved back and forth between analyst calls and analyst conferences. And conferences -- do you mean conference calls, or do you mean like an investor day where analysts meet? Because those are two different things.
Q. They absolutely are two different things, and I want to talk more about not conference calls, but analyst

meetings. You know, a company speaks at a -- goes to an analyst meeting or conference, but it's not an analyst conference call.

A. Okay.

Q. And there's a tran -- and a transcript is created.

Does that get fully incorporated into the stock price?

MR. ALEXANDER: Objection.

A. If the transcript is released public --

MR. ALEXANDER: Objection; incomplete hypothetical; outside the scope.

A. You said a transcript is created.

Do you mean released publicly as opposed to created and stored in somebody's vault?

Q. Well, I guess what I'm asking you is what does it mean for something to be public?

MR. ALEXANDER: Objection.

A. There is a range, but, you know, the ideal is that it's available at low or virtually no cost to anyone who wants to access it.

Q. So, if somebody can click to it on the Internet, is that public?

MR. ALEXANDER: Objection.

A. It generally is. Now, you know, there's some debate on what if you don't know to click to it. You know, if it's -- if it's a transcript that's listed on a company's investor relations site, that would be public.

If no one knows about the link, but if you hypothetically knew about the link you could click on it, that's not what we would generally consider public.

Q. So, how would you determine if something that's available just a click away, how would you determine whether that's public in the way that you used "public" in the -- under semi-strong efficiency?

MR. ALEXANDER: Objection;

incomplete hypothetical.

A. A couple of things.

Where is that click? If it's on a company's investor relations site, that's almost certainly public.

If it's, you know, one of the first things that pops up in a search on a search engine, that would be public.

If, you know, you -- I'm asked to find it and it takes my staff several days to find it, that may be not be considered as public.

Q. Not as public. It might be public even if it takes a few days?

MR. ALEXANDER: Objection; misstates his testimony.

A. You're suggesting, kind of, a yes/no question over there. And the literature recognizes that some things are easily available and clear public. Other things are difficult to obtain.

So, it's considered on a spectrum, but with a large block of things that are so effectively easily available

that we can just lump them all together as public.

Q. Okay.

Now, staying with your report. Does your report itself propose a damages model?

A. It discusses, you know, how a damages model is created generally, but it doesn't propose a particular damages model.

MR. ETH: Okay. Let me just look at the time. I see we've been going a little more than an hour.

Why don't we take ten minutes now and come back at 10:45 Pacific.

Okay?

THE WITNESS: Fine with me.

MR. ALEXANDER: All right.

Do you guys want to go to the breakout?

Great.

THE VIDEOGRAPHER: The time is 1:35 p.m.

We are going off the video

record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 1:46 p.m.
We are back on the record. You may proceed.
BY MR. ETH:
Q. Dr. Tabak, you have your report handy, right?
A. I do.
Q. Let's take a look at paragraph 57.
A. Okay.
Q. Which is on page 27, which is 28 of 110.
Do you have it in front of you?
A. I do.
Q. All right. If you look at the last sentence of that paragraph it says: As discussed below, the answer is unambiguously that the formulation of such a common methodology is possible in this matter.
You got that? You see it?

A. I do.
Q. So, it says "possible."
So it doesn't say that you've done it yet, does it?
A. It does not say that I've done it yet.
Q. And that's because you haven't done it, right?
A. Again, I just don't remember if we calculated damages. We may have, but that would be something that often my staff would do. So, the team may or may not have done it.
Q. It's not something that you discussed in this report though, is it?
A. Having done it as opposed to the possibility, is that what you mean, Mr. Eth? Then yes, I have not discussed having calculated damages.
Q. And you don't discuss the specific methodology for doing that, do you?
MR. ALEXANDER: Objection; misstates the report.

A. What do you mean by "specific"?
I believe I discuss event studies over here in paragraph 60.
Q. So, you say, I'm just using your words here "Formulation of a common methodology is possible." You don't say "I lay it out below." You say "It's possible."
You don't say -- you use the word "possible," correct?
A. That is correct.
Q. You don't say it's probable, do you?
MR. ALEXANDER: Objection.
A. I'm not using "possible" there as meaning probability.
I'm saying unambiguously it's doable. It is possible to do it.
Q. It's possible to do it, but this doesn't lay out a damages methodology, does it?
MR. ALEXANDER: Objection; misstates the report.
A. I don't think that misstates the

report.
This is not a damages report. It does not lay out the damages analysis.
Q. All right.
What does the -- what does the word in that sentence "unambiguously" add to that sentence?
A. It suggests that, at least in my view, this is not a -- something that is open to question. It can be done. It is possible to do it. Not I think it -- that it is possible that it is possible or it is probable that it is possible, but in my view, it is certain that it is possible, meaning it is capable of being done.
Q. All right.
Now, paragraphs 57 through 62, how much time did you spend personally on those -- on that part of this report?
A. You mean in typing it or in thinking about what went into it?
Q. Between thinking and typing. Just total time working on this part of the report.

A. The typing, probably very little. It's probably very similar to what I've done in other reports.

If you'll note though, for example, in footnote 43 I have a discussion that is specific to Oracle, because I believe three of the four disclosure dates here are actually earnings announcement dates. So I spent time thinking about whether or not it would be possible to disaggregate the components of the earnings announcement and market's reaction to it.

So, I don't know 'cause it was done at the same time as other things, but multiple hours.

Q. So, I'm looking for a number here, not words.

So, what is your estimate? You gave me an estimate of a hundred hours of your time for the entire project. That was your best estimate.

Of that estimate, best estimate, what's your best estimate for this part of

the report?

MR. ALEXANDER: Objection; asked and answered.

A. Five to ten hours. But that would overlap some of those -- that time, you know, covers both this part of the report and other things that I did.

Q. All right. I was just looking for your best estimate. And thank you for that.

So, I've gone through some of your writings in the past, and I'm going to ask you some questions about some statements in those writings just to make sure that, you know, that they're -- you believe those statements -- you still think those statements are accurate.

A. If you went through my writings in the future, that would be more fun.

Q. That would be.

It reminds me of a joke actually. You know, whenever anyone shows a photograph, they would say, Here's a picture of me when I was younger. It's

like, Well, I'd really like to see one when you're older. That's would be interesting.

Anyway, we can tell jokes some other time though. Happy to do that.

So, I'm going to show you -- I'm not going to show you. I'm going to read some things from some of your writings. You are more than welcome to say, Gee, I want to see that. Let's put it up on the screen.

But these are all basic propositions. You may not need that. And if you don't need that, that's fine. If you do need it, that's fine.

A. Let's see how it goes.

Q. Either way is fine with me. That could be for some you do and for some you don't. Okay.

MR. ALEXANDER: Jordan, I think for our purposes, we would appreciate it if you would introduce the exhibits, if possible.

MR. ETH: Well, I can introduce

them, sure.

I'll certainly mention the name of the document, okay. And I -- well, I'll do that at least.

BY MR. ETH:

Q. So, I'll read you this statement. I'll tell you where it's from, okay. Although I've seen this in some of your -- multiple of your writings.

Here's the statement: There are several --

MR. ALEXANDER: I'm just going to object to the commentary and characterization about a particular statement being all over the writings until we see it.

MR. ETH: Object all you want, Abe.

BY MR. ETH:

Q. All right.

Here's the -- here's the statement: There are several basic methodologies for measuring the true value in a stock before a corrective disclosure.

Is that an accurate statement?
MR. ALEXANDER: Objection.
A. Yes.
Q. Okay.
Among -- and by the way, that's from one -- one place it's from is a NERA working paper entitled "Inflation Methodologies in Securities Fraud Cases: Theory and Practice."
Another statement: Among the most common are the constant dollar inflation, constant percentage inflation and constant true value methodologies.
Is that a true statement?
MR. ALEXANDER: Objection.
A. It was at the time. If you want to talk about what's common, then constant true value has pretty much disappeared, and constant inflation is much less common than it was before the Dura case came out from the Supreme Court.
And that's D-U-R-A.
Q. Is it still used from time to time by some experts?

A. Probably. I mean, I haven't seen it much recently, but if you're going to say from some -- from time to time by some experts, I can't disprove that.

Q. Another statement: The nature of the misrepresentation, its effect on expected future cash flows, and hence the value of the firm, will determine the proper method to use when estimating share price inflation.

MR. ALEXANDER: Objection.

A. I'm generally fine with that.

Q. So, in this case, how did the alleged omissions here affect Oracle's future expected cash flows?

MR. ALEXANDER: Objection.

A. And obviously we're going to assume that there -- you know, they were actual omissions that should have been stated otherwise. In other words, there's no liability, no inflation, no damages.

So, assuming liability, the basic argument is that the market was misled as to whether the reported cash

flows or revenues, but let's say cash flows related to cloud services were likely to be recurring or were more likely to be one-time cash flows.

Q. Is this -- do you lay out what the -- the effect of the omissions on cash flows in the report that you submitted?

MR. ALEXANDER: Objection; outside the scope.

A. Of course not. It's not a damages report.

Q. All right.

Another statement: Unfortunately, it's not always clear whether a certain disclosure is better modeled as a constant percentage or constant dollar inflation.

A. I think that's a true statement.

Q. And the way that statement starts is with the word "unfortunately."

What's unfortunate about that?

MR. ALEXANDER: Objection; outside the scope.

A. I think the following words were

"it's not clear." So, in general when you're trying to model something, we would prefer it was clear what all the factors or effects are as opposed to if it's unclear.

Just simply modeling something that is clear is easier and less debatable than modeling something that is unclear, as a general rule.

Q. And another statement that constant dollar -- the constant dollar method could be aggressive if used by plaintiffs.

Notice I said "could be."

MR. ALEXANDER: Objection; outside the scope.

A. Well, I'll say I note that I wrote "could be." And the answer is yes, I still believe that. It could be. It could also be conservative. Sure.

Q. All right. Let's look at paragraph 58.

Actually, I'm sorry. Let's look at paragraph 59.

All right. Are you there?
A. I'm there.
Q. All right. If you see about -- and by the way, just for the record, 59, paragraph 59, which is page 27, which is page 28 of 110 of Exhibit 1.
So, if you go about five or six lines down you say: Further adjustments may be necessary.
You see where I am?
A. Yes.
Q. So, why do you say "may be necessary"?
MR. ALEXANDER: Objection.
A. Well, because the rest of that part of sentence says: If the amount of inflation declines for reasons other than a corrective disclosure.
So, it depends on what those reasons are. If there are some reasons that will require some adjustment or some reasons that will not.
Q. So, maybe there will need to be some adjustments and maybe there won't.

Is that what you're saying?
MR. ALEXANDER: Objection.
A. As a general matter, depending on what you see, you may have to make adjustments, sure.
Q. In this case, do you have to make adjustments?
MR. ALEXANDER: Objection; outside the scope.
A. Adjustments to what?
Q. To a damages model.
MR. ALEXANDER: Objection; outside the scope; incomplete hypothetical.
A. The problem, Mr. Eth, is this sentence says "further adjustments."
So, do you just want those further adjustments, or do you want adjustments to something earlier? I mean, you can say starting at zero and going to any number adjustments.
So, what type of adjustments are you referring to, if at all?
Q. I'm asking about what you wrote:

Further adjustments maybe necessary.
Have you determined whether they are necessary or they just may be necessary in this matter --
MR. ALEXANDER: Objection.
Q. -- in this matter? Or are you just saying it more generally?
MR. ALEXANDER: Objection; outside the scope; incomplete hypothetical.
A. I can certainly see how it may be necessary, but I'm not saying it is or it's not until I look at the actual numbers.
Q. Which you haven't done yet, right?
A. Again, because this is not a damages report.
So sure.
Q. All right.
So, you say that -- let me ask you about footnote 42.
A. Okay.
Q. So, footnote 42 -- footnote 42

comes up in paragraph 59 and it refers to the limit on damages, or a limit on damages imposed by the 1995 Private Securities Litigation Reform Act.
Correct?
A. That is correct. And I believe it is the limit, essentially, because it was basically one limit added.
Q. So, you write that damages - and I'm just excerpting here just to make it quicker - damages are limited to the purchase price less, one, the 90-day average closing price following that disclosure.
And then it goes on from there.
Do you see where I am?
A. Yes.
Q. Okay.
This matter has multiple alleged corrective disclosures, correct?
A. That is my understanding. I believe there are four of them.
Q. How do you apply this limit when there are multiple corrective disclosures?

MR. ALEXANDER: Objection;
beyond the scope.
A. Well, since we brought up
earlier my discussion what is common,
what's been commonly done is just apply it
to shares that have been held after the
end of the class period. That is what has
been commonly done.
Q. From an economist -- is that --
is that what you -- was that what you
would do?
MR. ALEXANDER: Objection.
A. What I would do is I would do my
best to follow the law.
You started by saying as an
economist. The answer is the limitation
in the PSLRA is not based on anything
that's really economics. There is a paper
cited, but let's put that aside. It's a
legal limitation. And as a damages
expert, I would do my best to implement
that legal or legislative ruling, or
legislation, let's say.
Q. So, from a -- so -- so you don't

have a view as a financial economist as to what the appropriate way is to implement this?

MR. ALEXANDER: Objection.

A. It's a legal construction. So I don't -- there is no real economics behind this concept.

If you want maybe off the record some time we can chat about the PSLRA cap and issues with it.

MR. ALEXANDER: You might have to pay him for that, Jordan, though.

THE WITNESS: Pro bono.

MR. ETH: Sold.

BY MR. ETH:

Q. All right.

Let's take a look at paragraph 60. Paragraph 60 you refer to an event study.

See that?

A. I do.

Q. What's an event study?

A. Very broadly, it's a statistical analysis of the effect of news events at a

certain point in time on the price of a security.

Q. All right. I'm going to read you some statements that you've written, as we did before. And if you want to see them, we can show them. Or if you don't want to see them, that's fine too.

So, here's the first one: It should be noted there are at least two instances where event studies are either unhelpful or insufficient.

MR. ALEXANDER: Objection.

A. Instances, yeah, in -- in -- there are many instances. I mean, in planting a garden an event study is not helpful. I -- you have to give me some context.

MR. ALEXANDER: Do you want to see the document, David?

THE WITNESS: Or you can --

MR. ETH: I'll ask -- I'll ask a more specific question taken from that very document.

MR. ALEXANDER: Why don't we

just see the document? Maybe that would give him what he needs. If you want him to answer honestly.

MR. ETH: I'm going to ask my questions and --

THE WITNESS: I want to say that, Mr. Alexander, I will always answer honestly. Maybe I won't have the information, but that's not --

MR. ETH: I'm going to --

THE WITNESS: -- an objection.

MR. ETH: -- ask the questions, and if Dr. Tabak wants to see the document, I'll show it to him and if he doesn't want to see it, I won't show it to him. But that's who I'm going to respond to.

All right. So, the -- okay.

I understand. Let me ask -- I'll ask what follows that in that document.

BY MR. ETH:

Q. So, first, a meaningful event study cannot be performed on the date of

an omission or on a date where nothing was announced.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Is that an accurate statement?
MR. ALEXANDER: Objection.
A. I think very broadly there are going to be some types of omissions that if they were meant to cancel out a statement, you can do it, but as a general rule, if all we're talking about is a plain vanilla omission, you can't say what is the -- you know, what is the effect on the stock price of omitting this information by looking at a change in stock price.
Q. Have you determined whether we have a plain van -- we have plain vanilla omissions in this case?
MR. ALEXANDER: Objection; outside the scope; incomplete hypothetical.
A. That's an interesting question. I'm going to answer it by saying I haven't

determined it because that's a damages question which can be dealt with whether the answer is yes or no.

Q. Are you the -- going to be the damages expert in this case?

MR. ALEXANDER: Objection.

A. I said my -- part of my job is to get business, so I hope so. But I have not discussed that with counsel yet.

Q. Okay.

So, the -- another quote from that same document says: Second, the basic event study as described in the academic literature measures the combined effect on a stock's price of all the news that entered the market during the measurement period. Additional steps are necessary if one is to isolate the effect of a particular statement in the news.

Is that an accurate statement?

MR. ALEXANDER: Objection.

A. To the best of my knowledge, yes.

Q. So, you've also written that:

Instead of an event study, sometimes a fundamental analysis is appropriate.

Is that correct?

MR. ALEXANDER: Objection.

BY MR. ETH:

Q. Is that an accurate statement?

A. Are you going to ask if it's correct that I wrote it?

Q. Yeah. I didn't mean it that way.

A. I think we're on the same page here.

I agree. Sometimes that is correct.

Q. And also the expected change in stock price based on a sample of stock price changes in response to similar events may be used.

A. Again, I think the -- the word "may" is doing a lot of work there. But sure, that may be used in appropriate circumstances.

Q. And which approach is best will depend on circumstances relating to the

allegations in the Complaint, right?

MR. ALEXANDER: Objection.

A. For purposes of a damages analysis, yes.

Q. And you haven't decided which approach to use in this case for damages, right?

A. Well, I --

MR. ALEXANDER: Objection; assumes facts.

A. Let me say that I don't see looking for other companies that had similar announcements, that doesn't seem to matter.

I think that, as I say in the report, I believe -- let me just check where I mention an event study.

Paragraph 60 I say: The inflation calculation referenced above is begun with an event study for the analysis of the change in Oracle's stock price.

And then the sentence continues.

So, my approach would be to begin with an event study of the various

disclosure dates and then, as we discussed earlier, to make any adjustments that I believe are necessary.

Q. Have you decided on what those adjustments would be?

MR. ALEXANDER: Objection; outside the scope; incomplete hypothetical.

A. I have thought about, kind of, the theory. I have not quantified those adjustments.

Q. Well, does your report lay out what those adjustments -- what you've been thinking about in terms of what those adjustments would be?

MR. ALEXANDER: Objection; beyond the scope.

A. No, because I said I've been thinking about it and it will depend potentially on fact discovery.

Q. What else will it depend on?

MR. ALEXANDER: Objection; outside the scope.

A. Possibly more thinking about it.

Q. All right.
Another -- another quote from one of your writings. You said: Courts have regularly held that if the price movement includes the effect of both fraud-related and non-fraud-related information, the resulting measurement is not a reliable measure of damages.
MR. ALEXANDER: Objection.
A. Yes, you're kind of asking me for a legal opinion, but I will say that is my -- still my understanding of what courts have held.
Q. Right. I mean, you wrote it, but right.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Then the next statement: Most damages experts attempt to parse out the effects of these two types of information when both are present.
MR. ALEXANDER: Objection.
A. I think that's true. There's sometimes a debate about obviously some

people say one -- you know, an effect might be zero, but I think conceptually, that's correct.

Q. Okay.

So, what is -- what do you mean by -- by "parsing"? What does that mean?

A. In other words, let's say that a total -- the total observed price decline is a dollar. It -- and let's say we've already accounted for market and industry effects. It may be the case that you say that 70 cents of that dollar relates to the allegations and 30 cents relates to news unrelated to the allegations. And when I say "you say," obviously ideally you'd actually do an analysis and don't just make up those numbers off the top of your head.

Q. Sure.

Is parsing necessary in this case?

MR. ALEXANDER: Objection; outside the scope; incomplete hypothetical.

A. In footnote 43, let me read the first two sentences. Quote: For example, three of the corrective disclosure dates alleged in the complaints are earnings announcements or calls discussing earnings. Standard techniques for disaggregating the effects of different components of earnings is this, end quote.

And disaggregating is just a different term for parsing.

Q. So "parsing" and "disaggregating" are synonyms?

A. At least within the context of event studies and securities litigation.

Q. So, paragraph 43 you say: Standard techniques.

A. You mean footnote 43, just for the record.

Q. I'm sorry. I'm sorry. Footnote 43.

Footnote 43 you say: Standard techniques.

Right?

A. I do.

Q. So, that sounds like there's more than one technique?
A. Yes.
Q. Tell me all techniques.
A. Well, I'm not going to tell you about all possible techniques. I'll tell you about all that come to mind, Mr. Eth.
Q. Okay. That's helpful.
A. So, very broadly, there are some of those that deal with, you know, very much in the, kind of, fundamental analysis range.
As I discussed in the footnote there. For example, if you have two divisions and you know how much of an earnings change was in Division A versus Division B, you can apply that ratio. You can also make that more expansive by looking at changes in the -- not just in the earnings announcement relative to expectations, but if they're forecast, because that's still like a form of fundamental analysis where you're valuing the divisions.

Another broad category that -- of analysis falls under the rubric of content analysis, which is basically asking how much attention was given to the different categories by market observers, such as analysts. And you'll find that referenced, for example, in an opinion by the First Circuit involving bricklayers or something, with Scott Hakala, H-A-K-A-L-A, is the expert.

Those are probably, you know, the fundamental analysis and the analysis of how much people discuss it. Obviously there's also some cases where you can argue from economic grounds that some effects are zero. For example, if they're simply repetitions of old news. So then they can be disaggregated out to be zero.

Sometimes to be conservative, you will be able to, for example, if you're a plaintiff's expert, ignore positive confounding news and say that you basically have a conservative estimate because, if anything, the positive

confounding news would mean as opposed to taking a dollar and disaggregating it into 70 and 30, it might be, so to speak, it might be a dollar-ten of decline which is not fully observed because there's ten cents of positive news.

So, those are three broad categories, I think it's three, that come to mind at the moment.

Q. Have you decided which -- which category to apply here -- would apply here?

MR. ALEXANDER: Objection; beyond the scope.

A. No. Again, this is not a damages report, so I have not done that yet.

Q. Okay.

Now, this footnote 43 talks about, for the most part, it talks about earnings surprises.

Is that right?

A. That's fair, yes.

Q. Is there an earnings surprise in

this case?
MR. ALEXANDER: Objection;
beyond the scope.
A. Let's be clear what the sentence says.
The first sentence, quote: For example, three of the corrective disclosure dates alleged in the complaint are earnings announcements or calls discussing earnings, end quote.
So, yes, three of the dates are on earnings announcements.
Q. Yeah, I wasn't asking you that though.
I was asking you is it your understanding that this case involves an earnings surprise?
MR. ALEXANDER: Objection;
beyond the scope.
A. Certainly within the category of earnings, some disclosures are the de -- are called the deceleration of cloud revenues. So that is a surprise relative to market expectations for that category

and whether it's revenues, I believe it's discussed as revenues from cloud services. But putting aside the difference between revenues, cash flows and earnings, yes, with respect to cloud services.

Q. Are you familiar with the term "guidance"?

A. Yes.

Q. What does guidance mean?

A. In this context, we're generally talking about statements made by a company to guide or tell the market where they expect earnings or revenues or other financial measures to be in upcoming quarters or years.

Q. Is it your understanding that Oracle ever, during the class period, missed its guidance?

A. I haven't looked at that. So I have no opinion one way or the other.

Q. Would that be something you'd want to know in --

MR. ALEXANDER: Sorry. Just for the reporter, I objected to that line

of questioning.
MR. ETH: Okay.
BY MR. ETH:
Q. Is that something you'd want to know in figuring out what techniques to apply? Would you want to know -- in other words, would you want to know if Oracle ever missed its guidance in figuring out what techniques to apply in a damages model?
MR. ALEXANDER: Objection; beyond the scope.
A. Generally, yes. May or may not use it, but I would certainly be interested in knowing.
Q. Going back to parsing and some of your statements in prior writings.
You say: However, unlike the case of the measurement of the overall price movement, there is no standard means of parsing.
Is that --
MR. ALEXANDER: Where are you reading from, Jordan?

MR. ETH: I'm reading from my notes.

So, I'm asking Dr. Tabak if he agrees with that statement.

MR. ALEXANDER: Objection.

BY MR. ETH:

Q. And the document is, I can tell you the name of it, if that will help you.

It's a paper called "Making assessments about materiality less subjective through the use of content analysis."

A. Let me, Mr. Eth, just so I'll be sure, did you quote me saying there is no standard means or there are no standard means?

Q. Well, I quoted you as saying there is no standard means.

A. In that case, I agree 'cause that implies a singular. That there is a single means that is used all the time. And I agree that there is no single one, as opposed to if I said there are no, which would imply that there are a range.

Q. Right.
So, you've used the term "content analysis."
Can you -- can you describe that again?
A. Sure.
Broadly, it starts from the idea that people write or talk about ideas that were important to them. So, if analysts, for example, let's put aside this case for the moment and say that there was an announcement where a company had poor revenues, you know, and high costs. The question may be do the analysts talk exclusively about revenues, mostly about revenues, about even between the two, mostly about costs or exclusively about costs. And by looking at the ratio of how much time they spend on each or how many references they make to each that may help you and actually used in parsing analyses.
Q. Have there been any peer-reviewed discussions of using content analysis in these circumstances?

A. I don't know if peer-reviewed. Again, there's that First Circuit case that supports it. But I don't believe that there are peer-reviewed articles involving content analysis specifically to the case of securities fraud litigation as opposed to the entire field of content analysis.
Q. Have -- have you used content analysis in any damages reports that you've submitted?
A. Yes.
Q. When?
A. One that comes to mind was my work for defendants in a case called CMS - that's Charlie, Michael, Sam - Energy.
Q. All right. I want to ask you a few questions about the court's order.
You're aware that the court dismissed parts of the Complaint, correct?
A. Yes. I believe I even mentioned that earlier.
Q. Right.
And some of the statements were

dismissed, the court said that they were puffery.
Are you aware of that?
A. That's my recollection from what was said in the order, yes.
Q. So, in a damages model, how would you take out the effect of dismissing those claims from overall damages calculations?
MR. ALEXANDER: Objection; outside the scope.
A. I would want to review the order more carefully. My general understanding is puffery means things that the market would not rely upon because they're vague and generic and therefore they had no effect when made. So, if they had no effect when made, there's nothing really to account for.
Q. So, the court rejected statements as protected by the Reform Act's Safe Harbor.
Are you familiar with that?
Familiar with the court's action on that?

A. Generally, yes. I didn't spend as much time on the dismissed allegations, but I do remember reading that.

Q. So, what methodology would you apply to remove the damages associated with those statements?

MR. ALEXANDER: Objection; outside the scope.

A. You'd have to remind me which statements those were.

Q. So, would your report -- let me ask you this more broadly.

Would your report be exactly the same no matter what the court dismissed?

A. No. I mean, it -- in theory it may be the case that, you know, hypothetically everything that was dismissed, let's say like puffery, actually had no effect. In which case, it would ultimately be the same. Other than if it weren't dismissed, obviously there would be more discussion of the -- of those topics. But to the extent that they had an effect that was -- that contributed

to any of the price declines that I measured that feed into inflation, having been dismissed, they may now be confounding news.

The one thing I want to say over there is sometimes the same news, you know, might apply to two different things. It may not. But certainly to the extent something solely applies to dismissed allegations and was a component of a price decline that I am using to measure damages, that would move it from being allegation-related to what's called confounding news.

Q. I'm asking you, though, about the report that you've submitted here.

A. Oh, this report.

Q. Yeah.

A. I was thinking ahead to the damages analysis.

I don't know if there's anything in this report that would substantively change. Certainly market efficiency wouldn't change.

So, I don't think there's anything substantive that would change in this report.

Q. All right.

Are you familiar with the term "event window"?

A. I am.

Q. What is an event window?

A. So, in an event study, that's the period of time over which the movement of the price of the security in question is measured to determine its response to the event.

Q. Have you determined what the appropriate event window would be here in a -- in a damages report?

MR. ALEXANDER: Objection; beyond the scope.

A. I've not specifically determined that, but I have a standard methodology that I apply unless there is substantial evidence to say otherwise.

And my anticipation is that I would use my standard methodology.

Q. But you haven't decided yet, right?

MR. ALEXANDER: Objection; beyond the scope.

A. Put this way. I would begin with my standard methodology, and if I didn't see anything particularly unusual to call that into question, I would apply that standard methodology, which is methodology I use -- I've been using for, I don't know, two decades.

Q. So, I didn't ask you that. I just asked you if you've decided yet. Not like, you know, if this, then that. You either have or haven't decided yet.

Have you decided yet?

MR. ALEXANDER: Objection; beyond the scope.

A. Again, I think that question's a little too limiting.

I think of my method -- my standard methodology as saying if I don't see anything unusual, here's what I do, and I've decided to go down that route.

Q. All right. So I'll have to follow up then.

Have you decided -- have you determined whether there's something unusual here?

MR. ALEXANDER: Objection; beyond the scope.

A. I have not determined that, but also, I haven't seen anything like that that typically would be very observable. So I haven't made a complete determination, but I haven't seen anything to suggest that there is something unusual.

Q. Let me ask you about the corrective disclosures.

Have you reviewed the corrective disclosures in this matter?

A. Yes.

Q. The alleged corrective disclosures.

A. Yes.

Q. All right.

Now, again referring to some of

your writings, you've identified there are multiple types of corrective disclosures.
Correct?
MR. ALEXANDER: Objection.
A. That sounds so generic that it almost can't be false.
Q. Well, I looked at one of your articles which is called "Inflation Methodologies." I may have referred to that before. And you list four basic types of corrective disclosures.
MR. ALEXANDER: Objection.
I mean, Jordan, you know, once again I have to say you have the document right in front of you. I don't know why you don't put it in front of him.
MR. ETH: Very simple. If Dr. Tabak wants to see it, all he has to do is say, "I want to see it."
So, I'm asking him questions. I'm not asking you.
BY MR. ETH:
Q. So, Dr. Tabak, if you want, at

any time, I can show you "Inflation Methodologies in Securities Fraud Cases: Theory and Practice."
Do you want to see it? We can go through it that way. I'm just asking you if there are four basic types of corrective disclosures.
A. And the answer is there may be multiple ways of classifying corrective disclosures. I'm sure there's one way that where you can say there's four ways. There may be other ways that we can say there's three, five, seven. Depends upon what your classification scheme is.
Q. And there might be, again from that same document: One can imagine variants and combinations of types of corrective disclosures.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Is that right?
A. Why don't you -- why don't you show me the document so I can see what the four types are?

MR. ETH: Okay.
Let's put up "Inflation Methodologies in Securities Fraud Cases: Theory and Practice" as Exhibit 2.
(Tabak Exhibit 2, July 2002 a NERA Working Paper, Inflation Methodologies in Securities Fraud Cases: Theory and Practice, was marked for identification, as of this date.)
BY MR. ETH:
Q. Then you can help clarify this for me.
A. That suggests the writing wasn't clear.
Q. No. No. The writing, I'm sure, is clear. I just need to understand it myself. Okay.
So --
A. Is there a particular page number, Mr. Eth?
Q. There is. And that particular page number is page 3.
So, if we go to page 3, which

you should be able to scroll to.
A. I'm scrolling to it. I'm fine with that, thank you.
Q. Okay.
I'm sorry. Maybe it's not page --
A. Yeah.
Q. Hold on a second.
Theoretical underpinnings.
MR. ALEXANDER: Maybe, Jordan, I think it's page 3 of the numbered document, not page 3 of the pdf. If you -- that makes sense.
MR. ETH: Yeah.
MR. ALEXANDER: Page 4 of the pdf.
MR. ETH: Correct.
Thank you. It's actually page 4 of the pdf. Page 3. At the bottom of the page it says 3, but it's page 4 of the pdf.
And --
MR. ALEXANDER: Yeah, I was just trying to help you, Jordan. That's

all.

MR. ETH: You succeeded, Abe.

BY MR. ETH:

Q. So, we can take a look at the second paragraph here.

A. Okay.

Q. It says: We begin by examining.

A. I see that.

Q. So -- so: We begin by examining four basic types of disclosures about future earnings in order to determine. Da, da, da, da, da.

And you see it goes on, the first type, the second type, and so forth. You could take your time and look at that as long as you like.

A. Give me a second to take the time to skim through this paragraph.

Q. You can take a minute, if you want.

(Pause.)

A. Okay.

Q. So, then what I actually wanted to -- so, this -- this describes four

different types of corrective disclosures, right?

A. Yes.

Although to be clear, and one reason why it threw me is it says we have four basic types of disclosures about future earnings. Then they're -- they're within the category here of earnings, particularly announcements regarding future earnings.

Q. Does this case involve announcements about future earnings?

MR. ALEXANDER: Objection.

A. Expectations of future earnings will presumably be implicit in the alleged corrective disclosures.

Q. Is that yes or no?

MR. ALEXANDER: Objection.

A. Put it this way. Substantively, yes. Whether there's an actual announcement that mentions future earnings as opposed to one that leads to implications for future earnings, that's a technical point that's irrelevant to the

article that you're showing me.
Q. All right.
And then on page 6 of this document, which is it's actually page 5 in the document. So it's page 6 of the exhibit.
A. Okay.
Q. If you go to the second paragraph from the top.
A. The one that starts "One taxonomy."
Q. Correct.
A. Or, excuse me. "Our taxonomy."
Q. Yes.
A. This is great. Just let me read: Our taxonomy of curative disclosures is by no means exhaustive.
So that fits in very much with my confusion about why -- what I said earlier that isn't necessarily just a four category scheme.
Q. Right.
There are many different categories of curative disclosures, right?

A. Sure.
Q. And in fact, that paragraph goes on to say: One can imagine variants and combinations of the four above, as well as disclosures of a completely different nature.
Right?
A. It does say that, yes.
Q. And that's still accurate?
A. Yes, it is.
Q. And you haven't determined in your report which kind of corrective disclosures we have here, correct?
MR. ALEXANDER: Objection; beyond the scope.
A. Again 'cause this is not a damages report, yes.
Q. Okay. All right.
So, I think I know what the answer's going to be here, but got to ask it anyway.
You haven't determined whether any of the alleged corrective disclosures corrected any of the alleged

misstatements, have you?
MR. ALEXANDER: Objection;
beyond the scope.
A. So, just to be clear, you're asking me if I've done a liability analysis or a loss causation analysis?
Q. A matching analysis.
MR. ALEXANDER: Objection.
A. A matching. No, I've not, if we call it that.
Q. You're familiar with the Goldman Sachs case?
MR. ALEXANDER: Objection.
A. Not a legal scholar or lawyer, but I'm pretty sure I know what you're talking about, Mr. Eth.
Q. I mean, you've been citing a bunch of legal cases. It sounds like you follow the law in this area, right?
MR. ALEXANDER: Objection. I don't know what that means.
A. We can debate the amount, but I'm assuming you're talking about the Supreme Court Goldman Sachs case, yes.

Q. Correct.
So, you haven't determined whether - I'm just asking if you've done this - whether any of the alleged corrective disclosures in this case match any of the alleged misrepresentations in this case?
MR. ALEXANDER: Objection; beyond the scope; assumes facts.
A. Well, let's put it this way. I have not determined that -- I haven't looked at how close the match is. But obviously, as we said, three of the announcements are earnings announcements where there will be information about cloud revenues because, at that point, Oracle was still reporting, or breaking things out by division or however we're going to characterize cloud. One involved a survey of CIO's, and that certainly went to the question of how interested companies were in continuing with Oracle cloud services.
So at a minimum, you know, I'm

happy if there's overlap. Is there a one-to-one matching exactly in that, that's not something I looked at because I don't believe that's my burden on a class cert report.

Q. So, when you said "went to the question." So let's talk about that CIO survey.

Have you determined whether that CIO survey corrected any of the alleged misstatements?

MR. ALEXANDER: Objection; beyond the scope; assumes facts; asked and answered.

A. No, because that's either a liability or a loss causation analysis or, at best, you know, something I may respond to on price impact, but I don't think it's necessary for my report here.

Q. And that's true of all the corrective disclosures, not just of that one, and all of the alleged misrepresentations, correct? In other words, I don't have to run through every

one with you.
MR. ALEXANDER: Objection; beyond the scope; assumes facts; asked and answered.
A. I'll go with "yes" as an answer to that.
Q. That's perfect.
All right. Why don't we -- why don't we take another ten minutes, okay?
MR. ALEXANDER: All right.
So, ten to?
MR. ETH: Sure.
MR. ALEXANDER: Okay.
THE VIDEOGRAPHER: The time is 2:37 p.m.
We are going off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 2:54 p.m.
We are back on the record. You may proceed.
BY MR. ETH:
Q. Dr. Tabak, does this case involve a failure to disclose risks?

MR. ALEXANDER: Objection.
A. I don't think of it primarily as failure to disclose risk.
Obviously you can say anything is a risk, but I think it -- and I understand that the Complaint does mention materialization of the risk, but I think of it more as an omissions case relating to the reasons why there was an acceleration and then a deceleration in cloud revenues.
Q. So, at least in part it involves a failure to disclose risks?
MR. ALEXANDER: Objection; beyond the scope.
A. That's not what I said. I mean, I said you can think of almost anything as a risk, but I think of it more as a failure to disclose reasons for an acceleration and deceleration in cloud revenues.
Q. Okay. So, I'm focusing on you said you think of it more that way.
So, it either does in some part

involve failure to disclose risks or it doesn't.
MR. ALEXANDER: Objection; assumes facts; asked and answered.
A. I think that assumes that you have to -- that -- that that has to be the case. As I just testified to, you can probably characterize almost anything as a risk of that thing occurring.
So, if you ask me -- if you said I have to decide one way or the other, I don't think of this really as a risk case.
Q. Okay. I'm asking about this in part because of an article you wrote called "Risk Disclosures and Damages Measurement."
Are you familiar with that article?
A. Is this in the Securities Court Litigation Reporter, or Securities -- something like -- Securities Litigation Reporter? Something of that nature?
Q. It's in the Securities Reform Act Litigation Reporter.

A. There we go. I was close.

MR. ALEXANDER: Do you want to see it, David?

THE WITNESS: Sure.

MR. ETH: Okay. Let's put it up.

I'm really not going to ask much about it, but if you'd like to see it, sure.

THE WITNESS: It can't hurt.

MR. ETH: No. It's just time, that's all.

All right. So, let's see.

(Tabak Exhibit 3, Tabak article, Risk Disclosures and Damages Measurement in Securities Fraud Cases, was marked for identification, as of this date.)

MR. ETH: Do you have it now?

THE WITNESS: Yeah, I do.

BY MR. ETH:

Q. Okay.

This -- this article describes methods for modeling damages in cases

involving failure to disclose risks, right?
A. That is correct.
Q. Have you determined whether the techniques in this article apply to this case?
MR. ALEXANDER: Objection; beyond the scope.
A. I've thought about it, and they may. And as a result, you could get an inflation that is either larger or smaller than what you'd get if you simply measured the price decline at the end.
Q. So, you say "they may."
So, may -- so, you've thought about it, but you haven't yet applied them here?
MR. ALEXANDER: Objection; beyond the scope.
A. Again, I have not done a damages analysis because this is not a damages report.
So you're right, I have not applied them by not having done a damages

report at this point.
Q. But if you -- but someone doing a damages model would need to consider whether to apply this or not, correct?
MR. ALEXANDER: Objection; beyond the scope; asked and answered.
A. I think you want to at least consider that.
There's a lot of things you always want to consider when doing a damages analysis, sure.
Q. Right.
And doing an event study is just one part of that, right?
MR. ALEXANDER: Objection; beyond the scope.
A. Absolutely. Here you -- there is certainly internal information that you could use to apply that article as another step.
Q. Right.
By the event study by itself wouldn't be enough, right?
MR. ALEXANDER: Objection;

beyond the scope.
A. That's an interesting question. And I'll just say that depends on whether there's a material effect from applying these things or not.
And again, if you can say that it would increase inflation, then if anything, as a plaintiff's expert you would have a conservative analysis by not applying the concepts in that article.
Q. But even -- besides this article, you haven't determined that, in this case, an event study by itself would be enough for a damages model, correct?
MR. ALEXANDER: Objection; beyond the scope; asked and answered.
A. That's basically correct. What I've determined is that an event study is a first step. As I said in the report, we talked about, what was it, further adjustments, and I recognize that those adjustments are standard adjustments that are made all the time.
Q. All right.

Let me -- are you familiar with the term "inflation maintenance"?
A. Yes.
Q. Is this an inflation maintenance case?
MR. ALEXANDER: Objection; beyond the scope.
A. It's an interesting question.
At -- I wouldn't want to think about it in particular at the beginning because it doesn't have the classic feature of an inflation maintenance case where something really bad happened and it's not disclosed.
Q. Okay.
So, for the readers of this transcript and posterity, maybe you could explain -- maybe you could explain what inflation maintenance means in this context.
A. So, an inflation maintenance case would basically be, you know, if you're taking that literally that there had actually been inflation, at least as a

financial concept, before the start of the class period and at some point, the company, let's say the defendants, were -- should have made some disclosure that would have revealed the inflation. So it's a little weird because you're saying inflation maintenance rather than price maintenance, so it's a little harder to think of. But if you want an inflation maintenance case, let's say, that your factory blew up before the start of the class period, you did not disclose that, the prices inflated from a financial sense, not from a legal sense until -- yet because you have not been required to disclose it, but at the point where you're required to disclose, you failed to disclose that. So the market never learns about the blown-up factory. The price doesn't change, at least for that reason.

Obviously there are other factors. And the inflation, again putting aside the legal issue that was in -- or the difference between the, kind of,

public and private evaluations of the company continues simply because defendants failed to disclose that their factory had blown up.

Q. All right.

And you said this is -- and the factory blowing up example is what you'd call a -- I don't remember the term you used. The classic example of inflation maintenance?

A. I may have said classic or something like that, yes.

Q. Okay.

So, going back to my question, and I may have -- I think you said -- let me just ask it again.

Is this an inflation maintenance case?

MR. ALEXANDER: Objection; beyond the scope; asked and answered.

A. The question, in some sense, here would be the size of the, I'm trying to remember the phrase you used because you didn't like scheme, alleged practices

and whether the -- whether they changed, at least relative to the size of cloud computing services. If they didn't change, then you can say, essentially, that it's an inflation maintenance case.

If there were more of the alleged practices, it's kind of like saying another factory blew up and then the inflation would go up. So, that's going to ultimately depend on the relative size of the alleged practices at issue relative -- and the size of, you know, the cloud computing services.

Q. Are you familiar with the term "back casting"?

A. Yes.

Q. And I mean in this context, of course.

MR. ALEXANDER: Objection.

A. Probably the main -- I don't know if I'm familiar with it in any other context.

Q. It could be fishing. But anyway. Although what do I know about

fishing.
So, what is --
A. Some of us would say that you're on a fishing expedition, Mr. Eth.
Q. Yeah, well. I am a pescatarian. So, anyway.
So, what -- what is -- what does back casting mean in this case?
A. In securities --
MR. ALEXANDER: Objection.
A. -- generally, let's say. It means you take the price decline, and let's make it easy with the single corrective disclosure, and you take that as the starting point for your inflation. So let's say the price declined by $10 a share. And then you take that number and then we mentioned the constant dollar inflation before. If that's the drop caused by the corrective disclosure, then inflation was $10 per share all the way back to the rest of the class period, unless you hit another event such as another corrective disclosure or

potentially a misrepresentation.
Q. So, have you determined that that's how damages would be modeled here?
MR. ALEXANDER: Objection; beyond the scope.
A. Back casting generally?
Q. Yes.
Is that a -- have you determined that that's how damages would be modeled here?
A. That's how I would model damages, yes.
And again, as I said in my report, potentially, as I said, the phrase was further adjustments. But yes, that would be the baseline.
Q. But that -- but you haven't made -- that's like maybe a default, but you haven't actually reached that determination yet, right?
A. No, I haven't.
MR. ALEXANDER: Objection.
BY MR. ETH:
Q. Okay.

A. I haven't reached that determination. Obviously if new information comes to light, I can always revisit things, but that is my determination.

Q. What is your determination?

A. That I would use a form of back casting.

Q. A form of back casting?

A. Yes.

Q. Do you know when inflation started in this -- in this case?

A. Yes.

Q. Have you modeled that?

A. The allegation is at the beginning of the class period.

Q. Is it the beginning of the class period, or is it before the class period?

A. Well, again --

MR. ALEXANDER: Objection; beyond the scope.

A. Inflation is a legal term. So technically, there is no inflation before the start of the class period.

If you're asking for a financial -- kind of, in a financial sense, it -- it would probably be before the start of the class period. Although that doesn't mean it was maintained at exactly the same level as of the start of the class period, which I believe was a Jeffries conference.

Q. So, you're familiar with the term "price impact"?

A. I am.

Q. Did you look here to see if any of the alleged misrepresentations had any price impact?

MR. ALEXANDER: Objection; beyond the scope.

A. No, because that's not an affirmative argument that has to be made by plaintiffs in class certification.

Q. I didn't ask you why. I didn't ask you why. I just asked you if you did it. So, you can just answer that question.

MR. ALEXANDER: He can answer

how he wants.
But objection; beyond the scope.
MR. ETH: And I can ask what I want.
BY MR. ETH:
Q. So let me ask again until I get an answer to my question and not your question.
My question is did you look to see if the alleged misrepresentations had any price impact? You either did or you didn't.
MR. ALEXANDER: Objection; beyond the scope; asked and answered.
And, David, answer any way you want.
A. Of course not.
Q. Now, you could, with your event study, take a look to see if there was any price impact, couldn't you?
MR. ALEXANDER: Objection.
A. That assumes that you're ruling out an idea of price maintenance. And if the -- if the misrepresentations would

have caused price -- price maintenance, then an event study wouldn't give that.

And secondly, one often looks at price impact both at the front end and the back end, and we know from Exhibit 8a that all of the earnings announcement dates had statistically significant price movements. So, there's at least evidence there of price impact to the extent that I believe two of those dates are also alleged corrective disclosure dates.

Q. So, you could look at your events -- by the way, this event study, in putting together a damages model, would you use this exact event study or do a different one?

MR. ALEXANDER: Objection; beyond the scope.

A. Unless, for example, your experts brought up some issues with it, I would use the same market model, and thus the same event study for every date as I'm using here. And as we said, again, if I'm the damages expert.

Q. So, we could look at your event study, and if necessary we could put it up on the screen here, but I think you have a column in the event study that's labeled "Statistical Significance" and it has a zero or a one in the column to indicate whether a date is statistically significant or not?

MR. ALEXANDER: Jordan, what in his report are you referring to?

MR. ETH: Not in the report. In the event study, the back-up to the report.

We can put it up on the screen and show you, if you like.

THE WITNESS: That is true, but since we're going to refer to it, if you're going to -- if you're asking more than just is there such a column, yeah, I'd like to see it.

MR. ETH: Well, I'm really not. But I'll put it up anyway.

So, let's put up the back-up here. It's pretty straightforward.

There are no hidden balls here, okay, so.

MR. ALEXANDER: That's what they all say.

MR. ETH: Yeah, but I mean it.

All right. So, let's see.

We're -- there we go. Is that 4?

Exhibit 4. Document 4. Which is taking a little while to come up on my screen.

(Tabak Exhibit 4, spreadsheet, was marked for identification, as of this date.)

MR. ETH: There we go. Probably because it has like a zillion numbers on it.

THE WITNESS: Sorry about that.

MR. ETH: No, I know the way these things go.

All right. So, I'm not going to ask you about anything other, I think, than if you look at Column J.

THE WITNESS: Hold on a second.

I'm trying to figure out how to get this --

MR. ETH: I'm sorry. What?

THE WITNESS: I can't see Column J and I can't see --

MR. ETH: Hold on one second.

(Pause.)

THE WITNESS: I can get it to scroll with my finger.

MR. ALEXANDER: Are you on a laptop or a --

MR. ETH: Okay. So, go to the -- you have to go to the News Test Inputs tab, which is like the third from the left.

THE WITNESS: Hold on. I don't really see the tab names on my screen.

MR. ETH: Okay. Can we put it up for him?

MR. ALEXANDER: Yeah, I think there's a way.

MR. ETH: We're going to try to put it up for you.

MR. WEINER: It's up on mine.

MR. ALEXANDER: It's up on mine too.
MR. WEINER: I could see it.
THE WITNESS: Well, I'm the odd man out then.
MR. ETH: It's okay. Take your time.
MR. ALEXANDER: Jordan, there might be a way. Jordan, maybe if you share your screen.
MR. ETH: Yeah, we've -- are we doing that, Dave?
(Pause.)
MR. ETH: Yeah, so everybody -- so far you are, as you said, Dr. Tabak, the odd man out. But we're -- should be able to see it.
Do you have any tabs at the bottom?
THE WITNESS: I can kind of see part of the tabs. But just not enough to see what they say. It's like the bot -- the bottom what you guys are probably seeing is cut off.

MR. ETH: I see.
THE WITNESS: I can click on tabs.
So, what color is the tab? Is it purple or orange?
MR. ETH: It's the one immediately to the right of the purple tab.
THE WITNESS: Okay. I think I'm there.
MR. ETH: Okay.
Do you see now like basically a spreadsheet?
THE WITNESS: Yeah. And column J says "Stat Sig?"
MR. ETH: That's it. You're there.
BY MR. ETH:
Q. So, zero on there means that the residual return on that day was not statistically significant, correct?
A. That is correct.
Q. And a 1 means that the residual return was statistically significant at

the 5 percent confidence level, right?
A. If you change that to the 5 percent significance level, that would be correct.
Q. Excellent.
And the two asterisks means instead of 5 percent it's 10 percent, right?
A. No, I don't believe that's correct.
Q. I'm sorry.
Maybe I got it the other way around. I got it the other way around, I think.
I think it's two -- two asterisks means, because the T statistic there is above 1.96, that the two asterisks means significant at the 5 percent level, right?
A. That is correct.
Q. And the one asterisk means at the 10 percent level.
A. But not at the 5, correct.
Q. Okay. Great.

And economists in this setting use the 5 percent level, correct?
MR. ALEXANDER: Objection.
A. Can I say with a little tongue-in-cheek, there are a few who don't, but they're wrong.
Q. Yeah, you could say that. For sure.
Okay.
So, if I look at any particular day and I, you know, pick out a date and then I scroll all the way over to the right, I can tell whether it has what you called front end price impact or not, correct?
MR. ALEXANDER: Objection.
A. No.
Q. No, okay.
Okay. Tell me why that's wrong.
A. Because the date might be a corrective disclosure date. It's not going to tell you front end price impact if you get a corrective disclosure date.
Q. Absolutely right. Absolutely

right. Let me rephrase it.
If I take an alleged misleading statement date that is just an alleged misleading statement, not also a corrective disclosure, and I scroll all the way over to the right and I see that it has no -- it has a zero in Column J, does that mean it has no front end price impact?
MR. ALEXANDER: Objection.
A. No, not necessarily.
And I can explain, if you like.
Q. Yeah, I would like to hear that because I want to understand this.
A. So, there are two issues. One is we talked about price planes. If you're going to say that the price would have declined but for the omission, I think it's -- it might be a little -- the language tends to go back and forth in various places, but people consider that, in my view, price impact as preventing the price from declining.
And the second, this is the

news -- all the news on that day, and we had a discussion about disaggregation and parsing. So this doesn't necessarily correspond to the misrepresentation, but rather to all of the news on that date.

Q. Okay.

So -- so, there are -- you have described at least two ways that even though there's no statistical significance on that date, there could, nevertheless, be what we've called front end price impact, right?

MR. ALEXANDER: Objection.

A. Correct.

Q. And one way is maybe there's a lot of information that came out on that date and you'd have to figure out the effect of all the various pieces before you could assign statistical significance to any single piece.

Is that right?

MR. ALEXANDER: Objection.

A. Not quite. I mean, you don't have to get every piece. As long as you

have the piece in question, there may not be a need to disaggregate all the others, but you certainly have to know, or at least bound the effects of the piece that you're considering.

Q. So, you used the word "disaggregate." Earlier we said that that's like a synonym for that in this context is "parsing."

So, would you -- you'd have to do, kind of, parsing that we discussed earlier; is that right?

A. If the -- if you believe there was material other news on that date and didn't let you just bound it and say it's at least this amount, yes.

Q. All right.

So, have you -- have you looked at whether the lead plaintiff in this case was damaged?

MR. ALEXANDER: Objection; beyond the scope.

A. I have not.

Q. How would you as a financial

economist figure out if a -- you know, how a particular plaintiff -- whether a particular plaintiff was damaged?

MR. ALEXANDER: Objection; beyond the scope.

A. Well, I mean, broadly, the nice thing here is whatever damages model I come up with would apply to every investor with the only issues being what their purchase and sales dates were and what quantities they purchased and sold at and, for purposes of PSA, the price of their purchases.

So, whatever the model is, it could be applied to lead plaintiff if you know they're trading, and that's how I would do it.

Q. All right.

And would you have to net the individual entity or person's gains versus losses?

MR. ALEXANDER: Objection; beyond the scope; calls for a legal conclusion.

A. The last one, Mr. Alexander's objections is actually valid over there in --

MR. ALEXANDER: Thank you.

A. I -- there have been court decisions that have gone both ways on that, is my understanding.

So if, you know, asked I could do it both ways, and if the court had a ruling or something, we'd obviously follow whatever the court's rule was, or ruling.

MR. ETH: I just want the record to reflect that you have now sustained Mr. Alexander's objection.

MR. ALEXANDER: He has that power. He's that good.

THE WITNESS: Look at the Teva opinion. I'm credited with overruling one of my counsel's objections.

MR. ETH: Excellent.

BY MR. ETH:

Q. All right.

You mentioned before that you may have done, or people at NERA may have

done, but you're not sure, may have done some estimate of damages in this case?

A. Yeah. I mean, I don't remember offhand. But if you really pushed me I had to guess, I would say more than likely than not they did a damages analysis.

Q. All right.

Now, you -- you -- NERA does plaintiff's style damages calculations, right?

MR. ALEXANDER: Objection.

A. As one type of damage. Not the only thing, but yes, we do that.

Q. Okay.

Have you done that in -- have you -- have you done that in this matter?

A. I think --

MR. ALEXANDER: Objection; beyond the scope; vague.

Okay. Go ahead.

THE WITNESS: I thought you were going to go with asked and answered.

A. I think you've asked me this a number of times.

You didn't mention plaintiff's style, but to the extent we did analysis --

MR. ALEXANDER: I don't know what that means, yeah.

But go ahead.

BY MR. ETH:

Q. I'll just ask you since it's in NERA's materials, NERA itself says they do plaintiff's style damages calculations. I can show you the document.

A. No, I --

Q. I assume you're familiar with the term probably because you've done hundreds of these.

So, what does -- what is plaintiff's style damage calculation? What does that mean?

A. It basically means not -- generally not accounting for parsing or other likely defenses or points -- well, actually, points not necessarily defense. But not accounting for parsing or many potential defenses that may be brought up

by defendants, but giving what may be considered an outer ballpark, you know, maximum type of damages estimate.

Q. Have you done that here?

MR. ALEXANDER: Objection; beyond the scope.

THE WITNESS: I think this is more asked and answered.

A. You're asking me if I've done a damages analysis. I said I think we did, but I don't recall.

To the extent we did, most likely it was a plaintiff's style analysis.

Q. And that's not reflected in your report, is it?

A. Again, this is not a damages report. So no.

Q. Right.

So, how do you do those -- the plaintiff's style damages calculations?

MR. ALEXANDER: Objection; beyond the scope.

A. Very broadly. I mean, you look

at the corrective disclosures. You perform an event study for each to find the market and/or industry adjusted price declines, and typically you back cast them either to the beginning of the class period, or if there are dates when inflation increased, you take that into account as well.

Q. And how long does it take you to put together a plaintiff's style damages calculation?

MR. ALEXANDER: Objection; beyond the scope.

A. Depends on the nature of the case. I mean, certainly it depends on the number of securities. If you've got just, you know, shares or also you could have fixed income securities or options. It may depend on how many price reactions they're at -- they have -- there are in the case.

But, you know, when you've got a good case, let me know, Mr. Eth, and we'll give you an estimate.

Q. Well, I've got one here. It's called the Oracle case.

So, you got any estimate of damages here?

MR. ALEXANDER: Objection; beyond the scope; asked and answered.

Are you looking for free advice, Jordan?

MR. ETH: I'm looking for some answers here.

BY MR. ETH:

Q. And I'm looking for your best estimate of what the plaintiff's style damages are here.

MR. ALEXANDER: Objection; beyond the scope; asked and answered I don't know how many times now.

A. Well, this one was not actually asked and answered, but it -- but it flows from the fact that I don't really remember for sure if we did a damages analysis.

Certainly if I remembered the conclusion of a damages analysis I would remember that we had done it.

Q. So, any estimate? Is this like hundred dollars, thousand dollars, a billion dollars?

MR. ALEXANDER: Objection; beyond --

BY MR. ETH:

Q. Any estimate that you have at all?

MR. ALEXANDER: Objection; beyond the scope; asked and answered.

For sure now, right, David?

A. Certainly not a hundred thousand dollars and you know that, Mr. Eth. Beyond that you're just basically asking me to speculate because I said I don't remember whether we have done that or not. So I certainly don't remember any conclusions.

Q. All right.

So, there's -- there's nothing, kind of, back of the envelope that you could do --

MR. ALEXANDER: Objection, Jordan.

Q. -- to figure it out?

MR. ALEXANDER: Come on. This is beyond the scope. This is asked and answered.

What are we doing? Come on.

A. Sitting here I wouldn't be comfortable doing that, you know, in any real degree of -- with any real degree of confidence.

MR. ETH: Okay.

All right. Why don't we -- why don't we do this. Why don't we take one more ten minute break.

We're pretty close to the end, if not at the end. And I'm just going to check with my colleagues to make sure I haven't missed too many crucial things.

Okay. So let's just take another ten minutes.

MR. ALEXANDER: Ten minutes, all right.

THE VIDEOGRAPHER: The time is 3:24 p.m.

We are going off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 3:34 p.m.
We are back on the record. You may proceed.
MR. ETH: Dr. Tabak, thank you very much. We have no further questions at this time.
I wish you a Happy Thanksgiving.
THE WITNESS: Thank you. Same to you, Mr. Eth.
MR. ALEXANDER: And we have no questions.
MR. ETH: All right.
MR. ALEXANDER: Thank you so much, Dr. Tabak.
And Happy Thanksgiving to everyone.
Thank you so much to the court reporter and the videographer.
THE VIDEOGRAPHER: This completes today's deposition with David Tabak.

The time is 3:35 p.m. We are going off the record.

(Deposition adjourned at approximately 3:35 p.m.)

C E R T I F I C A T E

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Marie Foley, RMR, CRR, a Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

THAT DAVID I. TABAK, PH.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of November, 2021.

Marie Foley

MARIE FOLEY, RMR, CRR

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

A C K N O W L E D G M E N T

STATE OF )

:ss

COUNTY OF )

I, DAVID I. TABAK, Ph.D., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of November 23, 2021; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

____________________________

DAVID I. TABAK, Ph.D.

Signed and subscribed to before me this _________ day of _______________, 20__.

_____________________________________

Notary Public, State of

E R R A T A

PAGE / LINE / CHANGE / REASON

**A**
**A-D-E-L-P-H-I-A** 10:2
**a.m** 63:21
**ABC** 50:24
**Abe** 2:5 13:5,22 30:14 80:19 120:3
**Abe's** 16:4
**abe.alexander@...** 2:12
**able** 7:20 17:21 102:21 119:2 147:18
**absolutely** 30:17 37:19 48:12 68:23 132:18 150:25,25
**AC** 14:22
**academic** 94:15
**acceleration** 50:2,5 50:19 128:11,21
**accept** 19:23
**accepted** 17:16
**access** 70:5
**account** 110:20 159:9
**accounted** 99:11
**accounting** 157:21 157:24
**accurate** 12:17 23:14 26:13 78:18 81:2 93:6 94:21 95:7 123:10 166:19
**accused** 38:8
**Act** 88:5 129:25
**Act's** 110:23
**action** 11:4 21:16 23:17,21 48:24 49:13 110:25 165:17
**actionable** 62:9
**actions** 22:23 23:2
**actual** 44:14 82:20 87:14 121:21
**add** 26:2 56:5 76:7
**added** 88:9
**Additional** 94:18
**addressed** 17:18
**Adelphia** 9:25 17:15,20 19:11
**adjourned** 164:4
**adjusted** 159:4
**adjustment** 85:22
**adjustments** 85:9 85:25 86:6,8,11 86:17,19,20,22,23 87:2 97:3,6,12,14 97:16 133:22,23 133:23 139:16
**advice** 160:8
**affect** 82:15
**affirmative** 65:11 141:19
**afternoon** 7:13
**AG** 2:14
**aggressive** 84:13
**ago** 10:15,20 11:20 14:18 16:3 37:10 39:12
**agree** 95:14 107:20 107:23
**agrees** 107:5
**ahead** 40:24 112:20 156:21 157:7
**Alexander** 2:5 13:2 13:7,11,19 14:6 14:11 16:16 19:8 20:6 21:24 24:14 24:23 25:3 28:5 28:20 30:13,16 31:25 32:17,20 33:2,8,13 35:7 38:10 39:7 40:3,6 40:16,22 41:18 42:5,17 44:11 47:8,23 49:2,8,18 50:9 51:9,18 52:11,24 54:8,24 56:15 58:7,13,18 60:19,25 64:23 65:5,18,25 66:21 67:4,11,22 69:11 69:14,25 70:8,25 71:16 72:19 74:24 75:15,23 78:3 79:21 80:13 81:3 81:16 82:12,17 83:9,23 84:16 85:15 86:3,9,13 87:6,9 89:2,13 90:5,12 91:13,19 91:25 92:8 93:4,7 93:21 94:7,22 95:5 96:3,10 97:7 97:17,23 98:10,17 98:23 99:23 103:14 104:3,19 105:24 106:12,24 107:6 110:11 111:8 113:18 114:4,18 115:7 116:5,13 117:20 119:11,16,24 121:14,19 123:15 124:3,9,14,21 125:9 126:13 127:3,11,14 128:2 128:15 129:4 130:3 131:8,19 132:6,16,25 133:16 134:7 136:20 137:20 138:11 139:5,23 140:21 141:16,25 142:14,22 143:18 144:10 145:4 146:11,21 147:2,9 150:4,17 151:11 152:14,23 153:22 154:5,23 155:5,16 156:12,19 157:5 158:6,23 159:13 160:6,16 161:5,10 161:24 162:3,22 163:14,17
**Alexander's** 155:2 155:15
**allegation** 140:16
**allegation-related** 112:14
**allegations** 64:21 96:2 99:14,15 111:3 112:11
**alleged** 48:14,23 51:8 52:8,22 61:14,18 62:3 65:3 82:15 88:20 100:5 104:9 115:21 121:16 123:24,25 125:5,7 126:11,23 136:25 137:8,12 141:14 142:11 143:11 151:3,4
**Allen** 15:21
**amended** 21:7,15 48:7,24 49:12
**Americas** 2:9
**amount** 47:14,19 47:20 85:17 124:23 153:17
**analyses** 108:22
**analysis** 43:25 44:4 44:6 52:19 53:2 56:25 57:2,6 64:10,11,12 76:4 90:25 95:3 96:5 96:21 99:17 101:12,24 102:3,4 102:13,13 107:13 108:4,25 109:6,9 109:11 112:21 124:7,7,8 126:17 131:22 132:12 133:10 156:7 157:4 158:11,15 160:22,24
**analyst** 67:2 68:11 68:14,18,18,25 69:3,4
**analysts** 66:23 68:21 102:7 108:10,15
**and/or** 159:4
**Andrew** 46:9
**annotations** 14:25
**announced** 93:3
**announcement** 63:10 77:10,13 101:21 108:13 121:22 143:7
**announcements** 96:14 100:6 104:10,13 121:10 121:13 125:15,15
**answer** 13:17 41:5 61:2 73:21 84:19 89:17 92:4,9 93:25 94:4 117:9 127:6 141:23,25 142:8,16
**answer's** 48:16 123:21
**answered** 59:17 78:4 126:15 127:5 129:5 132:7 133:17 136:21 142:15 156:23 158:9 160:7,17,20 161:11 162:5
**answers** 160:11 167:13
**anticipation** 113:24
**anyway** 30:9 39:2 45:15 48:19,21 79:5 123:22 137:25 138:7 144:23
**Appearances** 2:2 3:2 4:5 6:17
**applied** 54:17 131:17,25 154:16
**applies** 68:6 112:10
**apply** 88:24 89:6 101:18 103:12,12 106:7,10 111:6 112:8 113:22 114:9 131:6 132:5 132:20 154:9

**applying** 133:5,11
**appreciate** 79:22
**approach** 95:24 96:7,24
**appropriate** 90:3 95:3,22 113:16 166:7
**approximately** 164:5
**area** 32:11 34:19,21 124:20
**areas** 28:8 33:22
**argue** 102:16
**argument** 82:24 141:19
**article** 5:15 122:2 129:15,19 130:15 130:24 131:6 132:20 133:11,13
**articles** 109:5 116:9
**aside** 89:20 105:4 108:11 135:24
**asked** 41:11,13 59:16 60:12 71:10 78:3 114:14 126:14 127:4 129:5 132:7 133:17 136:21 141:22 142:15 155:9 156:23,24 158:9 160:7,17,20 161:11 162:4
**asking** 23:18 40:17 41:3 55:3 67:16 67:20 68:9,10 69:22 86:25 98:11 102:5 104:14,16 107:4 112:16 116:22,23 117:6 124:6 125:4 129:14 141:2 144:19 158:10 161:15
**assessments** 107:11
**Asset** 2:14
**assign** 152:20
**assignment** 14:3
**assist** 45:17,18
**assistance** 46:12 47:5
**assisted** 46:16
**associated** 62:8 111:6
**assume** 8:3 46:18 52:16 55:22 82:19 157:14
**assumes** 96:11 125:10 126:14 127:4 129:5,6 142:23
**assuming** 52:8,21 52:22 82:23 124:24
**assumptions** 51:15 51:16
**asterisk** 149:22
**asterisks** 149:7,17 149:19
**attached** 10:7 166:12
**attachment** 22:13
**attempt** 36:11 98:20
**attention** 50:14 66:24 102:5
**attorney** 166:15
**authored** 23:3
**available** 37:6 66:10 70:3,20 71:21,25
**Avenue** 2:9
**average** 88:14
**aware** 109:20 110:4

**B**

**B** 5:3 101:18
**B-L-E-I-C-H-M-...** 27:13
**back** 18:21 31:17 39:3 44:21 57:20 59:15 61:25 68:17 72:16 73:6 106:17 127:21 136:15 137:16 138:9,23 139:7 140:8,10 143:6 151:21 159:5 161:22 163:6
**back-up** 144:13,24
**background** 54:12
**bad** 134:14
**ballpark** 158:3
**balls** 145:2
**bankruptcy** 9:22 17:9
**Barring** 66:3
**based** 89:18 95:17
**baseline** 139:17
**basic** 79:13 80:23 82:24 94:14 116:11 117:7 120:11 121:7
**basically** 19:19 36:9 64:12 66:7 88:9 102:4,24 133:18 134:23 148:13 157:20 161:15
**bear** 31:18
**beginning** 134:11 140:17,18 159:6
**begins** 6:6
**begun** 96:21
**believe** 9:22 11:18 21:18 26:24 27:7 34:25 36:19 37:23 38:18 39:15,22 41:23 54:2 61:10 61:25 64:3 75:3 77:8 78:17 84:20 88:7,23 96:17 97:4 105:2 109:4 109:22 126:5 141:8 143:10 149:10 153:14
**benefit** 16:5
**BERGER** 2:4
**Bernstein** 2:4 40:4
**best** 8:18 10:18 13:18 18:17,23 22:16,22 23:2,10 38:11 39:16,24 45:4 47:13 48:3 60:20 61:3 77:23 77:24,25 78:10 89:15,22 94:23 95:24 126:18 160:13
**better** 83:16
**beyond** 19:14 34:8 40:18,19 89:3 97:18 103:15 104:4,20 106:13 113:19 114:5,19 115:8 123:16 124:4 125:10 126:14 127:4 128:16 131:9,20 132:7,17 133:2,17 134:8 136:21 139:6 140:22 141:17 142:3,15 143:19 153:23 154:6,24 156:20 158:7,24 159:14 160:7,17 161:6,11 161:15 162:4
**bias** 62:11
**big** 32:23
**billed** 47:14,19
**billing** 44:24,25
**billion** 161:4
**bills** 47:22
**bit** 27:8 44:23 66:8
**blanks** 31:16
**Bleichmar** 27:12
**blew** 135:12 137:9
**block** 71:24
**blood** 165:17
**blowing** 136:8
**blown** 136:5
**blown-up** 135:20
**Bond** 3:15
**bonds** 38:20
**bono** 90:14
**bot** 147:24
**bottom** 55:25 119:20 147:20,24
**bound** 153:5,16
**break** 8:24 46:19 162:14
**breaking** 125:18
**breakout** 72:21
**breaks** 9:3
**bricklayers** 102:9
**bring** 36:11 37:2
**broad** 34:7,14,15 53:4 102:2 103:8
**broader** 18:12
**broadly** 50:10 51:20 90:24 93:8 101:10 108:8 111:13 154:7 158:25
**broke** 68:11
**broken** 59:25
**brought** 89:4 143:21 157:25
**bunch** 124:19
**burden** 126:5
**business** 37:2 94:9

**C**

**C** 3:19 165:2,2 167:2
**C-A-M-M-E-R** 46:21
**C-A-R-R-O-N** 37:24
**calculated** 42:10 43:13 74:11,20
**calculation** 96:20 157:18 159:12
**calculations** 54:15 110:10 156:10 157:11 158:22
**California** 1:3 3:9
**call** 12:10,11,15,20 50:16 51:21 52:15 69:5 114:9 124:11

136:9
**called** 12:5 25:6 50:24 59:2 104:23 107:10 109:16 112:14 116:9 129:16 150:15 152:12 160:3
**calling** 51:4
**calls** 20:18 68:11,18 68:20,25 100:6 104:10 154:24
**Cammer** 46:20
**cancel** 93:10
**cap** 90:10
**capable** 76:16
**careful** 54:9
**carefully** 110:14 166:5
**Carron** 37:23 38:16,19
**case** 1:11 7:13 11:9 11:10 12:23 14:2 14:14,15,20 17:13 17:23,24 18:3,7 19:16 23:20 27:24 28:12,14,16 29:3 29:4 37:7,9,12,18 37:21 38:4,6,7,15 38:22 39:4,6,10 41:15 51:17 62:6 81:21 82:14 86:7 93:20 94:6 96:7 99:12,22 104:2,17 106:20 107:20 108:11 109:3,7,16 111:17,20 121:12 124:13,25 125:6,8 127:24 128:9 129:8,13 131:7 133:14 134:6,13 134:23 135:11 136:19 137:6 138:9 140:13 153:20 156:3 159:16,22,24 160:3
**cases** 5:12,18 55:2 81:9 102:15 117:3 118:5,10 124:19 130:17,25
**cash** 82:8,16,25 83:2,5,7 105:5
**cast** 159:5
**casting** 137:16 138:9 139:7 140:9 140:10
**categories** 68:12 102:6 103:9 122:25
**category** 102:2 103:12 104:21,25 121:9 122:22
**Catherine** 46:6
**Catz** 3:13
**causation** 27:19,23 28:3 29:7,8 49:7 124:7 126:17
**cause** 50:13 77:15 107:20 123:17
**caused** 138:21 143:2
**cents** 99:13,14 103:7
**cert** 126:6
**certain** 12:4 53:18 54:25 76:15 83:16 91:2
**certainly** 11:13 41:6,23 52:13 71:6 80:3 87:12 104:21 106:15 112:9,24 125:21 132:19 153:4 159:16 160:23 161:13,18
**certainty** 46:24
**CERTIFICATE** 4:11
**certification** 141:20
**Certified** 165:7
**certify** 165:9,15 167:9
**chance** 13:17
**Chancery** 9:19 11:10,16,23 14:17
**change** 35:23 47:18 54:13 58:10 60:22 93:16 95:16 96:22 101:17 112:24,25 113:3 135:21 137:5 149:3 168:3
**changed** 137:2
**changes** 95:18 101:20
**characterization** 80:15
**characterize** 125:20 129:9
**charge** 36:10
**Charlie** 109:17
**chat** 90:10
**check** 96:17 162:17
**CIO** 126:8,11
**CIO's** 125:21
**Circuit** 102:9 109:3
**circumstances** 95:23,25 108:25
**Citadel** 16:6
**cite** 15:2
**cited** 54:23 55:2 89:20
**citing** 124:18
**claim** 17:24
**claims** 110:9
**clarify** 67:12 118:13
**class** 2:15 11:3 21:16 22:17,23,25 23:17,21 27:11 29:11,13 48:24 49:13 57:16 64:25 89:8 105:18 126:5 135:3,13 138:23 140:17,18,19,25 141:5,8,20 159:6
**classic** 134:12 136:10,12
**classification** 117:15
**classifying** 117:10
**clear** 50:13 60:9 71:21 83:15 84:2 84:4,8 104:5 118:16,18 121:5 124:5
**clearly** 33:6 66:12
**click** 70:6,11,17,20 71:4 148:3
**clients** 36:12
**close** 35:17,21 45:6 125:13 130:2 162:15
**closing** 88:14
**cloud** 50:3,14 83:3 104:23 105:3,6 125:17,20,24 128:12,21 137:3 137:14
**CMS** 109:16
**colleagues** 47:11 162:17
**color** 148:5
**column** 144:5,7,20 145:24 146:5 148:15 151:8
**combinations** 117:18 123:5
**combined** 94:15
**Comcast** 51:21 52:15
**come** 26:25 34:10 35:5 72:16 101:8 103:9 145:11 154:9 162:3,6
**comes** 31:17 88:2 109:15 140:4
**comfortable** 162:8
**commencing** 1:20
**comment** 30:8
**commentary** 80:14
**comments** 67:2
**common** 57:15 73:23 75:6 81:12 81:18,20 89:5
**commonly** 89:6,9
**companies** 96:13 125:23
**company** 12:5 15:3 15:23 63:16 66:19 66:23 69:2 105:12 108:13 135:4 136:3
**company's** 58:10 70:13 71:5
**compensation** 44:23
**complaint** 20:23 21:2,2,5,6,16 48:6 48:7,11,15,25 49:5,7,13 51:12 61:19 62:11 64:21 96:2 104:9 109:21 128:7
**complaints** 100:5
**complete** 115:12 167:12
**completely** 123:6
**completes** 163:24
**component** 112:11
**components** 77:13 100:9
**computing** 137:4 137:14
**concept** 60:10 90:8 135:2
**concepts** 133:11
**conceptually** 99:3
**conclusion** 154:25 160:24
**conclusions** 161:19
**conducted** 1:18
**conference** 67:3 68:14,20,25 69:4 69:5 141:9
**conferences** 68:19 68:19
**confidence** 149:2 162:10
**confirming** 11:25
**confounding**

102:23 103:2 112:5,15
**confusion** 122:20
**conservative** 84:21 102:20,24 133:10
**consider** 70:18 132:4,9,11 151:22
**considered** 21:9 71:13,23 158:3
**considering** 153:6
**Consolidated** 21:16 48:7,24 49:13
**constant** 81:12,13 81:14,18,20 83:17 83:18 84:12,12 138:19
**construction** 90:6
**consult** 47:10
**Consulting** 36:4
**contain** 53:10
**content** 102:4 107:12 108:4,24 109:6,8,10
**context** 91:18 100:14 105:11 134:21 137:18,23 153:10
**continues** 96:23 136:3
**continuing** 125:23
**contributed** 111:25
**contributing** 36:14
**convenient** 29:24
**conveyance** 17:25
**copy** 14:24 29:24 30:6 55:16,20
**Corp** 6:9 64:5
**corporation** 1:7 3:12,20 10:2 12:9
**correct** 8:17 10:8 10:16 14:4,5,10 14:19 16:9 21:18 21:22 27:25 34:2 36:5 38:12 39:21 39:22 45:2,3 49:9 49:14,15 53:24 56:8 57:17,18,21 58:14 61:9 64:22 64:24 65:14 75:11 75:12 88:6,7,21 95:4,9,15 99:4 109:21 116:4 119:18 122:13 123:14 125:2 126:24 131:4 132:5 133:15,18 148:22,23 149:5 149:11,21,24 150:3,16 152:15 167:15
**corrected** 52:23 53:6 123:25 126:11
**corrections** 166:6,8
**corrective** 43:22 48:23 52:20,22 53:5 80:25 85:19 88:21,25 100:4 104:8 115:17,18 115:21 116:3,12 117:8,10,19 121:2 121:17 123:13,24 125:6 126:22 138:15,21,25 143:12 150:22,24 151:6 159:2
**correspond** 152:5
**cost** 70:4
**costs** 108:14,18,19
**counsel** 2:13,15 3:12 12:4 16:19 17:3 20:19 21:21 27:11 28:17 29:12 41:14 94:10
**counsel's** 155:20
**counted** 46:15 63:20 64:9
**Countrywide** 37:18 38:5,8
**COUNTY** 165:4 167:6
**couple** 18:23 19:12 21:20 23:11 28:11 71:3
**course** 16:24 24:4 36:22 83:11 137:19 142:18
**court** 1:2 6:15,19 9:19 11:10,23 14:17 20:9 50:7 50:22 81:22 109:20 110:2,21 111:15 124:25 129:20 155:6,10 163:21 166:20
**court's** 109:19 110:25 155:12
**courts** 98:4,14
**cover** 23:21
**covered** 12:24 64:6 64:7
**covers** 78:7
**COVID** 11:17
**created** 68:15 69:8 69:18,20 72:9
**credited** 155:19
**criteria** 62:14 63:4
**CRR** 1:25 165:6,24
**crucial** 162:18
**curative** 122:17,25
**Currently** 36:17
**cut** 147:25
**CV** 10:5,6 11:6 14:25 22:14 35:11
**CVR** 14:2,14
**CVRR** 12:5

**D**

**D** 167:2
**D-A-U-B-E-R-T** 20:10
**D-U-O-N-G** 46:6
**D-U-R-A** 81:23
**da** 120:13,13,13,13 120:13
**damage** 53:3 156:13 157:18
**damaged** 153:21 154:4
**damages** 5:16 10:25 12:12,18,21 12:22 14:4,9,13 16:12,13 18:3 24:21 25:8 27:18 27:20 33:24 34:5 34:19,22,25 37:12 41:22 42:4,10,12 42:15 43:10,15,25 44:4,6,15 51:23 52:2,19 53:3,7 72:6,9,10 74:11 74:20 75:21 76:3 76:4 82:22 83:12 86:12 87:19 88:3 88:4,10,12 89:21 94:2,6 96:4,7 98:9 98:20 103:17 106:10 109:11 110:7,10 111:6 112:13,21 113:17 123:18 129:16 130:16,25 131:21 131:22,25 132:4 132:12 133:15 139:4,10,13 143:15,25 154:8 156:3,7,10 157:11 158:4,11,18,22 159:11 160:5,15 160:22,24
**data** 54:17 63:14
**date** 1:21 30:22 64:14 92:25 93:2 118:11 130:19 143:23 144:8 145:15 150:12,21 150:22,24 151:4 152:6,11,18 153:15 166:11
**dated** 21:16 48:8
**dates** 43:23 62:12 63:10,13,13 64:13 64:15,18 77:9,10 97:2 100:4 104:9 104:12 143:7,11 143:12 154:11 159:7
**Daubert** 19:9 20:2
**Dave** 147:13
**David** 1:18 3:7 4:7 5:6 6:7 7:2 13:16 30:21 40:22 67:17 91:20 130:4 142:16 161:12 163:25 165:10 167:8,18
**day** 10:14 61:14 62:16 63:5,10 68:21 148:21 150:12 152:2 165:21 167:21
**days** 61:8,8 71:12 71:15 166:16
**de** 104:22
**deal** 30:5 32:23 101:11
**dealing** 17:23
**dealt** 17:15 94:3
**debatable** 84:8
**debate** 70:10 98:25 124:23
**decades** 114:12
**deceleration** 50:3,6 50:19 104:23 128:11,21
**decide** 129:12
**decided** 96:6 97:5 103:11 114:2,14 114:16,17,25 115:4
**decisions** 155:7
**decline** 99:9 103:5 112:12 131:14 138:13
**declined** 138:17 151:19
**declines** 85:18 112:2 159:5
**declining** 151:24
**deemed** 166:19

**default** 139:19
**defendant** 7:17
**defendant's** 28:9
**defendants** 17:4 38:3 109:16 135:4 136:4 158:2
**defense** 37:11 157:23
**defenses** 157:22,25
**defined** 21:5 23:22
**definition** 25:6
**degree** 162:9,9
**Delaware** 9:19 11:10,16,23 14:16
**delay** 33:11
**denied** 49:25
**depend** 95:25 97:20 97:22 137:11 159:20
**depending** 86:4
**depends** 85:20 117:14 133:4 159:15,16
**deposed** 8:2
**deposing** 166:15
**deposition** 1:17 6:7 6:12 19:15 20:12 26:6 163:24 164:4 165:11,13 166:4 166:12,16,18 167:11
**depositions** 8:11
**describe** 108:5
**described** 50:18 94:14 152:9
**describes** 120:25 130:24
**DESCRIPTION** 5:5
**detail** 8:13
**details** 11:2
**determination** 115:13 139:21 140:3,6,7
**determine** 70:19,21 82:9 113:13 120:12
**determined** 52:17 87:3 93:18 94:2 113:15,20 115:5,9 123:12,23 125:3 125:12 126:10 131:5 133:13,19 139:3,9
**determining** 48:14 61:13
**difference** 59:18 61:7 105:4 135:25
**different** 26:16 58:24 59:6,7,20 63:8 68:22,24 100:8,11 102:6 112:8 121:2 122:24 123:6 143:17
**difficult** 71:22
**digest** 66:11
**direct** 19:13
**directly** 50:11
**director** 35:21 36:4 36:6,7
**disaggregate** 77:12 153:3,8
**disaggregated** 102:19
**disaggregating** 100:8,10,13 103:3
**disaggregation** 152:3
**disagreed** 28:8
**disagreements** 28:10
**disappeared** 81:19
**disclose** 127:25 128:4,14,20 129:2 131:2 135:13,17 135:18,19 136:4
**disclosed** 134:15
**disclosure** 43:22 52:23 53:5 77:9 80:25 83:16 85:19 88:15 97:2 100:4 104:9 135:5 138:15,21,25 143:12 150:22,24 151:6
**disclosures** 5:16 48:23 52:21 88:21 88:25 104:22 115:17,19,22 116:3,12 117:8,11 117:19 120:11 121:2,7,17 122:18 122:25 123:6,14 123:24 125:6 126:22 129:16 130:16 159:2
**discovery** 97:21
**discuss** 37:11 41:15 74:21 75:3 102:14
**discussed** 73:21 74:16,19 94:10 97:2 101:14 105:3 153:12
**discusses** 72:8
**discussing** 100:6 104:11
**discussion** 53:3 77:7 89:5 111:23 152:3
**discussions** 108:24
**Dismiss** 20:24
**dismissed** 109:21 110:2 111:3,15,19 111:22 112:4,10
**dismissing** 110:9
**disprove** 82:5
**District** 1:2,3 9:23 17:10
**division** 1:4 101:17 101:18 125:19
**divisions** 101:16,25
**doable** 75:19
**document** 29:17 30:4,12 49:17 62:25 80:4 91:20 91:24 92:2,15,22 94:13 107:8 116:16 117:17,24 119:13 122:5,6 145:10 157:12
**documents** 20:15 20:20,22
**doing** 33:15,17 41:24 44:2 56:14 74:22 95:21 132:3 132:11,14 147:13 162:6,8 166:10
**dollar** 81:12 83:18 84:12,12 99:10,13 103:3 138:19
**dollar-ten** 103:5
**dollars** 45:10 161:3 161:3,4,14
**downplayed** 49:25
**dozen** 8:8 18:19,20 18:24 23:11,12
**Dr** 7:12,20 25:5 33:16,19 37:23 38:16,18 68:3 73:9 92:14 107:4 116:19,25 127:24 147:16 163:8,18
**drop** 138:20
**Due** 57:13
**duly** 7:3 165:12
**Duong** 46:5
**Dura** 81:21
**Dykhouse** 2:8 22:2

**E**

**E** 5:3 26:16 165:2,2 167:2,2 168:2
**earlier** 39:23 48:5 63:7 86:20 89:5 97:3 109:23 122:21 153:8,13
**early** 10:11,13,14
**earnings** 63:10 77:10,13 100:5,7 100:9 101:17,21 103:22,25 104:10 104:11,13,18,22 105:5,14 120:12 121:8,9,11,13,15 121:22,24 125:15 143:7
**easier** 84:8
**easily** 66:10 71:21 71:25
**Eastern** 63:22
**easy** 66:10 138:14
**economic** 36:4 102:16
**economics** 12:11,20 59:24 89:19 90:7
**economist** 89:10,17 90:2 154:2
**economists** 150:2
**Edward** 46:2
**effect** 82:7 83:7 90:25 93:14 94:16 94:19 98:6 99:2 110:8,18,19 111:20,25 133:5 152:19
**effectively** 71:25
**effects** 84:5 98:21 99:12 100:8 102:17 153:5
**efficiency** 38:19 41:7 52:14 53:2 53:16,21 54:3,13 57:23 58:2,9,25 58:25 59:3,23 60:2 65:13,22 70:24 112:24
**efficient** 41:9 57:15 58:15,19 59:11,13 59:18,19 60:13,16 66:18
**either** 39:19 44:7 52:16 64:5 79:18 91:11 114:16 126:16 128:25 131:12 142:12 159:6
**Electric** 28:14,16 29:5
**Ellison** 3:15

**Energy** 109:17
**engaged** 17:17
**engine** 71:9
**entered** 49:5 94:17
**entire** 77:22 109:8
**entirely** 31:16
**entitled** 81:8
**entity** 154:21
**entry** 15:18
**envelope** 161:22
**errata** 4:10 166:8 166:11,14
**Especially** 8:25
**Esquire** 2:5,6,7,8 3:5,6,7,19
**essentially** 88:8 137:5
**EST** 1:20
**estate** 9:25
**estimate** 8:6,7 10:19 18:17,18,23 22:15,16,21,22 23:2,10 45:4 47:13,16 48:3 77:20,21,23,24,24 77:25 78:10 102:24 156:3 158:4 159:25 160:4,14 161:2,8
**estimating** 82:10
**Eth** 3:5 4:8 7:11,14 7:15,16 9:7 13:5,9 13:21,24 14:7 16:17 20:11 22:18 24:20,25 25:4 27:25 29:14 30:5 30:7,14,18,24 31:2 32:2,19 33:18 37:7 39:8 40:10,21 41:2 42:20 43:5 45:12 47:9 51:10 52:5 56:12 67:20,24 68:2 72:12 73:8 74:19 79:25 80:6 80:18,20 86:16 90:15,16 91:22 92:5,11,13,23 93:5 95:6 98:18 101:8 106:3,4 107:2,7,14 116:19 116:24 117:21 118:2,12,22 119:15,18 120:3,4 124:17 127:13,23 130:6,12,20,22 138:5 139:24 142:4,6 144:12,22 145:6,16,20 146:4 146:7,13,19,23 147:7,12,15 148:2 148:7,12,17,19 155:13,21,22 157:8 159:24 160:10,12 161:7 161:14 162:11 163:8,13,16
**evaluations** 136:2
**event** 43:21 44:14 75:3 90:19,23 91:11,16 92:24 94:14 95:2 96:18 96:21,25 100:15 113:7,9,10,14,16 132:14,23 133:14 133:19 138:24 142:19 143:3,14 143:16,23 144:2,5 144:13 159:3
**events** 90:25 95:19 143:14
**everybody** 30:11 147:15
**evidence** 113:23 143:9
**exact** 15:2 143:16
**exactly** 28:22 32:3 42:21 64:4 111:14 126:3 141:7
**EXAMINATION** 4:7 7:10
**examined** 7:5
**examining** 120:8 120:10
**example** 50:23 77:6 100:3 101:15 102:8,17,21 104:8 108:11 136:8,10 143:20
**examples** 67:13 68:9,10
**Excellent** 149:6 155:21
**excerpting** 88:11
**exclude** 20:4
**excluded** 19:7
**exclusively** 108:16 108:18
**excuse** 122:14
**exercised** 12:10,15
**exhaustive** 122:18
**exhibit** 5:7,10,16 5:21 15:9,18 21:15 23:5,14,16 26:10 30:19,20 35:11,12 62:18,25 85:7 118:6,7 122:7 130:15 143:6 145:10,13
**exhibits** 4:6,13 79:24
**exist** 60:11
**expansive** 101:19
**expect** 62:5 66:17 105:14
**expectations** 101:22 104:25 121:15
**expected** 82:8,16 95:16
**expecting** 66:15
**expedition** 138:5
**expense** 47:20
**experience** 22:12 25:16
**expert** 5:6 10:25 26:3,22 28:9 29:19 30:20 31:10 65:9 89:22 94:6 102:11,22 133:9 143:25
**expertise** 31:8,11 31:14,20,24 32:5 32:6,9 35:6
**experts** 20:4 24:3 81:25 82:5 98:20 143:21
**explain** 134:19,19 151:13
**extend** 55:11
**extent** 17:19 40:17 44:15 50:17 65:8 111:24 112:9 143:10 157:3 158:13

**F**

**F** 165:2
**F-A-C-T-I-V-A** 63:15
**F-L-O-R-E-S** 46:3
**F-O-N-T-I** 27:13
**fact** 47:18 50:16 52:9 97:21 123:3 160:21
**Factiva** 63:15,18 64:7
**factors** 46:21 84:4 135:23
**factory** 135:12,20 136:5,8 137:9
**facts** 96:11 125:10 126:14 127:4 129:5
**fail** 166:17
**failed** 135:18 136:4
**failure** 127:25 128:4,14,20 129:2 131:2
**fair** 25:13 35:8 36:2 103:24
**fairness** 33:4
**falls** 102:3
**false** 116:7
**falsely** 38:8
**familiar** 20:3 105:7 110:24,25 113:6 124:12 129:18 134:2 137:15,22 141:10 157:14
**Family** 3:14
**far** 61:24 147:16
**feature** 134:13
**February** 21:17 48:9
**fed** 18:5
**feed** 112:3
**feeds** 44:13
**feel** 13:22 32:21,21
**field** 31:23 45:15 109:8
**fields** 31:7,10,11,14 31:20,24 32:5,6,9 35:6
**Fifteen** 10:20
**fifth** 63:24 64:11
**figure** 32:3 42:13 146:2 152:18 154:2 162:2
**figuring** 106:6,9
**file** 19:18 62:24
**filed** 19:24 25:20 48:8 55:23
**files** 21:19 65:20
**filing** 65:23
**filings** 66:12
**finally** 46:9 63:23
**financial** 37:18 59:24 90:2 105:15 135:2,14 141:3,3 153:25
**financing** 17:21
**find** 23:4 57:14 65:12 71:11,12 102:7 159:3
**fine** 7:24 40:21 56:2 67:24 72:18 79:15 79:16,18 82:13 91:8 119:3
**finger** 146:10

**firm** 36:15 38:17 40:4 82:9
**first** 7:3 22:7 46:8 50:2 54:11 63:9 63:17 64:7 71:8 91:9 92:24 100:3 102:9 104:7 109:3 120:15 133:20
**fishing** 137:24 138:2,5
**fit** 65:21
**fits** 122:19
**five** 23:8 78:5 85:8 117:14
**fixed** 159:19
**Flores** 46:2
**flows** 34:5 82:8,16 83:2,3,5,8 105:5 160:20
**focus** 49:19
**focusing** 128:23
**FOERSTER** 3:4
**Foley** 1:24 6:15 165:6,24
**follow** 89:15 115:3 124:20 155:11
**followed** 66:23
**following** 83:25 88:14
**follows** 7:6 48:17 92:21
**Fonti** 27:12
**footnote** 64:2 77:6 87:23,25,25 100:2 100:18,20,22 101:14 103:20
**forecast** 101:22
**forgot** 9:20
**form** 60:2,5,7 101:23 140:8,10
**formally** 29:16
**forms** 59:23 60:2
**formulation** 73:22 75:6
**forth** 9:2 20:5 37:13 51:13 68:18 120:15 151:21 165:12
**FOSTER** 3:6
**found** 12:12 41:8 59:2 60:17
**four** 77:8 88:23 116:11 117:7,12 117:25 120:11,25 121:7 122:21 123:5
**fourth** 63:24 64:9
**frames** 59:7,20
**Francisco** 3:9
**fraud** 5:12,18 17:17 17:20 81:9 109:7 117:3 118:4,9 130:17
**fraud-related** 98:7
**fraudulent** 17:24
**free** 13:22 160:8
**front** 73:17 116:16 116:18 143:5 150:15,23 151:9 152:12
**fully** 58:5 60:14 65:16,23 66:6,11 68:4 69:9 103:6
**fun** 78:20
**fundamental** 95:3 101:12,24 102:13
**further** 85:9 86:17 86:19 87:2 133:21 139:16 163:9 165:15
**future** 78:20 82:8 82:16 120:12 121:8,11,13,15,22 121:24

**G**

**G** 167:2
**gains** 154:21
**garden** 91:16
**gathering** 46:14
**Gee** 79:10
**general** 28:14,15 29:5 62:5,6 84:2 84:10 86:4 93:11 110:14
**generally** 20:7 59:25 66:16 70:9 70:18 72:9 82:13 87:8 105:11 106:14 111:2 138:12 139:7 157:21
**generic** 110:17 116:6
**George** 16:23 18:8
**give** 10:18 11:12 15:2 22:15,21 23:10 91:17 92:3 120:18 143:3 159:25
**given** 30:2 102:5 165:14 167:14
**giving** 158:2
**go** 15:10,14 23:4,13 24:7 34:8 40:24 42:11 43:9,15 59:15 62:17,18 72:20 85:8 114:25 117:6 118:25 122:9 127:6 130:2 137:10 145:8,16 145:21 146:13,14 151:21 156:21,23 157:7
**goes** 69:3 79:17 88:16 120:14 123:3
**going** 15:10 22:10 24:14 30:8 35:11 36:24 40:19 43:2 44:21 48:19,20 49:19 62:9 72:14 72:25 78:13 79:7 79:8,8 80:13 82:3 82:18 86:21 91:4 92:5,11,18 93:9 93:25 94:5 95:8 101:6 106:17 123:21 125:20 127:17 130:8 136:15 137:11 144:18,19 145:22 146:23 150:23 151:18 156:23 162:16 163:2 164:3
**Goldman** 124:12 124:25
**good** 7:12,13,14 8:22 9:6 47:16 155:17 159:24
**Gotcha** 25:3
**granting** 19:21
**great** 7:25 8:15 9:8 9:12 30:18,24 72:22 122:16 149:25
**GROSSMAN** 2:4
**grounds** 19:10 20:4 102:16
**group** 36:10
**guess** 7:13 9:24 52:6 63:23 69:22 156:6
**guessing** 43:24
**guidance** 105:8,10 105:19 106:9
**guide** 105:13
**guys** 72:20 147:24

**H**

**H** 5:3
**H-A-K-A-L-A** 102:10
**H-O-A** 46:5
**Hakala** 102:10
**hand** 13:12 165:21
**handy** 73:10
**happened** 22:19 134:14
**happy** 51:5 65:10 79:6 126:2 163:11 163:19
**Harbor** 110:23
**hard** 14:24 29:24 30:5 55:16
**harder** 135:9
**head** 99:19
**headlines** 64:7
**hear** 7:21 13:3,5,6 13:10 151:14
**hearing** 32:25 33:5 33:7 37:10
**held** 89:7 98:5,14
**help** 107:9 108:21 118:13 119:25
**helpful** 91:17 101:9
**helps** 56:2
**hereinbefore** 165:11
**hereunto** 165:21
**hidden** 145:2
**high** 108:14
**highlight** 62:10,12
**hired** 39:5 40:14,15
**hit** 138:24
**Hoa** 46:5
**hold** 42:25 43:3 44:17 60:18 66:19 68:16 119:9 145:25 146:7,17
**holders** 12:5,13
**Holding** 2:14
**Holdings** 16:7
**honestly** 92:4,9
**hope** 21:4 94:9
**Hopefully** 37:4
**hour** 22:9 45:2 72:14
**hours** 22:8 45:4 56:19,20 63:21 64:11,16 77:17,21 78:5
**hundred** 22:24 23:8,9 45:6,7,9,10 77:21 161:3,13
**hundreds** 157:16
**Hurd** 3:13,14
**hurt** 130:11
**hypothetical** 66:2

69:15 71:2 86:15 87:11 93:23 97:9 99:25
**hypothetically** 70:16 111:18

**I**

**idea** 108:8 142:24
**ideal** 58:8,20,22 59:6,18 66:9 70:3
**ideally** 99:16
**ideas** 108:9
**identification** 30:22 118:11 130:18 145:14
**identified** 48:6 116:2
**identifies** 23:16
**identifying** 48:22
**ignore** 102:22
**imagine** 117:17 123:4
**immediately** 28:12 148:8
**impact** 126:19 141:11,15 142:12 142:21 143:5,10 150:15,23 151:10 151:23 152:13
**imperative** 166:13
**implement** 89:22 90:3
**implications** 121:24
**implicit** 121:16
**implies** 107:21
**imply** 107:25
**important** 108:10
**imposed** 88:4
**impounded** 67:18
**incidental** 46:12
**include** 19:15 36:21 36:23 63:12
**included** 19:18
**includes** 47:21 49:6 98:6
**including** 19:22 62:15 63:4
**income** 159:19
**incomplete** 66:2 69:15 71:2 86:14 87:10 93:22 97:8 99:24
**incorporated** 65:4 65:17,24 66:4,6 66:11,17 69:9
**incorporates** 58:6 58:16 60:3,6,8,15 68:4
**increase** 50:2 62:7 133:8
**increased** 159:8
**incurred** 47:20
**independent** 61:17
**independently** 64:20
**INDEX** 4:3,6
**indicate** 144:7
**indicated** 22:13
**individual** 154:21
**industry** 99:11 159:4
**inflated** 135:14
**inflation** 5:10 81:8 81:13,13,20 82:11 82:22 83:18 85:18 96:20 112:3 116:9 117:2 118:3,8 131:12 133:8 134:3,5,13,20,22 134:25 135:6,8,10 135:23 136:10,18 137:6,10 138:16 138:20,22 140:12 140:23,24 159:8
**information** 46:14 55:12 58:6,12 60:6,8,15,24 64:3 65:16,23 66:16 67:15 68:5 92:10 93:16 98:8,21 125:16 132:19 140:4 152:17
**initials** 9:20
**Inputs** 146:15
**instances** 91:11,14 91:15
**INSTRUCTIONS** 166:2
**insufficient** 91:12
**intentionally** 32:14 35:3
**interested** 106:16 125:22 165:18
**interesting** 34:20 79:4 93:24 133:3 134:9
**internal** 132:19
**Internet** 70:7
**interposed** 13:7 33:14
**introduce** 79:23,25
**investigate** 41:7
**investor** 68:21 70:13 71:5 154:9
**investors** 12:4 28:17
**involve** 121:12 127:25 129:2
**involved** 125:20
**involvement** 48:10
**involves** 104:17 128:13
**involving** 9:19,23 17:24 102:9 109:6 131:2
**irrelevant** 52:25 121:25
**isolate** 94:19
**issue** 12:8 60:4 135:24 137:12
**issued** 24:17,18
**issues** 37:11 90:11 143:21 151:16 154:10

**J**

**J** 3:7,14 145:24 146:6 148:16 151:8
**James** 3:19
**Jeffries** 141:9
**JEth@mofo.com** 3:11
**Jim** 7:18
**job** 94:8
**JOHN** 2:6
**joke** 78:22
**jokes** 79:5
**JONATHAN** 2:7
**Jordan** 3:5 7:16 24:16 40:7 67:13 79:21 90:13 106:25 116:14 119:11,25 144:10 147:9,10 160:9 161:25
**JOSE** 1:4
**judge** 19:12,20
**July** 5:9 11:18,19 12:2 118:7
**jury** 10:9,12,19,22 11:22

**K**

**K** 167:2
**K-R-O-G-M-A-N** 46:22
**keep** 30:4
**Ken** 3:15
**Kessler** 28:18,19
**kind** 12:9 57:3 58:8 59:21 71:18 97:10 98:11 101:12 123:13 135:25 137:8 141:3 147:21 153:12 161:22
**kinds** 57:3
**Klein** 11:7
**knew** 70:16
**know** 9:2 11:5 13:2 13:14 15:11 19:17 19:23 23:5 28:7 28:22 33:8,10,11 33:12 34:24 40:11 40:13 42:2,6,8 43:19 44:5 46:12 46:25 55:20 56:16 56:18 58:20 66:7 66:14 68:6 69:2 70:2,9,11,11 71:7 71:10 72:8 77:15 78:7,16,23 82:19 93:14 99:2 101:11 101:16 102:12 105:23 106:6,7,8 108:14 109:2 111:17 112:8,22 114:12,15 116:14 116:17 123:20 124:16,22 125:25 126:18 134:23 137:13,22,25 140:12 143:6 145:20 150:12 153:4 154:2,17 155:9 157:5 158:3 159:18,23,24 160:18 161:14 162:8
**knowing** 106:16
**knowledge** 60:20 61:3 94:23
**known** 17:19 66:13
**knows** 70:15
**Krogman** 46:20

**L**

**L** 167:2
**L-E-E** 46:4
**labeled** 144:5
**language** 151:21
**laptop** 146:12
**large** 62:7,13 71:24
**larger** 131:12
**law** 89:15 124:20
**Lawrence** 3:14
**lawyer** 20:7 124:15
**lawyers** 19:17

**lay** 22:12 75:8,21 76:4 83:6 97:13
**lead** 2:13,14 50:11 153:20 154:16
**leads** 121:23
**learns** 135:19
**Lee** 46:3
**left** 146:16
**legal** 1:22 6:14,16 8:13 52:4 89:21 89:23 90:6 98:12 124:15,19 135:15 135:24 140:23 154:24
**legislation** 89:24
**legislative** 89:23
**let's** 13:14 15:5,5 29:15 30:10 31:3 35:10,20 39:3 53:8 57:9,9 67:9 68:13 73:12 79:11 79:17 83:2 84:22 84:24 89:20,24 90:18 99:8,10 104:5 108:11 111:19 118:3 125:11 126:8 130:6,14 135:4,11 138:12,14,17 144:24 145:7 162:20
**level** 141:7 149:2,4 149:20,23 150:3
**liability** 12:12 49:17 50:23 51:22 51:25 82:22,23 124:6 126:17
**librarians** 46:13
**light** 25:5 55:12 140:4
**limit** 56:20,22 57:6 88:3,3,8,9,24
**limitation** 89:17,21
**limited** 64:16 88:12
**limiting** 114:21
**limits** 56:13 57:2
**line** 55:13 105:25 168:3
**lines** 85:9
**link** 70:15,17
**list** 21:8 25:19 32:12 35:10 116:11
**listed** 25:17,23 32:18,19 33:22,25 70:12
**listing** 32:4,6,9 34:7 35:6
**lists** 31:7,10
**literally** 134:24
**literature** 59:24 71:20 94:15
**litigation** 1:8 6:9 24:17,24 25:2 26:11,19 28:4 34:9,23 88:5 100:15 109:7 129:21,22,25
**Litowitz** 2:4 40:4
**little** 8:7 27:8 39:23 44:22 49:20 50:12 66:8 72:14 77:3 114:21 135:7,9 145:11 150:5 151:20
**LLC** 16:7
**LLP** 2:4 3:4
**location** 1:19
**long** 22:6 120:17 152:25 159:10
**look** 11:6 15:5,9 29:15,22,23 31:3 42:21 57:9 61:14 72:13 73:12,19 84:22,24 87:14 90:18 120:5,16 141:13 142:10,20 143:13 144:2 145:24 150:11 155:18 158:25
**looked** 42:8 54:5 61:7 105:20 116:8 125:13 126:4 153:19
**looking** 30:4,9 44:17 64:4 77:18 78:9 93:16 96:13 101:20 108:19 160:8,10,13
**looks** 55:16 143:4
**loss** 29:7,8 49:6 124:7 126:17
**losses** 154:22
**lot** 19:2 38:21 95:21 132:10 152:17
**louder** 33:3
**low** 70:3
**lump** 72:2

**M**

**M** 167:2
**Magna** 1:22 6:14 6:16
**main** 10:25 16:23 137:21
**maintained** 141:6
**maintenance** 134:3 134:5,13,20,22 135:8,9,11 136:11 136:18 137:6 142:24 143:2
**making** 51:14 107:10
**man** 147:6,17
**management** 2:14 36:12,14
**managing** 35:21 36:3,6,7,13
**manufacturer** 9:21
**Marie** 1:24 6:15 32:21 165:6,24
**mark** 3:6 29:16
**marked** 30:21 118:10 130:18 145:14
**market** 3:8 17:19 38:19 41:7,9 44:13 50:4,25 52:13 53:2,16,21 54:2,13 57:15 58:3,15,20 59:11 59:12,13,19,19 60:3,14,16 63:21 64:11,16 66:18 68:4 82:24 94:17 99:11 102:6 104:25 105:13 110:15 112:24 135:19 143:22 159:4
**market's** 77:14
**Maroulis** 3:19 7:18
**marriage** 165:17
**massive** 17:17
**match** 125:6,13
**matching** 124:8,10 126:3
**material** 54:12,22 67:15,19 133:5 153:15
**materiality** 107:11
**materialization** 128:8
**materials** 54:25 157:10
**math** 45:8,14
**matter** 6:8 16:11,14 16:18 19:5,6 25:19 26:23 45:5 45:19 46:17 47:2 47:6,11,15 53:12 73:24 86:4 87:5,7 88:20 96:15 111:15 115:19 156:17 165:19
**mattered** 64:25
**matters** 18:10
**maximum** 158:4
**mean** 10:14,15 11:19 18:4,14,21 19:2 24:6 26:24 28:21 29:4 34:13 39:23 40:8 54:10 57:24 58:2 59:12 60:7 67:21 68:6 68:20,20 69:19,23 74:18 75:2 76:21 82:2 86:20 91:15 95:10 98:15 99:6 99:7 100:18 103:2 105:10 111:16 116:14 124:18 128:17 137:18 138:9 141:6 145:6 151:9 152:24 154:7 156:4 157:19 158:25 159:16
**meaning** 75:17 76:16
**meaningful** 92:24
**means** 36:9 56:16 60:2,5,14 106:21 107:16,17,19,22 110:15 122:18 124:22 134:20 138:13 148:20,24 149:7,17,19,22 157:6,20
**meant** 93:10
**measure** 98:9 112:12
**measured** 112:3 113:13 131:13
**measurement** 5:17 94:18 98:8 106:20 129:17 130:17
**measures** 94:15 105:15
**measuring** 80:24
**meet** 68:21
**meeting** 69:3
**meetings** 20:18 21:21 69:2
**members** 45:22 46:15
**memory's** 50:12
**mention** 80:3 96:18 128:7 157:2
**mentioned** 17:9

36:16 61:22 66:8 109:22 138:19 155:24
**mentions** 121:22
**method** 82:10 84:13 114:22
**methodologies** 5:11 80:24 81:9,14 116:10 117:3 118:4,9
**methodology** 73:23 74:22 75:7,21 111:5 113:21,25 114:7,10,11,23
**methods** 130:25
**MIC** 6:8
**Michael** 109:17
**microphone** 33:3
**middle** 35:24
**mind** 26:25 34:10 35:5 101:8 103:10 109:15
**mine** 52:6 146:25 147:2
**minimum** 125:25
**minute** 120:20 162:14
**minutes** 14:18 72:15 127:10 162:21,22
**misleading** 50:4,25 52:9,10,18 151:3 151:5
**misled** 82:25
**misrepresentation** 82:7 139:2 152:5
**misrepresentations** 125:7 126:24 141:14 142:11,25
**missed** 57:11 105:19 106:9 162:18
**missing** 32:22
**misstatement** 61:18
**misstatements** 48:14 61:15 62:3 65:3 124:2 126:12
**misstates** 42:18 71:17 74:25 75:24 75:25
**model** 41:22 42:4 44:13 72:7,9,11 84:3 86:12 106:11 110:7 132:4 133:15 139:12 143:15,22 154:8 154:15
**modeled** 83:17 139:4,10 140:15
**modeling** 84:7,9 130:25
**models** 37:12
**modify** 55:11 56:10
**moment** 103:10 108:12
**monetary** 56:22
**months** 11:20 26:4 35:18,19 39:12
**moot** 19:22
**morning** 7:12,14
**MORRISON** 3:4
**motion** 19:17,21 20:24
**motions** 20:4
**move** 44:18 112:13
**moved** 13:13 68:17
**movement** 98:6 106:21 113:11
**movements** 42:9 62:13 143:8
**moving** 13:12
**multiple** 77:17 80:10 88:20,25 116:3 117:10

**N**

**N** 167:2,2
**N-E-X-T-E-R-A** 9:24
**N-I-R-M-U-L** 28:25
**N-U-E-P-A-N-E** 46:9
**name** 28:24 46:7,8 80:3 107:9
**named** 16:2
**names** 45:24 146:18
**nature** 82:6 123:7 129:23 159:15
**necessarily** 122:21 151:12 152:4 157:23
**necessary** 85:10,14 87:2,4,5,13 94:19 97:4 99:21 126:20 144:3 166:5
**need** 8:24 9:2 33:3 79:14,15,16 85:24 118:18 132:4 153:3
**needs** 92:3
**negative** 27:18,23 28:3
**NERA** 5:9 24:2,3 24:19,21 25:9 35:13,21 36:4 38:3 45:18 47:4 81:7 118:8 155:25 156:9 157:10
**NERA's** 38:13,14 38:17 157:10
**net** 154:20
**never** 67:6 135:19
**nevertheless** 152:11
**new** 1:19,19 2:10 2:10 7:5 9:23 17:10 55:12 58:11 60:23 67:14,19 140:3 165:3,4,8
**news** 20:24 58:17 61:8,13 62:12,15 63:5,9,12,15 90:25 94:16,20 99:15 102:18,23 103:2,7 112:5,7 112:15 146:14 152:2,2,6 153:15
**Nextera** 9:24
**nice** 154:7
**Nirmul** 28:23
**non-fraud-related** 98:7
**non-news** 61:8
**NORTHERN** 1:3
**Notary** 7:4 165:7 167:24
**note** 77:5 84:18
**noted** 6:17 91:10
**notes** 107:3
**Notice** 84:15
**noticed** 33:24
**November** 1:14 6:10 25:24 26:4 165:22 167:11
**Nuepane** 46:7
**number** 6:7 22:16 22:22 37:10 42:15 57:12 61:23 63:8 64:13 77:18 86:22 118:22,24 138:18 156:25 159:17
**numbered** 119:12
**numbers** 55:19,20 87:15 99:18 145:17

**O**

**O** 167:2
**oath** 167:10
**object** 24:15 32:17 40:19 80:14,18
**objected** 105:25
**objection** 13:22 14:6,11 16:16 19:8 20:6 28:5,20 31:25 33:7 35:7 38:10 39:7 40:3,6 41:18 42:5,17 44:11 47:8,23 49:2,8,18 50:9 51:9,18 52:11,24 54:8,24 56:15 58:7,13,18 60:19 60:25 64:23 65:5 65:18,25 66:21 67:4,23 69:11,14 69:25 70:8,25 71:16 74:24 75:15 75:23 78:3 81:3 81:16 82:12,17 83:9,23 84:16 85:15 86:3,9,13 87:6,9 89:2,13 90:5 91:13 92:12 93:4,7,21 94:7,22 95:5 96:3,10 97:7 97:17,23 98:10,17 98:23 99:23 103:14 104:3,19 106:12 107:6 110:11 111:8 113:18 114:4,18 115:7 116:5,13 117:20 121:14,19 123:15 124:3,9,14 124:21 125:9 126:13 127:3 128:2,15 129:4 131:8,19 132:6,16 132:25 133:16 134:7 136:20 137:20 138:11 139:5,23 140:21 141:16 142:3,14 142:22 143:18 150:4,17 151:11 152:14,23 153:22 154:5,23 155:15 156:12,19 158:6 158:23 159:13 160:6,16 161:5,10 161:24
**objections** 13:8 32:22 155:3,20
**obscure** 66:14
**observable** 115:11
**observed** 99:9 103:6

**observers** 102:6
**observing** 7:18
**obtain** 17:21 71:22
**obviously** 25:23 26:5 51:20 53:17 54:15 65:8 82:18 98:25 99:16 102:14 111:22 125:14 128:5 135:22 140:3 155:11
**occurred** 10:19
**occurring** 129:10
**October** 25:21,24 25:25 26:4
**odd** 147:5,17
**offering** 38:18 65:6
**offhand** 10:4 23:6 47:17 156:5
**oh** 11:13 37:19 112:18
**okay** 7:21 8:15 10:17 13:4,11,19 13:25 15:8,13 16:4 17:7 18:9 21:11 23:15,24 24:24 25:3 26:8 29:14 30:10 31:5 31:12 32:21 33:2 33:14 35:19 37:5 39:2 41:25 43:3,6 44:21 45:13,23,25 48:4 55:8,23 57:8 58:21 59:9,15 61:5 62:22 64:19 67:24 69:6 72:4 72:12,17 73:14 79:20 80:4,9 81:5 87:24 88:19 92:19 94:11 99:5 101:9 103:19 106:3 118:2,19 119:5 120:7,23 122:8 123:19 127:10,14 128:23 129:14 130:6,23 134:16 136:14 139:25 145:2 146:13,19 147:7 148:10,12 149:25 150:10,19 150:20 152:7 156:15,21 162:11 162:20
**old** 38:23 102:18
**older** 79:3
**omission** 93:2,13 151:19
**omissions** 82:15,20 83:7 93:9,20 128:9
**omitted** 35:4
**omitting** 93:15
**once** 116:14
**one-time** 83:5
**one-to-one** 126:3
**ones** 23:16 49:21 55:25 64:10
**open** 76:11
**operative** 21:4
**opinion** 28:2 38:13 38:14,17,18 55:11 65:2,6,11 98:12 102:8 105:21 155:19
**opinions** 19:4,6 53:11
**opposed** 69:20 74:17 84:5 103:2 107:24 109:8 121:23
**option** 64:6
**options** 34:22 159:19
**Oracle** 1:7 3:12,20 6:9 7:19 41:8 49:25 54:18 60:17 63:14,18,25 64:5 77:7 105:18 106:8 125:18,23 160:3
**Oracle's** 57:14 60:22 82:15 96:22
**orange** 148:6
**ORCL** 64:6
**order** 20:23 32:13 32:19 51:23 109:19 110:6,13 120:12
**ordinarily** 44:4
**original** 4:13 55:21 166:14
**originally** 53:18
**ostensibly** 41:19
**outcome** 165:18
**outer** 158:3
**outside** 42:18 63:20 63:21 64:10,16 69:15 83:10,24 84:17 86:10,14 87:10 93:22 97:8 97:24 99:24 110:12 111:9
**overall** 106:20 110:9
**overarching** 31:23
**overlap** 44:12 78:6 126:2
**overruling** 155:19

**P**

**P-E-R-L-O-W-I-N** 46:10
**p.m** 1:20 6:3,11 63:22 72:24 73:5 127:16,20 162:25 163:5 164:2,5
**Pacific** 72:16
**page** 4:4,9 5:5 15:10,15,17,18 25:17 27:17 35:14 55:13 62:24 73:15 85:6,7 95:12 118:21,24,24,25 119:7,12,13,16,19 119:20,21,21 122:4,5,6 168:3
**pages** 57:20
**Paige** 3:24 6:13
**paper** 5:10 81:8 89:19 107:10 118:8
**papers** 24:18
**paragraph** 31:4,6 57:10,12 73:12,20 75:4 84:23,25 85:6 88:2 90:18 90:19 96:19 100:16 120:6,19 122:10 123:3
**paragraphs** 64:8 76:18
**parent** 12:9
**parse** 98:20
**parsing** 99:7,21 100:11,12 106:17 106:22 108:22 152:4 153:10,12 157:21,24
**part** 14:2,3 25:11 49:7 76:20,24 77:25 78:7 85:17 94:8 103:21 128:13,25 129:15 132:15 147:22
**particular** 32:13 34:4,11 54:15 62:12 64:2 72:10 80:15 94:20 118:21,23 134:11 150:11 154:3,4
**particularly** 66:22 114:8 121:10
**parties** 165:16
**partner** 36:8
**parts** 12:19 109:21
**Paula** 3:13
**Pause** 15:7,16 43:4 44:20 120:22 146:8 147:14
**pay** 50:13 66:24 90:13
**pdf** 119:13,17,20 119:22
**peer** 24:6,9,10 25:7 25:7
**peer-reviewed** 108:24 109:2,5
**people** 9:2 25:9 36:17 45:17,17,17 47:4 60:9 66:15 99:2 102:14 108:9 151:22 155:25
**percent** 48:20 64:17 149:2,4,8,8 149:20,23 150:3
**percentage** 81:13 83:17
**perfect** 127:8
**perfectly** 33:6 58:19
**perform** 63:25 159:3
**performed** 92:25
**period** 27:4 57:16 64:25 89:8 94:18 105:18 113:11 135:3,13 138:23 140:17,19,19,25 141:5,8 159:7
**Perlowin** 46:10
**person** 16:23 24:21
**person's** 154:21
**personally** 76:19
**pescatarian** 138:6
**Ph.D** 1:18 4:7 5:7 7:2 30:21 165:10 167:8,18
**Ph.D.'s** 36:21
**photograph** 78:24
**phrase** 136:24 139:15
**pick** 150:12
**picture** 78:25
**piece** 152:21,25 153:2,5
**pieces** 152:19
**pinned** 21:12
**place** 81:7
**placed** 56:13 57:3
**places** 151:22
**plain** 93:13,19,19

**plaintiff** 2:13 17:3 29:11,12 153:20 154:3,4,16
**plaintiff's** 49:16 51:15,17 102:22 133:9 156:10 157:2,11,18 158:14,22 159:11 160:14
**plaintiffs** 17:6,7 62:6 84:14 141:20
**planes** 151:17
**planting** 91:16
**plastics** 9:21 15:23 16:7
**please** 6:19 166:4 166:10
**point** 52:16,19 53:13 91:2 121:25 125:17 132:2 135:3,17 138:16
**pointed** 28:9
**points** 157:22,23
**poor** 108:13
**pops** 71:8
**portion** 10:24
**positive** 102:23,25 103:7
**possibility** 74:18
**possible** 73:23 74:3 75:7,9,11,16,19 75:20 76:12,13,13 76:14,15 77:12 79:24 101:7
**Possibly** 97:25
**posterity** 134:18
**potential** 157:25
**potentially** 63:12 97:21 139:2,15
**power** 155:17
**practice** 5:13 36:15 51:8 81:10 117:4 118:5,10
**practices** 38:9 136:25 137:8,12
**preceding** 28:13
**prefer** 84:4
**preparation** 48:11
**prepare** 12:22 16:13 20:13 24:3 27:20
**prepared** 12:24 14:8,9 25:8
**preparing** 24:22
**present** 3:18 98:22
**press** 66:20,24
**presumably** 121:16
**pretty** 34:14 81:19 124:16 144:25 162:15
**preventing** 151:23
**price** 42:8 43:19,21 58:11,16 60:23 62:7,13 65:4,17 65:24 66:18 69:10 82:11 88:13,14 91:2 93:15,17 94:16 95:17,18 96:22 98:5 99:9 106:21 112:2,11 113:12 126:19 131:14 135:8,20 138:13,17 141:11 141:15 142:12,21 142:24 143:2,2,5 143:8,10 150:15 150:23 151:9,17 151:18,23,24 152:12 154:13 159:4,20
**prices** 60:3 135:14
**primarily** 28:23 128:3
**prior** 48:17 60:3 106:18
**private** 60:8 88:4 136:2
**Pro** 90:14
**probability** 75:17
**probable** 75:13 76:14
**probably** 18:19
22:7 34:9 35:25 38:21,24,25 39:11 39:18 43:24 45:6 77:2,3 82:2 102:12 129:9 137:21 141:4 145:16 147:25 157:15
**problem** 9:4 86:16
**problematic** 62:4
**procedure** 9:10 61:17
**procedures** 54:16
**proceed** 7:9 73:7 127:22 163:7
**project** 77:22
**pronounced** 26:15
**pronunciation** 26:16
**proper** 82:10
**propose** 72:6,10
**propositions** 79:14
**protected** 110:22
**proved** 51:23
**provide** 47:4
**PSA** 154:13
**PSLRA** 89:18 90:10
**public** 7:4 28:7 58:6,16 60:6,15 65:15 66:9,10,12 68:5,7 69:13,24 70:7,14,18,22,23 71:6,9,13,14,15 71:21 72:3 136:2 165:8 167:24
**publicly** 67:6 69:19
**published** 31:11,13 31:20 32:7,10,11 34:18,21,24,25 35:2 61:24 64:10 64:14 66:14
**puffery** 110:3,15 111:19
**purchase** 88:13 154:11
**purchased** 12:14 154:12
**purchases** 154:14
**purple** 148:6,8
**purpose** 40:23 52:12,13,14
**purposes** 24:23,25 79:22 96:4 154:13
**pushed** 156:5
**put** 41:21 42:3 54:7 79:11 89:20 108:11 114:6 116:17 118:3 121:20 125:11 130:6 144:3,15,23 144:24 146:19,24 159:11
**putting** 54:21 105:4 135:23 143:15

**Q**

**quality** 50:14
**quantified** 97:11
**quantities** 154:12
**quarters** 105:16
**question** 8:20 17:18 17:22,23 18:6 33:15 34:20 40:17 48:17 56:3 71:19 76:11 91:23 93:24 94:3 108:15 113:12 114:9 125:22 126:8 133:3 134:9 136:15,22 141:24 142:8,9,10 153:2
**question's** 114:20
**questioning** 106:2
**questions** 9:9,11 22:11 28:12 57:23 60:13 78:14 92:6 92:13 109:19 116:22 163:10,15
**quicker** 88:12
**quickly** 58:5 60:14 68:4
**quite** 42:22 152:24
**quote** 94:12 98:3 100:3,9 104:7,11 107:15
**quoted** 107:18
**quotes** 53:17

**R**

**R** 3:13 165:2 168:2 168:2
**R.S** 3:6
**range** 48:2 70:2 101:13 107:25
**ranked** 64:13
**rate** 44:25
**ratio** 101:18 108:19
**reached** 139:20 140:2
**reaction** 77:14
**reactions** 43:19,22 159:20
**read** 49:11,12 55:4 79:8 80:7 91:4 100:2 122:17 166:4 167:9
**readers** 134:17
**reading** 43:8 106:25 107:2 111:4
**real** 60:11 90:7 162:9,9
**really** 11:2 66:3 79:2 89:19 110:19 129:13 130:8 134:14 144:22 146:18 156:5 160:21
**Realtime** 165:7
**reason** 33:20 34:4 34:11 121:6 135:21 166:7 168:3
**reasonable** 48:2
**reasons** 49:25 50:5 85:18,21,21,23 128:10,20

**rebuttal** 19:19,22 28:6
**recall** 38:14 39:11 41:13,24 42:9,12 43:12 44:2 158:12
**receipt** 166:16
**Recess** 73:3 127:18 163:3
**recognize** 133:22
**recognizes** 71:20
**recollection** 38:11 39:16,24 50:22 110:5
**record** 6:6,18 62:23 73:2,6 85:5 90:9 100:19 127:17,21 155:13 163:2,6 164:3 165:13 167:12,14
**recurring** 83:4
**refer** 90:19 144:18
**reference** 59:8,21
**referenced** 96:20 102:8
**references** 108:21
**referred** 11:11 14:17 21:14 48:5 116:10
**referring** 10:6 16:8 43:17 55:19 58:21 86:24 115:25 144:11
**refers** 88:2
**reflect** 58:11 60:23 155:14
**reflected** 158:16
**Reform** 88:5 110:22 129:24
**regarding** 121:10
**regular** 25:11
**regularly** 24:13 98:5
**reject** 50:8
**rejected** 110:21
**related** 19:9 41:20 83:3 165:16
**relates** 99:13,14
**relating** 37:11 63:13,16,18 95:25 128:9
**relation** 50:18
**relations** 70:13 71:5
**relative** 101:21 104:24 137:3,11 137:13
**released** 69:12,19
**releases** 66:20,25
**reliability** 20:5
**reliable** 98:9
**rely** 110:16
**remember** 10:4,23 11:2,9 27:2 37:10 38:20 42:14 49:21 74:10 111:4 136:9 136:24 156:4 160:21,25 161:17 161:18
**remembered** 160:23
**remind** 37:14 111:10
**reminds** 78:22
**Remote** 1:17 2:2 3:2
**remotely** 3:18 6:13
**remove** 111:6
**repetitions** 102:18
**rephrase** 151:2
**reply** 26:10,18
**report** 5:6 10:7 12:22,24 14:9,12 14:24 15:4,10 16:13 19:14,18,20 20:14,16,21 21:6 21:8,15 25:18,21 26:6,10,18 27:20 28:6 29:20 30:20 40:8,18,20,24 41:9,20 44:10,16 44:22 48:8 51:16 53:9,10,14,17,21 53:25 54:3,22 55:5,7,10,15,22 56:5,8,11,14 58:4 62:18 65:7,11 72:5,6 73:9 74:16 74:25 75:24 76:2 76:3,20,25 78:2,8 83:8,12 87:19 96:17 97:13 103:17 111:12,14 112:17,18,23 113:4,17 123:13 123:18 126:6,20 131:23 132:2 133:20 139:15 144:11,12,14 158:17,19
**reported** 67:6 82:25
**reporter** 6:15,19 20:10 105:25 129:21,23,25 163:22 165:7
**REPORTER'S** 4:11
**reporting** 125:18
**reports** 23:2 24:2 24:17,21 25:8,9 26:3,22 27:15,16 77:4 109:11
**require** 85:22
**required** 135:16,18
**reserve** 55:10
**residual** 148:21,24
**respect** 105:6
**respond** 65:10 92:18 126:18
**response** 95:18 113:13
**responsibilities** 36:13
**rest** 85:16 138:23
**result** 12:15 131:11
**resulting** 98:8
**retained** 12:3 16:18 17:2 18:7,13,17 27:10 28:15,22 29:10 37:20,22,24 38:2,3 39:9 40:2,5 40:12 41:4,21 42:3
**return** 148:21,25 166:13
**revealed** 135:6
**revenues** 50:4,17 50:20 51:2 83:2 104:24 105:2,3,5 105:14 108:14,16 108:17 125:17 128:12,22
**review** 20:22 21:3 24:2,6,9,10 25:7 110:13
**reviewed** 20:14,15 20:20 115:18
**reviews** 25:7
**revisit** 140:5
**right** 8:9,21,23 9:5 10:15 15:6 17:8 18:25 22:10 25:14 26:24 29:25 30:10 30:24 31:19 35:9 35:12,15,16 37:3 37:5 38:9 49:10 51:11,24 52:2,2 53:8 55:11 57:8 57:20 58:3 59:4,5 60:12 63:2 65:13 72:19 73:10,19 74:9 76:5,17 78:9 80:21 83:13 84:22 85:2,4 87:17,21 90:17 91:4 92:19 96:2,8 98:2,15,16 100:24 103:23 108:2 109:18,24 113:5 114:3 115:2 115:24 116:16 117:22 121:3 122:3,23,25 123:8 123:19 124:20 127:9,11 130:14 131:3,24 132:13 132:15,22,24 133:25 136:6 139:21 145:7,22 148:8 149:2,9,20 150:14,25 151:2,7 152:13,22 153:13 153:18 154:19 155:23 156:8,11 158:20 161:12,20 162:12,23 163:16
**risk** 5:15 128:4,6,8 128:19 129:10,13 129:16 130:16
**risks** 127:25 128:14 129:2 131:2
**Rizio-Hamilton** 2:6 21:25
**RMR** 1:25 165:6,24
**role** 48:13,25 49:4
**Rough** 18:17
**roughly** 57:19
**rounds** 35:22
**route** 114:25
**rubric** 102:3
**rule** 84:10 93:12 155:12
**rules** 8:10
**ruling** 89:23 142:23 155:11,12
**run** 126:25
**RYAN** 2:8

## S

**S** 5:3
**S-C-H-U-L-M-A...** 9:21
**S-H-A-R-A-N** 28:24
**S-H-U-L-A-V** 46:8
**Sachs** 124:13,25
**Safe** 110:23
**Safra** 3:12
**sales** 154:11
**Sam** 109:17
**sample** 95:17

**San** 1:4 3:9
**saying** 36:7 55:17 67:16 75:18 86:2 87:8,13 89:16 93:25 107:15,18 114:23 135:7 137:9
**says** 15:24 27:17 31:7,19 48:8 73:20 74:3 85:17 86:17 94:13 104:6 119:21 120:8 121:6 148:16 157:10
**scheme** 50:24 51:3 51:4 117:15 122:22 136:25
**schemes** 50:16
**scholar** 52:4 124:15
**Schul** 14:21
**Schulman** 9:20 11:14 14:22 15:3 15:20,21 16:6,19 17:5
**scope** 19:14 40:18 40:20 42:19 69:16 83:10,24 84:17 86:10,14 87:10 89:3 93:22 97:8 97:18,24 99:24 103:15 104:4,20 106:13 110:12 111:9 113:19 114:5,19 115:8 123:16 124:4 125:10 126:14 127:4 128:16 131:9,20 132:7,17 133:2,17 134:8 136:21 139:6 140:22 141:17 142:3,15 143:19 153:23 154:6,24 156:20 158:7,24 159:14 160:7,17 161:11 162:4
**Scott** 102:10
**screen** 22:20 29:22 29:23 30:3 31:15 31:16 42:24 79:12 144:4,15 145:12 146:18 147:11
**screens** 9:2
**scroll** 119:2 146:10 150:13 151:6
**scrolling** 119:3
**search** 63:25 64:6 71:8,9
**SEC** 65:20,23 66:12
**second** 22:8,19 42:25 44:18 46:3 62:2 63:11,19 94:13 119:9 120:6 120:15,18 122:9 145:25 146:7 151:25
**secondly** 143:4
**section** 27:24 51:21 52:15
**securities** 1:8 5:12 5:17 6:9 11:3 22:17,22,25 23:17 23:20 26:11,19 28:3 34:8,22 81:9 88:5 100:15 109:7 117:3 118:4,9 129:20,21,22,24 130:17 138:10 159:17,19
**security** 60:4 91:3 113:12
**see** 7:23,24 15:19 30:4,15,16,23 31:3,9 35:10,20 42:20,21,23 45:8 55:14,17 57:5 62:7 72:13 73:25 79:2,11,17 80:17 85:4,11 86:5 87:12 88:17 90:21 91:6,8,20 92:2,14 92:16 96:12 114:8 114:24 116:20,21 117:5,24 120:9,14 130:4,9,14 141:13 142:11,20 144:21 145:7 146:5,6,18 147:4,18,21,23 148:2,13 151:7
**seeing** 147:25
**seen** 80:9 82:3 115:10,13
**select** 62:3
**semi-strong** 59:2 59:13,19 60:5 65:13,22 70:23
**sense** 53:4 62:4 119:14 135:15,15 136:22 141:4
**sent** 47:22
**sentence** 31:7 73:20 76:7,8 85:17 86:17 96:23 104:5 104:7
**sentences** 100:3
**September** 25:20 26:12,19 27:5,16
**sequence** 33:21
**services** 1:22 6:14 6:16 50:15 83:3 105:3,6 125:24 137:4,14
**set** 64:8 165:12,21
**setting** 150:2
**seven** 36:20 46:15 117:14
**Sharan** 28:23
**share** 82:10 138:18 138:22 147:11
**shares** 89:7 159:18
**sheet** 166:8,11,14
**short** 26:16
**show** 29:18,21 43:2 79:7,8 91:7 92:15 92:17 117:2,24 144:16 157:12
**showing** 30:12 122:2
**shows** 78:23
**Shulav** 46:7
**side** 38:2
**side's** 19:21
**Sig** 148:16
**sign** 166:10
**SIGNATURE** 4:9
**Signed** 167:20
**significance** 144:6 149:4 152:10,20
**significant** 143:8 144:9 148:22,25 149:19
**similar** 36:7 77:3 95:18 96:14
**simple** 56:3 116:19
**simply** 28:7 84:7 102:18 131:13 136:3
**single** 107:22,23 138:14 152:21
**singular** 107:21
**sir** 68:16
**site** 70:13 71:5
**sitting** 43:25 46:23 162:7
**six** 63:9,24 85:8
**sixth** 64:12
**size** 136:23 137:3 137:12,13
**Skadden** 16:20,21 18:8,11,13,17
**skim** 120:19
**skip** 36:24
**slightly** 19:5
**small** 10:23
**smaller** 131:12
**Snellen** 3:24 6:14
**sold** 90:15 154:12
**solely** 112:10
**solvency** 17:22 18:5
**somebody** 70:6
**somebody's** 69:21
**Someone's** 42:25
**something's** 66:9
**sorry** 11:13 32:20 35:16 57:11 67:12 84:24 100:20,20 105:24 119:6 145:19 146:4 149:12
**sound** 45:11
**sounds** 8:22 9:6 18:25 29:10 31:22 45:9 101:2 116:6 124:19
**source** 54:21
**Southern** 9:23 17:10
**space** 166:7
**speak** 8:17 13:14 33:5 103:4
**speaks** 69:2
**specific** 68:10 74:22 75:2 77:7 91:23
**specifically** 62:3 67:14 109:6 113:20
**spectrum** 71:24
**speculate** 161:16
**spend** 56:19 76:19 108:20 111:2
**spent** 45:5 77:10
**spreadsheet** 5:20 145:13 148:14
**spring** 39:18,19,20 39:25
**ss** 167:5
**staff** 36:10,13,16,18 36:21,23 45:22 46:16 63:25 71:11 74:13
**standard** 100:7,17 100:22 106:21 107:16,16,19 113:21,25 114:7 114:10,23 133:23
**start** 59:21 135:2 135:12 140:25 141:5,7

**started** 39:19 68:8 89:16 140:13
**starting** 25:17 86:21 138:16
**starts** 83:21 108:8 122:11
**Stat** 148:16
**state** 7:4 13:23 165:3,8 166:6 167:4,24
**stated** 82:21
**statement** 60:18 62:8 80:8,11,16 80:23 81:2,11,15 82:6 83:14,19,20 84:11 93:6,11 94:20,21 95:7 98:19 107:5 151:4 151:5
**statements** 19:13 52:9 53:19 78:15 78:17,18 91:5 105:12 106:18 109:25 110:22 111:7,11
**STATES** 1:2
**stating** 38:8
**statistic** 149:17
**statistical** 90:24 144:6 152:10,20
**statistically** 143:8 144:8 148:22,25
**statistics** 34:13,15
**staying** 72:5
**STENOGRAPH...** 32:24
**stenographic** 6:18
**step** 132:21 133:20
**steps** 94:18
**stick** 53:8
**stock** 41:8 57:15 58:11,16 60:4,23 65:4,17,24 66:17 69:10 80:25 93:15 93:17 95:17,17 96:22
**stock's** 94:16
**stored** 69:20
**stories** 20:25 63:16 63:17,20,24 64:9 64:14
**straight** 37:15
**straightforward** 144:25
**Strategy** 51:7
**Street** 3:8
**strong** 60:7
**studies** 43:21 44:14 75:4 91:11 100:15
**study** 61:6,7,11 90:20,23 91:16 92:25 94:14 95:2 96:18,21,25 113:10 132:14,23 133:14,19 142:20 143:3,14,16,23 144:3,5,13 159:3
**stuff** 44:12
**style** 156:10 157:3 157:11,18 158:14 158:22 159:11 160:14
**subconsciously** 32:15 33:17
**subject** 10:21 12:6 12:17 16:10 17:12 17:14 27:14 29:2 34:16
**subjective** 107:12
**subjects** 31:14,21
**submitted** 25:25 26:21 83:8 109:12 112:17
**submitting** 27:2
**subscribed** 167:20
**substance** 35:24 50:15
**substantial** 113:22
**substantive** 47:5 113:3
**substantively** 112:23 121:20
**succeeded** 120:3
**suggest** 115:14
**suggesting** 71:18
**suggests** 76:9 118:15
**summer** 39:14,19 39:20
**supervisory** 24:8
**supporting** 37:25
**supports** 109:4
**Supreme** 81:22 124:25
**sure** 13:10 15:4 21:12 42:8 48:20 54:19 57:23,25 58:4 62:20 63:6 78:16 80:2 84:21 86:6 87:20 95:22 99:20 107:15 108:7 117:11 118:17 123:2 124:16 127:13 130:5,10 132:12 150:9 156:2 160:22 161:12 162:18
**surprise** 103:25 104:18,24
**surprised** 44:7
**surprises** 103:22
**survey** 125:21 126:9,11
**sustained** 49:20,24 155:14
**swear** 6:20
**switch** 30:3 39:3
**switching** 19:5
**sworn** 7:3 165:12
**synonym** 153:9
**synonyms** 100:13
**systematically** 62:21

**T**

**T** 5:3 149:17 165:2 165:2 167:2 168:2
**tab** 146:15,18 148:5 148:9
**Tabak** 1:18 4:7 5:6 5:7,9,15,15,20 6:8 7:2,12,20 25:5 30:20,21 33:16,19 68:3 73:9 92:14 107:4 116:20,25 118:7 127:24 130:15,15 145:13 147:17 163:8,18 163:25 165:10 167:8,18
**tabs** 147:19,22 148:4
**tag** 63:15
**tagged** 63:13,18
**take** 8:24 9:3 15:5 20:3 29:15 42:21 57:9 72:15 73:12 90:18 110:8 120:5 120:16,18,20 127:10 138:13,15 138:18 142:20 147:7 151:3 159:8 159:10 162:13,20
**taken** 6:12 12:13,14 53:16,20 73:3 91:23 127:18 163:3 167:10
**takes** 71:11,15
**talk** 40:23 41:14 68:13,24 81:18 108:9,15 126:8
**talked** 133:21 151:17
**talking** 24:16,18,20 29:17 40:7 59:6 62:5 67:14 68:8 93:12 105:12 124:17,24
**talks** 65:9 103:20 103:21
**tasks** 46:19,20
**taxonomy** 122:12 122:14,17
**team** 16:25 74:13
**technical** 121:25
**technically** 140:24
**technique** 101:3
**techniques** 100:7 100:17,23 101:5,7 106:6,10 131:6
**TECHNOLOGY** 2:2 3:2
**tell** 63:3 79:5 80:8 101:5,6,7 105:13 107:8 150:14,20 150:23
**ten** 38:25 56:19 72:15 78:5 103:6 127:10,12 162:14 162:21,22
**tends** 60:11 151:21
**term** 100:11 105:7 108:3 113:6 134:3 136:9 137:15 140:23 141:11 157:15
**terms** 25:15 26:2 44:13 52:20 59:23 66:8 97:15
**test** 61:23 146:14
**testified** 7:5 9:13,17 14:4,16 18:4,14 38:19 129:8
**testify** 18:2
**testimony** 12:7 16:11 17:13 26:3 27:4 29:3 42:18 43:8 71:17 165:14 167:10,13
**tests** 54:16
**Teva** 26:11,15,17 26:17,19 27:9,10 27:15,21 28:3 54:2,6,6,14,23 155:18
**text** 63:25
**thank** 7:8 9:6 13:19 15:12 20:11 26:17 48:4 64:19 78:10

119:4,19 155:5 163:8,12,17,21
**Thanksgiving** 163:11,19
**theoretical** 60:10 119:10
**theories** 50:7
**theory** 5:13 49:16 49:24 54:12 81:10 97:11 111:16 117:4 118:5,10
**thing** 61:21 64:24 112:6 129:10 154:8 156:14
**things** 14:9 33:21 34:6 36:25 47:21 51:12 59:16 68:22 68:24 71:3,8,20 71:22,24 77:16 78:8 79:9 110:15 112:8 125:19 132:10 133:6 140:5 145:21 162:19
**think** 8:12,13 10:11 11:6,7,24 14:21 15:14,25 17:16,16 18:21 20:17 23:15 25:13 26:7 29:10 32:10 34:5,6,8,23 37:9 38:16,22 39:17 48:16 50:15 51:19 57:24 58:23 60:9 62:2,9 75:25 76:12 78:18 79:21 83:19,25 93:8 95:12,20 96:16 98:24 99:3 103:9 113:2 114:20,22 119:12 123:20 126:19 128:3,6,8 128:18,19,24 129:6,13 132:8 134:10 135:10 136:16 144:4 145:23 146:21 148:10 149:15,16 151:20 156:18,24 158:8,11
**thinking** 76:22,23 77:11 97:15,20,25 112:20
**third** 46:4 63:11 146:15
**thirty** 166:15
**thought** 97:10 131:10,16 156:22
**thousand** 23:9 45:9 45:10 161:3,13
**three** 8:7 22:8 23:9 23:11 59:25 77:8 100:4 103:8,9 104:8,12 117:14 125:14
**threw** 121:6
**thrown** 49:22
**Thursday** 22:4
**ticker** 64:5
**time** 6:11 8:25 9:3 9:3 19:3 23:19 28:13 39:13 53:13 56:5 63:22 72:13 72:23 73:4 76:19 76:24 77:11,16,22 78:6 79:6 81:17 81:24,25 82:4,4 90:10 91:2 107:22 108:20 111:3 113:11 117:2 120:16,19 127:15 127:19 130:12 133:24 147:8 162:24 163:4,10 164:2
**times** 8:5 18:16,24 45:9 156:25 160:18
**title** 23:20 35:23
**today** 6:10 7:16 27:5,6
**today's** 163:24
**told** 44:5,6 56:18
**tongue-in-cheek** 150:6
**top** 55:19 64:17 99:18 122:10
**Topaz** 28:18,19
**topics** 12:25 14:13 19:5 111:24
**total** 47:13,19,20 76:24 99:9,9
**traded** 41:8 57:15 59:11,12
**trading** 154:17
**tran** 69:7
**transcript** 4:3,13 67:5,10 68:13,15 69:8,12,17 70:12 134:18 166:17,18 167:9,12
**trial** 9:14,16,22 10:12,19,22 11:11 11:22 14:16 17:9 19:11
**trials** 9:16 10:9,10
**true** 60:18 66:19 80:24 81:14,15,19 83:19 98:24 126:21 144:17 165:13 167:12,14
**Trust** 3:14
**Trustee** 3:13
**try** 8:20 13:14 49:21 57:5 146:23
**trying** 32:3 84:3 119:25 136:23 146:2
**Tuesday** 6:10
**two** 12:19 14:12 18:19 20:16 27:16 46:25 57:13,13,13 59:20 63:17,19 68:11,22,23 91:10 98:21 100:3 101:15 108:17 112:8 114:12 143:11 149:7,16 149:16,18 151:16 152:9
**type** 44:3 56:25,25 66:16 86:23 120:15,15 156:13 158:4
**types** 57:6 58:24 93:9 98:21 116:3 116:12 117:7,18 117:25 120:11 121:2,7
**typically** 115:11 159:5
**typing** 76:21,23 77:2

**U**

**ultimate** 42:13
**ultimately** 41:6 51:22 111:21 137:11
**unambiguously** 73:22 75:18 76:7
**uncertainty** 19:2
**unclear** 84:6,9
**underlie** 20:16
**underlying** 20:21
**underpinnings** 119:10
**understand** 8:10,16 8:19 29:6 33:20 47:24 57:24 58:5 92:20 118:18 128:7 151:15
**understanding** 49:23 50:12 52:5 88:22 98:13 104:17 105:17 110:14 155:8
**underwriting** 38:9
**unfortunate** 83:22
**unfortunately** 83:15,21
**unhelpful** 91:12
**Union** 2:13
**unit** 12:5,12
**UNITED** 1:2
**units** 12:13
**unrelated** 99:15
**unusual** 66:4 114:8 114:24 115:6,15
**upcoming** 105:15
**use** 55:25 62:15 75:10 82:10 96:7 106:15 107:12 113:25 114:11 132:20 140:8 143:16,22 150:3
**Uslaner** 2:7 21:25
**usual** 44:25
**Usually** 24:10

**V**

**V-L-A-D** 46:4
**vague** 110:16 156:20
**valid** 155:3
**value** 80:24 81:14 81:19 82:9
**valuing** 101:24
**van** 93:19
**vanilla** 93:13,19
**variants** 117:18 123:4
**various** 36:12 50:16 61:22 96:25 151:22 152:19
**vault** 69:21
**vendor** 63:14
**version** 62:24 63:9
**versions** 61:11,22 63:8,9,12
**versus** 11:7 16:6 101:17 154:21
**video** 72:25
**videographer** 3:23 6:5,13 7:8 72:23 73:4 127:15,19 162:24 163:4,22 163:23
**videotape** 6:6
**videotaped** 1:17
**view** 76:10,15 90:2

151:23
**virtual** 20:18
**virtually** 70:4
**Vlad** 46:3

**W**

**W** 167:2
**W-E-N** 46:4,5
**want** 7:15 15:2 25:22 27:8 28:11 31:3 33:19 40:11 40:12,23 44:22 54:9,20 56:4,7,10 57:25 58:4 68:5 68:24 72:20 79:11 80:18 81:17 86:18 86:19 90:9 91:6,8 91:19 92:4,7,16 105:23 106:5,7,8 109:18 110:13 112:6 116:21,25 117:5 120:21 130:3 132:8,11 134:10 135:10 142:5,17 151:15 155:13
**wanted** 120:24
**wants** 70:4 92:14 116:20 142:2
**wasn't** 10:24,24 11:13 19:20,23,23 35:3 37:22 41:19 104:14 118:15
**way** 23:23 32:16 34:11 44:8,10,19 61:20,23 65:7 70:22 79:18 81:6 83:20 85:5 90:3 95:11 105:21 114:6 117:6,11 121:20 125:11 128:24 129:12 138:22 142:16 143:14 145:20 146:22 147:10 149:13,14 150:13 151:7 152:16 165:18
**ways** 117:10,12,13 152:9 155:7,10
**we'll** 31:17 159:24
**we're** 63:2 82:18 93:12 95:12 105:11 125:19 144:18 145:8 146:23 147:17 162:15
**we've** 21:12 29:17 46:5,6 68:8 72:13 99:10 147:12 152:12
**weak** 60:2
**WEINER** 3:7 33:4 33:10 146:25 147:4
**weird** 135:7
**welcome** 79:10
**Wen** 46:4,4
**went** 17:21 19:13 22:7 76:22 78:19 125:21 126:7
**weren't** 45:13 56:18 111:22
**Whatever's** 29:24
**whatsoever** 49:4
**WHEREOF** 165:20
**white** 24:18
**Whoa** 22:18
**window** 113:7,9,16
**winds** 24:22
**wish** 163:11
**witness** 1:19 6:20 7:2 13:18 20:9 30:2,23 72:18 90:14 91:21 92:7 92:12 130:5,11,21 144:17 145:19,25 146:5,9,17 147:5 147:21 148:3,10 148:15 155:18 156:22 158:8 163:12 165:11,14 165:20 166:2
**word** 19:25 51:3,6 55:5,6 75:11 76:7 83:21 95:20 153:7
**words** 50:21 75:6 77:19 82:21 83:25 99:8 106:8 126:25
**work** 16:21 23:25 24:5 25:12,16,19 25:23 36:11,11 37:9,17 39:23 42:11 43:9,14,16 43:18 44:3,9,15 45:18 47:2 56:14 95:21 109:16
**worked** 22:23 28:23 38:5
**working** 5:9 35:13 76:24 81:8 118:8
**world** 60:11
**wouldn't** 44:7 112:25 132:24 134:10 143:3 162:7
**writ** 13:13
**write** 12:10,11,15 12:20 41:9 88:10 108:9
**writes** 13:13
**writing** 62:11 118:15,17
**writings** 78:13,15 78:19 79:9 80:10 80:16 98:4 106:18 116:2
**written** 19:13 91:5 94:25
**wrong** 150:7,20
**wrote** 53:14,22 55:6 84:19 86:25 95:9 98:15 129:15
**www.MagnaLS.c...** 1:23

**X**

**X** 5:3

**Y**

**yeah** 13:21 15:5 18:25 24:8 30:7 33:4 35:25 55:24 91:14 95:10 104:14 112:19 119:8,15,24 130:21 138:6 144:21 145:6 146:21 147:12,15 148:15 150:8 151:14 156:4 157:6
**year** 11:18 39:25
**years** 10:15,20 16:3 18:22 35:14,22 37:10 38:23 61:23 105:16
**yes/no** 71:19
**yesterday** 22:5
**York** 1:19,20 2:10 2:10 7:5 9:23 17:10 165:3,4,9
**younger** 78:25

**Z**

**Z-H-U** 46:7
**zero** 86:21 99:3 102:17,19 144:7 148:20 151:8
**Zhu** 46:6
**zillion** 145:17
**Zimmerman** 16:24 18:8,11
**Zoom** 2:2 3:2 20:16 20:17 21:21

**0**

**1**

**1** 5:7 6:7 30:19,20 35:12 62:25 85:7 148:24
**1,050** 45:2
**1.96** 149:18
**1:35** 72:24
**1:46** 73:5
**10** 64:2,17 138:17 138:22 149:8,23
**10-K** 67:18
**10:45** 72:16
**10020** 2:10
**11** 27:24
**110** 25:18 35:14 55:13,18 62:24 73:16 85:7
**118** 5:9
**12:30** 1:20
**12:31** 6:3,11
**1251** 2:9
**130** 5:15
**145** 5:20
**15** 38:23
**16** 35:22
**165** 4:11
**167** 4:9
**168** 4:10
**17** 21:17
**17th** 48:9
**1995** 88:4

**2**

**2** 4:5 5:10 15:9,18 21:15 23:5,14,16 57:10 118:6,7
**2:37** 127:16
**2:54** 127:20
**20** 10:20 25:20 26:12,20 27:5,17 167:21
**2002** 5:9 118:7
**2004** 61:25
**2019** 11:12
**2020** 21:17 48:9
**2021** 1:14 6:11 26:12,20 27:5 39:14,20 165:22 167:11
**212.554.1400** 2:11
**23** 1:14 167:11

**23rd** 6:10
**24th** 165:21
**25** 35:17,19
**26** 35:14 57:19
**27** 73:15 85:6
**28** 73:15 85:7
**29** 55:16

**3**

**3** 4:5 5:16 118:24 118:25 119:12,13 119:20,21 130:15
**3:24** 162:25
**3:34** 163:5
**3:35** 164:2,5
**30** 5:6 55:13,18 99:14 103:4 166:15
**300,000** 47:25
**32** 35:14
**34** 25:18

**4**

**4** 5:21 15:10 25:17 27:17 31:4,6 63:22 119:16,19 119:21 145:9,10 145:10,13
**415.268.7000** 3:10
**42** 87:23,25,25
**425** 3:8
**43** 77:6 100:2,16,18 100:21,22 103:20

**5**

**5** 4:6 15:15 122:5 149:2,3,8,19,24 150:3
**5:18-CV-4884-B...** 1:11
**57** 73:13 76:18
**58** 84:23
**59** 84:25 85:5,6 88:2
**5B** 11:7

**6**

**6** 15:17,18 122:4,6
**60** 75:4 90:19,19 96:19
**62** 76:18

**7**

**7** 4:8
**70** 99:13 103:4

**8**

**866-624-6221** 1:22
**8a** 62:18,23 143:6
**8th** 25:21,25

**9**

**9:30** 63:21
**90-day** 88:13
**94105-2482** 3:9
**98** 62:24
**99.9999** 48:20