# Exhibit C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | All Class Actions |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I. SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1. This report concerns a securities action brought on behalf of purchasers of securities of Teva Pharmaceutical Industries, Ltd. ("Teva") "during the Class Period (February 6, 2014 to May 10, 2019, inclusive)."[1] With regard to claims under Sections 10(b) and 20(a) of the Exchange Act of 1934, the Complaint states:[2]

> The Teva securities at issue in this action are:
>
> - American Depositary Shares registered on the NYSE ("ADS"), including ADS (i) registered pursuant to Teva's July 27, 2010 Registration Statement, and (ii) issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "ADS Offering");
> - 7.00% mandatory convertible preferred shares issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "Preferred Shares" and "Preferred Offering"); and

---

[1] Second Amended Consolidated Class Action Complaint ("Complaint"), ¶1.

[2] Complaint, ¶393.

## VI. DAMAGES FOR INVESTORS IN TEVA'S SECURITIES CAN BE CALCULATED THROUGH A COMMON METHODOLOGY

74. While I have not yet been asked to determine the level of inflation in any of Teva's securities, I have been asked to provide an opinion on whether such analyses can be performed on a Class-wide basis for each security. As discussed below, the answer is unambiguously that the formulation of such a common methodology is possible in this matter.

75. In the most common type of fraud-on-the-market securities-fraud cases under Rule 10b-5, including this action, damages are "out-of-pocket" damages, and the damages analysis begins with an allegation that members of the class have overpaid because the market price of the security they purchased was artificially inflated. Thus, the proper form of analysis depends not on what an individual investor believed, but on the degree, if any, by which the market price of the security in question was inflated.[39] As all investors face the same market price at any given point in time, the proper analysis of damages will be the same across all investors in any given security.

76. The starting point for calculating damages for an investor who both buys and sells during the class period is determined by the amount of artificial inflation in a security at the time of their purchase less the inflation in that security when sold. If an investor holds their purchase past the end of the class period, then the starting point for damages is the amount of inflation at the time of purchase. Further adjustments may be necessary if the amount of inflation declines for reasons other than a corrective disclosure (e.g., if inflation changes due to market, industry, or company-specific reasons unrelated to the allegations) in order to obtain the "out-of-pocket" measure of damages. In

---

[39] Certain investors, such as defendants, may be excluded from a class based on their knowledge or beliefs formed on the basis of non-public information, as the fraud-on-the-market theory applies to an investor who "buys or sells stock at the price set by the market[.]" (*Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).)

addition, the 1995 Private Securities Litigation Reform Act provides a limitation on damages.[40] Notably, all the above calculations are performed on a class-wide basis.

77. The inflation calculation referenced above is begun with an event study, or the analysis of the change in the market prices of each Teva security, accounting for changes in market and/or industry effects, on the dates of (or the trading dates following) the corrective disclosures and materializations of the risk alleged in this case. These calculations show the effect of the alleged corrective disclosure announcements and any other negative events as a result of materializations of risk.

78. In quantifying damages, it will be necessary to review the alleged corrective disclosures and relevant negative events to determine whether any of the information disclosed or negative events were unrelated to the alleged fraud. If so, the effects of such unrelated, "confounding" information and events on each of Teva's securities' prices would be removed.[41] For example, as portions of the truth were allegedly revealed to the market through Teva earnings announcements, it may be necessary to disaggregate the portion of each earnings surprise (i.e., by how much earnings exceeded or fell short of expectations) due to the allegedly fraudulent profits generated by the scheme underlying Plaintiffs' allegations from the portion of the earnings surprise due to the remainder of Teva's business. It is my understanding that Plaintiffs allege that Defendants generated profits by a fraudulent scheme of increasing prices and of generating profits through higher pricing while denying doing so, and that Defendants also misrepresented and concealed the accelerated pricing erosion and significant pricing pressure Teva faced. I

---

[40] For shares held beyond the disclosure that corrects the misrepresentation(s) that is (are) the basis for the action, damages are limited to the purchase price less (1) the 90-day average closing price following that disclosure if the shares are held through this 90-day period or (2) the average closing price through the time of sale if the shares are sold within the 90-day period.

[41] Such analyses are routinely performed through various means, such as by valuations of different business practices and/or reviews of analyst reports to determine the relative importance of different aspects of an alleged corrective disclosure.

understand that Plaintiffs are seeking discovery to help quantify the amount of profit Teva generated from the concealed price increases as well as the negative impact of pricing erosion and pricing pressure on profits. For example, using such evidence and additional data, one should be able to determine the amount of profit due to the alleged schemes and the remaining profit on each earnings announcement to estimate the portion of any earnings surprise due to each. This would provide an input to disaggregating the price movement following each such earnings announcement into the part due to the allegations from the part due to other profits by Teva.[42]

79. Thus, while further discovery should aid in some of the exact parameterizations of the damages calculations, a common method for determining inflation at any date, and thus damages for any Class member, will be feasible. While there may be questions about how to calculate inflation, those questions will affect all members of the Class who purchased Teva securities and will be resolved by common Class-wide proof. Consequently, the inflation in Teva securities will be determined in a common manner for all Class members for each security. The resultant figures will then be applied to each Class member's transactions in a mechanical fashion during the claims process to determine the appropriate claim for each member of the Class.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

David I. Tabak
June 18, 2020

[42] The exact method of disaggregation may take into account other variables and would presumably be based on the type of data obtained in discovery.