Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

May 23, 2022

| | |
|---|---|
| No.: | 22-80048 |
| D.C. No.: | 5:18-cv-04844-BLF |
| Short Title: | City of Sunrise Firefighters' Pension Fund, et al v. ORCL, et al |

Dear Appellant/Counsel

This is to acknowledge receipt of your Petition for Permission to Appeal under Federal Rule of Civil Procedure 23(f).

All subsequent letters and requests for information regarding this matter will be added to your file to be considered at the same time the cause is brought before the court.

The file number and the title of your case should be shown in the upper right corner of your letter to the clerk's office. All correspondence should be directed to the above address pursuant to Circuit Rule 25-1.

No. 22-___

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE: ORACLE CORPORATION SECURITIES LITIGATION

Petition from the United States District Court for the Northern District of California, Case No. 5:18-cv-04844-BLF, Hon. Beth Labson Freeman

## DEFENDANTS-PETITIONERS' PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS CERTIFICATION UNDER RULE 23(F)

DORIAN DALEY
PEGGY BRUGGMAN
JAMES C. MAROULIS
500 Oracle Parkway
Mail Stop 5OP7
Redwood City, CA 94065

*Counsel for Defendant-Petitioner Oracle Corporation*

JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C. 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

JORDAN ETH
MARK R.S. FOSTER
ROBERT W. MAY
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94015

*Counsel for Defendants-Petitioners Oracle Corporation, Safra A. Catz, Paula R. Hurd, as Trustee of the Hurd Family Trust, Lawrence J. Ellison, and Ken Bond*

May 23, 2022

## CORPORATE DISCLOSURE STATEMENT

Defendant-petitioner Oracle Corporation hereby states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: May 23, 2022

s/ Joseph R. Palmore
Joseph R. Palmore

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ISSUE PRESENTED .......... 3

BACKGROUND .......... 3

A. Plaintiffs' Allegations .......... 4

B. First Dismissal Order .......... 4

C. Second Dismissal Order .......... 5

D. Class Certification Motion .......... 6

E. Class Certification Order .......... 9

REASONS FOR GRANTING REVIEW .......... 11

I. THE CERTIFICATION ORDER IS MANIFESTLY ERRONEOUS .......... 11

A. Plaintiffs Must Present A Method That Measures Classwide Damages Attributable Only To Their Liability Theory .......... 12

B. Plaintiffs Failed To Present Any Model, Much Less One That Measures Only Classwide Damages Attributable To Their Liability Theory .......... 14

1. Plaintiffs' expert candidly acknowledged he had not prepared a damages model .......... 14

2. The district court misread *Comcast* .......... 16

II. THE CERTIFICATION ORDER PRESENTS AN UNSETTLED AND FUNDAMENTAL ISSUE OF LAW OF FIRST IMPRESSION THAT IS LIKELY TO EVADE END-OF-CASE REVIEW .......... 21

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) .......... 18

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 17

*In re BP P.L.C. Securities Litig.*,
MDL No. 10-md-2185, 2013 WL 6388408
(S.D. Tex. Dec. 6, 2013) .......... 23

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) .......... 11, 12, 25

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 1, 3, 9, 10, 12, 13, 14, 16, 17, 18, 19, 20, 21, 23

*In re ConAgra Foods*,
302 F.R.D. 537 (C.D. Cal. 2014) .......... 22, 23

*Doyle v. Chrysler Group, LLC*,
663 F.App'x 576 (9th Cir. 2016) .......... 13, 14, 18

*Ft. Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) .......... 23

*D.C. ex rel. Garter v. Cnty. of San Diego*,
783 F.App'x766 (9th Cir. 2019) .......... 18

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) .......... 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................17

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004)....................24

*Junge v. Geron Corp.*,
No. C 20-00547-WHA,
2022 WL 1002446 (N.D. Cal. Apr. 2, 2022)....................21, 23

*Loritz v. Exide Technologies*,
No. 2:13-cv-02607-SVW-E,
2015 WL 6790247 (C.D. Cal. July 21, 2015)....................22

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015)....................10

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*,
No. 4:08CV0160,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)....................22, 23

*In re Rail Freight Surcharge Antitrust Litig.-MDL*,
725 F.3d 244 (D.C. Cir. 2013)....................14

*Reitman v. Champion Petfoods USA, Inc.*,
830 F.App'x 880 (2020)....................18

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008)....................25

*Vaquero v. Ashley Furniture Indus.*,
824 F.3d 1150 (9th Cir. 2016)....................14

*Wal-Mart v. Dukes*,
564 U.S. 338 (2011)....................16

*Ward v. Apple Inc.*,
784 F.App'x 539 (2019)....................14, 19, 20

**Other Authorities**

17 C.F.R. § 240.10b-5....................3, 5

Cornerstone Research, *Securities Class Action Filings—2021 Year in Review* (2022), https://www.cornerstone.com/wp-content/uploads/2022/02/Securities-Class-Action-Filings-2021-Year-in-Review.pdf ....24

Fed. R. Civ. P. 23, Advisory Committee Notes to 1998 Amendments, Subdivision (f) ....24

Fed. R. Civ. P. 23(a)....12, 16, 17

Fed. R. Civ. P. 23(b)(3)....1, 3, 12, 13, 17, 20

Fed. R. Civ. P. 23(f)....1, 11, 24

Pursuant to Federal Rule of Civil Procedure 23(f), Defendants respectfully petition for permission to appeal a district court order certifying a class under Rule 23(b)(3).

## INTRODUCTION

This petition provides the Court with an opportunity to correct widespread disregard of Supreme Court precedent on a fundamental question of class-action law. In *Comcast Corp. v. Behrend*, the Supreme Court held that a class action cannot be certified unless plaintiffs submit a damages model capable of calculating classwide damages flowing from their theory of liability. 569 U.S. 27, 35 (2013). And district courts must conduct a "rigorous analysis" to determine whether plaintiffs have passed this test. *Id.*

Plaintiffs did not meet this obligation in this securities class action, because they did not even try to do so. Plaintiffs submitted no damages model at all. Their expert candidly admitted that he had not been retained to prepare a damages model and that his report "doesn't propose a particular damages model." Dkt112-2 at 72. Instead, he identified multiple methodological choices he would have to make if and when he did ultimately prepare a model. Absent a model, it is impossible to determine whether Plaintiffs have a way to obtain damages for all shareholders using a common methodology. They thus flunked *Comcast*'s foundational requirement.

The district court nonetheless certified the class. The court acknowledged the expert's frank admissions that he had not prepared a damages model, saying they were "likely not what [Plaintiffs] wanted to hear from [their] expert." Appx16. But the court nonetheless concluded that Plaintiffs had put forth an acceptable "'out of pocket' damages model," Appx13—even though "out of pocket" damages is just a label for a legal remedy, not a model. The court also stated that the predominance requirement was satisfied by the expert's sharing of some "details on how such a model *could be* constructed," Appx14 (emphasis added)—despite *Comcast*'s requirement of an *existing* damages model. According to the district court, this was enough to satisfy what it characterized as *Comcast*'s "minimal" requirements in securities cases. But Comcast requires a "rigorous," not minimal, analysis, and there's no basis for applying a different rule to securities class actions.

The district court's manifest errors were unfortunately not unique. While some district courts get this question right, many do not, effectively carving out securities class actions from *Comcast*'s rule. Yet those are the very cases most likely to settle after class certification because of the large damages exposure. Accordingly, this issue will continue to evade this Court's review—unless it grants interlocutory review to address it.

This case presents the perfect vehicle to do so. The legal issue is cleanly presented. Plaintiffs' expert expressly acknowledged that he prepared no damages

model and provided detailed testimony about all the fundamental methodological choices he had not made. Defendants opposed class certification on *Comcast* grounds alone. And the district court squarely addressed the question—holding that *Comcast* imposes a "minimal" burden that can be discharged through a mere description of how a damages model might ultimately be constructed.

The Court should grant this petition to correct the district court's manifest errors and provide much needed guidance on an important and frequently recurring class-certification question that will otherwise continue to evade review.

## ISSUE PRESENTED

Whether *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), requires that plaintiffs seeking to certify a securities fraud class action under Federal Rule of Civil Procedure 23(b)(3) submit a damages model capable of calculating classwide damages tracking their theory of liability, or whether it is enough for them to describe how they might construct such a model at some later date.

## BACKGROUND

Plaintiffs filed this putative securities class action against Oracle and several of its officers, alleging violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and of Rule10b-5, 17 C.F.R. § 240.10b-5. The district court dismissed the complaint in large part, but permitted plaintiffs to proceed with a "narrow omission theory." The court then certified a class.

### A. Plaintiffs' Allegations

Plaintiffs allege that Oracle misled investors about the success of its Cloud products. Even though Oracle met or exceeded its financial guidance throughout the Class Period and its Cloud business indisputably grew, Plaintiffs claim that Oracle did not disclose two allegedly improper sales practices. Under the first alleged practice, Plaintiffs claim that Oracle threatened to enforce its contractual right to audit its customers' use of its on-premises products unless the customers agreed to purchase Oracle's Cloud products. Dkt65 at 2. Under the second alleged practice, Plaintiffs claim that Oracle offered existing customers "a significant discount" on on-premises products when the customer also purchased a short-term cloud subscription. Dkt65 at 3.

Plaintiffs allege that when Oracle announced that its Cloud revenue growth rate had decelerated, its stock dropped by 8% from $50 to $46. Dkt65 at 3.

### B. First Dismissal Order

The district court dismissed the initial complaint, finding multiple pleading defects. First, the court held that some of the challenged statements "amount to nothing more than puffery." Dkt65 at 14. Second, the court held that other statements were forward-looking statements protected by the safe harbor of the Private Securities Litigation Reform Act. Dkt65 at15-17. Third, the court held that Plaintiffs "failed to sufficiently plead that the alleged misstatements were false or

misleading when made." Dkt65 at 29. Fourth, the court held that Plaintiffs "failed to plead facts creating a strong inference of scienter." Dkt65 at 37. Finally, the court held that Plaintiffs' failure to state a claim for a violation of Section 10(b) and Rule 10b-5 necessarily disposed of their "controlling persons" claims brought under Exchange Act Section 20(a). Dkt65 at 37.

### C. Second Dismissal Order

Plaintiffs tried to cure these defects by filing an amended complaint challenging 50 statements as misleading. The district court granted in part and denied in part Defendants' motion to dismiss that pleading. Dkt84. In what the court described as a "close call," it allowed Plaintiffs to move forward on a "narrow omission theory of securities fraud" for only 11 of the 50 challenged statements. Dkt84 at 23, 31-32, 35-36.[1] The sole surviving theory "centers on Defendants' statements about Oracle's cloud growth deceleration and the drivers of cloud growth." Dkt84 at 35. According to the court, "once Defendants made statements about the drivers of cloud revenue growth, investors would have been interested to know that Oracle's allegedly coercive sales practices were 'a material driver' of cloud sales." Dkt84 at 31.

[1] The court found that Plaintiffs had adequately alleged falsity for 13 statements, but had not adequately alleged scienter for two of them, resulting in 11 actionable statements. Dkt84 at 35 & n.19, 44.

In dismissing the other 39 challenged statements, the Court rejected all of Plaintiffs' other fraud theories. The court concluded that Plaintiffs had failed to plead that Oracle's statements in SEC filings about Cloud sales were false for failure to comply with Generally Accepted Accounting Principles (GAAP). Dkt84 at 23-26. The court examined the disclosure language and found that it "complie[d]" on its "face" with GAAP rules. Dkt84 at 26. The court also rejected Plaintiffs' claims predicated on the (incorrect) notion that Oracle had "an independent obligation to disclose" the sales practices underlying Plaintiffs' allegations. Dkt84 at 27 (citation omitted). The court likewise found that Plaintiffs failed to plead "falsity with respect to Defendants' statements about the technological strength of Oracle's cloud products." Dkt84 at 34.

**D. Class Certification Motion**

Plaintiffs moved to certify a class of all persons who purchased or acquired Oracle common stock between May 10, 2017, and June 20, 2018 (the "Class Period"). Dkt107. The 21-page motion included a single paragraph on damages, stating that Plaintiffs' expert, Dr. Tabak, "propose[d] to use" an "'out of pocket' damages model" for "calculating damages." Dkt107 at 19.

Plaintiffs supported their motion with Dr. Tabak's report, which dedicated only six of its 62 paragraphs to damages. Dkt107-11 at 27-29. He stated that the "formulation" of a "common methodology" to calculate "the level of inflation in

Oracle's stock prices" was "possible." Dkt107-11 at 27. He explained that in most securities fraud cases "damages are 'out-of-pocket' damages." Dkt107-11 at 27. Finally, Dr. Tabak promised that "any analysis of damages will be constructed so as to show damages attributable to" the statements that survived the Defendants' motion to dismiss. Dkt107-11 at 28.

When deposed, Dr. Tabak confirmed what was apparent from his report: He had not prepared a damages model. Dr. Tabak was asked whether he was "retained to put together a damages model," and he answered: "I don't believe so. I certainly don't recall doing it." Dkt112-2 at 41. He acknowledged that his expert report "does not lay out the damages analysis." Dkt112-2 at 76; *see* Dkt112-2 at 72 (admitting that report discusses "how a damages model is created generally" but "doesn't propose a particular damages model"). He said he "hope[d]" he would be retained as a damages expert but had "not discussed that with counsel yet." Dkt112-2 at 94.

Dr. Tabak's report had stated that the "inflation calculation" necessary to calculate damages "is begun with an event study." Dkt107-11 at 28. In his deposition, he confirmed that an event study is just "a first step" toward formulating a damages model. Dkt112-2 at 133. He also confirmed that many additional steps are required—and that he had not taken any of them:

- Dr. Tabak testified that he "generally" agreed that "the proper method to use when estimating share price inflation" would be "determine[d]"

by, among other things, "[t]he nature of the misrepresentation" and "its effect on expected future cash flows." Dkt112-2 at 82. When asked whether his report included that determination, he responded: "Of course not. It's not a damages report." Dkt112-2 at 83.

- He also acknowledged as "true" the fact that "it's not always clear whether a certain disclosure is better modeled as a constant percentage or constant dollar inflation." Dkt112-2 at 83. But his report was silent on which was appropriate here. Dkt107-11 at 27-29.
- His report had stated that "[f]urther adjustments may be necessary if the amount of inflation declines for reasons other than a corrective disclosure (e.g., if inflation changes due to market, industry, or company-specific reasons unrelated to the allegations) in order to obtain the 'out-of-pocket' measure of damages." Dkt107-11 at 27. But he acknowledged in his deposition that he was "not saying" whether such "further adjustments" would be "necessary" until he "look[ed] at the actual numbers," which he had not done. Dkt112-2 at 87.
- He also described three "techniques" for disaggregating "fraud-related" and "non-fraud-related" bases for stock movements. Dkt112-2 at 98, 101-103. But he testified that he had not decided which to use here. Dkt112-2 at 98,101-103.

- He explained that when doing event studies it is necessary to determine "the period of time over which the movement of the price of the security in question is measured to determine its response to the event." Dkt112-2 at 113. But he had not "determined that" period for this case. Dkt112-2 at 115.
- He agreed that there are many different types of corrective disclosures but had not determined which were present here. Dkt112-2 at 122-123.
- He agreed that there were multiple techniques for "modeling damages in cases involving failure to disclose risks," but had not chosen one for this case. Dkt112-2 at 130-132.

Defendants opposed class certification on a single basis: Plaintiffs' failure to offer a damages model measuring classwide damages tied to their liability theory. Dkt112. As Defendants explained, that is a mandatory obligation under *Comcast*, and the repeated express admissions by Plaintiffs' expert showed that Plaintiffs had not satisfied it. Dkt112 at 3-9.

**E. Class Certification Order**

On May 9, 2022, the district court granted Plaintiffs' motion to certify the class. Appx1-19. The court acknowledged *Comcast*'s holding that "absent an appropriate methodology for measuring damages on a classwide basis, '[q]uestions of individual damage calculations will inevitably overwhelm questions common to

the class.'" Appx11 (quoting *Comcast*, 569 U.S. at 34) (brackets by court). But the court endorsed Plaintiffs' view that *Comcast* imposed only a "'minimal burden' in securities fraud cases." Appx13 (quoting Dkt113 at 4-6). Indeed, the court suggested that *Comcast*'s "predominance analysis was specific to the antitrust claim at issue" there and not "analogous" to securities class actions at all. Appx14 (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)).

The court concluded that what it called Dr. Tabak's "class-wide 'out of pocket' damages model based on omission-based price inflation is feasible in this case." Appx13 (citation omitted). It viewed the predominance requirement as satisfied by Dr. Tabak's offering of "details on how such a model could be constructed." Appx14. For support, the court pointed to Northern District of California decisions certifying securities class actions with "similar" or even "less detail[ed]" expert testimony on damages. Appx15.

The court acknowledged Dr. Tabak's express statements that he had not developed a damages model. Appx16. It described those candid admissions as "likely not what [Plaintiffs] wanted to hear from [their] expert." Appx16. According to the court, however, those admissions did not "erase the disclosures in his expert report that identify a class-wide 'out-of-pocket' damages model and provide details on how such a model could be constructed—which other courts have found to be

sufficient." Appx16. The court thus deemed Plaintiffs' showing "sufficient despite [Dr. Tabak's] deposition testimony." Appx16.

## REASONS FOR GRANTING REVIEW

This Court grants review under Federal Rule of Civil Procedure 23(f) in at least three circumstances: where the class certification order is "manifestly erroneous"; where "the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review"; or where class certification results in a "death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam); *see id.* at 960 (noting these circumstances are not "exhaustive" and that review may be appropriate even when "a petition . . . does not fit within any of the [three] situations"). Although any of these circumstances alone is sufficient to warrant review, all three are present here.

## I. THE CERTIFICATION ORDER IS MANIFESTLY ERRONEOUS

A class certification order is manifestly erroneous when "the district court applies an incorrect Rule 23 standard or ignores a directly controlling case." *Id.* at 962. Both happened here—the court applied an incorrect Rule 23 standard to the question of damages and erroneously minimized *Comcast*.

### A. Plaintiffs Must Present A Method That Measures Classwide Damages Attributable Only To Their Liability Theory

Plaintiffs bear the burden to "'affirmatively demonstrate [their] compliance' with Rule 23." *Comcast*, 569 U.S. at 33 (citation omitted). Rule 23(b)(3) "requires a court to find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Id.* (quoting Rule 23(b)(3)). While Rule 23(a) requires the court to undertake a "rigorous analysis," Rule 23(b)(3)'s predominance criterion is "even more demanding." *Id.* at 33-34 (citations omitted). A district court must "take a close look at whether common questions predominate over individual ones." *Id.* at 34 (quotation marks and citation omitted).

In *Comcast*, the Supreme Court held that a class had been "improperly certified" where the district court "refus[ed] to entertain arguments against respondents' damages model that bore on the propriety of class certification." *Id.* at 34. Under "the proper standard for evaluating certification," the Court held that plaintiffs could "not show Rule 23(b)(3) predominance," because their model failed to "establish[] that damages are capable of measurement on a classwide basis." *Id.* In particular, the model failed to translate "the legal theory of the harmful event into an analysis of the economic impact of that event," which resulted in a "methodology that identifies damages that are not the result of the wrong." *Id.* at 37-38. That was impermissible: "a model purporting to serve as evidence of damages . . . must

measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35 (emphasis added).

In *Doyle v. Chrysler Group, LLC*, this Court reversed a certification order because the plaintiff failed to offer a damages model as *Comcast* requires. 663 F.App'x 576, 579 (9th Cir. 2016). That case involved an allegedly defective automobile component, and the putative class sought "partial reimbursement" of each class member's purchase price. *Id.* The Court held that plaintiffs had "fail[ed] to satisfy *Comcast*" because they had "not offered a model for determining what percentage of the purchase price the reimbursement should be." *Id.* "There is thus no way to determine whether the proposed damages model measures damages that are solely attributable to the theory of liability." *Id.*

In reaching that holding, the Court rejected plaintiff's reliance on the proposition that "the need for individualized findings as to the amount of damages does not defeat class certification." *Id.* (quoting *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016)). The Court explained that it had "applied this understanding" only "where there existed a common methodology for calculating damages" classwide. *Id.* Plaintiff in *Doyle* had offered no such methodology, so class certification was an abuse of discretion. *Id.*

This Court similarly applied *Comcast* in *Ward v. Apple Inc.*, 784 F.App'x 539 (2019). There, "[p]laintiffs' expert did not provide a workable method for classwide determination" of damages; "[i]nstead, he merely asserted that he would be able to develop a model at some point in the future." *Id.* at 540. The Court explained that "*Comcast* demonstrates why that is not enough." *Id.* Indeed, the *Ward* plaintiffs "ha[d] done even less than the *Comcast* plaintiffs: Instead of providing an imperfect model, they ha[d] provided only a promise of a model to come." *Id.* at 541.

In short, *Comcast* means "[n]o damages model, no predominance, no class certification." *In re Rail Freight Surcharge Antitrust Litig.-MDL*, 725 F.3d 244, 253, 254-255 (D.C. Cir. 2013) (granting 23(f) review and vacating certification order in light of *Comcast*).

### B. Plaintiffs Failed To Present Any Model, Much Less One That Measures Only Classwide Damages Attributable To Their Liability Theory

Plaintiffs' case for class certification flunks the basic test imposed by *Comcast* and applied in *Doyle* and *Ward*: They failed to submit any damages model.

#### *1. Plaintiffs' expert candidly acknowledged he had not prepared a damages model*

Plaintiff's expert, Dr. Tabak, was candid and emphatic on this point, repeatedly acknowledging that he had prepared no damages model. *See, e.g.*, Dkt112-2 at 41 ("I certainly don't recall doing it."); Dkt112-2 at 72 (Damages report "discusses, you know, how a damages model is created generally, but it doesn't

propose a particular damages model."); Dkt112-2 at 154 (referring to "whatever damages model I come up with").

Dr. Tabak acknowledged that preparing an actual damages model would require many fundamental methodological choices—choices not yet made. *See* pp. 7-9, *supra*. Among other things, he admitted that whoever was ultimately retained as a damages expert would need to decide (1) "the proper method to use when estimating share price inflation," Dkt112-2 at 82-83; (2) whether the disclosures at issue were "better modeled as a constant percentage or constant dollar inflation," Dkt112-2 at 83; (3) whether adjustments would be needed to disaggregate non-fraud-related reasons for share price declines, Dkt112-2 at 86-87; (4) which of three techniques to use in making any such adjustments, Dkt112-2 at 98, 101-103; (5) what "event window" to use for measuring changes in Oracle's stock price, Dkt112-2 at 113-115; (6) which of the many categories of corrective disclosures were present here, Dkt112-2 at 122-123; and (7) which of the many techniques for "modeling damages in cases involving failure to disclose risks" was appropriate, Dkt112-2 at 130-132.

It was impossible for plaintiffs to discharge their duty under *Comcast*—to offer a damages model that matches their theory of liability—without offering any damages model at all. Absent any evidentiary showing that damages (matching their

theory of liability) could be measured on a classwide basis, plaintiffs failed a basic requirement of Rule 23(b)(3)'s predominance test.

### *2. The district court misread* **Comcast**

The district court's contrary conclusion rests on a misreading of *Comcast*.

***First***, the district court endorsed Plaintiffs' view that *Comcast* imposes only a "'minimal burden' in securities fraud cases." Appx13 (quoting Dkt113 at 4-6). It cited no authority for that proposition other than Plaintiffs' briefing. And the proposition is flatly contradicted by *Comcast* itself. The decision "emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a *rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied." 569 U.S. at 33 (quotation marks omitted; emphasis added); *see Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard."). And, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34. *Comcast* requires a "demanding" standard, not a "minimal" one, and nothing in its analysis suggests it would apply differently depending on the underlying claims' subject matter.

Relatedly, the district court suggested that *Comcast*'s "predominance analysis was specific to the antitrust claim at issue." App.14 (citation omitted). Again, the court's reading of *Comcast* is refuted by *Comcast* itself. It was *the dissent* in

*Comcast* that read the majority's opinion as resting on a "view of antitrust law." 569 U.S. at 43 (Ginsburg, J., dissenting). The Court rejected that characterization, explaining that its analysis "turn[ed] on the straightforward application of class-certification principles" and "provide[d] no occasion for the dissent's extended discussion of substantive antitrust law." *Id.* at 34 (citation omitted); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (rejecting contention that *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), "should be limited to pleadings made in the context of an antitrust dispute" and explaining that *Twombly* "was based on our interpretation and application" of the rules of civil procedure). And the Supreme Court has elsewhere stressed the importance of the predominance requirement in securities class actions. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)."). Given *Comcast*'s grounding in generally applicable class action principles, it is not surprising that this Court has applied it in contexts beyond antitrust law. *See, e.g.*, *Reitman v. Champion Petfoods USA, Inc.*, 830 F.App'x 880, 881-882 (2020) (false labelling claim); *D.C. ex rel. Garter v. Cnty. of San Diego*, 783 F.App'x766, 767 (9th Cir. 2019) (constitutional claim); *Doyle*, 663 F.App'x at 579 (product defect claim).

***Second***, the district court credited Plaintiffs' invocation of the supposed "'out of pocket' damages model proposed by Dr. Tabak." Appx12. But "out-of-pocket" is simply the legal definition of the remedy Plaintiffs seek; it is not a "damages model." *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) ("[T]he correct measure of damages under [the Exchange Act] . . . is the difference between the fair value of all that [was] received . . . and the fair value . . . had there been no fraudulent conduct."). "Out of pocket" is not a damages model any more than benefit-of-the-bargain or rescission would be. What *Comcast* demands is a damages model showing how to calculate out of pocket damages on a classwide basis.

***Third***, the court pointed to Dr. Tabak's testimony "that it is possible to formulate a common damages model based on the artificial inflation in Oracle's stock price resulting from the alleged fraud." Appx12. But *Comcast* requires an *actual* model, not an aspirational statement that it is "possible" to create one. 569 U.S. at 35. For the same reason, the district court's reliance on Dr. Tabak's "details on how such a model could be constructed" (Appx14) is misplaced. A claim about what "could be" done is not enough. *See Ward*, 784 F.App'x at 540.

***Fourth***, the court erred by failing to take Dr. Tabak at his word that he had not prepared a damages model. Appx16. The court appeared to view those statements as just inartfully worded ("likely not what [Plaintiffs] wanted to hear from

[their] expert") and said Dr. Tabak's admissions could "not erase" the supposed "class-wide 'out of pocket' damages model" disclosed in his report Appx16; *see* Appx24 (Class Certification Hr'g Tr. (Mar. 24, 2022)) (district court characterizing expert's deposition comments as "unfortunate"). But Dr. Tabak sworn testimony was correct: He understood and repeatedly acknowledged that he had no damages model. *See* pp. 7-9, *supra*. Nowhere did he suggest that he had prepared an "'out of pocket' damages model." Nor were Defendants contending that Dr. Tabak's testimony "erase[d]" a damages model disclosed in his report (Appx16)—there was no model there to erase.

***Fifth***, the district court erred to the extent it thought Plaintiffs satisfied their *Comcast* obligation because Dr. Tabak pledged that whatever damages model he (or some other expert) eventually created would be limited to only those statements the district court's partial dismissal order found actionable (and not the dozens the court rejected). Appx14. That is not enough—*Comcast* requires show, not just tell. "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "[f]or purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Comcast*, 569 U.S. at 35 (quotation marks and citation omitted). While the plaintiffs in *Comcast* put forth a damages model that extended to dismissed theories of liability, it is unimaginable that the Supreme Court would have come to a different conclusion

based on a mere promise not to make that mistake when creating a model in the future. "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36. Indeed, this Court has rejected precisely this argument, finding a lack of predominance on *Comcast* grounds when, "[i]nstead of providing an imperfect model, [plaintiffs] have provided only a promise of a model to come." *Ward*, 784 F.App'x at 541.

***Finally***, the district court manifestly erred by accepting Plaintiffs' characterization of Defendants' arguments as prematurely challenging loss causation. Appx15. It is true that Plaintiffs' damages model—if and when submitted—may well fail to establish loss causation at later stages in the litigation. But the issue now is Plaintiffs' failure to introduce any model. And, in any case, the Supreme Court has held that courts analyzing predominance should not avoid analyzing evidence relating to the causes of a stock price drop just because that evidence overlaps with the merits of a securities fraud claim. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 n.2 (2021) (observing that even though "materiality and price impact are overlapping concepts and that the evidence relevant to one will almost always be relevant to the other," "a district court may not use the overlap to refuse to consider the evidence") (citation omitted).

## II. THE CERTIFICATION ORDER PRESENTS AN UNSETTLED AND FUNDAMENTAL ISSUE OF LAW OF FIRST IMPRESSION THAT IS LIKELY TO EVADE END-OF-CASE REVIEW

This Court has not yet addressed whether securities plaintiffs meet their *Comcast* burden by simply invoking the legal definition of damages under the securities laws, *i.e.*, the out-of-pocket measure, and promising to do an "event study" as part of getting there. In the absence of guidance from this Court, many district courts have gone astray, effectively carving out securities class actions from the *Comcast* requirement. Appx15 (collecting cases). Other courts, however, have accepted Defendants' position that *Comcast* requires submission of an actual damages model at class certification. This is a critical question of class action law dividing district courts, and granting interlocutory review is the only realistic way for this Court to address it. *See Junge v. Geron Corp.*, No. C 20-00547-WHA, 2022 WL 1002446, at *6-7 (N.D. Cal. Apr. 2, 2022) (noting this Court "has not spoken to the issue" and collecting conflicting district court decisions).

In cases involving various areas of substantive law (both in and out of this Circuit), a number of district courts have gotten this question right. In *In re ConAgra Foods, Inc.*, for example, the court found that plaintiffs' certification motion flunked *Comcast* because their expert "state[d] that it is possible to determine damages on a classwide basis" but "made no attempt to do so." 302 F.R.D. 537, 577 (C.D. Cal. 2014). The expert merely "describe[d] the methods he would use to make the

calculation," but did not "report that he ha[d] actually employed them." *Id.* "This alone suffices to support a finding that plaintiffs have not shown that damages can be calculated on a classwide basis." *Id.* at 577-578. In *Loritz v. Exide Technologies*, the court declined to certify a damages class where "[p]laintiffs failed to set forth any model of damages (let alone one tied to their theory of liability) in their opening brief" and on reply offered only "general techniques for computing damages in securities fraud cases," but no model. No. 2:13-cv-02607-SVW-E, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015).

And in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*, the court rejected as insufficient expert testimony strikingly similar to Dr. Tabak's here. No. 4:08CV0160, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (expert described "various techniques he believes he could use to calculate out-of-pocket damages" but had "not yet determined" the "specifics of exactly which model [he] would use"). "When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did [the expert]) that there are unspecified 'tools' available to measure damages," the court explained, "the model amounts to 'no damages model at all,' and the class cannot be certified." *Id.* at *19 (quoting *ConAgra Foods*, 302 F.R.D. at 552); *accord Ft. Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [the expert's] say-so, the Court cannot conclude that

there is a damages model that will permit the calculation of damages on a classwide basis."); *In re BP P.L.C. Securities Litig.*, MDL No. 10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Prior to *Comcast*, the Court may have been satisfied that Plaintiffs' invocation of the event study methodology alone showed the predominance of common issues." . . . But after *Comcast* "the court cannot certify this litigation for class action treatment" "[w]ithout a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability.").

Such decisions faithfully applying *Comcast* are admittedly in the minority, particularly in this circuit. Appx15 (collecting contrary cases). Without immediate guidance from this Court, the *Comcast*-minimizing body of district court law could become ossified, with each new court less likely to buck the seeming consensus against meaningful application of *Comcast*. *See, e.g.*, *Junge*, 2022 WL 1002446, at *6-7 (noting conflicting district court decisions and following majority group). That development would occur against the backdrop of this circuit's continued popularity with securities class action plaintiffs. It ranked second only to the Second Circuit in core federal securities filings in 2021; together those two circuits accounted for a

remarkable 72% of all such filings last year. Cornerstone Research, *Securities Class Action Filings—2021 Year in Review* 30 (2022).[2]

Unless this Court grants a Rule 23(f) petition, the question of *Comcast*'s application to securities class actions will almost certainly continue to evade review. It is well known that "[s]ettlement pressure exerted by class certification may prevent judicial resolution" of important issues. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013). This is especially true with securities class actions because "very few" of them "are litigated to conclusion, so review of a novel and important legal issue may be possible only through the Rule 23(f) device." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004) (citation and alterations omitted); Fed. R. Civ. P. 23, Advisory Committee Notes to 1998 Amendments, Subdivision (f) (noting that a class-certification order can exert substantial pressure on a defendant "to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability").

It is also well-recognized that certified securities class actions are prone to abuse and can enable "plaintiffs with weak claims to extort settlements from innocent companies." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 163 (2008). The pressure on Defendants to "settle without relation to the

[2]https://www.cornerstone.com/wp-content/uploads/2022/02/Securities-Class-Action-Filings-2021-Year-in-Review.pdf

merits" of the claims asserted provides an additional ground for interlocutory review. *Chamberlan*, 402 F.3d at 960. Here, plaintiffs' case is particularly weak—the district court dismissed their claims on 39 of the 50 statements they challenged and called the decision to let the remaining sliver of the case proceed a "close call." Dkt84 at 23, 31-32, 35-36. Yet even weak certified class actions typically settle before trial, taking traditional end-of-case review off the table. The best way to avoid that outcome—and to provide desperately needed guidance to the district courts in this circuit—is to grant interlocutory review.

## CONCLUSION

The petition should be granted.

Dated: May 23, 2022

Respectfully submitted,

s/ Joseph R. Palmore
JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C. 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

JORDAN ETH
MARK R.S. FOSTER
ROBERT W. MAY
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94015

*Counsel for Defendants-Petitioners Oracle Corporation, Safra A. Catz, Paula R. Hurd, as Trustee of the Hurd Family Trust, Lawrence J. Ellison, and Ken Bond*

DORIAN DALEY
PEGGY BRUGGMAN
JAMES C. MAROULIS
500 Oracle Parkway
Mail Stop 5OP7
Redwood City, CA 94065

*Counsel for Defendant-Petitioner Oracle Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing petition complies with the requirements of Ninth Circuit Rule 5-2(b), namely that the total word count of this document, excepting those parts excluded by Fed. R. App. P. 28(f), is 5,588 words, which, when divided by 280 as provided by Circuit Rule 32-3, yields a page count less than or equal to twenty pages as required by Circuit Rule 5-2(b).

Dated: May 23, 2022

s/ Joseph R. Palmore
Joseph R. Palmore

# APPENDIX

# IN RE: ORACLE CORPORATION SECURITIES LITIGATION

## No. 22-__ (9th Cir.)

## APPENDIX
## TABLE OF CONTENTS


| Date | Document | Page |
|---|---|---|
| 5/9/2022 | Order Granting Motion for Class Certification | Appx1 |
| 3/14/2022 | Transcript of Hearing re Motion for Class Certification | Appx20 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, et al.,<br>Plaintiffs,<br>v.<br>ORACLE CORPORATION, et al.,<br>Defendants. | Case No. 18-cv-04844-BLF<br>**ORDER GRANTING LEAD PLAINTIFF UNION ASSET MANAGEMENT HOLDING AG'S MOTION FOR CLASS CERTIFICATION**<br>[Re: ECF No. 107] |

Before the Court is Lead Plaintiff Union Asset Management Holding AG's ("Union") motion for class certification. This is a securities fraud class action against Defendant Oracle Corporation and its management (collectively, "Oracle") alleging violations of Sections 10b-5 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Union alleges that Oracle materially misrepresented its cloud business and its sales tactics related to its cloud products throughout the class period of May 10, 2017 through June 20, 2018 ("Class Period"). Union further alleges that the truth about Oracle's cloud business—including a faulty product and aggressive sales tactics seeking short-term revenue gains—was revealed through a series of disclosures between December 14, 2017 and June 19, 2018, causing Oracle's stock price to decline and damaging its shareholders who bought stock at artificially inflated prices. Union brings its claims on behalf of all persons who purchased or acquired Oracle common stock during the Class Period (the "Class").

Union moves to certify the Class under Federal Rules of Civil Procedure 23(a) and 23(b)(3). *See* Motion, ECF No. 107. Oracle only challenges that Union has met one of the requirements of Rules 23(b)(3)—the predominance requirement. *See* Opposition, ECF No. 112. Oracle argues that Union's damages-related disclosures fail to meet the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because Union and its expert Dr. David Tabak do not disclose a damages model.

United States District Court
Northern District of California

*See id.* In response, Union argues that its disclosures related to its "out of pocket" damages model are sufficient under *Comcast*, and that Oracle prematurely seeks damages-related details that courts do not require at the class certification stage. *See* Reply, ECF No. 113.

Based on the below reasoning, the Court hereby GRANTS Union's motion for class certification.

## I. BACKGROUND

Oracle is a Delaware technology company with its headquarters in California. *See* SAC, ECF No. 68 ¶ 32. Oracle trades on the New York Stock Exchange under the ticker symbol "ORCL." *See id.* Defendant Safra Catz was at all relevant times co-Chief Executive Officer at Oracle, and had been with the company in some capacity since 1999. *See id.* ¶ 33. Defendant Mark Hurd—who died in 2019 and is represented here by his estate—was at all relevant times the other co-Chief Executive Officer of Oracle. *See id.* ¶ 34. Defendant Lawrence J. Ellison was at all relevant times Chief Technology Officer of Oracle and Chairman of the company's Board of Directors. *See id.* ¶ 35. Defendant Ken Bond was at all relevant times Senior Vice President of Investor Relations at Oracle. *See id.* ¶ 37.[1] Lead Plaintiff Union is the parent holding company of Union Investment Group, a German company. *See id.* ¶ 31. Union allegedly purchased Oracle common stock during the Class Period and was damaged by Defendants' conduct. *See id.*

In the Second Amended Complaint, Union alleged violations of (1) SEC Rule 10b-5 and (2) § 20(a) of the Exchange Act on the basis that Oracle and its management allegedly misrepresented the company's cloud business. Union alleged that Oracle and its management publicly touted its cloud products and cloud-related revenue growth even though its products were deficient and sales of its cloud products were driven by aggressive sales tactics like product bundles and threats to audit existing clients that brought only short-term revenue. Union identified fifty challenged statements in its Second Amended Complaint, which fell into several groups: (1) financial information filed with the SEC, which allegedly did not adequately disclose its

[1] Plaintiff also brought claims against Thomas Kurian—Oracle's President, Product Development from January 2015 to September 2018—and Steve Miranda—Oracle's Executive Vice President, Oracle Applications Product Development. *See* SAC ¶¶ 36, 38. The Court dismissed Plaintiff's claims against Kurian and Miranda with prejudice. *See* Order, ECF No. 84.

bundling practices; (2) statements about cloud revenue that allegedly did not identify Oracle's sales tactics; (3) statements about the drivers of cloud revenue growth with the same alleged issue; (4) statements about the technological strength of Oracle's cloud products that allegedly did not disclose the defects in those products; and (5) statements about the eventual deceleration in the growth of Oracle's cloud business, which allegedly did not disclose the impact of Oracle's short-sighted sales practices. *See* Order, ECF No. 84 at 23–36; SAC, ECF No. 68.

Oracle moved to dismiss Union's Second Amended Complaint and the Court granted the motion in part. *See* Motion to Dismiss, ECF No. 72; Order, ECF No. 84. The Court dismissed Union's claims based on all but around thirteen of the fifty originally identified challenged statements. *See* Order, ECF No. 84 at 35. The Court allowed Union to proceed on a "narrow omission theory of securities fraud" based on Oracle's affirmative representations about cloud growth deceleration and the drivers of cloud growth. *See id.* at 35–36. The Court made clear that this theory was not based on Oracle's standalone duty to disclose its allegedly coercive sales tactics. *See id.* at 36. Rather, Union could proceed on a theory that in representing that the cloud growth and cloud growth deceleration were the result of circumstances other than Oracle's allegedly coercive sales tactics, Oracle "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *See id.* (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Union now moves for class certification, arguing that it meets all the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3). *See* Motion, ECF No. 107. Oracle declines to contest that Union has met most of these requirements.[2] *See* Opposition, ECF No. 112 at 3. Oracle's only challenge pertains to the predominance requirement of Rule 23(b)(3). Oracle argues that Union has failed to show this requirement is met under *Comcast*, which requires a plaintiff to show a class-wide damages model consistent with its liability theory. *See Comcast*, 569 U.S. at 34–35. Oracle argues that Union and its expert Dr. Tabak have failed to provide *any* damages model. *See*

[2] Oracle indicates that it may file a motion for decertification at a later stage as to the adequacy and typicality requirements of Rule 23(a) based on Union's recent document production. *See* Opposition, ECF No. 112 at 3.



United States District Court
Northern District of California

Opposition, ECF No. 112 at 3–6. Oracle points to excerpts from Dr. Tabak's report and deposition indicating that he was not retained to provide a damages model and did not construct one. *See id.* In response, Union argues that its disclosures and Dr. Tabak's expert testimony regarding Union's "out of pocket" damages model is in line with what courts have approved for securities class actions. *See* Reply, ECF No. 113 at 5–6. Further, Union argues that Oracle reads *Comcast* too broadly and seeks details regarding the inputs or loss causation aspect of Union's damages model that courts do not require at the class certification stage. *See id.* at 7–14.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class certification. "The party seeking class certification has the burden of affirmatively demonstrating that the class meets the requirements of [Rule] 23." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021) (internal quotation marks and citation omitted). "As a threshold matter, a class must first meet the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Id.*

"In addition to Rule 23(a)'s requirements, the class must meet the requirements of at least one of the three different types of classes set forth in Rule 23(b)." *Id.* (internal quotation marks and citation omitted). Union seeks certification under Rule 23(b)(3). *See* Motion, ECF No. 107 at 13–20. A class may be certified under Rule 23(b)(3) only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Further, parties seeking to certify a Rule 23(b)(3) class must also demonstrate that the class is sufficiently ascertainable." *Datta v. Asset Recovery Sols., LLC*, No. 15–CV–00188–LHK, 2016 WL 1070666, at *2 (N.D. Cal. Mar. 18, 2016).

## III. DISCUSSION

### A. Rule 23(a) Requirements

Rule 23(a) requires a party seeking class certification to meet four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See Stromberg*, 14 F.4th at 1066. Union argues that it meets each requirement of Rule 23(a). *See* Motion,



United States District Court
Northern District of California

ECF No. 107 at 8–13. Oracle does not dispute that Union has met any of Rule 23(a)'s requirements. *See* Opposition, ECF No. 112 at 3. Nonetheless, the Court must consider each of the requirements of Rule 23(a) in turn.

**1. Numerosity**

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No exact numerical cut-off is required; rather, the specific facts of each case must be considered." *Litty v. Merrill Lynch & Co.*, No. CV 14–0425 PA (PJWx), 2015 WL 4698475, at *3 (C.D. Cal. Apr. 27, 2015). "[N]umerosity is presumed where the plaintiff class contains forty or more members." *Id.* However, a class as small as twenty properly may be certified when the other Rule 23 factors are satisfied. *See Rannis v. Recchia*, 380 Fed.Appx. 646, 650–51 (9th Cir. 2010) (affirming district court's certification of 20-member class).

Union argues that the trading metrics for Oracle common stock during the Class Period support numerosity. *See* Motion, ECF No. 107 at 9–10. Over 3.6 billion shares of Oracle common stock were outstanding and over 4 billion shares traded during the Class Period, with an average weekly trading volume of 63.1 million shares. *See id.*; SAC ¶ 479; Expert Report of David I. Tabak, ECF No. 107-11 ("Tabak Rpt.") ¶¶ 17–18. At the start of the Class Period, over 1,900 institutions collectively held over 2.4 billion Oracle shares. *See* Tabak Rpt. ¶ 25. Union argues that courts have found numerosity given more modest trading metrics. *See* Motion, ECF No. 107 at 10 (citing, *e.g.*, *In re LendingClub Secs. Litig.*, 282 F.Supp.3d 1171, 1178 (N.D. Cal. 2017)). Oracle does not oppose class certification on numerosity grounds. *See* Opposition, ECF No. 112 at 3.

The Court agrees with Union. Oracle's trading metrics during the class period—which indicate at least thousands of class members—support that the class easily meets the numerosity requirement. *See* SAC ¶ 479; Tabak Rpt. ¶¶ 17–18; *Litty*, 2015 WL 4698475, at *3; *LendingClub*, 282 F.Supp.3d at 1178 (finding numerosity requirement satisfied where defendants did not challenge certification on this basis and "plaintiff estimates that there are thousands of members in the proposed class based on the over 394 million outstanding shares of . . . common stock.").

Accordingly, the Court finds that Union has met the numerosity requirement of Rule 23(a).

**2. Commonality**

Rule 23(a)(2) requires the plaintiff to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The requirement cannot be satisfied simply with common questions, however. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 349–50 (internal quotation marks and citation omitted). The claim of common injury must depend on a common contention "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Id.* at 359 (internal quotation marks, citation, and alterations omitted); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact.").

Union argues that the legal and factual questions common to the Class include "(i) whether Defendants made materially false and misleading statements and omissions during the Class Period; (ii) whether Defendants acted with scienter; (iii) whether Defendants' alleged misrepresentations and omissions were material; and (iv) whether Defendants' alleged misconduct caused investors to suffer damages." Motion, ECF No. 107 at 10. Oracle does not oppose class certification on commonality grounds. *See* Opposition, ECF No. 112 at 3.

The Court agrees with Union. As outlined in Union's class certification motion and its Second Amended Complaint, the core factual and legal issues underlying Union's allegations are the same for all members of the putative class. *See* Motion, ECF No. 107 at 10; SAC ¶ 480; *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 266 (N.D. Cal. 2011).

Accordingly, the Court finds that Union has met the commonality requirement of Rule 23(a).

**3. Typicality**

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105,

1124 (9th Cir. 2010) (internal quotation marks and citation omitted). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks and citation omitted). However, "[a] court should not certify a class if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (internal quotation marks and citation omitted).

Union argues that it has met the typicality requirement because it purchased Oracle common stock at artificially inflated prices due to Oracle's misrepresentations and omissions—just like all other Class members. *See* Motion, ECF No. 107 at 11–12. Further, Union alleges that it was damaged in the same way as the rest of the Class—through the corrective disclosure of concealed facts. *See id.* Oracle does not oppose class certification on typicality grounds at this stage. *See* Opposition, ECF No. 112 at 3. However, Oracle reserves that right to challenge Union's typicality as a class representative at a later stage. *See id.*

The Court agrees with Union. Union's claims are reasonably coextensive with those of the rest of the Class. *See Just Film*, 847 F.3d at 1116. Union claims that it bought Oracle common stock at a price inflated by the same omissions as all other Class members. And Union claims that it was damaged based on the same corrective disclosures as the rest of the Class. Accordingly, Union has shown that its claims are typical of the Class. *See Hodges*, 274 F.R.D. at 267 ("All members of the putative class were allegedly injured by the same course of conduct, even if not to the same degree."); *In re Silver Wheaton Corp. Secs. Litig.*, Nos. 2:15–cv–05146–CAS (JEMx), 2:15–CV–05173–CAS (JEMx), 2017 WL 2039171, at *7 (C.D. Cal. May 11, 2017).

Accordingly, Union has met the typicality requirement of Rule 23(a).

**4. Adequacy**

To determine Union's adequacy as a class representative, the Court "must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (internal

quotation marks and citation omitted).

Union argues that it meets both elements of the adequacy requirement—as does its counsel, Bernstein Litowitz Berger & Grossman LLP ("BLB&G"). *See* Motion, ECF No. 107 at 12–13. Union argues that neither it nor BLB&G have any conflicts of interest with other Class members. *See id.* at 12. Further, Union argues that as a large institutional investor, it understands its fiduciary duties to the Class and is the kind of plaintiff Congress intended to serve as a class representative. *See id.* (citing, *e.g.*, H.R. Rep. No. 104-369, at 32 (1995)). Further, Union argues that it has worked and will continue to work diligently to protect the Class's interests, pointing to its efforts so far in this litigation in filing two Amended Complaint, opposing Oracle's motion to dismiss, negotiating a protective order and discovery protocol, and engaging in discovery. *See id.* at 13. Union additionally argues that BLB&G has substantial experience in securities class actions, including in the Ninth Circuit. *See id.* Oracle does not oppose class certification on adequacy grounds at this stage. *See* Opposition, ECF No. 112 at 3. However, Oracle reserves the right to challenge Union's adequacy as a class representative at a later stage. *See id.*

The Court agrees with Union. Under the first element of the adequacy requirement, there is no indication that there are any conflicts of interest between Union or BLB&G and any other Class members. *See Ellis*, 657 F.3d at 985. Under the second element of the adequacy requirement, the Court finds that Union has sufficiently shown that it and BLB&G will vigorously prosecute the action on behalf of the Class. *See id.* Union has pointed to ample efforts both it and BLB&G have made in prosecuting the action thus far. *See* Motion, ECF No. 107 at 12–13. Additionally, the fact that Union is a large institutional investor and BLB&G is experienced with securities class actions provides further support that they will adequately represent the Class. *See* Rizio-Hamilton Decl., ECF No. 107-1, Exs. K, M; *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3 1152, 1162 (9th Cir. 2001).

Accordingly, Union has met the adequacy requirement of Rule 23(a).

**B. Rule 23(b)**

Union seeks class certification under Rule 23(b)(3). *See* Motion, ECF No. 107 at 2. Rule 23(b)(3) requires that (1) the class is ascertainable; (2) questions of law or fact common to

class members predominate over any questions affecting only individual members; and (3) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Rule 23(b)(3); *Datta*, 2016 WL 1070666, at *2. Oracle only disputes that Union has met the predominance requirement of Rule 23(b)(3) because of the inadequacy of its damages-related disclosures under *Comcast*. Nonetheless, the Court will consider each of the requirements of Rule 23(b)(3) in turn.

**1. Ascertainability**

"[A] class is ascertainable if the class is defined with objective criteria and if it is administratively feasible to determine whether a particular individual is a member of the class." *Huynh v. Harasz*, No. 14–CV–02367–LHK, 2015 WL 7015567, at *13 (N.D. Cal. Nov. 12, 2015) (internal quotation marks and citation omitted).

Union's class definition is "all persons who purchased or acquired Oracle common stock from May 10, 2017 until June 20, 2018, inclusive[.]" Motion, ECF No. 107 at 2. The Court finds that the putative Class is ascertainable based on Union's class definition.

**2. Predominance**

Union argues that it has established predominance because (1) it is entitled to a presumption of reliance and (2) damages are to be calculated through the class-wide "out of pocket" method. *See* Motion, ECF No. 107 at 14–20. The Court will consider each issue in turn.

**a. Reliance**

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). A plaintiff is entitled to a presumption of reliance if he or she can demonstrate (1) that the alleged misrepresentations were publicly known; (2) that the stock traded in an efficient market; and (3) that the relevant transaction took place between the time misrepresentations were made and the time the truth was revealed. *See id.* at 811 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

Regarding the first and third requirements for the presumption of reliance, Union points to its allegations that (1) Oracle made material misrepresentations in public statements and (2) Union purchased shares between the time the statements were made and the truth was revealed. *See*

United States District Court
Northern District of California

SAC ¶¶ 221–304, 455–72. Regarding the second requirement, Union argues that Oracle common stock traded in an efficient market based on Dr. Tabak's analysis using the factors outlined in *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989): (1) average weekly trading volume; (2) analyst coverage; (3) market makers and arbitrageurs; (4) SEC Form S-3 eligibility; and (5) price reaction to unexpected information. *See Cammer*, 711 F.Supp. at 1286–87. Union's evidence of an efficient market includes the following:

- Trading volume: Dr. Tabak states that the market-maker-adjusted trading volume of Oracle common stock during the Class Period was 1.53 percent of outstanding shares on average with a median of 1.40 percent of outstanding shares. *See* Tabak Rpt. ¶ 18. Union argues that courts have found turnover in excess of one percent of outstanding shares to warrant a "substantial presumption" of market efficiency. *See* Motion, ECF No. 107 at 16 (citing *In re Banc of Cal. Secs. Litig.*, 326 F.R.D. 640, 649 (C.D. Cal. 2018)).
- Analyst coverage: Dr. Tabak states that the average number of analysts included in the Institutional Brokers' Estimate System consensus earnings estimate for Oracle for each month in the Class Period was approximately 31—placing Oracle in the 99th percentile of analyst coverage, *i.e.* "among the very top" of firms. *See* Tabak Rpt. ¶ 21; *id.*, Ex. 4. Further, Dr. Tabak states that a Thomson Reuters database search for Oracle analyst reports over the Class Period yields hundreds of results. *See id.* ¶ 22.
- Market makers and arbitrageurs: Dr. Tabak states that since Oracle traded on the New York Stock Exchange, it had a designated market maker. *See* Tabak Rpt. ¶ 23. Further, in support of there being significant arbitrageur activity in Oracle, Dr. Tabak opines that (1) 81.54 percent of institutional investors with a positive holding in one quarter reported a different holding figure in the next quarter during the Class Period and (2) there were significant changes in short interest. *See id.* ¶¶ 25–28; *id.*, Exs. 5–6.
- SEC Form S-3 Eligibility: Dr. Tabak states that during the Class Period, Oracle was eligible to register shares using SEC Form S-3, which required (1) a float with a value of at least $75 million and (2) that the issuer was current in its SEC filings. *See* Tabak Rpt. ¶¶ 29–30. Dr. Tabak states that Oracle's market capitalization exceeded $130 billion and Oracle was

United States District Court
Northern District of California

not delinquent in its SEC filings throughout the Class Period. *See id.*

- Price reaction to unexpected information: Dr. Tabak conducted an event study and found that during the Class Period, Oracle stock was more than forty times more likely to have a statistically significant abnormal return on "earnings" announcement days" than on "non-news days." *See* Tabak Rpt. ¶¶ 31–44.

Union argues that Dr. Tabak's report supports that Oracle stock traded in an efficient market during the Class Period. *See* Motion, ECF No. 107 at 16–19. Oracle does not dispute that Union has established the elements necessary to show that it is entitled to a presumption of reliance.

The Court finds that Union is entitled to a presumption of reliance in support of Rule 23(b)(3) predominance. Union's claims are based on Oracle's public statements, and Union alleges that it purchased Oracle stock during the Class Period. *See* SAC ¶¶ 31, 221–304, 455–72. Further, Union provides ample evidence through Dr. Tabak's expert report—including for each of the *Cammer* factors—that Oracle traded in an efficient market throughout the Class Period. *See* Motion, ECF No. 107 at 14–19; Tabak Rpt. ¶¶ 13–56. Accordingly, Union has established each element necessary to show that it is entitled to the presumption of reliance. *See Halliburton*, 563 U.S. at 810. Oracle does not dispute that Union has established reliance.

Accordingly, the Court finds that Union has established reliance on the allegedly fraudulent statements in support of Rule 23(b)(3) predominance.

**b. Damages**

The parties dispute whether Union has disclosed a damages model sufficient to meet the Rule 23(b)(3) predominance requirement. "Rule 23(b)(3)'s predominance requirement takes into account questions of damages." *Just Film*, 847 F.3d at 1120. The Supreme Court has held that absent an appropriate methodology for measuring damages on a classwide basis, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34. "Calculations need not be exact." *Id.* at 35. In fact, the Ninth Circuit has made clear both before and after *Comcast* that "'damage calculations alone cannot defeat certification.'" *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). However, "at the class-



United States District Court
Northern District of California

certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast*, 569 U.S. at 35 (internal quotation marks and citation omitted). "If the plaintiffs cannot prove that damages resulted from the defendant's conduct, then the plaintiffs cannot establish predominance." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016).

Union points to the "out of pocket" damages model proposed by Dr. Tabak in support of Rule 23(b)(3) predominance. *See* Motion, ECF No. 107 at 19–20. Dr. Tabak opines that it is possible to formulate a common damages model based on the artificial inflation in Oracle's stock price resulting from the alleged fraud. *See* Tabak Report ¶ 57. However, Dr. Tabak states that he was not asked to determine the level of that inflation. *See id.* Dr. Tabak indicates that a damages model will be constructed to show damages attributable to "Defendants' stated reasons for cloud revenue growth and explanations for the subsequent slowing of that growth in light of alleged contrary factual circumstances known to them at the time"—quoting from the Court's order denying Oracle's motion to dismiss as to Union's "narrow omission theory." *See id.* ¶ 61 (quoting Order, ECF No. 84 at 54). Dr. Tabak opines that the level of artificial inflation based on the alleged fraud is the same for all investors, since all investors face the same market price at any given point in time. *See id.* ¶¶ 58, 62. Further, Dr. Tabak opines on techniques generally used to construct an "out of pocket" damages model. *See id.* ¶¶ 59–62. Dr. Tabak opines that the starting point is the artificial inflation at the time of purchase, which is determined through an event study on the dates of the alleged corrective disclosures. *See id.* ¶¶ 59–60. Dr. Tabak opines that adjustments are made if the amount of inflation declines for reasons other than a corrective disclosure. *See id.* Dr. Tabak opines that such "confounding" information is determined by valuations of business practices and reviews of analyst reports to determine the relative importance of different aspects of the alleged corrective disclosures. *See id.*; *see also id.* at 28 n.43.

Oracle argues that Dr. Tabak's damages-related disclosures are inadequate under *Comcast*. Oracle argues that *Comcast* held that a plaintiff must provide a damages model common to the class that measures only those damages attributable to a plaintiff's liability theory. *See* Opposition, ECF No. 112 at 4 (citing *Comcast*, 569 U.S. at 34–35). Oracle argues that Union fails to propose

United States District Court
Northern District of California

*any* damages model, so it has not met the *Comcast* requirements. *See* Opposition, ECF No. 112 at 4. Oracle points to deposition testimony from Dr. Tabak indicating that he was not retained to propose a particular damages model and he did not do so. *See id.* at 4–6 (citing Tabak Dep. Tr. at 41:21–24, 72:5–11, 75:5–76:4, 94:5–10, 143:24–25, 153:25–154:18). Oracle argues that Dr. Tabak's "bare invocation" of an event study is insufficient, since he opines that an event study is merely a starting point for a damages model that is followed by other steps he did not perform. *See id.* at 5–6 (citing Tabak Report ¶ 60; Tabak Dep. Tr. at 132:14–21, 133:12–24, 82:6–87:19, 138:8–143:25, 103:11–18). Oracle argues that following *Comcast*, courts have disapproved of such "generalized assertions about potential 'tools,' 'techniques,' and 'methodologies.'" *See id.* at 8–9. Further, Oracle argues that, similar to the plaintiffs in *Comcast*, Dr. Tabak failed to provide a damages model that accounted for the narrow theory of liability the Court allowed Union to proceed with in its order on Oracle's motion to dismiss. *See id.* at 6.

In response, Union argues that courts have consistently found the "out of pocket" damages methodology to satisfy *Comcast*'s "minimal burden" in securities fraud cases because it measures damages attributable to Union's artificial inflation-based theory of fraud. *See* Reply, ECF No. 113 at 4–6. Further, Union argues that Dr. Tabak's description of the "out of pocket" damages methodology is similar to damages-related expert disclosures approved by other courts. *See id.* at 6; Rizio-Hamilton Reply Decl., ECF No. 113-1, Exs. B–G. Additionally, Union argues that Oracle's objections pertain to loss causation, which courts decline to analyze at the class certification stage. *See Reply*, ECF No. 113 at 7–8. Oracle seeks disclosure of the inputs to the "out of pocket" damages model, but Union argues this is for a later stage of the case and makes no difference to the class-wide nature of the damages model. *See id.* at 9–11.

The Court agrees with Union. Union has adequately disclosed a class-wide damages model under *Comcast*. Dr. Tabak opines that a class-wide "out of pocket" damages model based on omission-based price inflation is feasible in this case to show damages attributable to the "narrow omission theory" of liability on which the Court allowed Union to proceed. *See* Tabak Rpt. ¶¶ 61–62; Order, ECF No. 84 at 35; *City of Miami Gen. Employees' & Sanitation Employees' Retirement Tr. v. RH, Inc.*, No. 17–cv–00554–YGR, 2018 WL 4931543, at *3 (N.D. Cal.



United States District Court
Northern District of California

Oct. 11, 2018) ("As a preliminary matter, the out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b) securities cases."). Dr. Tabak additionally provides details on how such a model could be constructed, including by using an event study and removing the effects of confounding information and events. *See* Tabak Rpt. ¶¶ 59–62. The Court finds these disclosures to be sufficient to satisfy Rule 23(b)(3). *City of Miami*, 2018 WL 4931543, at *3 ("[P]laintiffs' damages method is specifically tied to plaintiffs' claims under Section 10(b) and provides for damages equal to the inflation of [defendant's] stock price that is attributable to the alleged misstatements and omissions.").

*Comcast* does not require anything more than the damages-related evidence Union provides here in support of class certification. In *Comcast*, the Supreme Court found that the plaintiffs in an antitrust class action had not adequately disclosed a class-wide damages model at the certification stage. *See* 569 U.S. at 31. Plaintiffs sought class certification on four separate theories of antitrust impact, and the district court only allowed Plaintiffs to proceed on one of the theories. *See id.* Plaintiffs' damages theory relied solely on expert testimony that did not isolate damages resulting from any one theory of antitrust impact, so the Supreme Court found that Plaintiffs damages theory was not "consistent with [Plaintiffs'] liability case" and therefore insufficient under Rule 23(b)(3). *Id.* at 36. In the present case, the Court limited Union to only a fraction of the alleged misstatements it originally identified in its Second Amended Complaint. *See* Order, ECF No. 84 at 35. But Dr. Tabak tied his damages disclosures to the narrowed liability theory. *See* Tabak Rpt. ¶ 61. And at this stage, Dr. Tabak's damages-related testimony—and his opinion that a class-wide damages model could be constructed—does not depend on the fifty challenged statements originally identified being at issue. *See* Foster Decl., ECF No. 112-1, Ex. 1 at 111:14–113:4. In contrast, in *Comcast*, the only supporting expert testimony "identifie[d] damages that are not the result of the wrong" and "assum[ed] a market that contained none of the four distortions that respondents attributed to petitioners' actions." *See Comcast*, 569 U.S. at 36–37. The Court does not consider *Comcast* to be analogous to the present case. *See also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015) ("A close reading . . . [of *Comcast*] makes it clear that the predominance analysis was specific to the antitrust claim at issue.").

United States District Court
Northern District of California

Other courts in this District agree regarding the sufficiency of damages disclosures like Dr. Tabak's. Since *Comcast*, several courts in this District have granted class certification in cases involving expert disclosures similar to Dr. Tabak's, including disclosures that provide less detail. *See, e.g.*, Rizio-Hamilton Reply Decl., ECF No. 113-1, Ex. F, Expert Report of Chad Coffman in *In re: SanDisk LLC Secs. Litig.*, No. 3:15–cv–01455–VC (N.D. Cal.) ("Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class.") (class certification granted in *In re SanDisk LLC Secs. Litig.*, No. 15–cv–01455–VC, 2018 WL 4293336, at *3 (N.D. Cal. Sep. 4, 2018)); Rizio-Hamilton Reply Decl., ECF No. 113-1, Ex. B, Expert Report of Steven P. Feinstein in *In re RH Secs. Litig.*, No. 4:17–00554–YGR (N.D. Cal.) ("It should be noted that I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage.") (class certification granted in *City of Miami*, 2018 WL 4931543, at **3–4); Rizio-Hamilton Reply Decl., ECF No. 113-1, Ex. E, Expert Report of Steven P. Feinstein in *Luna v. Marvell Tech. Grp., Ltd.*, No. 5:15–cv–05447–WHA (N.D. Cal.) ("It should be noted that I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage.") (class certification granted in *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15–05447 WHA, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017) ("That lead plaintiff has not yet provided a loss-causation model does not defeat predominance.")); *see also Hatamian v. Adv. Micro Devices, Inc.*, No. 14–cv–00226 YGR, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) (finding similar expert disclosures sufficient to disclose damages theory under *Comcast* at class certification stage in securities case).

The details about Union's damages theory Oracle seeks pertain to loss causation issues that courts generally do not consider at the class certification stage. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19–04744 WHA, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) ("Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of 'loss causation.'"); *City of Miami*, 2018 WL 4931543, at *4 (courts consistently find that issues related to "quantification and allocation of damages" are "not appropriately raised at the class certification stage"); *Hatamian*, 2016 WL 1042502, at *8 ("The

United States District Court
Northern District of California

ultimate question, then, is not as Defendants suggest, but rather is whether 'damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.'") (quoting *Leyva*, 716 F.3d at 514); *City of Miami*, 2018 WL 4931543, at *4.

Oracle argues that Union has not met its burden under *Comcast* because Dr. Tabak testified that he did not propose *any* particular damages model. *See* Opposition, ECF No. 112 at 4–6. Oracle points to testimony indicating that Dr. Tabak "certainly [doesn't] recall" putting together a damages model (Foster Decl., ECF No. 112-1, Ex. 1 at 41:21–24); that he "doesn't propose a particular damages model" (*id.* at 72:5–11); that his report is "not a damages report" (*id.* at 75:5–76:4); that it is "possible" that "whatever damages model [he] come[s] up with" could be applied on a class-wide basis (*id.* at 111:14–113:4); and that he has yet to perform various steps necessary to construct his damages model (*id.* at 82:6–87:19, 86:25–87:19, 96:24–97:25, 103:11–18, 132:14–21, 133:12–24, 138:8–143:25); *see also* Tabak Rpt. ¶ 60.

While Dr. Tabak's statements are likely not what Union wanted to hear from its expert, the Court does not find that these statements are sufficient to show that Union has failed to comply with *Comcast*. Dr. Tabak's deposition testimony does not erase the disclosures in his expert report that identify a class-wide "out of pocket" damages model and provide details on how such a model could be constructed—which other courts have found to be sufficient. *See* Tabak Rpt. ¶¶ 57–62; *SanDisk*, 2018 WL 4293336, at *3; *City of Miami*, 2018 WL 4931543, at **3–4; *Marvell*, 2017 WL 4865559, at *6. Further, Dr. Tabak's testimony appears to be in line with what he states in his expert report: "While I have not yet been asked to determine the level of inflation in Oracle's stock prices, I have been asked to provide an opinion on whether such analyses can be performed on a Class-wide basis for its common stock." *See* Tabak Rpt. ¶ 57. Dr. Tabak's testimony indicating that he has yet to put together a damages model appears to be further confirmation that specifics will be developed at a later stage of the case. Dr. Tabak could have made this clearer—for example, in Union's briefing, they contrast their general "out of pocket" damages model with the more specific "inputs" and "loss causation" details that they plan to disclose at a later stage. *See* Reply, ECF No. 113 at 7–9. Nonetheless, the Court finds Dr. Tabak's damages-related disclosures sufficient despite his deposition testimony.

United States District Court
Northern District of California

Oracle argues that this Court has applied *Comcast* on multiple occasions, citing the *AdTrader* and *Broomfield* cases. *See* Opposition, ECF No. 112 at 4 (citing *AdTrader, Inc. v. Google LLC*, No. 17–CV–07082–BLF, 2020 WL 1922579, at *15 (N.D. Cal. Mar. 24, 2020); *Broomfield v. Craft Brew All., Inc.*, No. 17–CV–001027–BLF, 2018 WL 4952519, at *13 (N.D. Cal. Sept. 25, 2018)). But these were cases in which the Court *granted* class certification—and the actions in question did not involve securities fraud. *See AdTrader*, 2020 WL 1922579, at **15–16 (finding in breach of contract case that "'[a]t this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability,' and Plaintiffs have proposed as much here") (quoting *Just Film*, 847 F.3d at 1121); *Broomfield*, 2018 WL 4952519, at **16–18 (finding in false advertising case that "[n]one of [defendant's] arguments demonstrate that Plaintiffs' damages model is not tied to their theory of liability or harm."). Accordingly, the Court does not see how these cases indicate that class certification should be denied here.

Otherwise, Oracle can only cite distinguishable, out-of-district cases in support of the deficiency of Union's damages-related disclosures. *See* Opposition, ECF No. 112 at 8–9. Oracle's only case from a Ninth Circuit district court is *Loritz v. Exide Techs.*, No. 2:13–CV–02607–SVW–E, 2015 WL 6790247 (C.D. Cal. July 21, 2015). In that case, a Central District of California court found that the plaintiffs had failed to tie their damages theory to their theory of liability in a securities class action. *See Loritz*, 2015 WL 6790247, at **22–23. Plaintiffs failed to set forth any model of damages in their class certification motion; defendants pointed to a variety of issues that would make damages calculation "problematic" in opposition; and on reply, plaintiffs provided a rebuttal expert report that generally described "some techniques" but failed to tie them to the facts of the case. *See id.* at *23. While some facts are similar to the present case, the Court finds *Loritz* distinguishable, since Oracle does not raise any of the specific damages-related complications the defendants raised in *Loritz*, and the court cited damages-related concerns that do not appear to be at issue here. *See Loritz*, 2015 WL 6790247, at *22. Further, Union points out that the judge in *Loritz*—Central District of California Judge Wilson—distinguished *Loritz* in a later case where he granted class certification given damages-related expert disclosures similar to Dr. Tabak's. *See In re Snap*, 334 F.R.D. 209, 217 (C.D. Cal. 2019). Accordingly, *Loritz* does not support denying class

United States District Court
Northern District of California

certification here.

Otherwise, Oracle points to *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018), where the court found an expert's disclosures regarding an out-of-pocket damages theory based on price inflation were insufficient under *Comcast*. But that case involved testimony from defendants' expert affirmatively supporting that a class-wide damages model could *not* be constructed—which is not at issue in the present case. *See Ohio Pub. Emps.*, 2018 WL 3861840, at *19. The *Fort Worth* case Oracle points to is similarly distinguishable—it involved mortgage-backed securities sold in a market that was "not particularly liquid," so the court found "it is unclear at this stage how Plaintiffs plan to engage in the difficult process of valuing the complex asset-backed securities that underlie the Certificates." *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014). And unlike the present case, the *In re BP* case Oracle cites involved "various theories of liability." *See In re BP P.L.C. Secs. Litig.*, No. 10–md–2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment."); *see also Hatamian*, 2016 WL 1042502, at *9 (distinguishing *BP*).

Accordingly, the Court finds that Union has disclosed a damages model sufficient to meet the Rule 23(b)(3) predominance requirement under *Comcast*.

* * *

Based on the above reasoning, the Court finds that Union has met the predominance requirement of Rule 23(b)(3).

**3. Superiority**

To satisfy Rule 23(b)(3), Union also must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 lists the following factors that Courts should consider in making this determination: "(A) the class members' interests in individually controlling the prosecution or

defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Union argues that each of the Rule 23(b)(3) factors demonstrates that a class action is a superior method of adjudicating its claims. *See* Motion, ECF No. 107 at 20. For the first factor, Union argues that the Class consists of a large number of geographically dispersed individuals with small damages—which renders individual litigation prohibitively expensive. *See id.* For the second factor, Union indicates that it is unaware of any other litigation asserting these claims on behalf of individual class members. *See id.* For the third factor, Union argues that it is undisputed that this venue is desirable and convenient, since it is "home" to Oracle. *See id.* For the fourth factor, Union argues that managing this case as a class action presents no unusual difficulties. *See id.* Oracle does not dispute that a class action is a superior method of adjudication here.

The Court agrees with Union. The Rule 23(b)(3) factors support that a class action is a superior method of adjudicating Union's claims. *See, e.g., Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D. Cal. 2007).

Accordingly, Union has met the superiority requirement of Rule 23(b)(3).

* * *

Given that Union has met all requirements for class certification under Rule 23(a) and Rule 23(b)(3), the Court GRANTS Union's motion for class certification.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Union's motion for class certification is GRANTED.

Dated: May 9, 2022

[signature]

BETH LABSON FREEMAN
United States District Judge

PAGES 1 - 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE BETH LABSON FREEMAN

| | |
|---|---|
| IN RE:<br>ORACLE SECURITIES LITIGATION | CASE NO. 18-CV-04844 BLF<br><br>SAN JOSE, CALIFORNIA<br>THURSDAY, MARCH 24, 2022 |

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 9:00 A.M. - 9:24 A.M.**

**APPEARANCES:**

**FOR PLAINTIFF**
BERNSTEIN, LITOWITZ, BERGER & GROSSMAN
1251 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020
BY: **JOHN RIZIO-HAMILTON, ESQUIRE**

**FOR DEFENDANT**
MORRISON & FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO, CALIFORNIA 94105-2482
BY: **JORDAN ETH, ESQUIRE**

***TRANSCRIBED BY: JOAN MARIE COLUMBINI, CSR #5435, RPR***
***RETIRED OFFICIAL COURT REPORTER, USDC***

THURSDAY, MARCH 24, 2022 9:00 A.M.

---OOO---

ELECTRONICALLY RECORDED PROCEEDINGS

**THE CLERK:** CALLING CASE 18-4844, CITY OF SUNRISE FIREFIGHTERS PENSION FUND VERSUS ORACLE CORPORATION, ET AL.

COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES? AND IF WE COULD BEGIN WITH PLAINTIFF AND THEN MOVE TO DEFENDANT?

**MR. RIZIO-HAMILTON:** GOOD MORNING, YOUR HONOR. THIS IS JOHN RIZIO-HAMILTON FROM BERNSTEIN, LITOWITZ, BERGER & GROSSMAN FOR THE LEAD PLAINTIFF.

**THE COURT:** GOOD MORNING.

**MR. RIZIO-HAMILTON:** GOOD MORNING.

**MR. ETH:** GOOD MORNING, YOUR HONOR. JORDAN ETH FOR THE DEFENDANTS, AND IN THE GALLERY IS JAMES MAROULIS, SENIOR MANAGING COUNSEL FOR ORACLE.

**THE COURT:** GOOD. GOOD MORNING, AND NICE TO SEE YOU ALL. WE'RE INCHING BACK TO THE COURTROOM, BUT WE HAVEN'T DONE CIVIL MOTIONS YET, BUT WE'LL SEE WHEN THAT HAPPENS.

ALL RIGHT. THIS MOTION FOR CLASS CERTIFICATION IS ACTUALLY VERY STRAIGHTFORWARD. THERE'S ONLY ONE ISSUE IN CONTENTION REGARDING THE DAMAGES MODEL. AND I WANT TO BE JUST CANDID WITH YOU. I THOUGHT ABOUT TAKING IT OFF CALENDAR BECAUSE IT WAS SO STRAIGHTFORWARD, AND YOU'VE BOTH BEEN DOWN THIS ROAD BEFORE.

I ACTUALLY WANTED TO SEE YOU, AND I THOUGHT WE COULD -- I WANTED TO DISCUSS THE CASE A LITTLE BIT WITH YOU. SO THANK YOU FOR APPEARING.

I ACTUALLY THINK THAT THE PLAINTIFFS HAVE SUBMITTED SUFFICIENT EVIDENCE ON THE DAMAGES MODEL UNDER *COMCAST* TO BE -- IT IS ALIGNED WITH THEIR THEORY OF LIABILITY, AND *COMCAST* ISN'T -- I DIDN'T THINK *COMCAST* AND ITS PROGENY WERE PARTICULARLY RELEVANT TO THIS DISCUSSION.

MR. ETH, I'M SURE YOU'VE BRIEFED THIS A NUMBER OF TIMES ON SIMILAR ISSUES. MR. RIZIO-HAMILTON GAVE ME A LIST LONGER THAN MY ARM OF CASES. I THANK YOU. THAT'S (INDISCERNIBLE), AND I DID SPOT CHECK THOSE AND DO AGREE WITH HIM THAT IT SEEMS TO BE VIRTUALLY THE RULE THAT THIS BAREBONES KIND OF SHOWING IS SUFFICIENT AT THIS STAGE.

SO WITH THAT IN MIND, MR. ETH, IT IS YOUR -- I'M SORRY. MR. RIZIO-HAMILTON, IT'S YOUR MOTION FOR CLASS CERT, SO LET ME START WITH YOU.

**MR. RIZIO-HAMILTON:** THANK YOU SO MUCH, YOUR HONOR. GIVEN THOSE REMARKS, I'LL BE PRETTY BRIEF. I THINK THAT THERE'S JUST ONE OR TWO THINGS I WANT TO MENTION --

**THE COURT:** OKAY.

**MR. RIZIO-HAMILTON:** -- THAT WEREN'T HIGHLIGHTED, I THINK, AS MUCH AS THEY COULD HAVE BEEN IN THE BRIEFING, BECAUSE THEY STEM FROM THE TRANSCRIPT, IN PART, OF DR. TABAK'S DEPOSITION, AND I JUST WANT TO POINT OUT. AS YOUR HONOR IS

AWARE, DR. TABAK HAS IDENTIFIED THE OUT-OF-POCKET DAMAGES METHODOLOGY TO MEASURE DAMAGES, AND THAT, AS THE CASES SHOW, IS REALLY THE UNIVERSALLY ACCEPTED METHOD FOR CALCULATING DAMAGES IN THESE CASES.

THE KEY FIRST STEP IN THIS METHODOLOGY IS TO EMPLOY AN EVENT STUDY TO ISOLATE THE DECLINE IN ORACLE STOCK PRICE ON THE ALLEGED DISCLOSURE DATES RELATED TO COMPANY-SPECIFIC NEWS, AS (INDISCERNIBLE) MARKET OR INDUSTRY EFFECTS.

AND DR. TABAK HAS, IN FACT, PROVIDED DETAILS CONCERNING THE EVENT STUDY THAT HE WOULD USE TO MODEL DAMAGES IN THIS CASE. SO WHAT HE SUBMITTED HERE HAS REALLY GONE, AT LEAST SOMEWHAT, BEYOND JUST A BAREBONES RECITATION OF THE METHODOLOGY ITSELF.

AND, IN PARTICULAR, HE PROVIDED HIS MARKET MODEL, WHICH IS SUMMARIZED IN EXHIBIT 8B TO HIS REPORT. AND HE TESTIFIED AT PAGE 143 OF HIS DEPOSITION THAT THAT'S THE SAME MARKET MODEL, AND, THEREFORE, THE SAME EVENT STUDY THAT YOU WOULD USE TO MODEL DAMAGES IN THIS CASE.

SO HE'S DONE MORE THAN JUST SAY THAT HE WOULD USE THE OUT-OF-POCKET METHODOLOGY AND WOULD USE AN EVENTS STUDY. HE'S ACTUALLY PROVIDED THE MARKET MODEL AND THE EVENT STUDY THAT HE WOULD USE IN THIS --

**THE COURT:** SO, MR. RIZIO-HAMILTON, I WOULD ONLY SAY THAT SINCE YOU HAVE BEEN DOWN THIS ROAD SO MANY TIMES BEFORE, I'M SURPRISED YOU DIDN'T PREP HIM A LITTLE BIT MORE FOR HIS

DEPOSITION SO HE DIDN'T MAKE THOSE BROAD STATEMENTS THAT WALKED RIGHT INTO MR. ETH'S LINE OF SIGHT.

YOU KNOW, HE'S AN EXPERT. YOU HAVE TO REVEAL EVERYTHING HE SAYS IS -- CAN BE REVEALED, BUT THERE WERE SOME UNFORTUNATE COMMENTS IN THE DEPOSITION, I WOULD SAY.

**MR. RIZIO-HAMILTON:** I UNDERSTAND.

**THE COURT:** (INDISCERNIBLE.)

**MR. RIZIO-HAMILTON:** I UNDERSTAND WHAT YOU'RE SAYING. YOU KNOW, THE WAY I THINK ABOUT THAT IS THERE WAS A HANG UP OVER THE WORD "MODEL."

**THE COURT:** SURE.

**MR. RIZIO-HAMILTON:** WHEN DR. TABAK WAS TALKING ABOUT A MODEL, HE'S TALKING ABOUT QUANTIFYING AND FINALIZING THE ACTUAL MODEL, INCLUDING THE DISAGGREGATION ANALYSIS.

**THE COURT:** YEAH.

**MR. RIZIO-HAMILTON:** WHICH HE'S NOT REQUIRED TO DO AT THIS STAGE, AND, FRANKLY, HE HASN'T BEEN ASKED TO DO YET BECAUSE HE CAN'T DO THAT BEFORE THE CLOSE OF DISCOVERY.

**THE COURT:** SURE.

**MR. RIZIO-HAMILTON:** WHAT HE HAS DONE IS WHAT HE'S REQUIRED TO DO AT THIS STAGE, WHICH IS IDENTIFY THE METHODOLOGY THAT HE WOULD USE AS THE OUT-OF-POCKET METHODOLOGY SUPPORTED BY AN EVENT STUDY. HE'S PROVIDED THE MARKET MODEL HE WOULD USE IN THE EVENT STUDY TO ACTUALLY CALCULATE DAMAGES. AND HE HAS PROVIDED A DESCRIPTION OF THE TECHNIQUES THAT HE WOULD USE TO

DISAGGREGATE, SET FORTH IN PARAGRAPH 61 AND FOOTNOTE 43 OF HIS REPORT.

AND AS COURTS REALLY UNIVERSALLY HOLD, THAT SUFFICES AT THE CLASS CERTIFICATION STAGE TO SATISFY THE RELATIVELY MODEST *COMCAST* REQUIREMENT THAT THE DAMAGES METHODOLOGY ALIGN WITH THE THEORY OF LIABILITY.

THAT'S REALLY ALL I HAVE TO ADD BEYOND THE AUTHORITY AND THE PAPERS.

**THE COURT:** OKAY.

**MR. RIZIO-HAMILTON:** SO THANK YOU VERY MUCH FOR THE OPPORTUNITY TO SPEAK, YOUR HONOR.

**THE COURT:** OKAY. MR. ETH.

**MR. ETH:** YES. THANK YOU, YOUR HONOR.

AND I AGREE WITH MUCH OF WHAT THE COURT HAS SAID. I THINK THIS IS STRAIGHTFORWARD. I THINK IT IS *COMCAST*. WHILE WE HAVE NOT BRIEFED THIS SIMILAR ISSUE, WHAT WE DO HAVE HERE IS WHAT THE COURT SAID WERE UNFORTUNATE WORDS. AND I THINK IT'S VERY IMPORTANT TO KEEP IN MIND THAT *COMCAST* SAYS THE PLAINTIFFS HAVE A BURDEN. THE BURDEN IS NOT MINIMAL. IT'S NOT MINOR. THE COURT HAS TO ENGAGE IN A RIGOROUS REVIEW.

AND *COMCAST* SAYS PLAINTIFFS HAVE TO PROVIDE EVIDENTIARY PROOF, AND WHAT WE ACTUALLY HAVE IS EVIDENTIARY PROOF THAT THEY DO NOT NOW AT CLASS CERTIFICATION HAVE A MODEL.

WE HAVE DR. TABAK, WHO'S BEEN AT THIS FOR 26 YEARS WHO LISTS 243 REPORTS IN HIS INSTANCES OF TESTIMONY. HE KNOWS

WHAT A MODEL IS. AND HE SAID, I WASN'T EVEN ASKED TO DO A MODEL, I WASN'T EVEN ASKED. WE HAVE COUNSEL THIS MORNING CONFIRMING THAT HE HAS NOT DONE A MODEL. HE SAID FLAT OUT -- COUNSEL JUST SAID, THIS IS WHAT HE WOULD USE, THIS IS WHAT HE WILL DO, HE NEEDS DISCOVERY.

WELL, *COMCAST* SAYS NOW IS THE TIME, CLASS CERTIFICATION, AND IT'S NOT WHAT WOULD YOU DO DOWN THE ROAD, WHAT COULD YOU DO, WHAT MIGHT HAPPEN. TABAK ISN'T EVEN THE DAMAGES EXPERT. HE SAID HE HOPES HE GETS HIRED. HE LITERALLY SAID THAT, I HOPE I GET HIRED, BUT I'M NOT THE DAMAGES EXPERT.

SO THIS IDEA THAT YOU COULD JUST SAY, WELL, THIS IS THE WAY IT WORKS IN THESE CASES AND DOWN THE ROAD. IN TERMS OF IT BEING --

**THE COURT:** MR. ETH --

**MR. ETH:** YES.

**THE COURT:** -- LET'S REALLY ROLL IT BACK TO WHAT *COMCAST* SAYS. *COMCAST* WAS LOOKING AT A MASSIVE CASE INVOLVING INITIALLY FOUR THEORIES OF LIABILITY. THE DAMAGES REPORT WAS DONE ASSUMING ALL FOUR OF THEM. THREE OF THEM WENT BY THE BY. AND WITH ONE LEFT THE EXPERT COULD NOT SAY THAT THE MODEL WAS THE DAMAGES FOR THAT THEORY OF LIABILITY.

AND I READ *COMCAST* AS SAYING TO LITIGANTS, TO PLAINTIFFS, YOU HAVE TO BE ABLE TO DRAW A STRAIGHT LINE FROM YOUR THEORY TO YOUR DAMAGES. I DON'T SEE *COMCAST* AS REQUIRING PLAINTIFFS TO PENCIL OUT THE AMOUNT OF DAMAGES.

SO HERE WE HAVE A SINGLE THEORY OF LIABILITY. IT'S THE SAME THEORY OF LIABILITY YOU GET IN EVERY ONE OF THESE CASES. THE LINE IS AS STRAIGHT AS COULD BE, AND THE DETAILS AREN'T THERE.

SO I SUPPOSE, IF YOU REALLY WANTED, I COULD REQUIRE YOU TO PRODUCE ALL THAT DISCOVERY ON AN EXPEDITED BASIS SO THAT WE COULD REDO THIS MOTION. AND IF ORACLE WINS THIS CASE, THEN MR. RIZIO-HAMILTON'S FIRM IS LEFT HOLDING THE BAG ON THE EXPERT FEES. BUT IF YOU SETTLE OR YOU LOSE THE CASE, THEN YOU GET TO PAY FOR ALL OF IT.

I MEAN, IT DOESN'T MATTER TO ME. WE CAN SPEND ANOTHER FOUR MONTHS DOING THE DISCOVERY. IS THAT WHAT YOU'RE ASKING FOR?

**MR. ETH:** NO, THAT IS NOT WHAT I'M ASKING FOR.

**THE COURT:** YOU WANT ME TO DENY CLASS CERT, WHICH I'D DO WITHOUT PREJUDICE TO BRINGING BACK A MODEL?

**MR. ETH:** WELL --

**THE COURT:** THAT'S WHERE I WOULD END UP, AND THEN I WOULD EXPEDITE DISCOVERY. SO YOU WOULD HAVE TO GET YOUR DUMP TRUCKS READY TO SEND THE STUFF OVER.

**MR. ETH:** SO, YOUR HONOR, FIRST OF ALL, I DON'T THINK THAT DISCOVERY HAS ANYTHING TO DO WITH IT. WHAT I DO THINK IS IMPORTANT IS THAT IN THIS CASE, THE COURT ACTUALLY REJECTED MOST OF THE THEORIES.

**THE COURT:** I DID.

**MR. ETH:** SO WHAT'S -- WHAT THE PLAINTIFF HASN'T DONE IS, WELL, IF YOU REJECTED THE THEORIES, HOW IS THIS GOING TO WORK, WHAT KIND OF MODEL DO YOU HAVE? MAYBE THEY WILL HAVE A MODEL.

**THE COURT:** SO I'M NOT SURE -- LET ME BACK UP ON THAT BECAUSE --

**MR. ETH:** SURE.

**THE COURT:** -- THIS IS, AS I CALLED IT, A NARROW OMISSIONS THEORY IS WHAT'S LEFT.

**MR. ETH:** CORRECT, YOUR HONOR.

**THE COURT:** BUT OF THE 50 ALLEGED FALSE STATEMENTS -- AND THIS WAS PAINFUL, I'LL NEVER FORGET ALL THE WORK WE PUT INTO THIS. I MEAN, I PUT IT THROUGH A FINE SIEVE AND CAME OUT WITH 11 FALSE STATEMENTS THAT I WOULDN'T LET GET PAST THE PLEADING STAGE. AND MUCH TO YOUR CREDIT, MR. ETH, IN REALLY HIGHLIGHTING ALL OF THAT, AND IT WAS -- YOU KNOW, IT WAS NOT ULTIMATELY COMPLETELY SUCCESSFUL, BUT LARGELY.

SO WE HAVE AN OMISSIONS THEORY, AND THE MEASURE OF DAMAGES FOR THAT THEORY IS NOT -- I'M NOT AWARE THAT IT'S ANY DIFFERENT THAN THE MEASURE OF DAMAGES FOR THE OVERTLY FALSE STATEMENTS OF -- AS OPPOSED TO AN OMISSIONS THEORY OF FAILURE TO REVEAL CERTAIN INFORMATION THAT WAS KNOWN. THAT'S THE DIFFERENCE THAT I SEE HERE, IS THAT, YES, IT'S A DIFFERENT THEORY, BUT IT'S NOT, IT DOESN'T LEAD TO A DIFFERENT DAMAGES CALCULATION OR MODEL.

**MR. ETH:** YOUR HONOR, I AGREE THAT IT'S NOT ABOUT QUANTIFYING THE DAMAGES AT THIS POINT.

**THE COURT:** OKAY.

**MR. ETH:** IT'S CERTAINLY NOT ABOUT QUANTIFYING.

THE QUESTION HERE IS HOW IS THIS MODEL, WHICH WE DON'T HAVE, GOING TO ELIMINATE EFFECTS OF THOSE THEORIES THAT THE COURT HAS REJECTED. SO THAT'S -- THAT'S WHAT I'M GETTING AT.

I DID ALSO WANT TO ADDRESS JUST A COUPLE OF OTHER THINGS.

THERE ARE -- PLAINTIFFS SAY IN THEIR PAPERS THAT WE HAVE CITED NO CASE THAT GOES OUR WAY ON THIS. THAT'S JUST NOT -- THAT'S JUST NOT TRUE. WE'VE CITED FOUR CASES.

AND IN THE PLAINTIFF'S ATTEMPT TO DISTINGUISH THOSE CASES, THEY REALLY JUST POINT OUT THAT THEY ACTUALLY DID GO OUR WAY. FOR EXAMPLE, THE *BP* CASE, THE COURT SAID, WE'LL GIVE YOU ANOTHER CHANCE, PLAINTIFFS, BUT THAT'S BECAUSE *COMCAST* CAME DOWN IN THE MIDDLE OF THE BRIEFING.

OR IN THE CASE FROM OHIO, THE PLAINTIFFS POINT OUT, WELL, EFFICIENCY WAS IMPROVED THERE. WELL, THAT WAS ANOTHER PROBLEM. THAT WAS A SEPARATE PROBLEM. AND SO ON. SO THERE ARE CASES.

AND THE PLAINTIFFS -- I THINK WHAT'S REALLY GOING ON HERE IS THAT WHAT THE PLAINTIFFS ARE ADVOCATING IS WHAT THEY HAVE IN THEIR FOOTNOTE 2, WHICH IS, WELL, IT'S A SECURITIES

CLASS ACTION, THESE THINGS -- YOU KNOW, DOESN'T REALLY APPLY; YOU KNOW, *COMCAST* DOESN'T REALLY APPLY HERE. AND THEY SAY COURTS WIDELY RECOGNIZE THAT. AND WHAT THEY CITE IS A THIRD CIRCUIT CASE INVOLVING CONSUMER CLASS ACTIONS, DOESN'T SAY A WORD ABOUT SECURITIES CLASS ACTIONS.

SO WHAT WE'RE BOTTOM LINE SAYING IS, IF IT APPLIES -- IF THE PLAINTIFFS CAN SAY, WELL, IT'S A SECURITIES CASE, AND EVEN THOUGH OUR EXPERT WASN'T ASKED TO DO A DAMAGES MODEL, THIS IS GOOD ENOUGH, THEN *COMCAST* MAY NOT APPLY IN THESE CASES, AND IT MAY JUST BE ALL THEY HAVE TO DO IS SAY EVENT STUDY, THIS IS THE WAY IT GOES, AND THEY'RE OFF TO THE RACES.

SO WHAT WE'RE SAYING IS, WHEN THEIR OWN EXPERT SAYS, I WASN'T EVEN ASKED TO DO IT --

**THE COURT:** YEAH.

**MR. ETH:** -- NEEDS TO BE HELD TO THE PROOF, NEEDS TO BE HELD TO THE PROOF. THAT'S WHY I AGREED WITH THE COURT'S OPENING STATEMENT THAT IT'S PRETTY STRAIGHTFORWARD.

**THE COURT:** ALL RIGHT. MR. RIZIO-HAMILTON, LET ME HEAR YOUR FINAL RESPONSE.

**MR. RIZIO-HAMILTON:** THE FINAL POINT I WOULD MAKE, YOUR HONOR, ARE THE CASES THAT WE'VE CITED IN THE BRIEFING REALLY DO APPLY VERY MUCH TO OMISSION THEORIES, AS WELL AS MISSTATEMENTS THEORIES. IF YOU LOOK AT THE *SYMANTEC* CASE, THE *RH* CASE, THE *SEAWORLD* CASE, THEY TALK ABOUT THIS OUT-OF-POCKET METHODOLOGY BEING THE STANDARD METHODOLOGY TO QUANTIFY

ARTIFICIAL INFLATION RELATED TO ALLEGED MISSTATEMENTS AND/OR OMISSIONS. THEY DON'T DISTINGUISH BETWEEN WHETHER THE THEORY IS ONE OF AN AFFIRMATIVE MISSTATEMENT AN OMISSION MISSTATEMENT.

AND I'M NOT AWARE OF ANY CASE, FRANKLY, THAT EVER HAS REJECTED THE OUT-OF-POCKET DAMAGES METHODOLOGY SUPPORTED BY AN EVENT STUDY ON THE GROUND THAT IT WAS APPLIED TO AN OMISSION. THAT'S POINT ONE.

POINT TWO, AS TO THE CASES THAT MR. ETH REFERENCED THAT THEY CITED, YOU KNOW, WE VERY MUCH STAND BY HOW WE DISTINGUISH THEM IN OUR BRIEF. THE ONLY POINT I'LL MAKE IN RESPONSE TO WHAT HE SAID IS THAT THE FAILING TO SHOW MARKET EFFICIENCY IS FATAL TO AN OUT-OF-POCKET DAMAGES METHODOLOGY BECAUSE IT RELIES, BY DEFINITION, ON THE EXISTENCE OF AN EFFICIENT MARKET --

**THE COURT:** YES.

**MR. RIZIO-HAMILTON:** -- BECAUSE IT IS ONLY IN AN EFFICIENT MARKET WHERE ONE CAN SHOW THAT ALLEGEDLY WITHHELD INFORMATION DISTORTED A STOCK PRICE. AND THAT'S WHY THE FAILURE OF MARKET EFFICIENCY THERE NATURALLY RESULTED IN THE FAILURE OF THE DAMAGES MODEL IN THAT CASE.

OTHER THAN THAT, I WILL SAY, THE LAST POINT IS THAT DR. TABAK HAS DONE WHAT HE'S REQUIRED TO DO AT THIS STAGE. HE'S IDENTIFIED THE METHODOLOGY THAT HE WOULD USE IN HIS REPORT. HE HAS PROVIDED HIS MARKET MODEL, AND HE HAS TESTIFIED THAT THAT IS THE SAME MARKET MODEL AND EVENT STUDY THAT HE

WOULD USE TO CALCULATE DAMAGES, AND HE'S GOING TO BE OUR DAMAGES EXPERT. I MEAN, I'LL SAY THAT NOW. YOU KNOW, WE HAVEN'T ASKED HIM TO CALCULATE DAMAGES IN THIS CASE AND DO A FULL LOSS CAUSATION ANALYSIS BECAUSE WE'RE NOT AT THAT STAGE OF THE CASE YET, BUT --

**THE COURT:** RIGHT.

**MR. RIZIO-HAMILTON:** BUT HE'S OUR GUY. SO...

**THE COURT:** OKAY. ALL RIGHT. WELL, THANK YOU.

I'M INCLINED TO GRANT THIS MOTION TO CERTIFY THE CLASS, AND I'LL TAKE A LOOK AT THE -- I MEAN, I READ YOUR CASES, MR. ETH. I'LL LOOK AT THEM AGAIN JUST TO SEE IF I THINK THAT IT'S WORTH SENDING THE PLAINTIFFS BACK TO THE DRAWING BOARD TO EXPAND ON DR. TABAK'S REPORT.

I WANTED TO -- I WANTED TO JUST SPEND A COUPLE MINUTES TALKING TO YOU ABOUT WHAT IS NEXT. OBVIOUSLY, IF I DON'T CERTIFY CLASS, THEN WE'RE DONE, AND THE CASE WILL SETTLE IN ABOUT ONE MINUTE, BUT -- OR WILL BE APPEALED, I SUPPOSE.

BUT IF I DO CERTIFY THE CLASS, WHICH I'M INCLINED TO DO, WE GET INTO THE REALM OF A CASE THAT IS LESS COMMON, ALMOST TO BEING UNCOMMON, IN SECURITIES CASES, AND WE ARE -- FROM MY STANDPOINT, I'M HEADED TO SUMMARY JUDGMENT MOTIONS. AND FROM YOUR STANDPOINT, I WOULD IMAGINE YOU HAVE SIGNIFICANT DISCOVERY THAT NEEDS TO BE DONE.

SO MR. RIZIO-HAMILTON, WHY DON'T YOU JUST LAY THAT OUT FOR ME A LITTLE BIT?

**MR. RIZIO-HAMILTON:** SURE. SO I THINK THERE WERE A COUPLE OF MILESTONES THAT HAVE OCCURRED, AND THERE ARE A COUPLE OF MEDIUM TERM MILESTONES YET TO OCCUR.

SO AS YOUR HONOR MAY RECALL, YOUR HONOR ORDERED US TO ENGAGE IN MEDIATION PRIOR TO THE HEARING, WHICH ACTUALLY WAS A FANTASTIC CASE MANAGEMENT TOOL, I THOUGHT. I WISH OTHER -- MORE JUDGES DID THAT. BUT WE DID, AND NOW THAT WE'VE HAD THIS HEARING --

**THE COURT:** SO LET ME JUST BACK UP. DID YOU HAVE A PRIVATE MEDIATOR OR MAGISTRATE JUDGE?

**MR. RIZIO-HAMILTON:** WE HAD A PRIVATE MEDIATOR.

**THE COURT:** OKAY. AND THAT'S SOMEONE WHO IS EFFECTIVE FOR YOU?

**MR. RIZIO-HAMILTON:** I THINK SO. JORDAN, DO YOU AGREE?

**MR. ETH:** YEAH, ABSOLUTELY. THIS IS SOMEONE WHO IS VERY EXPERIENCED IN THIS AREA WHO BOTH MR. RIZIO-HAMILTON AND I HAVE WORKED WITH BEFORE.

**THE COURT:** GOOD. OKAY.

**MR. RIZIO-HAMILTON:** YOU KNOW, I CAN SAY FROM THE LEAD PLAINTIFF SIDE, WE'RE CONTINUING TO SPEAK WITH HIM AND ENGAGE IN A DIALOGUE WITH HIM. WE'LL SEE WHERE THAT GOES.

I THINK THE DATE FOR SUBSTANTIAL COMPLETION OF DOCUMENT PRODUCTION IS APPROXIMATELY THE END OF APRIL, AND I THINK THAT'S THE NEXT SIGNIFICANT MILESTONE IN TERMS OF CASE

MANAGEMENT.

**THE COURT:** OKAY.

**MR. RIZIO-HAMILTON:** AND ONCE THAT HAS OCCURRED, DEPOSITIONS WILL BEGIN. AND IF MEMORY SERVES BACK, DISCOVERY IS SCHEDULED TO BE COMPLETE APPROXIMATELY MID SEPTEMBER, AND BOTH SIDES HAVE BEGUN TO NOTICE DEPOSITIONS.

I THINK THAT, YOU KNOW, WE'VE HAD SOME DISAGREEMENTS OVER DISCOVERY, BUT, FORTUNATELY, THROUGH MEET AND CONFER PROCESS, WE'VE BEEN ABLE TO RESOLVE THEM WITHOUT COURT INTERVENTION.

**THE COURT:** GOOD.

**MR. RIZIO-HAMILTON:** AND WE'LL CONTINUE TO WORK COOPERATIVELY IN THAT FASHION.

AND I THINK YOU'RE RIGHT, YOUR HONOR, THAT AFTER THE COMPLETION OF FACT AND THEN EXPERT DISCOVERY, THE NEXT MAJOR MARK WOULD BE THE SUMMARY JUDGMENT PHASE.

**THE COURT:** OKAY. SO WHAT IS THE NEXT -- WELL, LET ME BACK UP.

YOUR MEDIATOR WILL CONTINUE TO HAVE AN OPEN DOOR AND DIALOGUE WITH YOU, PROBABLY REACHING OUT AT VARIOUS TIMES TO YOU. BUT I WOULD LIKE TO ENSURE THAT THERE IS A -- A NEXT POINT WHEN I ORDER YOU BACK TO MEDIATION. AND IT'S NOT CLEAR TO ME WHETHER THAT'S BEST DONE BEFORE YOU FILE -- YOU WRITE YOUR SUMMARY JUDGMENT MOTIONS OR AFTER.

SO WHAT'S YOUR THINKING ON THAT?

**MR. RIZIO-HAMILTON:** MY INITIAL THOUGHT IS THAT THERE'S A PRETTY LONG STRETCH OF TIME BETWEEN NOW AND WHEN SUMMARY JUDGMENT WOULD BE BRIEFED.

**THE COURT:** YES.

**MR. RIZIO-HAMILTON:** SO I WOULD IMAGINE THAT IT WOULD PROBABLY -- AND AS THE RECORD TAKES SHAPE, THE DOCUMENTARY RECORD, AS DEPOSITIONS GO, I THINK THE PARTIES, YOU KNOW, SORT OF SEE WHERE THE CASE IS LIKELY HEADED, AND SO I THINK IT PROBABLY WOULD MAKE SENSE, FROM MY PERSPECTIVE, TO HAVE ANOTHER MEDIATION SESSION BEFORE SUMMARY JUDGMENT WAS BRIEFED, BUT I DON'T KNOW IF MR. ETH FEELS DIFFERENTLY.

**MR. ETH:** YOUR HONOR, I THINK THE MEDIATOR IS STILL ENGAGED, AND THE PARTIES HAVE BEEN THROUGH THIS, AND WE CAN DO THAT, BUT I ALSO UNDERSTAND THE COURT'S INTEREST IN HAVING SOMETHING FIRMLY SET. SO THAT WILL BE FINE IF THE COURT WANTS TO SET A DATE BY WHICH FURTHER MEDIATION WILL OCCUR. EITHER WAY IS FINE. EITHER WAY IS FINE.

**THE COURT:** OKAY. WELL, I THINK IT MAKES SENSE, GIVEN THIS LONG TIME PERIOD, FOR THERE TO BE A REQUIREMENT THAT YOU HAVE A FURTHER FORMAL MEDIATION SESSION BEFORE YOU COMMENCE BRIEFING ON SUMMARY JUDGMENT.

NOW, I DON'T THINK PLAINTIFFS WILL BE FILING SUMMARY JUDGMENT. THAT WOULD BE A LITTLE BIT UNUSUAL, BUT NOTHING PROHIBITS IT.

MR. ETH, THAT REALLY IS YOU. I DON'T KNOW WHETHER

YOU'VE AGREED TO A BRIEFING SCHEDULE ON SUMMARY JUDGMENT THAT IS MORE THAN THE 35 DAYS THAT THE RULES ALLOW. I HOPE YOU HAVE BECAUSE THESE ARE BIG MOTIONS.

SO I THINK WHAT I'D LIKE YOU TO DO IS LOOK AT YOUR SCHEDULES, TALK BETWEEN YOURSELVES, AND SEND ME A STIP AND PROPOSED ORDER ON THE LAST DAY TO COMPLETE THE COURT-ORDERED MEDIATION BEFORE SUMMARY JUDGMENT.

I JUST DON'T WANT TO ARBITRARILY PICK A DATE. AND SO IF WE'RE LOOKING FOR EFFICIENCY, I WANT TO BACK IT UP SO YOU CAN PRESERVE THE COST OF BRIEFING A MOTION IF MEDIATION COULD BE SUCCESSFUL.

SO I THINK YOU TWO COULD LOOK AT CALENDARS. IT MIGHT TAW FEW MINUTES, AND YOU'D KNOW THE DATE. JUST SUBMIT THAT TO ME, AND THAT WILL BECOME THE ORDER FOR THE MEMBERS MEDIATION.

**MR. ETH:** YOUR HONOR, JUST TO BE CLEAR, THAT WOULD BE FOR THE MEDIATION TO TAKE PLACE BEFORE THE FILING OF A SUMMARY JUDGMENT MOTION?

**THE COURT:** THAT'S WHAT I'M LOOKING AT, YES.

**MR. ETH:** OKAY, OKAY. FINE. JUST WANTED TO --

**THE COURT:** AND THEN IF THAT DOESN'T DO ANYTHING, THEN I'D BE LOOKING AT -- I WOULD BE SENDING YOU BACK AFTER I RULE ON SUMMARY JUDGMENT. THEN AT THAT POINT I'D BE LOOKING AT WHETHER YOU WANT TO STICK WITH YOUR MEDIATOR OR COME INTO THE MAGISTRATE JUDGE.

IN THESE SPECIALIZED CASES, I THINK THE MEDIATORS WHO

YOU KNOW AND HAVE WORKED WITH HAVE A REALLY SPECIAL PLACE IN UNDERSTANDING THE SCOPE OF THE DAMAGES THAT CAN BE LOOKED AT, HOW THE TRIALS PLAY OUT. THERE AREN'T VERY MANY OF THEM, SO -- AND I DON'T KNOW WHAT YOUR OWN STOREHOUSE OF EXPERIENCE IS IN TRYING THESE CASES TO VERDICT. I KNOW THAT LITIGATORS CAN SPEND A CAREER AND HAVE EXACTLY ZERO THAT GO TO TRIAL, SO...

**MR. ETH:** WELL, I'VE DONE ONE IN THE NORTHERN DISTRICT, AND I'VE ANOTHER ONE SCHEDULED FOR ABOUT TWO WEEKS FROM NOW --

**THE COURT:** OH, FOR GOODNESS SAKES.

**MR. ETH:** -- IN ANOTHER DISTRICT.

**THE COURT:** OKAY. THAT'S GOOD.

**MR. ETH:** SO IT DOES HAPPEN.

**THE COURT:** ALL RIGHT.

**MR. ETH:** BUT IT IS RARE. IT IS RARE.

**THE COURT:** WELL, I'M LOOKING AT YOUR GRAY HAIR, MR. ETH, AND SAYING THAT'S A LONG CAREER THAT'S --

**MR. ETH:** SOMETHING HAD TO CAUSE IT, RIGHT?

**THE COURT:** THERE YOU GO.

**MR. ETH:** BESIDES MY CHILDREN.

**THE COURT:** YES, EQUAL PARTS.

ALL RIGHT. WELL, THAT'S GOOD. THAT'S HELPFUL. I WILL GET THIS ORDER OUT. YOU MAKE MY JOB EASY ON NOT CONTESTING ALL THE OTHER ASPECTS OF IT, SO THAT WON'T TAKE ME AS LONG. BUT I THINK YOU CAN BE PRETTY CERTAIN THAT I'M GOING

TO CERTIFY THE CLASS, SO YOU SHOULD KEEP WORKING ON THE CASE WITH YOUR DEADLINES. ALL RIGHT?

AND THANK YOU FOR THIS. THE CASE MANAGEMENT PART WAS HELPFUL, AND I DON'T NEED TO CALL A SPECIAL CASE MANAGEMENT CONFERENCE. SO IF ANYTHING COMES UP FOR CASE MANAGEMENT, OF COURSE JUST REACH OUT, OTHERWISE, THE DISCOVERY ISSUES WILL GO TO THE MANAGEMENT JUDGE.

**MR. RIZIO-HAMILTON:** THANK YOU, YOUR HONOR.

**MR. ETH:** THANK YOU, YOUR HONOR.

**THE COURT:** ALL RIGHT. THANK YOU BOTH.

(PROCEEDINGS ADJOURNED AT 9:24 A.M.)

## CERTIFICATE OF TRANSCRIBER

I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE ABOVE MATTER.

I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

jmcolumbini

JOAN MARIE COLUMBINI

MARCH 31, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 22-___

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Petition for Permission to Appeal; Appendix

**Signature** s/ Joseph R. Palmore **Date** 05/23/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

---

**ATTENTION ALL PARTIES AND COUNSEL**
**PLEASE REVIEW PARTIES AND COUNSEL LISTING**

---

We have opened this appeal/petition based on the information provided to us by the appellant/petitioner and/or the lower court or agency. EVERY attorney and unrepresented litigant receiving this notice MUST immediately review the caption and service list for this case and notify the Court of any corrections.

Failure to ensure that all parties and counsel are accurately listed on our docket, and that counsel are registered and admitted, may result in your inability to participate in and/or receive notice of filings in this case, and may also result in the waiver of claims or defenses.

PARTY LISTING:
Notify the Clerk immediately if you (as an unrepresented litigant) or your client(s) are not properly and accurately listed or identified as a party to the appeal/petition. To report an inaccurate identification of a party (including company names, substitution of government officials appearing only in their official capacity, or spelling errors), or to request that a party who is listed only by their lower court role (such as plaintiff/defendant/movant) be listed as a party to the appeal/petition as an appellee or respondent so that the party can appear in this Court and submit filings, contact the Help Desk at http://www.ca9.uscourts.gov/cmecf/feedback/ or send a letter to the Clerk. If you or your client were identified as a party to the appeal/petition in the notice of appeal/petition for review or representation statement and you believe this is in error, file a motion to dismiss as to those parties.

COUNSEL LISTING:
In addition to reviewing the caption with respect to your client(s) as discussed above, all counsel receiving this notice must also review the electronic notice of docket activity or the service list for the case to ensure that the correct counsel are

listed for your clients. If appellate counsel are not on the service list, they must file a notice of appearance or substitution immediately or contact the Clerk's office.

NOTE that in criminal and habeas corpus appeals, trial counsel WILL remain as counsel of record on appeal until or unless they are relieved or replaced by Court order. *See* Ninth Circuit Rule 4-1.

REGISTRATION AND ADMISSION TO PRACTICE:
Every counsel listed on the docket must be admitted to practice before the Ninth Circuit AND registered for electronic filing in the Ninth Circuit in order to remain or appear on the docket as counsel of record. *See* Ninth Circuit Rules 25-5(a) and 46-1.2. These are two separate and independent requirements and doing one does not satisfy the other. If you are not registered and/or admitted, you MUST, within 7 days from receipt of this notice, register for electronic filing AND apply for admission, or be replaced by substitute counsel or otherwise withdraw from the case.

If you are not registered for electronic filing, you will not receive further notices of filings from the Court in this case, including important scheduling orders and orders requiring a response. Failure to respond to a Court order or otherwise meet an established deadline can result in the dismissal of the appeal/petition for failure to prosecute by the Clerk pursuant to Ninth Circuit Rule 42-1, or other action adverse to your client.

If you will be replaced by substitute counsel, new counsel should file a notice of appearance/substitution (no form or other attachment is required) and should note that they are replacing existing counsel. To withdraw without replacement, you must electronically file a notice or motion to withdraw as counsel from this appeal/petition and include your client's contact information.

To register for electronic filing, and for more information about Ninth Circuit CM/ECF, visit our website at http://www.ca9.uscourts.gov/cmecf/#section-registration.

To apply for admission, see the instructions and form application available on our website at https://www.ca9.uscourts.gov/attorneys/.